IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL MINING ASSOCIATION<br>101 Constitution Avenue, N.W.<br>Suite 500 East<br>Washington, D.C. 20001<br>(202) 463-2600,<br><br>       Plaintiff,<br><br>   v.<br><br>LISA JACKSON, sued in her official capacity,<br>Administrator<br>U.S. Environmental Protection Agency<br>1200 Pennsylvania Avenue, N. W.<br>*Mail Code:* 1101A<br>Washington, D.C. 20460,<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>JOHN MCHUGH, sued in his official capacity,<br>Secretary of the Army<br>101 Army Pentagon<br>Washington, D.C. 20310,<br><br>LIEUTENANT GENERAL ROBERT L. VAN<br>ANTWERP, sued in his official capacity,<br>Chief of Engineers and Commanding General of<br>the U.S. Army Corps of Engineers<br>441 G Street, N.W.<br>Washington, D.C. 20314, and<br><br>UNITED STATES ARMY CORPS OF<br>ENGINEERS<br>441 G Street, N.W.<br>Washington, D.C. 20314,<br><br>       Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>No. _____<br><br><br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 3

PARTIES ................................................................................................................... 4

LEGAL FRAMEWORK ........................................................................................... 5

    A.    Clean Water Act .............................................................................. 6

        1.    Section 404 and the Codified Regulatory Permitting Process ............. 6

            a.    The Corps' Role ............................................................. 6

            b.    EPA's Role ...................................................................... 8

        2.    Section 303 Water Quality Standards Development ............................ 10

        3.    Section 402 Permitting and Water Quality Standards ........................ 12

        4.    Section 401 Certification .................................................................. 13

    B.    National Environmental Policy Act ................................................. 13

    C.    Surface Mining Control and Reclamation Act of 1977 ................... 14

    D.    Administrative Procedure Act .......................................................... 15

FACTUAL BACKGROUND ..................................................................................... 15

    A.    June 11, 2009 Memorandum of Understanding ............................... 17

    B.    June 11, 2009 EC Process Memoranda ............................................ 18

        1.    New Screening Process for Section 404 Permit Applications ............ 18

        2.    The EC Process ................................................................................ 20

    C.    April 1, 2010 Detailed Guidance ..................................................... 21

        1.    Section 402 Permits ........................................................................ 21

        2.    Section 404 Permits ........................................................................ 25

        3.    Operational Practices Regulated Under SMCRA ............................. 26

        4.    NEPA Review of Section 404 Permits ............................................. 27

CLAIMS FOR RELIEF ............................................................................................. 28

PRAYER FOR RELIEF ............................................................................................ 39

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiff NATIONAL MINING ASSOCIATION ("NMA") seeks declaratory and

injunctive relief against Defendants LISA JACKSON, in her official capacity as Administrator

of the United States Environmental Protection Agency; JOHN MCHUGH, in his official

capacity as Secretary of the Army; LIEUTENANT GENERAL ROBERT L. VAN ANTWERP,

in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps

of Engineers, the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA");

and the UNITED STATES ARMY CORPS OF ENGINEERS ("Corps") (collectively,

"Defendants") for violating Federal law.

2.      This civil action challenges a series of EPA and Corps actions that have unlawfully

obstructed Clean Water Act permitting processes for coal mining.  NMA brings this action under

Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, seeking review of the

June 11, 2009 Enhanced Coordination Process ("EC Process") memoranda

(http://www.epa.gov/owow/wetlands/pdf/Final_MTM_Permit_Coordination_Procedures_6-11-

09.pdf; and http://www.epa.gov/owow/wetlands/pdf/Final_EPA_MTM_letter_to_Army_6-11-

09.pdf) and the April 1, 2010 Detailed Guidance Memorandum ("Detailed Guidance") (75 Fed.

Reg. 18500,

http://www.epa.gov/owow/wetlands/guidance/pdf/appalachian_mtntop_mining_detailed.pdf) as

contrary to the APA, the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*., the Surface

Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 *et seq*., and other federal

law.  As explained in the Factual Background section, *infra*, these memoranda substantially and

illegally amend the statutory and regulatory permitting processes for coal mining that form the

backbone of coal companies' expectations in planning to extract coal for our nation's power

supply, particularly for those companies that require "valley fills" for their coal mining

operations.  By dramatically altering timelines and imposing new requirements in complete

disregard of existing federal law and procedure, EPA and the Corps have launched a moving

target in coal mining permitting that is substantially and irreparably harming NMA's coal mining

members.

3.      In addition, through these actions, EPA has radically altered the statutory delegation of

regulatory authority over coal mining to rob the Corps, the Office of Surface Mining

Reclamation and Enforcement within the U.S. Department of the Interior ("OSM"), and states of

their respective statutory roles as permitting authorities and regulators of the environmental

effects of coal mining, and to arrogate primary authority to itself.  Taken together, these actions

also amount to a *de facto* moratorium on permitting for coal mining, particularly in Central

Appalachia.  Administrator Jackson explained the effects of EPA's actions during the press

conference releasing the Detailed Guidance, stating that, "You're talking about no, or very few,

valley fills that are going to meet this [new] standard."  http://www.washingtonpost.com/wp-

dyn/content/article/2010/04/01/AR2010040102312.html.  "Jackson said the EPA will now

instruct its local offices not to approve new CWA valley-fill permits that are likely to produce a

certain level of pollution in waters downstream," *id.,* even though that "certain level" of water

quality set by the Detailed Guidance has never been promulgated under the APA and CWA.

4.      NMA seeks an order from this Court holding unlawful, enjoining implementation of, and

vacating both the EC Process and the Detailed Guidance as arbitrary, capricious, an abuse of

discretion, and contrary to law in numerous respects, including:

(i) failing to comply with the APA's notice and comment rulemaking requirements;

(ii) violating the delegation of authority between the Corps and EPA in CWA Section 404;

(iii) violating the delegation of authority to the states for development of water quality standards set forth in CWA Section 303, 33 U.S.C. § 1313, and unlawfully promulgating a water quality standard;

(iv) creating illegal presumptions in the development and implementation of a conductivity water quality standard;

(v) creating an illegal presumption in the application of National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331, *et seq.*, to coal mines; and

(vi) invading the exclusive regulatory authority Congress granted to OSM and the primacy states in SMCRA, 30 U.S.C. § 1201, *et seq.*

NMA asks this Court to order the Corps to reinstate and adhere to the codified Section 404 permit review process and order EPA to perform, and not exceed, the role Congress crafted for it in the Section 404 permitting process.

5.      The EC Process and Detailed Guidance are having immediate adverse effects on coal mining through the implementation of an illegal permit review process that seeks to impose prohibitive conditions on mining.  Should the EC Process and Detailed Guidance be left to stand and their implementation continues on its current course, NMA's coal mining members, particularly the small businesses, will be unable to provide coal for our nation's energy supply, despite Congressional directives to the contrary.  *See, e.g.,* 30 U.S.C. § 1202(f).

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction); and the APA, 5 U.S.C. § 702 (judicial review of final agency action).  This Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706, for violations of, *inter alia*, the APA,

5 U.S.C. § 706, CWA, 33 U.S.C. § 1251, *et seq.*, SMCRA, 30 U.S.C. § 1201, *et seq.*, and NEPA,

42 U.S.C. § 4331, *et seq.*

7.      Venue is proper in the U.S. District Court for the District of Columbia under 28 U.S.C.

§ 1391(e) in that (i) Defendants reside in the District of Columbia, (ii) a substantial part of the

events giving rise to this claim occurred in the District of Columbia, and (iii) the Plaintiff resides

in the District of Columbia.

## PARTIES

8.      Plaintiff NATIONAL MINING ASSOCIATION is the national trade association of the

mining industry.  NMA's members include the producers of most of America's coal, metals, and

industrial and agricultural minerals; manufacturers of mining and mineral processing machinery,

equipment, and supplies; and engineering and consulting firms that serve the mining industry.

NMA's members are significantly and adversely affected by the agency actions challenged in

this case.  NMA is headquartered in Washington, D.C.

