## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____)
)
NATIONAL MINING ASSOCIATION,          )
)
        Plaintiff,          )
)
        v.          )     No. 1:10-CV-1220-RBW
)
LISA JACKSON, ADMINISTRATOR,          )
U.S. ENVIRONMENTAL PROTECTION          )
AGENCY, <u>et</u> <u>al.</u>,          )
)
        Defendants.          )
_____)

### <u>MOTION TO DISMISS</u>

      Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and for the reasons set forth in the

attached memorandum, Defendants respectfully move to dismiss the claims asserted by Plaintiff

in this action.

                               Respectfully submitted,

                               IGNACIA S. MORENO
                               Assistant Attorney General
                               Environment and Natural Resources Division

                               /s/Kenneth C. Amaditz
                               CYNTHIA J. MORRIS
                               KENNETH C. AMADITZ
                               Environmental Defense Section
                                 Environment and Natural Resources Division
                               United States Department of Justice
                               P.O. Box 23986
                               Washington, DC  20026-3986
                               (202) 616-7554 (Morris)
                               (202) 514-3698 (Amaditz)
                               Fax: (202) 514-8865
                               c.j.morris@usdoj.gov
                               kenneth.amaditz@usdoj.gov

OF COUNSEL:

KARYN WENDELOWSKI
Office of General Counsel
U.S. EPA
1200 Pennsylvania Ave., N.W.
MC 2355A
Washington, D.C.  20460

RUSSELL W. PETIT
Office of the Chief Counsel
U.S. Army Corps of Engineers
Washington, D.C.  20314

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
NATIONAL MINING ASSOCIATION,        )
                                                    )
         Plaintiff,                        )
                                                    )
       v.                                  )     No. 1:10-CV-1220-RBW
                                                    )
LISA JACKSON, ADMINISTRATOR,       )
U.S. ENVIRONMENTAL PROTECTION    )
AGENCY, <u>et al.</u>,                         )
                                                    )
         Defendants.                   )
_____)

<u>**DEFENDANTS' MEMORANDUM IN
SUPPORT OF THEIR MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................1

I.    STATUTORY AND REGULATORY BACKGROUND ...................................................1

    A.  The Clean Water Act...................................................................................................1

        1.    Section 404 Permits ...........................................................................................2

        2.    Section 402 Permits ...........................................................................................4

II.    FACTUAL BACKGROUND................................................................................................6

    A.    The "Enhanced Coordination" Process.......................................................6

    B.    EPA's Multi-Criteria Integrated Resource Assessment ("MIRA").......................7

    C.    EPA's Detailed Guidance ...........................................................................9

STANDARD OF REVIEW ................................................................................................11

ARGUMENT ................................................................................................................11

I.    NMA HAS NOT IDENTIFIED A FINAL AGENCY ACTION TAKEN BY EPA OR THE CORPS.................................................................................................13

    A.    EPA's Use of MIRA Did Not Constitute Final Agency Action .....................13

    B.    The EC Memo Is Not Final Agency Action .............................................15

    C.    EPA's Detailed Guidance Is Not Final Agency Action..........................17

II.    NMA'S CLAIMS ARE NOT RIPE FOR REVIEW .......................................................19

    A.    NMA's Challenge to MIRA is Not Ripe .................................................20

    B.    NMA's Challenges to the EC Memo Are Not Ripe .................................22

    C.    NMA's Challenges to EPA's Detailed Guidance Are Not Ripe............................24

1.    NMA's Merits-Based Challenges to the Detailed Guidance Are Not Ripe For Review ..............................................................................24

2.    NMA's Procedural Challenge to the Detailed Guidance Is Not Ripe ..............26

III.    NMA LACKS STANDING TO CHALLENGE MIRA AND THE EC MEMO..............29

    A.    NMA Has Suffered No Injury-In-Fact from the EC Process.................................30

    B.    The Delay Alleged by NMA Is Not Caused by the EC Process............................30

    C.    The Remedy Sought by NMA Would Not Redress NMA's Alleged Injury from the EC Process...................................................................................................32

IV.    EPA'S USE OF MIRA TO SCREEN PERMIT APPLICATIONS IS A DECISION COMMITTED TO AGENCY DISCRETION BY LAW ..................................................32

V.    NOTICE-AND-COMMENT RULEMAKING WAS NOT REQUIRED FOR MIRA, THE EC MEMO, OR THE DETAILED GUIDANCE........................................34

    A.    EPA's Use of MIRA Did Not Constitute a Legislative Rule................................35

    B.    The EC Memo Is Not a Legislative Rule .............................................................37

    C.    EPA's Detailed Guidance Is Not A Legislative Rule ..........................................40

CONCLUSION...................................................................................................................45

## TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) ........................................................................................19, 21, 25

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,*
   789 F.2d 931 (D.C. Cir. 1986) ........................................................................19, 22, 24

*Aluminum Co. of Am. v. United States,*
   790 F.2d 938 (D.C. Cir. 1986) .................................................................................15

*American Hospital Ass'n v. Bowen,*
   834 F.2d 1037 (D.C. Cir. 1987) ...............................................................................38

*Appalachian Power Co. v. EPA,*
   208 F.3d 1015 (D.C. Cir. 2000) ...............................................................................42

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) .............................................................................................11

*Association of Flight Attendants-CWA v. U.S. Dep't of Transp.,*
   564 F.3d 462 (D.C. Cir. 2009) .................................................................................29

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................................11

*Bennett v. Spear,*
   520 U.S. 154 (1997) .....................................................................................13, 16, 17

*Catawba County v. EPA,*
   571 F.3d 20 (D.C. Cir. 2009) ..............................................................................41, 44

*Cement Kiln Recycling Coal. v. EPA,*
   493 F.3d 207 (D.C. Cir. 2007) .................................21, 23, 26, 27, 37, 38, 41, 42, 43

*Center for Auto. Safety v. NHTSA,*
   452 F.3d 798 (D.C. Cir. 2006) .........................13, 19, 35, 37, 38, 40, 41, 43

*Center for Sci. in the Pub. Interest v. FDA,*
   Number Civ.A.03-1962 RBW, 2004 WL 2011467 (D.D.C. Aug. 6, 2004) ...............23

*Chemical Mfrs. Ass'n v. EPA,*
   26 F. Supp. 2d 180 (D.D.C. 1998) .......................................................................14, 15

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)..........................................................................................34, 38, 44

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)..........................................................................................30

*DRG Funding Corp. v. Sec'y of Housing & Urban Dev.*,
   76 F.3d 1212 (D.C. Cir. 1996).........................................................................14, 18

*District of Columbia v. Schramm*,
   631 F.2d 854 (D.C. Cir. 1980).........................................................................24, 33

*Erby v. United States*,
   424 F. Supp. 2d 180 (D.D.C. 2006)..............................................................11

*FTC v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980)..........................................................................................14, 15

*Florida Power & Light Co. v. EPA*,
   145 F.3d 1414 (D.C. Cir. 1998).........................................................................18, 21, 23, 26

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006).........................................................................13

*Gem County Mosquito Abatement Dist. v. EPA*,
   398 F. Supp. 2d 1 (D.D.C. 2005)..............................................................17

*General Elec. Co. v. EPA*,
   290 F.3d 377 (D.C. Cir. 2002).........................................................................34

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..........................................................................................29

*Heckler v. Chaney*,
   470 U.S. 821 (1985)..........................................................................................33, 34

*James V. Hurson Assocs., Inc. v. Glickman*,
   229 F.3d 277 (D.C. Cir. 2000).........................................................................38, 39, 40

*JEM Broad. Co. v. FCC*,
   22 F.3d 320 (D.C. Cir. 1994).........................................................................39

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..........................................................................................29

*McLouth Steel Prods. Corp. v. Thomas,*
    838 F.2d 1317 (D.C. Cir. 1988) ................................................................28, 36

*Municipality of Anchorage v. United States,*
    980 F.2d 1320 (9th Cir. 1992) ...................................................................26

*Munsell v. Dep't of Agric.,*
    509 F.3d 572 (D.C. Cir. 2007) ...................................................................19

*National Ass'n of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007) .....................................................................................4

*National Ass'n of Home Builders v. Norton,*
    415 F.3d 8 (D.C. Cir. 2005) ........................................................15, 16, 18

*National Park Hospitality Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ............................................................20, 21, 23, 25, 26

*National Whistleblower Ctr. v. Nuclear Regulatory Comm'n,*
    208 F.3d 256 (D.C. Cir. 2000) ...............................................................39, 40

*National Wildlife Fed'n v. Marsh,*
    568 F. Supp. 985 (D.D.C. 1983) ...............................................................36

*Neighborhood TV Co. v. FCC,*
    742 F.2d 629 (D.C. Cir. 1984) ...................................................................39

*Neitzke v. Williams,*
    490 U.S. 319 (1989) ...................................................................................11

*Nevada v. Dep't of Energy,*
    457 F.3d 78 (D.C. Cir. 2006) ....................................................................21

*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004)......................................................................................13

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998)......................................................................19, 20, 25

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,*
    556 F.3d 177 (4th Cir. 2009) ...................................................................2, 6

*O'Shea v. Littleton,*
    414 U.S. 488 (1974)...................................................................................30

*Panhandle Producers & Royalty Owners Ass'n v. Economic Reg. Admin.*,
822 F.2d 1105 (D.C. Cir.1987).................................................................................44

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*,
87 F.3d 1242 (11th Cir. 1996) ................................................................................33

*Public Citizen v. Dep't of State*,
276 F.3d 634 (D.C. Cir. 2002)................................................................................39

*Public Citizen, Inc. v. Nuclear Regulatory Comm'n*,
940 F.2d 679 (D.C. Cir. 1991)................................................................26, 29, 44, 45

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
324 F.3d 726 (D.C. Cir. 2003)..........................................................................16, 18

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976)...........................................................................................30, 31

*Sprint Corp. v. FCC*,
331 F.3d 952 (D.C. Cir. 2003)................................................................19, 20, 22, 24

*State Farm Mut. Auto. Ins. Co. v. Dole*,
802 F.2d 474 (D.C. Cir. 1986)................................................................20, 21, 23, 25

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998).................................................................................................11

*Summers v. Earth Island Inst.*,
129 S. Ct. 1142 (2009)..........................................................................................30

*Syncor Int'l Corp. v. Shalala*,
127 F.3d 90 (D.C. Cir. 1997)............................................................................34, 44

*Texas v. United States*,
523 U.S. 296 (1998)..........................................................................................20, 26

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967)................................................................................19, 20, 21, 23

*Warth v. Seldin*,
422 U.S. 490 (1975)..............................................................................................30

*Waste Mgmt., Inc. v. EPA*,
669 F. Supp. 536 (D.D.C. 1987).............................................................................39

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990).............................................................................................30

*Wilson v. Gov't of Dist. of Columbia,*
  Civ. No. 09-2258 (RBW), 2010 WL 3001716 (D.D.C. July 30, 2010)......................................11

**STATUTES**
Administrative Procedure Act,
5 U.S.C. § 551(6)-(7)..........................................................................................36

5 U.S.C. § 553 ...................................................................................................34

5 U.S.C. § 553(b)(3)(A) .......................................................................................38

5 U.S.C. § 701(a)(2).............................................................................................32

5 U.S.C. § 704 ...................................................................................................13

The Clean Water Act,
33 U.S.C. § 1251(a)..............................................................................................1

33 U.S.C. § 1311(a) .............................................................................................1

33 U.S.C. § 1311(b)(1)(C) .......................................................................................5

33 U.S.C. § 1313(a)-(c).........................................................................................5

33 U.S.C. § 1342 ................................................................................................4

33 U.S.C. § 1342(a).............................................................................................5

33 U.S.C. § 1342(b)-(c).........................................................................................4

33 U.S.C. § 1342(d).............................................................................................5

33 U.S.C. § 1342(d)(4)..........................................................................................6

33 U.S.C. § 1342(e)............................................................................................33

33 U.S.C. § 1344(a).............................................................................................2

33 U.S.C. § 1344(b).............................................................................................4

33 U.S.C. § 1344(b)(1) .........................................................................................2

33 U.S.C. § 1344(c).............................................................................................4

33 U.S.C. § 1344(q) ........................................................................................................3

