**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL MINING ASSOCIATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:10-CV-1220-RBW |
| ) | |
| LISA JACKSON, ADMINISTRATOR, ) | |
| U.S. ENVIRONMENTAL PROTECTION ) | |
| AGENCY, et al., ) | |
| ) | |
| Defendants. ) | |

## UNITED STATES' MEMORANDUM IN OPPOSITION TO NATIONAL MINING ASSOCIATION'S MOTION FOR PRELIMINARY INJUNCTION

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/Kenneth C. Amaditz
CYNTHIA J. MORRIS
KENNETH C. AMADITZ
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, DC  20026-3986
(202) 616-7554 (Morris)
(202) 514-3698 (Amaditz)
Fax: (202) 514-8865
c.j.morris@usdoj.gov
kenneth.amaditz@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND ....................................................2

I.    THE CLEAN WATER ACT ...........................................................................................2

    A.    CWA Section 303 Water Quality Standards ........................................................2

    B.    CWA Section 404 Permits ...................................................................................3

    C.    CWA Section 402 Permits ...................................................................................6

    D.    CWA Section 401 State Water Quality Certification .........................................7

II.    THE NATIONAL ENVIRONMENTAL POLICY ACT ...............................................8

FACTUAL BACKGROUND ..............................................................................................8

I.    The "Enhanced Coordination" Process ...........................................................................9

II.    EPA's Multi-Criteria Integrated Resource Assessment ("MIRA") .............................10

III.    EPA's Detailed Guidance ............................................................................................11

STANDARD OF REVIEW ...............................................................................................13

ARGUMENT ....................................................................................................................14

I.    NMA IS NOT LIKELY TO SUCCEED ON THE MERITS ........................................14

    A.    NMA's Claims Must Be Dismissed for Lack of Finality, Ripeness, and
        Standing ..............................................................................................................14

    B.    Notice and Comment Rulemaking Was Not Required Because the Challenged
        Agency Policies Are Not Legislative Rules ......................................................15

        1.    The EC Process Memoranda Are Not Legislative Rules ...............................15

        2.    The Detailed Guidance Is Not a Legislative Rule .........................................18

    C.    The EC Memoranda and the Detailed Guidance are Fully Consistent
        With the CWA and NEPA ..................................................................................21

        1.    The EC Process is Consistent With the CWA ..............................................22

2.    The Detailed Guidance is Consistent With the CWA...................................24

       a.    The Detailed Guidance does not establish a water quality standard ...................................................................................................24

       b.    The Detailed Guidance properly applies to section 404 Permits.......26

3.    The Detailed Guidance is Consistent With NEPA ........................................28

II.    NMA HAS NOT ESTABLISHED THAT ITS MEMBERS WILL FACE IRREPARABLE INJURY ABSENT EXTRAORDINARY INJUNCTIVE RELIEF .........................................................................................................................29

    A.    NMA Has Not Demonstrated that the Challenged Agency Policies Pose a Certain and Immediate Threat to the Survival of Any of Its Members .................30

    B.    The Cost of Regulatory Compliance Is Not Irreparable Harm .................................34

    C.    NMA Has Not Demonstrated Irreparable Harm to Property Interests.....................38

    D.    NMA's Delay in Seeking Injunctive Relief Further Undermines Its Claims of Irreparable Harm ...............................................................................................40

III.    THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF THE UNITED STATES.........................................................................................................................40

IV.    DENIAL OF THE PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.......42

CONCLUSION.....................................................................................................................42

# TABLE OF AUTHORITIES

## CASES

A.O. Smith Corp. v. FTC, 530 F.2d 515 (3d Cir. 1976)........................................................34, 35

Ashcroft v. ACLU, 542 U.S. 656 (2004)................................................................................13

*Cement Kiln Recycling Coal. v. EPA, 493 F.3d 207 (D.C. Cir. 2007) ...............................19

Chamber of Commerce v. Edmondson, 594 F.3d 742 (10th Cir. 2010).................................34

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006) .................29

Coal. For Common Sense In Gov't Procurement v. United States,
    576 F. Supp. 2d 162 (D.D.C. 2008) .................................................................................36

Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 129 S. Ct. 2458 (2009).............22, 27

Ctr. for Auto. Safety v. NHTSA, 452 F.3d 798 (D.C. Cir. 2006)..........................................15

Ctr. for Marine Conservation v. Brown, 917 F. Supp. 1128 (S.D. Tex. 1996)........................8

*Doran v. Salem Inn, Inc., 422 U.S. 922 (1975) .............................................................13, 29

FPC v. Transcom Gas Pipe Line, 423 U.S. 326 (1976)........................................................29

Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112 (2d Cir. 2005) ..........................................34

General Electric Co. v. EPA, 290 F.3d 377 (D.C. Cir. 2002)..........................................15, 17

Hi-Technology Pharmacal Co., Inc. v. FDA, 587 F. Supp. 2d 1 (D.D.C. 2008)...................29

Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333 (1977)...............................31

IMS Health Inc. v. Sorrell, 631 F. Supp. 2d 429 (D. Vt. 2009).............................................35

Marsh v. Oregon Natural Resource Council, 490 U.S. 360 (1989) .........................................8

*Mazurek v. Armstrong, 520 U.S. 968 (1997) ...............................................13, 29, 35, 39

Meghrig v. KFC Western, Inc., 516 U.S. 479 (1996)...........................................................33

*Authorities chiefly relied upon are marked with an asterisk.

Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30 (D.D.C. 2000)................................40

National Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644 (2007)........................6

National Medical Care, Inc. v. Shalala, No. 95-0860 WBB,
   1995 WL 465650 (D.D.C. June 6, 1995)..............................34

Ohio Valley Envt'l Coal. v. Aracoma Coal Co., 556 F.3d 177 (4th Cir. 2009) ....................4

Pelfresne v. Village of Williams Bay, 865 F.2d 877 (7th Cir. 1989) .........................39

Pennsy Supply, Inc. v. Susquehanna River Basin Comm'n,
   No. 1:CV-06-2454, 2007 WL 551573 (M.D. Pa. Feb. 20, 2007)..............................35

*Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190, supplemented by
   No. 05cv2027, 2005 WL 3312962 (D.D.C., Dec. 7, 2005) ................29, 30, 33, 36, 37

RoDa Drilling Co. v. Siegal, 552 F.3d 1203 (10th Cir. 2009)...............................39

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989)..............................8

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)..............................14

Syncor International Corp. v. Shalala, 127 F.3d 90 (D.C. Cir. 1997) .............................15

University of Tex. v. Camenisch, 451 U.S. 390 (1981)..................................13

Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978)..................................29

S.D. Warren Co. v. Maine Board of Environmental Prot., 547 U.S. 370 (2006) ........................7

*Winter v. NRDC, Inc., 129 S. Ct. 365 (2008)..................................13

Wisconsin Gas Co. v. FERC, 758 F.2d 669 (D.C. Cir. 1985) .....................29, 30, 35, 37

**STATUTES**

Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387:

33 U.S.C. § 1251(a) ...................................................2

33 U.S.C. § 1311...................................................2

33 U.S.C. § 1311(a) ...................................................2

*33 U.S.C. § 1311(b)(1)(C)..........................................................................6, 25

33 U.S.C. § 1313....................................................................................2

*33 U.S.C. § 1313(a)-(c).............................................................................2

33 U.S.C. § 1313(c)..................................................................................3

33 U.S.C. § 1313(c)(3)-(4)...........................................................................3

33 U.S.C. § 1314(a)..................................................................................3

33 U.S.C. § 1341(a)(1)...............................................................................7

*33 U.S.C. § 1342....................................................................................6

*33 U.S.C. § 1342(b)-(c).............................................................................6

*33 U.S.C. § 1342(c)(2)..............................................................................25

*33 U.S.C. § 1342(d)...............................................................................7, 25

*33 U.S.C. § 1342(d)(4)..............................................................................7

*33 U.S.C. § 1344(a)..................................................................................3

*33 U.S.C. § 1344(b)..................................................................................5

*33 U.S.C. § 1344(b)(1)..............................................................................4

*33 U.S.C. § 1344(c)..................................................................................5

*33 U.S.C. § 1344(q)...............................................................................4, 23

National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321-4370f.......................................8

## REGULATIONS

33 C.F.R. Part 230....................................................................................8

33 C.F.R. § 320.4(b)(4)...............................................................................4

33 C.F.R. § 320.4(d)...............................................................................27, 28

33 C.F.R. Part 325....................................................................................4

33 C.F.R. Part 325, Appendix B ........................................................................8

33 C.F.R. § 325.2(a)(6) ....................................................................................4

33 C.F.R. § 325.3(d) .....................................................................................4, 24

*40 C.F.R. § 122.44(d)(1)........................................................................3, 6, 7, 25

40 C.F.R. § 122.44(d)(1)(v) & (vi) ...................................................................6

40 C.F.R. § 122.44(d)(1)(vi) ......................................................................7, 25

40 C.F.R. § 122.44(k)(3) ..................................................................................6

40 C.F.R. § 123.25(a) .....................................................................................25

40 C.F.R. § 123.44 ...........................................................................................7

40 C.F.R. § 131.5 .............................................................................................3

40 C.F.R. § 131.21 ...........................................................................................3

40 C.F.R. Part 230 ...........................................................................................4

40 C.F.R. § 230.10(c)(1)-(3) ...........................................................................4

40 C.F.R. §§ 1500-1508 ...................................................................................8

## FEDERAL REGISTER

54 Fed. Reg. 23,968, 23,875 (June 2, 1989) ..................................................3

75 Fed. Reg. 18,500 (Apr. 12, 2010) ......................................................13, 18

## MISCELLANEOUS

Webster's New International Dictionary of English Language 1245 (2d ed. 1934) ......................33

## INTRODUCTION

The United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers ("Corps") respectfully oppose the motion for preliminary injunction filed by National Mining Association ("NMA").

First, as we demonstrated in our Memorandum in Support of Defendants' Motion to Dismiss filed on September 27, 2010 (Dkt. No. 14) (hereinafter, "U.S. MTD Br."), the Complaint should be dismissed because NMA has challenged non-binding agency policies that qualify neither as legislative rules nor "final agency action" under the Administrative Procedure Act ("APA"), and NMA's generalized challenges to the agency policies are not ripe for judicial review because the claims can only be determined in a more concrete setting. Furthermore, NMA lacks standing to challenge two of the policies because it has not identified an injury-in-fact caused by the policies. And finally, one of those two challenged policies is committed to agency discretion by law and, thus, is immune from review under the APA. For all these reasons, this Court lacks subject matter jurisdiction over the claims asserted in the Complaint and/or the Complaint fails to state a claim upon which relief can be granted. Accordingly, the requested preliminary relief cannot be granted.

Even if NMA could overcome these jurisdictional hurdles, it is not entitled to the preliminary injunctive relief it seeks because it has not, and cannot, establish a likelihood of success on the merits of its claims. On the contrary, as demonstrated below, the challenged policy documents are not legislative rules subject to the procedural requirements of the APA, and, moreover, the policies reflected in the documents are fully consistent with, and authorized by, the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA").

In addition, even if NMA could establish a likelihood of success on the merits of its claims, it has not, and cannot, establish that failure to grant preliminary injunctive relief would result in irreparable harm. The procedural delays and potential economic harm and damage to property interests alleged by NMA are not supported by any evidence and, in any event, are flatly insufficient to warrant the extraordinary relief requested here.

Finally, the balance of the equities tips decidedly in favor of the United States, and the public interest will be served by denial of the preliminary relief requested.

