## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NATIONAL MINING ASSOCIATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No.  10-cv-01220-RBW** |
| **LISA JACKSON, in her official capacity as** | ) | |
| **Administrator, U.S. Environmental Protection** | ) | |
| **Agency, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### PLAINTIFF NATIONAL MINING ASSOCIATION'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

|  |  |
|---|---|
| | John Martin, No. 358679 |
| Katie Sweeney | Kirsten L. Nathanson, No. 463992 |
| Of Counsel | David Y. Chung, No. 500420 |
| Karen C. Bennett, No. 477151 | CROWELL & MORING LLP |
| NATIONAL MINING ASSOCIATION | 1001 Pennsylvania Avenue, N.W. |
| 101 Constitution Avenue, N.W. | Washington, DC 20004-2595 |
| Suite 500 East | (202) 624-2500 |
| Washington, DC 20001 | |
| (202) 463-2600 | |

ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION

Dated: October 20, 2010

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATUTORY BACKGROUND..............................................................................3

    I.      CLEAN WATER ACT SECTION 404 PERMITTING PROCESS....................3

    II.     CLEAN WATER ACT SECTION 303 WATER QUALITY STANDARDS
             DEVELOPMENT ................................................................................4

    III.    CLEAN WATER ACT SECTION 402 PERMITTING PROCESS....................5

FACTUAL BACKGROUND ..................................................................................6

    I.      JUNE 11, 2009 EC PROCESS MEMORANDA..................................................6

    II.     APRIL 1, 2010 GUIDANCE ..............................................................................9

STANDARD OF REVIEW ....................................................................................10

ARGUMENT ..........................................................................................................11

    I.      THE COMPLAINT SUFFICIENTLY ALLEGES THAT EPA PROMULGATED
             THE EC PROCESS MEMORANDA AND GUIDANCE IN VIOLATION OF
             THE ADMINISTRATIVE PROCEDURE ACT.................................................11

          A.     The EC Process Memoranda Were Promulgated In Violation Of
                The APA. ...................................................................................13

               1.     The EC Process Memoranda Substantially Altered
                      The Legal Framework For CWA Permits for Coal
                      Mining............................................................................13

               2.     The EC Process Memoranda Are Binding
                        Legislative Rules............................................................15

               3.     No Exception To The APA's Rulemaking
                        Requirements Applies To The EC Process
                      Memoranda. ....................................................................17

          B.     EPA Promulgated The Guidance In Violation Of The APA. .................19

                1.     The Guidance Substantially Altered The Legal
                        Framework For CWA Permits for Coal Mining. ........................19

               2.     The Guidance Is A Binding Legislative Rule. ............................20

               3.     No Exception To The APA's Rulemaking
                        Requirements Applies To The Guidance....................................22

    II.     NMA'S COMPLAINT CHALLENGES FINAL AGENCY ACTIONS. ..........23

          A.     The EC Process Memoranda Are Final Agency Actions........................23

          B.     EPA's Guidance Is Final Agency Action. .............................................26

    III.    NMA'S CLAIMS ARE RIPE FOR REVIEW...................................................29

   A. NMA's Challenges To The EC Process Memoranda Are Ripe..............30

   B. NMA's Challenge To The Guidance Is Ripe.........................................34

IV. NMA HAS STANDING TO CHALLENGE THE EC PROCESS
  MEMORANDA...............................................................................................39

V. THE COURT SHOULD DEFER CONSIDERATION OF DEFENDANTS'
  JURISDICTIONAL CHALLENGES UNTIL THE MERITS IF IT FACES
  DISPUTED FACTS.........................................................................................42

VI. EPA'S USE OF THE MCIR ASSESSMENT IS NOT A DECISION
  COMMITTED TO AGENCY DISCRETION BY LAW...................................44

CONCLUSION....................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Aluminum Co. of Am. v. United States*,
   790 F.2d 938 (D.C. Cir. 1986) ................................................................. 26

*Am. Paper Inst. v. EPA*,
   996 F.2d 346 (D.C. Cir. 1993) ................................................................... 6

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (D.C. Cir. 2000) ........................................................ passim

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ............................................................................ 22

*Ass'n of Flight Attendants v. U.S. Dep't of Transp.*,
   564 F.3d 462 (D.C. Cir. 2009) ................................................................ 39

*Barrick Goldstrike Mines, Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000) .................................................................. 30

*Batterton v. Marshall*,
   648 F.2d 694 (D.C. Cir. 1980) ................................................................ 18

*Bennett v. Spear*,
   520 U.S. 154, 117 S. Ct. 1154 (1997) ..................................................... 23

*Better Gov't Ass'n v. Dep't of State*,
   780 F.2d 86 (D.C. Cir. 1986) ...................................................... 30, 32, 35

*Catawba County v. EPA*,
   571 F.3d 20 (D.C. Cir. 2009) ............................................................ 20, 21

*Cement Kiln Recycling Coal. v. EPA*,
   493 F.3d 207 (D.C. Cir. 2007) .......................................................... 21, 38

*Chamber of Commerce v. U.S. Dep't of Labor*,
   174 F.3d 206 (D.C. Cir. 1999) ................................................................ 12

*Chem. Mfrs. Ass'n v. EPA*,
   26 F. Supp. 2d 180 (D.D.C. 1998) .......................................................... 25

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402, 91 S. Ct. 814 (1971) ......................................................... 44

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) ................................................................ 15

*Cody v. Cox*,
   509 F.3d 606 (D.C. Cir. 2007) ................................................................ 44

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*,
   129 S. Ct. 2458 (2009) ............................................................. 4, 14, 25, 44

*Crop Life America v. EPA*,
  329 F.3d 876 (D.C. Cir. 2003) ...................................................................... passim

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
  452 F.3d 798 (D.C. Cir. 2006) ............................................................ 23, 27, 29

*Defenders of Wildlife v. EPA*, 415 F.3d 1121 (10th Cir. 2005) ...................... 5

*District of Columbia v. Schramm*,
  631 F.2d 854 (D.C. Cir. 1980) ............................................................................ 45

*Fla. Power & Light Co. v. EPA*,
  145 F.3d 1414 (D.C. Cir. 1998) .................................................................. 29, 33

*Freehold Cogeneration Assocs. v. Bd. of Regulatory Comm'rs*,
  44 F.3d 1178 (3d Cir. 1995) ........................................................................ 32, 33

*FTC v. Standard Oil of Cal.*,
  449 U.S. 232, 101 S. Ct. 488 (1980) ......................................................... 25, 26

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002) ..................................................................... passim

*Heckler v. Chaney*,
  470 U.S. 821, 105 S. Ct. 1649 (1985) ............................................................ 45

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192 (D.C. Cir. 1992) ................ 10, 43

*Hous. Study Grp. v. Kemp*,
  736 F. Supp. 321 (D.D.C. 1990) ........................................................................ 12

*Mun. of Anchorage v. United States*, 980 F.2d 1320 (9th Cir. 1992) ............ 38

*Nat'l Ass'n of Home Builders v. Norton*,
  415 F.3d 8 (D.C. Cir. 2005) ......................................................................... 27, 29

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
  538 U.S. 803, 123 S. Ct. 2026 (2003) ............................................................ 33

*Navegar, Inc. v. United States*,
  103 F.3d 994 (D.C. Cir. 1997) ........................................................................... 40

*NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333 (3d. Cir. 2001) .. 31, 32, 34, 40

*Nevada v. Dep't of Energy*,
  457 F.3d 78 (D.C. Cir. 2006) ............................................................................. 33

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) ......................................................................... 3, 7

*Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*,
  87 F.3d 1242 (11th Cir. 1996) ........................................................................... 45

*Pub. Citizen, Inc. v. Nuclear Regulatory Comm'n*,
  940 F.2d 679 (D.C. Cir. 1991) ........................................................................... 38

*Reckitt Benckiser, Inc. v. EPA*,
  613 F.3d 1131 (D.C. Cir. 2010) .................................................................. passim

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) ................................................................. 28

*Scolara v. Dist. of Columbia Bd. of Elections & Ethics*,
  104 F. Supp. 2d 18 (D.D.C. 2000) ............................................................ 11

*U.S. Tel. Ass'n v. FCC*,
  28 F.3d 1232 (D.C. Cir. 1994) .................................................... 12, 37, 43

*U.S. Telecom Ass'n v. FCC*,
  400 F.3d 29 (D.C. Cir. 2005) .................................................................... 11

*Wilson v. Dist. of Columbia*,
  Civ. No. 09-2258 (RBW), 2010 WL 3001716 (D.D.C. July 30, 2010) ............................ 10, 11

**Statutes**

5 U.S.C. § 553 ............................................................................................ 11, 12

33 U.S.C. § 1251 ................................................................................................ 5

33 U.S.C. § 1311 ................................................................................................ 5

33 U.S.C. § 1312 ................................................................................................ 5

33 U.S.C. § 1313 ...................................................................................... 3, 5, 19

33 U.S.C. § 1341 ................................................................................................ 3

33 U.S.C. § 1342 ...................................................................................... 3, 5, 6

33 U.S.C. § 1344 ....................................................................................... passim

**Regulations**

33 C.F.R. part 325 ...................................................................................... passim

33 C.F.R. § 325.2 ................................................................................................ 8

33 C.F.R. § 325.2(a) ........................................................................................... 4

33 C.F.R. § 325.2(a)(2) ................................................................................. 13, 15

33 C.F.R. § 325.2(d)(2) ...................................................................................... 4

33 C.F.R. § 325.2(d)(3) ................................................................................. 4, 13, 15

40 C.F.R. § 123.44 ............................................................................................ 6

40 C.F.R. § 131.2 .............................................................................................. 5

40 C.F.R. § 131.4 ............................................................................................ 19

40 C.F.R. Part 230 ............................................................................................ 4

**Other Authorities**

51 Fed. Reg. 41236 .......................................................................................... 16

David Fahrenthold, *Environmental Regulations to Curtail Mountaintop Mining*, THE
  WASHINGTON POST, April 2, 2010 ............................................................... 38

Ken Ward, Jr., EPA Says Its New Mining Guidance 'Stands,' CHARLESTON GAZETTE, Aug. 13, 2010 ............................................................................................................................. 27

Peter L. Strauss, Comment, *The Rulemaking Continuum*,
41 DUKE L.J. 1463 (1992) ................................................................................................... 17

## EXHIBIT LIST

**Exhibits 1 through 23 were filed with Plaintiff's Motion for Preliminary Injunction. Exhibits 24 through 30 are being filed with this Memorandum in Opposition to Motion to Dismiss.**

| Exhibit Number | Description |
|---|---|
| 1 | June 11, 2009 Memorandum to the Field on Enhanced Coordination Procedures for Pending Permits ("EC Memo") |
| 2 | June 11, 2009 EPA Letter to the Department of the Army Regard Key Factual Consideration for Surface Coal Mining Permit Review ("MCIR Assessment Memo") |
| 3 | April 1, 2010 Memorandum: Improving EPA Review of Appalachian Surface Coal Mining Operations Under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order ("Guidance") |
| 4 | Declaration of Randy Johnson, Best Coal, Inc. (Sept. 15, 2010) |
| 5 | Letter from Jeffrey Lapp, EPA Region 3, to Ginger Mullins, Corps Huntington District (Jan. 20, 2009) |
| 6 | Letter from John Pomponio, EPA Region 3, to Dana Hurst, Corps Huntington District (Mar. 23, 2009) |
| 7 | Letter from John Pomponio, EPA Region 3, to Dana Hurst, Corps Huntington District (Apr. 3, 2009) |
| 8 | Declaration of Thomas Cook, Massey Coal Services (Sept. 16, 2010) |
| 9 | Declaration of William Wells, Jr., United Coal Company LLC (Sept. 1, 2010) |
| 10 | Declaration of Dr. Randall Johnson, Alabama Surface Mining Commission (Sept. 15, 2010) |
| 11 | Declaration of Jeffrey D. Jarrett (Sept. 14, 2010) |
| 12 | Declaration of Margaret H. Dunn, Stream Restoration, Inc. (Sept. 16, 2010) |
| 13 | Letter from John Pomponio, U.S. EPA to Ginger Mullins, Corps Huntington District (Sept. 14, 2010) |
| 14 | EC Memo Transmittal Letter (June 11, 2009) |
| 15 | Letter from John Pomponio, U.S. EPA Region 3 to CONSOL Energy Corp. (Aug. 7, 2009) |
| 16 | U.S. EPA Briefing on the Mining Analysis for EPA Regions 3, 4, and 5 (July 13, 2009) |
| 17 | April 1, 2010 Memorandum Questions & Answers |
| 18 | Letter from James Giattina, U.S. EPA Region 4, to Col. Steven Roemhildt, U.S. Army Corps of Engineers, Mobile District (Jul. 26, 2010) |
| 19 | Email from Tom Welborn, EPA Region 4, to James Townsend, *et al.* (June 23, 2010) |
| 20 | Brief for the Federal Appellee, *City of Albuquerque v. Browner*, 97 F.3d 415 (10th Cir. 1996) (No. 93-2315) |
| 21 | National Mining Association, Conductivity Study Comments and |

| Exhibit Number | Description |
|---|---|
| | Attachments (Sept. 3, 2010) |
| 22 | Declaration of John T. Gray, Association of American Railroads (Sept. 15, 2010) |
| 23 | Declaration of Paul B. Horn, Jr., Booth Energy (Sept. 17, 2010) |
| 24 | Declaration of James C. Higgins, II, Simmons Fork Mining, Inc. (Oct. 18, 2010) |
| 25 | Second Declaration of Thomas Cook, Massey Coal Services (Oct. 19, 2010) |
| 26 | Complaint for Declaratory and Injunctive Relief, *Huffman v. EPA* (No. 10-cv-1189) (S.D.W.Va. Oct. 6, 2010) |
| 27 | Complaint in Intervention, *Ky. Coal Ass'n v. EPA* (No. 10-cv-125) (E.D.Ky. Oct. 17, 2010) |
| 28 | Letter from Evelyn MacKnight, EPA Region 3, to Jeffrey Parsons, W. Va. Dep't of Envtl. Prot. (May 13, 2010) |
| 29 | Letter from Tinka Hyde, EPA Region 5, to Ginger Mullins, Corps Huntington Dist. (May 27, 2010) |
| 30 | Declaration of Bradley C. Lambert, Va. Dep't of Mines, Minerals and Energy (Oct. 20, 2010) |

Plaintiff National Mining Association ("NMA") hereby submits the following memorandum of points and authorities in opposition to the Defendants' motion to dismiss.

