**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
NATIONAL MINING ASSOCIATION,    )
)
        Plaintiff,    )
)
        v.    )    No. 1:10-cv-01220-RBW
)
LISA JACKSON, ADMINISTRATOR,    )
U.S. ENVIRONMENTAL PROTECTION    )
AGENCY, et al.,    )
)
        Defendants,    )
)
    and    )
)
SIERRA CLUB, WEST VIRGINIA    )
HIGHLANDS CONSERVANCY,    )
COAL RIVER MOUNTAIN WATCH,    )
OHIO VALLEY ENVIRONMENTAL    )
COALITION, KENTUCKIANS FOR    )
THE COMMONWEALTH,    )
SOUTHERN APPALACHIAN    )
MOUNTAIN STEWARDS,    )
STATEWIDE ORGANIZING FOR    )
COMMUNITY EMPOWERMENT,    )
)
    Movants.    )
_____)

**MEMORANDUM OF SIERRA CLUB ET AL. IN OPPOSITION TO THE
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

STATUTORY BACKGROUND...........................................................................2

    A.    Clean Water Act Section 404 Permits and Veto Determinations ...............2

    B.    CWA Section 303 Water Quality Standards and Review...........................5

    C.    CWA Section 402 Permits and Objections.................................................6

FACTUAL BACKGROUND ................................................................................7

    A.    Serious Environmental Impacts Are At Stake ............................................7

    B.    The Challenged Documents Explain Compliance Policies. ......................10

STANDARD OF REVIEW ................................................................................14

ARGUMENT .....................................................................................................15

    I.    NMA IS NOT LIKELY TO SUCCEED ON THE MERITS. ...............................15

        A.    Significant Threshold Problems Bar the Court from Reaching the Merits. ......................................................................................................15

            1.    The NMA Does Not Have Standing to Bring This Suit. ...............16

            2.    This Case Is Not Justiciable and the Relief Sought Would Be Premature...............................................................................22

        B.    EPA's Guidance and Coordination with the Corps Are Reasonable and Lawful. ..............................................................................................27

            1.    The April 2010 Guidance Is Squarely Grounded in the Text and Regulations of the Clean Water Act........................................28

            2.    The Guidance Is Consistent with NEPA.......................................35

            3.    The Interagency Review Process Comports with the CWA..........36

        C.    NMA's APA Claims Depend on Erroneous or Unproven Assumptions.............................................................................................39

    II.    ABSENT A PRELIMINARY INJUNCTION, THE NMA IS NOT LIKELY TO SUFFER IRREPARABLE INJURY................................................40

III.    A PRELIMINARY INJUNCTION WOULD NOT SERVE THE PUBLIC
        INTEREST..........................................................................................................42

IV.     THE BALANCE OF THE EQUITIES TIPS AGAINST THE NMA. .................45

CONCLUSION.................................................................................................................45

## TABLE OF AUTHORITIES

### CASES

*AT&T Co. v. E.E.O.C.*, 270 F.3d 973 (D.C. Cir. 2001) ......................................................25

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)......................................................23

*American Hospital Association v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) ....................34

*Appalachian Power v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000)...........................................39

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ........................................................................6

*Auer v. Robbins*, 519 U.S. 452 (1997) .................................................................28, 32, 37

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ......................................................20

*Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207 (D.C. Cir. 2007)............24, 28, 32

*Chaplaincy of Full Gospel Churches v. England*,
     454 F.3d 290 (D.C. Cir. 2006) ...................................................................................41

*Chevron USA v. Natural Resource Defense Council*, 467 U.S. 837 (1984).....................27

*Citizen's Alert Regarding Environment v. U.S. Department of Justice*,
     Civ. A. No. 95-1702 (GK), 1995 WL 748246 (D.D.C. Dec. 8, 1995) ........................44

*Clean Air Implementation Project v. E.P.A.*, 150 F.3d 1200 (D.C. Cir. 1998) ................24

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ..............................................................14

*Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*,
     129 S. Ct. 2458 (2009)...........................................................................................33, 34

*Colo. Wild Horse & Burro Coal.*, 639 F. Supp. 2d 87 (D.D.C. 2007) ..............................37

*Davis v. Pension Ben. Guaranty Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ..................14, 15

*Friends for America Free Enterprise Association v. Wal-Mart Stores, Inc.*,
  284 F.3d 575 (5th Cir. 2002) ....................................................................................21

*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000)....................................................................................................16

*General Motors Corp. v. EPA*, 363 F.3d 442 (D.C. Cir. 2004)..................................23, 40

*GrassRoots Recycling Network, Inc. v. U.S. E.P.A.*,
  429 F.3d 1109 (D.C. Cir. 2005)..................................................................................19

*Herbert v. National Academy of Scis.*, 974 F.2d 192 (D.C. Cir. 1992) ............................15

*Hoffman Group v. EPA*, 902 F.2d 567 (7th Cir. 1990).......................................................26

*Hunt v. Wash. State Apple Advertising Commission*, 432 U.S. 333 (1977)........... 16-17, 21

*Ky. Waterways Alliance v. Johnson*, 540 F.3d 466 (6th Cir. 2009)....................................13

*Long Island Care at Home, Ltd. v. Coke*, , 551 U.S. 158 (2007)........................................28

*Lujan v. Defenders of Wildlife*, 504 U.S. 554 (1992) ........................................................18

*Molycorp, Inc. v. U.S. EPA*, 197 F.3d 543 (D.C. Cir. 1999) .............................................34

*Munaf v. Geren*, 553 U.S. 674 (2008)..........................................................................14, 15

*Munsell v. Department of Agriculture*, 509 F.3d 572 (D.C. Cir. 2007)....................... 25-27

*National Association of Reg. Utility Comm'rs v. U.S. Department of Energy*,
  851 F.2d 1424 (D.C. Cir. 1988)............................................................................ 24-25

*National Min. Association v. Mine Safety & Health Admin.*,
  599 F.3d 662 (D.C. Cir. 2010) .............................................................................. 39-40

*National Park Hospitality Association v. Department of Interior*,
  538 U.S. 803 (2003)...............................................................................................23, 27

*Natural Resources Defense Council v. EPA*, 489 F.3d 1364 (D.C. Cir. 2007) .................16

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)..............................................37

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) .......................................25

*OVEC v. Apogee Mining Co.*, 555 F. Supp. 2d 640 (S.D. W. Va. 2008) .........................13

*OVEC v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) ...............................................36

*OVEC v. Aracoma Coal Co.*, 567 F.3d 130 (4th Cir. 2009) ........................................10, 36

*OVEC v. Hurst*, 604 F. Supp. 2d 860 (S.D. W.Va. 2009).................................................13

*OVEC v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783 (S.D. W.Va. 2009) ..............13

*Public Citizen, Inc. v. Nuclear Reg. Commission*, 940 F.2d 679 (D.C. Cir. 1991) ..........23

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
    993 F.2d 800 (11th Cir. 1993) .....................................................................................17

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Commission*,
    324 F.3d 726 (D.C. Cir. 2003) .....................................................................................24

*Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993).................................................23

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) .....................................................27

*S. Ohio Coal Co. v. Ofc. of Surface Min.*, 20 F.3d 1418 (6th Cir. 1994)...........................26

*S. Pines Associates v. United States*, 912 F.2d 713 (4th Cir. 1990) ..................................26

*Sackett v. U.S. E.P.A.*, ---, F.3d -- 2010 WL 3607142 (9th Cir. 2010) .............................26

*Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974).....................27

*Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998).............................45

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ..........................................................16

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998).................................15

*Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009) ........................................ 16-18

*TEAC America, Inc. v. U.S. Department of Navy*, 876 F. Supp. 289 (D.D.C. 1995) ........18

*Taylor v. F.D.I.C.*, 132 F.3d 753 (D.C. Cir. 1997) ...........................................................42

*Texas v. United States*, 523 U.S. 296 (1998) .....................................................................27

*Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967)........................................ 25-26

*United States v. Richardson*, 418 U.S. 166 (1974) ...........................................................16

*W. Va. Highlands Conservancy v. Huffman*,
    651 F. Supp. 2d 512 (S.D. W.Va. 2009)....................................................................13

*Winter v. Natural Resource Defense Council*, 129 S. Ct. 365 (2008) .........................14, 19

*Wis. Gas Co. v. Federal  Energy Reg. Commission*,
    758 F.2d 669 (D.C. Cir. 1985) .............................................................................. 40-42

## STATUTES

Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 – 1387  ....................................................1

    CWA § 101(a), 33 U.S.C. § 1251(a)..................................2, 3, 30, 37, 43, 44

    CWA § 101(d), 33 U.S.C. § 1251(d) ...........................................2, 30, 35

    CWA § 102(a) 33 U.S.C. § 1252(a)  ...............................................................2

    CWA § 301, 33 U.S.C. § 1311 ......................................................................37

    CWA § 301(a), 33 U.S.C. § 1311(a)..................................................2, 5, 42

    CWA § 301(b), 33 U.S.C. § 1311(b) ..............................................................6

    CWA § 303, 33 U.S.C. § 1313 ................................................................33, 34

    CWA § 303(c), 33 U.S.C. § 1313(c)................................................................6

    CWA § 306, 33 U.S.C. § 1316 ......................................................................33

    CWA § 308, 33 U.S.C. § 1318 ........................................................................2

    CWA § 309, 33 U.S.C. § 1319 ........................................................................2

    CWA § 402, 33 U.S.C. § 1342 ........................................................................2

    CWA § 402(b), 33 U.S.C. § 1342(b)..........................................................6, 29
    , 29
    CWA § 402(c), 33 U.S.C. § 1342(c)................................................................5

    CWA § 402(d), 33 U.S.C. § 1342(d)..................................................7, 28, 30

    CWA § 404, 33 U.S.C. § 1344 .......................................................... 2, 36 - 37

    CWA § 404(a), 33 U.S.C. § 1344(a)  ........................................ 2, 35, 37 - 38

CWA § 404(b), 33 U.S.C. § 1344(b) ........................................................................3, 37

CWA § 404(c), 33 U.S.C. § 1344(c).....................................................4, 20, 33, 35, 38

CWA § 404(m), 33 U.S.C. § 1344(m) ..........................................................................38

CWA § 404(q), 33 U.S.C. § 1344(q) ......................................................................4, 37

CWA § 501, 33 U.S.C. § 1361 .......................................................................................2

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332...............................5, 35

Clean Air Act ("CAA"), 42 U.S.C. § 7609 ............................................................5, 35, 36

Administrative Procedure Act, ("APA"), 5 U.S.C. § 706...........................................37, 40

5 U.S.C. § 704..............................................................................................................22

28 U.S.C. § 2401(a) .....................................................................................................34

## REGULATIONS

33 C.F.R. § 320.2 ....................................................................................................3, 4, 37

33 C.F.R. § 320.4 ...............................................................................3, 4, 20, 33, 37, 42

33 C.F.R. § 325.2 ..........................................................................................................38

33 C.F.R. § 325.7 ..........................................................................................................20

33 C.F.R. § 325 App. A ................................................................................................20

33 C.F.R. § 331.1 ....................................................................................3, 22, 25, 42

33 C.F.R. § 331.12 .........................................................................................................3

40 C.F.R. § 122.4 ......................................................................................................6, 7

40 C.F.R. § 122.44(d) ..........................................................6, 12, 29, 30, 31, 32

40 C.F.R. § 123.25 ...............................................................................................5, 6, 29

40 C.F.R. § 123.30 ............................................................................................7, 22, 42

40 C.F.R. § 123.41(b) ....................................................................................................6