9.      Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY is the

federal agency charged with the administration and enforcement of many of the federal

environmental laws, pursuant to specific delegations of authority from Congress.  With respect to

the CWA Section 404 permitting program, Congress instructed EPA to develop guidelines

related to environmental protection that would be applied by the Corps, the permitting authority,

in evaluating Section 404 permit applications.  Congress also granted EPA specifically defined

authority to object to certain decisions by the Corps in issuing Section 404 permits.  Such

authority can only be exercised following notice and an opportunity for public hearings,

consultation with the Corps, and publication of written findings and reasons for such objection.

EPA is headquartered in Washington, D.C.

10.     Defendant LISA JACKSON is the Administrator of EPA and is sued in her official capacity. Administrator Jackson has ultimate responsibility for EPA's actions pursuant to CWA Section 404, and is the signatory to several of the EPA letters and memoranda being challenged in this action. The Administrator's office is located within EPA's headquarters in Washington, D.C.

11.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS is the federal agency charged with issuing permits for the discharge of dredged or fill material into the waters of the United States pursuant to Section 404 of the CWA, including permits for the discharge of fill material associated with coal mining operations. The Corps is headquartered in Washington, D.C.

12.     Defendant JOHN MCHUGH is the Secretary of the Army and is sued in his official capacity. The Secretary of the Army, acting through the Corps, has ultimate responsibility for the issuance of Section 404 permits by the Corps. The Department of the Army's headquarters is located in Washington, D.C.

13.     Defendant LIEUTENANT GENERAL ROBERT L. VAN ANTWERP is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. The Office of the Chief of Engineers is located in the Corps' headquarters in Washington, D.C. Defendant Van Antwerp is charged with the supervision and management of all Corps decisions and actions, and is sued in his official capacity.

**LEGAL FRAMEWORK**

14.     Coal mining operations are subject to complex and myriad statutory and regulatory requirements, including permitting under SMCRA and the CWA (with two categories of CWA permits under Sections 402 and 404), and NEPA review of permits issued by the Corps under

CWA Section 404. The paragraphs below outline some of the key provisions governing this permitting process that are implicated by the EC Process and the Detailed Guidance.

**A.   Clean Water Act**

15.   Coal mining operations generally require two types of CWA permits for operation: (i) Section 404 permits, issued by the Corps, for the discharge of dredged and fill material; and (ii) Section 402 permits, ordinarily issued by states with delegated permitting programs, for the discharge of all other pollutants. Section 402 permits govern pollutants that are assimilated by receiving waters, while Section 404 permits authorize the discharge of material that fills or displaces receiving waters.

**1.   Section 404 and the Codified Regulatory Permitting Process**

***a.   The Corps' Role***

16.   Section 404 of the CWA, 33 U.S.C. § 1344(a), gives the Secretary of the Army sole authority to issue Section 404 permits for the discharge of "dredged or fill" material into navigable waterways at specified disposal sites. Under 30 C.F.R. § 325.2(a), the Secretary of the Army has delegated its authority to the Corps, which may issue Section 404 permits after undertaking a public interest analysis.

17.   The Corps' procedures for issuing a Section 404 permit are codified at 33 C.F.R. Part 325.

18.   The Corps' regulations, 33 C.F.R. § 325.1(d) and (e), include requirements regarding what must be contained in a Section 404 permit application and give the district engineer sole authority to request additional information deemed essential to make a public interest determination, including environmental data and a determination of compliance with the guidelines developed pursuant to Section 404(b)(1).

19.     Those regulations also specify that the district engineer must review the Section 404

permit application for completeness and, within 15 days of receiving a Section 404 permit

application, the district engineer must determine whether the application is complete and issue a

public notice pursuant to the regulations.  33 C.F.R. § 325.2(a)(2).  33 C.F.R. § 325.2(a)(3)

authorizes the district engineer to delay processing of an application only if an applicant makes a

request for a reasonable delay, and the delay normally would not exceed 30 days.

20.     The Corps' regulations, 33 C.F.R. § 325.2(a)(4), make clear that the district engineer is

responsible for following environmental procedures and documentation required by NEPA and

evaluating the need for a public hearing.

21.     Finally, 33 C.F.R. § 325.2(a)(6) expressly provides that the district engineer will

determine, based on the record and applicable regulations, whether or not a Section 404 permit

should be issued.

22.     Pursuant to 33 C.F.R. § 325.3, public notice of the permit serves the purposes of advising

all interested parties of the proposed activity for which a permit is sought and soliciting

comments and information necessary to evaluate the probable impact on the public interest.

Interested parties that may offer comments include federal agencies such as EPA.  The

regulations specify that the comment period shall extend for a reasonable period of time within

which interested parties may express their views, but generally should not be more than 30 days.

23.     District engineers generally must decide on all applications no later than 60 days after

receipt of a complete application, unless (i) precluded as a matter of law or by procedures

required by law, (ii) the case must be referred to a higher authority, (iii) the comment period is

extended, (iv) the applicant does not provide timely submittal of information or comments, (v)

processing is suspended at the request of the applicant, or (vi) information needed to process the application cannot reasonably be obtained within the 60-day period. 33 C.F.R. § 325.2(d)(3).

24.     District engineers have authority to add conditions to permits when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement. Permit conditions must be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable. 33 C.F.R. § 325.4(a).

### b.     EPA's Role

25.     The CWA allocates two primary responsibilities to EPA in the Section 404 process. First, EPA has statutory authority to develop environmental guidelines (*i.e.*, the "404(b)(1) Guidelines") in conjunction with the Corps. 33 U.S.C. § 1344(b)(1).  Second, the CWA confers EPA authority, under specified procedures, to prevent the Corps from authorizing certain disposal sites under limited circumstances. 33 U.S.C. § 1344(c).

26.     As required by the CWA, EPA has promulgated 404(b)(1) Guidelines, which are codified at 40 C.F.R. Part 230 and guide the Corps' review of the environmental effects of the proposed disposal sites. For example, pursuant to 40 C.F.R. § 230.10(a), no Section 404 permit shall be issued if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. In addition, under 40 C.F.R. § 230.10(b), no permit shall be issued if it (i) causes or contributes to any water quality standard violations, (ii) violates any applicable toxic effluent standard or prohibition under Section 307 of the CWA, (iii) jeopardizes the continued existence of a listed species, or (iv) violates any requirement necessary to protect a marine sanctuary pursuant to law. Furthermore, pursuant to 40 C.F.R. § 230.10(c), no permit shall be issued which will cause or contribute to significant degradation of the waters of the United States, and pursuant to 40 C.F.R. § 230.10(d), no permit shall be issued unless

appropriate and practicable steps have been taken to minimize potential adverse impacts of the discharge on the aquatic ecosystem.

27.     The 404(b)(1) Guidelines also provide that "[g]uidance on interpreting and implementing these Guidelines may be prepared *jointly* by the EPA and the Corps at the national or regional level from time to time.  No modifications to the basic application, meaning, or intent of these Guidelines will be made *without rulemaking by the Administrator under the Administrative Procedure Act* (5 U.S.C. § 551 *et seq.*)." 40 C.F.R. § 230.2(c) (emphasis added).

28.     As described above, the authority to apply the 404(b)(1) Guidelines to specific disposal sites for the dredged or fill material rests solely with the Corps.  33 U.S.C. § 1344(a), (b).  EPA has the ability to comment on the Corps' application of the 404(b)(1) Guidelines to particular permit applications during the interagency review period required for each permit.

29.     In addition to requiring 404(b)(1) Guidelines development, under Section 404(c), Congress granted EPA limited authority to prevent the Corps from authorizing certain disposal sites in limited circumstances, if the EPA Administrator determines, after notice and an opportunity for public hearing, that certain unacceptable environmental effects on municipal water supplies, shellfish beds and fishery areas, wildlife, or recreation areas would result.  33 U.S.C. § 1344(c).

30.     Section 404(c) does not grant EPA authority to exercise unlimited enforcement of compliance with the 404(b)(1) Guidelines.  As reflected in EPA's own regulations, "[t]he Administrator is authorized to prohibit or otherwise restrict a [dredged or fill material] site whenever he determines that the discharge of dredged or fill material is having or will have an 'unacceptable adverse impact' on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 40 C.F.R. § 230.1(a).