33 U.S.C. § 1362(7) ........................................................................................................2

## RULES
Fed. R. Civ. P. 12(b)(1) ..............................................................................................1, 11

Fed, R. Civ. P. 12(b)(6) ..................................................................................................1

## CODE OF FEDERAL REGULATIONS
33 C.F.R. § 320.4(b)(4) ...................................................................................................3

33 C.F.R. pt. 325 .............................................................................................................2

33 C.F.R. § 325.2(a)(6) ...................................................................................................3

33 C.F.R. § 325.3(d) ........................................................................................................3

33 C.F.R. § 328.3(a)(1), (2), (5), (7) ..............................................................................2

40 C.F.R. § 122.44(d)(1) .................................................................................................5

40 C.F.R. § 122.44(d)(1)(v) ............................................................................................5

40 C.F.R. § 122.44(d)(1)(vi) ...........................................................................................5

40 C.F.R. § 122.44(k)(3) .................................................................................................5

40 C.F.R. § 123.44 ........................................................................................................5, 6

40 C.F.R. pt. 230 .............................................................................................................2

40 C.F.R. § 230.10(c)(1)-(3) ...........................................................................................3

40 C.F.R. pt. 231 ...........................................................................................................32

40 C.F.R. § 232.2 ............................................................................................................2

## FEDERAL REGISTER
75 Fed. Reg. 18,500 (Apr. 12, 2010) .................................................................10, 17, 41

**INTRODUCTION**

The United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers ("Corps") respectfully request that the Court dismiss the claims asserted by Plaintiff National Mining Association ("NMA") in this action.

The claims in this case arise from policy documents issued by EPA and the Corps in connection with their review of Clean Water Act ("CWA") permit applications associated with surface coal mining projects in Appalachia. As we demonstrate below, the Complaint must be dismissed because NMA has challenged non-binding agency policies that qualify neither as legislative rules nor "final agency action" under the Administrative Procedure Act ("APA"). NMA's generalized challenges to the agency policies must also be dismissed on ripeness grounds because the claims can only be determined in a more concrete setting. Furthermore, NMA lacks standing to challenge two of the policies because it has not identified an injury-in-fact caused by the policies. And finally, one of those two challenged policies is committed to agency discretion by law and, thus, is immune from review under the APA. For all these reasons, and as explained in detail below, EPA and the Corps respectfully request that the Court dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

**BACKGROUND**

## I.   STATUTORY AND REGULATORY BACKGROUND

### A.   The Clean Water Act

The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of pollutants from point sources into navigable waters unless consistent with the requirements of the Act. Id. § 1311(a). The CWA

defines "navigable waters" as "the waters of the United States, including the territorial seas."  33

U.S.C. § 1362(7).  "Waters of the United States" includes, among other things, all waters that are

currently used, were used in the past, or may be susceptible to use in interstate or foreign

commerce; tributaries of such waters; and wetlands adjacent to such waters.  33 C.F.R. §

328.3(a)(1), (2), (5), (7); 40 C.F.R. § 232.2.

     The CWA authorizes the discharge of pollutants into waters of the United States under

two permitting programs under Sections 404 and 402 of the Act.

## 1.     Section 404 Permits

     Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the

Chief of Engineers, to "issue permits . . . for the discharge of dredged or fill material into the

navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  By this authority, the Corps

regulates discharges of dredged and fill material associated with surface coal mining and

reclamation activities, such as the construction of valley fills, stream channel diversions,

sediment ponds, road crossings, and disposal of coal waste, into waters of the United States,

including primarily ephemeral and intermittent streams and some perennial streams.  See Ohio

Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 190-91 (4th Cir. 2009).  The Corps'

regulations set forth the requirements for Section 404 permit applications and the procedures for

the Corps' review of permit applications.  33 C.F.R. pt. 325.

     Although the Corps is the permitting authority under Section 404, EPA has an important

role in the permitting process.  Section 404(b) of the CWA requires that the Corps' permit

decisions must comply with guidelines developed by EPA.  33 U.S.C. § 1344(b)(1).  These

regulations, which are referred to as the "404(b)(1) Guidelines" and are codified at 40 C.F.R. pt.

230, provide that the Corps must ensure that the proposed fill will not cause significant adverse

effects on human health or welfare, aquatic life, and aquatic ecosystems.  40 C.F.R. §

230.10(c)(1)-(3).  EPA's 404(b)(1) Guidelines are incorporated in the Corps' regulations.  33

C.F.R. §§ 320.4(b)(4), 325.2(a)(6).

In addition, the Corps and EPA have entered into a Memorandum of Agreement

("MOA") (Ex. 1) pursuant to Section 404(q) of the CWA, 33 U.S.C. § 1344(q).  The MOA

expressly recognizes that "the EPA has an important role in the Department of the Army

Regulatory Program under the Clean Water Act[.]"  Id. at 1.  It further provides that "[p]ursuant

to its authority under Section 404(b)(1) of the Clean Water Act, the EPA may provide comments

to the Corps identifying its views regarding compliance with the Section 404(b)(1) Guidelines"

and "[t]he Corps will fully consider EPA's comments when determining [compliance] with the

National Environmental Policy Act, and other relevant statutes, regulations, and policies."  Id.

Although the Corps need not defer to EPA's comments, the Corps will "fully consider the EPA's

views when determining whether to issue the permit, to issue the permit with conditions and/or

mitigation, or to deny the permit."  Id.  The MOA also provides for an "elevation" procedure to

resolve certain differences that may arise between the agencies.  Id. at 4-7.

Corps regulations also require that before the Corps issues a CWA Section 404 permit, it

must provide public notice to EPA and other resource agencies, and those agencies may provide

comments for consideration by the Corps.  33 C.F.R. § 325.3(d).

Finally, although the final decision on any permit application rests with the Corps, that

decision is subject to the exercise of EPA's authority under Section 404(c) of the CWA, often

referred to as EPA's "veto" authority.  Section 404(c) provides:

> The [EPA] Administrator is authorized to prohibit the specification (including the
> withdrawal of specification) of any defined area as a disposal site, and he is
> authorized to deny or restrict the use of any defined area for specification
> (including the withdrawal of specification) as a disposal site, whenever he

determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.  Before making such determination, the [EPA] Administrator shall consult with the Secretary [of the Army].  The [EPA] Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

33 U.S.C. § 1344(c).  The "specification" of a disposal site refers to the process by which a disposal site is specified by a Section 404 permit.  See 33 U.S.C. § 1344(b) ("each such disposal site shall be specified for each such permit by the [Corps]").  Because Section 404(c) authorizes EPA to prohibit, withdraw, deny, or restrict the specification of such disposal sites that would otherwise be authorized by a Section 404 permit, EPA's authority under Section 404(c) is often designated as the authority to "veto" the permit.

> 2.    **Section 402 Permits**

Section 402 of the CWA governs discharges of pollutants other than dredged or fill material.  33 U.S.C. § 1342.  Section 402 permits are issued by EPA, unless the state has an approved program, in which case the state issues the permits, subject to EPA oversight.  See id. § 1342(b)-(c); see generally Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 650-51 (2007).  All of the Appalachian states relevant to this case (Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia) have approved programs and, thus, administer the Section 402 permitting programs within their states.

Permits issued under the authority of Section 402 are known as National Pollutant Discharge Elimination System ("NPDES") permits, and typically contain numerical limits called "effluent limitations" that restrict the amounts of specified pollutants that may be discharged.  NPDES permits must contain technology-based effluent limits, and more stringent water quality-

based effluent limits when necessary to meet state "water quality standards."[1] 33 U.S.C. §§ 1311(b)(1)(C), 1342(a); 40 C.F.R. § 122.44(d)(1).

State water quality standards may be expressed as numeric or narrative criteria.  Where necessary to ensure compliance with the state's narrative water criteria, an NPDES permit must contain effluent limits based on whole effluent toxicity and/or a chemical-specific numeric interpretation of the narrative criteria.  40 C.F.R. § 122.44(d)(1)(v) and (vi).  If it is infeasible to calculate a numeric effluent limit to implement a narrative water quality criterion, the NPDES permit must include best management practices to control or abate the discharge of pollutants. 40 C.F.R. § 122.44(k)(3).

In order to determine whether water quality-based effluent limits are necessary, the permitting authority is required to conduct a "reasonable potential analysis."  A reasonable potential analysis evaluates whether a discharge will cause, or has the reasonable potential to cause or contribute to, an excursion above a numeric or narrative water quality criterion.  The permit must include limitations for any pollutants for which there is a reasonable potential to exceed either numeric or narrative water quality criteria.  40 C.F.R. § 122.44(d)(1), (d)(1)(vi).

Because all of the states in the Appalachian region have been approved by EPA to implement the CWA Section 402 permitting program, NPDES permits are issued by the states, subject to EPA oversight.  EPA retains authority to review proposed state-issued permits and to object to the issuance of a permit. 33 U.S.C. § 1342(d); 40 C.F.R. § 123.44.  If the state does not adequately address EPA's objections, EPA may assume the authority to issue the permit.  33

---

[1]  Section 303 of the CWA requires States to adopt water quality standards applicable to its intrastate and interstate waters.  33 U.S.C. § 1313(a)-(c).  Water quality standards assist in maintaining the physical, chemical and biological integrity of a water body by designating its uses, setting criteria to protect those uses, and establishing provisions to protect water quality from degradation.  EPA reviews and approves state water quality standards to ensure their consistency with the CWA.  Id. § 1313(c).

U.S.C. § 1342(d)(4).  EPA's procedures for the review of state-issued permits are set forth in

regulations at 40 C.F.R. § 123.44.

## II.    FACTUAL BACKGROUND[2]

On June 11, 2009, EPA, the Corps, and the Department of the Interior entered into a

Memorandum of Understanding ("MOU") to establish an Interagency Action Plan on

Appalachian surface coal mining.[3]  In the MOU, the Corps and EPA agreed to strengthen and

coordinate review of CWA Section 404 permit applications to ensure compliance with the

Section 404(b)(1) Guidelines.  EPA also committed to strengthen its oversight and review of

Section 402 permits issued by states in connection with surface coal mining projects.  A copy of

the MOU is attached as Exhibit 2.

### A.    The "Enhanced Coordination" Process

One component of the Interagency Action Plan adopted by the Corps and EPA in the

MOU was an "enhanced coordination process" to facilitate the joint review of approximately 108

pending applications for CWA Section 404 permits in connection with surface coal mining

projects in Appalachia.  See "EPA/Corps of Engineers Enhanced Coordination Process for

Pending Clean Water Act Permits Involving Appalachian Surface Coal Mining" (June 11, 2009)

("EC Memo") (Ex. 3).  The process agreed upon by EPA and the Corps applies only to these 108

---

[2]  Solely for the purpose of this Motion to Dismiss, the United States assumes the truth of the facts alleged in the Complaint.