## STATUTORY AND REGULATORY BACKGROUND

### I.   THE CLEAN WATER ACT

The Clean Water Act ("CWA") establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA authorizes the development of water quality standards pursuant to CWA section 303, 33 U.S.C. § 1313, and prohibits the discharge of pollutants from point sources into navigable waters unless consistent with the requirements of the Act. Id. § 1311(a). The CWA authorizes the discharge of pollutants into waters of the United States under two permitting programs under Sections 404 and 402 of the Act. Id. §§ 1344, 1342.

#### A.   CWA Section 303 Water Quality Standards

Section 303 of the CWA requires States to adopt water quality standards applicable to its intrastate and interstate waters. 33 U.S.C. § 1313(a)-(c). Water quality standards assist in maintaining the physical, chemical and biological integrity of a water body by designating its uses, setting criteria to protect those uses, and establishing provisions to protect water quality

from degradation. Anti-degradation implementation procedures identify the issues that must be addressed when regulated activities are proposed that may affect water quality.

Water quality criteria can be expressed as numeric chemical-specific concentrations or toxicity levels ("numeric criteria"), or as narrative statements representing the quality of water necessary to support a particular use of the waterbody ("narrative criteria"). Narrative water quality criteria have the same force and effect as numeric criteria, and must be attained and maintained in the same way. See 40 C.F.R. §122.44(d)(1) (requiring that NPDES permits contain effluent limits "necessary to . . . [a]chieve water quality standards established under section 303 of the CWA, including State narrative criteria for water quality"); 54 Fed. Reg. 23,968, 23,875 (June 2, 1989).

State-adopted water quality standards are subject to EPA review. 40 C.F.R. § 131.5; 33 U.S.C. § 1313(c). EPA may object to state-adopted water quality standards and may require changes to the state-adopted water quality standards. 40 C.F.R. §§ 131.5, 131.21; 33 U.S.C. § 1313(c)(3)-(4). If the state does not respond to EPA's objections, EPA may promulgate federal standards. 40 C.F.R. § 131.5, 33 U.S.C. § 1313(c)(3)-(4).

To assist states in adopting water quality standards that will meet with EPA's approval, EPA may develop and publish criteria for water quality that accurately reflect "the latest scientific knowledge." 33 U.S.C. § 1314(a).

**B.     CWA Section 404 Permits**

Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the Chief of Engineers, to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). By this authority, the Corps regulates discharges of dredged and fill material associated with surface coal mining and

reclamation activities, such as the construction of valley fills, stream channel diversions, sediment ponds, road crossings, and disposal of coal waste, into waters of the United States, including primarily ephemeral and intermittent streams and some perennial streams. See Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 190-91 (4th Cir. 2009). The Corps' regulations set forth the requirements for Section 404 permit applications and the procedures for the Corps' review of permit applications. 33 C.F.R. pt. 325.

Although the Corps is the permitting authority under Section 404, EPA has an important role in the permitting process. Section 404(b) of the CWA requires that the Corps' permit decisions must comply with guidelines developed by EPA. 33 U.S.C. § 1344(b)(1). These regulations, which are referred to as the "404(b)(1) Guidelines," provide that the Corps must ensure that the proposed fill will not cause significant adverse effects on human health or welfare, aquatic life, and aquatic ecosystems. 40 C.F.R. § 230.10(c)(1)-(3). EPA's 404(b)(1) Guidelines are codified at 40 C.F.R. pt. 230, and are incorporated in the Corps' regulations. See 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6).

Corps regulations also require that before the Corps issues a CWA Section 404 permit, it must provide notice to EPA and other resource agencies, and those agencies may provide comments for consideration by the Corps. 33 C.F.R. § 325.3(d). The Corps and EPA have entered into a Memorandum of Agreement ("MOA") (Ex. 1),[1] pursuant to Section 404(q) of the CWA, 33 U.S.C. § 1344(q), that expressly recognizes that "the EPA has an important role in the Department of the Army Regulatory Program under the Clean Water Act[.]" MOA (Ex. 1) at 1. The MOA provides that "[p]ursuant to its authority under Section 404(b)(1) of the Clean Water

---

[1] The MOA was attached to the United States' Motion to Dismiss as Exhibit 1 (Doc. # 13-1). To avoid confusion, this Brief will refer to exhibits submitted with the Motion to Dismiss by the same exhibit number, and new exhibits will be numbered consecutively.

Act, the EPA may provide comments to the Corps identifying its views regarding compliance

with the Section 404(b)(1) Guidelines" and "[t]he Corps will fully consider EPA's comments

when determining [compliance] with the National Environmental Policy Act, and other relevant

statutes, regulations, and policies." Id. Although the Corps need not defer to EPA's comments,

the Corps must "fully consider the EPA's views when determining whether to issue the permit,

to issue the permit with conditions and/or mitigation, or to deny the permit." Id. It further

provides for an "elevation" procedure to resolve certain differences that may arise between the

agencies. Id. at 4-7.

     Finally, although the final decision on any permit application rests with the Corps, that

decision is subject to the exercise of EPA's authority under Section 404(c) of the CWA, often

referred to as EPA's "veto" authority.  Section 404(c) provides:

> The [EPA] Administrator is authorized to prohibit the specification
> (including the withdrawal of specification) of any defined area as a disposal site,
> and he is authorized to deny or restrict the use of any defined area for
> specification (including the withdrawal of specification) as a disposal site,
> whenever he determines, after notice and opportunity for public hearings, that the
> discharge of such materials into such area will have an unacceptable adverse
> effect on municipal water supplies, shellfish beds and fishery areas (including
> spawning and breeding areas), wildlife, or recreational areas.  Before making such
> determination, the [EPA] Administrator shall consult with the Secretary [of the
> Army].  The [EPA] Administrator shall set forth in writing and make public his
> findings and his reasons for making any determination under this subsection.

33 U.S.C. § 1344(c).  The "specification" of a disposal site refers to the process by which a

disposal site is specified by a Section 404 permit.  See 33 U.S.C. § 1344(b) ("each such disposal

site shall be specified for each such permit by the [Corps]").  Because Section 404(c) authorizes

EPA to prohibit, withdraw, deny, or restrict the specification of such disposal sites that would

otherwise be authorized by a Section 404 permit, EPA's authority under Section 404(c) is often

designated as the authority to "veto" the permit.

C.    **CWA Section 402 Permits**

Section 402 of the CWA, 33 U.S.C. § 1342, governs discharges of pollutants other than dredged or fill material.  Section 402 permits are issued by EPA, unless the state has an approved program, in which case the state is authorized to issue the permits, subject to EPA oversight.  See id. § 1342(b)-(c); see generally Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 650-51 (2007).  All of the Appalachian states relevant to this case (Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia) have approved programs and, thus, are authorized to administer the Section 402 permitting programs within their states.

Permits issued under the authority of Section 402 are known as National Pollutant Discharge Elimination System ("NPDES") permits, and typically contain numerical limits called "effluent limitations" that restrict the amounts of specified pollutants that may be discharged. NPDES permits must contain technology-based effluent limits, and more stringent water quality-based effluent limits when necessary to meet state "water quality standards."  33 U.S.C. §§ 1311(b)(1)(C), 1342(a); 40 C.F.R. § 122.44(d)(1).

State water quality standards may be expressed as numeric or narrative criteria.  Where necessary to ensure compliance with the state's narrative water criteria, an NPDES permit must contain effluent limits based on whole effluent toxicity and/or a chemical-specific numeric interpretation of the narrative criteria.  40 C.F.R. § 122.44(d)(1)(v) & (vi).  If it is infeasible to calculate a numeric effluent limit, the NPDES permit must include best management practices to control or abate the discharge of pollutants.  40 C.F.R. § 122.44(k)(3).

In order to determine whether water quality-based effluent limits are necessary, the permitting authority is required to conduct a "reasonable potential analysis."  A reasonable potential analysis evaluates whether a discharge will cause, or has the reasonable potential to

cause or contribute to, an excursion above a numeric or narrative water quality criterion. The permit must include limitations for any pollutants for which there is a reasonable potential to exceed either numeric or narrative water quality criteria. 40 C.F.R. § 122.44(d)(1), (d)(1)(vi).

Because all of the states in the Appalachian region are authorized by EPA to administer the CWA Section 402 permitting program, NPDES permits are issued by the states, subject to EPA oversight. EPA retains authority to review proposed state-issued permits and to object to the issuance of a permit. 33 U.S.C. § 1342(d); 40 C.F.R. § 123.44. If the state does not adequately address EPA's objections, authority to issue the permit transfers to EPA. 33 U.S.C. § 1342(d)(4). EPA's procedures for the review of state-issued permits are set forth in regulations at 40 C.F.R. § 123.44.

### D.    CWA Section 401 State Water Quality Certification

CWA Section 401, 33 U.S.C. § 1341, requires each applicant to submit a certification from the affected state that the discharge will be consistent with certain water quality requirements, including those set by the state. 33 U.S.C. § 1341(a)(1); S.D. Warren Co. v. Maine Bd. of Envtl. Prot., 547 U.S. 370, 374 (2006). CWA Section 401 provides that "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived" and "[n]o license or permit shall be granted if certification has been denied by the State." 33 U.S.C. § 1341(a)(1). If individual or cumulative effects of a project violate state water quality requirements, the state may deny certification.

The states are responsible for providing CWA § 401 water quality certifications. Neither a CWA § 404 permit nor a CWA § 402 permit can be issued without a state CWA § 401 certification that state water quality standards will not be violated by authorizing the proposed activity, unless a state waives its right to file such a certification.

II.     **THE NATIONAL ENVIRONMENTAL POLICY ACT**

NEPA, 42 U.S.C. §§ 4321-70f, focuses the attention of federal decisionmakers and the public on potential environmental effects of proposed federal agency action. It is purely procedural because it does not compel particular results, and it does not impose substantive obligations. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989). NEPA does not require that an agency select any particular course of action. Rather, it requires only that the agency make its decision to proceed with a particular action after taking a "hard look" at environmental consequences. Ctr. for Marine Conservation v. Brown, 917 F. Supp. 1128, 1136 (S.D. Tex. 1996). "NEPA merely prohibits uninformed – rather than unwise – agency action." Methow Valley Citizens Council, 490 U.S. at 351. "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989).

When a section 404 permit application requires analysis of environmental impacts under NEPA, the Corps follows three sets of guidelines: (1) the Corps' own NEPA guidelines, set forth at 33 C.F.R. Parts 230 and 325, Appendix B; (2) the Corps' general regulatory policies at 33 C.F.R. Part 320; and (3) the regulations promulgated by the Council on Environmental Quality ("CEQ"), set forth at 40 C.F.R. §§ 1500-1508.

**FACTUAL BACKGROUND**

On June 11, 2009, EPA, the Corps, and the Department of the Interior entered into a Memorandum of Understanding ("MOU") (Ex. 2) to establish an Interagency Action Plan on Appalachian surface coal mining. In the MOU, the Corps and EPA agreed to strengthen and coordinate review of CWA Section 404 permit applications to ensure compliance with the

Section 404(b)(1) Guidelines.  EPA also committed to strengthen its oversight and review of Section 402 permits issued by states in connection with surface coal mining projects.

## I.   The "Enhanced Coordination" Process

One component of the Interagency Action Plan adopted by the Corps and EPA in the MOU was an "enhanced coordination process" to facilitate the joint review of approximately 108 pending applications for CWA Section 404 permits in connection with surface coal mining projects in Appalachia.  See "EPA/Corps of Engineers Enhanced Coordination Process for Pending Clean Water Act Permits Involving Appalachian Surface Coal Mining" (June 11, 2009) ("EC Memo") (Ex. 3).  The process agreed upon by EPA and the Corps applies only to these 108 permit applications.[2]  As explained in the EC Memo, EPA and the Corps agreed to a two-step approach to expedite the review of these applications.  First, EPA would identify which of the pending applications raised environmental concerns and thus warranted further review and coordination.  Id. at 2.  The remaining applications would be processed by the Corps without further review by EPA.  Second, the EC Memo lays out a process for coordination between EPA and the Corps as they review the applications EPA identified.  Id. at 2-3.