## INTRODUCTION

This suit challenges a series of agency actions that have fundamentally altered the regulatory infrastructure that governs Clean Water Act ("CWA") permitting for coal mining in the eastern United States: (i) the Enhanced Coordination Process ("EC Process"), launched in mid-2009 by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps"), and (ii) the April 1, 2010 Detailed Guidance Memorandum ("Guidance") issued by EPA. These actions have effectively brought permitting to a halt and are subjecting NMA's members to costly delays and uncertainty, in addition to forcing adverse business decisions that have ripple effects across the local communities dependent on mining.

The government seeks to evade judicial review of its actions, arguing that NMA has not stated a claim under the Administrative Procedure Act ("APA"), that the challenged actions are not final or ripe for review, and that NMA lacks standing to challenge some of the actions. The government's brief relies heavily on the agencies' artful drafting of the memoranda at issue and ignores that the challenged actions cast aside a codified regulatory process that has been in place for more than two decades. The brief further fails to recognize EPA's unprecedented intrusion, in both process and substance, into permitting processes delegated by statute to the Corps and the states. While the government's brief is replete with cited authority and selective quotation, it fails to draw any factual analogs between precedent and the agency actions at issue here.

Comparing the government's arguments to the realities both in the law and at the coal mines demonstrates that NMA's suit should proceed. The facts and teachings of *Appalachian*

*Power*, *Crop Life*, and *General Electric* (among others)[1] defeat the government's arguments on

finality, ripeness, and whether rulemaking procedures were required.  The declarations of

NMA's members, both in support of the preliminary injunction motion and attached to this

opposition, illustrate an industry that is suffering concrete injuries in the face of the challenged

actions that would be redressed by a favorable ruling from this Court.  The compelling

statements also answer whatever prudential questions on ripeness the government's motion may

raise.

Finally, and perhaps most importantly, the challenged actions are inflicting injury beyond

industry – state governments are rising up, speaking out, and seeking judicial review of the

broad-based application of the challenged actions in their jurisdictions, which is having

widespread impacts on the states' abilities to govern and regulate water quality while at the same

time allowing responsible coal mining consonant with federally delegated state law.  Not only

have two states (West Virginia and Kentucky) brought litigation against the same EPA actions

that NMA challenges here,[2] but the attached declaration from the state of Virginia describes in

deep and dramatic detail how EPA is implementing the Guidance in a broad and binding manner:

> The Detailed Guidance effectively announced a new water
> conductivity standard of 500 µS/cm that is applicable to both
> Section 402 and 404 permits. . . . EPA has made efforts to disguise
> the mandatory nature of the Detailed Guidance while utilizing it as
> though it had been enacted with regulatory formality. . . . EPA staff
> noted . . . that they would not approve any permits that would
> result in a conductivity level of greater than 500 µS/cm.

Declaration of Bradley C. Lambert, Va. Dep't of Mines, Minerals and Energy (Oct. 20, 2010)

(NMA Ex. 30) ¶¶ 2, 5.  EPA's conduct bears the hallmarks of finality and ripeness.

---

[1] *See Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000); *Crop Life Am. v. EPA*, 329 F.3d 876 (D.C. Cir. 2003); *Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002).

[2] Complaint for Declaratory and Injunctive Relief, *Huffman v. EPA* (No. 10-cv-1189) (S.D.W.Va. Oct. 6, 2010) (Ex. 26); Complaint in Intervention, *Ky. Coal Ass'n v. EPA* (No. 10-cv-125) (E.D.Ky. Oct. 17, 2010) (Ex. 27).

For these reasons and those set forth in detail in the below memorandum, NMA respectfully asks that the government's motion to dismiss be denied.

## STATUTORY BACKGROUND

Coal mining operations require numerous permits and pre-project reviews, including two types of CWA permits: (i) Section 404 permits, issued by the Corps, for the discharge of dredged and fill material; and (ii) Section 402 permits, typically issued by states, for the discharge of all other pollutants. *See* 33 U.S.C. §§ 1344, 1342; *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.* ("*OVEC*"), 556 F.3d 177, 186-87, 190-91 (4th Cir. 2009). Section 404 permits govern material that fills or displaces receiving waters, while Section 402 permits govern pollutants that are discharged into receiving waters. Such permits need to ensure compliance with applicable water quality standards developed by the states. *See* 33 U.S.C. § 1313. For federally issued permits, Section 401 requires certification from the state that proposed discharges comply with applicable water quality standards. *See* 33 U.S.C. § 1341.

## I.     CLEAN WATER ACT SECTION 404 PERMITTING PROCESS

Under CWA Section 404, the Corps has sole authority to issue permits for the discharge of "dredged or fill" material into navigable waterways at specified disposal sites. *See* 33 U.S.C. § 1344(a). Before issuing a permit, the Corps must provide notice and an opportunity for public hearings. *See id.* In specifying disposal sites, the Corps must apply guidelines ("the 404(b)(1) Guidelines"), which it develops in conjunction with EPA. *See id.* § 1344(b). Congress intended for expeditious decisions on Section 404 permits and thus, it instructed that, "to the maximum extent practicable," decisions on such permits be made within ninety days. *See id.* § 1344(q).

The Corps' procedures for issuing a Section 404 permit are codified at 33 C.F.R. part 325. Among other things, they require the Corps to review permit applications for completeness and, within 15 days of receipt, issue a public notice for applications deemed complete. 33 C.F.R.

§ 325.2(a).  By regulation, the comment period shall last for a reasonable period of time within which interested parties may express their views, but generally should not exceed 30 days.  *See id.* § 325.2(d)(2).  The Corps must decide on applications within 60 days of receipt of a complete application, unless one of several specific regulatory exceptions applies.  *See id.* § 325.2(d)(3).

"Section 404 assigns the EPA two tasks in regard to fill material."  *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458, 2467 (2009).  First, EPA must develop the 404(b)(1) Guidelines in conjunction with the Corps "for the Corps to follow in determining whether to permit a discharge of fill material."  *Id.*  Second, the Act confers EPA authority, under specified procedures, to prevent the Corps from authorizing certain disposal sites.  *Id.*

EPA promulgated the 404(b)(1) Guidelines, which are codified at 40 C.F.R. Part 230 and guide the Corps' review of the environmental effects of the proposed disposal sites.  *See* 33 U.S.C. § 1344(a), (b).  EPA may comment on the Corps' application of the 404(b)(1) Guidelines to particular permit applications during the interagency review period required for each permit.  In addition, EPA has limited authority under Section 404(c) to prevent the Corps from authorizing a particular disposal site.  *See id.* § 1344(c).  To exercise that authority, EPA must determine, after notice and an opportunity for public hearing, that certain unacceptable environmental effects on municipal water supplies, shellfish beds and fishery areas, wildlife, or recreation areas would result, *id.*; EPA lacks authority to exercise unfettered enforcement of compliance with the 404(b)(1) Guidelines.  EPA must also consult with the Corps and publicize written findings and reasons for any determinations it makes under Section 404(c).  *Id.*

## II.   CLEAN WATER ACT SECTION 303 WATER QUALITY STANDARDS DEVELOPMENT

Section 303 of the CWA, among other provisions, reflects Congress' policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent,

reduce and eliminate pollution." 33 U.S.C. § 1251(b). Section 303 allocates primary authority for development of water quality standards to the states. *See* 33 U.S.C. § 1313. A water quality standard defines the water quality goals of a water body by designating uses for that body and setting criteria necessary to protect those uses. 40 C.F.R. § 131.2. Such standards can be expressed as specific numeric limitations or as general narrative statements.

"[S]tates have the primary role . . . in establishing water quality standards," and "EPA's sole function, in this respect, is to review those standards for approval." *Defenders of Wildlife v. EPA*, 415 F.3d 1121, 1124 (10th Cir. 2005) (internal quotation marks and citation omitted).[3]

## III.   CLEAN WATER ACT SECTION 402 PERMITTING PROCESS

The CWA Section 402 permit program, known as the National Pollutant Discharge Elimination System ("NPDES"), focuses on wastewater discharges to receiving waters and governs such discharges through the establishment of technology-based limits. 33 U.S.C. § 1342; *id.* § 1311(b)(2). When application of a technology-based limit to a particular discharge will not assure compliance with applicable water quality standards established for the particular receiving water body, the permitting authority must develop permit limitations that would work to maintain such water quality. 33 U.S.C. § 1312; 40 C.F.R. § 122.44(d).

Conforming to the statute's goal of allocating the "primary responsibilities" for water pollution control to the states, 33 U.S.C. § 1251(b), states assume primary administration and enforcement of the NPDES permitting program. 33 U.S.C. § 1342(b). Once EPA approves a proposed state permitting program, states have exclusive authority to implement the NPDES program within their boundaries, and EPA has only limited authority to review state action. EPA

---

[3] While not at issue in this litigation, Congress gave EPA limited authority to promulgate water quality standards only if "it determines that a state's proposed new or revised standard does not measure up to [the Act's] requirements *and* the state refuses to accept EPA-proposed revisions to the standard" or "a state does not act . . . but,

retains authority, in specified circumstances, to object to a particular NPDES permit. 33 U.S.C.

§ 1342(d); 40 C.F.R. § 123.44. If the state does not respond adequately to EPA's objection

within specified timeframes, EPA may assume the authority to issue the permit. 33 U.S.C.

§ 1342(d)(4). If EPA does not object to a permit within the specified procedures and timeframes,

the state may proceed in accordance with its delegated authority and issue the permit.

## FACTUAL BACKGROUND

Beginning in January 2009, in a marked departure from prior, longstanding EPA practice,

EPA initiated an extra-regulatory review process for CWA Section 404 permits that had no basis

in the Corps' or EPA's codified procedures. Complaint for Declaratory and Injunctive Relief

("Compl.") ¶ 50. EPA issued a series of letters to the Corps recommending denial of certain

CWA Section 404 permit applications for coal mining operations. *Id.* In each of these cases, the

Corps was poised to issue the permits, and EPA had already either commented or waived its

opportunity to comment. *See* Compl. ¶ 50. Undaunted by the fact that the opportunity for

comment had passed, EPA's letters contained newly articulated positions questioning the legality

of the permits at issue. *Id.* EPA raised concerns about conductivity levels in water quality

citing, for the first time, a 2008 study (Pond *et al.*) that analyzed the relationship between

conductivity as a measure of water quality and aquatic life use.[4] *Id.*

## I.     JUNE 11, 2009 EC PROCESS MEMORANDA

On June 11, 2009, EPA, the Corps, and the Department of Interior released a

Memorandum of Understanding on Implementing the Interagency Action Plan on Appalachian

Surface Coal Mining (the "MOU"). Compl. ¶ 54. Among other things, the MOU formalized the

---

in the EPA's view, a new or revised standard is necessary." *Am. Paper Inst. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993) (emphasis in original).

[4] EPA continued to send these letters even after a February 2009 decision from the Fourth Circuit ended long-running litigation against various Section 404 permits and upheld the legality of the Corps' permit review process.

extra-regulatory review process of CWA Section 404 permits that EPA had previously commenced in January 2009 and signaled a further change in the Section 404 permitting process – the launch of the EC Process.  *Id.*  The EC Process effectively allowed EPA and the Corps to revisit and/or restart the review process for pending Section 404 permit applications.  *Id.* ¶ 57; *see also* Declaration of James C. Higgins, II, Simmons Fork Mining, Inc. (Oct. 18, 2010) (NMA Ex. 24) ¶ 4. Concurrent with the release of the MOU, EPA issued formal details on the EC Process, which were immediately effective and imposed substantive changes to the Section 404 permitting process by creating a new level of review by EPA and a separate permitting pathway not contemplated by the current regulatory structure.  Compl. ¶ 60.