40 C.F.R. § 123.44 ................................................................................7, 28, 30

40 C.F.R. § 124.19 ....................................................................................7, 22

40 C.F.R. § 131.2 .............................................................................................5

40 C.F.R. § 131.5(a) ........................................................................................5

40 C.F.R. § 131.21 ...........................................................................................6

40 C.F.R. § 131.22 ...........................................................................................6

40 C.F.R. § 230 .................................................................................................2

40 C.F.R. § 230.1 .......................................................................................3, 36

40 C.F.R. § 230.10 ..........................................................................3, 32,33, 34

40 C.F.R. § 230.12 ...........................................................................................3

40 C.F.R. § 231 ......................................................4, 9, 20, 22, 33, 37, 38

40 C.F.R. § 1501.6 ........................................................................................36

40 C.F.R. § 1504.1 ........................................................................................36

40 C.F.R. § 1508.27(10) ...............................................................................35

44 Fed. Reg. 58,076 (Oct. 9, 1979) .........................................................4, 33

45 Fed. Reg. 85,336 (Dec. 24, 1980) ......................................................3, 34

75 Fed. Reg. 16,788 (Apr. 2, 2010) ...........................................................39

75 Fed. Reg. 18,500 (Apr. 12, 2010) .........................................................40

401 KY. ADMIN. REGS. 10:001 Sec. 1(5) .....................................................7

401 KY. ADMIN. REGS. 10:031 Sec. 4(f) .....................................................7

OHIO ADMIN. CODE 3745-1-04(A) ...............................................................7

OHIO ADMIN. CODE 3745-1-04(D) ...............................................................7

25 PA. CODE § 93.6(a) ....................................................................................7

Tᴇɴɴ. Cᴏᴍᴘ. R. & Rᴇɢs. 1200-04-04-.03(3)(h) .................................................................7

9 Vᴀ. Aᴅᴍɪɴ Cᴏᴅᴇ § 25-260-140 .....................................................................................7

47 W. Vᴀ. Cᴏᴅᴇ R. § 2-3.2e ............................................................................................7

47 W. Vᴀ. Cᴏᴅᴇ R. § 2-3.2i .............................................................................................7

47 W. Vᴀ. Cᴏᴅᴇ R. § 30-3.4b .........................................................................................20

## INTRODUCTION

Through its motion, Plaintiff seeks a preliminary injunction to vacate the April 2010 Guidance and EC Process memoranda, and thus to shut down a reasonable interagency review process and prevent one expert agency, the U.S. Environmental Protection Agency ("EPA") from communicating with another agency, the U.S. Army Corps of Engineers ("Corps") regarding important environmental requirements at the heart of the agencies' delegated responsibilities under the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*. Framed as a challenge to "new processes" and "new standards," NMA's core argument distorts the plain language of the policy documents at issue. Rather than materially changing the applicable standards or permit process, as NMA contends, those documents aim to help both the Corps and EPA follow, apply, and enforce existing permitting requirements for surface coal mining activities in Appalachia.

The Court should deny Plaintiff's motion without reaching the merits because Plaintiff's fear—that its members are being subjected to the application and enforcement of existing (albeit often-violated) legal requirements—cannot serve as a basis for a legally protected interest to ground standing under Article III and does not constitute irreparable harm. NMA's procedural challenge is premature and unripe, and seeks as relief unlawful substantive results, specifically, permit decisions unfettered by the consideration of relevant science and environmental impacts as described in the April 2010 Guidance and required by the applicable regulatory framework. The Court does not have jurisdiction to adjudicate the NMA's claims.

NMA has established none of the prerequisites necessary to receive the extraordinary form of relief requested, nor resolved the significant problems raised by the Government, *see* Dkts. 13, 15. Movants emphasize that Plaintiff's motion should be denied because the balance of equities tilts heavily against the mountaintop removal mining industry's request due to the significant risk of environmental damage. A preliminary injunction would cause grave harm to

the public interest, by leading to inadequately studied and hastily issued permit decisions governing the fate of valuable headwater streams in Appalachia. The relief sought would undermine Movants' interests in having the defendant agencies apply existing requirements in the permitting process to prevent unacceptable loss of Appalachian streams, and thereby to protect Movants' members' ability to continue to use and enjoy their local waters.

## STATUTORY BACKGROUND

Under the Clean Water Act, it is unlawful to discharge any pollutant into U.S. waters without a valid permit. 33 U.S.C. § 1311(a). This ban serves the primary purpose of the Clean Water Act: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). To seek permission to engage in the controversial method of mountaintop removal mining, companies apply for a section 404 permit under 33 U.S.C. § 1344 to create a valley fill, by dumping mining waste into U.S. waters and burying and destroying those waters. The companies separately apply for a section 402 permit under 33 U.S.C. § 1342 for the point source discharge from the end (or "toe") of a valley fill into downstream waters.

Congress granted EPA broad authority to implement, interpret, apply, and enforce the Clean Water Act, while working in coordination with agencies given certain, circumscribed responsibilities. *See, e.g.*, 33 U.S.C. §§ 1251(d), 1318, 1319, 1361 (granting EPA authority). The CWA also authorizes EPA to engage in "cooperation with" other agencies, and "to make joint investigations with any such agencies," to protect U.S. waters. *Id.* § 1252(a).

A.    *Clean Water Act Section 404 Permits and Veto Determinations*

The Corps may only issue a section 404 permit to allow a discharge of "fill" material into U.S. waters if all Clean Water Act requirements are satisfied. *Id.* § 1344(a). To do so, the Corps must fulfill the Section 404(b)(1) Guidelines (40 C.F.R. Part 230), which were promulgated by

EPA, in conjunction with the Corps.  33 U.S.C. § 1344(b)(1); *see* Guidelines for Specification of

Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336 (Dec. 24, 1980).

The regulations known as the Section 404(b)(1) Guidelines include both procedural and

substantive requirements designed "to restore and maintain the chemical, physical, and

biological integrity of waters of the United States through the control of discharges of dredged or

fill material."  40 C.F.R. § 230.1(a) (implementing 33 U.S.C. § 1251(a)).  The specific

requirements of the Guidelines have as their premise "the precept that dredged or fill material

should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a

discharge will not have an unacceptable adverse impact either individually or in combination

with known and/or probable impacts of other activities affecting the ecosystems of concern."  *Id.*

§ 230.1(c).  As a result, the Guidelines specifically prohibit the permitting of any discharge if a

number of criteria are present, including if such a discharge "[c]auses or contributes, after

consideration of disposal site dilution and dispersion, to violations of any applicable State water

quality standard." *Id.* § 230.10(b)(1).  Also prohibited is any discharge that "will cause or

contribute to significant degradation of the waters of the United States," as determined according

to factors outlined in the Guidelines.  *Id.* § 230.10(c).  Both EPA and Corps regulations require

the Section 404(b)(1) Guidelines to be satisfied *before* a permit may issue.  *See* 33 C.F.R. §§

320.2(f), 320.4(a)(1) (requiring a permit to be denied if it "would not comply with [EPA's]

404(b)(1) guidelines"); 40 C.F.R. § 230.12 (in Subpart B, "compliance with Guidelines").  After

a permit decision, an unsuccessful permit applicant may challenge final permitting decisions in

administrative proceedings, 33 C.F.R. §§ 331.1-2 *et seq.*, and federal district court, *id.* § 331.12

(requiring exhaustion of administrative remedies).

Under section 404(c), EPA has the ultimate authority to prohibit, deny, or withdraw—in other words, to "veto"—a potential or final permit, through barring or restricting the specification of an area as a disposal site.  33 U.S.C. § 1344(c).  EPA has promulgated regulations that govern the process of proposing and completing a veto decision.  *See* 40 C.F.R. Part 231.  The Section 404(c) regulations, *id.*, authorize EPA to veto a permit or application whenever it believes that unacceptable impacts may occur, before or after the Corps makes its final decision.  *See* Denial or Restriction of Disposal Sites; Section 404(c) Procedures, 44 Fed. Reg. 58,076, 58,081 (Oct. 9, 1979).  First, the Regional Administrator of EPA initiates the veto process by publishing a proposed veto determination in the Federal Register stating that there is "reason to believe after evaluating the information available . . . that an 'unacceptable adverse effect' could result from the specification or use for specification of a defined area for the disposal of dredged or fill material."  40 C.F.R. § 231.3(a).  After review of public comments and the recommendation of the Regional Administrator regarding whether "the discharge of dredged or fill material at such site would be likely to have an unacceptable adverse effect," *id.* § 231.5(a), and after consultation with the Corps (or the state) and the permit applicant, the EPA Administrator makes a final decision on whether to veto a permit.  *Id.* § 231.6.  Only then, "[f]or purposes of judicial review, a final determination constitutes final agency action."  *Id.*

The regulatory framework emphasizes the importance of interagency coordination and consultation under section 404.  *See, e.g.*, 33 U.S.C. § 1344(c) ("Before making [a veto] determination, the Administrator [of EPA] shall consult with the Secretary [of the Army].");  *id.* § 1344(q) (requiring Army Corps to "enter into agreements" with EPA and other agencies).[1]

---

[1] *See also* 33 C.F.R. § 320.2(f) (providing for Corps – EPA consultation); *id.* § 320.4(d) (providing for water quality consultation); 40 C.F.R. § 231.1(a) (requiring consultation and consideration of "compliance with the section 404(b)(1) Guidelines").

In addition to satisfying all Clean Water Act requirements, before the Corps can issue a section 404 permit, it also must conduct a lawful analysis of environmental impacts under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332.  As part of this analysis, the Corps must decide whether to perform a full "environmental impact statement," which is required if the action is likely to "significantly affect[] the quality of the human environment." *Id.* § 4332(C).  Then, EPA has explicit authority to review and decide whether or not the Corps' analysis satisfies NEPA's requirements, granted to EPA both under NEPA, *id.* § 4332(C), and the Clean Air Act ("CAA"), 42 U.S.C. § 7609(b).  EPA must refer the Corps' action to the Council on Environmental Quality ("CEQ") if it determines that the action "is unsatisfactory from the standpoint of public health or welfare or environmental quality."  *Id.* § 7609(b).

B.      *CWA Section 303 Water Quality Standards and Review*

Water quality standards form one of the foundations for the Clean Water Act's core permit requirement under section 301(a), 33 U.S.C. § 1311(a). *See* 33 C.F.R. § 131.2.  Under CWA regulations, EPA has a prominent role in both a state's water quality standards development process and the state's implementation of these standards in section 402 permits.  A state may receive delegation of section 402 authority, but it must comply "at all times" with federal law and its program "must be administered in conformance with [section 402]" and all guidelines and regulations promulgated by EPA. 33 U.S.C. § 1342(c)(2); 40 C.F.R. § 123.25(a).  EPA must withdraw approval for any delegated program if EPA "determines . . . that a State is not administering a program approved under this section in accordance with requirements of [section 402]."  33 U.S.C. § 1342(c)(3).   Thus, where EPA has delegated permitting authority to a state, EPA retains full responsibility to oversee this program and to enforce the CWA.

In a state delegated program, EPA must review and decide whether to approve water quality standards developed by the state.  40 C.F.R. § 131.5(a).  State water quality standards are

not state law, but only become effective after EPA approval, which leads to their incorporation

into federal law.  33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21-22; *see Arkansas v. Oklahoma*, 503

U.S. 91, 110 (1992) (explaining that EPA-approved water quality standards are "part of the

federal law of water pollution control").  Even after EPA approves state water quality standards,

it maintains an ongoing duty to ensure that states require compliance with water quality

standards.  For example, EPA and the states must share information needed to implement

approved section 402 permitting programs.  40 C.F.R. § 123.41.