"In evaluating the unacceptability of such impacts, consideration should be given to the *relevant portions of the 404(b)(1) Guidelines*," *e.g.* those portions that relate to impacts to municipal water supplies, shellfish beds and fishery areas, wildlife, or recreational areas. 40 C.F.R. § 231.2(e) (emphasis added). Yet, EPA construes Section 404(c) to mean that EPA can unilaterally, at any time, withdraw a Section 404 permit that has been or will be issued by the Corps. EPA invokes this flawed interpretation to impose its policy preferences in proposed Section 404 permits while avoiding the strictures and publicity of the Section 404(c) process.

31.     The Section 404(c) process occurs subsequent to an agency coordination and dispute resolution process set forth in detailed interagency agreements executed pursuant to Section 404(q). *See* http://www.epa.gov/owow/wetlands/regs/dispmoa.html.

### 2.     Section 303 Water Quality Standards Development

32.     The CWA explicitly acknowledges the Congressional policy to "recognize, preserve, and protect the *primary responsibilities and rights of States* to prevent, reduce and eliminate pollution." CWA Section 101(b), 33 U.S.C. § 1251(b). This policy is effectuated, in part, in Section 303 of the CWA, which allocates primary authority for development of water quality standards to the states.

33.     Under Section 303(c), states perform the function of establishing, reviewing, and revising water quality standards. 33 U.S.C. § 1313(c). EPA echoes this statutory provision in its regulations, prescribing that, "[s]tates . . . are responsible for reviewing, establishing, and revising water quality standards." 40 C.F.R. § 131.4.

34.     A water quality standard defines the water quality goals of a water body by designating uses for a particular body of water and setting criteria necessary to protect those uses. 40 C.F.R. § 131.2. Such standards can be expressed as specific numeric limitations or as general narrative statements. For narrative statements, states must develop a mechanism for translating or

10

interpreting them into numeric permit limits. 40 C.F.R. § 122.44(d)(1)(vi). Any competing

federal interpretation does not defeat the state's interpretation, assuming the state's interpretation

is supported by substantial evidence.

35.     Similar to Section 404, Congress specifically delineated a limited role for EPA in the

water quality standard process. First, EPA may develop and publish criteria for water quality

that accurately reflect "the latest scientific knowledge." 33 U.S.C. § 1314(a). Such criteria are

not binding on the states nor are they independently enforceable. States are free to adopt,

modify, or reject EPA's published criteria, provided they have a sound scientific rationale.

Second, when states establish, review, or revise their water quality standards, EPA's role is to

review and approve or disapprove of state-adopted water quality standards. 33 U.S.C. § 1313(c);

40 C.F.R. § 131.5. If EPA determines that a state's standards are not consistent with the CWA,

then EPA must inform the state within 90 days of the state's submission of the standard to EPA.

If the state does not adequately respond to EPA's notice and implement necessary changes

within 90 days of EPA's notice, EPA must promulgate federal standards. 33 U.S.C.

§ 1313(c)(3)-(4); 40 C.F.R. §§ 131.5, 131.21. Water quality standards are applicable (*e.g.* can be

used in permitting decisions) only when EPA has either approved the state's standards or

disapproved the state's standards and promulgated, through formal notice and comment, federal

standards. 40 C.F.R. § 131.21.

36.     EPA may also promulgate water quality standards on its own only for particular waters,

*i.e.*, "for the navigable waters involved," and only where the Administrator makes a

determination "that a revised or new standard is necessary to meet the requirements of [the

CWA]." EPA can act unilaterally only if it "prepare[s] and publish[es] proposed regulations"

and "promulgate[s]" the particular standard. 33 U.S.C. § 1313(c)(4).

11

### 3.    Section 402 Permitting and Water Quality Standards

37.    Congress established the second CWA permitting program at Section 402, known as the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1342. The NPDES permitting system focuses on wastewater discharges to receiving waters, and governs such discharges through the establishment of technology-based limits placed on the constituent make-up of a wastewater discharge. 33 U.S.C. § 1311(b)(2).

38.    Conforming to the statute's goal of allocating the "primary responsibilities" for water pollution control to the states, 33 U.S.C. § 1251(b), the CWA establishes a system of cooperative federalism, whereby states assume primary administration and enforcement of the NPDES permitting program. 33 U.S.C. § 1342(b). Once EPA approves a proposed state permitting program, EPA must suspend its own program. 33 U.S.C. § 1342(c)(1). Under such delegated permitting programs, states have exclusive authority to implement the NPDES program within their boundaries, and again, EPA has only limited authority to review state action. Specifically, EPA retains authority, in specified circumstances, to object to a particular NPDES permit that authorizes discharges to waters within the statute's jurisdiction. 33 U.S.C. § 1342(d); 40 C.F.R. § 123.44. If the state does not respond adequately to EPA's objection within specified timeframes, EPA may assume the authority to issue the permit. 33 U.S.C. § 1342(d)(4). If EPA does not object to a permit based on statutory or regulatory grounds and within the specified procedures and timeframes, the state may proceed in accordance with its delegated authority and issue the permit.

39.    When application of a technology-based limit to a particular discharge will not assure compliance with any applicable water quality standards established for the particular receiving stream, the permitting authority must develop permit limitations that would work to maintain such water quality. 33 U.S.C. § 1312; 40 C.F.R. § 122.44(d). The permitting authority, usually

12

a state agency, determines whether the proposed discharge will cause, or have the reasonable

potential to cause, or contribute to an in-stream excursion above a numeric or narrative criteria

within an applicable water quality standard. 40 C.F.R. § 122.44(d).

### 4.      Section 401 Certification

40.      For federally permitted activities, Section 401 of the CWA requires certification from the

state that proposed discharges are in compliance with applicable state water quality standards.

33 U.S.C. § 1341(a). In states with delegated NPDES programs, this state water quality

certification process is built in to the permit issuance process. States issue such certifications for

Section 404 permits issued by the Corps. EPA lacks authority under the CWA to review or

overturn a state Section 401 certification for state-issued NPDES permits or Section 404 permits

from the Corps. EPA may review and comment on a state Section 401 certification or seek

judicial review.

### B.      National Environmental Policy Act

41.      Congress enacted NEPA to establish a process by which federal agencies must consider

the potential environmental consequences of their actions. 42 U.S.C. § 4231 *et seq.* NEPA is a

procedural, not substantive, statute, and therefore agency actions with adverse environmental

consequences can be compliant with NEPA so long as the agency properly considered those

effects.

42.      NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS")

for "major Federal actions significantly affecting the quality of the human environment." 42

U.S.C. § 4332(2)(C). Where it is not readily determined that an EIS is required, an agency may

prepare an Environmental Assessment ("EA") that documents the findings and analysis of

environmental impacts. The agency may choose either to proceed with the preparation of an EIS

or, alternatively, to make a Finding of No Significant Impact ("FONSI"). 40 C.F.R. §§ 1501.4, 1508.9.

43.     Even where an EA determines that a proposed action would ordinarily have a significant effect on the environment, an agency can, in lieu of preparing an EIS, require mitigating measures to reduce the environmental impact of the proposed action below the level of significance that would otherwise trigger an EIS.

44.     In general, NEPA applies to the issuance of permits pursuant to Section 404 of the CWA. In evaluating CWA Section 404 permit applications, the Corps must "address the impacts of the specific activity requiring a [404] permit and those portions of the entire project over which the [Corps] district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. pt. 325, App. B, § 7(b)(1).

C.     **Surface Mining Control and Reclamation Act of 1977**

45.     SMCRA was enacted on August 3, 1977, to regulate the environmental and related impacts of surface coal mining operations and the surface effects of underground mining operations. A principal purpose of SMCRA is to "assure that the coal supply essential to the Nation's energy requirements, and to its economic well-being is provided" and to "strike a balance between the protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy." 30 U.S.C. § 1202(f).