[3]  The MOU applies to surface coal mining activities generally, including a practice known as "mountaintop mining."  As the Fourth Circuit Court of Appeals has described it, "[t]he mountaintop removal method of surface coal mining, pioneered in West Virginia, involves the blasting of the soil and rock atop a mountain to expose coal deposits below."  Ohio Valley Envtl. Coal., 556 F.3d at 186. Excavated overburden, or "spoil," is then "hauled or pushed into adjacent valleys."  Id.  "Once the coal has been extracted, efforts are made to re-contour the mountaintop by replacing the removed overburden, but stability concerns limit the amount of spoil that can be returned to the area."  Id.  The spoil material in its "natural state . . . is heavily compacted," but once it has been excavated it swells.  Id.  "As a result, large quantities of the blasted material cannot be replaced, and this excess spoil . . . remains in the valley, creating a 'valley fill' that buries intermittent and perennial streams in the process."  Id.

permit applications.[4] As explained in the EC Memo, EPA and the Corps agreed to a two-step approach to expedite the review of these applications.  First, EPA would identify which of the pending applications raised environmental concerns and thus warranted further review and coordination.  Id. at 2.  The remaining applications would be processed by the Corps without further review by EPA.  Second, the EC Memo laid out a process for coordination between EPA and the Corps as they review the applications EPA identified.  Id. at 2-3.  For example, the Memo states that EPA and the Corps will complete their coordination within 60 days after the Corps determines that an application is ready for review.  Id. at 2.  It further provides for timely communication between the agencies after the close of the review period in the event that there are unresolved issues.  Id. at 2-3.

The EC Memo does not address the substantive criteria for review of the permit applications.  It merely establishes procedures designed to allow the agencies to work efficiently through the backlog of pending permit applications.  The EC Memo expressly provides that:

> This document does not, and is not intended to, impose any legally binding requirements on Federal agencies, States, or the regulated public, and does not restrict the authority of the employees of the signatory agencies to exercise their discretion in each case to make regulatory decisions based on their judgment about the specific facts and application of relevant statutes and regulations.

Id. at 3.

**B.      EPA's Multi-Criteria Integrated Resource Assessment ("MIRA")**

In accordance with the approach set forth in the EC Memo, EPA identified the "regulations and key factual considerations" that the Agency "intend[ed] to use to screen and evaluate the pending permit applications to determine which permit applications require further

---

[4]  Permit applications received after March 31, 2009, would be processed pursuant to the agencies' existing procedures.  EC Memo (Ex. 3) at 1.

coordination between EPA and the Corps." Letter from L. Jackson, EPA Adm'r, to T. Salt, Acting Ass't Sec'y of Civil Works (June 11, 2009) at 1-2 ("Jackson Letter") (Ex. 4). In particular, EPA identified provisions of the Section 404(b)(1) Guidelines and factual considerations that relate to those provisions. Id. at 1-2. Further, EPA explained that it "intend[ed] to utilize a database containing information on each of the pending permit applications" in order "[t]o expedite this process and assist in making EPA's decisions efficient, consistent, and transparent[.]" Id. at 2. The database EPA employed was the key component in a process known as the Multi-Criteria Integrated Resource Assessment ("MIRA").

MIRA is a tool EPA developed to assist in the organization and analysis of a broad array of scientific and technical information in various regulatory contexts. See Multi-criteria Integrated Resource Assessment Questions and Answers, at 1 (Ex. 5). With respect to the 108 pending permit applications at issue here, EPA used MIRA to organize an extensive set of technical data relevant to the considerations under the Section 404(b)(1) Guidelines. Id. Use of MIRA in this fashion "allow[ed] decision makers from three EPA [regional offices] to review, discuss and reach consistency and consensus using a common set of data for discussion and analysis." Id. The relevant data inputs were obtained from a variety of sources, including the Section 404 permit applications, surface mining permit applications, and other data available from public sources. Id. The permit applicants had the opportunity to confirm or correct certain categories of data, and many took advantage of that opportunity. Id.

MIRA did not create a new standard or compel any particular outcome, nor was it used as a substitute for the Section 404(b)(1) Guidelines. Id. at 2. Instead, MIRA allowed EPA officials to consider the available data in various combinations, identify potential areas of concern, and consider the proposed projects in the context of the Guidelines. Id. at 1. After considering the

data and performing additional analysis – including consultations with other federal agencies –

EPA officials determined which permit applications would be subject to the enhanced

coordination procedures.  Id.; "Appalachian Surface Coal Mining Initial List Resulting from

Enhanced Coordination Procedures" (Sept. 11, 2009) ("Initial ECP List Fact Sheet") at 1 (Ex. 6).

On September 11, 2009, EPA published on its web site for a 14-day public review period

the initial list of 79 permit applications that the Agency had determined should be subject to

enhanced coordination.  Id. at 1-2; Compl. ¶ 64.  By letter dated September 30, 2009, EPA

advised the Corps of its view that all 79 permit applications raised environmental concerns and

should be subject to the procedures in the EC Memo.  See Letter from P. Silva, EPA Ass't

Adm'r, to J. Darcy, Ass't Sec'y of the Army (Sept. 30, 2009) (Ex. 7); Compl. ¶ 65.

## C.     EPA's Detailed Guidance

EPA issued interim guidance on April 1, 2010, to provide clarification of EPA's role and

expectations, in coordinating with other federal agencies and with states, with regard to

environmental review of Appalachian surface coal mining operations under the CWA and other

authorities.  See "Detailed Guidance: Improving EPA Review of Appalachian Surface Coal

Mining Operations under the Clean Water Act, National Environmental Policy Act, and the

Environmental Justice Executive Order" (Apr. 1, 2010) ("Detailed Guidance") (Ex. 8).  The

Detailed Guidance does not establish any new standards or requirements, but rather explains how

EPA intends to apply its existing legal authorities in its review of CWA Section 402 and 404

permit applications associated with surface coal mining operations in Appalachia.  As EPA

emphasized in the Guidance:

> The CWA and NEPA provisions and regulations described in this document
> contain legally binding requirements.  This guidance does not substitute for those
> provisions or regulations, nor is it a regulation itself.  It does not impose legally
> binding requirements on EPA, the U.S. Army Corps of Engineers (Corps), the

States, or the regulated community, and may not apply to a particular situation depending on the circumstances.  Any decisions regarding a particular permit will be based on the applicable statutes, regulations, case-specific facts and circumstances, and case law.  Therefore, interested persons are free to raise questions about the appropriateness of the application of this guidance to a particular situation, and EPA and/or the Corps will consider whether or not the recommendations or interpretation of this guidance are appropriate in that situation based on the statues, regulations, and case law.

Detailed Guidance (Ex. 8) at 2 n.3.

Among other things, the Guidance identifies several areas of concern that EPA's regional offices "should evaluate" when reviewing state-issued Section 402 permits associated with surface coal mining projects.  Id. at 8-15.  For example, EPA explained its view that a recent EPA report, which indicates adverse environmental impacts associated with stream "conductivity" levels, "should be considered by Appalachian states as relevant information" under EPA's regulations when states set effluent limits in permits.  Id. at 12.  The Guidance also sets forth recommendations for strengthening EPA's environmental review of Section 404 permits issued by the Corps.  Id. at 16-28.  For example, the Guidance identifies types of data EPA's regional offices "should evaluate" for Section 404 permits, and sets forth "EPA's expectations" for the types of analyses necessary to achieve compliance with the Section 404(b)(1) Guidelines.  Id. at 19-20.

In light of emerging science on water quality, and in recognition of "the importance of this guidance to [EPA's] Federal and state partners, to the regulated community, and to the public," EPA issued the document as "interim" guidance, published it in the Federal Register, and solicited public comment until December 2010.  75 Fed. Reg. 18,500 (Apr. 12, 2010); Detailed Guidance (Ex. 8) at 1 n.1.  EPA expects to issue final guidance no later than April 1, 2011.  Detailed Guidance (Ex. 8) at 1 n.1.

**STANDARD OF REVIEW**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the court must determine whether the complaint sets forth allegations sufficient to establish the court's jurisdiction over the subject matter of the claims for relief.  Because the plaintiff has the burden of establishing the court's jurisdiction, the factual allegations in the complaint "'will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'" Wilson v. Gov't of Dist. of Columbia, Civ. No. 09-2258 (RBW), 2010 WL 3001716, at *2 (D.D.C. July 30, 2010) (citation omitted).  Furthermore, to determine whether jurisdiction is present, the court may consider materials outside of the pleadings.  Id.; see also Erby v. United States, 424 F. Supp. 2d 180, 182-83 (D.D.C. 2006).  Where subject matter jurisdiction does not exist, "'the court cannot proceed at all in any cause.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (citation omitted).

Fed, R. Civ. P. 12(b)(6) authorizes courts to dismiss claims based on dispositive issues of law.  Neitzke v. Williams, 490 U.S. 319, 326 (1989).  The court should grant a Rule 12(b)(6) motion if the plaintiff has failed to meet its obligation "to provide the 'grounds' of its 'entitle[ment] to relief.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.  To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).

**ARGUMENT**

NMA's challenges to MIRA, the EC Memo, and the Detailed Guidance must be dismissed.  The critical flaw in this suit is that the actions NMA has challenged are non-binding

agency policies.  Because MIRA, the EC Memo and the Detailed Guidance were non-binding

policy statements, not only were they exempt from the notice and comment requirements of the

APA, see Part V infra, but they also fail to qualify as "final agency action" subject to APA

review.  The policies do not alter the statutory and regulatory criteria that apply to CWA permit

applicants; thus, they do not create rights or obligations or fix legal relationships.  Furthermore,

because the policies represent only preliminary steps in the CWA permitting process, they do not

mark the consummation of that process.  Accordingly, NMA has not identified a "final agency

action" subject to APA review and the Complaint must be dismissed.  See Part I infra.

The claims raised by NMA are also not ripe for review.  NMA's challenges to the agency

policies are not fit for review at this time because EPA and the Corps have significant discretion

in implementing the policies; thus, NMA's claims that the policies violate the CWA or other

statutes cannot reasonably be evaluated absent a concrete example of where the policies have

been applied in the course of a specific permitting action.  Because NMA cannot point to any

substantial hardship that would result from deferring judicial review, its claims must be

dismissed as unripe.  See Part II infra.

Furthermore, NMA lacks standing to challenge MIRA and the EC Memo because NMA

cannot identify any concrete harm caused by these policies.  Although NMA contends that the

policies have resulted in permitting delays, NMA cannot establish beyond speculation that the

relevant permit applications would have been processed any more quickly absent the procedures

in the EC Memo.  Indeed, the prime example of delay identified by NMA involves a company

whose permit applications were not even subject to the challenged procedures.  See Part III infra.

Finally, even if NMA's challenge to MIRA were not barred for the reasons above, review under the APA would still not be available because EPA's decision to use MIRA was an action committed to agency discretion by law.  See Part IV infra.  The Complaint must be dismissed.

## I.   NMA HAS NOT IDENTIFIED A FINAL AGENCY ACTION TAKEN BY EPA OR THE CORPS

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; see Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61-62 (2004).  Because the absence of "final agency action" in an APA suit results in a failure to state a claim, see Center for Auto. Safety v. NHTSA, 452 F.3d 798, 811 (D.C. Cir. 2006), the existence of finality is a "threshold question[]" that determines whether judicial review is available, Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 18 (D.C. Cir. 2006).  The Supreme Court has explained that two conditions must be satisfied for agency action to be "final."  "First, the action must mark the 'consummation' of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation omitted).  Second, the agency action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Id. at 178 (citation omitted).

Here, none of the challenged EPA and Corps qualifies as "final agency action" within the meaning of the APA.  The Complaint must therefore be dismissed.

### A.   EPA's Use of MIRA Did Not Constitute Final Agency Action.

NMA contends that EPA's use of the Multi-criteria Integrated Resource Assessment ("MIRA") created a legislative rule and was contrary to the CWA.[5]  These claims must be

---

[5]  Although NMA suggests that its challenge to MIRA is based on the Jackson Letter (Ex. 4), see Compl. ¶ 2, that letter does not refer specifically to MIRA.  It states only that EPA "intend[ed] to utilize a *(. . . continued)*

dismissed for lack of finality.  As described above, EPA employed MIRA in the process of

determining which of the 108 pending Section 404 permit applications would be subject to the

procedures described in the EC Memo.  In other words, EPA used MIRA as a tool to screen

permit applications, which was only the first of several steps in the broader statutory decision-

making process at issue here, i.e., the review of CWA Section 404 permit applications.  EPA's

screening activity did not mark the consummation of that decision-making process.  See FTC v.