The EC Memo does not address the substantive criteria for review of CWA Section 404 permit applications.  It merely establishes procedures designed to allow the agencies to work efficiently through the backlog of pending permit applications.  The EC Memo expressly provides that:

> This document does not, and is not intended to, impose any legally binding requirements on Federal agencies, States, or the regulated public, and does not restrict the authority of the employees of the signatory agencies to exercise their

---

[2]  Permit applications received after March 31, 2009, would be processed pursuant to the agencies' existing procedures.  EC Memo (Ex. 3) at 1.

discretion in each case to make regulatory decisions based on their judgment about the specific facts and application of relevant statutes and regulations.

Id. at 3.

## II.   EPA's Multi-Criteria Integrated Resource Assessment ("MIRA")

In accordance with the approach set forth in the EC Memo, EPA identified the "regulations and key factual considerations" that the Agency "intend[ed] to use to screen and evaluate the pending permit applications to determine which permit applications require further coordination between EPA and the Corps." Letter from L. Jackson, EPA Adm'r, to T. Salt, Acting Ass't Sec'y of Civil Works (June 11, 2009) ("Jackson Letter") (Ex. 4) at 1-2. In particular, EPA identified provisions of the Section 404(b)(1) Guidelines and factual considerations that relate to those provisions. Id. at 1-2. Further, EPA explained that it "intend[ed] to utilize a database containing information on each of the pending permit applications" in order "[t]o expedite this process and assist in making EPA's decisions efficient, consistent, and transparent[.]" Id. at 2. The database EPA employed was the key component in a process known as the Multi-Criteria Integrated Resource Assessment ("MIRA").

MIRA is a tool EPA developed to assist in the organization and analysis of a broad array of scientific and technical information in various regulatory contexts. See Multi-Criteria Integrated Resource Assessment Questions and Answers (Ex. 5) at 1. With respect to the 108 pending permit applications at issue here, EPA used MIRA to organize an extensive set of technical data relevant to the considerations under the Section 404(b)(1) Guidelines. Id. Use of MIRA in this fashion "allow[ed] decision makers from three EPA [regional offices] to review, discuss and reach consistency and consensus using a common set of data for discussion and analysis." Id. The relevant data inputs were obtained from a variety of sources, including the Section 404 permit applications, surface mining permit applications, and other data available

from public sources. Id. The permit applicants had the opportunity to confirm or correct certain categories of data, and many took advantage of that opportunity. Id.

MIRA did not create a new standard or compel any particular outcome, nor was it used as a substitute for the Section 404(b)(1) Guidelines. Id. at 2. Instead, MIRA allowed EPA officials to consider the available data in various combinations, identify potential areas of concern, and consider the proposed projects in the context of the Guidelines. Id. at 1. After considering the data and performing additional analysis – including consultations with other federal agencies – EPA officials determined which permit applications would be subject to the enhanced coordination procedures. Id.; "Appalachian Surface Coal Mining Initial List Resulting from Enhanced Coordination Procedures" (Sept. 11, 2009) ("Initial ECP List Fact Sheet") (Ex. 6) at 1.

On September 11, 2009, EPA published on its web site for a 14-day public review period the initial list of 79 permit applications that the Agency had determined should be subject to enhanced coordination. Id.; Compl. ¶ 64. By letter dated September 30, 2009, EPA advised the Corps of its view that all 79 permit applications raised environmental concerns and should be subject to the procedures in the EC Memo. See Letter from P. Silva, EPA Ass't Adm'r, to J. Darcy, Ass't Sec'y of the Army (Sept. 30, 2009) (Ex. 7); Compl. ¶ 65.

## III.    EPA's Detailed Guidance

EPA issued interim guidance on April 1, 2010, to provide clarification of EPA's role and expectations in coordinating with other federal agencies and with states, with regard to environmental review of Appalachian surface coal mining operations under the CWA and other authorities. See "Detailed Guidance: Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" (Apr. 1, 2010) ("Detailed Guidance") (Ex. 8).  The

Detailed Guidance does not establish any new standards or requirements, but rather explains how

EPA intends to apply its existing legal authorities in its review of CWA Section 402 and 404

permit applications associated with surface coal mining operations in Appalachia.  As EPA

emphasized in the Detailed Guidance:

> The CWA and NEPA provisions and regulations described in this document
> contain legally binding requirements.  This guidance does not substitute for those
> provisions or regulations, nor is it a regulation itself.  It does not impose legally
> binding requirements on EPA, the U.S. Army Corps of Engineers (Corps), the
> States, or the regulated community, and may not apply to a particular situation
> depending on the circumstances.  Any decisions regarding a particular permit will
> be based on the applicable statutes, regulations, case-specific facts and
> circumstances, and case law.  Therefore, interested persons are free to raise
> questions about the appropriateness of the application of this guidance to a
> particular situation, and EPA and/or the Corps will consider whether or not the
> recommendations or interpretation of this guidance are appropriate in that
> situation based on the statues, regulations, and case law.

Detailed Guidance (Ex. 8) at 2 n.3.

Among other things, the Detailed Guidance identifies several areas of concern that EPA's

regional offices "should evaluate" when reviewing state-issued Section 402 permits associated

with surface coal mining projects.  Id. at 8-15.  For example, EPA explained its view that a

recent EPA report, which indicates adverse environmental impacts associated with stream

"conductivity" levels, "should be considered by Appalachian states as relevant information"

under EPA's regulations when states set effluent limits in permits issued under CWA Section

402.  Id. at 12.  The Detailed Guidance also sets forth recommendations for strengthening EPA's

environmental review of Section 404 permits issued by the Corps.  Id. at 16-28.  For example,

the Detailed Guidance identifies types of data EPA's regional offices "should evaluate" for

Section 404 permits, and sets forth "EPA's expectations" for the types of analyses necessary to

achieve compliance with the Section 404(b)(1) Guidelines.  Id. at 19-20.

In light of emerging science on water quality, and in recognition of "the importance of this guidance to [EPA's] Federal and state partners, to the regulated community, and to the public," EPA issued the document as "interim" guidance, published it in the Federal Register, and solicited public comment until December, 2010.  75 Fed. Reg. 18,500 (Apr. 12, 2010); Detailed Guidance (Ex. 8) at 1 n.1.  EPA expects to issue final guidance no later than April 1, 2011.  Detailed Guidance (Ex. 8) at 1 n.1.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. NRDC, Inc., 129 S. Ct. 365, 374 (2008).  Because a "preliminary injunction is an extraordinary and drastic remedy," Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam), whose "purpose . . . is merely to preserve the relative positions of the parties until a trial on the merits can be held," Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981), the party seeking such an injunction must make a "clear showing" that temporary equitable relief is necessary.  Mazurek, 520 U.S. at 972; see Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975) ("stringent" showing required). The movant therefore carries a heavy burden not only of demonstrating that "he is likely to prevail on the merits" but also that "he will suffer irreparable injury" without injunctive relief. Doran, 422 U.S. at 931 (emphasis added); see Ashcroft v. ACLU, 542 U.S. 656, 666 (2004) ("likelihood of irreparable injury" required).

## ARGUMENT

I.   **NMA IS NOT LIKELY TO SUCCEED ON THE MERITS**

   A.   **NMA's Claims Must Be Dismissed for Lack of Finality, Ripeness, and Standing.**

   Before addressing NMA's motion for a preliminary injunction, the Court must first satisfy itself that NMA's claims are properly before the Court. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (where subject matter jurisdiction does not exist, "'the court cannot proceed at all in any cause.'") (citation omitted).  In its Motion to Dismiss, filed September 27, 2010 (dkt. No. 12), the United States has challenged the Court's subject matter jurisdiction over the claims asserted by NMA.  As demonstrated therein, NMA's claims must be dismissed as a matter of law for lack of finality, ripeness and standing.  First, NMA's claims must be dismissed for failure to state a claim because the agency policies NMA challenges are not "final agency action" subject to review under the APA.  U.S. MTD Br. at 13-18.  Second, the Court lacks subject matter jurisdiction over NMA's challenge because NMA's claims are not ripe for review.  Id. at 19-29.  Third, NMA lacks standing to challenge MIRA and the EC Memo. Id. at 29-32.  Finally, NMA cannot challenge MIRA because EPA's screening process was a decision committed to agency discretion by law and, thus, is not subject to review under the APA.  Id. at 32-34.  For these reasons, the Court must dismiss the Complaint and deny NMA's motion for preliminary injunctive relief as moot.[3]

---

[3]   Because the issues raised in the U.S. Motion to Dismiss establish that NMA has no likelihood of success on the merits, the United States incorporates herein its Motion to Dismiss and its Memorandum in Support of its Motion to Dismiss, and the United States intends to address the jurisdictional arguments presented in its Motion to Dismiss at the hearing scheduled for November 5, 2010.

**B.      Notice and Comment Rulemaking Was Not Required Because the Challenged Agency Policies Are Not Legislative Rules.**

Even if the Court decides not to dismiss NMA's claims, the Court nevertheless should deny NMA's motion for preliminary relief because NMA is unlikely to prevail on the merits.  As we demonstrated in our memorandum in support of our motion to dismiss, U.S. MTD Br. at 34-45, and as explained further below, the APA requires public notice and opportunity to comment only for "substantive" or "legislative" rules.  Here, NMA cannot prevail on its claim that MIRA, the EC Memo and the Detailed Guidance are legislative rules because none of those challenged policies is binding or creates any new legal standards.  See Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997).

### 1.      The EC Process Memoranda Are Not Legislative Rules.

NMA contends that the "EC Process memoranda"[4] are legislative rules because they "effectively amend the longstanding permitting regime set forth in Section 404, as well as the Corps' regulations implementing that section."  NMA PI Br. at 14.  But NMA vastly overstates and mischaracterizes the stated intent and the effect of those policy memoranda.

The primary criterion used to distinguish between a legislative rule and a policy statement is whether the agency action "binds private parties or the agency itself with the 'force of law.'"  Gen. Elec. Co. v. EPA, 290 F.3d 377, 382 (D.C. Cir. 2002).  In making this determination, courts consider whether the agency has imposed any rights and obligations, or left itself genuinely free to exercise discretion.  Ctr. for Auto Safety v. NHTSA, 452 F.3d 798, 806 (D.C. Cir. 2006).

---

[4]  NMA defines this term to include the EC Memo, which was Ex. 3 [Doc. # 13-3] to the U.S. MTD Br. and is Ex. 1 to the NMA PI Br., and the Jackson Letter, which was Ex. 4 [Doc. # 13-4] to the U.S. MTD Br. and is Ex. 2 to the NMA PI Br.  Although NMA alleged separate challenges to MIRA and the EC Memo procedures in its Complaint, it has lumped the two documents together for the purposes of its PI briefing.

Here, the EC Process memoranda are plainly not legislative rules.  The first of the two

memoranda -- the Jackson Letter (Ex. 4) -- describes in general terms the consideration EPA

intended to use to screen permit applications, but it suggests no intent to bind EPA to any

particular approach or to otherwise curb the Agency's discretion.  See Jackson Letter (Ex. 4) at

1-2 (describing "how we intend to conduct the review of the approximately 110 pending permit

applications" and the "factors EPA intends to use to screen and evaluate the pending permit

applications") (emphasis added).  Moreover, the Jackson Letter created no new legal norms.  To

the contrary, it made clear that EPA planned to base its screening process on the already-existing

Section 404(b)(1) Guidelines.  Id.  Furthermore, the Jackson Letter established no legal

obligations or requirements for the regulated community – it merely stated the approach EPA

planned to use to screen permit applications for enhanced review.  Id.  The selected permit

applications were not granted or denied, and they remained subject to the same CWA standards

that apply to every permit, the only difference being that those applications would be subject to

the procedures set forth in the EC Memo, which procedures are themselves non-binding.  See EC

Memo (U.S. MTD Br. Ex. 3) at 3.  Thus, the Jackson Letter does not constitute a legislative rule.