In the EC Process, EPA first utilizes the Multi-Criteria Integrated Resource Assessment (the "MCIR Assessment")[5] to screen all pending Section 404 permit applications for Appalachian coal mining operations.  *Id.* ¶¶ 61-62.  In the MCIR Assessment screening stage, EPA applies the 404(b)(1) Guidelines and determines which permit applications will proceed to review by the Corps under the long-standing existing permit processing procedures and which applications will be subject to the newly devised EC Process.  *Id.*  It effectively sets a threshold of acceptable effects from coal mining to create a "fork in the road" in the Section 404 permitting process, and it expands EPA's role from mere commenter to gate-keeper.  *Id.* ¶ 62. The MCIR Assessment was not subjected to public notice and comment.  *See id.* ¶ 63.

---

*See OVEC*, 556 F.3d 177; *see also* Compl. ¶¶ 51-52.

[5] To clarify, NMA is challenging EPA's use of the MCIR Assessment to screen Section 404 permit applications that were pending as of March 31, 2009 to determine which applications would be subject to the EC Process.  In that screening process, EPA gathered data that it determined would be relevant to an evaluation under the 404(b)(1) Guidelines and input it into the MCIR Assessment.  *See* Defs.' MTD Ex. 5; *see also* Compl. ¶¶ 61-62, 107-08.  The MCIR Assessment screening process at issue in this case appears to have been established through a series of agency pronouncements, most notably, the June 11, 2009 memorandum from Administrator Jackson to Acting Assistant Secretary Terrence Salt.  *See, e.g.* Defs.' MTD Ex. 4; *see also* http://water.epa.gov/lawsregs/guidance/ wetlands/mining-screening.cfm.

Once a permit application is earmarked for the EC Process as a result of the MCIR Assessment, the applicant faces a burdensome review process that is wholly separate from (i) the public hearing and comment process envisioned in Section 404(a) and (ii) EPA's exercise, if any, of its Section 404(c) authority.  *See id.* ¶¶ 67-70.  Specifically, the EC Process involves discussions among EPA, the Corps, the permit applicant, and other potentially relevant agencies both before and during a 60-day coordination period.  *Id.* ¶ 67; *see also* NMA Ex. 24 (Higgins Decl. ¶ 5); Second Declaration of Thomas Cook, Massey Coal Services (Oct. 19, 2010) ("2d Cook Decl.") (NMA Ex. 25) ¶¶ 9, 11-17.  There is no requirement to initiate the coordination period in a timely fashion, which contrasts sharply with the timelines set forth in Section 404 and its implementing regulations.  *See* 33 U.S.C. § 1344(a), (q); 33 C.F.R. § 325.2.

The EC Process adds a *minimum* 60 days (and potentially many months) of review to the existing review process entirely outside of, and in addition to, the existing Section 404 procedures and timelines.  Compl. ¶ 68.  At the end of the EC Process, only if issues identified by EPA are resolved in individual permit applications may those permits move forward to the Corps for processing and incorporation of new permit terms or conditions dictated by EPA during the EC Process.  *Id.* ¶ 70.  Neither EPA nor the Corps proposed to revise the existing codified review procedures in 33 C.F.R. Part 325, and EPA did not propose to amend the 404(b)(1) Guidelines when formalizing the EC Process.  *Id.* ¶ 71.

In practice, EPA announced, in September 2009, that it utilized the MCIR Assessment to identify 79 coal-related Section 404 permits currently pending with the Corps that would be subject to the EC Process, rather than the 33 C.F.R. Part 325 process.  *See* Compl. ¶¶ 64-65; Defs.' MTD Exs. 6, 7.  Not surprisingly, numerous permit applications remain indefinitely stalled, and those applicants are being injured as a direct result of the EC Process Memoranda.

*See, e.g.*, NMA Ex. 24 (Higgins Decl. ¶¶ 4-6); NMA Ex. 25 (2d Cook Decl. ¶¶ 9-17); NMA Ex. 23 (Horn ¶¶ 6-7, 10).  The timelines for those permit applications stray far from the deadlines that Congress envisioned in Section 404 and from the Corps' own regulatory deadlines.  *See* 33 C.F.R. § 325.2.  Even so, Defendants never proposed to revise the existing regulations governing Section 404 permits or to provide any notice or an opportunity to comment.  *See* Compl. ¶ 71.

## II.     APRIL 1, 2010 GUIDANCE

EPA unilaterally released the Guidance on April 1, 2010 to provide "detailed guidance" to EPA Regions 3, 4, and 5 for the review of all coal mining operations under the CWA, National Environmental Policy Act ("NEPA"), and the Environmental Justice Executive Order. Compl. ¶ 72.  While EPA solicited public comment on the Guidance, 75 Fed. Reg. 18500, it nevertheless made the Guidance effective immediately.  *See id.*

In the Guidance, EPA made sweeping pronouncements about both the need for water quality-based limits in Section 402 and 404 permits and the adequacy of mitigation measures associated with Section 404 permits.  *See id.* ¶¶ 73-84.  For example, the Guidance effectively established a region-wide water quality standard by directing that Section 402 and 404 permits should contain conditions to ensure that conductivity levels do not exceed 500 µS/cm.  *See id.* ¶¶ 112-13.  EPA's direction was based on a draft, not-yet-peer-reviewed report, which purports to recognize "stream-life impacts associated with conductivity."  Defs.' MTD Ex. 8 at 11.  From that report, EPA concluded that it "expects that in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts to water quality."  *Id.* at 12, 22.

EPA is using the Guidance to cause indefinite delays and impose new and unattainable conditions in the Section 402 and 404 permit processes for coal mining operations.  Compl. ¶¶ 2-3, 80, 90.  In addition, EPA is pressuring permitting authorities to insert the conductivity limit from the Guidance into pending permits.  *See, e.g.*, NMA Ex. 30 (Lambert Decl. ¶ 5); NMA Ex.

26 (W. Va. Compl. at ¶¶ 135, 142-43), NMA Ex. 27 (Ky. Compl. in Intervention ¶¶ 9-10, 73-74); NMA Ex. 4 (R. Johnson Decl. ¶¶ 11, 14); NMA Ex. 9 (Wells Decl. ¶¶ 11-12, 24); NMA Ex. 10 (Dr. Johnson Decl. ¶¶ 8, 10).  Yet, EPA has provided no basis to conclude that this conductivity level will harm the uses protected by a given state narrative water quality standard and, in some instances, natural background levels are higher than 500 μS/cm.  *See, e.g.*, NMA Ex. 9 (Wells Decl. ¶ 7); NMA Ex. 11 (Jarrett Decl. ¶ 11); NMA Ex. 12 (Dunn Decl. ¶¶ 5-8); NMA Ex. 23 (Horn Decl. ¶ 9).  Simply put, the Guidance is presently being applied to wreak havoc on the coal mining industry in the eastern United States and is threatening to cause significant financial losses and even drive some companies out of business.  *See, e.g.*, NMA Ex. 25 (2d Cook Decl. ¶¶ 19-21); NMA Ex. 9 (Wells Decl. ¶¶ 24-25); NMA Ex. 4 (R. Johnson Decl. ¶¶ 17-18); NMA Ex. 23 (Horn Decl. ¶¶ 11-13).

## **STANDARD OF REVIEW**

"The Court must accept as true all of the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)."  *Wilson v. Dist. of Columbia*, Civ. No. 09-2258 (RBW), 2010 WL 3001716, at *2 (D.D.C. July 30, 2010) (citations omitted). Although a trial court may consider materials beyond the complaint in resolving Rule 12(b)(1) motions, "it must bear in mind what procedural protections could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties."  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992).  Indeed, the D.C. Circuit "has previously indicated that ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction."  *Id.* (citation omitted).

In ruling upon a Rule 12(b)(6) motion, "a court does not test whether the plaintiff will prevail on the merits, but instead whether the claimant has properly stated a claim."  *Scolara v.*

*Dist. of Columbia Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (internal

quotation marks and citation omitted).  The Court "must accept the plaintiffs' factual allegations

as true" but need only accept allegations pled with factual support "to the extent they plausibly

give rise to an entitlement to relief."  *Wilson*, 2010 WL 3001716, at *3.  The Court must also

"liberally construe[] the complaint in favor of the plaintiff, who must be granted the benefit of all

inferences that can be derived from the facts alleged."  *Id.*  A claim will survive a motion to

dismiss under Rule 12(b)(6) so long as it is "facially plausible," *i.e.*, it is supported by "factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (internal quotation marks and citation omitted).

## <u>ARGUMENT</u>

**I.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT EPA PROMULGATED
       THE EC PROCESS MEMORANDA AND GUIDANCE IN VIOLATION OF THE
       ADMINISTRATIVE PROCEDURE ACT.**

Counts I, II, and III of NMA's Complaint set forth the necessary elements of claims for

failure to provide notice-and-comment rulemaking under the APA and thus, dismissal of those

claims would be improper.  NMA's Complaint details how the three agency actions challenged

in this case are *de facto* legislative rules, and therefore, that the Federal Defendants' failure to

promulgate them with advance notice and comment violated the APA, 5 U.S.C. § 553.  *See*

Compl. ¶¶ 60-99.  While the government's brief reads like one for summary judgment, the

Complaint more than adequately satisfies the Rule 12(b)(6) standard, as explained further below.

Legislative rules are those agency pronouncements that "have the force and effect of

law."  *Appalachian Power*, 208 F.3d at 1020.  In particular, "new rules that work substantive

changes . . . or major substantive legal additions . . . to prior regulations are subject to the APA's

procedures."  *U.S. Telecom Ass'n v. FCC*,  400 F.3d 29, 34-35 (D.C. Cir. 2005) (internal

quotation marks and citations omitted).  Under the APA, an agency that intends to promulgate a

legislative rule "must first provide the public with notice of, and an opportunity to comment upon, a proposed version of it." *Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999); *see also* 5 U.S.C. § 553.  By contrast, when an agency issues "general statements of policy," it is exempt from the APA's notice-and-comment requirements, *see* 5 U.S.C. § 553(b), but that exemption is to be "construed narrowly" and "only reluctantly countenanced." *Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 325 (D.D.C. 1990).

Although D.C. Circuit "case law reflects two related formulations for determining whether a challenged action constitutes a regulation or merely a statement of policy," *Crop Life*, 329 F.3d at 883,[6] the Defendants correctly note that the primary criterion used to distinguish between legislative rules and policy statements is "whether the agency action binds private parties or the agency itself with the force of law."  Defs.' MTD at 34 (quoting *Gen. Elec.*, 290 F.3d at 382).  Indeed, the D.C. Circuit has "said repeatedly that [the distinction between a legislative rule and a policy statement] turns on an agency's intention to bind itself to a particular legal policy position." *U.S. Tel. Ass'n v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994).  Importantly, circuit precedent "make[s] clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 383.

As explained below, NMA's Complaint sufficiently alleges that the EC Process Memoranda and the Guidance made substantial, binding changes to the existing CWA permitting regime and therefore, constituted legislative rules promulgated in violation of the APA.  This Court should deny Defendants' motion to dismiss Counts I, II, and III for failure to state a claim.

---

[6] The first formulation looks to whether the agency action (i) "imposes any rights and obligations;" or (ii) "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Id.* (internal quotation marks and citations omitted).  The second formulation looks to (i) "the agency's own characterization of the action;" (ii)

### A.    The EC Process Memoranda Were Promulgated In Violation Of The APA.

Counts I and II, which challenge the EC Process Memoranda, allege sufficient facts to state claims for violation of the APA.  The EC Process Memoranda established: (i) the screening process in which EPA uses the MCIR Assessment model to review and screen permit applications to identify which will be subject to the EC Process, *see* Compl. ¶¶ 61-62; and (ii) the EC Process for Section 404 permits for coal mining projects in Appalachia, *see id.* ¶¶ 67-70. Rather than providing notice of either of these documents and making them available for public comment, the agencies simply posted them on EPA's website.  *See* Compl. ¶¶ 63, 71, 92, 95.