C.      *CWA Section 402 Permits and Objections*

State permitting authorities may only issue section 402 permits to allow a point source

discharge of effluent into U.S. waters if all Clean Water Act requirements are satisfied.  33

U.S.C. § 1342(b).  One of the key requirements applicable to section 402 permits is that such

permits must include conditions that "ensure" compliance with water quality standards.  *See* 40

C.F.R. § 122.4 (providing that "[n]o permit may be issued" when, among other things, the permit

does not satisfy all regulations under the CWA and when the imposition of conditions cannot

"ensure compliance with the applicable water quality requirements of all affected States"); 40

C.F.R. § 123.25 (listing requirements).  To assess compliance with these standards for a

proposed section 402 discharge permit, the state permitting authority must consider "relevant

information," including any information provided by EPA.  40 C.F.R. § 122.44(d)(1)(vi); 33

U.S.C. § 1311(b)(1)(C).  If relevant information shows that that there is "reasonable potential"

that a discharge will violate any numeric or narrative water quality standard, then the permit

must limit pollutants in that discharge. 40 C.F.R. § 122.44(d)(1)(vi).  Appalachian states have

adopted water quality standards that prohibit harm to aquatic life.[2]

_____

[2] For example, the standard in West Virginia prohibits discharges of "[m]aterials in
concentrations which are harmful . . . to aquatic life," or "[a]ny other condition . . . which

The Clean Water Act and its implementing regulations explicitly authorize EPA to review individual permits that are proposed in a state program.  33 U.S.C. § 1342(d)(1)-(2); 40 C.F.R. § 123.44(b)(2).  The regulations also require EPA to conduct a substantive review of whether the proposed permits comply with the regulations and guidelines, including water quality standards.  40 C.F.R. § 123.44(c).  If EPA objects to a proposed permit, "[n]o permit shall issue," 33 U.S.C. § 1342(d)(2); 40 C.F.R. § 122.4(c), unless the state revises the permit to meet such objection.  33 U.S.C. § 1342(d)(4).  If a state fails to resubmit a revised permit to EPA, EPA may issue a permit pursuant to section 402(a).  *Id.*  A final approval or denial of a section 402 permit is reviewable.  *See* 40 C.F.R. § 123.30 (state permits), 124.19 (EPA permits).

## FACTUAL BACKGROUND

A.      *Serious Environmental Impacts Are At Stake*

This case involves policy documents that interpret the requirements of existing law and facilitate the government's compliance review of permit applications sought under the Clean Water Act for a particular surface coal mining method, generally known as mountaintop removal mining.  This mining method causes extraordinary harm and has already led to the destruction of

---

adversely alters the integrity of the waters," and directs that "no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed." 47 W. VA. CODE R. § 2-3.2e, 2-3.2.i.  Similarly, Kentucky standards require that "total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected." 401 KY. ADMIN. REGS. 10:031 Sec. 4(f) (also providing, *id.* at 10:001 Sec. 1(5), that "adversely affected . . . means to alter or change the community structure or function, to reduce the number or proportion of sensitive species, or to increase the number or proportion of pollution tolerant aquatic species so that aquatic life use support or aquatic habitat is impaired"). *See also, e.g.*, 9 VA. ADMIN. CODE § 25-260-140 ("[i]nstream water quality conditions shall not be acutely or chronically toxic"); TENN. COMP. R. & REGS. 1200-04-03-.03(3)(h) ("The waters shall not contain other pollutants that will be detrimental to fish or aquatic life."); 25 PA. CODE § 93.6(a) ("Water may not contain substances attributable to point or nonpoint source discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life."); OHIO ADMIN. CODE 3745-1-04(A), (D) (requiring waters to be free from substances "that will adversely affect aquatic life" and that "are toxic or harmful to human, animal or aquatic life").

an estimated 2,000 miles of Appalachian mountain streams, with irreversible damage to these waters and the area watersheds. Through this method of coal extraction, mining companies use explosives to blast away the top, side, or other upper areas of a mountain to reach one or more coal seams, and then dispose of the resulting rock and other mining waste by dumping it into a nearby valley or hollow. Those hollows and valleys are generally coursing with protected waters of the United States. The resulting waste dump, known as a valley fill, permanently buries all waters, wildlife, and aquatic ecosystems and habitat previously existing there. Mining companies have primarily employed this practice in the Appalachian Mountain region.

The industry has long faced significant public opposition to the practice of mountaintop removal mining, especially in recent years as citizens have become increasingly aware of the lasting environmental impacts caused by this mining method. The scientific evidence of harm from this practice – including harm from prior permits issued by the Corps – is well-documented in recent peer-reviewed scientific literature and continues to accumulate. *See, e.g.*, Palmer et al., *Mountaintop Removal Mining Consequences*, 327 SCI. MAG. 148 (Jan. 8, 2010) (attached as Ex. 16). Valley fills destroy headwater streams, including the life they support and the ecosystem services they provide, at the upper reaches of Appalachian waterways, and cause impacts downstream throughout the affected watersheds due to harm from pollutants discharged from the fills, including sulfates and selenium, among others. *Id.* at 148-49. Headwater streams are the starting point for entire waterways in the Appalachian Mountain region and have vital ecological value in their own right, in addition to providing important functions to the aquatic life and ecosystem throughout the watershed.[3] On top of this, the science shows that the harm to an

---

[3] *See* Recommended Determination of the U.S. Envtl. Prot. Agency Region III Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine 7, 18-19 (Sept. 24, 2010), http://water.epa.gov/lawsregs/guidance/cwa/dredgdis/404c_index.cfm ("Spruce RD"),

individual mountain and an individual stream is dramatically and cumulatively deepened as it echoes throughout the entire watershed and affects the people and wildlife who depend on waters throughout these interconnected ecosystems.

Severe mountaintop removal mining in recent decades has decimated major watersheds in the Appalachian Region and changed forever the local communities living near and downstream from these operations. The cumulative harm to the watersheds devastated by mountaintop removal mining in recent decades has reached an unprecedented level and these watersheds cannot sustain additional harm. For example, in southern West Virginia, many local watersheds have already had more than 10% of their total area disturbed by surface mining, and some have had more than 50% disturbed. Palmer et al. (Ex. 16) at 148 & tbl. S1.

To make matters worse, there are no valid scientific studies showing that it is possible to replace or mitigate for this loss, such as through an attempt to create a new stream from a ditch. As the EPA Regional Administrator for Region III has found, "[t]here is no evidence in the peer-reviewed literature that . . . stream creation . . . will successfully replace lost biological functions and comparable stream chemistry to high quality stream resources." Spruce RD (Ex. 17) at 66. For this reason, as stated in comments on past Corps permits, the U.S. Fish and Wildlife Service "continue[s] to believe that it is not possible to fully replace the critical aquatic and terrestrial ecosystem functions of healthy headwater streams," and the Service "is not aware of any scientific support for the concept that . . . ditches can be considered biologically equivalent to, or even rough approximations of flowing streams." *Id.* at 67. Consequently, after a mountaintop removal mining operation has come through an area of Appalachia:

---

attached as Ex. 17. This recommended determination provides more detail on relevant science discussed in the April 2010 Guidance, although it does not rely on this guidance, *id.* at 17 n.2, and also illustrates EPA's veto process, *see* 40 C.F.R. §§ 231.5-6.

> Effectively the new landscape wildly departs from that within which the stream network has evolved.  The subsequent ecosystem is an entirely new system.  Assumptions that much of the structure and function of the pre-mined conditions can be recaptured with mitigation are very optimistic and highly speculative.

*Id.* at 70.

Notably, this unacceptable devastation is unjustly concentrated in Appalachian communities in which generations of individuals and families have depended upon, used, and enjoyed the affected waterways and mountains as a central part of their way of life and culture. As observed by Judge Wilkinson (U.S. Court of Appeals for the Fourth Circuit),

> West Virginia is witnessing in the Appalachian headwaters the long, sad decline that Virginia and Maryland have seen with the Chesapeake Bay.  Once the ecologies of streams and rivers and bays and oceans turn, they cannot be easily reclaimed.  More often than not, the waterway is simply gone for good.

*OVEC v. Aracoma Coal Co*., 567 F.3d 130, 133 (4th Cir. 2009) (Wilkinson, J., dissenting on denial of reh'g).  Movants and their members have witnessed and have been and continue to be affected personally by significant devastation of and the risk of further harm to these waters in West Virginia and other Appalachian states.  Mot. to Intervene ("MTI"), Dkt. 14 (citing Exs.).

B.      *The Challenged Documents Explain Compliance Policies.*

On June 11, 2009, the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, and the U.S. Department of Interior issued a joint Memorandum of Understanding applicable to the Appalachian Region.  U.S. Ex. 2 Dkt. 13-2 ("MOU").  They stated therein their intent to undertake "interim actions under existing authorities to minimize the adverse environmental consequences of Appalachian surface coal mining," including "[c]oordinated environmental reviews of pending permit applications."  *Id.* at 2.  In the policy documents accompanying this MOU, EPA and the Corps further explained the need to ensure compliance with existing legal requirements.  U.S. Ex. 3, Dkt. 13-3, at 1; U.S. Ex. 4, Dkt. 13-4, at 1-2 (citing

Section 404(b)(1) Guidelines).  They also stated the need to facilitate the agencies' review of a backlog of permit applications that had existed for over a year.  NMA Ex. 1, Dkt. 10-4, at 1.

On April 1, 2010, EPA Assistant Administrator Peter Silva issued Detailed Guidance to EPA staff in Regions 3, 4, and 5.  NMA Ex. 3, Dkt. 10-6 ("April 2010 Guidance" or "Guidance").  This regional guidance applies to EPA staff's review of Appalachian surface coal mining operations under the CWA, NEPA, and the Environmental Justice Executive Order in Kentucky, West Virginia, Virginia, Ohio, Tennessee, and Pennsylvania.  *Id.* at 2 n.4.  The April 2010 Guidance states that "[t]his memorandum reflects reviews of past practices and emerging science to improve and strengthen permit decision-making in order to better ensure compliance with federal environmental statutes, implementing regulations, and policies."  *Id.* at 1-2.  As provided therein, the following key considerations motivated the Guidance: (1) "the collection and publication of technical information documenting the scope and significance of adverse environmental and water quality effects associated with surface coal mining practices," (2) "recently completed reviews of permitting actions under CWA Sections 402 and 404 for Appalachian surface coal mining" that "demonstrate that current permitting practices can be more effective in addressing adverse environmental and water quality effects associated with coal mining by more robustly conducting analyses required by the CWA," and (3) "extensive work evaluating the relationship between pollutants in streams associated with surface coal mining and impacts from these pollutants on aquatic ecosystems" by EPA.  *Id.* at 5.  In other words, the agency responded to newly available information suggesting the prior application of relevant regulations was not securing legally required environmental protections.

To serve the stated purposes, the Guidance discusses scientific information and research relevant to the permitting decisionmaking process under sections 402 and 404, including

information establishing that there is a reasonable potential that mining discharges are causing and are likely to cause or contribute to violations of applicable water quality standards, due to potential harm to aquatic life within the affected waters. *See, e.g.*, *id.* at 13 (discussing scientific information regarding elevated conductivity as "relevant information" under 40 C.F.R. § 122.44(d)(1)(vi)).[4] This guidance aims to ensure that permits are reviewed using the best science available in order to protect Appalachian residents from the significant and irreversible damage that mine valley fills impose on local communities and their waters.

There is a formidable body of scientific literature that "reflect[s] a growing scientific consensus of the importance of headwater streams, a growing concern about the adverse effects of mountaintop removal mining, and concern that impacted streams cannot be easily replaced." Spruce RD (Ex. 17) at 17. Although new, comprehensive EPA reports summarizing this literature are in draft form, the peer-reviewed science they discuss is final and definitive.[5] Since EPA issued the April 2010 Guidance, an independent scientific panel released a draft report reaffirming the discussion of conductivity in EPA's draft report, and the science indicating that the conductivity levels discussed in the Guidance are likely to be harmful to aquatic life.[6]

---

[4] "Conductivity is the ability of a solution to carry an electric current at a specific temperature . . . and is normally reported in the units µS/cm (microsiemens per centimeter). Conductivity and TDS [total dissolved solids] both increase as the concentration of ions in a solution increase and are very strongly correlated. . . . Conductivity is an excellent indicator of the total concentration of all ions and is also a good predictor of aquatic life use impairment, especially in ecoregion 69" (in West Virginia). Spruce RD (Ex. 17) at 47-48 (citing 2008 Pond study showing that 100% of mined sites with conductivity over 500 µS/cm showed adverse impact to macroinvertebrates).

[5] The following EPA website contains each of the draft EPA reports. EPA, Activities for Advisory Panel on Ecological Impacts Associated with Mountaintop Mining and Valley-Fills, http://yosemite.epa.gov/sab/SABPRODUCT.NSF/WebProjectsbyCommittee?OpenView&committee=BOARD&secondname=Advisory%20Panel%20on%20Ecological%20Impacts%20Associated%20with%20Mountaintop%20Mining%20and%20Valley-Fills (last viewed Oct. 26, 2010).