46.     Like the CWA, SMCRA is anchored in cooperative federalism principles and a recognition that "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations . . . should rest with the States." 30 U.S.C. § 1201(f); *see also* 30 U.S.C. § 1253. After a state's SMCRA program has been approved, all those wishing to engage in coal mining operations in the state must obtain a SMCRA permit from the state regulatory authority. 30 U.S.C. § 1256(a).

14

47.     A SMCRA permit must incorporate and implement extensive environmental performance standards. 30 U.S.C. § 1265.  Such standards contemplate and regulate disposal of excess spoil material. 30 U.S.C. § 1265(b)(22).  A SMCRA permitted operation must transport and place excess spoil material "in a controlled manner" and in a way that assures "mass stability" and prevents "mass movement." *Id.* § 1265(b)(22)(A).  Further, Congress contemplated that such disposal would occur in water courses – if a disposal area contains "springs, natural water courses or wet weather seeps," lateral drains must be constructed "from the wet areas to the main underdrains in such a manner that filtration of the water into the spoil pile will be prevented." *Id.* § 1265(b)(22)(D).  These provisions are implemented by the various states pursuant to their authority under SMCRA.

**D.     Administrative Procedure Act**

48.     If NMA's members suffer a "legal wrong because of agency action" and are "adversely affected or aggrieved" by EPA's and the Corps' actions, the APA affords judicial review of these agency actions.  5 U.S.C. §§ 702, 704.

49.     The APA also provides the applicable process a Federal agency must follow when it proposes and adopts final rules and regulations.  5 U.S.C. § 553; *id.* § 551(4)-(5).  When EPA and the Corps arbitrarily issued substantive revisions to the Section 404 permitting process without following the required APA procedures, they violated the APA.

**FACTUAL BACKGROUND**

50.     In January 2009, in a marked departure from prior, longstanding EPA practice and a harbinger of the agency actions challenged in this Complaint, EPA initiated an extra-regulatory review process for CWA Section 404 permits that had no basis in the Corps' or EPA's codified procedures.  EPA issued a series of letters to the Corps recommending denial of certain CWA Section 404 permit applications for coal mining operations.  In each of these cases, the Corps

15

was poised to imminently issue the permits, and EPA had already either commented or waived

its opportunity to comment during the interagency comment process, long-expired by January

2009.  Undaunted by the fact that the opportunity for comment, as provided by regulation, had

passed, EPA's January 2009 letters contained newly articulated positions questioning the legality

of the permits at issue.  Specifically, EPA raised concerns about conductivity levels in water

quality, citing for the first time (even though it was readily available to EPA during the

interagency review process) a 2008 study (Pond et al.) that analyzed the relationship between

conductivity as a measure of water quality and aquatic life use.

51.     On February 13, 2009, the U.S. Court of Appeals for the Fourth Circuit decided *Ohio*

*Valley Environmental Coalition v. Aracoma Coal Company*, 556 F.3d 177 (4th Cir. 2009), which

ended long-running litigation by various citizen advocacy organizations against the Corps and

various coal companies challenging four proposed CWA Section 404 permits for coal mining

operations.  The Fourth Circuit upheld the Corps' permit review procedures and analysis on all

fronts (including (a) affirming the Corps' exclusion of upland areas from CWA and NEPA

review, (b) ruling that a state's CWA Section 401 certification is binding on the Corps and

confirms compliance with all EPA-approved state water quality standards, (c) affirming the

Corps' practice of utilizing cumulative and hydrological impacts analyses performed pursuant to

SMCRA to avoid regulatory overlap, (d) upholding the Corps' use of available assessment tools

and best professional judgment in mitigation determinations, and (e) upholding the Corps' use of

off-site stream mitigation measures), thus clearing the way for prompt release of the backlog and

processing of long-pending Section 404 permit applications.  The decision provided a path

forward not only for the permits challenged in the case, but also for numerous other Section 404

permit applications pending with the Corps that had been stalled awaiting the Fourth Circuit's decision.

52.     Reacting in part to the Fourth Circuit's decision, on March 23, 2009, EPA sent two more letters to the Corps expressing concerns regarding two coal mining projects in West Virginia and Kentucky. The press statement accompanying the release of the letters indicated Administrator Jackson had "directed the agency to review other mining permit requests" and indicated the need for EPA to be "actively involved" in review of permits anticipated to be forthcoming after the Fourth Circuit decision. Similar letters followed in April 2009 with EPA objecting to at least four proposed coal mining projects in Virginia, West Virginia, and Kentucky. An EPA spokesperson stated on April 9, 2009 that EPA "could not rule out that more permits would soon be reviewed."

53.     On June 4, 2009, U.S. Representative Shelley Moore Capito and eleven other U.S. Representatives wrote to Administrator Jackson seeking action on more than 200 permit applications for coal mining that were being delayed by a "new process" of EPA review.

**A.     June 11, 2009 Memorandum of Understanding**

54.     On June 11, 2009, EPA, the Corps, and the Department of Interior released a Memorandum of Understanding on Implementing the Interagency Action Plan on Appalachian Surface Coal Mining (the "MOU"). A key component of the MOU was to formalize the extra-regulatory review process of CWA Section 404 permits that EPA had previously commenced in January 2009.

55.     The MOU stated that the agencies will begin immediately to implement the EC Process for the CWA review of Section 404 permit applications for Appalachian surface coal mining activities, including those pending permit applications submitted prior to execution of the MOU.

56.     An initial list of 108 pending Section 404 permit applications for proposed coal mines was provided by the Corps and published at the same time as the MOU.  The agencies stated that those 108 permits would be evaluated for further coordination under the EC Process.

57.     The Corps had already issued public notice for all of the permit applications now subject to the EC Process, and the official comment period for those permit applications had expired a year earlier.  Thus, the EC Process had the effect of revisiting and/or restarting the interagency review process for hundreds of pending permit applications.

58.     Under the MOU, the EC Process will apply to Section 404 permit applications in six states and three EPA regions in the eastern United States.

59.     Since the release of the MOU and announcement of the EC Process, the Corps permit backlog had grown to more than 235 permits by July 30, 2009, and several companies have since withdrawn their Section 404 permit applications.

**B.      June 11, 2009 EC Process Memoranda**

60.     In conjunction with the release of the MOU, EPA also issued formal details on the EC Process, which were immediately effective and imposed substantive changes to the Section 404 permitting process.  *See* http://www.epa.gov/owow/wetlands/pdf/Final_MTM_Permit_Coordination_Procedures_6-11-09.pdf; and http://www.epa.gov/owow/wetlands/pdf/Final_EPA_MTM_letter_to_Army_6-11-09.pdf.  Such details included those considerations that would be used by EPA to screen and identify pending permit applications that would be subject to the EC Process.

**1.      New Screening Process for Section 404 Permit Applications**

61.     EPA's first step in the EC Process is to screen all pending Section 404 permit applications and decide which will proceed for review by the Corps under existing permit

18

processing procedures, codified in 33 C.F.R. Part 325, and which will instead be subject to the EC Process.

62.     Such screening occurs pursuant to a special method, the Multi-Criteria Integrated Resource Assessment (the "MCIR Assessment"). The stated goal of the MCIR Assessment is to develop a threshold of acceptable mining impacts and to create a list of permits that EPA determines do not meet that threshold and, therefore, require the use of the EC Process, whereas only those permits that do meet EPA's newly established threshold will proceed through the Corps' lawful regulatory process governed by regulations at 33 C.F.R. Part 325. The Corps was not involved in developing the components of the MCIR Assessment.

63.     EPA's development and use of the MCIR Assessment for evaluating Section 404 permit applications and identifying them for application of EC Process is not embodied or otherwise provided for in any properly promulgated regulation, nor has it been subjected to public notice and comment.

64.     On September 11, 2009, EPA announced that it utilized the MCIR Assessment to identify 79 coal-related Section 404 permits currently pending with the Corps and was proposing to submit those 79 permit applications to the EC Process, rather than the 33 C.F.R. Part 325 process. The permits were associated with coal mining projects proposed within six states: Ohio, Pennsylvania, Tennessee, Virginia, Kentucky, and West Virginia. EPA published the list of 79 permit applications on its website for a 14-day review period. http://www.epa.gov/owow/wetlands/pdf/ECP_Factsheet_09-11-09.pdf.