Standard Oil Co. of Cal., 449 U.S. 232, 242, 244 (1980) (issuance of administrative complaint is

not final agency action because it merely initiates administrative enforcement proceeding);

Chemical Mfrs. Ass'n v. EPA, 26 F. Supp. 2d 180, 183-85 (D.D.C. 1998) (agency settlement

policy was not consummation of decision-making process because it merely served as a guide to

future proceedings).

Nor did EPA's screening process determine rights or obligations or give rise to legal

consequences, as is required for finality under Bennett.  The screening process did not grant,

deny, or veto any permits.  The only consequence of the screening process was to identify permit

applications that would be subject to the procedures in the EC Memo.  Those procedures do not,

however, impose any additional legal requirements on permit applicants, nor do they alter the

statutory and regulatory standards for obtaining a permit.  EC Memo (Ex. 3) at 3 (the Memo

"does not, and is not intended to, impose any legally binding requirements on Federal agencies,

States, or the regulated public"); see also Part V.A infra.  The rights and obligations of the permit

applicants are only determined when the Corps grants or denies, or EPA "vetoes," a permit.  See

DRG Funding Corp. v. Sec'y of Housing & Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996)

---

database containing information on each of the pending permit applications" in screening permit
applications.  Jackson Letter (Ex. 4) at 2.  Because the counts in the Complaint are directed at MIRA, our
arguments herein are directed at NMA's challenge to EPA's use of MIRA.

(agency action not final where it "does not itself adversely affect [the plaintiff] but only affects [its] rights adversely on the contingency of future administrative action") (citation omitted).

Moreover, although being subject to the EC Process may have practical consequences (e.g., different timeframes for coordination between EPA and the Corps), those consequences do not affect the finality analysis.  "It is firmly established that agency action is not final merely because it has the effect of requiring a party to participate in an agency proceeding." Aluminum Co. of Am. v. United States, 790 F.2d 938, 941 (D.C. Cir. 1986); see Standard Oil Co. of Cal., 449 U.S. at 242.  Because EPA's use of MIRA in the process of screening applications did not result in "a certain change in the legal obligations" of the permit applicants, EPA's "action is non-final for the purpose of judicial review." Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005).

**B.      The EC Memo Is Not Final Agency Action.**

NMA's challenges to the EC Memo must also be dismissed because the issuance of the EC Memo by EPA and the Corps was not final agency action.[6]  First, issuance of the EC Memo does not mark the consummation of the process for rendering decisions on CWA permit applications.  See Chemical Mfrs. Ass'n, 26 F. Supp. 2d at 183 n.2 ("the relevant question is not whether the action concludes a decisionmaking process – such as what a policy published in the Federal Register is to contain – but whether the action concludes the decisionmaking process – that is, a broader process that impacts individual parties and their rights and obligations.") (emphasis in original).  Instead, it merely announces in a preliminary fashion the manner by

---

[6]  Counts I, IV, X, and XI all state that NMA is challenging the "EC Process," which NMA confusingly defines as including both the Jackson Letter (Ex. 4) and the EC Memo (Ex. 3). See Compl. ¶ 2.  The actual process for enhanced coordination between EPA and the Corps is set forth in the EC Memo, and so we focus our arguments on NMA's challenge to the EC Memo.

which EPA and the Corps intend to coordinate in that process for the 108 permit applications that were pending before the Corps.

Second, the EC Memo does not determine any rights, create any legal obligations, or fix any legal relationships.  See Bennett, 520 U.S. at 178; Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n, 324 F.3d 726, 731 (D.C. Cir. 2003).  The EC Memo itself states explicitly that it "does not constitute final agency action on any issue" and "does not, and is not intended to, impose any legally binding requirements on Federal agencies, States, or the regulated public[.]"  EC Memo (Ex. 3) at 3; see Nat'l Ass'n of Home Builders, 415 F.3d at 14 (an agency's characterization of its own action "is entitled to respect in a finality analysis").  Indeed, the EC Memo does not change the legal standards for approval or denial of permits, nor does it impose any obligations on permit applicants beyond what the CWA and implementing regulations require.  Thus, the EC Memo does not create a "certain change in the legal obligations" of the permit applicants, id. at 15, and it does not qualify as final agency action.

In addition, although the EC Memo sets forth certain coordination procedures EPA and the Corps plan to employ during the permit review process, it also reserves significant flexibility and discretion to the agencies.  EPA and the Corps state in the Memo that they "will work to adhere" to the Memo's time frames and procedures "to the maximum practical extent," while at the same time recognizing that "flexibility may be needed under particular circumstances."  EC Memo (Ex. 3) at 3.  The Memo also emphasizes that it is not "binding" and "does not restrict the authority of the employees of [EPA and the Corps] to exercise their discretion in each case to make regulatory decisions based on their judgment about the specific facts and application of relevant statutes and regulations."  Id.  In light of the above, the EC Memo does not represent an agency action "by which 'rights or obligations have been determined,' or from which 'legal

consequences will flow.'"  Bennett, 520 U.S. at 178 (citation omitted); see Part V.B infra.  It

follows that the EC Memo is not "final agency action" and NMA's challenge to the EC Memo

must be dismissed.

### C.       EPA's Detailed Guidance Is Not Final Agency Action.

NMA's challenge to EPA's Detailed Guidance must also be dismissed for lack of finality.

First, EPA's adoption of the Detailed Guidance does not even mark the consummation of EPA's

work on the Guidance itself because the Guidance is an "interim final document."  Detailed

Guidance (Ex. 8) at 1 n.1.  EPA published notice of the Guidance in the Federal Register and is

soliciting public comment until December 1, 2010.  Id.; see 75 Fed. Reg. at 18,500.  "No later

than April 1, 2011, EPA will issue final guidance after consideration of public comments and the

results of the Science Advisory Board (SAB) review, and consistent with our experience in

implementation of this memorandum."  Detailed Guidance (Ex. 8) at 1 n.1.  Because EPA's

Detailed Guidance is an interim document, it is tentative and interlocutory and, thus, does not

mark the consummation of any EPA decision-making process.  See Gem County Mosquito

Abatement Dist. v. EPA, 398 F. Supp. 2d 1, 11-12 (D.D.C. 2005) (rejecting APA challenge to an

EPA interim guidance document because the guidance document was "interlocutory").

Second, as with the MIRA process and the EC Memo, the Detailed Guidance does not

mark the consummation of the relevant decision-making process here, i.e., the review of permit

applications pursuant to the CWA.[7]  That process consummates in final agency action only when

a permit is issued, denied, or vetoed.  The Detailed Guidance, far from representing the

consummation of the permitting process, is merely EPA's prospective statement as to how it may

---

[7]  In contrast to MIRA and the EC Memo, which apply only to the 108 pending applications for CWA
Section 404 permits, the Detailed Guidance covers both Section 402 and Section 404 permits associated
with surface mining projects in Appalachia.

exercise its discretion during the consideration of CWA Section 402 and 404 permit applications associated with surface coal mining projects in Appalachia.  Accordingly, the Detailed Guidance is only a prelude to future EPA involvement in the permitting process and does not represent the consummation of that process.  See DRG Funding Corp., 76 F.3d at 1214 (agency action not final where it "does not itself adversely affect [the plaintiffs] but only affects [their] rights adversely on the contingency of future administrative action") (citation omitted); Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1419-21 (D.C. Cir. 1998) (EPA policy statements not final where petitioner would only be affected by enforcement action based on such policies).

NMA's challenge to the Detailed Guidance also fails to meet the second prong of the finality test because the Guidance does not determine any rights, create any legal obligations, or fix any legal relationships.  See Reliable Automatic Sprinkler, 324 F.3d at 731; Part V.C infra. The Detailed Guidance explains EPA's view of the Agency's role in the CWA permitting process, provides an indication of how EPA intends to exercise its discretion during the process, and advises the public as to what EPA believes is required for permits to comply with the CWA. See, e.g., Detailed Guidance (Ex. 8) at 1, 11, 14-15, 18.  The Guidance does not, however, establish any new standards that supplement or amend the existing statutory and regulatory requirements.  Indeed, the document states in plain terms that it "does not impose legally binding requirements on EPA, the [Corps], the States, or the regulated community" and "does not substitute" for the statutes and regulations described in the document.  Id. at 2 n.3.  Instead, the Guidance makes clear that decisions about any permit "will be based on the applicable statutes, regulations, case-specific facts and circumstances, and case law[.]"  Id.  It follows that the Detailed Guidance does not result in "a certain change in the legal obligations" of NMA's members and, thus, it is "non-final for the purpose of judicial review."  Nat'l Ass'n of Home

Builders, 415 F.3d at 15; see Center for Auto. Safety v. NHTSA, 452 F.3d 798, 808 (D.C. Cir. 2006) (judicial review unavailable "'where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'") (citation omitted).  NMA's challenges to the Detailed Guidance must therefore be dismissed.

## II.      NMA'S CLAIMS ARE NOT RIPE FOR REVIEW

"Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review." Munsell v. Dep't of Agric., 509 F.3d 572, 585 (D.C. Cir. 2007) (citing Toilet Goods Ass'n v. Gardner, 387 U.S. 158 (1967)).  The purpose of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs v. Gardner, 387 U.S. 136, 148-49 (1967).  In applying the ripeness doctrine, courts consider two basic factors:  "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." Id. at 149; accord Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998).

Under the fitness prong of the ripeness test, courts consider "whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position[.]" Action Alliance of Senior Citizens of Greater Phila. v. Heckler, 789 F.2d 931, 940 (D.C. Cir. 1986).  The existence of "final agency action" is "'a crucial prerequisit[e]' to ripeness[.]" Sprint Corp. v. FCC, 331 F.3d 952, 956 (D.C. Cir. 2003) (citation omitted).  But even where there is final agency action and the challenge raises issues of law, the dispute "still

may not be fit for review where the agency retains considerable discretion to apply the new rule

on a case-by-case basis, particularly where there is a complex statutory scheme[.]"  Id.  In such

cases, judicial review "is likely to stand on a much surer footing in the context of a specific

application" of the agency's policy than it would "in the framework of [a] generalized

challenge."  Toilet Goods Ass'n, 387 U.S. at 164.

Under the hardship prong, courts consider the detriment to the parties from deferring

judicial review.  Where the court or the agency has an institutional interest in deferral, that

interest will only be outweighed if deferral would "impose a hardship on the complaining party

that is immediate, direct, and significant."  State Farm Mut. Auto. Ins. Co. v. Dole, 802 F.2d 474,

479-80 (D.C. Cir. 1986).  Such hardship must consist of "'adverse effects of a strictly legal

kind[.]'"  Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 809 (2003) (quoting

Ohio Forestry Ass'n, 523 U.S. at 733).  Sufficient hardship is not present when a complaining

party "is not required to engage in, or to refrain from, any conduct," Texas v. United States, 523

U.S. 296, 301 (1998), nor is hardship present when a party faces "mere uncertainty as to the

validity of a legal rule[.]"  Nat'l Park Hospitality Ass'n, 538 U.S. at 811.

As we demonstrate below, NMA's challenges to MIRA, the EC Memo, and the Detailed

Guidance are not ripe and must be dismissed.

A.   **NMA's Challenge to MIRA is Not Ripe.**

The Court should dismiss NMA's challenge to MIRA because it is neither fit for review,

nor would deferring review pose any hardship to NMA.  As we demonstrated in Part I.A supra,

EPA's use of MIRA as a tool in the screening of permit applications is not "final agency action,"

which is "'a crucial prerequisit[e]' to ripeness."  Sprint Corp., 331 F.3d at 956 (citation omitted).