The same is true for the EC Memo.  The Memo itself makes it clear that EPA and the

Corps did not intend it to be binding.  It was not published in the Federal Register or

incorporated in the Code of Federal Regulations, and the Memo's plain text states that it is

"intended solely as guidance" and "does not, and is not intended to, impose any legally binding

requirements on Federal agencies, States, or the regulated public[.]"  Id.  Furthermore, the EC

Memo does not create a new legal norm:  permit applicants remain subject to the substantive

requirements of the CWA and relevant regulations.  Id.  The Memo only establishes new

procedures for EPA-Corps coordination, but those procedures are non-binding and the agencies

retain discretion to vary from them in any particular case.  Id. (the agencies "will work to

adhere" to the time frames and procedures in the Memo "to the maximum practical extent"

though "flexibility may be needed under particular circumstances"; further, the Memo "does not

restrict the authority of the employees of [EPA and the Corps] to exercise their discretion in each

case to make regulatory decisions based on their judgment about the specific facts and

application of relevant statutes and regulations.").  The EC Memo does not bind EPA, the Corps,

or the regulated community with the force of law and, therefore, it does not qualify as a

legislative rule.[5]  See Gen. Elec. Co., 290 F.3d at 382.

     In spite of this plain language establishing that the EC Process memoranda are not

binding, NMA asserts that the memoranda are in fact binding because the agencies used the word

"will" as opposed to "may" in a handful of statements.  NMA PI Br. at 16.  These words,

however, naturally draw their import from context.  Thus, the word "will" is only a useful

indicator that a document is binding in a case where the agency does not explicitly state in plain

terms that the document is not binding, as EPA and the Corps stated in the EC Memo.

Accordingly, a statement such as the one cited by NMA -- where EPA wrote to the Corps that

"108 CWA Section 404 permit applications for surface coal mining activities in Appalachia will

be subject to review in accordance with these procedures," NMA PI Br. at 16 (citing NMA Ex.

14 at 1) -- does not support the conclusion that EPA and the Corps meant the EC Memo to be

binding, because the procedures referred to in that statement are explicitly not binding.  EC

Memo (U.S. MTD Br. Ex. 3) at 3.  For the same reason, the two additional statements from the

EC Memo cited by NMA (NMA PI Br. at 16) do not support NMA's contention because they,

too, are subject to the EC Memo's explicit statement that the procedures are not binding and that

---

[5] Furthermore, even if the EC Memo could qualify as a "rule," it would easily constitute a procedural rule that is exempt from notice-and-comment under the APA.  See U.S. MTD Br. at 38-40.

the agencies retain discretion. The statements cited by NMA from the Jackson letter (NMA PI

Br. at 16 (citing NMA Ex. 2)), also miss the mark, because they appear in a letter that makes it

clear that EPA is describing "factors EPA intends to use to screen and evaluate the pending

permit applications[.]" NMA PI Br. Ex. 2 (also U.S. MTD Br. Ex. 4) at 2 (emphasis added).

Thus, NMA's reliance on the use of the word "will" is misplaced.[6] NMA has no likelihood of

prevailing on its claim that the EC Process memoranda are legislative rules.

## 2.     The Detailed Guidance Is Not a Legislative Rule.

NMA also has no likelihood of prevailing on its challenge to the Detailed Guidance

because that document is a quintessential policy statement. As we established in our motion to

dismiss brief, U.S. MTD Br. at 40-45, there is nothing about the Detailed Guidance to suggest

that EPA intended it to be binding. The document was not incorporated in the Code of Federal

Regulations, nor was it published as a proposed or final rule in the Federal Register. See 75 Fed.

Reg. at 18,500. In addition, EPA issued the Detailed Guidance as an "interim" document that is

open to revision, thus demonstrating that EPA did not intend for the document to create

permanent standards. See id.; Detailed Guidance (U.S. MTD Br. Ex. 8) at 1 n.1. Furthermore,

the Detailed Guidance states explicitly that it "does not impose legally binding requirements on

EPA, the [Corps], the States, or the regulated community, and may not apply to a particular

situation depending on the circumstances." Id. at 2 n.3. This statement is consistent with the

remainder of the Detailed Guidance, which does not suggest that it imposes mandatory

---

[6] NMA posits that EPA and the Corps have implemented the EC Memo as a binding rule because an EPA letter
states that the agencies "committed to" follow the EC Memo procedures. NMA PI Br. at 17. But stating that the
agencies have committed to procedures that allow flexibility and the exercise of discretion is hardly evidence of a
legislative rule. Along the same lines, there is no merit to NMA's attempt to demonstrate that EPA has applied the
MIRA process as a binding rule because letters from the Agency confirm that, in fact, EPA has performed the MIRA
assessment. Id. at 18. To the extent that NMA means to suggest that a legislative rule is created whenever an
agency says it will apply procedures which themselves provide for flexibility and exercise of discretion, and then
does so, that argument is specious and must be rejected.

requirements on EPA's regional offices, state permitting authorities, or the regulated community. See U.S. MTD Br. at 42-44.  Instead, as we demonstrated in our motion to dismiss brief, U.S. MTD Br. at 40-45, the document's "pages are replete with words of suggestion." Cement Kiln Recycling Coal. v. EPA, 493 F.3d 207, 227 (D.C. Cir. 2007).

NMA nevertheless alleges that the Detailed Guidance: "directs" permitting authorities to incorporate certain conductivity limits into Section 402 and 404 permits, NMA PI Br. at 20; "makes substantive legal additions to the Section 404(b)(1) guidelines," id. at 21; "has a present, binding effect" and "constrains agency decisionmakers' discretion," id. at 22; and "dictat[es] what constitutes acceptable mitigation measures for Section 404 permits," id. at 21.  These allegations, however, are nothing but unsupported and conclusory statements that are contradicted by the plain language of the Detailed Guidance.  Tellingly, NMA has failed to pinpoint a single statement in the Detailed Guidance that can be read to direct or dictate anything.  For example, although NMA cites pages 12 and 18-21 of the Detailed Guidance for the proposition that the Detailed Guidance "directs State regulatory authorities and the Corps to incorporate [the] conductivity standard into permits," the cited pages include no such directive. Indeed, the document does not give any direction to the Corps (which, of course, is a separate agency and is not covered by EPA guidance),[7] but instead is directed at EPA's regional offices. See, e.g., Detailed Guidance (U.S. MTD Br. Ex. 8) at 18 ("Regions should convey their conclusions . . . to the Corps and, if appropriate changes to the permit are not made . . . , may proceed under the [CWA Section] 404(q) [Memorandum of Agreement] and/or Section 404(c).").  As to EPA's regional offices, the document provides no directives, but rather advises

---

[7] Nor does the Detailed Guidance give direction to the state agencies with respect to their CWA Section 402 permit programs.  Those agencies are also separate and not covered by the Detailed Guidance.  The Detailed Guidance provides direction to EPA's regional offices regarding their review of the states' draft CWA Section 402 permits.

as to what steps and analyses they "should" take. Id. at 12, 18-21.  In the end, NMA's

conclusory and misleading statements do nothing to undermine the clarity of the Detailed

Guidance on the key point here:  it "does not impose legally binding requirements."  Id. at 2 n.3.

    Unable to identify any text that would suggest the Detailed Guidance is binding, NMA

makes a flawed and insubstantial attempt to show that EPA is applying the Detailed Guidance as

a rule.  As we established in our Memorandum in Support of our Motion to Dismiss, such a

claim is, at best, unripe given EPA's limited application of the Detailed Guidance since April 1,

2010.  U.S. MTD Br. at 26-29.  Certainly, NMA cannot conclusively establish that EPA is

applying the Detailed Guidance as a rule because, as we demonstrated in our earlier brief, there

are several examples of permits that were issued that did not meet the recommended conductivity

parameters set forth in the Detailed Guidance that NMA contends are "binding."  Id. at 28-29 &

n.12.

    NMA has failed to identify a single permit that was denied or vetoed as a result of

application of the Detailed Guidance.  Instead, NMA attempts to show that EPA is applying the

Detailed Guidance in a binding fashion.  Specifically, NMA contends that "[w]ithout question,

EPA has followed through on its assurance that it would use the *de facto* water quality standard

in the Detailed Guidance to impose conductivity limits in pending permits."  NMA PI Br. at 20.

Setting aside the fact that EPA made no such "assurance," a fair reading of the sources cited by

NMA simply does not support the assertion that EPA has imposed conductivity discharge limits

in permits.  For example, the R. Johnson Declaration states only that "EPA asked the Corps to

include conductivity monitoring[.]"[8]  NMA PI Br. Ex. 4 ¶ 14 (emphasis added).  The Wells

---

[8]  Furthermore, this statement is incorrect insofar as it pertains to conductivity.  EPA's only comment letter to the Corps with respect to the Jagger Mine project was issued on September 29, 2010, which is two weeks *after* the Johnson Declaration was signed.  See Letter from T. Wellborn, EPA Region 4, to Col. S. Roemhildt, Corps Mobile (. . . *continued*)

Declaration states only that a conductivity limit in a Corps permit authorization was "based on comments made by USEPA[.]" Id. Ex. 9 ¶ 24 (emphasis added). The Dr. Johnson Declaration references a letter in which EPA explained to the Corps that the applicant agreed to perform conductivity monitoring and EPA "request[ed] that this be made a condition of the Section 404 permit." Id. Ex. 10 att. B (emphasis added). Finally, the EPA letter cited by NMA does not "require" any conductivity limit; rather, the letter is EPA's recommendation to the Corps that the subject permit "should limit" conductivity to below 500 μS/cm. Id. Ex. 18 at 2 (emphasis added).[9]

Thus, all that NMA's sources establish is that, in connection with a handful of permits, EPA has: asked for monitoring; requested and recommended that the Corps include discharge limitations; and suggested that the Corps include a monitoring condition that was agreed to by the applicant. Based on this evidence, NMA cannot succeed on its claim that the Detailed Guidance is a binding legislative rule.[10]

## C.    The EC Memoranda and the Detailed Guidance are Fully Consistent With the CWA and NEPA

NMA's argument that EPA has exceeded its authority under the CWA and NEPA is necessarily based on NMA's false predicate that the EC Process and the Detailed Guidance are binding and enforceable rules. If the Court finds that the EC Process and Detailed Guidance

---

Dist. (Sept. 29, 2010) (attached as Ex.14). In that letter, EPA did not recommend that the Corps include conductivity monitoring in the Jagger Mine permit. See id. at 3 (stating that "[t]urbidity monitoring should occur up and downstream of the project site's receiving waterbodies" but making no mention of conductivity).

[9] Notably, the two Johnson declarations and the EPA letter all pertain to mining projects in Alabama, which is not one of the Appalachian states subject to the Guidance.

[10] NMA also cites a newspaper article in support of the notion that EPA is implementing the Detailed Guidance in a binding fashion. NMA PI Br. at 20. Even assuming that a newspaper article could be probative on the issue at hand, the quoted statement -- that EPA intends to use the Guidance "to ensure that mining permits . . . provide the protection required under federal law," NMA PI Br. at 21 -- does not support NMA's argument; rather, it is consistent with the fact that the Guidance creates no new requirements beyond the CWA and existing regulations.

challenged by NMA are not legislative rules subject to APA rulemaking requirements, then there is no need to address the remaining issues raised by NMA, which are relevant, if at all, only if the challenged processes are deemed to be binding and enforceable rules. Nonetheless, we demonstrate below that the EC Process and the Detailed Guidance are consistent with, and authorized by, the CWA and NEPA.