### 1.    The EC Process Memoranda Substantially Altered The Legal Framework For CWA Permits for Coal Mining.

Like the EPA press release that was vacated in *Crop Life* for want of notice and comment, the EC Process Memoranda "reflect[ed] an obvious change" in both the established permitting regime under Section 404 of the CWA and the Corps' regulations, 33 C.F.R. part 325, implementing that section.  *See Crop Life*, 329 F.3d at 881; *see also* Compl. ¶¶ 2-3, 61-71.  The Section 404 permit regime is characterized by a specified regulatory pathway, deadlines for the Corps' permitting decisions, and a clearly defined, statutory division of authority between the Corps and EPA.  *See* Compl. ¶¶ 16-31; 33 C.F.R. § 325.2(a)(2), (d)(3); 33 U.S.C. § 1344(q). Moreover, Congress intended for the Corps, and only the Corps, to apply the Section 404(b)(1) Guidelines when making permit decisions.  *See* Compl. ¶ 28; 33 U.S.C. § 1344(b).  Last, the statute envisions consultation between EPA and the Corps on permitting, but only in the context of EPA's exercise of its authority to "veto" the Corps' designation of any particular area as a

---

"whether the action was published in the Federal Register of Code of Federal Regulations;" and (iii) "whether the action has binding effects on private parties or on the agency."  *Id.* (internal quotation marks and citations omitted).

disposal site.[7]  *See* 33 U.S.C. § 404(c); *see also* Compl. ¶¶ 30-31.  The Supreme Court

recognized EPA's limited role in the Section 404 process in *Coeur Alaska*, when it stated that

"Section 404 assigns the EPA two tasks in regard to fill material"—writing the Section 404(b)(1)

Guidelines and exercising its 404(c) authority.  129 S. Ct. at 2463.

The EC Process Memoranda substantially alter this established regime.  *See* Compl. ¶¶ 2-

3, 61-71, 101-04, 107-08.  The EC Process Memoranda "constitute[] binding regulation[s] that

[are] directly aimed at and enforceable against petitioners."  *Crop Life*, 329 F.3d at 881.  The

"clear and unequivocal language" in the EC Process Memoranda "reflects an obvious change in

established agency practice, [and] creates a binding norm that is finally determinative of the

issues or rights to which it is addressed."  *Id.*  Moreover, "[i]n practical effect, [the EC Process

Memoranda] create[d] a new regime, a new legal system governing permits, and as such [they]

should have been, but [were] not, promulgated in compliance with notice and comment

rulemaking procedures.  *Appalachian Power*, 208 F.3d at 1024.

Specifically, EPA established a new screening process, in which EPA, and <u>not</u> the Corps,

uses the MCIR Assessment to apply EPA's interpretation of the Section 404(b)(1) Guidelines

early in the permitting process to determine which permit applications "require further

[enhanced] coordination between EPA and the Corps."  *See* Defs.' MTD Ex. 4 at 2; *see also*

Compl. ¶¶ 107-08.  Additionally, EPA's and the Corps' enhanced coordination procedures add at

least an additional sixty days of review and consultation into the Section 404 process, which

disrupts the deadlines envisioned under the Corps' existing regulations and ignores Congress'

desire to have permitting decisions made within ninety days of submitting an application.  *See*

---

[7] Like any other federal agency or public citizen, EPA has the right to offer comment on any pending Section 404 permit application during the public comment process.  *See* 33 U.S.C. § 1344(a).  Such a right, however, does not justify the creation of an alternate permitting pathway that targets a category of operations within a particular industry.

Compl. ¶¶ 67-69, 104; *see also* 33 C.F.R. § 325.2(a)(2), (d)(3); 33 U.S.C. § 1344(q).  In short,

the EC Process Memoranda allow EPA to use extra-regulatory processes to expand EPA's role in

the Section 404 permit process and cause delays in permitting, without having to abide by formal

requirements governing the exercise of its Section 404(c) authority.  *See* Compl. ¶ 70; *see also*

33 U.S.C. § 1344(c) (requiring notice, an opportunity for public hearings, consultation with the

Corps, and the publication of written findings and reasons).

2.      <strong>The EC Process Memoranda Are Binding Legislative Rules.</strong>

The plain text of the EC Process Memoranda demonstrates that they are binding,

legislative rules, not policy statements.  EPA and the Corps announced in no uncertain terms that

"108 CWA Section 404 permit applications for surface coal mining activities in Appalachia *will*

*be subject to* review in accordance with these procedures."  *See* Defs.' MTD Ex. 3 at 1 (emphasis

added); *see also id.* (EC Memo at 3) (emphasis added) ("The procedures below *will apply* to

applications for individual and Nationwide permits . . .");  *id.* at 4 (emphasis added) ("Permit

applications raising concerns *will be subject to* additional coordination and review following the

procedures and timeframes identified below").  Similarly, EPA has unequivocally declared that

the screening process involving use of the MCIR Assessment "*will form* the basis for [its]

identification of pending permit applications that will require further coordination between EPA

and the Corps."  Defs.' MTD Ex. 4 at 1 (emphasis added); *see also id.* (emphasis added) (stating

that, when undertaking the screening process, the Section 404(b)(1) Guidelines "*will guide*

[EPA's] review of the pending permit applications").  These unwavering statements are

important because the D.C. Circuit has "found decisive the choice between [an agency's use of]

the words 'will' and 'may.'"  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987)

(explaining that use of "will" indicates a legislative rule).

In promulgating the EC Process Memoranda, Defendants issued a clear message to those applicants whose permits were pending at the time: "in reviewing applications the Agenc[ies] will not be open to considering approaches other than those prescribed in the Document." *Gen. Elec.*, 290 F.3d at 384.  As in both *General Electric* and *Crop Life*, the affected permit applicants in this case were plainly told that they would be bound by the new screening procedure employing the MCIR Assessment and ultimately, the EC Process.  *See id.*; *see also Crop Life*, 329 F.3d at 881, 883.  And, the wording of the EC Process Memoranda left the agencies with no choice but to apply the new, extra-legal procedures in place of the Corps' existing procedures.[8] *See* Defs.' MTD Exs. 3, 4; *see also* Compl. ¶¶ 61, 65.

Not only is the language of the EC Process Memoranda binding, Defendants have applied those documents "in a way that indicates [they are] binding." *Gen. Elec.*, 290 F.3d at 383. Defendants acknowledged that they agreed to apply the EC Process and MCIR Assessment to all permits that were pending as of March 31, 2009.[9]  *See, e.g.*, Defs.' MTD at 6-7 ("The process agreed upon by EPA and the Corps applies only to these 108 permit applications" that were pending as of March 31, 2009); *id.* at 8 ("with respect to the 108 pending permit applications at issue here, EPA used MIRA . . ."). Indeed, EPA's website provides the complete status of each of the 79 permits placed in the EC Process, illustrating the definitive application of the Memoranda.  *See* http://water.epa.gov/lawsregs/guidance/wetlands/mining-projects.cfm.  As was

---

[8] Arguably, EPA's issuance of the EC Process Memoranda is an even more dramatic shift in agency practice than the challenged directive in *Crop Life*.  The EC Process Memoranda cast aside a codified regulatory regime that has been largely unchanged since 1986.  *See* 51 Fed. Reg. 41236.  Despite the fact that Section 404 permits had previously been processed under 33 C.F.R. part 325 for decades, those applicants whose permits were pending as of March 31, 2009 could no longer rely on the codified procedures in part 325. *See id.* ¶¶ 64-70.

[9] Numerous letters to permit applicants further confirm that EPA and the Corps are required to apply the EC Process memoranda to pending Section 404 permit applications.  *See, e.g.*, NMA Ex. 15 (Pomponio-CONSOL Energy Corp. letter) (indicating that EPA and the Corps have "commit[ted] . . . to enhanced coordination procedures for certain pending [CWA] Section 404 permit applications"); *accord* NMA Ex. 16 (U.S. EPA Briefing on the Mining Analysis for EPA Regions 3, 4, and 5, at slides 3-4) (proclaiming that (i) "100% of pending permits to be reviewed" in

the case in *General Electric*, Defendants' "application of the [challenged] [d]ocument[s] does nothing to demonstrate that the [d]ocument[s] ha[d] any lesser effect in practice" than the binding language contained in those documents.  *See* 290 F.3d at 385.

### 3.    No Exception To The APA's Rulemaking Requirements Applies To The EC Process Memoranda.

Defendants' attempts to show that the EC Process Memoranda fit in an APA rulemaking exception and qualify as mere policy statements are unconvincing.  *See* Defs.' MTD at 35-40. Defendants assertion that the MCIR Assessment "does not predict or dictate any substantive outcome" and instead left officials free to exercise their discretion is divorced from reality.  *See id.* at 35-36.  The EC Process Memoranda obligate EPA officials to apply the Section 404(b)(1) Guidelines, through use of the MCIR Assessment, in screening all pending applications for inclusion in the EC Process.  In other words, the Memoranda removed any agency discretion to process the pending permits under the Corps' existing regulations by requiring adherence to Administrator Jackson's directive to apply the screening process.

Defendants also point to the Corps' and EPA's inclusion of "non-binding" boilerplate language in one of the EC Process Memoranda to argue that it is a policy statement, not a binding rule.  *See* Defs.' MTD at 37.  But Defendants' "characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule . . . but the record indicates otherwise."  *Crop Life*, 329 F.3d at 883; *see also* Peter L. Strauss, Comment, *The Rulemaking Continuum*, 41 DUKE L.J. 1463, 1485 (1992) (describing EPA's boilerplate notice for guidance documents as "a charade, intended to keep the proceduralizing courts at bay").  Even if EPA's characterization of the precise procedures of the EC Process being in flux is correct, *see* Defs.'

---

accordance with the EC Process; and (ii) environmental criteria "*will be used* by EPA in its screening of pending permits" and "*will be used* in decision analysis screening tool," *i.e.*, the MCIR Assessment).

MTD at 38, that does not alter Defendants' prior admonition that the EC Process "will" apply. As a result, neither permit applicants nor agency officials had any discretion to ignore the EC Process Memoranda and instead proceed under 33 C.F.R. part 325.

Last, contrary to Defendants' claims, the EC Process Memorandum is not a procedural rule. *See* Defs.' MTD at 38-40. The APA's exception for procedural rules "cannot apply . . . where the agency action trenches on substantial private rights and interests" such as, for example, "when applicants for food stamps are subject to modified approval procedures." *Batterton v. Marshall*, 648 F.2d 694, 708 (D.C. Cir. 1980) (citation omitted). Thus, this exception is inapplicable here, where the EC Process Memoranda modified the established Section 404 permitting procedures, subjecting applicants for permits in connection with the exercise of private property rights to new substantive standards and a new, unique review and coordination process. The cases cited by Defendants are inapposite, as none of those cases involved a proclamation that a long-standing, codified permitting procedure simply would no longer apply to a narrow subset of permit applications. Instead, each of the procedural rules in those cases is distinguishable from the EC Process Memoranda as they involved: (i) a "rule rejecting incomplete permit applications;" (ii) a "temporary freeze on applications;" and (iii) "a decision to defer consideration of permit applications." *See* Defs.' MTD at 39 (citations omitted). The EC Process Memorandum is a legislative, not procedural, rule because it "effect[ed] a dramatic change in the agency's established regulatory regime." *Crop Life*, 329 F.3d at 884.

In sum, Counts I and II of NMA's Complaint state a claim under the APA for failure to provide for notice and comment on binding, legislative rulemakings.

B.     **EPA Promulgated The Guidance In Violation Of The APA.**

Count III alleges sufficient facts to state a claim that the Guidance is a legislative rule promulgated without notice and comment in violation of the APA.  *See* Compl. ¶¶ 72-90, 97-99. EPA's attempts to characterize the Guidance as a policy statement must fail as the Guidance substantively amends EPA's regulatory authority under the CWA and NEPA and is binding upon the regulated community and agencies alike.  The Guidance is, therefore, a legislative rule.

1.     **The Guidance Substantially Altered The Legal Framework
For CWA Permits for Coal Mining.**

EPA's Guidance significantly changed the existing CWA regulatory scheme, thereby creating "a new regime, a new legal system governing permits."  *See Appalachian Power*, 208 F.3d at 1024; *see also* Compl. ¶¶ 2-3, 72-81.  First, EPA effectively promulgated a region-wide water quality standard for conductivity (500 µS/cm) for water bodies in all of Appalachia.  *See* Defs.' MTD Ex. 8 at 12, 18-21; *see also* Compl. ¶ 113.  EPA did so despite the fact that Congress delegated (i) authority to the states for promulgating water quality standards that are specific to water bodies; and (ii) limited authority to EPA to approve and reject those standards. *See* 33 U.S.C. § 1313; *see also* Compl. ¶¶ 32-36.[10]  Moreover, the Act contemplates that states will develop water quality standards for particular water bodies, "or portion[s] thereof," as opposed to on a region-wide basis spanning multiple states and water bodies.  *See* 40 C.F.R. § 131.4; *see also* 33 U.S.C. § 1313(c)(2).  That the Guidance established a *de facto*, region-wide water quality standard plainly contravenes the established regulatory scheme.