[6] *See* Sci. Adv. Bd., Review of Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Sept. 28, 2010 draft), *at*

As the Guidance further elaborates, in EPA's Permit Quality Review of prior decisions, EPA staff found that "[a]s many as 80% of these permits raised concerns with respect to compliance with state narrative water quality standards, while more than half raised concern for the potential for significant degradation of aquatic ecosystems." NMA Ex. 3 at 6; *id.* at 10-11; *see also* U.S. Opp. Br., Dkt. 15, at 25.[7] As the Guidance explains, "EPA recently conducted assessments of permitting practices under CWA Sections 402 and 404 for surface coal mining projects in Appalachia" which "identified concerns related to effective protection of downstream water quality consistent with requirements of the CWA" and "found that many of these projects may not be consistent with EPA and Corps regulations, including the Section 404(b)(1) Guidelines." NMA Ex. 3 at 6. In recent years, numerous judges have found violations in the permitting process or administration of water quality standards.[8] To address these problems, the Guidance emphasizes numerous *existing* regulations and requirements. *See, e.g.*, *id.* at 6-14, 17-18, 20-23. It does not establish any new requirement that section 402 or 404 permits in the region must satisfy.

---

http://yosemite.epa.gov/sab/SABPRODUCT.NSF/81e39f4c09954fcb85256ead006be86e/73EFD038CD5705AC852577AE004B972C/$File/Conductivity+Report+Draft+Sep+28.pdf.

[7] Between January 2009 and April 2010, EPA also received information from citizen groups, including movants, bringing to EPA's attention problems in the state NPDES permitting programs in West Virginia and Kentucky. *See* Hopkins Decl. ¶ 7, Movants' Ex. 5, Dkt. 14-6.

[8] *See, e.g.*, *Ky. Waterways Alliance v. Johnson*, 540 F.3d 466 (6th Cir. 2009) (affirming district court ruling that EPA had violated CWA by approving unlawful Kentucky antidegradation regulations); *OVEC v. Hurst*, 604 F. Supp. 2d 860 (S.D. W.Va. 2009) (vacating Corps' Nationwide Permit 21 for surface coal mining under CWA § 404); *OVEC v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783 (S.D. W.Va. 2009) (remanding individual § 404 permits under the CWA); *W. Va. Highlands Conservancy v. Huffman*, 651 F. Supp. 2d 512 (S.D. W.Va. 2009) (requiring WVDEP to obtain § 402 permits); *OVEC v. Apogee Mining Co.*, 555 F. Supp. 2d 640 (S.D. W. Va. 2008) (requiring coal mining company to comply with its § 402 permit limits).

In view of the significant findings of relevant, peer-reviewed science showing adverse impacts of MTR and evidence of past permitting problems, both the April 2010 Guidance and the defendant agencies' interagency review aim to address these problems by ensuring compliance with the applicable laws and regulatory framework.

## STANDARD OF REVIEW

As the Supreme Court has observed, "[a] preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations and quotations omitted) (vacating grant of preliminary injunction because petitioner had stated no claim upon which relief could be granted).  The Supreme Court requires a four-factor test for a preliminary injunction, under which a plaintiff seeking a preliminary injunction must establish: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374-76 (2008) (reversing the grant of a preliminary injunction based on the mere "possibility" of harm).  A party seeking this rare form of relief must "by a clear showing, carr[y] the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  The D.C. Circuit's "sliding scale" standard (assuming it remains controlling law after *Winter*, 129 S. Ct. 365), does not nullify the requirement to make a showing on each of the four factors.  *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (affirming denial of preliminary injunction after finding plaintiffs had not met the sliding scale standard, and were "insist[ing] they need 'only establish that serious legal questions are at issue' in order to succeed"); *cf. Winter*, 129 S. Ct. at 375-76 (requiring a showing of irreparable harm); *Munaf*, 553 U.S. at 690 (requiring a showing of a likelihood of success on the merits).

**ARGUMENT**

This Court should deny the relief sought for two reasons: first, insurmountable jurisdictional and threshold issues bar this Court from reaching the merits and, second, the NMA has not established each of the four factors required to receive the extraordinary relief of a preliminary injunction.  In fact, the relief sought by NMA threatens both the public interest and environmental resources enjoyed by Movants' members in Appalachia.  For these reasons and others offered by the Government, this Court should not grant preliminary relief.[9]

**I.      NMA IS NOT LIKELY TO SUCCEED ON THE MERITS.**

       *A.      Significant Threshold Problems Bar the Court from Reaching the Merits.*

This Court must satisfy itself that it has jurisdiction, without a doubt, before proceeding to address a request for a motion for a preliminary injunction.  *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (holding that in all cases Article III standing must be found before reaching the merits); *Munaf,* 553 U.S. at 690 (noting that "[a] difficult question as to jurisdiction" makes success on the merits "more unlikely").  When resolving a jurisdictional challenge under Federal Rule 12(b)(1), the Court is not limited to the allegations contained in the complaint and is not required to accept all facts alleged therein as true, if they paint an incomplete picture.  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  Instead, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.*  As additional reasons to deny the NMA's motion, Movants offer the following points.

---

[9] As NMA's motion fails even under the less stringent "sliding scale" test, the Court need not decide whether this standard remains controlling after *Winter.  Cf. Davis*, 571 F.3d at 1292.

1.      The NMA Does Not Have Standing to Bring This Suit.

NMA has no standing to seek the relief requested in NMA's motion before this Court regarding either the April 2010 Guidance or the EC Process Memoranda.  "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury."  *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-181 (2000)).  The Court must not even consider granting preliminary relief unless those criteria are met, because "[w]here [such a] need does not exist, allowing courts to oversee legislative or executive action 'would significantly alter the allocation of power . . . away from a democratic form of government.'"  *Id.* (quoting *United States v. Richardson,* 418 U.S. 166, 188 (1974) (Powell, J., concurring)).  The plaintiff must provide sufficient evidence of standing to meet the burden of proof as applies at each stage of the case.  *See Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (holding that party seeking to progress "beyond the pleading stage" must meet the appropriate burden of proof) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Plaintiff has not shown it has associational standing based on the standing of an individual member. Under this standard, an association "must demonstrate that at least one member would have standing under Article III to sue in his or her own right, that the interests it seeks to protect are germane to its purposes, and that neither the claim asserted nor the relief requested requires that an individual member participate in the lawsuit."  *Natural Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977)).  Although NMA bases its claimed injury solely on that

of its members, the NMA has not shown that its members have standing under Article III to sue

in their own right.[10]  First, as shown by their plain language, the policy documents at stake

"neither require nor forbid any action on the part of" NMA's members, *cf. Summers*, 129 S. Ct.

at 1149, but instead only apply to EPA staff.  Second, the evidence offered does not prove

NMA's standing.

The EPA letters on which the NMA attempts to rely speak for the EPA Regional offices

from which they come, and as such, do not provide evidence of Article III injury to any NMA

members.  Antithetical to the NMA's claims, the EPA letter on Consol Energy's Peg Fork mine

actually discusses a *permit that was issued to the company* after it agreed to the conditions

contained therein, and that, notably, that company has not challenged through the appropriate

procedures.  NMA Ex. 13, Dkt. 10-35.[11]  It would defy logic to find that NMA has standing

based on Consol Energy's receipt of authorization to discharge under a permit issued by the

Corps and that can be independently challenged, or based on other authorizations to discharge

not yet final merely because a company has not yet signed the offered permit.[12]

---

[10] NMA cannot base its argument for standing on injury it claims may occur to workers or to other industries, such as the rail industry, as these individuals are not NMA members, and their interests, whether in employment (in any industry) or in having rail customers (from any industry), are different from and not germane to the NMA's purposes, Compl. ¶ 4.  *Cf. Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 n.15 (11th Cir. 1993) ("The associational standing test articulated in *Hunt* is properly reserved for voluntary membership organizations- like trade associations or environmental groups - and has no application to a corporation's standing to assert the interests of its employees.").  Further, most exhibits offered by NMA include no evidence that the companies it aims to represent "possess all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 344.  NMA cannot speak for any state and no state official's declaration can prove injury of any individual mining company.

[11] In view of the fact that this and other permit decisions are not before this Court, Defendant-Intervenors reserve all rights and claims in regard to each such permit decision.

[12] Wells Decl., NMA Ex. 9, Dkt. 10-24, ¶¶ 11, 21-22, 26 (stating that United/Sapphire has received a proposed authorization but chose not to accept it; no NMA membership evidence);

The company declarations NMA has submitted from states covered by the April 2010 Guidance and EC Process also fail to prove the NMA's standing.  Any economic harm described in the submitted declarations is completely hypothetical and not "imminent," as required.  *See, e.g.*, Horn Decl., NMA Ex. 23, Dkt. 10-45, ¶ 13 (tentatively speculating that Czar "may be unable to go forward with the Project"); Cook Decl., NMA Ex. 8, Dkt. 10-11, ¶ 24 (claiming that "delays . . . have had and will have economic consequences" without describing or proving this conclusory statement, and not showing NMA membership).  The abstract, past loss of money, alone, NMA Ex. 8; Higgins Decl., NMA Ex. 24, Dkt. 16-1, ¶ 8, cannot ground the NMA's standing.  *Cf. Summers*, 129 S. Ct. at 1150.  Uncertainty regarding a speculative future loss of investment for a road – based on the hypothetical result of an ongoing agency decisionmaking process, *see* NMA Ex. 8 ¶ 24 – also does not prove injury sufficient for standing (or for preliminary injunctive relief).  The company chose to build the road under a cloud of legal uncertainty.  Furthermore, although the road might be less valuable if used for other purposes, it remains a road from which Alex Energy can reap future financial benefits unrelated to mining activities, for other land uses.  Indeed, whether connected with future mining or not, as long as an NMA member "retains the possibility" of recovering the claimed loss, its injury is "speculative or at most minimal."  *Cf. TEAC Am., Inc. v. U.S. Dep't of Navy*, 876 F. Supp. 289, 295 (D.D.C. 1995).  The further speculation that "at some point, without the permit," a mining company will experience potential economic harm of one type or another, *e.g.*, NMA Ex. 8 ¶ 24, is neither specific nor imminent enough to ground Article III standing, and shows nothing more than "'some day intentions.'"  *Cf. Summers*, 129 S. Ct. at 1151 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 554, 564 (1992)).  It is unclear if or when that "point" will ever be reached.  A

NMA Ex. 23 ¶ 10 (explaining that Czar Coal received a final permit by the Corps but chosen not to accept it; no NMA membership evidence).

court may not award a preliminary injunction "'simply to prevent the possibility of some remote future injury.'"  *Winter*, 129 S. Ct. at 376 (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FED. PRAC. & PROC. § 2948.1, at 155 (2d ed. 1995)).  The claimed future, hypothetical loss of investment, for which a company retains a possibility of recoupment is at most temporary harm that cannot ground standing.

Even assuming that delay, in some circumstances, could create harm, the NMA's members are economic actors that have made a calculated choice to seek permission to engage in a mining method where a high risk or uncertainty is part of the expected cost of doing business.[13] What the NMA characterizes as *per se* harmful "delay" appears simply to be time that the expert agencies deem necessary to complete their duties under existing law for an individual permit application.  Yet, if all permit applicants had fully addressed applicable legal requirements and relied upon available science in their permit applications, this would have facilitated the agencies' review and reduced the time needed.