65.     On September 30, 2009, EPA announced in a letter to the Corps that all 79 proposed, pending projects previously identified using the MCIR Assessment would be subject to the EC

Process.  EPA directed that "each Corps District will notify the appropriate EPA Region in writing when a permit application is ready to begin the 60-day coordination period."

66.     As of July 19, 2010, of the 79 pending projects identified in 2009 for the EC Process, 36 are still awaiting the start of the 60-day EC Process, 36 permit applications have been withdrawn, only five permits have been issued, and just two are under current review.

## 2.     The EC Process

67.     Once triggered after the MCIR Assessment, the EC Process adds significant additional time to the Corps regulatory review.  The EC Process involves discussions among EPA, the Corps, the permit applicant, and other potentially relevant agencies.  While EPA describes a 60-day EC Process, as written, the 60-day period actually does not begin until the Corps initiates the EC Process, and there is no binding requirement for the Corps to do so in a timely fashion, in direct contrast to the permitting processing timelines set forth in Section 404(a) and (q), 33 U.S.C. § 1344(a), (q).

68.     In fact, EPA has instructed the Corps that the 60-day period for EC Process discussions does not commence until *after* the Corps, EPA, and permit applicant have held multiple negotiation sessions, which effectively could delay initiation of the EC Process indefinitely. Thus, the EC Process adds a *minimum* 60 days (and potentially many months) of review to the existing review process entirely outside of, and in addition to, the procedures and timelines codified in 33 C.F.R. Part 325.

69.     During the EC Process period, EPA will attempt to "resolve" environmental concerns raised by the permit application by, for example, proposing revisions to proposed discharges, special conditions, or mitigation requirements.

70.     At the end of the EC Process period, if issues identified by EPA are resolved in individual permit applications, those permits may move forward to the Corps for processing and

incorporation of new permit terms or conditions dictated by EPA during the EC Process. If

EPA's concerns remain unresolved at the close of the EC Process period, EPA may then initiate

Section 404(c) procedures. In short, the EC Process provides EPA with an extra-regulatory

vehicle to impose its will on coal mining permits and avoid the spotlight and administrative

burden of the statutory Section 404(c) process.

71.     Neither EPA nor the Corps proposed to revise the existing codified procedures for review

of Section 404 permits at 33 C.F.R. Part 325, and EPA has not proposed to amend its existing

404(b)(1) Guidelines as part of formalizing the EC Process.

**C.      April 1, 2010 Detailed Guidance**

72.     On April 1, 2010, EPA released the Detailed Guidance as one of a series of documents to

provide "detailed guidance" to EPA Regions 3, 4, and 5 for those Regions' review of all surface

coal mining operations under the CWA, NEPA, and the Environmental Justice Executive Order.

The Detailed Guidance and all related documents are found at

http://www.epa.gov/owow/wetlands/guidance/mining.html#memo20100401. While EPA issued

the Detailed Guidance for public comment, 75 Fed. Reg. 18500, it also nevertheless stated that

the Detailed Guidance is effective immediately. "We expect you to begin using this interim final

guidance immediately in your review of Appalachian surface coal mining activities." Detailed

Guidance at 2. The Detailed Guidance addresses CWA permitting under Sections 402 and 404,

along with NEPA review of Section 404 permits, and operational practices covered by SMCRA

permitting.

**1.      Section 402 Permits**

73.     In the Detailed Guidance, EPA proclaimed that it "expects that in many, if not most,

cases the available science will demonstrate that there is a reasonable potential for these [surface

coal mining] discharges to cause or contribute to an excursion above numeric or narrative water

21

quality standards, thus making water quality-based effluent limits necessary." Detailed

Guidance at 8. Such a blanket statement about the need for water quality-based limits ignores (i)

the role of the delegated state regulatory authority under Section 402 and (ii) the existing

protections under the CWA and its implementing regulations. Because all the states subject to

the Detailed Guidance have delegated authority to issue Section 402 NPDES permits, the states,

not EPA, have the duty to determine whether any proposed discharges will cause, or have the

reasonable potential to cause, or contribute to an in-stream excursion above a numeric or

narrative criteria within an applicable water quality standard. 40 C.F.R. § 122.44(d).

74.     The states make the "reasonable potential" determination on a case-by-case basis using

site specific data and information. EPA's blanket presumption ignores the fact that states cannot

approve any discharge which would cause or contribute to an excursion in excess of a water

quality standard. *See* 40 C.F.R. § 122.4(i); 40 C.F.R. § 122.44(d).

75.     Under existing regulations, in writing a permit based on narrative water quality standards,

states are to "[e]stablish effluent limits using a calculated numeric water quality criterion for the

pollutant which the [state] demonstrates will attain and maintain applicable narrative water

quality criteria and will fully protect the designated use." 40 C.F.R. § 122.44(d)(1)(vi)(A).

States are free to use state criteria, policies, regulations, or other relevant information in

establishing these permit limits. *Id.*

76.     Nonetheless, in discussing how states should derive NPDES permit effluent limits from

applicable narrative water quality standards, EPA directed its Regions to a draft, not-yet-peer-

reviewed EPA report entitled, "A Field-Based Aquatic Life Benchmark for Conductivity in

Central Appalachian Streams," which purports to recognize "stream-life impacts associated with

conductivity." Detailed Guidance at 11. EPA's draft report on conductivity concluded "that

genus-level impacts to the biological community occur at conductivity levels of 300 µS/cm."

Detailed Guidance at 12.  EPA stated that it has been working on developing scientific

information "to support new numeric water quality values for conductivity."  Detailed Guidance

at 7.

77.     Even though (i) EPA's draft report on conductivity has not yet been subjected to external

peer review by the Science Advisory Board, (ii) EPA expressly provides that the report is to be

used "solely for the purpose of pre-dissemination peer review" and that the report is not an EPA

"determination or policy," and (iii) the Detailed Guidance makes no attempt to interpret

particular states' existing narrative water quality standards or the uses to which these criteria

apply, the Detailed Guidance directs that the study "should be considered by Appalachian

states . . . in implementing state narrative water quality standards in NPDES permits, and by

Regions in . . . review of these permits."  Detailed Guidance at 12.

78.     Further, EPA established a presumption that "EPA expects that the conductivity impacts

of projects with predicted conductivity levels below 300 µS/cm generally will not cause a water

quality standard violation and that in-stream conductivity levels above 500 µS/cm are likely to

be associated with adverse impacts that may rise to the level of exceedances of narrative state

water quality standards.  If water quality modeling suggests that in-stream levels will exceed 500

µS/cm, EPA believes that a reasonable potential likely exists to cause or contribute to an

excursion above applicable water quality standards . . . .  Similarly, if water quality monitoring

suggests that in-stream levels will exceed 300 µS/cm but will be below 500 µS/cm, EPA should

work with the permitting authority to ensure that the permit includes conditions that protect

against conductivity levels exceeding 500 µS/cm. . . . As noted above, as a general matter, EPA

expects that in-stream conductivity levels above 500 µS/cm are likely to be associated with

adverse impacts to water quality." Detailed Guidance at 12. On information and belief, these

levels are, for many streams in the Appalachian region, lower than naturally-occurring

background. Moreover, the draft report contains express limitations that make these levels

wholly inappropriate to apply "as a general matter." Rather, on information and belief, the effect

of discharges with these levels of electrical conductivity varies greatly among the many surface

waters in the regions subject to the Detailed Guidance.

79.     EPA next expressed its expectation for states in their review of surface coal mining

NPDES permit applications, and specifically the analysis of compliance with narrative water

quality standards that incorporate the newly expressed conductivity standard: "The state must

provide adequate documentation in the permit fact sheet or statement of basis to demonstrate that

it has assessed reasonable potential and, where necessary, developed effluent limits (or other

permit conditions) adequate to protect all applicable water quality standards, including narrative

water quality standards. . . . Where EPA concludes that the state's explanation is not adequate, or

the state fails to provide an explanation of how it has interpreted or applied its narrative water

quality standards, EPA may object to the permit in accordance with the provisions of 40 CFR

Section 123.44(c)." Detailed Guidance at 13.