Therefore, judicial review is not appropriate at this time.  Furthermore, review of the MIRA

process outside the context of a specific permitting decision would entangle the court in abstract considerations about how EPA chooses to apply its resources, expertise, and discretion in deciding which permit applications deserve additional agency scrutiny – precisely the sort of entanglement in "abstract disagreements over administrative policies" and judicial interference in agency policymaking, that the ripeness doctrine is designed to avoid.  Abbott Labs, 387 U.S. at 148-49.  NMA's challenge is not fit for review now.

Nor would deferring review subject NMA to a hardship "that is immediate, direct, and significant."  State Farm, 802 F.2d at 479-80.  Critically, EPA's use of MIRA required nothing of NMA's members.  As with the regulation found to be unripe in Nat'l Park Hospitality Ass'n, EPA's use of MIRA in the screening process "'do[es] not command anyone to do anything or to refrain from doing anything; [it] do[es] not grant, withhold, or modify any formal legal license, power, or authority; [it] do[es] not subject anyone to any civil or criminal liability; [and it] create[s] no legal rights or obligations.'"  538 U.S. at 809 (citation omitted).  The only effect of EPA's screening process was that certain permit applications became subject to the review procedures in the EC Memo, which is not the type of adverse effect that can create ripeness.  See Nevada v. Dep't of Energy, 457 F.3d 78, 85-86 (D.C. Cir. 2006); Florida Power & Light Co., 145 F.3d at 1421 ("the burden of participating in further administrative and judicial proceedings" is not sufficient hardship).  In sum, NMA will face "no irremediable adverse consequences . . . from requiring a later challenge" to MIRA.  Toilet Goods Ass'n, 387 U.S. at 164.  NMA's claims based on MIRA must therefore be dismissed as unripe.[8]

---

[8]  Our ripeness arguments apply not only to NMA's substantive challenges to MIRA, but also to its procedural challenge in Count II.  As discussed in Part II.C infra, a petitioner can, in limited circumstances, avoid the inherent ripeness problems of a pre-enforcement challenge by asserting a facial procedural challenge to an agency statement or guidance document.  See Cement Kiln Recycling Coal. v. EPA, 493 F.3d 207, 226 (D.C. Cir. 2007).  However, Count II of NMA's Complaint does not permit such
*(. . . continued)*

B.    **NMA's Challenges to the EC Memo Are Not Ripe.**

NMA's challenges to the EC Memo are also unripe and should be dismissed.  The claims asserted by NMA meet none of the prerequisites to qualify as fit for review.  As demonstrated in Part I.B supra, the EC Memo is not final agency action; thus, it is not fit for review at this time.  See Sprint Corp., 331 F.3d at 956.

In addition, although NMA's challenge may raise legal issues, such issues are not fit for review where, as here, "the agency retains considerable discretion to apply [its policy] on a case-by-case basis[,]" id., and "further administrative action is needed to clarify the agency's position" because it is "unclear . . . how the agency will employ" its discretionary policy, Action Alliance, 789 F.2d at 940.  Here, the challenged EC Memo states that it is not binding.  EC Memo (Ex. 3) at 3.  EPA and the Corps retain the discretion to vary from the procedures in the EC Memo in any given case, id., and the agencies' methods in applying the EC Memo largely remain to be seen, see Compl. ¶ 66 (as of July 19, 2010, only seven of 79 permit applications were under review or had completed the process).  NMA contends that EPA has "supplant[ed]" the Corps in the permitting process and that the EC Process has caused detrimental delays, see Compl. ¶¶ 103-04, but those claims cannot be resolved in the abstract because they depend entirely on how the agencies employ their discretion in implementing the EC Memo.  Outside the context of a final and discrete permitting decision where the EC Memo has been adversely applied to the permit applicant, any challenge to the EC Memo is not ripe.  See Action Alliance, 789 F.2d at 941 (challenge is not ripe where a court would need to conclude that the agency

---

a facial challenge because NMA has not identified any EPA document pertaining to MIRA that could be assessed on its face.  Instead, the sole document NMA has identified in this regard is the Jackson Letter (Ex. 4), which does not even mention MIRA, but instead merely states that EPA "intend[ed] to utilize a database containing information on each of the pending permit applications."  Id. at 2.  That statement did not even commit EPA to any particular course of action, much less create a binding legislative rule.

action "stands in conflict with the statute regardless of how the agency exercises its discretion");

Center for Science in the Pub. Interest v. FDA, No. Civ.A.03-1962 RBW, 2004 WL 2011467, at

*3-5 (D.D.C. Aug. 6, 2004) (non-final, non-binding agency policy statement was not fit for

review until it was applied in a concrete setting).

Furthermore, NMA cannot point to any "immediate, direct, and significant" hardship,

State Farm, 802 F.2d at 479-80, that would warrant judicial review at this juncture.  The EC

Memo simply sets forth the procedures and timing for coordination between EPA and the Corps

as the agencies review the subject permit applications.  It does not require anything of permit

applicants beyond what is required by the CWA and the agencies' regulations, and EPA and the

Corps retain discretion to vary from the process in any given case.  See EC Memo (Ex. 3) at 3.

As such, the EC Memo "'do[es] not command anyone to do anything or to refrain from doing

anything; [it] do[es] not grant, withhold, or modify any formal legal license, power, or authority;

[it] do[es] not subject anyone to any civil or criminal liability; [and it] create[s] no legal rights or

obligations.'"  Nat'l Park Hospitality Ass'n, 538 U.S. at 809 (citation omitted).  Although

postponement of a decision on NMA's claims will require NMA's members to challenge the EC

Memo and its application in the context of a specific permitting decision, that effect is not

sufficient hardship to create ripeness.  See Florida Power & Light, 145 F.3d at 1421.  In sum,

NMA will face "no irremediable adverse consequences . . . from requiring a later challenge,"

Toilet Goods Ass'n, 387 U.S. at 164, and its claims must be dismissed as unripe.[9]

---

[9]   Our ripeness arguments apply not only to NMA's substantive challenges to the EC Memo, but also to
its procedural challenge in Count I.  If NMA contends that the EC Memo is a legislative rule because it is
binding on its face, see Cement Kiln Recycling Coal., 493 F.3d at 226, then NMA's claim must be
dismissed because, as we describe in Part V.B infra, a plain reading of the document demonstrates it is
not binding.  However, if NMA contends that EPA has implemented the EC Memo in a binding manner,
then its claim is not ripe for the reasons set forth above.

C.     **NMA's Challenges to EPA's Detailed Guidance Are Not Ripe.**

NMA challenges the Detailed Guidance on procedural grounds, arguing that the Detailed

Guidance is a de facto legislative rule improperly promulgated without notice and comment, and

on the merits, arguing that the Guidance is arbitrary and capricious or contrary to the CWA and

other statutes.  As we establish below, neither type of claim is ripe for review.

1.     **NMA's Merits-Based Challenges to the Detailed Guidance Are Not Ripe for Review.**

NMA's challenges to the merits of the Detailed Guidance are not fit for review.  First, as

we established in Part I.C supra, the Detailed Guidance is not "final agency action" and thus is

unfit for review at this time.  See Sprint Corp., 331 F.3d at 956.

Second, although NMA's challenge may appear to raise legal issues, those issues are not

fit for review because they cannot be determined outside of a concrete scenario where EPA has

exercised its discretion in applying the Detailed Guidance to a specific case.  See Action

Alliance, 789 F.2d at 940.  The Detailed Guidance concerns EPA's role in overseeing the Section

402 permitting program and in exercising its authority under Section 404 of the CWA, which are

both areas where EPA has broad discretion.  See Dist. of Columbia v. Schramm, 631 F.2d 854,

860 (D.C. Cir. 1980).  Because that discretion is expressly retained in the Detailed Guidance, and

it is unclear how EPA will exercise that discretion in a given case, NMA's claims are not fit for

review at this time.  See Action Alliance, 789 F.2d at 940.

For example, NMA alleges that EPA "direct[ed]" its regional offices to object to Section

402 permits that fail to meet the 300-500 µS/cm conductivity levels described in the Guidance,

thereby creating a de facto water quality standard that is contrary to the CWA.  Compl. ¶¶ 112-

13.  This allegation, however, ignores the plain terms of the Detailed Guidance, which preserves

EPA's statutory discretion not to object to a permit in these circumstances.  See Detailed

Guidance (Ex. 8) at 13 ("EPA may object to the permit"), 15 ("Regions should consider objecting to permits").  Thus, absent further action by EPA in the context of a concrete permitting decision, NMA's claims involve no more than "abstract disagreements over administrative policies," Abbott Labs, 387 U.S. at 148-49, that the ripeness doctrine is designed to avoid.  NMA's challenge to the Detailed Guidance is thus not fit for review at this time.

Third, EPA has a significant institutional interest in refining its policies through implementation of the Detailed Guidance.  See Ohio Forestry Ass'n., 523 U.S. at 733-34.  The approach set forth in the Guidance is based on emerging science and recent regulatory reviews that identified areas where the permitting process could be more efficient and effective.  Detailed Guidance (Ex. 8) at 5-6.  As the science develops and permitting approaches are tested in the field, EPA should be allowed the latitude to refine its methods without premature judicial interference.  Indeed, EPA's interest in this regard is demonstrated by the fact that EPA designated the Detailed Guidance as "interim" and solicited comments from the regulated community and the public about EPA's implementation of the new policy.  See id. at 1 n.1.  For all these reasons, judicial review at this juncture would be premature.

In contrast to these weighty institutional interests in postponing review of the Detailed Guidance, NMA cannot point to a hardship "that is immediate, direct, and significant."  State Farm, 802 F.2d at 479-80.  The Detailed Guidance "'do[es] not command anyone to do anything or to refrain from doing anything; [it] do[es] not grant, withhold, or modify any formal legal license, power, or authority; [it] do[es] not subject anyone to any civil or criminal liability; [and it] create[s] no legal rights or obligations.'"  Nat'l Park Hospitality Ass'n, 538 U.S. at 809 (citation omitted).  NMA's members are not forced to choose between immediate compliance and the risk of penalties in an enforcement proceeding.  Cf. Abbott Labs, 387 U.S. at 152-53.

- 25 -

Instead, they can continue to apply for permits and then seek judicial review in the event that a permit is denied, vetoed, or issued with conditions they find objectionable. Neither the requirement to participate in future proceedings, nor any legal uncertainty that may attach to the Detailed Guidance, is sufficient hardship to render NMA's challenge ripe.[10] See Nat'l Park Hospitality Ass'n, 538 U.S. at 811; Florida Power & Light, 145 F.3d at 1421. NMA's challenges to the Detailed Guidance must be dismissed.

### 2.    NMA's Procedural Challenge to the Detailed Guidance Is Not Ripe.

NMA's claim that the Detailed Guidance is a "legislative rule" is also not ripe. Such a claim is fit for review only when the agency document "'on its face . . . purports to bind both applicants and the Agency with the force of law[.]'" Cement Kiln Recycling Coalition v. EPA, 493 F.3d 207, 216 (D.C. Cir. 2007) ("CKRC") (emphasis added; citation omitted). However, such a claim is not fit for review when "the agency's practical application of [the document] would be important[.]" Id. (quoting Pub. Citizen, Inc. v. Nuclear Regulatory Comm'n, 940 F.2d 679, 683 (D.C. Cir. 1991)); see also Municipality of Anchorage v. United States, 980 F.2d 1320, 1324 (9th Cir. 1992) (challenge to Corps-EPA memorandum of agreement was unripe where it was unclear from the face of the document that the agencies intended to be bound by it).