### 1. The EC Process is Consistent With the CWA

As explained in the Factual Background, above, the EC Memo (Ex. 3) does not address the substantive criteria for review of the CWA Section 404 permit applications at issue. It merely establishes a procedure -- agreed to by both EPA and the Corps -- to facilitate their coordinated review of pending permit applications. This process is not inconsistent with the CWA; on the contrary, such coordination is expressly encouraged by the CWA and the Corps' own regulations.[11]

NMA's argument is based on the erroneous premise that EPA's role in the section 404 permitting process is limited to promulgation of the 404(b)(1) guidelines for the Corps to follow when determining whether to issue a permit, and its exercise of section 404(c) authority to prohibit specification (or "veto") certain disposal sites. NMA PI Br. at 4, 25, citing Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 129 S. Ct. 2458 (2009). Thus, NMA concludes that the EC Process illegally expands EPA's role in the permitting process. EPA's role, however, is not so limited.

---

[11] Similarly, the MIRA did not create a new standard or compel any particular outcome, nor was it used as a substitute for the Section 404(b)(1) Guidelines. MIRA (Ex. 4) at 2. It was merely a tool employed by EPA officials to facilitate consideration of the available data in various combinations and identify potential areas of concern. Id. at 1.

The CWA authorizes coordination between EPA and the Corps during the permit review process, and expressly requires the agencies to enter into an agreement to facilitate such coordination. 33 U.S.C. § 1344(q). Pursuant to that statutory directive, EPA and the Corps entered into a "Memorandum of Agreement between the Environmental Protection Agency and the Department of the Army dated August 11, 1992" (Ex. 1), expressly recognizing that "the EPA has an important role in the Department of the Army Regulatory Program under the Clean Water Act[.]" MOA (Ex. 1) at Pt. I, ¶ 2. The MOA provides that "[p]ursuant to its authority under Section 404(b)(1) of the Clean Water Act, the EPA may provide comments to the Corps identifying its views regarding compliance with the Section 404(b)(1) Guidelines," id., and "[t]he Corps will fully consider EPA's comments when determining [compliance] with the National Environmental Policy Act, and other relevant statutes, regulations, and policies. The Corps will also fully consider the EPA's views when determining whether to issue the permit, to issue the permit with conditions and/or mitigation, or to deny the permit." Id.

Not only is coordination authorized, but the MOA also sets forth coordination procedures "to provide and encourage communication and full consideration of each agencies' views concerning proposed projects" (MOA (Ex. 1) at Pt. II, ¶ 1), and encourages the Corps and EPA to develop:

> written procedures to ensure effective interagency coordination and to discuss issues, expedite comments, foster strong professional partnerships and cooperative working relationships. These professional partnerships will be based on EPA providing substantive, project specific comments and the Corps giving full consideration to EPA's recommendations as the Corps makes its determination of compliance with the Section 404(b)(1) Guidelines and the decision on the permit application.

MOA (Ex. 1) at Pt. II, ¶ 2.[12]

EPA's role in the Section 404 permitting process is codified in the Corps' own regulations, which require that before the Corps issues a CWA Section 404 permit, it must provide public notice to EPA and other resource agencies, and those agencies may provide comments for consideration by the Corps.  33 C.F.R. § 325.3(d). [13]

The EC Process is fully consistent with the coordination process authorized by the CWA and the Corps' regulations. It does not expand EPA's role in the Section 404 permitting process or "relegate the Corps to a virtual lackey with no independent voice in the permitting process" (NMA PI Br. at 25).  On the contrary, the Corps remains the final decisionmaker with respect to issuance of the permit, subject only to EPA's exercise of Section 404(c) authority.

### 2.  The Detailed Guidance is Consistent With the CWA

NMA argues that the Detailed Guidance is inconsistent with the CWA because it establishes a water quality standard and it unlawfully applies that standard to section 404 permits.  NMA is incorrect on both counts.

### a.  The Detailed Guidance does not establish a water quality standard.

NMA's argument that EPA has established a water quality standard for conductivity (NMA PI Br. at 9) is based on the fundamentally flawed premise that "the Guidance requires a limit on water quality of 500 µS/cm." NMA PI Br. at 28.  As demonstrated in Part I. B, above,

---

[12] NMA's argument that the EC Process  is an unlawful attempt to exercise its 404(c) authority without the procedural requirements (NMA PI Br. at 25) must be rejected because the the EC Process, like the MOA coordination process, is "in addition to EPA's authority under Section 404(c) of the Clean Water Act."  MOA (Ex. 1) at Pt. I, ¶ 5.

[13] To the extent NMA contends that EPA's participation in the process must be limited to the regulatory comment period (NMA PI Br. at 4), the MOA expressly rejects such limitation and provides that the Corps may discuss issues relevant to the project with EPA after the close of the comment period to either clarify matters or obtain information relevant to the permit decision.  MOA (Ex. 1) at Pt. II, ¶ 6.

the Guidance does not establish a water quality standard or require that any particular limit be established in state-issued CWA Section 402 permits. Rather, the Detailed Guidance provides guidance to the EPA Regions for their review of state-issued NPDES permits, as expressly authorized by the CWA and EPA's implementing regulations.

NMA's assertion that the state has exclusive authority to implement the NPDES program (NMA PI Br. at 6) is also incorrect. Even when a state has been authorized to implement the CWA Section 402 permit program, EPA has continuing oversight authority to ensure compliance of the State program with federal law. 33 U.S.C. § 1342(c)(2) (state programs "shall at all times be in accordance with this section"); 40 C.F.R. § 123.25(a) (state programs must be administered in conformance with EPA regulations). Pursuant to its oversight authority, EPA may comment upon, or object to, a proposed permit. If the state does not respond adequately to an EPA objection, permitting authority for that facility transfers to EPA. 33 U.S.C. § 1342(d).

As discussed in the Detailed Guidance, EPA became aware that some states were issuing NPDES permits that did not comply with the existing provisions of the CWA and EPA regulations. Specifically, the CWA requires NPDES permits to contain water quality-based effluent limits when necessary to meet water quality standards. 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. § 122.44(d)(1). In order to determine whether water quality-based effluent limits are necessary, the permitting authority is required to conduct a "reasonable potential analysis" to determine whether a discharge will cause, or has the reasonable potential to cause or contribute to, a violation of applicable numeric or narrative water quality standards. 40 CFR 122.44(d)(1). That analysis must be based on "relevant information." 40 C.F.R. § 122.44(d)(1)(vi). When the analysis suggests that a reasonable potential exists, the NPDES permit must include effluent limits or other permit conditions to ensure compliance with the state's water quality standards.

EPA's Permit Quality Review revealed that although states had adopted (and EPA had approved) narrative water quality standards for protection against biological impairment of streams, some states were issuing NPDES permits that did not adequately assess the reasonable potential for the discharge to cause violations of the narrative standards, and that EPA Regions, in exercise of their oversight authority, were not objecting to those permits.  Detailed Guidance (Ex. 8) at 7-8.[14]

The Detailed Guidance encourages compliance with existing federal law.  It identifies areas where state-issued NPDES permits have not been in compliance with existing CWA requirements, as interpreted in existing EPA regulations, and encourages EPA Regions to exercise their existing oversight authority to require compliance.  To assist in the development of effluent limits, or other permit conditions where necessary to ensure compliance with the state's narrative water quality standards, the Detailed Guidance provides information regarding recent scientific studies and literature that may be relevant and offers suggestions as to how such information may be incorporated into NPDES permits.  In sum, the Detailed Guidance does not establish a water quality standard but, rather, encourages compliance with existing federal law by explaining the regulatory requirements and stating that EPA intends to exercise its statutory oversight authority to ensure that state-issued NPDES permits contain conditions assuring compliance with existing narrative water quality standards adopted by the state.

**b.  The Detailed Guidance properly applies to section 404 permits.**

As explained in Part I.C.1, above, although the Corps has the final authority for issuance of Section 404 permits, EPA has an important role in the permitting process.  The Corps must evaluate permit applications for compliance with the 404(b)(1) Guidelines and its own

---

[14] As explained in the Detailed Guidance, EPA conducted a Permit Quality Review based on review of permit files for surface coal mining activities and interviews with state permit writers.  The review revealed that as many as 80% of the NPDES permits reviewed raised concerns with respect to compliance with state narrative water quality standards.  Detailed Guidance (Ex. 8) at 8.

regulations, including "compliance with applicable [EPA] effluent limitations and water quality standards." 33 C.F.R. § 320.4(d). EPA reviews the Section 404 permit applications and makes its own judgments about compliance with the 404(b)(1) Guidelines and threats to water quality. The Detailed Guidance properly counsels EPA Regions regarding the analyses that will ensure compliance with the 404(b)(1) Guidelines, including compliance with water quality standards, prevention of significant degradation, and full analysis of avoidance, minimization, and (where necessary) mitigation. Detailed Guidance (Ex. 8) at 20. These are appropriate considerations for EPA when reviewing a Section 404 permit application.

NMA's argument that EPA is precluded from applying the Detailed Guidance in its review of Section 404 permits is based on a misreading of Coeur Alaska. Coeur Alaska holds that a Section 402 permit is not required for a discharge that is permitted by the Corps under Section 404. Coeur Alaska, 129 S. Ct. at 2467. Nothing in the Detailed Guidance suggests that a Section 402 permit is required to authorize the discharge of dredged or fill material as authorized under the Section 404 permit. More relevant to the issue presented in this case is the second issue considered by the Supreme Court in Coeur Alaska. The Supreme Court held that the Corps was not required to assure compliance with EPA's "new source performance standards" promulgated pursuant to section 306 of the CWA because the 404(b)(1) Guidelines did not expressly require that they be considered. By contrast, the 404(b)(1) Guidelines do require that the Corps evaluate permit applications for compliance with water quality standards; indeed, the Supreme Court in Coeur noted that the Corps' own regulations require the Corps to evaluate permit applications "for compliance with applicable [EPA] effluent limitations [and water quality standards]. 33 C.F.R. § 320.4(d)." Coeur Alaska, 129 S. Ct. at 2472.

Finally, NMA also asserts that the consideration of water quality-based effluent limits in Section 404 permits improperly allows EPA and the Corps to "cast aside State certifications under Section 401 of the Act." NMA PI Br. at 32. Again, NMA is mistaken. The Corps' regulations provide that "[c]ertification of compliance with applicable effluent limitations and water quality standards required under provisions of section 401 of the [CWA] will be considered conclusive with respect to water quality considerations *unless the [EPA] advises of other water quality aspects to be taken into consideration.*" 33 C.F.R. § 320.4(d) (emphasis added). Thus, EPA's review of the permit applications with respect to impacts on water quality is fully consistent with the CWA and the Corps' own regulations.

### 3.   The Detailed Guidance is Consistent With NEPA

NMA argues that the Detailed Guidance violates NEPA in three respects: 1) that EPA attempts to substitute its preferences for the NEPA procedures adopted by the Corps; 2) that the Detailed Guidance contradicts the Corps' regulation specifying who will make NEPA decisions; and 3) that the Detailed Guidance "procedures were not subject to notice and comment nor CEQ consultation. NMA PI Br. at 33-35. NMA's arguments must fail because, as noted above, the Detailed Guidance specifically provides that it does not impose legally binding obligations on the participating agencies. The Detailed Guidance provides direction but is not an enforceable rule and therefore, cannot be read to amend or supplant the Corps' lawfully adopted NEPA procedures.