EPA's Guidance also effectively amends EPA's authority under Section 309 of the Clean Air Act, 42 U.S.C. § 7609, to review the NEPA analyses of its sister agencies.  Compl. ¶¶ 88,

---

[10] Though not at issue here, the statute also allows EPA to "prepare and publish" a water quality standard for the "navigable waters involved" based upon a determination that a state standard is inconsistent with the statute or is

126-31.  The Guidance presumes that an entire category of agency actions – surface coal mining projects involving more than one mile of stream loss or more than one valley fill – are likely to result in significant impacts.  *See* Defs.' MTD Ex. 8 at 29; *see also* Compl. ¶ 88.  In doing so, EPA is attempting to expand its authority under 42 U.S.C. § 7609 and to rewrite the CEQ's and the Corps' regulations implementing NEPA.  *See id.* ¶¶ 127-29.  In light of the foregoing, the Guidance "significantly broaden[s]" existing laws.  *See Appalachian Power*, 208 F.3d at 1028.

### 2.        The Guidance Is A Binding Legislative Rule.

NMA's Complaint sufficiently alleges that the Guidance is binding on states and the regulated community; therefore, dismissal of Count III is improper.  *See* Compl. ¶¶ 3, 80, 90, 113, 122.  The D.C. Circuit has "explained that an agency pronouncement will be considered binding as a practical matter [and hence, subject to notice and comment,] if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Catawba County v. EPA*, 571 F.3d 20, 33 (D.C. Cir. 2009).  Here, the Guidance directs EPA employees to work with state regulatory authorities and the Corps "to ensure that the [Section 402 or 404] permit includes conditions that protect against conductivity levels exceeding 500 μS/cm."  *See* Compl. ¶¶ 112-13; *see also* Defs.' MTD Ex. 8 at 12, 22.  And, EPA has declared that it "*will* use these [conductivity] values as benchmarks in our work with States under Section 402 and with the Corps under Section 404 to ensure that permits are designed to meet the [CWA] requirements."  NMA Ex. 17 (April 1, 2010 Memorandum Questions & Answers at 1).

Defendants quote extensively from the Guidance in arguing essentially that the Guidance: (i) disclaims any legally binding effect; (ii) contains purely suggestive language and does not command or order anything; and (iii) sets forth rebuttable presumptions that preserve agency

---

"necessary to meet the requirements" of the Act.  Such a standard may only be "promulgate[d]" after publication. 33 U.S.C. 1313(c)(4).  EPA does not profess to have followed this statutory mechanism for its Guidance.

discretion.  Defs.' MTD at 41-44.  In making these points, Defendants cite heavily to two recent D.C. Circuit decisions.  *Id.* (citing *Catawba County*, 571 F.3d at 33-34 and *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 226-28 (D.C. Cir. 2007)).  Yet, in neither of those cases was the plaintiff able to point to any evidence that the challenged documents were being applied in a binding manner.  In *Catawba County*, for example, record evidence showed that states were ignoring EPA's guidance both in part and in whole.  *See* 571 F.3d at 34.  In *Cement Kiln*, the Court emphasized that "the [challenged action] ha[d] not yet been applied to any facility." 493 F.3d at 227; *see also id.* at 228.

Here, by contrast, NMA's Complaint alleges that EPA is applying the Guidance as though it were a binding rule in order to impose the conductivity standard in pending permits and cause indefinite delays.  *See* Compl. ¶¶ 2-3, 80, 90, 113, 122.[11]  As was the case in *Appalachian Power*, EPA has "treat[ed] the [Guidance] as binding" and has "le[d] private parties [and] . . . permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the [Guidance]."  *Cement Kiln*, 493 F.3d at 227-28 (quoting *Appalachian Power*, 208 F.3d at 1020-23).  NMA has further alleged that EPA did this without first providing for notice and comment.  *See id.* ¶¶ 72, 90, 98.  Taken together, NMA's allegations "contain sufficient

---

[11] The allegations in NMA's Complaint are well supported.  *See, e.g.*, NMA Ex. 4 (R. Johnson Decl. ¶¶ 11, 14-15) (noting delays in permits due to EPA's Guidance and the conductivity standard therein); NMA Ex. 9 (Wells Decl. ¶¶ 11-12, 24) (stating that the Corps, at EPA's insistence, imposed the conductivity standard from the Guidance in a recent permit); NMA Ex. 10 (Dr. Johnson Decl. ¶¶ 8, 10) (referencing EPA statement demanding that permits conform to the Guidance); *see also* NMA Ex. 30 (Lambert Decl. ¶ 5) (detailing EPA's efforts to apply the Guidance as a binding rule); NMA Ex. 26 (W. Va. Compl. ¶¶ 134, 142-43) (describing how EPA has used the Guidance and the new conductivity standard to delay issuance of CWA permits); NMA Ex. 27 (Ky. Compl. in Intervention ¶¶ 9-10, 73-74)  (describing how EPA has begun objecting to proposed permits based on the Guidance and how EPA had never before objected to permits before issuing the Guidance).

Defendants criticize this evidence regarding implementation of the Guidance in a binding manner as "spotty and anecdotal. "  Defs.' MTD at 45.  They cross-reference an earlier discussion in their motion (part II.C.2) in which they allege that, in some instances, permits have been issued without the conductivity standard set forth in the Guidance.  *See id.* at 45, 26-29.  As explained in Part IV.B., *infra*, such outlier evidence does not detract from the justiciability of NMA's claims.

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citation omitted).

### 3.    No Exception To The APA's Rulemaking Requirements Applies To The Guidance.

The Court should reject Defendants' remaining attempts to label the Guidance as a "quintessential" policy statement. *See* Defs.' MTD at 40. Defendants emphasize that the challenged document was designated as "guidance" and that EPA "has not sought to codify it in the C.F.R." *Id.* But, EPA's "self-serving" characterization is not controlling. *See Crop Life*, 329 F.3d at 883. And, courts in this circuit have frequently set aside agency pronouncements that were not published in the C.F.R. for failure to comply with the APA. *See, e.g.*, *id.* at 878 (setting aside EPA press release); *Appalachian Power*, 208 F.3d at 1019 (setting aside guidance document posted on EPA's web site).

Defendants' contention that the Guidance merely "reflects EPA's current views" and is "explicitly open to revision in the near future" is similarly unconvincing. The D.C. Circuit rejected this very argument in *Appalachian Power*, explaining that "all laws are subject to change" and "[t]he fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." 208 F.3d at 1022. Likewise, in *Crop Life*, the Court invalidated an agency pronouncement announcing an "<u>interim</u> policy" that was "pending review by the National Academy of Sciences." 329 F.3d at 878 (emphasis added). EPA's proclamation in this case that the Guidance is merely in "interim final" form and could be revised following consideration by the Science Advisory Board is therefore inconsequential in light of this precedent. *See id.*

In sum, NMA's Complaint adequately alleges that the Guidance is a legislative rule that was promulgated in violation of the APA.

## II.   NMA'S COMPLAINT CHALLENGES FINAL AGENCY ACTIONS.

For agency action to be final and, thus, subject to judicial review, it must (i) "mark the consummation of the agency's decision making process . . . [and] not be of a merely tentative or interlocutory nature;" and (ii) "be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78, 117 S. Ct. 1154, 1168 (1997) (internal quotation marks and citations omitted).   Notably, an "agency's adoption of a binding norm obviously would reflect final agency action." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006).   As explained below, the EC Process Memoranda and the Guidance are final agency actions.

### A.   The EC Process Memoranda Are Final Agency Actions.

The EC Process Memoranda reflect the agencies' "settled [] position which has legal consequences both for [the Corps] administering [the Section 404] permit program[] and for companies like those represented by [NMA] who must obtain [Section 404] permits in order to" mine coal.   *Appalachian Power*, 208 F.3d at 1023.   As such, they are final agency actions.

EPA's issuance of the MCIR Assessment Memo reflects EPA's settled, final position that it would screen all Section 404 permit applications pending in Regions 3, 4, and 5 as of March 31, 2009 in order to determine whether to subject each application to the EC Process.   *See* Defs.' MTD Ex. 4 (summarizing the screening process that "*will* form the basis for [EPA's] identification of pending permit applications that *will* require further coordination").   In addition, EPA's and the Corps' creation of the EC Process reflects the settled, final position to establish an alternate permitting framework that EPA and the Corps must apply when reviewing those pending permit applications, instead of applying the procedures codified at 33 C.F.R. part 325. *See* Defs.' MTD Ex. 3 (stating that the EC Process "will apply to those permits" pending as of March 31, 2009 and that 108 CWA Section 404 permit applications . . . "will be subject to

review in accordance with" the EC Process).  Like the guidance document at issue in

*Appalachian Power*, the EC Process Memoranda are "unequivocal" on questions relating to the

exercise of regulatory authority as to those identified permit applications.  *See* 208 F.3d at 1022.

Indeed, the language in the EC Process Memoranda announced a firm commitment to divert

those permit applications to an alternate permit regime.  *Cf. Crop Life*, 329 F.3d at 882-83

(rejecting argument that an EPA document was not a binding, final agency action because, *inter

alia*, the document reflected EPA's firm stance that it "will not consider" a certain type of study

when evaluating the safety of pesticides).  And, the EC Process Memoranda "gave no indication

that [they] w[ere] subject to further agency consideration or possible modification."  *See Reckitt

Benckiser, Inc. v. EPA*, 613 F.3d 1131, 1138 (D.C. Cir. 2010).

      Defendants' primary argument as to why the EC Process Memoranda do not mark the

consummation of the decision making process appears to be that they are early steps in the

broader process of rendering the ultimate decisions (*i.e.*, issue, deny, or veto) on Section 404

permit applications.  *See* Defs.' MTD at 14, 15-16.  Defendants' tunnel vision does not align

with the law.  The D.C. Circuit has, on numerous occasions, set aside agency pronouncements

upon determining that they were final agency actions without requiring the petitioners in those

cases to await individual decisions on specific permits or applications.  *See, e.g.*, *Crop Life*, 329

F.3d 876 (invalidating EPA press release governing case-by-case determinations of pesticide

safety); *Gen. Elec.*, 290 F.3d  377 (invalidating EPA guidance document governing applications

for permission to use alternative methods for handling certain remediation waste); *Appalachian

Power*, 208 F.3d 1015 (invalidating EPA guidance document governing Clean Air Act Section V

permit applications filed with states).  Defendants' interpretation of finality is too restrictive, as it

encompasses only the last, possible agency decision, and therefore fails against the governing precedent.[12]

In addition to marking the consummation of the agencies' decision making process, the EC Process Memoranda also have legal consequences.  First, EPA's MCIR Assessment, which obligates EPA, not the Corps, to apply the 404(b)(1) Guidelines, alters the statutory division of authority by Congress.  *See Coeur Alaska*, 129 S. Ct. at 2467 (explaining that one of EPA's "two tasks" under Section 404 is to develop the 404(b)(1) Guidelines "for the Corps to follow in determining whether to permit a discharge of fill material").  Second, it is simply untrue that subjecting permit applicants to a new permitting regime filled with uncertainty in place of the long-standing, codified regime has no legal consequences.  Both the CWA and its implementing regulations set forth detailed procedures, requirements, and deadlines that the Corps is to follow when reviewing Section 404 permit applications.  *See* 33 U.S.C. § 1344; 33 C.F.R. part 325. Notwithstanding those regulatory provisions, EPA and the Corps declared, without notice and comment, that applicants whose permits were pending as of March 31, 2009 under the existing regulations – some of which were far along in the permitting process – would nevertheless be thrust into the new system for review.  Like the agency pronouncement that "effect[ed] a dramatic change in the agency's establish regulatory regime" in *Crop Life*, the EC Process Memoranda amount to "firm rule[s] with legal consequences that are binding on both [NMA] and the agencies."  *See* 329 F.3d at 882, 884.

---

[12] Defendants rely on *FTC v. Standard Oil of Cal.*, 449 U.S. 232, 101 S. Ct. 488 (1980) and *Chem. Mfrs. Ass'n v. EPA*, 26 F. Supp. 2d 180 (D.D.C. 1998) for support.  *Standard Oil* is inapposite because it dealt with whether the filing of an administrative complaint to initiate an administrative enforcement proceeding was final agency action, *see* 449 U.S. at 242, 244, 101 S. Ct. at 494, 495, not an agency pronouncement that had broad effects on a regulated community.  The *Chem. Mfrs. Ass'n* district court case predates the D.C. Circuit's holdings in *Crop Life*, *General Electric*, and *Appalachian Power* and is not controlling to the extent it conflicts with those later appellate holdings.

Defendants quote selectively from several cases in arguing that the EC Process Memoranda do not determine rights or obligations or have legal consequences. *See* Defs.' MTD at 14, 15-16. First, Defendants' position that "rights and obligations of the permit applicants are only determined when the Corps grants or denies, or EPA 'vetoes,' a permit" cannot be reconciled with established D.C. Circuit precedent and, therefore, must be rejected. *See supra* at 24-25. Second, Defendants' suggestion that agency actions are not final merely because they have the effect of requiring parties to participate in agency proceedings is premised on case law arising in the context of administrative investigation and enforcement proceedings. *See, e.g.*, *Aluminum Co. of Am. v. United States*, 790 F.2d 938 (D.C. Cir. 1986) (agency's assertion of original jurisdiction over an administrative complaint); *Standard Oil Co.*, 449 U.S. at 242, 101 S. Ct. at 494 (complaint initiating administrative enforcement proceedings). Importantly, neither of those cases involved subjecting a petitioner to extra-legal procedures that were promulgated without notice and comment and that departed from properly promulgated regulations.