Rather than proving causation, the NMA's declarations demonstrate the type of "multi-tiered speculation," that the D.C. Circuit has held insufficient to ground standing.  *Cf. GrassRoots Recycling Network, Inc. v. U.S. E.P.A.*, 429 F.3d 1109, 1112 (D.C. Cir. 2005) (finding that property owners near landfills had no standing where there were multiple permitting authorities and intervening steps that could affect the final decision made).  No NMA declaration proves that any mining company has submitted permit applications that satisfy all applicable legal requirements, and the fact that the Guidance and EC Process are being used in the review of their permit application cannot alone demonstrate injury.  Still, NMA asks this Court to shut

---

[13] *See, e.g.*, Spruce RD (Ex. 17) at 6 (discussing "lengthy and complex" permitting history in which serious problems remain unresolved) and the dockets of litigation pending on the Spruce permit, OVEC et al. v. U.S. Army Corps of Eng'rs et al., Civ. No. 05-0784 (S.D. W. Va.) (Chambers, J.), and Mingo Logan v. EPA, Civ. No. 10-0541 (D.D.C.) (Kollar-Kotelly, J.).

down the agencies' permit review process, ignore intervening steps and the agencies' views on the need to carefully address existing legal requirements, and set an arbitrary deadline for the Corps to issue permit decisions.  Compl. prayer for relief Nos. 6-8, Dkt. 1; NMA Opp., Dkt. 16, at 42.  Yet, no mining company has a legally protected property interest in or a right to a section 402 or section 404 permit, and there certainly is no right to an invalid permit.  *See, e.g.*, 33 C.F.R. § 320.4(g)(6) (providing that Corps permits, like section 404 permits, do "not convey any property rights, either in real estate or material, or any exclusive privileges"); 47 W. VA. CODE R. § 30-3.4.b (providing that the issuance of a section 402 permit by the State of West Virginia "does not convey any property rights of any sort").[14]

Finally, the NMA has not proven that the relief sought would redress the injuries that it claims are due to delay.  Vacatur of the April 2010 Guidance would not lead to any permit decision by any particular time, and is actually more likely to cause delay due to the need to explain in greater detail what existing law requires to EPA staff reviewing permit applications. Further, it is unclear how injunctive relief against the EC Process, affecting those section 404 permit applications that remain under consideration in this process, would resolve NMA's concerns.  *See* U.S. Opp. Br. at 9 & n.2.[15]  The Court has no authority to order the Corps to issue a decision on a specific timeline.  *See infra*, at 37-38.

---

[14] *See also* 33 C.F.R. Pt. 325, App. A (standard Corps' permit form language that includes statement that "[t]his permit does not grant any property rights or exclusive privileges"); 33 C.F.R. § 325.7 (allowing the Corps to suspend, revoke or modify any previously issued permit); 33 U.S.C. § 1344(c) and 40 C.F.R. §§ 231.1-.8 (allowing EPA to withdraw or restrict any previously issued permit). There is no analogy between a permit seeking permission to dump mining pollution into U.S. waters and an entitlement such as a food stamp or emergency jobs program.  NMA PI Br. at 18 (citing *Batterton v. Marshall*, 648 F.2d 694, 708 (D.C. Cir. 1980)).

[15] Through the relief sought, which applies solely to a process and Guidance that do not cover Alabama, *see* NMA Ex. 3, at 2 n.4, this Court would not redress any injury (even if proven) for any of the Alabama companies.  Thus, the Court should ignore as irrelevant the Alabama documents, including from Best Coal.  Any NMA protest otherwise only shows that it seeks

NMA also cannot meet the last factor of the test for associational standing under *Hunt*, that individual members' participation must not be necessary to resolve claims or grant relief, 432 U.S. at 344.  With its request for relief from the EC Process and April 2010 Guidance, NMA seeks to move all of its members to the finish line, by asking this Court to accelerate all pending permit applications and put them "near[] the end of the Section 404 permit process, with all comment periods closed, all requirements satisfied, and awaiting the Corps' drafting of the final permit decision."  NMA Opp., Dkt. 16, at 42.  This, however, would "require[] individualized proof," *Hunt*, 432 U.S. at 344, that all pending permit applications should be at that place, and it is thus not proper for the Court to resolve the NMA's claims in a group context.  By aiming to prevent EPA or the Corps from scrutinizing specific permits based on the scientific information described in the April 2010 Guidance, *see, e.g.*, NMA Ex. 9, Dkt. 10-24; NMA Ex. 23, Dkt. 10-45, the NMA seeks a substantive, not a procedural, outcome from this Court, for which its individual members' participation would be necessary.  Yet, NMA cannot ground its standing on such a variety of potential (although hypothetical) types of claimed injury when it is uncertain how the claimed relief of vacating the policy documents or other relief sought (see Compl. prayer for relief) could provide redress.  *Cf. Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 576 (5th Cir. 2002) (finding no associational standing where court "would need individualized information . . . to determine the proper scope of an injunction").[16]

---

broad, sweeping relief that goes beyond mere vacatur of specific policy documents, to prevent EPA from exercising its basic authority under section 404.  *See* Compl. prayer for relief Nos. 3-5, 7.  Furthermore, the Best Coal declaration suffers from similar problems as other declarations, alleging, at worst, that harm may occur over a year from now ("within 18 months"), and is likely caused by Best Coal's decision to enter a contract for coal that it did not have legal authorization to mine.  *See* Johnson Decl., NMA Ex. 4, Dkt. 10-7, ¶¶ 18, 19.

[16] Plaintiff has not pled or proven any independent ground for standing apart from its members. *See* Compl. ¶¶ 2, 5; NMA Mot., Dkt. 10, at 35 (claiming injury only to "NMA's members").

2.      This Case Is Not Justiciable and the Relief Sought Would Be Premature.

In the guise of challenging policy documents that announce the defendant agencies' plan to enforce existing law, the NMA's action seeks premature relief from the investigation of permit applications that are not before this Court, and its challenge should fail for the following reasons.

First, the NMA cannot bring an APA claim here because its members, if ever harmed, will have an adequate remedy after completion of the permit review process.  The APA provides:

> Agency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.

5 U.S.C. § 704 (emphasis added).  In this instance, a permit applicant has the ability to receive review should the Corps deny a permit, 33 C.F.R. § 331.1, or should EPA veto a permit, 40 C.F.R. § 231.6; *see also* 40 C.F.R. §§ 123.30, 124.19.  The Corps has an established administrative appeal process "to be used for the administrative appeal of approved jurisdictional determinations (JDs), permit applications denied with prejudice, and declined permits."  33 C.F.R. § 331.1.  Under the APA, the NMA cannot challenge EPA's use of the April 2010 Guidance as part of an interagency review process for which NMA's members will have a full, alternative remedy "on the review of the final agency action," 5 U.S.C. § 704.  As a result, Plaintiff also has not exhausted its administrative remedies under the regulations, and could not do so for its members whose potential claims would be disparate and varied regarding different permit applications at different stages of review, including some final permit decisions.[17]

Second, the NMA's claims regarding the April 2010 Guidance and other policy documents challenged here are unripe.  To show ripeness, the plaintiff has the burden to prove

---

[17] Movants also incorporate the Government's demonstration in its motion to dismiss that the "final agency action" requirement of 5 U.S.C. § 704 is not met.  *See* Dkt. 12 at 13-18.

"both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). "The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)).

At base, the NMA's claims of injury do not stem from the April 2010 Guidance or EC Process, but from assumptions that the final, substantive outcome of pending permit applications will cost its members money. *See, e.g.*, NMA PI Br., Dkt. 10-3, at 38 (complaining of the cost of compliance). In the posture of a motion for a preliminary injunction, the Court may not accept this line of purely legal speculation as true, but must investigate whether the NMA has met the "likelihood of success" standard of proof. NMA's declarations show that both final agency action and judicial review of such action will be "dependent on the findings of" particular permit application reviews, combined with the review and application of scientific information and existing legal requirements. *Cf. Gen. Motors Corp. v. EPA*, 363 F.3d 442, 452 (D.C. Cir. 2004) (denying review of guidance letters that were "merely preliminary enforcement statements," where there were no "irremediable adverse consequences [that will] flow from requiring a later challenge") (quotation omitted).

In addition, NMA's claims are not fit for review at this time because a record of how the defendant agencies have applied the policy documents in final permit decisions would facilitate judicial review. Where the court "believe[s] that the agency's practical application of a statement would be important," it is unfit for judicial determination. *Pub. Citizen, Inc. v. Nuclear Reg. Comm'n*, 940 F.2d 679, 683 (D.C. Cir. 1991) (finding policy document unripe even though it set a "baseline" and used some "unequivocal" language). Thus, when other parties

have made arguments similar to those of NMA in the past – such as "contending that [a] rule alters [existing] standards" – the D.C. Circuit has held that they "have raised issues that are not purely legal, issues that are not suitable for decision in the abstract." *Clean Air Implementation Project v. E.P.A.*, 150 F.3d 1200, 1205 (D.C. Cir. 1998) (finding too many "imponderables" barred review at the time sought).   Here, any reference to the April 2010 Guidance in the permit review process "amounts to an investigation" of a permit applicant's proposed operation, and merely because the cited EPA letters include preliminary statements of a possible determination, or "a request for voluntary corrective action," does not make judicial review of the policy documents appropriate now.  *Cf. Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (holding that pre-decisional communication was not reviewable where "the agency has not yet made any determination or issued any order imposing any obligation on [the regulated entity], denying any right of [that entity], or fixing any legal relationship").  Unlike in *Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207 (D.C. Cir. 2007), where the petitioner limited a claim to purely legal issues regarding the plain text of the guidance document challenged, here the NMA attempts to rely on the *application* of the challenged guidance to specific permit applications, before those decisions are complete.  Because the NMA's arguments cannot be resolved purely "on the face of the document," but instead "depend[] as well on the way in which the document will be applied," *id.* at 216, each of its claims is not yet fit for review, and is thus unripe.

Many of the issues raised by NMA in regard to the policy documents, e.g., the application of relevant science on conductivity, or the relevant science on mitigation in a given permit setting, are "open to doubt" and "may well be clarified" through actual, final permit decisions, and thus, judicial restraint and efficiency favor postponing review.  *See Nat'l Ass'n of*

*Reg. Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).  The

challenged policy documents do not resolve the issues the NMA challenges in any manner

sufficient to create a justiciable controversy.  For example, the April 2010 Guidance describes

relevant science demonstrating that certain conductivity levels (such as 500 µS/cm) are likely to

cause significant harm and EPA's interpretation of the significance of this science, but it does not

establish an effluent limit for conductivity or related pollutants for any or all permits.  Guidance,

NMA Ex. 3 at 12, 29 (citing need for case-specific review).  In view of the complex factual and

scientific questions discussed in the April 2010 Guidance (and implicated in the EC Process),

this Court should not decide the issues raised by Plaintiff at this time.  To ripen an issue, "[t]he

agency must have made up its mind, and its decision must have 'inflict[ed] an actual, concrete

injury'" that "typically is not caused when an agency merely expresses its view of what the law

requires of a party, even if that view is adverse to the party."  *AT&T Co. v. E.E.O.C.*, 270 F.3d

973, 975 (D.C. Cir. 2001) (holding challenge to guidance letter was not ripe).

Finally, before NMA can challenge the enforcement of section 404 requirements against

its members, it must allow the agencies' decisionmaking process, and any administrative review

thereof, *e.g.*, 33 C.F.R. § 331.1, to run its full course.  *Cf. Ohio Forestry Ass'n v. Sierra Club*,

523 U.S. 726, 737 (1998) (finding a challenge to a Forest Service plan unripe, in part because

"Congress has not provided for preimplementation judicial review of forest plans," in contrast to

other statutes under which "Congress has specifically instructed the courts to review

'preenforcement'").  A challenge to agency action is unripe where the challenged action does

"no more than 'serve[] notice . . . that the [agency] may under certain circumstances'" order

certain action or that a final approval "may be refused" on certain grounds.  *Munsell v. Dep't of

Agriculture*, 509 F.3d 572, 586 (D.C. Cir. 2007) (quoting *Toilet Goods Ass'n v. Gardner*, 387

U.S. 158, 163 (1967)).  Thus, it is relevant to the question of fitness that the Clean Water Act

includes a strong policy against pre-decisional compliance challenges, such as challenges to "the

investigatory work necessary to determine whether a violation exists." *S. Ohio Coal Co. v. Ofc.

of Surface Min*., 20 F.3d 1418, 1427 (6th Cir. 1994) (holding that district court "lacked

jurisdiction to enjoin USEPA from investigating the situation at [a specific mine]" and citing

cases); *see also Sackett v. U.S. E.P.A.*, --- F.3d ----, 2010 WL 3607142, at *3 (9th Cir. Sept. 17,

2010) (denying review of a compliance order and citing cases).  The principles barring review in

pre-enforcement cases similarly apply to the situation at hand, where the question is whether the

Court should intervene now, or await a final decision on a given permit application, if indeed any

applicant is harmed.  The structure of the Clean Water Act, as in similar environmental statutes,

"indicates that Congress intended to allow EPA to act to address environmental problems

quickly and without becoming immediately entangled in litigation."  *S. Pines Assocs. v. United

States*, 912 F.2d 713, 716 (4th Cir. 1990) (denying premature review of a CWA compliance

order).  Where there is a remedy provided for judicial review of agency actions at the end of the

CWA decisionmaking process, earlier review is "impliedly precluded."  *S. Ohio Coal Co.*, 20

F.3d at 1426-27 (quoting *Hoffman Group v. EPA*, 902 F.2d 567, 569 (7th Cir. 1990)).