80.     EPA is now utilizing the Detailed Guidance to cause indefinite delays in the Section 402

permit process for coal mining operations. EPA is informing state permitting authorities that the

permit application materials submitted to EPA are "incomplete," without further guidance on the

alleged deficiency, and that EPA's period to review and object to the proposed permit does not

commence until the state submits complete information. In so doing, permits are held in

indefinite abeyance while the state works to determine what information is missing from the

permit application package.

81.    The Detailed Guidance further concludes that state-issued general permits for NPDES

discharges from surface coal mining activities "will often be inadequate," and suggests that EPA

Regional offices may demand that "permitting authorities should require individual permits *in all*

*instances*." Detailed Guidance at 15 (emphasis added).  Yet, these general permits were properly

promulgated as part of the state programs and EPA cites no authority or basis to rescind its

approval of these general permits.

## 2.    Section 404 Permits

82.    With respect to EPA review of proposed authorizations from the Corps for Section 404

permits, the Detailed Guidance contains a series of directives for the Regions to follow.  First,

EPA emphasized its "role and responsibility for ensuring that water quality standards are not

exceeded because of discharges regulated under Section 404 from Appalachian surface coal

mining operations." Detailed Guidance at 18.  That "responsibility" even extends to "ensuring

that neither numeric nor narrative water quality standards are exceeded due to discharges of fill

material *even if a state has issued a water quality certification under Section 401 of the CWA*."

Detailed Guidance at 18 (emphasis added).  "Regions should convey their conclusions with

respect to possible exceedances of water quality standards to the Corps and, if appropriate

changes to the permit are not made in response to these water quality concerns, may proceed

under the 404(q) MOA and/or 404(c)." Detailed Guidance at 19.

83.    Just as with review of water quality impacts in the Section 402 permit process, EPA

instructs the Regions to utilize the draft, not-yet-peer-reviewed report on conductivity "when

examining whether a draft 404 permit is likely to result in significant degradation of waters of

the U.S. . . . EPA anticipates that the conductivity impacts of projects with predicted conductivity

levels below 300 μS/cm generally will not cause a water quality standard violation or significant

degradation of the aquatic ecosystem. On the other hand, EPA expects that in-stream

25

conductivity levels above 500 µS/cm are likely to be associated with adverse impacts that could

rise to the level of significant degradation of the aquatic ecosystem." Detailed Guidance at 22.

"Projects projected to increase conductivity levels above 300 µS/cm should include permit

conditions requiring adaptive remedial action to prevent conductivity levels from rising to levels

that may contribute to water quality degradation." *Id.*

84.     EPA has provided no basis to conclude that these conductivity levels will harm the uses

protected by the various narrative water quality standards promulgated by the states. In some

instances, natural background is higher than these levels. In other cases, because of the

chemistry of a particular stream, the data accumulated in the draft report would have no

application. EPA also ignores the fact that water quality standards have no place in a Section

404 permit for coal mining where the ultimate discharge from any fill areas is regulated by a

Section 402 permit.

85.     The Detailed Guidance also imposes several de facto amendments to the 404(b)(1)

Guidelines and interpretive Corps guidance, including (a) requiring watershed scale (HUC 12)

cumulative impact analysis "as an element of the factual determinations required by the

404(b)(1) Guidelines; and (b) denying Section 404 mitigation credit for sediment, groin, or other

water control ditches required for mining projects under SMCRA and CWA Section 402 (despite

the Fourth Circuit's ruling to the contrary).

### 3.     Operational Practices Regulated Under SMCRA

86.     EPA next proffers a series of best management practices that EPA "expects" will help

reduce or eliminate any increases to conductivity levels to meet narrative water quality standards.

Such practices are part of the SMCRA permitting process administered and enforced by OSM

and primacy states. In the Detailed Guidance, EPA rejects many of the industry's proposed best

management practices associated with the design of mining operations as "unproven in their

effectiveness to protect water quality and prevent significant degradation." Detailed Guidance at 24. In the alternative, EPA suggests that multiple fills on a project should be "sequenced," such that the permit applicant must demonstrate compliance with water quality standards at each valley fill before construction of subsequent valley fills may commence. Detailed Guidance at 24-25.

87.     Other best management practices issues addressed in the Detailed Guidance include: (a) a presumption that high-ratio mining operations "generally do not represent the least environmentally damaging alternative," and (b) a direction that "[p]rojects should also incorporate environmentally effective limits on the linear extent of stream impacts per ton of excess spoil produced through a robust alternatives analysis." Detailed Guidance at 26.

### 4.    NEPA Review of Section 404 Permits

88.     Finally, the Detailed Guidance also addresses issues related to NEPA analyses performed by the Corps in conjunction with Section 404 permit decisions. Detailed Guidance at 29-30. EPA repeats earlier assertions that cumulative impact analyses should be on a watershed scale, and that mitigation for sediment, groin, or other water control ditches is inappropriate and should not be used as a basis for supporting a FONSI. In addition, EPA proffers a presumption "that projects that involve more than one mile of stream loss or more than one valley fill are likely to result in significant adverse impacts," thus requiring an EIS. The Detailed Guidance is quick to point out that while "the decision to prepare an EIS rests with the Corps and OSM, under EPA's Clean Air Act Section 309 authority, EPA must 'refer' to CEQ matters that the Administrator finds 'are unsatisfactory from the standpoint of public health or welfare or environmental quality.'" Detailed Guidance at 30.

89.     Concurrent with the Detailed Guidance, EPA released a Guidance Summary Memorandum to Regions 3, 4, and 5 that made EPA's expectations clear with respect to

Appalachian surface coal mining: "[W]e expect that, generally, it will be easier for projects with no or few valley fills to demonstrate that they comply with the requirements of the CWA and the 404(b)(1) Guidelines. Conversely, projects with multiple valley fills will generally raise questions about their compliance with CWA requirements and may require permit objection under 402 or elevation and possible veto under 404." Guidance Summary at 4. Administrator Jackson stated during the press conference releasing the Detailed Guidance that, "You're talking about no, or very few, valley fills that are going to meet this standard." http://www.washingtonpost.com/wp-dyn/content/article/2010/04/01/AR2010040102312.html.

90.     While seeking public comment on the Detailed Guidance and submitting the non-peer-reviewed conductivity study to the Science Advisory Board for review, EPA is applying the Detailed Guidance, its various presumptions, and the conductivity standard to pending coal mining permit applications as part of the EC Process. Implementation of the Detailed Guidance is yielding further unreasonable delay and severe irreparable harm for many NMA members.

## CLAIMS FOR RELIEF

## COUNT I

### The EC Process constitutes a legislative rule that was not properly promulgated under the APA

91.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 90 of this Complaint, as though fully set forth below.

92.     The EC Process constrains EPA's and the Corps' decision-making process in a way that substantially affects agency decisions. In addition, the EC Process amounts to a substantive revision of the 33 C.F.R. Part 325 regulations. Therefore, the EC Process is a substantive and legislative rule and should not have been issued absent compliance with the notice-and-comment rulemaking requirements of APA § 553.

28

93.     Accordingly, Defendants have violated APA § 553 through the issuance of the EC

Process, which is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with

law, and issued without observance of procedure required by law.

## COUNT II

### The MCIR Assessment constitutes a legislative rule that was not properly promulgated under the APA

94.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 93 of

this Complaint, as though fully set forth below.

95.     EPA's use of the MCIR Assessment model effectively curtails the agency's discretion

and has present binding effect.  Therefore, the MCIR Assessment is a substantive and legislative

rule and should not have been issued absent compliance with the notice-and-comment

rulemaking requirements of APA § 553.

96.     Accordingly, Defendants have violated APA § 553 through the issuance of the MCIR

Assessment, which is arbitrary, capricious, an abuse of discretion, otherwise not in accordance

with law, and issued without observance of procedure required by law.