_____

[10] In its brief supporting its motion for a preliminary injunction, NMA contends that the Detailed Guidance has led to permitting delays that threaten irreversible damage to its small business members. NMA Mem. in Supp. of Mot. for P.I. [Dkt. 10-3] ("NMA PI Br.") at 36-37. As its sole support for these assertions, NMA points to a declaration that discusses the situation of a coal company in Alabama that claims it will be out of business within 18 months without CWA permits needed to expand its operations. Id. (citing Ex. 4 to that brief). As an initial matter, the supposed link between this company and the Detailed Guidance is questionable from the outset because the Guidance specifies that it applies in six Appalachian states – a list that does not include Alabama. Detailed Guidance (Ex. 8) at 2 n.4. In any event, there is no allegation that the company's permits have been denied, nor is there any reason beyond speculation to believe that the company will not receive a final permit decision within the next 18 months. In the end, the key point is that the Detailed Guidance – which does not even apply in Alabama – does not require the coal company "to engage in, or to refrain from, any conduct," Texas, 523 U.S. at 301, and thus there is insufficient hardship to create ripeness here.

If NMA "disclaims any intent to rely on how the guidance has been or will be applied to particular" permit applications, CKRC, 493 F.3d at 216, and limits its claim to the argument that the Detailed Guidance, on its face, purports to bind EPA and permit applicants with the force of law, then that claim must be rejected for the reasons set forth in Part V.C infra.  As we explain there, and as is clear from a cursory review of the Detailed Guidance, nothing on the face of the document suggests that it is binding.

On the other hand, if NMA intends to show that EPA is applying the Guidance as though it were binding, then NMA's claim is not ripe.  The claim is not fit for review because the Detailed Guidance is not final agency action.  See Part I.C supra.  Furthermore, NMA cannot establish that EPA has in fact applied the Guidance as binding.  Indeed, NMA has not identified a single instance where a permit was denied or vetoed because EPA applied the Detailed Guidance in a binding fashion.  Instead, NMA draws on anecdotal evidence concerning a handful of the many permits that have come to EPA for review since the issuance of the Detailed Guidance – evidence largely related to permits in Alabama, which is not one of the Appalachian states covered by the Guidance – to assert that EPA is imposing the conductivity levels discussed in the Detailed Guidance (300-500 µS/cm) as though they were a binding water quality standard. NMA PI Br. at 20-21.  But even if NMA's assertion were based in fact,[11] the tiny sample size it

---

[11] See NMA PI Br. at 21.  Insofar as NMA is claiming that EPA is applying the Guidance in a binding fashion, that claim goes well beyond the statements in the declarations.  For example, the R. Johnson Declaration does not state that EPA required the Corps to impose a conductivity standard, but instead states that "EPA asked the Corps to include conductivity monitoring[.]"  NMA PI Br. Ex. 4 ¶ 14.  The Wells Declaration states only that a conductivity limit in a Corps permit authorization was "based on comments made by USEPA[.]"  Id. Ex. 9 ¶ 24.  The Dr. Johnson Declaration references a letter where EPA explained to the Corps that the applicant agreed to perform conductivity monitoring and EPA "request[ed] that this be made a condition of the Section 404 permit."  Id. Ex. 10 att. B.  Finally, the EPA letter cited by NMA does not "require" any conductivity limit; rather, the letter is EPA's recommendation to the Corps and says that subject permit "should limit" conductivity to below 500 µS/cm.  Id. Ex. 18 at 2. Notably, the two Johnson declarations and the EPA letter all pertain to mining projects in Alabama.

relies upon would hardly suffice to establish that EPA is applying the Guidance as binding on the whole.  Cf. McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1321-22 (D.C. Cir. 1988) (EPA model was a legislative rule because it was outcome-determinative in 96 of 100 cases).

Indeed, looking at the broader picture, the available evidence shows that EPA is not applying the Guidance as a binding rule.  Since issuing the Detailed Guidance in April 2010, EPA has received for review scores of draft or proposed Section 402 permits associated with mining projects in the relevant Appalachian states.  Although EPA has raised objections to some of these permits and has recommended that state regulators include conductivity limits in Section 402 permits, EPA has not suggested to states that the Guidance imposes a binding standard, and, in some instances, states have issued the permits without following EPA's recommendations or imposing conductivity limits.  For example, EPA "recommend[ed]" that Kentucky permit writers include a numeric limitation for conductivity in the Section 402 permit for Stinking Creek Mine. Letter from J. Giattina, EPA, to S. Gruzesky, Ky. Dep't of Envt'l Prot. (Mar. 4, 2010) at 3 (Ex. 9).  The state nevertheless decided to issue the permit without such a limitation, see "Fact Sheet" KPDES Permit No. 107069 (July 9, 2010) at 4, 14 (Ex. 10), and EPA did not object to the permit.[12]  Although there is less information available for Section 404 permit applications,[13] one

_____

[12]  In another example, EPA objected to a draft permit for the Bucy #2 mine in West Virginia because EPA was concerned about high conductivity levels.  Letter from E. McKnight, EPA, to J. Parsons, W.Va. Dep't of Envt'l Prot. (Apr. 30, 2010) at 1 (Ex. 11).  EPA later withdrew its objection after the state provided additional information that indicated to EPA that the project was unlikely to have a significant detrimental effect on receiving waters.  Letter from E. McKnight, EPA, to J. Parsons, W.Va. Dep't of Envt'l Prot. (May 13, 2010) at 1 (Ex. 12).  The permit was subsequently issued with no conductivity limits.  Letter from T. Clarke, W.Va. Dep't of Envt'l Prot., to E. McKnight, EPA, transmitting permit (May 14, 2010) at 1 & permit at 2-9 (showing no discharge limitation for specific conductivity) (Ex. 13).

[13]  As of July 19, 2010, 36 of the 79 permit applications originally identified for enhanced coordination had been withdrawn, 36 were in process, five had been issued, and two were under review.  Compl. ¶ 66. Since that time, the two applications that were under review have completed review under the EC procedures (one permit issued and one permit proffered to the applicant but not signed), and two
*(. . . continued)*

permit that the Corps issued for a mining project in Ohio, after concluding the EC process with

EPA, has a provision that triggers certain remedial measures at a conductivity level of 2,400

µS/cm, which is far above the 300-500 µS/cm levels discussed in the Detailed Guidance.  See

Letter from G. Mullins, Corps, to Oxford Mining Co. & attached permit (July 12, 2010) at

Special Condition Sheet 2 of 7 (Ex. 14).

Even if these examples are not sufficient to show conclusively that EPA is not

implementing the Detailed Guidance in a binding fashion, they at least demonstrate that the issue

is not yet fit for review.  See Pub. Citizen, 940 F.2d at 682 (claim that agency policy was being

applied as a rule was unripe where "only [agency] practice under the policy can make the issue

determinable and thus fit for review").  Because NMA's members face no present hardship from

postponing judicial review of the Detailed Guidance, as demonstrated above, NMA's challenge

must therefore be dismissed as unripe.

## III.    NMA LACKS STANDING TO CHALLENGE MIRA AND THE EC MEMO

"The 'irreducible constitutional minimum of standing contains three elements': (1)

injury-in-fact, (2) causation, and (3) redressability."  Ass'n of Flight Attendants-CWA v. U.S.

Dep't of Transp., 564 F.3d 462, 464 (D.C. Cir. 2009) (quoting Lujan v. Defenders of Wildlife,

504 U.S. 555, 560-61 (1992)).  These requirements apply whether an organization asserts

standing to sue on its own behalf, or on behalf of its members.  Havens Realty Corp. v. Coleman,

455 U.S. 363, 378 (1982).  As we demonstrate below, NMA cannot show that any of its

members has Article III standing to challenge MIRA or the EC Memo, and thus NMA itself has

no standing to assert these challenges.

---

additional applications are under review.  See http://water.epa.gov/lawsregs/guidance/wetlands/mining-
projects.cfm.

**A.      NMA Has Suffered No Injury-In-Fact from the EC Process.**

NMA alleges that MIRA and the EC Memo are contrary to the CWA and were adopted without complying with APA notice-and-comment procedures.  For purposes of this argument, we assume, as we must, that NMA is correct on the merits of its claims.  However, to establish injury-in-fact, NMA must show that its members have suffered a particularized and concrete injury traceable to MIRA and the EC Memo.  The injury alleged cannot be "conjectural" or "hypothetical," City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983), "remote," Warth v. Seldin, 422 U.S. 490, 507 (1975), "speculative," Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 42-46 (1976), or "abstract," O'Shea v. Littleton, 414 U.S. 488, 494 (1974).  Rather, it must be "certainly impending."  Whitmore v. Arkansas, 495 U.S. 149, 158 (1990).

NMA has yet to suffer such an injury as a result of MIRA or the EC Memo because none of the permit applications subject to that process has been denied by the Corps or vetoed by EPA. Moreover, any claim that the EC process will result in the denial of a permit application would be pure speculation.  NMA may allege procedural injury based on its notice-and-comment claims, but "deprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing."  Summers v. Earth Island Inst., 129 S. Ct. 1142, 1151 (2009).  Accordingly, NMA has not identified an injury that is sufficiently "actual and imminent," id. at 1149, to meet the requirements for Article III standing.

**B.      The Delay Alleged by NMA Is Not Caused by the EC Process.**

In the absence of any adverse permit decision resulting from the EC process, the only possible injury identified by NMA is its allegation that the EC process is causing permitting delays.  But NMA's claims of delay are speculative because NMA cannot establish any likelihood that the permit applications now subject to the EC review process would have been

processed more quickly absent the procedures in the EC Memo.  Indeed, the contrary is more likely true given that the procedures in the EC Memo were intended to expedite the normal review process to address the large backlog of pending permit applications.[14]  See EC Memo (Ex. 3) at 1 (one of the key objectives of the EC Memo is to "expedite[] review and final decisions regarding all pending permits.").

Moreover, even if NMA could establish that permit applications subject to the EC Memo procedures have been delayed, it cannot establish beyond speculation that those EC procedures are the cause of the delay.  NMA has made this point itself in its recently-filed preliminary injunction brief, where NMA relies on a declaration from the president of an Alabama coal mining company to make the argument that permitting delays are harming NMA's small business members.  NMA PI Br. at 36-37.  The permit applications referenced in that declaration, however, are not subject to the EC process, which applies only to 108 permit applications from Ohio, Pennsylvania, West Virginia, Tennessee, and Kentucky.  EC Memo (Ex. 3) at 1 & n.1.  Thus, the permitting delays alleged by the Alabama company – the very delays that NMA emphasizes in this case – did not result from MIRA and the EC Memo, but rather occurred in the course of the standard permitting process.  Accordingly, even if some permit applications subject to the EC process experience delays, it does not necessarily mean those delays were caused by the EC process.  Delay could just as easily be attributed to factors that allegedly caused delay for the Alabama coal company, or for any number of other reasons.  Such speculation as to the cause of NMA's alleged injury will not suffice to establish Article III standing.  See Simon, 426 U.S. at 44.

---

[14] At the time the EC process was established, there were approximately 108 permit applications pending. A backlog had developed due, in large part, to ongoing litigation regarding the permits and the uncertainty resulting from the litigation.

**C.**     **The Remedy Sought by NMA Would Not Redress NMA's Alleged Injury from the EC Process.**

It is also far from certain that the remedy sought by NMA (vacatur of the EC process) would redress the alleged harm.  If EPA and the Corps were prevented from using the EC Memo procedures, there is no certainty – or even a reasonable probability – that permits raising environmental concerns would be evaluated any more quickly.  Rather, the agencies would continue to facilitate the review and disposition of the permit applications to ensure compliance with the CWA, using other regulatory tools if necessary.  For example, if EPA determined that there may be adverse environmental effects from any proposed permit, EPA could exercise its authority under Section 404(c) to "veto" that permit, which would initiate a process that may last significantly longer than the EC process.  See 40 C.F.R. pt. 231.  Moreover, because the applications subject to the EC process are those that EPA has identified as raising environmental concerns, it would be mere conjecture to assume that EPA would not exercise this authority. The procedures in the EC Memo were designed to enable the Corps and EPA to coordinate early in the process so that EPA's concerns can be addressed and the delays that might otherwise result from the more formal process described above can be minimized or avoided.  See EC Memo (Ex. 3) at 1.  Thus, it is unlikely that a favorable ruling from the Court would remedy the alleged permitting delays cited by NMA.  For all these reasons, NMA's challenges to MIRA and the EC Memo must be dismissed for lack of standing.