Furthermore, NMA has not and cannot point to anything in the Detailed Guidance that is inconsistent with the procedural requirements of NEPA and Courts have upheld the discretion of federal agencies as to how to achieve those procedural requirements. An agency must be allowed to "exercise its administrative discretion in deciding how, in light of internal

organization considerations, it may best proceed to develop the needed evidence . . ." Vt. Yankee

Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-44 (1978) (quoting FPC v. Transcom Gas

Pipe Line, 423 U.S. 326, 333 (1976)). NMA has not met its burden of showing how the

provisions of the Detailed Guidance are outside the bounds of that agency discretion.

## II.   NMA HAS NOT ESTABLISHED THAT ITS MEMBERS WILL FACE IRREPARABLE INJURY ABSENT EXTRAORDINARY INJUNCTIVE RELIEF

Because a "preliminary injunction is an extraordinary and drastic remedy," the party

seeking such an injunction must make a "clear showing" that temporary equitable relief is

necessary. Mazurek v. Armstrong, 520 U.S. at 972. The movant therefore carries a heavy

burden not only of demonstrating that "he is likely to prevail on the merits" but also that "he will

suffer irreparable injury" without injunctive relief. Doran v. Salem Inn, Inc., 422 U.S. at 931

(emphasis added). The failure to demonstrate harm is "grounds for refusing to issue a

preliminary injunction, even if the other three factors entering the calculus merit such relief."

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); accord

Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190, 204 (D.D.C. 2005), supplemented by No.

05cv2027, 2005 WL 3312962 (D.D.C. Dec. 7, 2005).

The burden of establishing irreparable harm is "considerable" and "require[s] proof that

the movant's injury is certain, great and actual--not theoretical--and imminent, creating a clear

and present need for extraordinary equitable relief to prevent harm." Power Mobility Coal., 404

F. Supp. 2d at 204 (citing Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985));

accord Hi-Tech Pharmacal Co., Inc. v. FDA, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) ("the alleged

injury must be certain, great, actual, and imminent"). "Bare allegations of what is likely to occur

are of no value since the court must decide whether the harm will in fact occur." Wisconsin Gas

Co., 758 F.2d at 674 (emphasis in original). Accordingly, "[t]he movant must provide proof . . .

indicating that the harm is certain to occur in the near future . . . [and] that the alleged harm will directly result from the action which the movant seeks to enjoin." Id.

In this Circuit, "it is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm." Wisconsin Gas Co., 758 F.2d at 674. "[O]nly economic loss that threatens the survival of a movant's business amounts to irreparable harm." Power Mobility Coal., 404 F. Supp. 2d at 204. Moreover, that economic harm will only warrant injunctive relief when the harm is "certain to occur in the near future as a direct result of the threatened action." Id.

### A. NMA Has Not Demonstrated that the Challenged Agency Policies Pose a Certain and Immediate Threat to the Survival of Any of Its Members.

NMA contends that its "small business members are likely to be driven out of business by the delays in permitting that are resulting from the Guidance."[15] NMA PI Br. at 35. Although NMA speaks of "the small size of some coal operators" and the likelihood that some of those unidentified companies may be forced to shut down, id. at 37, NMA provides no evidence to support those assertions. Instead, NMA relies exclusively on the situation of one company -- an Alabama coal company known as Best Coal, Inc. Id. at 36-37. The President of Best Coal, Randy Johnson, states in his Declaration that the company will be out of business within 18 months if pending Section 402 and 404 permit applications are not granted by Alabama permitting authorities and the Corps. Id. Ex. 4 ¶ 19.

NMA has fallen well short of meeting its "considerable" burden. Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190, 204 (D.D.C. 2005). As an initial matter, even assuming everything NMA asserts is correct, the possibility that one small company may be forced to go

---

[15] NMA does not assert that MIRA or the procedures in the EC Memo pose any threat of irreparable harm to its small business members. Indeed, the only so-called small business identified by NMA is a coal company in Alabama whose permit applications were not subject to the EC Process.

out of business in March of 2012 is flatly insufficient to warrant an injunction against EPA's use

of a guidance document in connection with review of hundreds of draft permits and permit

applications associated with surface coal mining across the Appalachian states. Indeed, the fact

that NMA is unable to identify a single member company facing a present or imminent threat of

shutdown is sufficient to demonstrate that preliminary injunctive relief is unwarranted.

But even if the Court were willing to assume that this potential future injury to one

company could justify the broad injunctive relief NMA seeks, NMA has still failed to carry its

burden for a number of reasons. First, Best Coal is not even a member of NMA. NMA PI Br.

Ex. 4 ¶ 2. Instead, Best Coal is a member of the Alabama Coal Association, which, in turn, is a

member of NMA. Id.; see also http://www.nma.org/about/membership_dir.asp (visited Oct. 8,

2010). Because NMA only has standing to sue on behalf of its members, see, e.g., Hunt v.

Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977), NMA cannot rely upon the

alleged harms to a non-member in order to obtain injunctive relief here.

Second, even if Best Coal were a member of NMA, Best Coal is located in Alabama,

which is not a state in the Appalachian Region covered by the Detailed Guidance challenged by

NMA. The Detailed Guidance provides that "[t]he discussion of the provisions of the CWA,

NEPA, and E.O. 12898 in this memorandum focuses on their applicablity to Appalachian surface

coal mining operations in Kentucky, West Virginia, Virginia, Ohio, Tennessee, and

Pennsylvania." Detailed Guidance (Ex. 8) at 2, n.4.

Third, even if Best Coal were in a state which is covered by the Detailed Guidance, NMA

has not demonstrated that the alleged delay was caused by the Detailed Guidance. The lengthy

delays of which Best Coal complains cannot be attributable to the Detailed Guidance, because

most of the delay occurred before the Detailed Guidance was issued in April, 2010. Best Coal

alleges that it submitted its application for a Section 402 permit to Alabama regulators in July 2008, but that the state authorities did not conclude that the permit application was complete until October 2009, NMA PI Br. Ex. 4 ¶¶ 9-10 – a gap of 15 months that occurred long before EPA issued the Detailed Guidance. Best Coal alleges that further delay began in October 2009, id. ¶ 11, which was six months before EPA issued the Detailed Guidance. Thus, even assuming Best Coal's allegations are true, the Detailed Guidance can only be associated with, at most, 6 of the 27 months that Best Coal contends constitutes delay regarding its Section 402 permit application (i.e., from April, 2010 until the present).

The link between the Detailed Guidance and permitting delays is even more tenuous in the context of Best Coal's application for a Section 404 permit. Best Coal states that it submitted a permit application to the Corps in September, 2008, but then made revisions to its application as late as July, 2010. Id. ¶ 13. Best Coal provides no clear explanation for the delay, but it certainly cannot be attributed to the Detailed Guidance, which did not come into existence until April, 2010. Thus, although NMA attempts to create the impression that Best Coal's Section 404 permit application has been delayed by the Detailed Guidance[16] for two years, the very longest delay that could be attributed to the Detailed Guidance is three months. Consequently, there is no basis to conclude that the Detailed Guidance is the direct cause of the delay alleged by NMA.

Fourth, NMA cannot establish that the Detailed Guidance is the cause of the alleged delay in the issuance of its permit. The Corps issues Section 404 permits in Alabama and Section 402 permits are issued by Alabama permitting authorities. Although EPA can comment on draft permits and object to or veto a permit, the decision to grant or deny a permit rests with

---

[16] Best Coal itself does not allege that the delays are attributable to the Detailed Guidance, as NMA is contending. Instead, Best Coal alleges, without specifying a time period, that "the delay in issuance of a modified Section 404 permit is due to EPA's review of the project and EPA's concerns over water quality based on EPA's [Memorandum of Understanding] with the Corps." NMA PI Br. Ex. 4 ¶ 14.

the Corps for Section 404 permits, and with Alabama regulators for Section 402 permits in that

state. As we have established, the Detailed Guidance is not binding on EPA or those permitting

authorities. The Corps or state regulators may delay issuance of permits for any number of

reasons, or deny the permits on water quality grounds or any other permissible basis. Thus, to

the extent that there is a delay in permitting that has affected Best Coal, that delay cannot be

attributable to the Detailed Guidance.[17]

Fifth, the alleged harm to Best Coal is clearly not imminent or certain, as is required to

establish "irreparable harm." As noted, the company claims that it will be out of business in 18

months if it does not receive the Section 402 and 404 permits necessary to expand its mining

operations. NMA PI Br. Ex. 4 ¶ 19. However, 18 months is not imminent. See Meghrig v. KFC

Western, Inc., 516 U.S. 479, 485 (1996) (noting that an endangerment "can only be 'imminent' if

it 'threaten[s] to occur immediately'" (quoting Webster's New International Dictionary of

English Language 1245 (2d ed.1934)); Power Mobility Coal., 404 F. Supp. 2d at 204 (to be

irreparable, harm must be "certain to occur in the near future") (emphasis added). Nor is there

any certainty in the alleged harm, given that there is no basis to assume that final permit

decisions will not be issued within 18 months or that this litigation will not be resolved by

March, 2012.

Finally, it is impossible to determine whether Best Coal's alleged irreparable harm is

"actual." Best Coal has made assertions about its assets, but has provided no means to determine

whether the asserted financial information is accurate. Moreover, absent that information, it

becomes impossible to determine whether it was the delay in permit issuance, as opposed to

---

[17] For these reasons, NMA cannot establish that the requested injunctive relief would abate the alleged irreparable injury. Even if the Court were to enjoin EPA from relying on the Detailed Guidance, there is no certainty that Best Coal would receive the permits it seeks.

other factors -- for example, inadequate capitalization or other liabilities -- that is the cause of Best Coal's predicted insolvency in 18 months. For all these reasons, NMA has fallen far short of establishing the irreparable harm necessary to warrant a preliminary injunction.

**B.      The Cost of Regulatory Compliance Is Not Irreparable Harm.**

In its next attempt to locate irreparable harm stemming from the Detailed Guidance, NMA argues that its members "are likely to incur substantial economic losses as a result of permit conditions being imposed under the Guidance[.]" NMA PI Br. at 35-36. Recognizing that economic loss alone cannot constitute irreparable harm, NMA contends that the alleged economic losses here "are unrecoverable because of sovereign immunity," id. at 36, and thus constitute irreparable injury.

NMA's contention fails both on the law and the facts. Although some courts have concluded that economic harm can be irreparable where damages cannot be recovered due to sovereign immunity, see Chamber of Commerce v. Edmondson, 594 F.3d 742, 770-71 (10th Cir. 2010), the D.C. Circuit has not adopted this exception to the general rule that economic loss is not irreparable. Furthermore, the exception pressed by NMA fails to take account of the well-established principle that the cost of compliance with a regulatory scheme does not constitute irreparable injury. See Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 115 (2d Cir. 2005); Am. Hosp. Ass'n v. Harris, 625 F.2d 1328, 1331 (7th Cir. 1980); A.O. Smith Corp. v. FTC, 530 F.2d 515, 527-28 (3d Cir. 1976); Nat'l Medical Care, Inc. v. Shalala, No. 95-0860 WBB, 1995 WL 465650, at *3 (D.D.C. June 6, 1995). As the Third Circuit explained in A.O. Smith, "[a]ny time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction." 530 F.2d at 527. Accordingly,

the cost of compliance is not irreparable injury, even where that cost cannot be recovered, because "[s]pending money to comply with the law is simply a fact of doing business."[18] IMS Health Inc. v. Sorrell, 631 F. Supp. 2d 429, 432 (D. Vt. 2009) (rejecting argument that compliance costs were irreparable harm where sovereign immunity would bar recovery of those costs); accord Pennsy Supply, Inc. v. Susquehanna River Basin Comm'n, No. 1:CV-06-2454, 2007 WL 551573, at *3 (M.D. Pa. Feb. 20, 2007) (same).