Last, Defendants' reliance on the self-serving language at the end of the EC Memo is misplaced. *See supra* at 17-18; *see also Appalachian Power*, 208 F.3d at 1023. In sum, Defendants have disregarded established agency regulations and imposed an alternate regime under which EPA arrogates primary authority to itself. Such an action undoubtedly has legal consequences and is final agency action.

### B. EPA's Guidance Is Final Agency Action.

The Guidance is final agency action because it reflects EPA's settled position and has legal consequences for permitting authorities (*i.e.*, states and the Corps) administering the CWA permit programs and for NMA's coal mining members who require those permits to operate. *See Appalachian Coal*, 208 F.3d at 1023. Importantly, "[f]inality resulting from the practical effect of an . . . agency proclamation is a concept [the D.C. Circuit] ha[s] recognized in the past." *Nat'l*

*Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).  Such a practical effect must change a party's legal obligations – a requirement that can be satisfied, as it is in this case, by a showing that permitting authorities "were coerced by [EPA]" to act in conformance with EPA's directives.  *Ctr. for Auto Safety*, 452 F.3d at 811 (citation omitted).

First, the Guidance marks the consummation of EPA's decision making process.   EPA directed that its regional employees are to apply the Guidance "immediately in [their] review of Appalachian surface coal mining activities."  Defs.' MTD Ex. 8 at 2.  And, like in *Appalachian Power*, EPA has taken the firm view that the Guidance in this case was immediately applicable and binding upon the Corps and state regulators.  *Compare* 208 F.3d at 1022 (noting that the guidance was unequivocal with regard to whether state agencies were required to undertake certain actions) *with* Ken Ward, Jr., EPA Says Its New Mining Guidance 'Stands,' CHARLESTON GAZETTE, Aug. 13, 2010[13] (quoting Aug. 12, 2010 EPA Desk Statement on Newly Released West Virginia MTM Guidance) ("We look forward to reviewing West Virginia's new water quality guidance.  In the meantime, *EPA's guidance stands and we will continue to use it* to ensure that mining permits issued in West Virginia and other Appalachian states provide the protection required under federal law").  EPA's recent remarks refute any contention that the Guidance is merely interlocutory or tentative.

Defendants' assertions that the Guidance was designated as an "interim final" document and is subject to review by the Science Advisory Board also carry little weight.  *See Crop Life*, 329 F.3d at 878 (invalidating agency pronouncement announcing an "interim policy" that was "pending review by the National Academy of Sciences"); *see also Appalachian Power*, 208 F.3d at 1022 (rejecting EPA's argument that a guidance document was subject to change and thus, not

---

[13] *Available at* http://blogs.wvgazette.com/ coaltattoo/ 2010/08/13/epa-says-its-new-mining-guidance-stands.

final).  And, as explained in more detail above, Defendants' claim that review of CWA permits

"consummates in final agency action only when a permit is issued, denied, or vetoed" again

warrants rejection.

Second, the practical effects of the Guidance illustrate how EPA "made an authoritative

interpretation of its . . . authority [under the Clean Water Act] that has practical and significant

legal effects."  *Reckitt Benckiser, Inc.*, 613 F.3d at 1138.  Contrary to Defendants' claims, *see*

Defs.' MTD at 18,[14] EPA's Guidance has effectively created obligations and legal consequences

vis-à-vis the Corps, state regulators, and regulated entities, as EPA's Guidance, and the 500

μS/cm conductivity standard set forth therein, are being treated as a binding standard.  *See*

*Appalachian Power*, 208 F.3d at 1023; *see also* NMA Ex. 30 (Lambert Decl. ¶ 5) (detailing

EPA's efforts to "disguise the mandatory nature" of the Guidance and referencing an EPA

statement that "they would not approve any permits that would result in a conductivity level of

greater than 500 μS/cm"); NMA Ex. 26 (W. Va. Compl. ¶¶ 134, 142-43) (stating that EPA is

applying the Guidance's conductivity standard and highlighting that "EPA . . . has required that

WVDEP delay issuing NPDES permits until EPA determines that the conductivity water quality

standard has been satisfied"); NMA Ex. 27 (Ky. Compl. in Intervention ¶¶ 9-10, 73-74)

(describing how EPA has begun objecting to proposed  permits based on the Guidance and how

EPA had never before objected to any permits prior to April 1, 2010); NMA Ex. 10 (Dr. Johnson

Decl. ¶ 8) ("After issuance of the April 1, 2010 Guidance Memorandum, EPA representatives

---

[14] Defendants quote *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726 (D.C. Cir. 2003) in arguing that neither the Guidance nor the EC Process "determine any rights, create any legal obligations, or fix any legal relationships."  *See* Defs.' MTD at 16, 18.  There, the agency was merely investigating the petitioner's products.  *See* 324 F.3d at 732.  More importantly, the agency in that case was "required by statute to bring an administrative proceeding before it [could] make any legally binding determination," but it had not yet done so.  *Id.* at 734.

stated that each permit must conform to that document");[15] NMA  Ex. 9 (Wells Aff. ¶ 11-12, 24) (noting that the Corps, at EPA's insistence, imposed the conductivity standard from the Guidance in a recent Section 404 permit).

The regulatory environment in this case is, therefore, closely analogous to that in *Appalachian Power*, where the court highlighted evidence of the coercive effect of EPA's guidance in practice and found that "obligations certainly are [created] . . . on the part of the State [and Corps] regulators and those they regulate."  208 F.3d at 1023.  Notably, such evidence was lacking in both *Ctr. for Auto. Safety* and *Nat'l Ass'n of Home Builders*, which Defendants rely on in attempting to refute final agency action in this case.  *See* Defs.' MTD at 18-19.  At bottom, *Appalachian Power* provides a more persuasive analog to the Guidance than any of the authorities cited throughout Defendants' arguments on finality.  Consequently, this Court should reject Defendants' arguments and find that the Guidance constitutes final agency action.

## III.   NMA'S CLAIMS ARE RIPE FOR REVIEW.

Ripeness is a flexible and functional doctrine which "represents a prudential attempt to balance the interests of the court and the agency in delaying review against the petitioner's interest in prompt consideration of allegedly unlawful agency action."  *Fla. Power & Light Co. v. EPA*, 145 F.3d 1414, 1420-21 (D.C. Cir. 1998).  Ripeness is determined by a "two-pronged test that requires a reviewing court first to evaluate the 'fitness of the issues for judicial decision.' . . . When a challenged decision is not 'fit' for review, the petitioner must show 'hardship' in order to overcome a claim of lack of ripeness.'"  *Id.* at 1421 (citations omitted).  Whether an issue is fit for review depends, in turn, on whether "(i) the issue presented is a purely

---

[15] Defendants criticize NMA for relying upon evidence demonstrating the practical effect of the Guidance in Alabama, noting that the document does not apply in that State.  *See, e.g.*, Defs.' MTD at 26-27, n. 10-11.  EPA's fealty to the text of the Guidance is plainly belied by the evidence, which underscores EPA's flawed reliance on the

legal one, (ii) consideration of that issue would benefit from a more concrete setting; and (iii) the

agency's action is sufficiently final."  *Reckitt Benckiser*, 613 F.3d at 1137 (internal quotation

marks and citations omitted).  As shown below, NMA's claims satisfy the "fitness" and

"hardship" prongs and, thus, are ripe for review at this time.

     **A.**     **NMA's Challenges To The EC Process Memoranda Are Ripe.**

     NMA's claims involving the EC Process Memoranda are fit for review.  Also, immediate

review of those agency actions is appropriate given the hardship to NMA's members that would

result from delayed review.

     Whether the EC Process Memoranda are legislative rules that were issued improperly

absent notice and comment and whether Defendants exceeded their statutory authority under the

CWA and acted arbitrarily and capriciously in establishing the EC Process and the related

screening process involving the MCIR Assessment are purely legal questions.  *See Barrick*

*Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000); *accord Gen. Elec.*, 290

F.3d at 380 ("[W]hether the Guidance Document is a legislative rule is largely a legal, not a

factual question, turning as it does in this case primarily upon the text of the Document"); *Better*

*Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986) (finding claims that DOJ

guidelines violated FOIA and were issued without notice and comment in violation of the APA

were purely legal and fit for review).  In particular, the EC Process Memoranda reflect

Defendants' interpretation that it can ignore the established Section 404 permit regulations in 33

C.F.R. Part 325 and instead impose an alternate process that defies Congress's statutory division

of authority and alters the Corps' anticipated regulatory timelines.  Like the purely legal question

of what procedures EPA must follow under the statute at issue in *Reckitt Benckiser*, Defendants

---

disclaimers set forth in the text of the Guidance.  The Guidance is determining rights and obligations and has legal
consequences in Alabama, among other states, and, therefore, constitutes final agency action.

in this case have not sought to justify their interpretation of their CWA authority "on the basis of the specific facts" or any particular permit application.  613 F.3d at 1137.  Instead, they have adopted an interpretation that applies to all permit applications pending as of a certain date.

NMA's challenges to the EC Process Memoranda would not benefit from further factual development.  The Court's "appraisal of the legitimacy of the [EC Process Memoranda] in light of the statutory requirements of [the CWA] and the APA would not be enhanced by" the examination of a particular permit application that is currently trapped within the EC Process. *Better Gov't Ass'n*, 780 F.2d at 92-93.  Contrary to Defendants' suggestion, *see* Defs.' MTD at 22-23, the Court need not await the outcome of the EC Process for individual permit applications.  The D.C. Circuit rejected a similar argument in *Appalachian Power*, emphasizing that its review of an EPA guidance document governing the Clean Air Act Title V permitting program (administered primarily by states) would not be "more focused in the context of a challenge to a particular permit."  208 F.3d at 1023 n. 18.  Likewise, in this case, whether Defendants properly subjected permit applicants to extra-legal procedures that were promulgated without notice and comment and that conflict with the statutory and regulatory framework of CWA Section 404 "will not turn on the specifics of any particular permit."  *Id.*; *see also NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344 (3d. Cir. 2001) (holding that a challenge to a state regulatory process was ripe for review and that the plaintiff need not await the outcome of the very process that it argued was unlawful).  NMA's contention is that Defendants acted contrary to law in issuing the EC Process Memoranda, which unambiguously dictated that the memoranda – and not the existing regulations – would govern permit applications that were pending as of March 31, 2009.  No factual developments would bring these issues into greater focus or assist the Court in evaluating NMA's claims.

Moreover, as explained more fully above in Part II, the EC Process Memoranda are final agency actions.  Defendants have plainly stated that the EC Process Memoranda "will" apply and govern the agencies' review of Section 404 permit applications pending as of March 31, 2009.  Such a pronouncement "must be viewed as final in [the Court's] analysis of ripeness."  *Better Gov't Ass'n*, 780 F.2d at 93.  For the foregoing reasons, NMA's challenges to the EC Process Memoranda are fit for review.

As for hardship, NMA is being harmed by the EC Process Memoranda and will continue to suffer hardship if the Court delays review of NMA's challenges.  Like in *NE Hub Partners*, "the [EC] [P]rocess itself is the alleged harm."  239 F.3d at 343 (quoting cases demonstrating that the "hardship is the process itself").  A key determination in *NE Hub Partners*, and other cases cited therein, is that "the need to participate in a state regulatory process in conflict with federal policy has been recognized as a hardship" when a claim is made against that state process.  *Id.* at 346  Such hardship is analogous to that which results from being subjected to an unlawfully promulgated permit process (*e.g.*, the EC Process) that departs from and conflicts with the existing federal statutory and regulatory framework.  In both instances, a party that is "put to considerable delay and expense" as a result of an unlawful process undoubtedly suffers hardship.  *Id.* at 345; *see also Freehold Cogeneration Assocs. v. Bd. of Regulatory Comm'rs*, 44 F.3d 1178, 1188-89 (3d Cir. 1995).

Here, NMA members governed by the EC Process Memoranda have suffered delays and expense.  For example, Paynter Branch Mining, an NMA member whose permit application was nearing the end of the process in early 2009, has since been diverted to the EC Process and, as a result, EPA has successfully delayed action on that application.  *See* NMA Ex. 24 (Higgins Decl. ¶¶ 2, 4-5).  Paynter has spent $114,000 gathering water quality and benthic data in the project

area in response to an EPA demand conveyed during the preliminary stages of the EC Process.

*Id.* ¶ 6.  Given the inaction on its application since early 2009 and the demands set forth by EPA

as a result of the EC Process, Paynter has eliminated the project from its mine plan.  *Id.* ¶ 7.