NMA's claims are also unripe for reasons similar to those that establish its lacks of

standing.  *See supra* Part I.A.1.  In the absence of the relief sought, NMA and its members will

experience no injury or hardship.  NMA can point to nothing in the text of the EC Process

Memoranda or April 2010 Guidance that is a requirement of or prohibition on its members.  As

the D.C. Circuit explained, in finding a USDA compliance directive unripe because "[t]here are

no obvious adverse consequences that will flow from requiring [the plaintiff] and its members to

pursue challenges to [the document] in the context of concrete enforcement actions," there is no

hardship "when a complaining party 'is not required to engage in, or to refrain from, any conduct.'" *Munsell*, 509 F.3d at 586 (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)). Because its claims of harm in the application of the documents are speculative, on their face, the NMA also cannot show hardship sufficient to prove ripeness. Although NMA claims harm from uncertainty regarding final permits that it contends its members are owed, "[m]ere uncertainty as to the validity of a legal rule does not constitute a hardship for purposes of the ripeness analysis." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 804.

In sum, due to the lack of standing, the lack of ripeness, and the availability of review later, the Court should deny this motion because there is no "real need to exercise the power of judicial review in order to protect the interests of the complaining party," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974). If the Court finds that the NMA has failed to prove any threshold issue discussed herein or in the Government's briefs, Dkts. 13, 15, the Court must deny relief to the NMA. *Cf. Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) (holding that a court may "choose among threshold grounds for denying audience to a case on the merits").

B.      *EPA's Guidance and Coordination with the Corps Are Reasonable and Lawful.*

NMA cannot show a likelihood of success on the merits of its claims that EPA is acting outside of its authority or that the challenged policy documents violate the Clean Water Act or NEPA. When considering a claim based on a federal statute, "[i]f the intent of Congress is clear," then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," but "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron USA v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). When considering a claim based on the interpretation of an agency regulation, the agency's

interpretation "is 'controlling' unless 'plainly erroneous or inconsistent with' the regulation." *Cement Kiln Recycling Coal.*, 493 F.3d at 220 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172 (2007) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (additional citations omitted))).   Rather than accepting NMA's characterizations of the challenged policy documents, the Court must engage in a text-based analysis that addresses the specific factual circumstances of these documents.   Because the defendant agencies' interpretations of their authorizing statutes and applicable regulations, as stated in the April 2010 Guidance and EC Process memoranda and their briefs, are fully permissible under the Clean Water Act and plainly consistent with existing regulations, each of NMA's arguments on the merits must fail.

> 1.     The April 2010 Guidance Is Squarely Grounded in the Text and
>         Regulations of the Clean Water Act.

The April 2010 Guidance is fully consistent with the Clean Water Act, its implementing regulations, and EPA's authority under both section 402 and section 404.

> a.     EPA's Guidance Comports with Section 402 of the CWA.

The Court should reject NMA's contention that the Guidance is unlawful because it set a water quality standard.   The Guidance's plain text and application show that it does no such thing, but is a reasonable use of EPA's CWA section 402 authority to ensure state compliance with *existing* water quality standards, as the Guidance itself explains.   As elaborated below, in the first instance, when a state reviews a section 402 permit application, applicable regulations require the state to analyze and incorporate current science into the decision of how to apply existing water quality standards and set effluent limitations in such a permit. *See, e.g.*, 40 C.F.R. § 122.44(d).   If a state does not satisfy these requirements, EPA must object to the permit as unlawful under section 402(d), 33 U.S.C. § 1342(d).   In citing relevant scientific studies and

advising agency staff on how these studies relate to existing narrative water quality criteria, the Guidance appropriately follows an established regulatory path.

First, as discussed in the Guidance, section 402 requires that state permits must meet certain conditions to protect waters, 33 U.S.C. § 1342(b)(1), (c); *see* 40 C.F.R. § 123.25 (listing requirements applicable to CWA § 402 permits issued by states). Of particular relevance here, EPA's regulations direct that section 402 permits must incorporate "any requirements . . . necessary to [a]chieve water quality standards established under section 303 of the CWA, including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1). This requirement applies to states even after they obtain EPA approval to issue 402 permits. 40 C.F.R. § 123.25. In the Appalachian region, the applicable narrative criteria include those listed in footnote 2, above. When a discharger applies for a section 402 permit, the state must analyze whether any pollutant in the proposed discharge "causes, has the reasonable potential to cause, or contributes to an excursion above a narrative criterion within an applicable State water quality standard." *Id.* § 122.44(d)(1)(vi)(A) and (B). In analyzing this "reasonable potential" of a violation of a narrative standard, the state must consider all "relevant information." *Id.* § 122.44(d)(1)(vi)(B). As provided by this key regulation:

> Where a State has not established a water quality criterion for a specific chemical pollutant that is present in an effluent at a concentration that causes, has the reasonable potential to cause, or contributes to an excursion above a narrative criterion within an applicable State water quality standard, the permitting authority must establish effluent limits. . . .

40 C.F.R. § 122.44(d)(1)(vi) (emphasis added). Thus, if relevant information shows that there is a "reasonable potential" that a narrative standard will be violated, then the permit must include a numeric effluent limit to achieve compliance with that narrative standard, even if the state has not yet adopted a generally applicable numeric standard for that pollutant. *Id.* § 122.44(d)(1)(vi).

It is longstanding EPA policy that "permitting authorities need to investigate for the existence of specific chemicals in effluents for which the State has not adopted numeric criteria, but which may be contributing to aquatic toxicity or impairment of human health."  EPA, Technical Support Document for Water-Quality Based Control 48 (1991), http://www.epa.gov/npdes/pubs/owm0264.pdf; *see* Guidance, NMA Ex. 3, at 8.

Moreover, if a state permitting authority fails to incorporate relevant information or set appropriate permit limits, EPA has full authority to object to the permit as unlawful.  33 U.S.C. § 1342(d)(2).  As part of deciding whether to object to a permit, EPA judges whether the permit complies with section 122.44(d) and other applicable requirements.  40 C.F.R. § 123.44(c)(1).  These regulations allow EPA to object if, for example, a permit fails to contain pollution limits when relevant science shows a discharge has "reasonable potential" to cause or contribute to an excursion above an applicable State narrative water quality standard.  40 C.F.R. 122.44(d)(1)(vi).  In deciding whether to object, EPA must ensure that it satisfies its CWA responsibility which "includes preserving the long-term integrity of Appalachian watersheds, which is important in protecting their ecological condition and maintaining safe, clean, and abundant water for local communities."  Guidance, NMA Ex. 3, at 1; *see also* 33 U.S.C. § 1251(a),(d).

As the Guidance explains, it aims to ensure compliance with these important, existing legal requirements by emphasizing the need for EPA to enforce them through a section 402 objection, if a state permitting authority fails to satisfy the requirements.  NMA Ex. 3 at 8; *id.* at 10 ("EPA regulations are clear that NPDES [section 402] permits must contain provisions that implement both numeric water quality standards and narrative water quality standards.").  The plain language of the Guidance demonstrates that it provides scientific information to EPA staff that is relevant to an objection, and thus reinforces both existing regulations and water quality

standards that already bar the types of impacts demonstrated by available science.  *See id.* at 10

(citing the water quality standards in the covered states, cited *supra* note 2).  In view of this, it

was eminently reasonable for EPA to issue the April 2010 Guidance to emphasize its

expectations regarding the states' implementation of the *existing* water quality standards and to

make clear that its staff should fulfill their duty to object, if necessary.  *See, e.g.*, *id.* at 8, 13, 15.

As EPA has plainly not set a new standard, but is simply attempting to assure compliance with

existing requirements including 40 C.F.R. § 122.44(d), the Court must reject the NMA's

challenge to the Guidance on this basis.

Moreover, the need for EPA's Guidance is well-supported.  First, the significant past

problems EPA found in the permitting process under section 402 and 404, *see, e.g.*, Guidance,

NMA Ex. 3, at 2-3, 6, only reinforce the value of EPA's extensive discussion in the April 2010

Guidance of a series of critical existing legal requirements under section 402, section 404 and the

Section 404(b)(1) Guidelines.  Second, the cited science on elevated conductivity is "relevant

information" both for state permitting authorities to rely on in permitting decisions, and for EPA

to rely on as the basis for a potential objection, as it shows that pollutants in discharges from

surface coal mines in Appalachia have a "reasonable potential" to cause or contribute to the

biological impairment of a stream, as discussed in the Guidance.  *Id.* at 5, 10-12 (discussing

scientific studies and explaining how this indicator demonstrates that pollutants from mining

discharge are likely causing violations of state water quality standards by harming aquatic life

and the integrity of affected waters); *see also* Spruce RD (Ex. 17) at 48 (citing Pond study

finding "that elevated conductivity greater than 500 μS/cm caused by alkaline mine effluents was

strongly associated with high probability of degradation of native biota"); Palmer et al. (Ex. 16)

at 148 (discussing research showing conductivity and associated pollutant concentrations "can

directly cause environmental degradation, including disruption of water and ion balance in aquatic biota"). For example, as the Guidance points out, research has shown that "nine out of every ten streams downstream from surface mining operations were impaired." NMA Ex. 3, at 3. This satisfies the reasonable potential standard in 40 C.F.R. § 122.44(d)(1)(i)-(vi), because the relevant science shows streams have already been impaired by mining waste, thereby demonstrating the potential of pollutants in new mining discharges to negatively impact streams. NMA simply cannot show that it is unreasonable for EPA to advise staff that the science on high levels of conductivity, dissolved solids, sulfates, and other pollutants from discharges, provides valid, potential grounds to object if a state has not appropriately incorporated this information and set necessary requirements in permits, consistent with existing water quality standards.[18]  As EPA's interpretation that this peer-reviewed research is relevant to important CWA requirements closely follows and is, at minimum, plainly consistent with existing regulations, the Court should affirm it. *Cf. Cement Kiln*, 493 F.3d at 220; *Auer*, 519 U.S. at 461.

      b.      EPA's Guidance Comports with Section 404 of the CWA.

NMA's contention that the Guidance violates section 404 also fails. Under the Section 404(b)(1) Guidelines, compliance with water quality standards is an express prerequisite before the Corps can issue a section 404 permit for the discharge of fill material. *See* 40 C.F.R. § 230.10(b)(1). This regulation specifically prohibits any discharge under section 404 that "[c]auses or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." *Id.* The Corps' own regulations direct it to

---

[18] NMA can present no peer-reviewed science that casts doubt on EPA's discussion of the problem of elevated conductivity due to surface mining or other water quality concerns in the Guidance. The independent Science Advisory Board has released a draft report providing further support, in its preliminary findings, for the fact that science on conductivity shows that the levels discussed in the Guidance are likely to cause harm to waters and aquatic life. *See supra*, note 6.

consider not just the state water quality standards or a state's water quality certification that a discharge meets those standards, but also whether "the Regional Administrator [of EPA] advises of other water quality aspects to be taken into consideration."  33 C.F.R. § 320.4(d).  Thus, on top of the fact that EPA itself promulgated the applicable regulations in conjunction with the Corps, EPA also has an explicit role in the Corps' regulations to guide the Corps in applying the Section 404(b)(1) Guidelines, including on water quality, *e.g.*, 40 C.F.R. § 230.10(b)(1).  The Guidance is consistent with this regulation and with "EPA's policy to try to resolve environmental problems before permit issuances," 44 Fed. Reg. at 58,077 (preamble to section 404(c) regulations).  To judge whether or not to veto, EPA assesses a permit's compliance with section 404(c), which includes an analysis of whether or not the Corps has satisfied the Section 404(b)(1) Guidelines. 33 U.S.C. § 1344(c); 40 C.F.R. § 231.1(a) ("[i]n making [a section 404(c)] determination, the Administrator will take into account all information available . . . , including any written determination of compliance with the section 404(b)(1) Guidelines made in 40 CFR Part 230"); 40 C.F.R. § 231.2 (defining "unacceptable adverse effect" in part based on "the relevant portions of the section 404(b)(1) guidelines (40 CFR part 230)").  By describing why the potential harm to water quality caused by elevated conductivity from mining waste must be taken into account under section 404, and specifically 40 C.F.R. § 230.10(b)(1), the Guidance shows it is consistent with these regulations.  *See* NMA Ex. 3, at 20-22.