## COUNT III

### The Detailed Guidance constitutes a legislative rule that was not properly promulgated under the APA

97.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 96 of

this Complaint, as though fully set forth below.

98.     The Detailed Guidance is immediately effective, constrains the agency's discretion, and

has a substantial effect on agency decisions.  Further, the Detailed Guidance amounts to a

substantive revision and unlawful amendment of the 404(b)(1) Guidelines, codified at 40 C.F.R.

Part 230, water quality standards regulations, codified at 40 C.F.R. Part 131, and permitting

regulations applicable to the states, codified at 40 C.F.R. Parts 122, 125.  Therefore, the Detailed

Guidance is a substantive and legislative rule and should not have been issued absent compliance with the notice-and-comment rulemaking requirements of APA § 553.

99.     Accordingly, Defendants have violated APA § 553 through the issuance of the Detailed Guidance, which is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and issued without observance of procedure required by law.

## COUNT IV

### The EC Process is contrary to the Clean Water Act

100.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 99 of this Complaint, as though fully set forth below.

101.    CWA Section 404(a) grants authority to the Corps to issue permits for the discharge of dredged and fill material.  33 U.S.C. § 1344(a).  In addition, the Corps' regulations specify that an applicant has a right to a "full public interest review and independent decision by the division or division engineer."  30 C.F.R. § 325.2(e)(3) ("the applicant's rights to . . . an independent decision by the district of division engineer must be strictly observed").

102.    The EC Process was not issued pursuant to any statutory direction or authorization.

103.    The EC Process authorizes EPA to supplant the Corps at the beginning of the Section 404 permitting process and control a new permit review process that falls wholly outside the codified regulatory process.  Accordingly, the EC Process violates the CWA's delegation of authority to the Corps as the permitting authority and disrupts the division of authority Congress crafted between the Corps and EPA in Section 404 permitting decisions.  33 U.S.C. § 1344(a)-(b). Further, the EC Process violates 30 C.F.R. § 325.2(e)'s guarantee of an independent Corps permitting decision.

104.    In addition, the EC Process is unlawful in that it violates the CWA's directive to "minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in

the issuance of permits under this section," in addition to thwarting Congress's directive for a

permitting decision within 90 days after the permit is published for public notice and comment

(which must occur within 15 days after an application is complete, 33 U.S.C. § 1344(a)).  33

U.S.C. § 1344(q).

105.    For the above reasons, the EC Process is unlawful and should be set aside pursuant to 5

U.S.C. § 706(2).

### COUNT V

**The MCIR Assessment is contrary to the Clean Water Act**

106.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 105

of this Complaint, as though fully set forth below.

107.    CWA Section 404(b)(1) directs EPA to develop guidelines for the specification of

disposal sites for dredged and fill material, and such guidelines are to be applied by the Corps in

evaluating permit applications. 33 U.S.C. § 1344(b).  Outside of the Section 404(c) process and

the Section 404(a) public notice and comment process, EPA lacks statutory authority to apply the

404(b)(1) Guidelines during the Section 404 permitting process.

108.    EPA contends that the MCIR Assessment is based upon the 404(b)(1) Guidelines, and

EPA has used the MCIR Assessment to screen and identify Section 404 permit applications for

the EC Process.  By utilizing the MCIR Assessment to apply the 404(b)(1) Guidelines and direct

the regulatory process for Section 404 permit applications, EPA is exceeding its statutory

authority under the CWA.  Authority to apply the 404(b)(1) Guidelines at the onset of the

Section 404 permitting process rests solely with the Corps.  Accordingly, the MCIR Assessment

is contrary to law and should be set aside pursuant to 5 U.S.C. § 706(2).

## COUNT VI

### The Detailed Guidance is contrary to the Clean Water Act

**Unlawful Development of Water Quality Standard**

109.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 108 of this Complaint, as though fully set forth below.

110.    The Clean Water Act allocates authority for development of water quality standards to the states.  Under Section 303(c) of the statute, states perform the function of establishing, reviewing and revising water quality standards.  33 U.S.C. § 1313(c).

111.    EPA echoed the statutory provision in its regulation prescribing that, "[s]tates . . . are responsible for reviewing, establishing, and revising water quality standards." 40 C.F.R. § 131.4.  In construing the statute and its own regulation, EPA has consistently taken the position that it does not perform a federal rulemaking to establish water quality standards and that, except under specified circumstances for particular waters, *only* the states perform the functions necessary to establish the standards.

112.    Yet, in its Detailed Guidance, EPA has pronounced that "in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts to water quality," Detailed Guidance at 12, and directed the EPA Regions to "work with the permitting authority to ensure that the permit includes conditions that protect against conductivity levels exceeding 500 µS/cm." *Id.*  EPA has gone so far as to direct its Regional offices to "object to issuance of [a] proposed permit" if it does not satisfy the requirements of the Act "as noted" in the Detailed Guidance.  Detailed Guidance at 8.

113.    Thus, EPA's 500 µS/cm amounts to a water quality standard that the Agency is imposing on the states and permittees.  Unilateral imposition of its own water quality standard is contrary both to the Clean Water Act and to EPA's regulatory interpretation of the statute.

114.    Because the water quality standard is unlawful, EPA lacks authority to direct regulatory

authorities to implement the standard through Section 402 or 404 permits.

**Unlawful Conflict with Regulations Codified Pursuant to Section 404(b)(1)**

115.    The Corps and EPA issued joint regulations, codified at 40 C.F.R. Part 230, Subparts H

and J, governing mitigation for activities authorized by permits issued by the Corps pursuant to

Section 404.  In addition, the Corps has issued lawful guidance interpreting its regulations.

116.    The Detailed Guidance (at 23-24) addresses mitigation issues in a way that conflicts with

codified regulations and existing guidance, *e.g.* EPA states that "[n]o Section 404 compensation

credit should be given for sediment, groin, or other water control ditches required for mining

projects."

117.    In addition, the Detailed Guidance seeks to impose water quality based effluent limits in

Section 404 permits, which is inconsistent with the 404(b)(1) Guidelines as applied to coal

mining activity that controls any effluent discharges from Section 404 fill areas through sediment

ponds that discharge pursuant to Section 402 permits.  EPA lacks authority to demand, and the

Corps lacks authority to impose, such water quality limits in Section 404 permits for coal

mining.

118.    Accordingly, the Detailed Guidance is unlawful and should be set aside pursuant to 5

U.S.C. § 706(2).

## COUNT VII

**The conductivity water quality standard is arbitrary and capricious
under the APA in that it is based upon unlawful presumptions**

119.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 118

of this Complaint, as though fully set forth below.

120.   The Detailed Guidance assumes that "in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts to water quality," and that such levels are likely caused or contributed to by surface coal mining operations where such levels appear in Appalachian streams.  Detailed Guidance at 12-13.  EPA relies on scientific literature that has not yet been peer reviewed as the basis for these presumptions and on a study that it has specifically disclaimed as not constituting an EPA determination or policy.

121.   The Detailed Guidance dictates that EPA utilize these presumptions to require from state regulators  reasonable potential analyses and the development of permit conditions that enforce the conductivity standard unless the state has site-specific data that supports an alternative approach.  Detailed Guidance at 11-12.

122.   Since the issuance of the Detailed Guidance, EPA is applying, and demanding adherence to, the conductivity standard in its review of Section 404 permit applications.

123.   EPA makes no attempt to cite specific state narrative water quality standards that it claims will be violated at these levels.  Because it has not even identified the narrative standards at issue, the Agency has no record that would link its levels to these unspecified narrative water quality standards.  Finally, EPA can claim no basis for applying these numeric limits to a very large number of unnamed streams across six states with varying natural constituents, differing flows, and varying chemistry.

124.   EPA has created impermissible and irrational administrative presumptions through the conductivity standard, in that there is no "sound or rational connection between the proved and inferred facts." *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1100 (D.C. Cir. 1998).  Accordingly, the conductivity standard is unlawful and should be set aside under 5 U.S.C. § 706(2).

34

## COUNT VIII

### The Detailed Guidance is contrary to the National Environmental Policy Act

125.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 124 of this Complaint, as though fully set forth below.