**IV.     EPA'S USE OF MIRA TO SCREEN PERMIT APPLICATIONS IS A DECISION COMMITTED TO AGENCY DISCRETION BY LAW**

NMA's challenge to MIRA must also be dismissed because EPA's use of MIRA in this case was committed to agency discretion by law and, thus, is not subject to review under the APA.  See 5 U.S.C. § 701(a)(2).  The APA bars judicial review of discretionary agency action

where the statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985).

Here, EPA employed MIRA as a tool in determining which of the 108 pending CWA Section 404 permit applications for surface mining projects in Appalachia would be subject to the review procedures in the EC Memo. In other words, EPA used MIRA as a tool in screening the permit applications to decide which applications were most likely to raise concern and, thus, where EPA should best apply its resources to carry out its responsibilities under the CWA.

EPA's use of MIRA in this fashion was a decision committed to the Agency's discretion. Nothing in the CWA provides a "meaningful standard" to evaluate the tools and methods EPA decides to use in determining where and how to focus its resources in the review of CWA permit applications. To the contrary, the CWA gives EPA broad discretion in carrying out its statutory authorities in the Section 402 and 404 permitting programs, and EPA is under no duty to object to (or "veto") a permit issued by a state or the Corps. See Schramm, 631 F.2d at 860-61 (EPA has "broad discretion in administering the [NPDES] program" and its decision whether to object to a state-issued permit is committed to agency discretion); Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1249-50 (11th Cir. 1996) (EPA's "veto" authority under Section 404(c) is discretionary).

Consistent with its grant of broad discretion to EPA, the CWA provides no standard for how EPA must decide which permit applications it will review, nor does it direct EPA in how the Agency must marshal its resources in carrying out its oversight authorities. See 33 U.S.C. § 1342(e) (EPA authorized to waive review of state-issued permits). Instead, screening permit applications for enhanced review and coordination is a decision that "involves a complicated balancing of a number of factors which are peculiarly within [the Agency's] expertise." Heckler,

470 U.S. at 831.  EPA must determine whether its resources are best spent in the review of

certain types of permit applications or draft permits, whether that review will be fruitful, whether

that review coincides with the Agency's policies, and whether EPA has adequate resources to

undertake the review at all.  See id.  In making such screening decisions, including the choice of

tools and methods the Agency will employ in the process, EPA "is far better equipped than the

courts to deal with the many variables involved in the proper ordering of its priorities."  Id. at

831-32.  Because "no judicially manageable standards are available for judging how and when

[EPA] should exercise its discretion," id. at 830, in screening permit applications for further

review or in deciding what tools and methods the Agency will use in that screening process,

EPA's decision to use MIRA here was a decision committed to EPA's discretion and immune

from review under the APA.

## V.   NOTICE-AND-COMMENT RULEMAKING WAS NOT REQUIRED FOR MIRA, THE EC MEMO, OR THE DETAILED GUIDANCE

Although the APA requires public notice and comment prior to the promulgation of a

"substantive" or "legislative" rule, policy statements, interpretive rules, and rules of agency

organization and procedure are exempt from the notice and comment requirements.  See 5 U.S.C.

§ 553.  A substantive or legislative rule is a rule that "implement[s]" a statute and has "the force

and effect of law."  Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979) (citation omitted).

By contrast, policy statements are "statements issued by an agency to advise the public

prospectively of the manner in which the agency proposes to exercise a discretionary power."

Id.; see Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997).

The primary criterion used to distinguish between a legislative rule and a policy

statement is whether the agency action "binds private parties or the agency itself with the 'force

of law.'"  General Elec. Co. v. EPA, 290 F.3d 377, 382 (D.C. Cir. 2002).  In making this

determination, courts consider whether the agency has imposed any rights and obligations, or left itself genuinely free to exercise discretion.  Center for Auto. Safety, 452 F.3d at 806.  Courts will also consider (1) the agency's characterization of the action; (2) whether the statement was published in the Federal Register or Code of Federal Regulations ("C.F.R."); and (3) whether the action has binding effects on the agency or private parties.  Id. at 806-07.

As we demonstrate below, none of the three policies challenged by NMA in this case qualifies as a legislative rule, and thus Counts I, II, and III of the Complaint must be dismissed.  Moreover, because the challenged agency actions were all non-binding policy statements, they are not "final agency action," and NMA's Complaint must be dismissed in its entirety.  See id.

**A.**      **EPA's Use of MIRA Did Not Constitute a Legislative Rule.**

NMA contends that MIRA is a legislative rule that EPA improperly issued without notice and comment, because "EPA's use of the [MIRA] model effectively curtails the agency's discretion and has present binding effect."  Compl. ¶ 95.  This argument falls short in several respects.

First, to the extent that NMA contends that EPA effectively created a legislative rule by using MIRA during the application screening process, that contention is meritless.  As noted, MIRA is a tool EPA used to collect and organize data for consideration by the Agency's decision-makers.  In contrast to a prescriptive model, MIRA does not predict or dictate any substantive outcome; rather, it was a structure used by EPA to ensure data consistency and to assign varying weights to certain types of data in the course of screening permit applications.  EPA officials remained free to exercise their discretion and, in fact, had to do so, given that MIRA itself does not dictate any particular outcome.

Accordingly, EPA's use of MIRA here is readily distinguishable from the computer model that was held to be a legislative rule in McLouth, 838 F.2d at 1321-22.  There, the court found that EPA's model effectively served as a binding rule because EPA had treated the model "as conclusively disposing of certain issues -- the relationship between its input (leachate concentrations and amounts of waste) and its output (predicted contamination levels)[.]"  Id. at 1321.  Consequently, nearly 100 percent of the time, EPA rejected an application that failed to meet the standard as determined by the model.  Id. at 1321-22.  In sharp contrast, MIRA did not dictate a relationship between the data inputs and outputs; instead, MIRA was simply used by EPA officials to collect and analyze certain categories of data.  Moreover, because EPA officials made the final screening decision, MIRA did not generate any outcome, much less determine whether an applicant met the regulatory standard.  EPA's use of MIRA did not, therefore, constitute a legislative rule.

Second, EPA did not engage in legislative rulemaking by issuing the list of 79 permit applications that would be subject to the procedures in the EC Memo.  As an initial matter, that determination does not even constitute a "rule" within the meaning of the APA because EPA made the determination as a preliminary step in the CWA permitting process for the 108 pending permit applications.  The CWA permitting process is not a rulemaking proceeding, but is rather an "adjudication" within the meaning of the APA.  See 5 U.S.C. § 551(6)-(7); National Wildlife Fed'n v. Marsh, 568 F. Supp. 985, 992 n.12 (D.D.C. 1983) ("[a] permit decision-making proceeding is clearly adjudication rather than rule making.").  EPA's determination that 79 of the 108 permit applications would be subject to the procedures in the EC Memo applies only to those applicants and has no prospective application to future permit applicants.  Thus, EPA's

determination was no more than a preliminary step in 108 adjudicatory proceedings, and was not a "rule" within the meaning of the APA.

But even if this EPA determination were not merely a preliminary adjudicatory decision, it still would not qualify as a legislative rule. The determination was not published in the C.F.R. or the Federal Register, nor did it impose any rights or obligations: permit applicants remain subject to the same legal standards (i.e., the CWA and applicable regulations) to which they were subject prior to EPA's determination. See Center for Auto. Safety, 452 F.3d at 806. Moreover, EPA's determination does not carry the force of law. The only effect of the determination is to subject the 79 permit applications to the EC Process, which, as we explain below, is not itself binding on EPA or the Corps. Because EPA's use of MIRA did not constitute a legislative rule, Count II of the Complaint must therefore be dismissed.

**B.     The EC Memo Is Not a Legislative Rule.**

The Court should also reject NMA's claim that the EC Memo constitutes a legislative rule under the APA. See Compl. Count I. The EC Memo bears none of the hallmarks of a legislative rule. First, EPA and the Corps do not consider the EC Memo to be a rule. The Memo was not published in the C.F.R. or the Federal Register, see Center for Auto. Safety, 452 F.3d at 806, and the Memo itself states that it is "intended solely as guidance," EC Memo (Ex. 3) at 3; see CKRC, 493 F.3d at 227. Second, the language of the EC Memo does not indicate that EPA and the Corps consider it to be binding. Indeed, the Memo states explicitly that it "does not, and is not intended to, impose any legally binding requirements on Federal agencies, States, or the regulated public[.]" EC Memo (Ex. 3) at 3; see CKRC, 493 F.3d at 227-28.

Third, the EC Memo does not create a new legal norm: permit applicants remain subject to the substantive requirements of the CWA and relevant regulations. EC Memo (Ex. 3) at 3; see

Center for Auto. Safety, 452 F.3d at 806.  Although the Memo represents an agreement by EPA

and the Corps to implement new procedures, those procedures are flexible and the agencies

retain discretion to vary from the procedures in any particular case.  See CKRC, 493 F.3d at 227.

As EPA and the Corps stated in the Memo, they "will work to adhere" to the time frames and

procedures in the Memo "to the maximum practical extent" while also recognizing that

"flexibility may be needed under particular circumstances."  EC Memo (Ex. 3) at 3.  The Memo

also emphasizes that it "does not restrict the authority of the employees of [EPA and the Corps]

to exercise their discretion in each case to make regulatory decisions based on their judgment

about the specific facts and application of relevant statutes and regulations."  Id.  Because the EC

Memo does not bind the agencies or the regulated community, it does not have "'the force and

effect of law.'"  Chrysler Corp., 441 U.S. at 302 n.31 (citation omitted).  Accordingly, the EC

Memo is a non-binding policy statement rather than a legislative rule, and NMA's challenges to

the EC Memo must therefore be dismissed.

But even if the EC Memo did not qualify as a policy statement, it would still be exempt

from the notice-and-comment procedures of the APA as a "procedural" rule.  See 5 U.S.C. §

553(b)(3)(A) (exempting "rules of agency organization, procedure or practice" from the notice-

and-comment requirement).  The purpose of the procedural rule exemption is "'to ensure that

agencies retain latitude in organizing their internal operations.'"  American Hosp. Ass'n v.

Bowen, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (citation omitted).  The "'critical feature'" of such

a rule is that it "'covers agency actions that do not themselves alter the rights or interests of

parties, although it may alter the manner in which the parties present themselves or their

viewpoints to the agency.'"  James V. Hurson Assocs., Inc. v. Glickman, 229 F.3d 277, 280

(D.C. Cir. 2000) (citation omitted).

In this case, even assuming <u>arguendo</u> that the enhanced coordination guidelines set forth in the EC Memo could be considered a "rule," they would easily qualify as rules of agency procedure under the APA.  First, the guidelines in the EC Memo plainly apply to agency "procedure":  they explain the manner and timing of cooperation and coordination between EPA and the Corps during the review of permit applications.  <u>See</u> <u>National Whistleblower Ctr. v. Nuclear Regulatory Comm'n</u>, 208 F.3d 256, 262 (D.C. Cir. 2000) (rules that merely "'prescribe[] a timetable for asserting substantive rights' are procedural") (citation omitted).