Here, it is undisputed that alleged harms identified by NMA are compliance costs. See NMA PI Br. at 38 (citing "the financial injuries that NMA's members are likely to face . . . from complying with the challenged agency actions" and costs that NMA's members will incur "[i]n order to obtain and comply with permits"). Because regulatory compliance costs are simply the economic reality of doing business, see, e.g., A.O. Smith Corp., 530 F.2d at 527-28, they cannot constitute irreparable harm.

But even assuming that compliance costs could constitute irreparable harm, NMA has not demonstrated any irreparable harm in this case. NMA contends that its member companies "must commit to, and ultimately spend, considerable amounts" to obtain and comply with permits that meet the standards in the Detailed Guidance.[19] NMA PI Br. at 38. NMA does not provide any evidence to support this broad statement, but instead relies exclusively upon the circumstances of one company -- a subsidiary of one of its member companies, United Coal Company ("UCC"), as set forth in the Wells Declaration attached to NMA's opening brief.

---

[18] The exception pressed by NMA would swallow the D.C. Circuit rule that economic loss is not irreparable, see Wisconsin Gas Co., 758 F.2d at 674, in any suit against a federal agency where the movant faces some cost to comply with the challenged agency action. Because sovereign immunity would typically shield the agency from a suit to recover those costs, such movants would nearly always establish irreparable injury, thereby undermining the Supreme Court's admonition that a preliminary injunction is a drastic and extraordinary remedy. See Mazurek, 520 U.S. at 972.

[19] NMA does not contend that MIRA or the EC Memo have resulted in unrecoverable costs.

According to NMA, the Detailed Guidance will require that company to forego a certain mine reclamation project because the cost of complying with special conditions in a proposed permit issued by the Corps would make the project unprofitable. Id. at 38-39.

This example falls well short of the irreparable harm standard established by the D.C. Circuit. As an initial matter, and assuming everything NMA alleges is correct, the possibility that one company may have a proposed project that becomes unprofitable due to the Detailed Guidance is manifestly insufficient to warrant an injunction against EPA's regulatory efforts with respect to hundreds of permits throughout the Appalachian states.

In any event, NMA has not established that the alleged costs to the UCC subsidiary are certain, actual, great, or imminent. See Power Mobility Coal., 404 F. Supp. 2d at 204. Indeed, it is clear that the UCC subsidiary has, at least for now, decided not to pursue the project and, thus, will incur no costs aside from non-quantified lost profits. Although it is impossible to tell from the Wells Declaration what those profits would have been, it seems unlikely that they would rise to the level of significance necessary to justify an injunction, especially given UCC's annual revenues, which were over $500 million during 2008.[20]  See http://www.unitedcoal.com/?p=20 (last visited Oct. 18, 2010) ("UCC's metallurgical coal production accounted for approximately 4% of total U.S. metallurgical coal production in 2008. Revenues totaled more than $500 million in 2008."); Coal. For Common Sense In Gov't Procurement v. United States, 576 F. Supp. 2d 162, 169-70 (D.D.C. 2008) (explaining that irreparable harm is not present where loss of profits constitutes a small percentage of company revenues).

---

[20] UCC is wholly-owned by Metinvest, which had annual revenues of more than $6 billion during 2009, and net profits of more than $2.8 billion for 2008 and $334 million for 2009, according to the company's annual report. Available at http://www.metinvestholding.com/en/investors/reports/.

Moreover, even if lost profits had been quantified, the additional project costs that would allegedly result from the Detailed Guidance are pure speculation. The Wells Declaration itself states that the special permit condition that would allegedly result in the increased costs is "highly ambiguous" as to what it actually requires. NMA PI Br. Ex. 9 ¶ 22. Accordingly, the Declaration includes a number of explicit presumptions and assumptions about what the permit might actually require. Id. ¶¶ 15, 17-18. Furthermore, the alleged water treatment costs projected in the Wells Declaration may not even be necessary, given that they would only come into play if water quality monitoring first demonstrated that additional controls were necessary. See id. ¶ 12. In that event, and based on the aforementioned series of presumptions and assumptions -- plus one undocumented cost estimate -- the Declaration concludes that "water treatment costs that could potentially be required from these draft special conditions would likely exceed the selling price of the coal mined by $192 per ton or over $25,000,000 for the project." Id. ¶ 14 (emphasis added). This type of contingent speculation about a draft permit condition that is "highly ambiguous" and has not been clarified with the Corps, see id. ¶ 25 (citing "the low likelihood of reaching a prompt and reasonably acceptable resolution" of the issue) is manifestly insufficient to support the drastic and extraordinary remedy NMA seeks here. See Wisconsin Gas Co., 758 F.2d at 674 ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur.") (emphasis in original); Power Mobility Coal., 404 F. Supp. 2d at 204 (to be irreparable, harm must be "certain to occur in the near future").

NMA has also failed to show that the alleged harm is the direct result of EPA's Detailed Guidance. As discussed above, the Detailed Guidance is neither binding nor self-implementing; it merely explains how EPA may exercise its discretion during the permitting process for permits

associated with surface coal mining operations in Appalachia. Only when a final permit decision is reached can there be any harm to the permit applicant. In the example relied upon by NMA, the Corps is the permitting authority. Although EPA may have made recommendations to the Corps based on EPA's Detailed Guidance, the Corps is the agency charged with making the final permitting decision (subject to EPA's "veto" authority under CWA Section 404(c)). Unless or until the Corps grants or denies a permit, or EPA vetoes a permit, there is no obligation on the applicant and, thus, no harm. Accordingly, NMA cannot establish that the Detailed Guidance is the direct cause of the alleged economic harms in this case.[21]

### C.   NMA Has Not Demonstrated Irreparable Harm to Property Interests.

In its last attempt to identify irreparable harm that stems from the agency policies at issue in this suit, NMA contends that EPA and the Corps, through the EC Process and the Detailed Guidance, are infringing on the property interests of NMA's members by "delaying and effectively preventing NMA member companies from developing their private property interests." NMA PI Br. at 40. Because interests in real property are unique, NMA contends that the EC Process and Detailed Guidance are causing irreparable harm to NMA's members. Id.

This argument is baseless. The cases relied upon by NMA do not suggest in any manner whatsoever that the type of environmental regulation at issue here could qualify as an "infringement" upon property rights sufficient to constitute irreparable harm. Indeed, the rule suggested by NMA would create de facto irreparable harm across much of the field of environmental regulation, given that environmental regulations often place conditions on the use

---

[21] NMA also argues that injunctive relief is required because the science underlying the conductivity limits in the Guidance may turn out to be incorrect. NMA PI Br. at 39. Of course, that is always the case with any agency action that is based on science. More to the point, speculation that the underlying science could turn out to be flawed does not create irreparable injury where NMA has otherwise failed to establish that any of its members faces anything more than typical compliance costs.

of private property.  Such an interpretation of the law would be in plain contravention of the

basic principle that preliminary injunctive relief is a drastic remedy reserved for extraordinary

circumstances.  See Mazurek, 520 U.S. at 972.

Moreover, the cases cited by NMA do not support irreparable harm here.  To the

contrary, those decisions address whether the loss of real property – as may occur in a dispute

over ownership or title – can constitute an irreparable harm because land is unique.  In RoDa

Drilling Co. v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009), the court refused to "decide

whether it would be appropriate to assume the existence of irreparable harm because we are

dealing with interests in real property."  However, the court found that the plaintiff had

established irreparable harm because the defendant was improperly holding record title to the

plaintiff's property and, as a result, plaintiff "simply cannot participate in the everyday

operations of its own interests, and the damages arising from that denial are incalculable."  Id. at

1211.  In Pelfresne v. Village of Williams Bay, 865 F.2d 877, 883 (7th Cir. 1989), the court

stated the "general rule" that "interference with the enjoyment or possession of land is

considered 'irreparable' since land is viewed as a unique commodity," but went on to find that

the demolition of buildings on land was not irreparable injury.

Here, there is no dispute over the ownership or title to any property.  Nor is there any

allegation that EPA or the Corps are taking possession of any mining property or interfering with

the title of coal mines such that NMA's members are unable to participate in the everyday

operation of their mining operations.  Accordingly, NMA has not demonstrated irreparable harm

and its motion for a preliminary injunction must be denied.

**D.    NMA's Delay in Seeking Injunctive Relief Further Undermines Its Claims of Irreparable Harm.**

A delay in seeking injunctive relief, though not dispositive, can "militate[] against a finding of irreparable harm." Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 44 (D.D.C. 2000).  In this case, NMA seeks to enjoin both the EC Process and the Detailed Guidance.  The "EC Process memoranda" NMA is challenging were issued by EPA and the Corps in June, 2009. Yet, NMA waited 13 months (until July 20, 2010) to file this suit challenging the memoranda.. Given that NMA was willing to wait more than a year to challenge the EC Process, "despite NMA's belief that the agencies were subverting federal law," NMA PI Br. at 1, NMA's claims of irreparable injury associated with the EC Process memoranda are entitled to no weight.

NMA is also challenging the Detailed Guidance, which EPA issued on April 1, 2010.  In spite of NMA's belief that EPA was "subverting federal law," id., NMA waited until July 20, 2010, to challenge the Detailed Guidance.  This apparent lack of urgency further undermines NMA's assertion that immediate injunctive relief is necessary here.  The Court should therefore deny NMA's motion.

**III.    THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF THE UNITED STATES**

The balance of equities tips decidedly in favor of the United States.  As indicated above, there is very little weight on the NMA side of the scales because NMA has no likelihood of success on the merits and it has demonstrated no irreparable harm that will occur in the short term while this case is pending.[22]  Accordingly, the burden on the United States to shift the balance is very modest, indeed.

---

[22] Because this is a claim brought pursuant to the APA, it is likely to be resolved on cross-motions for summary judgment without discovery and trial.  Accordingly, the preliminary relief sought by NMA would exist for a relatively short time.

In contrast to the utter lack of irreparable harm demonstrated by NMA, significant environmental interests are at stake here. Consequently, the equities weigh in favor of allowing EPA and the Corps to review the permit applications in an orderly and coordinated framework as set forth in the EC Process, and support the scrutiny of proposed actions by EPA in accordance with the Detailed Guidance. As recognized by both the Corps and EPA in the Preamble to the MOU:

> This mining practice often stresses the natural environment and impacts the health and welfare of surrounding human communities. Streams once used for swimming, fishing, and drinking water have been adversely impacted, and groundwater resources used for drinking water have been contaminated. Some forest lands that sustain water quality and habitat and contribute to the Appalachian way of life have been fragmented or lost. These negative impacts are likely to further increase as mines transition to less accessible coal resources within already affected watersheds and communities.

MOU (Ex. 2) at 1. The EC Process and the Detailed Guidance challenged by NMA are designed to "significantly reduce the harmful environmental consequences of Appalachian surface coal mining operations, while ensuring that future mining remains consistent with federal laws." Id. at 2. The environmental interests thus weigh heavily in favor of the United States and compel denial of the preliminary injunction.

In addition, the United States has a strong interest in the regularity of the administrative process. It is important -- not just for this case, but for all regulatory actions -- that non-final and non-binding agency actions are not subject to judicial review. To hold otherwise would encourage premature judicial challenges to agency actions before the administrative process has been completed, would interfere with the administrative process, and unnecessarily waste judicial resources.

For these reasons, the balance of the equities compels denial of the preliminary injunction.