Another NMA member, Alex Energy, Inc., has experienced similar delays as a result of the EC

Process, despite its persistent efforts to engage EPA.  NMA Ex. 25 (2d Cook Decl. ¶¶ 12-17)

(summarizing emails to EPA inquiring when the 60-day enhanced coordination period can

begin).  Such delays are threatening the financial viability of Alex Energy's contemplated mining

project, which constitutes a severe hardship.  *See id.* ¶¶ 20-21; *see also Freehold Cogeneration*

*Assocs.*, 44 F.3d at 1188-89.

       The hardship resulting from being forced into an <u>ongoing</u>, unlawful process is precisely

what distinguishes this case from the cases that Defendants rely on in arguing that having to

participate in agency proceedings is not sufficient hardship.  *See* Defs.' MTD at 21, 23 (citing

*Nevada v. Dep't of Energy*, 457 F.3d 78, 85-86 (D.C. Cir. 2006); *Fla. Power*, 145 F.3d at 1421;

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 809, 123 S. Ct. 2026, 2031

(2003)).  In each of those cases, how and when an agency pronouncement would have applied

was unclear.  *Nevada* involved a challenge to an agency transportation plan that the court found

"may never materialize."  *See* 457 F.3d at 84-85.  In *Florida Power*, the petitioner was

challenging statements in a preamble to a proposed rule that it asserted was EPA's interpretation

of the law.  *See* 145 F.3d at 1416.  It was "uncertain whether, or on what grounds," EPA might

take action; therefore, the "further administrative proceedings" were hypothetical and attenuated.

*See id.* at 1421.  *Nat'l Park Hospitality Ass'n* involved a challenge to a National Park Service

rule stating that the Contract Disputes Act would not apply to disputes arising out of concession

contracts.  *See* 538 U.S. at 804-05, 123 S. Ct. at 2028.  But, no disputes had even materialized in

that case.  *See id.* at 810-12.  None of those holdings are controlling in this case where NMA's

"challenge is to the conduct of an administrative process that imposes an ongoing burden."  *NE*

*Hub Partners*, 239 F.3d at 346.  Here, as in *NE Hub Partners*, permit applicants are currently

being subjected to an improper process (*i.e.*, the MCIR Assessment and the EC Process) and are

being harmed as a result.  In light of the fitness of the issues and the hardship that NMA will

suffer from delaying review, NMA's challenges to the EC Process Memoranda are ripe.

      **B.**      **NMA's Challenge To The Guidance Is Ripe.**

      EPA's Guidance is fit for review.  NMA's challenge to the Guidance raises primarily

legal issues, the Court's consideration of that challenge would not benefit from further factual

development, and the Guidance is final agency action.  *See Reckitt Benckiser*, 613 F.3d at 1137.

      As Defendants point out, NMA's challenge to the Guidance raises legal issues.  *See*

Defs.' MTD at 24.  NMA has claimed that the Guidance (i) violates the APA because it was

issued without notice and comment; and (ii) violates the CWA, NEPA, and the Surface Mining

Control and Reclamation Act because EPA exceeded its statutory authority and acted arbitrarily

and capriciously.  *See* Compl. ¶¶ 97-99, 109-137.  Such claims present legal questions regarding

the scope of EPA's authority under each of those statutes.

      The Court's consideration of NMA's challenge to the Guidance would not benefit from

further factual development in a more concrete setting, despite Defendants' arguments to the

contrary.  *See* Defs.' MTD at 24-25, 27.  The D.C. Circuit found that a challenge to an EPA

guidance document impacting an analogous regulatory environment was ripe for review, and it

rejected EPA's argument that the Court's "review would be more focused in the context of a

challenge to a particular permit."  *Appalachian Power*, 208 F.3d at 1023 n. 18.  The same is true

in this case.  Whether EPA properly instructed state authorities and the Corps to include the 500

µS/cm conductivity standard in CWA Section 402 and 404 permits or whether EPA properly

proclaimed that an entire category of projects is likely to result in significant impacts and, hence, require the preparation of an environmental impact statement under NEPA, does not turn on the specifics of any particular permit application. EPA does not seek to justify the interpretation of its authority (*e.g.*, to promulgate a region-wide water quality standard under the CWA) on the specific facts of any particular permit application, "but has instead adopted an interpretation . . . that would apply in many situations" involving proposed surface mining projects. *See Reckitt Benckiser*, 613 F.3d at 1137.

The Guidance is sufficiently final for purposes of this Court's ripeness analysis. *See* Part II *supra* (explaining how the Guidance is final agency action). "Where, as here, the agency has stated that the action in question *governs and will continue to govern* its decisions, such action must be viewed as final in [the Court's] analysis of ripeness." *Better Gov't Ass'n*, 780 F.2d at 93 (emphasis in original).

Defendants go to great lengths to argue that the Guidance is discretionary and, hence, that review should await a "concrete scenario where EPA has exercised its discretion in applying the [] Guidance to a specific case." Defs.' MTD at 24-25, 26-29. Defendants further assert that the available evidence demonstrates that the Guidance is not being applied as a binding rule. *See id.* at 27-29. In doing so, they argue that reliance on evidence of application automatically renders NMA's challenge unfit for review. *See id.* at 26-27.[16] Each of Defendants' contentions fails.

The Guidance is, in fact, being applied as a binding, legislative rule because, among other things, EPA is insisting that CWA Section 402 and 404 permits include the conductivity limit set

---

[16] Defendants also insist that EPA has an "institutional interest" in refining the Guidance "[a]s the science develops," and they point to the fact that the Guidance was designated as "interim" and that they are still considering comments. *See* Defs.' MTD at 25. That a document, which announces that it is effective immediately, is artfully labeled as "interim" and is made subject to continuing review and refinement does not render it unripe. *See, e.g.*, *Crop Life*, 329 F.3d at 878, 884 (setting aside an EPA "interim policy" that was pending review by the National Academy of Sciences).

forth therein.  *See* Compl. ¶¶ 90, 113-14; *see also* NMA Ex. 30 (Lambert Decl. ¶ 5); NMA Ex.

26 (W. Va. Compl. ¶¶ 134, 142-43); NMA Ex. 27 (Ky. Compl. in Intervention ¶¶ 9-10, 73-74);

NMA Ex. 10 (Dr. Johnson Decl. ¶ 8); NMA Ex. 9 (Wells Aff. ¶ 24); NMA Ex. 4 (R. Johnson

Decl. ¶ 14).[17]

 In addition to the statements from NMA's members, it is the evidence from state

regulators confirming that EPA is applying the Guidance as a binding rule that most glaringly

illustrates that the Guidance is fit for review.  *See, e.g.*, NMA Ex. 30 (Lambert Decl. ¶ 5); NMA

Ex. 26 (W. Va. Compl. ¶¶ 134, 142-43); NMA Ex. 27 (Ky. Compl. in Intervention ¶¶ 9-10, 73-

74); NMA Ex. 10 (Dr. Johnson Decl. ¶ 8).  The coercive effect of EPA's Guidance on permitting

authorities in this case – to include the conductivity standard in permits or risk EPA's objection –

is analogous to the effect of the challenged guidance in *Appalachian Power*.  *See* 208 F.3d at

1023-24 (noting that "with the Guidance in place, regional EPA offices have solid legal grounds

for objecting to State-issued permits if the State authorities refuse to bend to EPA's will").

Whether EPA has properly instructed permitting authorities to apply the Guidance and require

compliance with the conductivity standard will not get any more ripe and "will not turn on the

specifics of any particular permit."  *See id.* at n. 18.

 Defendants point to three examples of permits that they claim were issued without the

conductivity limit contained in the Guidance.  The presence of these exceptions does not render

an otherwise ripe controversy unripe.  *Cf. Appalachian Power*, 208 F.3d at 1023 ("EPA has

given the States their 'marching orders' and EPA expects the States to fall in line, as all have

---

[17] *See supra* at 28-29 for full explanatory parentheticals.  Defendants suggest that NMA's claim that EPA is
applying the Guidance in a binding manner "goes well beyond the statements in the declarations" cited in NMA's
motion for preliminary injunction.  *See* Defs.' MTD at 27. n.11.  Defendants quote selectively from those
declarations and ignore other statements within the declarations, set forth above, that adequately support NMA's
claim.  Moreover, given the procedural posture of this case, the Court must still "accept as true all of the factual
allegations contained in the complaint."  *Wilson*, 2010 WL 3001716, at *2.

done, save perhaps Florida and Texas").  The key inquiry for purposes of this Court's ripeness

analysis is whether EPA has instructed permitting authorities that the Guidance is binding and

that permits must include the conductivity standard.  *See id.* at n. 18.  In any event, Defendants'

examples are distinguishable for the following reasons: (i) EPA's evaluation of the Section 402

permit for the Stinking Creek Mine in Kentucky pre-dated the issuance of the Guidance, *see*

Defs.' MTD Ex. 9; (ii) the Bucy #2 Mine in West Virginia involves no valley fills,[18] *see* Letter

from Evelyn MacKnight, EPA Region 3, to Jeffrey Parsons, W. Va. Dep't of Envtl. Prot. (May

13, 2010) (NMA Ex. 28); and (iii) Oxford Mining Company's proposed project is in Ohio, which

already has a numeric water quality standard (2400 µS/cm), as opposed to a narrative standard,

for conductivity in place as a matter of state law.  *See* Letter from Tinka Hyde, EPA Region 5, to

Ginger Mullins, Corps Huntington Dist. (May 27, 2010) (NMA Ex. 29), at 6 (referencing

"Ohio's water quality standard for conductivity of 2400 µS/cm").

      Defendants erroneously argue that the Court's consideration of evidence of application of

the Guidance automatically renders NMA's challenge unripe.  *See* Defs.' MTD at 26-29.  To the

contrary, the D.C. Circuit has, on numerous occasions, considered evidence of application in

reviewing and invalidating agency pronouncements.  *See Appalachian Power*, 208 F.3d at 1023

(emphasizing evidence that an EPA guidance document was being applied as binding in the

field); *U.S. Tel. Ass'n*, 28 F.3d at 1234-35 (considering evidence of application in holding that an

agency's penalty schedule was a legislative rule, not a policy statement).  In both of those cases,

the court rejected ripeness challenges.  *See Appalachian Power*, 208 F.3d at 1023 n. 18; *U.S. Tel.

Ass'n*, 28 F.3d at 1234 n. 2.  In another case, although the court evaluated a challenge to an

---

[18] The use of valley fills in surface mining operations is arguably the key driver for EPA's promulgation of the Guidance, as demonstrated by Administrator Jackson's pronouncement during the press conference releasing the Guidance that "You're talking about no, or very few valley fills that are going to meet this standard."  David

agency guidance document primarily on the text of the document, its consideration of evidence of application did not render the case unripe. *See Gen. Elec.*, 290 F.3d at 380-81, 385 (finding ripe controversy and concluding that "the Agency's application of the Document does nothing to demonstrate that the Document has any lesser [binding] effect in practice").

The cases that Defendants cite to in arguing that consideration of evidence of application renders a challenge unfit for review are inapt. *See* Defs.' MTD at 26. In each of those cases, the agency had not yet begun applying the challenged document; thus, any evidence of application would have been speculative. *See Cement Kiln*, 493 F.3d at 227 (explaining that an argument regarding evidence of application "would be unavailable in any event, as the HHRAP has not yet been applied to any facility"); *Pub. Citizen, Inc. v. Nuclear Regulatory Comm'n*, 940 F.2d 679, 680 (D.C. Cir. 1991) ("Because . . . the Commission has yet to employ [the challenged document] in a specific rulemaking or licensing proceeding, we find the challenge unripe."); *Mun. of Anchorage v. United States*, 980 F.2d 1320, 1324-25 (9th Cir. 1992) (noting that evidence of application was necessary to evaluate whether an EPA-Corps memorandum of agreement was substantive and, thus, subject to the APA's notice and comment requirement). Here, by contrast, NMA has presented evidence demonstrating that EPA has taken the unequivocal position that the conductivity standard in the Guidance applies to the Corps' and states' administration of CWA permit programs. As in *Appalachian Power*, NMA's challenge to EPA's Guidance is ripe for review. *See* 208 F.3d at 1023 n. 18.

Regarding the second part of the ripeness test, "delayed review would cause hardship" because NMA's members are already being harmed by EPA's Guidance. *See Reckitt Benckiser*, 613 F.3d at 1137. EPA's unlawful imposition of the conductivity standard in the Guidance is

---

Fahrenthold, *Environmental Regulations to Curtail Mountaintop Mining*, THE WASHINGTON POST, April 2, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/04/01/AR2010040102312.html.

threatening the very existence of an NMA small business member company.[19]  *See* NMA Ex. 4 (R. Johnson Decl. ¶¶ 11-19).  That operator is suffering delays in the issuance of Section 402 and 404 permits that stem from EPA's imposition of the Guidance.  *See id.* ¶¶ 11-16.  EPA's imposition of the conductivity standard also threatens to render a proposed mining project in Kentucky infeasible for one of NMA's members.  *See* NMA Ex. 9 (Wells Decl. ¶¶ 11-14, 23-24).  Indeed, having to lower existing conductivity levels to the levels set forth in the Guidance is forcing the company to choose between expending prohibitive sums of money on technology and abandoning the project and the right to exercise its property rights.  *See id.* ¶¶ 13-14.  NMA's members' hardships as a result of the Guidance are real and significant, and therefore immediate judicial review of the Guidance is warranted.