The Supreme Court decision in *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 129 S. Ct. 2458 (2009), provides no support for the NMA's claim that EPA has usurped the Corps' authority under section 404 by attempting to ensure that the Corps' permits satisfy the Section 404(b)(1) Guidelines.  *Coeur Alaska* addressed section 306, 33 U.S.C. § 1316, holding that EPA and the Corps could decide not to apply new source performance standards in a section

404 permit decision or veto because these standards were not an explicit criterion for

consideration under section 404 or the Section 404(b)(1) Guidelines. 129 S. Ct. at 2472-73.  By

contrast, water quality standards adopted under section 303, 33 U.S.C. § 1313, are both an

important and explicit factor incorporated into the Section 404(b)(1) Guidelines, *see* 40 C.F.R. §

230.10(b)(1), so *Coeur Alaska* supports the use of water quality standards in the April 2010

Guidance and the section 404 permit review process.  Furthermore, *Coeur Alaska* fully affirmed

EPA's statutory duty under section 404 to oversee and enforce the Corps' compliance with the

fundamental regulatory requirements of Section 404 and the Guidelines.  *See* 129 S. Ct. at 2464-

65, 2469, 2472 (citing section 404(c) and 40 CFR pt. 230); *id.* at 2465, 2474 (deferring

ultimately to EPA, rather than the Corps, as the lead agency under section 404).

NMA has no likelihood of being able to prove the Guidance is anything but reasonable

and well-grounded in science and an appropriate compliance policy that aims to ensure

applicable statutory text and regulations are followed.[19]  The Court should hold that NMA has

not met factor one of the preliminary injunction test in regard to the Guidance because "[f]ar

from imposing a new substantive burden," the Guidance reflects "the agency's decision to focus

its resources on such likely problem areas" as it has found in a prior permitting review, in

reliance on available science.  *Cf. Am. Hosp. Ass*'*n v. Bowen*, 834 F.2d 1037, 1052 (D.C. Cir.

1987) (holding that agency's procedural policy merely "expose[d] . . . undeserving hospital

claims").

---

[19] Thus, a challenge to the Guidance is "based not on the document . . . but on the underlying . . . regulation," such that the plaintiff "is no worse off than it would be had the document not been issued at all," as explained in *Molycorp, Inc. v. U.S. EPA*, 197 F.3d 543, 547 (D.C. Cir. 1999) (holding that the court had no jurisdiction to review an unripe challenge to policy guidance). Consequently, the challenge is not only unripe, as discussed *supra,* but is also an untimely challenge to the existing regulations themselves, to which the 6-year statute of limitations under 28 U.S.C. § 2401(a) applies.  *See* 45 Fed. Reg. 85,336 (Dec. 24, 1980).

2.      The Guidance Is Consistent with NEPA.

Contrary to the NMA's contentions, the April 2010 Guidance is also a proper exercise of

EPA's authority to review the Corps' NEPA analysis.  It is undisputed that before the Corps can

issue a section 404 permit, it must conduct a lawful NEPA analysis under 42 U.S.C. § 4332 and

NEPA regulations (40 C.F.R. Pt. 1500).  *See* Guidance, NMA Ex. 3, at 4.  Then, the

environmental assessment documents for all of these permit applications fall under EPA's review

and referral authority because EPA is an agency with "jurisdiction by law or special expertise

with respect to any environmental impact involved," under NEPA, 42 U.S.C. § 4332(C), and

under the Clean Air Act, 42 U.S.C. § 7609(a).  EPA has "jurisdiction" and "special expertise" as

the guidelines developer and pursuant to its ability to comment and coordinate with the Corps,

and as the ultimate veto authority under section 404(a), (c), 33 U.S.C. § 1344(a), (c), as well as

under the Clean Water Act generally, as the lead administrator, *id.* § 1251(d).

In keeping with these authorities, the plain text of the Guidance demonstrates that it does

not establish any new NEPA requirements, but simply makes clear what EPA considers to be

failings in the Corps' past NEPA analyses, and emphasizes existing NEPA requirements, such as

the need to avoid problems found with previously used types of mitigation.  NMA Ex. 3 at 29-

30.  The Guidance also gives EPA's expert opinion that "more than one mile of stream loss or

more than one valley fill are likely to result in significant adverse impacts."  *Id.* at 30.  As the

question of significance includes the question "[w]hether the action threatens a violation of

Federal, State, or local law or requirements imposed for the protection of the environment," 40

C.F.R. § 1508.27(10), among other things, this is an especially appropriate topic for EPA's

expertise.  Thus, these statements in the Guidance fully comport with EPA's legal authorities to

review and refer problematic NEPA analyses.  The Guidance expressly maintains the Corps'

ability to exercise its discretion in fulfilling the Corps' NEPA responsibilities in the section 404

permitting process, while encouraging the Corps to follow legal and scientific requirements so

that EPA need not take further action, such as referral to CEQ under section 309(b), 42 U.S.C. §

7609(b).  Finally, as under the CWA, NEPA regulations also encourage close interagency

communication, stating that EPA "[e]nvironmental referrals should be made to the Council only

after concerted, timely (as early as possible in the process), but unsuccessful attempts to resolve

differences with the lead agency."  40 C.F.R. § 1504.2; *see also* 40 C.F.R. § 1501.6

(emphasizing need for early interagency cooperation).

3. The Interagency Review Process Comports with the CWA.

Just as the April 2010 Guidance is consistent with the Clean Water Act and implementing

regulations, EPA's ability to rely on and implement that guidance as part of the ECP interagency

process is similarly lawful under the text and framework of section 404 of the Clean Water Act,

33 U.S.C. § 1344.[20]

First, neither the EC Process nor the MCIR Assessment tool (which mirrors the Section

404(b)(1) Guidelines), violates *Coeur Alaska*, for the same reasons already discussed *supra,* Part

I.B.1.b.  In its review, as in the April 2010 Guidance, EPA is acting within its granted section

404 authority to attempt to ensure that the Corps satisfies permitting requirements, which

explicitly include requirements to protect water quality, *e.g.*, 40 C.F.R. § 230.1(b), and is clearly

neither making permitting decisions nor requiring a section 402 permit for fill discharges.

Second, the agencies' process comports with the multiple statutory provisions authorizing

and encouraging consultation and coordination.  *See, e.g.*, 33 U.S.C. § 1344(a), (b), (q) (directing

---

[20] Notwithstanding the NMA's contentions, *OVEC v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), did not uphold the NMA's view of the Corps' permit review process but merely addressed individual permit decisions in a dramatically divided judicial ruling.  *See also OVEC v. Aracoma Coal Co.*, 567 F.3d 130, 132-33 (4th Cir. 2009) (Wilkinson, J., dissenting from denial of reh'g en banc); *id.* at 134 (Michael, J., same) (finding that "the Corps has simply failed to do its job").

the Corps to enter into an agreement with EPA); *see also* U.S. Ex. 1, Dkt. 13-1.  Applicable

regulations further emphasize the value and importance of this coordination.  *See, e.g.*, 33 C.F.R.

§§ 320.2(f), 320.4(d); 40 C.F.R. § 231.1(a), (b)(3).  By contrast with the case cited by NMA,

*Colo. Wild Horse & Burro Coal.*, 639 F. Supp. 2d 87, 97 (D.D.C. 2007), where there was an

express limitation on the Bureau of Land Management's authority (specifically, to remove only

"excess animals"), there is no such express bar or limitation on EPA's ability to review permit

applications here, and instead there are provisions encouraging EPA's involvement.  Rather than

a situation where the challenged activity conflicts with the statutory purpose, EPA's review is

plainly valuable "[i]n light of the statute's purpose," which is to protect the integrity of waters of

the United States, *see* 33 U.S.C. §§ 1251(a), 1311, 1344, not to protect permit applicants.  *Cf.*

*Colo. Wild Horse & Burro Coal.*, 639 F. Supp. 2d at 97 (holding that "[i]n light of the statute's

purpose to protect wild free-roaming horses and burros, the Court finds that the only plausible

inference to be drawn from the omission of any procedure for removing non-excess animals is

that Congress did not intend for BLM's management authority to be so broad").  Thus, NMA

cannot prove that the EC Process memoranda, including the MCIR, are "plainly erroneous or

inconsistent with" the applicable regulations which they emphasize.  *Cf. Auer*, 519 U.S. at 452.

NMA's argument that the challenged memoranda violate a legally required timeline also

has no merit.  Even if NMA had pled a deadline claim under the APA, 5 U.S.C. § 706(1), which

it has not, the provisions it relies upon include no enforceable deadlines and there has been no

unreasonable delay.  *Cf. Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (holding

that "the only agency action that can be compelled under the APA is action legally required").

There is no mandatory deadline for a permit decision by the Corps or for EPA's initiation of a

section 404(c) veto.  33 U.S.C. § 1344(a), (c).  Section 404(q) establishes no deadline for

individual permit applications but merely directs that the Corps "enter into agreements" with

other agencies.  *Id.* § 1344(q) (applying the term "shall" only to the agreements in question); *see*

U.S. Opp. Br. at 23 (citing Section 404(q) Memo. of Agreement (Aug. 11, 1992), U.S. Ex. 1).

Clear deadlines that are in the statute put the intentional lack of a deadline for a final permit

decision in stark relief.  *See, e.g.*, 33 U.S.C. § 1344(a) (deadline to publish a notice within 15

days); *id.* § 1344(m) (deadline for Secretary of Interior to submit comments within 90 days).[21]

The regulations are replete with exceptions to the suggested timeframes.  *See, e.g.*, 33 C.F.R. §

325.2 (providing numerous exceptions to timeframe for a permit decision); 40 C.F.R. § 231.8

(authorizing EPA to extend the veto timeframe).[22] Absent a legal duty, the NMA's claims based

on delay and timing fail.

        In considering its motion, the Court also should reject NMA's attempt to minimize

material facts as outliers.  It is undisputed that the Corps has issued permit decisions since

January 2009, in which it granted permits to individual mining companies, and the NMA has

conceded that there are additional instances of the Corps' offering permit authorizations to

applicants.[23]  Similarly, rather than evading section 404(c), EPA is using the section 404(c) veto

---

[21] If there were a 90-day permit deadline, giving Interior 90 days to comment would be illogical.

[22] For example, the Corps' regulations allow for time in order to seek more information, or
whenever applicable laws such as the Clean Water Act or NEPA "require procedures such as
state or other federal agency certifications, public hearings, environmental impact statements,
consultation, special studies, and testing which may prevent district engineers from being able to
decide certain applications within 60 days."  33 C.F.R. § 325.2(d)(3)(i)-(vi); *see also id.* §
325.2(d)(4) (allowing more time where "it would be prudent to defer taking final action until
another agency has acted"); *id.* § 325.2(e)(3) (authorizing and "encourag[ing]" the Corps "to
develop management techniques such as joint agency review meetings" with other state and
federal agencies with authority over a regulated activity).

[23] *See supra* note 12 (describing authorizations received); U.S. Ex. 3, Dkt. 13-3, at 3 (describing
permits issued); ECP List, http://water.epa.gov/lawsregs/guidance/wetlands/mining-projects.cfm
(cited by NMA Opp. Br., Dkt. 16, at 16) (showing permits issued in OH, TN, and WV).

process.  *See, e.g.*, Spruce No. 1 Mine Proposed Veto, 75 Fed. Reg. 16,788 (Apr. 2, 2010); *supra*

note 3.  Defendant agencies' actions show that the Corps has not become a "virtual lackey," and

the Court should reject the NMA's request for extraordinary relief based on its false

characterization of "EPA hopes."

       C.       *NMA's APA Claims Depend on Erroneous or Unproven Assumptions.*

       NMA is not likely to succeed on its notice-and-comment claims because the challenged

policy documents do not "substantively amend[]" EPA's authority under the Clean Water Act or

NEPA, and second, the NMA has not proven prejudice.

       First, as discussed *supra* in Part II.A-B, the April 2010 Guidance and EC Process do not

change the existing permitting framework.  This case is not like *Appalachian Power v. EPA*, 208

F.3d 1015 (D.C. Cir. 2000), in which the D.C. Circuit held that nationally applicable guidance

"significantly broadened" an existing regulation, by adding specific monitoring that was

"required" for Clean Air Act permits beyond what the existing standard and national regulation

provided.  *Id.* at 1028.  Instead, the April 2010 Guidance by its plain text and application aims to

ensure compliance with existing requirements, representing EPA's enforcement and compliance

strategy for the applicable law and regulations for a mining method with a history of problems.

In reiterating and explaining the Section 404(b)(1) Guidelines and focusing on the requirement to

apply available science, the Guidance adds neither procedural hoops nor substantive standards

but simply enforces existing regulations.  *Cf. Nat'l Min. Ass'n v. Mine Safety & Health Admin.*,

599 F.3d 662, 671 (D.C. Cir. 2010) (finding no APA violation where agency issued enforcement

strategy based on data without completing a rulemaking).

       Second, APA procedural claims are subject to "the rule of prejudicial error," 5 U.S.C. §

706(2), which the NMA has not met.  NMA protests so much regarding the alleged lack of APA

procedure for the April 2010 Guidance – even as it also complains of too much procedure – that

it fails to explain what, if anything, additional procedure would do to redress the harm NMA believes will occur, between now and the finalization of the Guidance (scheduled for April 2011, *see* NMA Ex. 3, at 1 n.1).  Even ignoring the fact that EPA issued a public notice and is taking comment, 75 Fed. Reg. 18,500 (Apr. 12, 2010), EPA and the Corps are providing NMA's members with individualized, one-on-one, personally tailored discussions regarding individual permit applications and the April 2010 Guidance.  *See, e.g.*, NMA Ex. 8.  Notwithstanding NMA's complaints, "[t]he conduct of . . . industry illustrates their awareness of the value of such discussions," *Gen. Motors*, 363 F.3d at 453.  Further, allowing EPA to finalize its Guidance before judicial review would not foreclose NMA's ability to challenge final permit decisions made before April 2011, or before the resolution of this litigation, whichever is sooner.

## II.   ABSENT A PRELIMINARY INJUNCTION, THE NMA IS NOT LIKELY TO SUFFER IRREPARABLE INJURY.

Just as the NMA has no standing (see Part I.A.1), it also has not satisfied the greater and necessary showing that irreparable injury will occur during the course of this Court's adjudication of this case, absent the preliminary injunction requested.

To show irreparable harm the plaintiff must not only prove injury but also must show that it is "both certain and great; it must be actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (quotations omitted).  Further, "the injury must be beyond remediation" or it will not merit injunctive relief.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

As already discussed in Part I.A.2, *supra*, NMA has not proven run-of-the-mill economic loss, much less that its member companies will certainly close for good without the requested relief, either during this litigation or before April 2011.  "It is . . . well settled that economic loss

does not, in and of itself, constitute irreparable harm," *Wis. Gas Co.*, 758 F.2d at 674, because "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [equitable relief] are not enough." *Chaplaincy*, 454 F.3d at 297-98 (D.C. Cir. 2006) (quoting *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958))). NMA has not demonstrated that an irreparable injury is "certain," is "great," or even likely. Its claimed cost of compliance is not irreparable harm. *Cf.* U.S. Opp., Dkt. 15, at 34-38. Treating it as such would have the absurd result of allowing a regulated entity to bring suit routinely as a basic tactic to evade legal compliance. As NMA's declarations recognize, permitting delay is nothing new or extraordinary for the mining companies that choose to engage in the mountaintop removal mining business. *See* NMA Ex. 8 ¶¶ 2-6; *see also supra* note 13 (discussing history of Spruce No.1 Mine).

Even the Best Coal declaration (that this Court should ignore for reasons discussed *supra* note 15) has failed to prove irreparable harm, as it merely states the company's unsupported fear of going out of business in "18 months," NMA Ex. 4, Dkt. 10-7, ¶ 18, well beyond the time needed to resolve this case. Importantly, speculating that the company may experience irreparable harm on a hypothetical timeframe is not the same as contending that irreparable harm is certain to occur during the course of this litigation unless the NMA receives preliminary relief. *Cf. Chaplaincy*, 454 F.3d at 297 (requiring a showing of "such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm") (quotation omitted). Besides, this declaration shows the source of the claimed harm stems from the company's choice to enter a contract without the legal authorization needed to perform that contract, NMA Ex. 4, Dkt. 10-7, ¶ 8, and it thus cannot show causation. *Id.* Article III does not allow a plaintiff to "seek a remedy for injury that is in large part self-inflicted." *Taylor v. F.D.I.C.*, 132 F.3d 753, 767 (D.C.

Cir. 1997) (finding employees who voluntarily quit an unpleasant but not unlawful environment had no standing to seek reinstatement).

NMA's contention that the defendant agencies have caused irreparable harm by interfering with property interests also fails.  It has not proven that the policy documents prevent the use of any properly owned land for a broad range of purposes, such as mining methods not addressed by these documents.  NMA and its members have no legal right or protected property interest in filling or polluting waters.  If anything, it is the Clean Water Act itself that interferes with the specific property use sought by NMA by barring the dumping of waste into U.S. waters without a valid permit. 33 U.S.C. § 1311(a).  Even upon issuance, a permit does not become a legally protected property interest.  *See, e.g.*, 33 C.F.R. § 320.4(g)(6); *supra* note 14.

Important to this inquiry, NMA and its members will have a full opportunity later, if ever needed, to receive a remedy through applicable administrative and judicial review provisions available after final agency action.  *See, e.g.*, 33 C.F.R. § 331.1; 40 C.F.R. § 123.30.  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Va. Petroleum Jobbers*, 259 F.2d at 925).  If NMA's members indeed meet the criteria to receive permits, any short-term losses can be vindicated after review of any final agency action and they can fully recoup any temporary economic losses at that time.

## III.   A PRELIMINARY INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST.

The Court should not grant a preliminary injunction here because doing so would be inconsistent with the public interest.  The challenged policy documents make clear that they aim to improve the environmental scrutiny of permit applications.  However viewed – whether as a basic compliance policy document that aims to enforce critical, existing environmental

requirements as the text shows, or as characterized by NMA – an injunction against the April

2010 Guidance, at minimum, would undermine procedural protections for waters and for people

like Movants' members who have particular interests in the integrity of those waters.  NMA's

preferred route of fast-tracked permit decisions that ignore the existing requirements and the

science described in the April 2010 Guidance is likely to lead to additional, irreversible harm to

U.S. waters in Appalachia, and thus to harm movants' recreational and aesthetic interests in

those waters.  *See* MTI, Dkt. 14.  The fact that 2,000 miles of streams have already been

destroyed in Appalachia, and the Guidance's discussion of the Permit Quality Review represent

powerful evidence of this likelihood.  The NMA seeks an injunction against the policy

documents so that, for as long as this litigation lasts, it can succeed in reducing scrutiny of

pending permit applications and disrupting the defendant agencies' ability to consider basic

science and legal requirements as discussed in the policy documents.

Yet, the cumulative impacts to the Appalachian region have already reached ecologically

destructive levels.  *See* Palmer et al. (Ex. 16), at 148; Guidance, NMA Ex. 3, at 2-3 (finding that

"nearly 2,000 miles of Appalachian streams have been filled at a rate of 120 miles per year").

Such dramatic environmental harm alone justifies judicial caution, rather than a grant of

extraordinary relief that would vacate compliance policy documents and shut down a basic

government review to ensure satisfaction of essential legal requirements.  The purpose of the

Clean Water Act, "to restore and maintain the chemical, physical, and biological integrity of the

Nation's waters," 33 U.S.C. § 1251(a), must guide this Court's review at every stage.  In view of

this purpose, the threat of serious environmental harm greatly outweighs NMA's speculative

fear.  "'[E]nvironmental injury, by its nature, can seldom be adequately remedied by money

damages and is often . . .  irreparable,'" and therefore when there is a probability of

environmental harm in the balance, "the balance of harms will usually favor . . . the environment." *Citizen's Alert Regarding Env't v. U.S. Dep't. of Justice*, Civ. A. No. 95-1702 (GK), 1995 WL 748246, at *10 (D.D.C. Dec. 8, 1995) (granting a preliminary injunction based on likely destruction of a mountain) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).  The public interest in efficiency also weighs against having inadequately studied permits issued, such that movants must then expend resources to challenge their deficiencies in court.  *See* Hopkins Decl. ¶¶ 9, 11, Movants' Ex. 5, Dkt. 14-6.

Allowing the defendant agencies to do their job to protect Appalachian waters, using the policy documents at issue, without premature interference by any single industry group is strongly in the public interest.  Plaintiff brings suit on behalf of a subsector of the coal mining industry that wishes to prevent basic EPA communication with its staff, in the form of the regional April 2010 Guidance, to enjoin its interagency communication with the Corps through the EC Process memoranda, and to have this Court supervise the duties of two federal agencies, all to protect insular economic interests in short-term profit.  Such an injunction would both violate the basic principle that interagency communication serves good government and chill the defendant agencies' effort to ensure the best available science and applicable law govern permit decisions.  It serves the public interest for the defendant agencies to publicly announce their regulatory compliance policy in the challenged documents and to publicize and review existing legal requirements and relevant scientific information, rather than only discussing these issues behind closed doors in individualized permitting reviews.  As NMA cannot show a likelihood of success on the merits, "public interest considerations weigh against an injunction." *Cf. Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998).

**IV.     THE BALANCE OF THE EQUITIES TIPS AGAINST THE NMA.**

On balance, Plaintiff's claims of lost financial revenue, based on their members' unproven, short-term financial interests, pale in comparison to the substantial and permanent loss of natural resources and societal values in those resources on the other side of the equation. NMA completely ignores the impacts that Movants and their members who live in Appalachia have to face, in the form of irreparable harm to waters that the NMA's members have already wrought, and seek to continue.  The harm to waterways at stake is dramatic and irreversible. MOU, U.S. Ex. 2 at 1; Palmer et al. (Ex. 16), at 149; *see also* Spruce RD (Ex. 17) at 17, 70.  The balance of factors weighs strongly against granting NMA the ability to inject its one-sided, private interests into the defendant agencies' review, whether through an injunction against the April 2010 Guidance or EC Process memoranda.  Whatever the outcome of the permit review process, these policy documents – with their plainly corrective purpose to ensure compliance with legally required safeguards for waterways based on robust scientific research – make clear that defendant agencies are engaged in a lawful and reasonable effort to meet their existing regulatory responsibilities to protect waters under the Clean Water Act and NEPA.  As the NMA will have full recourse later, if ever harmed, this Court should allow the defendant agencies to complete their legal duties and deny the extraordinary relief requested.

## CONCLUSION

For the foregoing reasons, the Court should deny the NMA's motion for a preliminary injunction.

DATED: November 2, 2010                Respectfully submitted,

                                       /s/ Jennifer C. Chavez

                                       Jennifer C. Chavez, D.C. Bar 493421
                                       Emma C. Cheuse, D.C. Bar 488201
                                       Stephen E. Roady, D.C. Bar 926477
                                       EARTHJUSTICE
                                       1625 Massachusetts Avenue, N.W., Suite 702
                                       Washington, D.C. 20036-2212
                                       Telephone: (202) 667-4500
                                       Facsimile: (202) 667-2356
                                       jchavez@earthjustice.org
                                       echeuse@earthjustice.org
                                       sroady@earthjustice.org

                                       *Counsel for Movants*