126.    To determine whether a matter is sufficiently "significant" that it requires an EIS, an agency must assess the environmental impacts by their "context" and "intensity." 40 C.F.R. § 1508.27. The regulatory scheme prescribes this assessment on a case-by-case basis.

127.    The Corps is the lead agency in preparing NEPA documents related to Section 404 permits for coal mining operations. EPA's only role is to comment and, if an EIS is prepared, to review the EIS for sufficiency. Thus, EPA is not empowered to decide by "guidance" what may be a "significant" impact requiring preparation of an EIS.

128.    EPA nonetheless directs that "projects that involve more than one mile of stream loss or more than one valley fill are likely to result in significant adverse impacts." Detailed Guidance at 30. This presumption is well outside NEPA regulations and beyond EPA's authority.

129.    Similarly, under longstanding practices and regulations, the Corps decides, based upon conditions of each mine, whether particular efforts constitute mitigation that will permit it to issue a FONSI. Yet, EPA announces in its Detailed Guidance that "no mitigation credit should be given for sediment, groin, or other water control ditches." Detailed Guidance at 24. In addition, EPA asserts that "mitigation measures that rely on establishing or re-establishing streams, rather than rehabilitating or enhancing existing streams, . . . should generally not be used to support a FONSI. *Id.* at 30.

130.    EPA purports to establish NEPA procedures applicable to coal mining in the Detailed Guidance. Yet, such "procedures shall be adopted only *after* an opportunity for public review and after review by the Council [on Environmental Quality] for conformity with [NEPA] and [40

C.F.R. § § Part 1500 – 1599].'' 40 C.F.R. § 1507.3. The procedures in the Detailed Guidance were adopted without prior public review and EPA provides no record of having submitted the procedures for review by CEQ.

131.    Nor may EPA suggest that this is only a suggestion without consequences. In the paragraph following its opinions about what constitutes to "significant" impact from yet-to-be-announced mines, while acknowledging that it is the Corps who decides whether to prepare EISs, the Agency asserts that it has authority to find NEPA compliance "unsatisfactory" and the Detailed Guidance recounts EPA's ability to "refer" matters to the Council on Environmental Quality. Detailed Guidance at 30.

132.    Accordingly, the Detailed Guidance violates NEPA and should be set aside under 5 U.S.C. § 706(2).

## COUNT IX

**The Detailed Guidance is contrary to the Surface Mining Control and Reclamation Act**

133.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 132 of this Complaint, as though fully set forth below.

134.    SMCRA's structure of cooperative federalism grants "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" to those states with regulatory programs approved by OSM, 30 U.S.C. § 1253(a), subject to the continuing validity of various federal laws, including the CWA. 30 U.S.C. § 1292.

135.    The recitation of best management practices in the Detailed Guidance, along with EPA's rejection of existing practices as "unproven in their effectiveness," (Detailed Guidance at 24) have no basis in any of the federal laws listed in 30 U.S.C. § 1292. Specifically, they are not lawful amendments to the 404(b)(1) Guidelines under the CWA, nor are they cognizable under any other federal law.

136.    Therefore, EPA's rejection of existing mining management practices and preference for

additional practices (Detailed Guidance at 24-27) that have never been evaluated by OSM or

primacy states, nor subject to public notice and comment prior to implementation, invade and

disrupt the primary regulatory authority Congress granted to OSM and primacy states under

SMCRA.

137.    Specifically, EPA establishes a permitting scheme that "sequences" multiple valley fills

on a project (Detailed Guidance at 24-25).  Requiring authorization for only one valley fill at a

time is *ultra vires* under SMCRA and beyond the scope of EPA's delegated authority under any

federal law.  EPA's permitting authorization scheme is within the sole jurisdiction of OSM and

primacy states, and indeed, such issues are currently under consideration by OSM in a pending

SMCRA rulemaking regarding stream protection.  EPA has no jurisdiction or authority to

predetermine OSM's regulatory decisions.

## COUNT X

**The EC Process, MCIR Assessment, and the Detailed Guidance are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or in excess of statutory jurisdiction, authority, or limitations**

138.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 137

of this Complaint, as though fully set forth below.

139.    To the extent not specifically alleged above, the EC Process, MCIR Assessment, and the

Detailed Guidance are arbitrary, capricious, an abuse of discretion, otherwise not in accordance

with law, or in excess of statutory jurisdiction, authority, or limitation in violation of 5 U.S.C.

§ 706, for numerous reasons, including: (a) conflict with existing codified regulations and/or

unlawful or unreasonable interpretations of codified regulations, including 33 C.F.R. Part 325

and 40 C.F.R. Part 230; (b) articulation of impermissible presumptions that lack a reasonably

articulated basis, *e.g.* presumption that high-ratio mining operations do not represent the least

37

damaging alternative; presumption that general permits are inadequate; and presumption that an EIS is required for projects that involve more than one mile of stream loss or more than one valley fill; (c) expressing authority to overrule CWA Section 401 state water quality certifications; (d) lacking substantial scientific evidentiary support for the conductivity standard and other findings on the impacts of surface coal mining operations; and (e) creating unreasonable delay in the review and processing of Section 404 permits for NMA's members.

## COUNT XI

### The EC Process, MCIR Assessment, and Detailed Guidance are *ultra vires*.

140.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 139 of this Complaint, as though fully set forth below.

141.    The EC Process, MCIR Assessment, and Detailed Guidance are in excess of delegated statutory authority under the CWA and other federal law and therefore are *ultra vires*, for multiple reasons, including *inter alia*, that EPA lacks authority to (a) direct the course of the Section 404 permit review process through the application of the 404(b)(1) Guidelines; (b) impose unreasonable delays on the Section 404 permit review process; (c) undermine the independent decision-making of the Corps, the statutory permitting authority; (d) develop and apply a water quality standard outside of the CWA Section 303 process; (e) develop and impose presumptions that affect NEPA and other statutory review; and (f) apply and enforce the 404(b)(1) Guidelines outside of the interagency comment or Section 404(c) process. Accordingly, and irrespective of federal court jurisdiction under any other statute, the EC Process, MCIR Assessment, and Detailed Guidance are unlawful and should be set aside as *ultra vires*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NMA respectfully requests this Court enter judgment in its favor, and:

1. Declare that EPA and the Corps violated the APA in issuing and implementing the EC Process without following APA procedures;

2. Declare that EPA violated the APA in issuing and implementing the MCIR Assessment and the Detailed Guidance without following APA procedures;

3. Declare that the EC Process, MCIR Assessment, and Detailed Guidance are contrary to federal law, including the Clean Water Act, NEPA, and SMCRA, or are otherwise arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, or limitations, or *ultra vires*;

4. Declare that EPA has exceeded its statutory role in the Section 404 permitting process, and is imposing unreasonable delay on the Section 404 permitting process, through the issuance and implementation of the EC Process, MCIR Assessment, and Detailed Guidance;

5. Declare that EPA is imposing unreasonable delay on the Section 402 permitting process through the issuance of the Detailed Guidance;

6. Vacate the EC Process, MCIR Assessment, and Detailed Guidance;

7. Enjoin and restrain Defendants, their agents, employees, successors, and all persons acting in concert or participating with them from enforcing, applying, or implementing (or requiring others to enforce, apply, or implement) the EC Process, MCIR Assessment, and Detailed Guidance;

8. Order the Corps to process all pending Section 404 permit applications pursuant to the codified regulatory process and timelines; and

39

9. Grant Plaintiff such other relief as may be necessary and appropriate or as the Court deems just and proper.

Respectfully submitted,

John C. Martin, No. 358679

Katie Sweeney, Of Counsel          Kirsten L. Nathanson, No. 463992
Karen C. Bennett, No. 477151       CROWELL & MORING LLP
NATIONAL MINING ASSOCIATION        1001 Pennsylvania Avenue, N.W.
101 Constitution Avenue, N.W.      Washington, D.C. 20004-2595
Suite 500 East                     (202) 624-2500
Washington, DC 20001
(202) 463-2600

ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION

Dated: July 20, 2010