Second, the guidelines in the EC Memo do not alter the rights or interests of permit applicants because permit applicants remain subject to the substantive permitting standards established by the CWA and relevant regulations.  <u>See</u> <u>JEM Broad. Co. v. FCC</u>, 22 F.3d 320, 326-27 (D.C. Cir. 1994) (agency rule rejecting incomplete permit applications was procedural rule under the APA because it did not alter substantive standards for evaluating applications). Even if the EC Process leads to permitting delay, such delay is not sufficient to alter the procedural character of a rule.  <u>See</u>, <u>e.g.</u>, <u>Neighborhood TV Co. v. FCC</u>, 742 F.2d 629, 637-38 (D.C. Cir. 1984) (temporary freeze on applications was procedural rule despite causing delays and increased competition); <u>Waste Mgmt., Inc. v. EPA</u>, 669 F. Supp. 536, 538-39 (D.D.C. 1987) (decision to defer consideration of permit applications was a procedural rule); <u>see</u> <u>also</u> <u>James V. Hurson</u>, 229 F.3d at 281 ("an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties").

Finally, the procedures in the EC Memo do not encode a value judgment, aside from a judgment that the recommended procedures will improve efficiency between EPA and the Corps as they carry out their respective roles in the CWA permitting process.  <u>See</u> <u>Pub. Citizen v. Dep't of State</u>, 276 F.3d 634, 640 (D.C. Cir. 2002) (in determining whether a rule is procedural, courts

consider whether the rule "encodes a substantive value judgment.").  Although the permit

applications that are subject to the EC Memo procedures are applications that EPA has identified

as raising environmental concerns, the purpose of the new procedures is to promote "already-

existing goals."  James V. Hurson, 229 F.3d at 282.  Specifically, EPA and the Corps agreed to

the new procedures to:  expedite the review of permit applications that present unique

challenges; provide for timely resolution of concerns raised by EPA; ensure effective

cooperation between EPA and the Corps in ensuring CWA compliance; and provide additional

public transparency.  EC Memo (Ex. 3) at 1.  The fact that EPA and the Corps agreed upon the

new procedures to improve efficiency in line with existing goals does not transform a procedural

rule into a substantive one.  See James V. Hurson, 229 F.3d at 282 (a "judgment about

procedural efficiency . . . 'does not convert a procedural rule into a substantive one.'") (citation

omitted); Nat'l Whistleblower, 208 F.3d at 263.  Accordingly, even assuming the EC Memo

could be a "rule," it was at most a rule of agency procedure that is exempt from the notice-and-

comment requirements of the APA.  Count I of the Complaint must therefore be dismissed.

        **C.**      **EPA's Detailed Guidance Is Not A Legislative Rule.**

Finally, the Court must reject NMA's claim that the Detailed Guidance is a legislative

rule that was improperly adopted without notice and comment.  See Compl. Count III.  Contrary

to NMA's suggestion, the Detailed Guidance is a quintessential policy statement.  As such, it

was exempt from notice and comment requirements and, moreover, is not reviewable "final

agency action" under the APA.  See Center for Auto. Safety, 452 F.3d at 806-07.

First, EPA's actions make it clear that the Detailed Guidance is not a legislative rule.

EPA designated the document as "guidance" and has not sought to codify it in the C.F.R.

Although EPA provided notice of the Detailed Guidance in the Federal Register and is taking

public comment on the document, the Federal Register notice clarifies that the Detailed

Guidance:  is an interim guidance document; "do[es] not represent a regulation"; and is "not

subject to the formal provisions of the Administrative Procedure Act."  75 Fed. Reg. at 18,500.

That EPA believes the Detailed Guidance is not a legislative rule is further demonstrated

by the fact that the document is explicitly open to revision in the near future.  EPA issued the

Detailed Guidance in "interim final" form and requested public comment, with a plan to issue

final guidance on April 1, 2011, or sooner, after consideration of the comments and the results of

the Science Advisory Board's review of two scientific reports underlying certain

recommendations in the Guidance.  Detailed Guidance (Ex. 8) at 1 n.1; 75 Fed. Reg. at 18,500.

Thus, the Guidance simply reflects EPA's current views on the matters at hand, and those views

will most likely be revised in the near future.  See Catawba County v. EPA, 571 F.3d 20, 33-34

(D.C. Cir. 2009) (EPA guidance document was not a legislative rule where the document

provided EPA's "current views" and, thus, "suggest[ed] that those views are open to revision").

Second, the non-binding nature of the Detailed Guidance is clear from the face of the

document itself.  See CKRC, 493 F.3d at 227-28.  The Guidance states explicitly that it "does not

impose legally binding requirements on EPA, the [Corps], the States, or the regulated

community, and may not apply to a particular situation depending on the circumstances."

Detailed Guidance (Ex. 8) at 2 n.3; see CKRC, 493 F.3d at 228 (finding identical language to be

evidence that guidance document was not a rule).  As additional clarification, EPA explained that

the Guidance is not a regulation and "does not substitute" for the statutes and regulations

described in the document.  Detailed Guidance (Ex. 8) at 2 n.3; see Center for Auto. Safety, 452

F.3d at 806.  EPA further explained that permit decisions "will be based on the applicable

statutes, regulations, case-specific facts and circumstances, and case law," and interested persons

can challenge the appropriateness of applying the Guidance to any particular situation.  Detailed

Guidance (Ex. 8) at 2 n.3.  In that case, "EPA and/or the Corps will consider whether or not the

recommendations or interpretations of this guidance are appropriate in that situation <u>based on the

statutes, regulations, and case law</u>."  <u>Id.</u> (emphasis added).

EPA's statements are consistent with the remainder of the Detailed Guidance, which does

not suggest that it imposes mandatory requirements on EPA's regional offices, state permitting

authorities, or the regulated community.  Instead, the document's "pages are replete with words

of suggestion."  <u>CKRC</u>, 493 F.3d at 227.  EPA describes the document as providing "further

clarification of EPA's roles and expectations" and also "clarifying EPA's expectations regarding

the need to reduce harmful impacts on public health and the environment associated with

Appalachian surface coal mining[.]"  Detailed Guidance (Ex. 8) at 1-2.  The Guidance advises

EPA's regional offices that they "should ensure" that underlying data are closely scrutinized;

they are "encourage[d]" to work with states to resolve concerns about the sufficiency of draft

permits; and where state-issued permits fail to implement water quality standards, the Guidance

suggests that EPA's regional offices "consider objecting" to the permits.  <u>Id.</u> at 7-8, 15.  The

Guidance counsels state permitting authorities that it is EPA's "expectation" that they will use all

valid and representative data to determine whether a discharge has the potential to exceed

standards.  <u>Id.</u> at 9.  In certain situations, the Guidance advises permitting authorities that they

"should require the applicant" to characterize anticipated pollutant concentration and loads in a

certain manner.  <u>Id.</u>  Similar language appears consistently throughout the document.  In short,

the Guidance does not command, require, order, or dictate.  <u>Cf.</u> <u>Appalachian Power Co. v. EPA</u>,

208 F.3d 1015,1023 (D.C. Cir. 2000).  Rather, it suggests, encourages, cautions, and edifies, all

with the aim of setting forth EPA's views and expectations on the types of permit restrictions and conditions that are required to meet the CWA standards.

Even where the Detailed Guidance is specific, there is no indication that EPA has curbed its discretion or imposed a new legal norm, for the guidelines described by EPA are conditional and any presumptions are rebuttable. A prime example is the Guidance's treatment of the issue of conductivity. Here, the Guidance states that

> As a general matter, EPA expects that conductivity impacts of projects with predicted conductivity levels below 300μS/cm generally will not cause a water quality standard violation and that in-stream conductivity levels above 500μS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative state water quality standards.

Detailed Guidance (Ex. 8) at 12 (emphasis added). Thus, if modeling indicates levels above 500μS/cm, "EPA believes that reasonable potential likely exists to cause or contribute to an excursion above applicable water quality standards; unless, based on site-specific data, the state has an alternative interpretation of their water quality standard that is supported by relevant science." Id. (emphasis added). The Guidance further acknowledges that "[i]n certain fact-specific circumstances, conductivity levels above 500μS/cm may not be associated with adverse aquatic impacts. EPA will work with permitting authorities on a site-specific basis to assess reasonable potential." Id. at 12 n.22.

The approach adopted by EPA for conductivity demonstrates that the Detailed Guidance is a policy statement and not a legislative rule. The conductivity levels described above do not read like a regulation or a binding standard; instead, they are conditional, site-specific, and show that the Agency remains flexible. See CKRC, 493 F.3d at 226; Center for Auto. Safety, 452 F.3d at 806. To the extent that the conductivity levels establish a presumption, that presumption is rebuttable whenever "relevant science" supports an "alternative interpretation." Detailed

Guidance (Ex. 8) at 12.  Such rebuttable presumptions preserve agency discretion and, thus, are

acceptable in a policy statement.  Catawba County, 571 F.3d at 34; Panhandle Producers &

Royalty Owners Ass'n v. Econ. Reg. Admin., 822 F.2d 1105, 1110 (D.C. Cir.1987).  Moreover,

even where the presumption is not rebutted, the Guidance does not constrain EPA's discretion to

act.  Rather, the Guidance merely states that EPA "may object to the permit" in such

circumstances.  Detailed Guidance (Ex. 8) at 13.

In sum, the language and intent of the Detailed Guidance, its issuance as an interim

document, and its purpose and role in the CWA permitting scheme all establish that it is a policy

statement and not a legislative rule.  The Detailed Guidance does not establish law; rather, it

advises permitting authorities and the regulated community as to EPA's expectations for what

the CWA and implementing regulations require for the approval of permits issued in connection

with surface coal mining projects.  It thereby advises the public as to how EPA may exercise its

discretionary authority to object to, or "veto," proposed CWA permits.  See Chrysler Corp., 441

U.S. at 302 n.31.  Because the Detailed Guidance relies upon, but does not replace, the CWA and

relevant permitting regulations -- including the Section 404(b)(1) Guidelines -- it does not "seek

to impose or elaborate or interpret a legal norm" but rather "represents an agency position with

respect to how it will treat . . . the governing legal norm" in the Agency's oversight of CWA

permitting.  Syncor Int'l Corp., 127 F.3d at 94.  It follows that the Detailed Guidance is a non-

binding policy statement that is exempt from the notice and comment requirements of the APA.

Because a policy statement does not constitute "final agency action" under the APA, all of

NMA's challenges to the Detailed Guidance must be dismissed.

Given that "a simple reading of the [Detailed Guidance] document and study of its role in

the regulatory scheme," Public Citizen, Inc., 940 F.2d at 682, demonstrates that the Detailed

Guidance is not binding, there is no need to examine EPA's implementation of the Guidance.  In

any event, as we established in Part II.C.2 supra, NMA's spotty and anecdotal evidence that EPA

is implementing the Detailed Guidance in a binding fashion – even if taken as true – falls well

short of establishing that EPA as an agency is treating the Guidance as though it were a

legislative rule.  Thus, to the extent that NMA seeks to assert a claim that EPA's application of

the Guidance has created a legislative rule, that claim is unripe at best.  See Pub. Citizen, 940

F.2d at 682-83.  NMA's challenges to the Detailed Guidance must be dismissed.

## **CONCLUSION**

For the reasons set forth above, EPA and the Corps respectfully request that the Court

dismiss the Complaint and enter judgment in their favor.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/Kenneth C. Amaditz
CYNTHIA J. MORRIS
KENNETH C. AMADITZ
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, DC  20026-3986
(202) 616-7554 (Morris)
(202) 514-3698 (Amaditz)
Fax: (202) 514-8865
c.j.morris@usdoj.gov
kenneth.amaditz@usdoj.gov

OF COUNSEL:

KARYN WENDELOWSKI
Office of General Counsel
U.S. EPA
1200 Pennsylvania Ave., N.W.

MC 2355A
Washington, D.C.  20460

RUSSELL W. PETIT
Office of the Chief Counsel
U.S. Army Corps of Engineers
Washington, D.C.  20314

CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2010, I caused a copy of the foregoing documents plus exhibits and a proposed order to be served on counsel of record via the Court's CM/ECF system.

/s/Kenneth C. Amaditz