IV.   **DENIAL OF THE PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST**

Absent any likelihood that NMA will succeed on the merits of its claims, and absent any immediate irreparable harm, there is simply no public interest that would be served by an injunction here. The public interest is served by allowing the Corps and EPA to complete their review and consideration of permit applications in a thoughtful and considered manner as set forth in the EC Process. The public interest would not be served by enjoining the EC Process adopted by the Corps and EPA, and instead imposing artificial barriers between the two agencies, as suggested by NMA.

Similarly, the public interest would not be served by enjoining use of the Detailed Guidance. In the absence of the Detailed Guidance, the EPA Regions will still exercise their oversight authority to assure compliance with Federal law, and EPA may still exercise its authority to object to State-issued Section 402 permits and veto Corps-issued Section 404 permits. The Detailed Guidance provides assistance to EPA Regions and facilitates their review of applications for Section 402 permits issued by the States, and applications for Section 404 permits issued by the Corps. The Detailed Guidance thus serves the public interest in the permit process.

## CONCLUSION

For the reasons set forth above, EPA and the Corps respectfully request that the Plaintiff's Motion for Preliminary Injunction be denied. Further, for the reasons set forth in the United States' Motion to Dismiss, as incorporated herein, EPA and the Corps respectfully request that Plaintiff's Complaint be dismissed.

Respectfully submitted,

IGNACIA S. MORENO

Assistant Attorney General
Environment and Natural Resources Division

/s/Kenneth C. Amaditz
CYNTHIA J. MORRIS
KENNETH C. AMADITZ
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, DC  20026-3986
(202) 616-7554 (Morris)
(202) 514-3698 (Amaditz)
Fax: (202) 514-8865
c.j.morris@usdoj.gov
kenneth.amaditz@usdoj.gov

OF COUNSEL:

KARYN WENDELOWSKI
Office of General Counsel
U.S. EPA
1200 Pennsylvania Ave., N.W.
MC 2355A
Washington, D.C.  20460
RUSSELL W. PETIT
Office of the Chief Counsel
U.S. Army Corps of Engineers
Washington, D.C.  20314





**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

September 29, 2010

Colonel Steven J. Roemhildt
U.S. Army Corps of Engineers
Mobile District
Attn:  Candice McCullough
218 Summit Parkway
Homewood, Alabama  35209

Subject:  Pre-Discharge Notification, Best Coal Company – Jagger Mine,
          SAM 2009-01688-CTM, Jefferson County, Alabama

Dear Colonel Roemhildt:

The U.S. Environmental Protection Agency (EPA), Region 4, has reviewed the Nationwide Permit (NWP) 21 Pre-Discharge Notification (PDN), regarding the proposed 307-acre Jagger Mine in Jefferson County, Alabama.  Impacts to jurisdictional waters of the United States include 4,080 linear feet (lf) of intermittent stream, 9,200 lf of ephemeral.stream, and 0.36 acres of wetlands.  This project is within the United States Geographic Society Ecoregion 68f of the major Appalachian geographic province.  The proposed life of the project is 5 years.

EPA recommends that the project be considered under an Individual Section 404 Permit (IP) because the potential impacts are more than minimal, have the potential for cumulative impacts not considered under NWP's, and have the potential to cause or contribute to an exceedance of applicable State water quality standards.  The reasons for our recommendation are discussed below.

**Water Dependency**

*"Water dependent"* means development that cannot physically function without direct access to the body of water along which it is proposed.  The test for water dependency should assess both the need of the proposed use for access to the water and the *capacity of the proposed water body to satisfy the requirements and absorb the impacts of the proposed use*.  A proposed project is not considered water dependent if either the use can function away from the water or if the water body proposed is *unsuitable for the use*.  Where the activity associated with a discharge which is proposed for a special aquatic site does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.  In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve

a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

Mining in general, and specifically this project, does not meet the criteria of water dependency. The applicant has not provided information as to why this project must impact waters of the United States except for economic reasons. The economic discussion does not include a balance sheet detailing a cost analysis that compares the cost of avoidance to mitigation costs – i.e., avoidance of aquatic resource impacts may be more economically advantageous than the cost of restoring these ecosystems.

## Avoidance & Minimization

The CWA Section 404(b)(1) Guidelines (Guidelines) at 40 CFR 230.10(a) allows permit issuance for only the least environmentally damaging practicable alternative (LEDPA). No discharge shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact to the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. Section 230.10(d) of the guidelines states that appropriate and practicable steps to minimize the adverse impacts may be required through project modifications and permit conditions. The proposed project does not offer any avoidance of on-site aquatic ecosystems. All of the aquatic resources on the site are proposed for impact.

The Guidelines require an alternatives analysis that selects the LEDPA that satisfies the basic project purpose. While the applicant has partially met the LEDPA requirement by documenting and comparing various mining methods for coal extraction, the analysis is based on purely economic factors and does not include an analysis of environmental impacts of each method. The applicant is encouraged to seek additional avoidance of impacts.

## Compensatory Mitigation

Appropriate and practicable compensatory mitigation is required for unavoidable adverse impacts which remain after all appropriate and practicable minimization has been met. The applicant indicates that silviculture activities on the southern half of the project that have occurred within the last few months in preparation for mining may have degraded on-site aquatic resources with excessive sediment, debris, and channel alteration. The applicant then used the degraded stream mitigation factors to assess the mitigation credits required. As recently as April 2, 2010, EPA Region 4 expressed written concern over these types of practices wherein silviculture activities in preparation for mining do not follow Best Management Practices (BMPs) and then cause degradation of aquatic systems. The Mobile Corps District was forwarded a copy of the referenced letter, and a copy is enclosed.

EPA made a site visit on September 23, 2010, to assess the aquatic effects of the silviculture practices on the site. From the site inspection it was determined that approximately 1,200 lf of ephemeral stream (0.05-acre) was impacted by improper application of BMPs. The sediment in the stream channels has remained on-site and downstream water quality has not been affected. The violation is minor in scope and would be best addressed by establishing a working relationship with Best Coal and the landowners to prevent future violations. The applicant has

agreed to inform landowners of permit requirement associated with silvicultural operations and to assist EPA and the Corps in this endeavor.

The applicant and consultant will also verify the mitigation calculations to ensure that appropriate factors are used in the current permit application.  The compensatory mitigation should establish success criteria and adaptive management plans that can be implemented if the compensatory mitigation does not meet its success criteria.  Once restored, the compensatory mitigation sites should be preserved in perpetuity.  Collection of adequate baseline data will be difficult if the applicant plans to start mining in the near future.  Still, EPA believes the collection of adequate baseline is essential to overall water quality and compensatory mitigation success, and is a requirement of the 2008 Compensatory Mitigation Rule.  If the applicant's proposed on-site compensatory mitigation cannot fully comply with the 2008 Compensatory Mitigation Rule, then use of approved mitigation banks would be a more suitable approach.

## Cumulative Impacts

There are 95 active coal mines in the Black Warrior River watershed, which includes the Locust Fork River.  The cumulative effect of numerous mines does not seem to have been considered by the Corps.  This is an additional reason that justifies advertising this project as an IP.  An IP will allow public comment and expand the scope of review of the resource agencies to include an analysis of the cumulative effects of mining projects.

## Water Quality

A Water Quality Standards Protection Plan (WQSPP) specific to the proposed mining activity should be adopted before authorizing the final permit.  The permit should require that the WQSPP include BMPs and use of Best Available Technology that will ensure discharges from the mine's permitted outfalls, do not cause, or contribute to violations of the State's narrative or numerical water quality standards, in particular sediment discharges into the Locust Fork River, which is listed as impaired by sediment in Alabama's 303(d) list.  We feel that the stream/river buffers required by the Surface Mining Control and Reclamation Act along with the effluent guidelines are not adequate to protect the Locust Fork River and will continue to cause degradation of the river.  We recommend a 200-foot buffer between the mine and associated ponds and the Locust Fork River and Trouble Creek and request the Corps to include this buffer requirement as a condition of the permit.  Turbidity monitoring should occur up and downstream of the project site's receiving waterbodies to ensure that the Alabama turbidity requirements are not violated.

The BMPs must be implemented before, during, and after construction.  BMPs may include but are not limited to, topsoil management, utilization of silt fences, straw bales, check dams, limiting vegetation removal within buffers to the maximum extent practicable, mulching and seeding.

## Environmental Justice

The requirements of Executive Order (E.O.) 12898 and the Presidential Memorandum accompanying it must be addressed appropriately in federal action—such as federal permitting

3

under 404 of the CWA and National Environmental Policy Act. Under E.O. 12898, "each Federal agency shall make achieving environmental justice (EJ) part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." EPA would encourage the District to include EJ as part of this permit's review. Residences may be affected by changes in groundwater (drinking water wells), particulate matter related to respiratory illness, noise, vibrations, and increased traffic. EPA is also concerned that the Nationwide PDN may not have provided the EJ community with a chance to review and comment.

### Conclusion

The EPA, Region 4, has reviewed the PDN regarding the Jagger Mine and recommends that this project be considered under a Section 404 IP because the potential impacts are more than minimal and have the potential to cause or contribute to degradation of applicable State water quality standards. We are requesting expanded buffers on the project to protect the Locust Fork River, which is already listed on the Alabama 303(d) list for water quality degradation from sediment. The project's compensatory mitigation plan is not complete, design elements lack detail, and should be further developed to derive a compensatory mitigation plan that protects aquatic resources in accordance with the 2008 Compensatory Mitigation Rule. Thank you for the opportunity to comment on this PDN. If you have any questions regarding these comments, please contact Mark LaRue (larue.mark@epa.gov or 404-562-9417) or Duncan Powell (powell.duncan@epa.gov or 404-562-9258).

Sincerely,

Thomas C. Welborn
Chief
Wetlands, Coastal, and Oceans Branch

Enclosures (2)

cc:   Elizabeth Brown, AHC, Montgomery, AL
      William Pearson. USFWS, Daphne, AL
      Matthew Marshall, ADCNR, Montgomery, AL
      Brandy Bowen, ADEM, Montgomery, AL
      Eric Sanderson, ADEM, Montgomery, AL
      Randall Johnson, ASMC, Jasper, AL
      Candice McCullough, USACE, Birmingham, AL

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL MINING ASSOCIATION,  )<br>  )<br>  Plaintiff,  )<br>  )<br>  v.  )<br>  )<br> LISA JACKSON, ADMINISTRATOR,  )<br> U.S. ENVIRONMENTAL PROTECTION  )<br> AGENCY, et al.,  )<br>  )<br>  Defendants.  )<br>_____)  | No. 1:10-CV-1220-RBW |

**[PROPOSED] ORDER**

This matter is before the Court on the Motion for Preliminary Injunction filed by

Plaintiff, National Mining Association ("NMA").  Having considered the arguments presented

by NMA in support of the relief requested, and having considered the arguments presented by

the United States in opposition to the preliminary relief requested, including the arguments

presented in the United States' Motion to Dismiss the Complaint and the arguments presented by

NMA in opposition to the Motion to Dismiss, and having heard and considered argument of

counsel, and for reasons apparent to the Court, it is

ORDERED that the Motion for Preliminary Injunction be, and hereby is, DENIED; and it

is further

ORDERED that the United States' Motion to Dismiss be, and herby is, GRANTED.

It is so ORDERED this _____ day of _____, 201_.


_____
United States District Judge

- 1 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>LISA JACKSON, ADMINISTRATOR, )<br>U.S. ENVIRONMENTAL PROTECTION )<br>AGENCY, et al., )<br><br>Defendants. )<br>_____ ) | No. 1:10-CV-1220-RBW |

CERTIFICATE OF SERVICE

    I hereby certify that on October 20, 2010, I filed the foregoing Memorandum in Opposition to NMA's Motion for Preliminary Injunction and a [Proposed] Order with the Court's CM/ECF system which will cause a copy be served on counsel of record.

                                      /s/Cynthia J. Morris