## IV.   NMA HAS STANDING TO CHALLENGE THE EC PROCESS MEMORANDA.

NMA has standing under Article III of the Constitution to challenge the EC Process Memoranda.  Constitutional standing requires a showing of (i) injury-in-fact; (ii) causation; and (iii) redressability.  *See* Defs.' MTD at 29 (quoting *Ass'n of Flight Attendants v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009)).  NMA satisfies each of these three elements.

First, NMA's members are suffering, and will continue to suffer, injury that is concrete and particularized.  The EC Process Memoranda have allowed Defendants to restart and pause the clock with respect to Section 404 permit applications pending on March 31, 2009, even in instances where EPA did not comment during the Corps' designated comment period.  *See* NMA Ex. 24 (Higgins Decl. ¶¶ 3-6); NMA Ex. 25 (2d Cook Decl. ¶¶ 5, 9, 12-18).  One permit application that is currently subject to the EC Process, for example, was nearing the end of the

---

[19] Again, Defendants seek to downplay the impact of this declaration by arguing that the Guidance states that it does not apply in Alabama.  For the reasons explained above, *see supra* at n. 15, Defendants' arguments should be rejected.  EPA has, in fact, applied the Guidance to this company, which has effectively stalled the permitting process and is thereby threatening to drive the company out of business.

existing permit process under 33 C.F.R. part 325, and all that remained was for the Corps to draft

the narrative for the permit.  *See* NMA Ex. 24 (Higgins Decl. ¶ 3).  EPA effectively "reset" the

timeline for that permit application, which currently remains in limbo.  *See id.* ¶ 4.  Moreover,

despite Defendants' claim that the EC Process is intended to expedite the permitting process for

those pending applications, EPA has demonstrated an unwillingness to even initiate the 60-day

enhanced coordination period.  *See id.* ¶ 5; NMA Ex. 25 (2d Cook Decl. ¶¶ 12-17).  The delays

from the EC Process are threatening the financial viability of proposed mining projects.  *See*

NMA Ex. 24 (Higgins Decl. ¶¶ 7-8); NMA Ex. 25 (2d Cook Decl. ¶¶ 19-21).

    The EC Process has also resulted in undue and costly process.  For example, one operator

has spent about $114,000 in an attempt to gather data that EPA demanded after subjecting that

operator to the EC Process.  NMA Ex. 24 (Higgins Decl. ¶¶ 6-7).  That operator recently decided

to remove the project from its mining plan, thereby foregoing the exercise of its property rights.

*See id.* ¶ 8.  Being subjected to this additional, illegal process is itself a sufficient injury for

standing purposes.  *Cf. NE Hub Partners*, 239 F.3d at 342.[20]  Consequently, NMA's members

whose permit applications are subject to the EC Process need not await the ultimate denial or

veto of a permit to allege sufficient injury, as Defendants suggest.  *See* Defs.' MTD at 30.

    Defendants implicitly concede that delays resulting from the EC Process constitute

sufficient injury for purposes of constitutional standing, *see id.*, and instead argue that NMA

cannot demonstrate that such injury is caused by the EC Process.  *See id.* at 30-31.  Defendants

are wrong on this point.  As explained above, EPA and the Corps have used the EC Process

Memoranda to revisit permit applications that were pending as of March 31, 2009 and effectively

---

[20] Although the *NE Hub Partners* decision analyzed hardship in the context of a ripeness analysis, the requirement to show hardship from delayed review under the ripeness doctrine "overlaps with the injury in fact facet of standing doctrine."  *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997).

start the permitting process all over again.  One of those applicants, Paynter Branch Mining, would not have spent $114,000 to gather additional data that EPA demanded but for the EC Process.  *See* NMA Ex. 24 (Higgins Decl. ¶¶ 3, 6-7).  Moreover, but for the EC Process, Paynter would not have removed a project from its plan that had received all required permits other than the Section 404 permit, and was nearing the end of that permitting process in early 2009.  *See id.* ¶¶ 3, 8.  Another NMA member, Alex Energy, has experienced delays that can only be attributed to the EC Process, as EPA has repeatedly ignored its pleas to initiate the 60-day coordination period.  *See* NMA Ex. 25 (2d Cook Decl. ¶¶ 9, 12-17).  But for the EC Process, Alex Energy would not be in the position that it is today, awaiting action from an unresponsive EPA and uncertain of what process lies ahead.  Indeed, EPA failed to participate in the original comment period for that permit, which closed on September 11, 2008.  *See id.* ¶¶ 4-5.

Defendants primarily attempt to disprove causation by arguing that a declaration submitted in support of NMA's motion for preliminary injunction reflects that delays could result from factors other than the EC Process.  *See* Defs.' MTD at 31.  In that declaration, an NMA member details the delays that it is suffering as a result of EPA's Guidance with regard to Section 402 and 404 permitting processes for a project in Alabama.  *See* NMA Ex. 4 (R. Johnson Decl. ¶¶ 11-16).  Defendants' reliance on that declaration is misplaced.  That the Guidance is currently being used to delay the issuance of permits that are not subject to the EC Process does nothing to disprove that the EC Process is also causing separate injury to other permit applicants.  Indeed, the EC Process has effectively reset and stalled permitting timelines and subjected NMA members to additional process that is not contemplated under the existing regulatory scheme.

The remedy that NMA seeks, *i.e.*, vacatur of the EC Process Memoranda, would redress the injuries outlined above.  If the EC Process Memoranda are invalidated, NMA will no longer

be subject to the unlawful process contemplated therein.  Moreover, such a remedy would place permit applicants back in the position that they expected to be in absent the EC Process, *i.e.*, nearing the end of the Section 404 permit process, with all comment periods closed, all requirements satisfied, and awaiting the Corps' drafting of the final permit decision.  *See* NMA Ex. 24 (Higgins Decl. ¶ 3); NMA Ex. 25 (2d Cook Decl. ¶ 18).  Any further action on those applications would be governed by established, codified regulations with timeframes and procedural safeguards.  *See generally* 33 U.S.C. § 1344; 33 C.F.R. part 325.  Defendants speculate that even if the EC Process Memoranda are set aside, there is no guarantee that the permit applications will be evaluated any more quickly because, for example, EPA may choose to exercise its Section 404(c) authority.  *See* Defs.' MTD at 32.  Defendants' speculation is improper and beside the point.  A number of events might affect the issuance of a Section 404 permit in the future, *e.g.*, EPA's exercise of Section 404(c) authority, or a challenge to a permit filed by anti-coal groups.  Such events, however, would be governed by codified procedures and are mere contingencies at this point.  By contrast, it is clear that the delays, uncertainty, and costs that are a direct result of the EC Process would be redressed by vacatur of the EC Process Memoranda and the reinstatement of permit applications at the point within the existing permit regime where those applications were prior to their diversion into the EC Process.

V.      **THE COURT SHOULD DEFER CONSIDERATION OF DEFENDANTS' JURISDICTIONAL CHALLENGES UNTIL THE MERITS IF IT FACES DISPUTED FACTS.**

        In the alternative, if the Court cannot decide Defendants' jurisdictional challenges based solely on the allegations of the Complaint and the undisputed facts outside of the Complaint, it should defer consideration of those challenges until it hears the merits of NMA's APA claims (Counts I-III).  Defendants' arguments regarding final agency action, ripeness, and standing are inextricably intertwined with the merits of NMA's claims (Counts I-III) that the EC Process

Memoranda and Guidance are binding, legislative rules promulgated without notice and comment in violation of the APA.  Accordingly, to the extent the Court must resolve disputed facts in resolving Defendants' jurisdictional challenges, it should wait until it adjudicates the merits of those claims.  *See Herbert*, 974 F.2d at 198 ("[T]hough the trial court may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard.").

Whether the EC Process Memoranda and Guidance constitute binding, legislative rules, as opposed to policy statements, may require the Court to analyze whether those agency pronouncements are binding as a practical matter, as demonstrated by Defendants' application of those documents.  *See Gen. Elec.*, 290 F.3d at 383 ("Our cases likewise make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding[.]").  Such an analysis is also linked to the Court's determinations on final agency action, ripeness, and standing, as recognized by the D.C. Circuit in similar cases involving APA challenges to agency pronouncements where the government raised the same jurisdictional defenses as here.  *See U.S. Tel. Ass'n*, 28 F.3d at 1234 n. 2 ("The Commission also raises ostensible jurisdictional arguments, standing and ripeness, which really turn on the same question – whether the statement is binding.  As such, they are circular and not worth separate consideration as jurisdictional arguments."); *see also Crop Life*, 329 F.3d at 881 (concluding that the agency's arguments on standing and ripeness "rapidly fall by the wayside" after the court "determin[ed] that the [challenged] directive . . . is indeed a binding regulation").

In light of the foregoing, Defendants' jurisdictional challenges are "inextricably intertwined" with the merits of NMA's claims under the APA.  *Herbert*, 974 F.2d at 198.

Consequently, if the Court cannot rule on Defendants' motion based solely on the undisputed facts within or outside of the Complaint, it should defer resolution of the jurisdictional challenges in Defendants' motion until it adjudicates the merits of NMA's APA claims.

## VI.    EPA'S USE OF THE MCIR ASSESSMENT IS NOT A DECISION COMMITTED TO AGENCY DISCRETION BY LAW.

The APA bars judicial review of agency action that is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  "This is a very narrow exception," *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S. Ct. 814, 820 (1971), and an agency which invokes the exception "must rebut the presumption that agency action is judicially reviewable."  *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (noting that only "narrow categories [of agency decisions] satisf[y] the strictures of subsection 701(a)(2)," *e.g.*, "decision[s] involving complicated foreign policy matters," "an agency's refusal to undertake an enforcement action," or an agency's "determination [on] how to spend a lump-sum appropriation") (citations omitted).

Defendants' argument that EPA's use of the MCIR Assessment to screen permit applications for inclusion in the EC Process was committed to its discretion by law is flatly wrong.  Defendants' argument assumes that the EC Process is lawful and contemplated under the statute.  Yet, nothing in the CWA provides EPA the authority to divert a group of permit applications from the lawful process governed by long-standing, codified regulations into an alternate permitting regime promulgated without notice and comment.  And nothing in the statute provides EPA with the authority to apply its own interpretation of the 404(b)(1) Guidelines early in the permitting process, *see Coeur Alaska*, 129 S. Ct. at 2467 (noting that EPA's only two tasks under Section 404 are to develop the 404(b)(1) Guidelines for the Corps to apply and to exercise its authority under 404(c)), which is effectively what EPA has done during the screening process.

EPA used the screening process to improperly remove permit applications from the existing permitting process and to subject them to an alternate, unlawful process.  And, it did so without notice and comment.  Certainly, nothing in the APA or the CWA commits to EPA the unfettered authority to prescribe processes that conflict with existing regulatory requirements.

Defendants' authority has little bearing on this case.  Each of those cases was an instance where an agency refrained from taking administrative action.  *Heckler v. Chaney* involved the situation where courts most often invoke the exception to reviewability, *i.e.*, an agency's decision *not* to bring an enforcement action.  *See generally* 470 U.S. 821, 105 S. Ct. 1649 (1985) (holding that prison inmates could not compel FDA to bring enforcement action against prison officials for use of drugs in lethal injection).  In addition, Defendants rely on two cases in which the courts held that EPA's decision *not* to "veto" CWA permits was not reviewable.  *See District of Columbia v. Schramm*, 631 F.2d 854, 859-60 (D.C. Cir. 1980) (noting that while EPA's decision to "veto" a Section 402 permit is reviewable, EPA decision *not* to veto such a permit is not reviewable); *see also Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1249 (11th Cir. 1996) (without analyzing APA Section 701(a)(2) exception, holding that EPA's decision not to "veto" a section 404 permit was not reviewable under the CWA because "[b]y statute, the Administrator is authorized rather than mandated to overrule the Corps").  Thus, the MCIR Assessment is subject to judicial review.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.

October 20, 2010                                    Respectfully submitted,


                                                    /s/ Kirsten L. Nathanson
                                                    John Martin, No. 358679
Katie Sweeney                                       Kirsten L. Nathanson, No. 463992
Of Counsel                                          David Y. Chung, No. 500420
Karen C. Bennett, No. 477151                        CROWELL & MORING LLP
NATIONAL MINING ASSOCIATION                         1001 Pennsylvania Avenue, N.W.
101 Constitution Avenue, N.W.                       Washington, DC 20004-2595
Suite 500 East                                      (202) 624-2500
Washington, DC 20001
(202) 463-2600

              ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION