# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

)
NATIONAL MINING ASSOCIATION,     )
)
         Plaintiff,     )
)
     v.     )
)
LISA JACKSON Administrator,     )     Civil Action No. 10-1220 (RBW)
U.S. ENVIRONMENTAL PROTECTION     )
AGENCY, et al.,     )
)
         Defendants,     )
)
SIERRA CLUB et al.,     )
)
         Defendant-Intervenors.     )
_____)

## MEMORANDUM OPINION

The plaintiff brings this action against the federal defendants pursuant to the Clean Water

Act, 33 U.S.C. § 1251 (2006), the Surface Mining Control and Reclamation Act, 30 U.S.C. §

1201 (2006), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (2006), challenging

a series of memoranda and a detailed guidance released by the Environmental Protection Agency

("EPA"). The parties appeared before the Court on December 15, 2010, for argument on the

federal defendants' motion to dismiss, Defendants' Motion to Dismiss ("Defs.' Mot. to Dismiss"),

and the plaintiff's motion for a preliminary injunction, Plaintiff's Motion for a Preliminary

Injunction ("Pl.'s PI Mot."). For the reasons that follow, the Court denies both the motion to

dismiss and the motion for a preliminary injunction.[1]

_____

[1]       In deciding these two motions, the Court also considered: the Complaint for Declaratory and Injunctive
Relief ("Compl."); the Defendants' Memorandum in Support of their Motion to Dismiss ("Defs.' Mem. re:
Dismiss"); the Plaintiff National Mining Association's Memorandum in Opposition to Defendants' Motion to
Dismiss ("Pl.'s Opp'n re: Dismiss"); the United States' Reply Memorandum in Support of its Motion to Dismiss

(Continued . . . )

# I.  Statutory Background

This section summarizes the relevant Clean Water Act permit granting scheme.

Clean Water Act Section 404 Permits

Section 404 permits are issued by the United States Army Corps of Engineers ("Corps") "for the discharge of dredged and fill material into navigable waters at specified disposal sites." 33 U.S.C. § 1344(a).  The Corps has sole authority to issue Section 404 permits, but in doing so it must apply guidelines that it develops in conjunction with the EPA.[2]  Id. § 1344(b).  In addition to providing the EPA with the responsibility to develop the guidelines in conjunction with the Corps, the Clean Water Act grants the EPA authority to prevent the Corps from authorizing certain disposal sites.[3]  Id. § 1344(c).  In the absence of a specific regulatory exception, the Corps must reach a decision on a pending application for a Section 404 permit no later than 60 days after receipt of the application for the permit.  See 33 C.F.R. § 325.2(d)(3) (2010) (providing that "[d]istrict engineers will decide on all applications not later than 60 days after receipt of a complete application, unless" one of six exceptions applies).

---

(. . . continued)

("Defs.' Reply re: Dismiss"); the Plaintiff's Memorandum in Support of a Motion for Preliminary Injunction ("Pl.'s PI Mem."); the United States' Memorandum in Opposition to National Mining Association's Motion for a Preliminary Injunction ("Defs.' PI Opp'n"); the Plaintiff National Mining Association's Reply Memorandum in Support of Motion for Preliminary Injunction ("Pl.'s PI Reply"); the United States' Surreply Brief in Opposition to the National Mining Association's Motion for a Preliminary Injunction ("Defs.' PI Surreply"); and the Memorandum of Sierra Club et al. in Opposition to the Plaintiff's Motion for a Preliminary Injunction ("Def. Ints.' PI Opp'n").

[2]     The EPA-promulgated 404(b)(1) guidelines, codified at 40 C.F.R. Part 230, guide the Corps' review of the environmental effects of proposed disposal sites.  The guidelines provide that "[n]o modifications to the basic application, meaning, or intent of these guidelines will be made without rulemaking by the Administrator under the Administrative Procedure Act."  40 C.F.R. § 230.2(c) (emphasis added).

[3]     To exercise its authority to prevent the Corps from authorizing a particular dumpsite, known as the 404(c) veto authority, the EPA must determine, after notice and an opportunity for public hearing, that certain unacceptable environmental effects would occur if the disposal site were approved by the Corps and granted a permit.

Clean Water Act Section 402 Permits

        Known as National Pollutant Discharge Elimination System ("NPDES") permits, Section

402 permits are typically issued by states for the discharge of non-dredged and non-fill material.

33 U.S.C. § 1342(a)(5).  These permits govern pollutants that are assimilated into receiving

waters by establishing limits placed on the make-up of wastewater discharge.  Once the EPA

approves a state permitting program, states have exclusive authority to issue NPDES permits,

although the EPA does have limited authority to review the issuance of such permits by states.

33 U.S.C. § 1342(d).  All of the Appalachian States allegedly impacted by the EPA actions at

issue in this litigation (Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia)

have EPA-approved Section 402 permit authority.

Clean Water Act Section 303 Water Quality Standards

        Section 303 of the Clean Water Act allocates primary authority for the development of

water quality standards to the states.  33 U.S.C. § 1313.  A water quality standard designates uses

for a particular body of water and establishes criteria for protecting and maintaining those uses.

40 C.F.R. § 131.2 (2010).  These standards can be expressed as a specific numeric limitation on

pollutants or as a general narrative statement.  See 40 C.F.R. § 131.3(b).  While states have the

responsibility to develop the water quality standards, the EPA reviews the standards for

approval.  40 C.F.R §§ 131.4, 131.5.  The EPA may promulgate water quality standards to the

exclusion of a state only if (1) it determines that a state's proposed new or revised standard does

not measure up to the Clean Water Act's requirements and the state refuses to accept EPA-

proposed revisions, or (2) a state does not act, but in the EPA's view a new or revised standard is

necessary.  33 U.S.C. § 1313(a)(2).

## II. <u>Factual Background</u>[4]

Plaintiff National Mining Association ("NMA") alleges that recent actions taken by the EPA and the Corps have unlawfully obstructed the Clean Water Act permitting processes for coal mining. Complaint ("Compl.") ¶ 2. The plaintiff identifies two series of documents that it asserts unlawfully changed the established permitting process: (1) the June 11, 2009 Enhanced Coordination Process ("EC Process") Memoranda, and (2) the April 1, 2010 Detailed Guidance Memorandum ("Guidance Memorandum"). Id. The plaintiff represents that its member companies are "not seeking to shirk their responsibilities under any environmental protection laws or regulations; rather, they are merely asking [the] EPA and the Corps to regulate" within the bounds of the law. Pl.'s PI Mem. at 41-42.

The plaintiff asserts that the EC Process memoranda formalized an "extraregulatory" practice that commenced in January 2009. Id. at 7. At that time, the EPA issued a series of letters to the Corps raising questions about the legality of Section 404 permits that, the plaintiff claims, the Corps was poised to issue imminently. Id. According to the plaintiff, the EC Process memoranda then "imposed substantive changes to the Section 404 permitting process by creating a new level of review by [the] EPA and an alternate permitting pathway not contemplated by the current regulatory structure." Id. The plaintiff represents that the EC Process utilizes the Multi-Criteria Integrated Resource Assessment ("MCIR Assessment") to screen pending Section 404 permits and determine which of those pending permits will proceed for standard review by the Corps and which will be subject to the EC process. Id. at 8. The plaintiff contends that once a permit is designated for the EC Process, it faces a burdensome review process wholly different

[4] The following facts are drawn from the allegations contained in the plaintiff's complaint and in the plaintiff's memorandum supporting its motion for a preliminary injunction.

than that contemplated by the Clean Water Act.[5]  Id.  Ultimately, the EPA announced, in

September 2009, that through the MCIR Assessment it had identified 79 coal-related pending

Section 404 permits that would be subjected to the EC process.  Id. at 9.

Then, in April 2010, the EPA released its Guidance Memorandum in which, the plaintiff

asserts, the EPA "made sweeping pronouncements regarding the need for water quality-based

limits" in Section 402 and 404 permits.  Id.  The plaintiff maintains that the Guidance (1)

effectively established a region-wide water quality standard based on conductivity levels it

associated with adverse impacts to water quality, (2) was being used by the EPA to cause

indefinite delays in the permitting process, and (3) caused various permitting authorities to insert

the conductivity level into pending permits.  Id. at 9-10.  Further, the EPA used the Guidance to

reopen previously issued permits to impose the conductivity limit, which, the plaintiff alleges

"halt[s mining] projects in their tracks."  Id.  at 10-11.  In contrast to the MCIR Assessment and

the EC process, which apply only to pending Section 404 permits, the Guidance covers both

Section 402 and 404 permits associated with surface mining projects in Appalachia.  Defs.' Mem.

re: Dismiss at 17 n.7.

### III.  The Defendants' Motion to Dismiss

A.  Standard of Review

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of claims

for which the complaint does not set forth allegations sufficient to establish the court's

jurisdiction over the subject matter of the claims presented.  Fed. R. Civ. P. 12(b)(1).  In deciding

a motion to dismiss challenging the Court's subject matter jurisdiction under Rule 12(b)(1), a

---

[5]      The plaintiff alleges that the EC process adds a minimum of 60 days, and perhaps many months, to the
Section 404 review process.

court "must accept as true all of the factual allegations contained in the complaint" and draw all reasonable inferences in favor of the plaintiff, Brown v. District of Columbia, 514 F.3d 1279, 1283 (D.C. Cir. 2008), but courts are "not required . . . to accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001). Further, the "court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000). Ultimately, however, the plaintiff bears the burden of establishing the Court's jurisdiction, Rasul v. Bush, 215 F. Supp. 2d 55, 61 (D.D.C. 2002), and where subject matter jurisdiction does not exist, "the court cannot proceed at all in any cause." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).

B. Legal Analysis

The federal defendants assert three separate but related jurisdictional grounds for dismissal: (1) the lack of final agency action; (2) the plaintiff's claims are not ripe for review; and (3) the plaintiff's lack of standing. The Court will address each argument in turn.

1. Final Agency Action

The APA limits judicial review to "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. In other words, finality is a "threshold question" that determines whether judicial review is available. Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 18 (D.C. Cir. 2006). The Supreme Court has explained that, "[a]s a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decision[-]making process," Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quotation marks omitted), and second, "the action must be one by which rights or

obligations have been determined, or from which legal consequences will flow."[6]  Id. at 178

(quotation marks omitted).

Here, the federal defendants assert that none of the EPA's actions—the MCIR

Assessment, the EC Process, or the Guidance Memorandum—qualify as final agency action

within the meaning of the APA, and that the plaintiff's claims must therefore be dismissed.

Defs.' Mem. re: Dismiss at 13.  They maintain that the EPA used the MCIR Assessment to

screen permit applications as only the first of several steps in the permitting process, and that the

MCIR Assessment therefore did not mark the consummation of the decision-making process or

give rise to legal consequences.  Id. at 14.  The federal defendants similarly argue that neither the

EC Process nor the Guidance Memorandum mark the consummation of the decision-making

process or give rise to any legal obligations.  Id. at 15, 17.  Throughout their filings with the

Court, the federal defendants emphasize what seems to be their core finality argument: that the

EPA's actions are not final because they do not mark the grant or denial of the various permits at

issue.  See id. at 15 (quoting Chem. Mfrs. Ass'n v. EPA, 26 F. Supp. 2d 180, 183 n.2 (D.D.C.

---

[6]     In deciding the question of finality, the Court must also assess the question of whether the EPA's actions
constitute a de facto legislative rule, promulgated in violation of the APA's notice and comment requirements. This
is so given the similarity between the second aspect of the finality assessment—whether the action gives rise to legal
obligations or is one from which legal consequences flow—and the standard for determining whether a challenged
action constitutes a regulation or a mere statement of policy—"whether the action has binding effects on private
parties or on the agency," Molycorp, Inc. v. EPA, 197 F.3d 543, 545 (D.C. Cir. 1999), or, in other words, "whether
the agency action binds private parties or the agency itself with the force of law," Gen. Elec. Co. v. EPA, 290 F.3d
377, 382 (D.C. Cir. 2002).  Indeed, the District of Columbia Circuit has recognized the manner in which these
standards become interwined:

> In order to sustain their position, appellants must show that the [challenged guidelines] either (1)
> reflect "final agency action," . . . or, (2) constitute a de facto rule or binding norm that could not
> properly be promulgated absent the notice-and-comment rulemaking required by [the APA].
> These two inquiries are alternative ways of viewing the question before the court.  Although, if
> appellants could demonstrate the latter proposition, they would implicitly prove the former,
> because the agency's adoption of a binding norm obviously would reflect final agency action.

Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 806 (D.C. Cir. 2006).  Agency action,
however, can meet the first prong of the Bennett test without meeting the second.  See, e.g., id. at 431 ("The
guidelines are nothing more than general policy statements with no legal force. . . . Therefore, the guidelines cannot
be taken as 'final agency action,' nor can they otherwise be seen to constitute a binding legal norm.").

1998), where the Court stated: "the relevant question is not whether the action concludes a decision[-]making process . . . but whether the action concludes the decision[-]making process"), 17 ("As with the [MCIR] Assessment and the EC Process, the Guidance does not mark the consummation of the relevant decision[-] making process here, i.e., the review of permit applications pursuant to the [Clean Water Act]. That process consummates in final agency action only when a permit is issued, denied, or vetoed.").

The plaintiff counters that the federal "defendants' interpretation of finality is too restrictive, as it encompasses only the last possible agency decision." Pl.'s Opp'n re: Dismiss at 24-25. It asserts that the issuance of the MCIR Assessment reflects the EPA's settled, final position concerning how it would screen all pending Section 404 permit applications; that the creation of the EC process reflects the settled, final position to establish an alternate permitting framework, thus changing the legal landscape set forth in the 404(b)(1) guidelines; and that the Guidance Memorandum marks the consummation of the decision-making process and has had practical effects that have changed the legal obligations of the permitting authorities, i.e., the Corps and the state regulators, and the plaintiff's members who are seeking permits. Id. at 26-27.

The plaintiff points to both Appalachian Power Co. v. EPA, 208 F.3d 1015 (D.C. Cir. 2000), and CropLife America v. EPA, 329 F.3d 876 (D.C. Cir. 2003), as supporting its assertions that the EPA's actions here constitute final agency action. In Appalachian Power, power companies alleged that an EPA guidance document imposed unauthorized requirements on states in connection with the operation of permit programs under the Clean Air Act. 208 F.3d at 1015. There, as here, the EPA argued that the guidance was not subject to judicial review because it was neither final agency action nor a binding legislative rule. Id. at 1020. The District of Columbia Circuit, however, disagreed, concluding that

The short of the matter is that the guidance, insofar as relevant here, is final agency action, reflecting settled agency position which has legal consequences both for State agencies administering their permit programs and for companies like those represented by petitioners who must obtain [Clean Air Act] permits in order to continue operating.[7]

Id. at 1023. There was evidence in Appalachian Power that "State authorities, with EPA's guidance in hand, [were] insisting on continuous opacity monitors," id., i.e., compliance with the standards set forth in the guidance. Next, in CropLife, the District of Columbia Circuit determined that an EPA directive, which had been published in a press release and changed the established practice of relying on third-party studies, was a binding regulation. 329 F.3d at 876. The court held that "the directive clearly establish[d] a substantive rule declaring that third-party human studies are now deemed immaterial in EPA regulatory decision[-]making," id. at 883, and further concluded that the "disputed directive concretely injures petitioners, because it unambiguously precludes the agency's consideration of all third-party human studies, i.e., studies that petitioners previously have been permitted to use to verify the safety of their products." Id. at 884.

The federal defendants argue that the EC Process memoranda here can be distinguished from the actions in Appalachian Power and CropLife because the EC process memoranda are not binding on their face and the EPA explicitly stated they were not binding. Defs.' Reply re: Dismiss at 3-4. The federal defendants further attempt to distinguish the Guidance by pointing out that it was issued as an interim document and clearly stated, on its face, that it would be issued in final form in 2011. Id. at 9-10. The federal defendants assert that the Court should

---

[7] The court acknowledged that the concluding paragraph of the guidance contained a disclaimer of sorts, indicating that the policies set forth in the document were intended solely as guidance, did not represent final agency action, and could not be relied upon to create enforceable rights, but then pointed out that "this language is boilerplate; since 1991 EPA has been placing it at the end of all of its guidance documents." Appalachian Power, 208 F.3d at 1023.

follow <u>Gem County Mosquito Abatement District v. EPA</u>, 398 F. Supp. 2d 1 (D.D.C. 2005), in which the court held that an interim EPA guidance advising a county mosquito abatement entity that it did not need an NPDES permit to apply pesticides to waters was not final agency action. In <u>Gem County</u>, although believing it did not need one, the plaintiff nonetheless sought an NPDES permit because it had been threatened with being sued and was then sued by organic farmers who asserted that the pesticides used to abate the mosquitoes threatened their certification as organic farms. <u>Id.</u> at 4. The EPA advised the abatement entity that its position that it did not need an NPDES permit was correct, which ultimately lead to dismissal of the case due to the absence of a case or controversy, as both parties agreed that a permit was unnecessary. <u>Id.</u> at 8. In its rejection of the plaintiff's argument that the interim guidance was a final rule, the court found that the EPA had "made clear that the Interim Guidance was just that: interim guidance on which public comment would be solicited and considered before issuing a final interpretation and guidance. In its interim form, [the] guidance is interlocutory and does not finally determine legal rights or obligations." <u>Id.</u> at 11. The court did explain, however, that "the 'finality' element is interpreted in a 'pragmatic way.'" <u>Id.</u> (quoting <u>FTC v. Standard Oil Co. of Cal.</u>, 449 U.S. 232, 239 (1980)). Drawing from its analysis of the case and controversy prequisite to its authority to exercise jurisdiction in the matter, the court concluded: "To regard EPA's interim guidance as final where it does not impose a legal obligation to obtain permits would improperly and prematurely interfere with the process by which an agency reaches a final position on maters committed to its discretion." <u>Gem Cnty</u>, 398 F. Supp. 2d at 11. Therefore, the Court's finality assessment seems to have had more to do with what had actually occurred in response to the guidance—the preservation of the status quo—and not the mere fact that the EPA had stated that the document it issued was interim and interlocutory.

Here, because the agency actions more closely resemble those at issue in <u>Appalachian Power</u> and <u>CropLife</u> than was the situation before the Court in <u>Gem County</u>, the MCIR Assessment, the EC Process, and the Guidance Memorandum all meet the criteria of final agency actions. The federal defendants' view of what amounts to finality is too narrow, as it is possible for an agency to take final agency actions during a permit assessment process prior to actually determining whether to grant or deny an application for a permit. Although the federal defendants stress in their filings, and vigorously reiterated at the December 15, 2010 hearing, that the MCIR Assessment, the EC Process, and the Guidance Memorandum impose no new substantive requirements on permit applications, <u>see, e.g.</u>, Defs' Mem. re: Dismiss at 18 (asserting that the "Guidance does not . . . establish any new standards that supplement or amend the existing statutory and regulatory requirements"), it is clear to the Court that the EPA has implemented a change in the permitting process.

It appears obvious on the current record that the MCIR Assessment reflects the EPA's final decision to evaluate pending permits to determine whether they would undergo the EC Process. As shown in <u>Appalachian Power</u>, a reworking of the permitting process gives rise to legal consequences for companies that must obtain those permits to operate. 208 F.3d at 1023. From the moment a permit is screened pursuant to the MCIR Assessment, the EPA seems to be imposing an additional step to the permitting process that is not contemplated or set forth in the 404(b)(1) guidelines. This is also true for the EC Process itself. Again, like the documents at issue in <u>Appalachian Power</u>, the EC Process Memoranda impose unequivocal requirements on the exercise of regulatory authority regarding the pending permit applications.[8] Accordingly, as

_____

[8] For example, the June 11, 2009 EC Process Memorandum begins by explaining that the "EPA and the Corps <u>hereby establish</u> a process for enhanced coordination." Pl.'s PI Mot., Ex. 1 (June 11, 2009 Memorandum to the Field on Enhanced Coordination Procedures) (emphasis added).

in <u>CropLife</u>, the EC Process "reflects an obvious change," 329 F.3d at 881, in the permitting regime set forth in Section 404 of the Clean Water Act and in the regulations implementing that provision. Thus, despite the fact that the 404(b)(1) guidelines provide that "[n]o modifications to the basic application . . . of these [g]uidelines will be made without rulemaking . . . under the [APA]", 40 C.F.R. § 230.2(c), it seems quite apparent that the MCIR Assessment and the EC Process enacted a change in the basic application of the permitting procedures for Section 404 permits. Accordingly, these changes to the statutorily established process give rise to the legal consequences necessary to satisfy the second prong of the <u>Bennett</u> finality analysis.

While the Guidance Memorandum is perhaps a closer call than the MCIR Assessment and the EC Process, it too, qualifies as final agency action because, despite the representation that it is an interim document, it is nonetheless being applied in a binding manner and has been implemented in its current version even though the EPA continues to receive comments about it. Therefore, based on the record before the Court at this time, it appears that the EPA is treating the Guidance as binding. <u>See</u> Pl.'s PI Mem. at 21 (quoting an EPA official as saying that the "guidance stands" and "will continue to [be used to ensure] that mining permits issued in West Virginia and other Appalachian states provide the protection required under federal law"). The EPA official's statement can only be interpreted as reflecting the EPA's settled, final stance on its current application of the Guidance Memorandum, even if this position may change at some point in the future once the EPA promulgates a new version of the Guidance Memorandum. <u>See</u> <u>Appalachian Power</u>, 208 F.3d at 1022 (noting that the "EPA may think that because the Guidance . . . is subject to change, it is not binding and therefore not final action," but concluding that "all laws are subject to change . . . . The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.").

Thus, unlike the guidance in Gem County, which merely had the effect of preserving the status quo, the Guidance Memorandum here has a practical impact on the plaintiff's members seeking permits. In other words, despite the EPA's assertions that the Guidance Memorandum is only an interim document, the Guidance Memorandum is being treated and applied in practice as if it were final. The practical impact imposed upon permit applicants by the recent actions of the EPA are sufficient to satisfy the Bennett finality test because the "'finality' element is interpreted in a 'pragmatic way.'" Gem Cnty, 398 F. Supp. 2d at 11 (quoting FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 239 (1980)); accord Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005) ("Finality resulting from the practical effect of an ostensibly non-binding agency proclamation is a concept [this Circuit has] recognized in the past.") (citing Gen. Elec. Co. v. EPA, 290 F.3d 377, 383 (D.C. Cir. 2002)).

2. Ripeness

"[R]epresent[ing] a prudential attempt to balance the interests of the court and the agency in delaying review against the petitioner's interest in prompt consideration of allegedly unlawful agency action," Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1420-21 (D.C. Cir. 1998), the ripeness doctrine requires courts to consider the framework set forth by the Supreme Court in Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967). First, a court must "evaluate the 'fitness of the issues for judicial decision.'" Fla. Power & Light, 145 F.3d at 1421 (quoting Abbott Labs., 387 U.S. at 149). If a challenged decision is not "fit" for review, "the petitioner must show 'hardship' in order to overcome a claim of lack of ripeness." Fla. Power & Light, 145 F.3d at 1421. In assessing the fitness prong, courts evaluate "whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual

development; and whether further administrative action is needed to clarify the agency's position."  Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931, 940 (D.C. Cir. 1986).

The federal defendants assert that the plaintiff's claims should be dismissed because they are not ripe for review.  Defs.' Mem. re: Dismiss at 19.  Specifically, the federal defendants again argue that the MCIR Assessment, the EC Process, and Guidance Memorandum are not final agency actions, and further, that their review "outside the context of a specific permitting decision would entangle the court in abstract considerations."  Id. at 21.  The plaintiff in turn again contends that the three actions at issue here constitute final agency actions and present primarily, if not purely, legal questions for which further factual development in the context of a specific permitting decision is unnecessary.  Pl.'s Opp'n re: Dismiss at 30, 34.

As explained above, based on the record currently before the Court, the MCIR Assessment, the EC Process, and the Guidance all appear to constitute final agency actions. Moreover, the claims raised by the plaintiff, i.e., whether the actions constitute legislative rules and whether the EPA violated the notice and comment requirement of the APA, present purely legal questions.  See Cement Kiln Recycling Coal. v. EPA, 493 F.3d 207, 215 (D.C. Cir. 2007) (explaining that it is "well-established that claims that an agency's action is  . . . contrary to law present purely legal issues . . . [s]o, too, do claims that an agency violated the APA by failing to provide notice and opportunity for comment.").  The federal defendants' insistence on "specific permitting decisions," Defs.' Mem. re: Dismiss at 21, echoes their argument that their actions could not be final as they had not granted or denied any permits it has subjected to the EC process.  This, however, misses the point of the plaintiff's claim: that the process itself is unlawful, and not simply any decisions that may result from the application of that process.  See Pl.'s Opp'n re: Dismiss at 31 ("NMA's contention is that Defendants acted contrary to law in

issuing the EC Process Memoranda, which unambiguously dictated that the memoranda—and not existing regulations—would govern [pending] permit applications.").  Thus, no factual developments would clarify these issues or assist the Court in evaluating the plaintiff's claims. See Appalachian Power, 208 F.3d at 1023 n.18 ("Whether EPA properly instructed state authorities to conduct sufficiency reviews of existing state and federal standards and to make those standards more stringent if not enough monitoring was provided will not turn on the specifics of any particular permit.").  Accordingly, the Court finds the plaintiff's claims ripe for review on the defendants' dismissal motion.[9]

   3.  Standing

   The irreducible constitutional minimum of standing contains three elements: (1) injury in fact, (2) causation, and (3) the possibility of redress by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  These requirements apply whether an organization asserts standing on its own behalf, or on behalf of its members.  Havens Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982).  "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Bennett, 520 U.S. at 168 (internal quotations omitted).

   The federal defendants assert that the plaintiff has failed to establish the requisite injury-in-fact prong of the test for standing because it has not shown that its members have suffered a particularized and concrete injury traceable to the MCIR Assessment, the EC Process, or the Guidance Memorandum.  Defs.' Mem. re: Dismiss at 30.  They again rely on the fact that "none

---

[9]       Because the Court, pursuant to the first element of the ripeness doctrine set forth by the Supreme Court in Abbott Laboratories, 387 U.S. 136 (1967), and clarified by this Circuit in Florida Power & Light, 145 F.3d 1414 (D.C. Cir. 1998), concludes that the issues presented in this litigation are "fit" for review, it need not address the second, hardship factor of the ripeness test.  See Fla. Power & Light, 145 F.3d at 1421.

of the permit applications subject to the process has been denied by the Corps or vetoed by EPA." Id. The federal defendants' acknowledge that the plaintiff "may allege procedural injury based on its notice and comment claims," id., but assert that deprivation of a procedural right without some concrete interest affected by the deprivation is insufficient to create standing. Id. The plaintiff, however, asserts that "being subject to this additional, illegal process is itself sufficient injury for standing purposes," Pl.'s Opp'n re: Dimiss at 40, an injury which in turn is "threatening the financial viability of proposed mining projects." Id. The plaintiff further alleges that the delays in the permitting process its members have experienced are attributable to the EC Process and that a favorable decision—declaring the EC Process and Guidance Memorandum illegal—would redress the injuries its members are incurring. Id. at 41-42.

The Court agrees that the procedural injury alleged by the plaintiff is more than just that stemming from the claimed notice and comment violations. While the plaintiff does allege notice and comment violations, its main point of contention is that the additional process created by the EPA's actions has and will continue to cause its members "injury that is concrete and particularized." Id. at 39; see id. (asserting that the "EC Process Memoranda have allowed [the] Defendants to restart and pause the clock with respect to Section 404 permit applications pending on March 31, 2009, even in instances where [the] EPA did not comment during the Corps' designated comment period"). As noted above, on the record currently before the Court, it seems clear that the EPA has imposed additional processes—the MCIR Assessment and the EC Process—to the permitting procedures, and that these additional processes are not contemplated or set forth in the 404(b)(1) guidelines. It also appears that the Guidance Memorandum is being applied in a binding manner. There is therefore support for both the plaintiff's allegations of injury in the form of notice and comment violation and, more importantly so far as standing is

concerned, in the form of "additional, illegal process."  Pl.'s Opp'n re: Dimiss at 39.  Thus, on the record currently before it, and in light of the fact that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," Bennett, 520 U.S. at 168, the Court can and does conclude that at this stage of the proceedings the plaintiff's allegations are sufficient to establish that it has standing to maintain this suit.

## IV.  The Plaintiff's Motion for a Preliminary Injunction

### A.  Standard of Review

District courts have the power to grant preliminary injunctions under Rule 65 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 65.  As a general matter, preliminary injunctions are "extraordinary" forms of relief and should be granted sparingly.  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  "An injunction is designed to deter future wrongful acts," United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953), and thus, while past harm is relevant, the ultimate inquiry remains "whether there is a real and immediate threat of repeated injury." D.C. Common Cause v. District of Columbia, 858 F.2d 1, 8-9 (D.C. Cir. 1988).

In evaluating a motion for preliminary injunctive relief, courts must balance: "(1) the [movant's likelihood] of success on the merits; (2) the threat of irreparable injury in the absence of an injunction; (3) the possibility of substantial harm to other interested parties from the issuance of an injunction; and (4) the interests of the public."  Wagner v. Taylor, 836 F.2d 566, 575 (D.C. Cir. 1987).  Although a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors, id. at 576, the movant must show that the threat of irreparable harm is "likely," as opposed to just a "possibility."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008).

B.  Legal Analysis

1.  Likelihood of Success on the Merits

Unsurprisingly, the plaintiff argues that it is likely to succeed on the merits of its claims. The plaintiff first asserts that the EC Process Memoranda and the Guidance are legislative rules that were promulgated in violation of the APA.  Pl.'s PI Mem. at 12.  The plaintiff further maintains that the EPA has exceeded its statutory authority under the Clean Water Act, the National Environmental Policy Act, and the APA.  Id. at 24.

a.  Whether The EPA's Actions are Legislative Rules

As previously noted, the standard for determining whether an agency pronouncement is a legislative rule is very similar to the second element of the Bennett finality analysis.  A legislative rule is agency action that has "the force and effect of law."  Appalachian Power, 208 F.3d at 1020.  Such a rule "grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests;" "narrowly constrict[s] the discretion of agency officials by largely determining the issue addressed"; and "[has] substantive legal effect."  Batterton v. Marshall, 648 F.2d 694, 701-02 (D.C. Cir. 1980).  A rule that effectively amends a prior legislative rule is a legislative, not an interpretative rule.  Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C. Cir. 1993).  "[N]ew rules that work substantive changes . . . or major substantive legal additions . . . to prior regulations are subject to the APA's procedures."  U.S. Telecom Ass'n v. FCC, 400 F.3d 29, 34-35 (D.C. Cir. 2005) (citations omitted).  If an agency adopts a new position inconsistent with an existing regulation, or effects a substantive change in the regulation, notice and comment are required.  Id. at 35.

As explained above in regard to the Court's finality analysis, based on the record currently before the Court the MCIR Assessment, the EC Process Memoranda, and the Guidance

Memorandum all appear to qualify as legislative rules because they seemingly have altered the permitting procedures under the Clean Water Act by changing the codified administrative review process. Thus, the MCIR Assessment, the EC Process, and the Guidance Memorandum all seem to "effectively amend" the Clean Water Act's permitting process, Am. Mining Cong., 995 F.2d at 1112, and represent the EPA's adoption of a new position inconsistent with an existing regulation. U.S. Telecom Ass'n, 400 F.3d at 34-35. The plaintiff has therefore established that it is likely to succeed on the merits of its claim that the challenged EPA actions are legislative rules that were adopted in violation of the APA's notice and comment requirements.

    b. Whether The EPA Exceeded its Statutory Authority

    Under the APA, courts must hold unlawful and set aside agency actions found to be in excess of the agency's statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(C). To determine whether an agency exceeded its statutory authority under the APA, the Court must engage in the two-step inquiry adopted by the Supreme Court in Chevron U.S.A, Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984). Under Chevron, if the text of a statute shows that Congress has directly addressed the question at issue, then the court and the agency must give effect to the clearly expressed intent of Congress. See id. at 842-43. If, however, the court determines that an agency's enabling statute is silent or unclear with respect to the issue at hand, the question for the court then becomes whether the agency's action is based on a permissible construction of the statute. See id. at 843.

    The plaintiff maintains that the EPA and the Corps are violating the plain language of the Clean Water Act. Pl.'s PI Mem. at 25. Specifically, it alleges that the MCIR Assessment and the EC Process Memoranda violate the congressional statutory division of authority between the two agencies as set forth in Section 404 of the Clean Water Act because they improperly expanded

the EPA's role in Section 404 permitting decisions. Id. Similarly, the plaintiff maintains that the Guidance Memorandum requires permitting authorities to require adherence to the conductivity levels designated in the Guidance Memorandum, thus resulting in the EPA overstepping the authority it was granted under Section 303 of the Clean Water Act. Id. at 28. By promulgating this region-wide water quality standard and by applying it to Section 404 permits, in addition to Section 402 permits, the plaintiff asserts that the EPA has significantly exceeded its statutory authority. Id. at 30-31.

The federal defendants respond that the Clean Water Act authorizes coordination between the EPA and the Corps during the permit review process and expressly requires the agencies to enter into an agreement to facilitate such coordination. Defs.' PI Opp'n at 23. They contend that nothing more than this has been done and assert that the Corps remains the final decision-maker with respect to issuance of permits, subject only to the EPA's exercise of its 404(c) veto authority. Id. at 24.

Again, for reasons that mirror its finality analysis, the Court finds the plaintiff's arguments more persuasive and agrees that the plaintiff is likely to prevail on its claim that the EPA has exceeded its statutory authority. As to the MCIR Assessment, the EPA, and only the EPA, evaluates pending permits to determine if they will be subject to the EC Process. Pl.'s PI Mem. at 8. It seems clear, however, that Congress intended the EPA to have a limited role in the issuance of Section 404 permits, and that nothing in Section 404 of the Clean Water Act gives the EPA the authorization to develop a new evaluation or permitting process which expands its role. Likewise, it seems clear that with the implementation of the Guidance Memorandum the EPA has encroached upon the role carved out for the states under the Clean Water Act by setting region-wide conductivity standards. In short, the EPA has modified the Section 404 permitting

scheme, authority not granted to it under the Clean Water Act, and has similarly taken an expansive role beyond what was afforded to it in determining Section 303 Water Quality Standards. Accordingly, the plaintiff has also established that it will likely succeed in showing that the EPA has exceeded its statutory authority under the Clean Water Act by adopting and implementing the MCIR Assessment, the EC Process, and the Guidance Memorandum.

2. Threat of Irreparable Harm

A preliminary injunction should issue only when irreparable injury is likely to occur in the absence of an injunction. See Brady Campaign to Prevent Gun Violence v. Salazar, 612 F. Supp. 2d 1, 12 (D.D.C. 2009) (explaining that the Supreme Court in Winter rejected as sufficient for the purpose of acquiring a preliminary injunction the plaintiff's showing of a "possibility" of irreparable harm). The failure to demonstrate irreparable harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the [preliminary injunction] calculus merit such relief." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (Walton, J.) (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)) (emphasis in original). In this Circuit, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." Wis. Gas Go., 758 F.2d at 674. However, economic loss that threatens the survival of the movant's business can amount to irreparable harm. Power Mobility Coal., 404 F. Supp. 2d at 204.

Here, the plaintiff asserts that its members face likely irreparable harm in three respects: (1) its "small business members are likely to be driven out of business by the delays in permitting

. . . resulting from the Guidance"; (2) its "members are likely to incur substantial economic losses as a result of [additional] permit[ting] conditions being imposed under the Guidance [Memorandum]"; and, (3) "the EC Process and Guidance [Memorandum] are impermissibly interfering with the exercise of private property rights."  Pl.'s PI Mem. at 35-36.

The federal defendants counter all three of these arguments.  First, they point out that the president of Best Coal, whose declaration the plaintiff offers to support its small business argument, fails to satisfy the irreparable harm standard because it merely states that his "company will be out of business within [eighteen] months if" it does not receive the requisite mining permits.  Defs.' PI Opp'n at 30, 33.  Second, the federal defendants assert that the alleged economic losses identified by the plaintiff are "compliance costs," id. at 35, and that the plaintiff has not demonstrated these costs threaten the survival of the plaintiff's member's businesses to the degree required to overcome this Circuit's rule that economic losses do not constitute irreparable harms.  Id. at 35-36.  Third, the federal defendants argue that a finding by this Court that the type of environmental regulations at issue in this case amount to an infringement on property rights would "create de facto irreparable harm across much of the field of environmental regulation, given that environmental regulations often place conditions on the use of private property."  Id. at 38-39.  Lastly, the federal defendants contend that the plaintiff's "delay in seeking injunctive relief, though not dispositive, can 'militate against a finding of irreparable harm.'"  Id. at 40 (quoting Mylan Pharm., Inc. v. Shalala, 81 F. Supp. 2d 30, 44 (D.D.C. 2000)).

The Court agrees with the federal defendants' position that the plaintiff has not shown that its small business members face irreparable harm in the form of certain or imminent business closings due to delays in receiving permits caused by the Guidance Memorandum.  In

Power Mobility Coalition, a case in which a national association whose membership included manufacturers and suppliers of motorized wheelchairs sought an injunction enjoining enforcement of the Department of Health and Human Services regulations that changed the reimbursement structure under Medicare for motorized scooters, 404 F. Supp. 2d at 192, this Court held that the plaintiff had not demonstrated that the new regulation would cause any of its members irreparable harm as a result of being forced out of business. Id. at 205. There, this Court considered a declaration from the president of one member company in which he stated that "'if the new rule take[s] effect as planned . . . [it is anticipated] that Mr. Mobility will wind-down its operations and stop doing business as a supplier of mobility equipment in [five or six months].'" Id. at 204 (quoting Declaration of Philip DeLernia). The Court determined that because the plaintiff was "basically predicting that many of their claims for reimbursement" would be denied, the "plaintiff's claim of imminent harm [was], at best, remote and speculative." Id. at 205.

Here, as the federal defendants aptly recognize, the plaintiff's only support for its claim that its small business members will be driven out of business by the permitting delays being occasioned by the EPA's actions is the declaration of Randy Johnson, president of Best Coal, Inc.[10] Mr. Johnson asserts that

> [o]ur company is in a crisis. We want to finish our [ten] year plan but we are not mining the tonnage sufficient to support even our equipment payments. We survived to this point in 2010 with cash from prior years profit but that cash is now gone. We literally exist from week to week. We have cost[s] that cannot be recovered if the NPDES and Section 404 permits are not issued. Today, we are mining every possible ton to pay our employees, vendor bills, and bank note payments. If these permits are not issued, we will be out of business within [eighteen] months.

---

[10]     Indeed, this small business argument consumes only two paragraphs of the plaintiff's 45-page memorandum in support of its motion for a preliminary injunction, and is not mentioned whatsoever in its reply in support of its motion for a preliminary injunction. See Pl.'s PI Mem. at 37.

Pl.'s PI Mem., Ex. 4 (Declaration of Randy Johnson ("R. Johnson Decl.")) ¶ 19.  Mr. Johnson

further maintains that (i) the company's total lost revenue from 2009 and 2010 was nearly $6.7

million; (ii) the company laid off five of its twenty-eight employees; and (iii) the company will

likely need to lay off more employees and "'sell[] equipment to lower [its] cost[s] and loan debt

in the very near future.'"  Pl.'s PI Mem. at 37 (quoting R. Johnson Decl. ¶ 18).  Although, Mr.

Johnson claims that Best Coal has lost revenues totaling $6,686,751, Pl.'s PI Mem., Ex. 4 (R.

Johnson Decl.) ¶ 18, he does not offer a projection of anticipated future losses, tie that to an

accounting of the company's current assets, or explain with any specificity how he arrived at the

conclusion that he would be forced out of business in eighteen months.

     While Mr. Johnson's representations raise legitimate concerns about the current and

future health of his company, his declaration falls short of what is necessary to merit a finding of

irreparable harm.  Much like the plaintiff in <u>Power Mobility Coalition</u>, the plaintiff here is

offering nothing more than a "predict[ion]" that is "at best, remote and speculative."  404 F.

Supp. 2d at 205.  Something more than Mr. Johnson's conclusory projection is necessary to show

that any of the plaintiff's small business members currently face certain, imminent business

closings.  Accordingly, there is no "'clear and present need for extraordinary equitable relief to

prevent harm."  <u>Id.</u> at 204 (quoting <u>Wis. Gas Co.</u>, 758 F.2d at 674).

     Likewise, the Court finds that the plaintiff has not shown to the degree required by law

that its members are likely to incur substantial economic losses as a result of the additional

permitting conditions imposed by the Guidance Memorandum.  While it is true that "if a movant

seeking a preliminary injunction 'will be unable to sue to recover any monetary damages against'

a government agency in the future because of, among other things, sovereign immunity, financial

loss can constitute irreparable injury," Pl.'s PI Mem. at 38 (quoting <u>Brendsel v. Office of Fed.</u>

Hous. Enter. Oversight, 339 F. Supp. 2d 52, 66-67 (D.D.C. 2004), the fact that economic losses may be unrecoverable does not absolve the movant from its "considerable burden" of proving that those losses are "'certain, great and actual.'" Power Mobility Coal., 404 F. Supp. 2d at 204 (quoting Wis. Gas Co., 758 F.2d at 674) (emphasis in original).

Although this Circuit has not specifically addressed the issue of how recoverability of economic losses should fit into the irreparable harm analysis, this Court has confronted the issue and repeatedly held that recoverability of the claimed losses is but one element for consideration. First, in Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20 (D.D.C. 1997), a case in which medical device manufacturers sought a preliminary injunction to enjoin FDA action, the Court found that the "plaintiffs' greater financial costs, which are on-going, can never be recouped. Id. at 29. The Court went on to find that while the injury to plaintiffs was 'admittedly economic,' there [wa]s 'no adequate compensatory or other corrective relief' that [could] be provided at a later date, tipping the balance in favor of injunctive relief." Id. (quoting Hoffmann-Laroche, Inc. v. Califano, 453 F. Supp. 900, 903 (D.D.C. 1978)) (finding that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm"). In Bracco, however, the court also determined that the plaintiffs had shown "two primary sources of non-speculative, on-going, and imminent harm." 963 F. Supp. at 28-29. Next, although this Court held in Feinerman that "where . . . the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity, . . . any loss of income suffered by the plaintiff is irreparable per se," Feinerman v. Bernandi, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (Walton, J.) (emphasis in original), the Court also recognized that "the alleged injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. at 50 (quoting

Wis. Gas Co., 758 F.2d at 674).  Lastly, in Sherley v. Sebelius, 704 F. Supp. 2d 63 (D.D.C. 2010), a case in which the plaintiffs sought to enjoin the Department of Health and Human Services from applying National Institute of Health guidelines regarding the funding of medical research that used embryonic stem cells, the Court concluded "[t]here is no after-the-fact remedy for this injury because the Court cannot compensate plaintiffs for their lost opportunity to receive funds . . . . Accordingly, plaintiffs would suffer irreparable injury in the absence of the injunction."  Id. at 72.  However, earlier in its opinion, the court noted that "[f]irst . . . the alleged injury must be of 'such imminence that there is a 'clear and present need' for equitable relief to prevent irreparable harm . . . . [and s]econd, the plaintiff's injury 'must be beyond remediation.'"  Id. (quoting Wis. Gas Co., 758 F.2d at 674) (emphasis in original).  Bracco, Feinerman, and Sherley demonstrate that recoverability of monetary losses can, and should, have some influence on the irreparable harm calculus, but that recoverability is but one factor the court must consider in assessing alleged irreparable harm in the form of economic losses.  In other words, the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm.[11]

If a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary; here, however, the

---

[11]    Moreover, the Tenth Circuit case cited by the plaintiff in its memorandum supporting its motion for a preliminary injunction seems to confirm this conclusion.  Although the court in Chamber of Commerce v. Edmondson, 594 F.3d 742, 770-71 (10th Cir. 2010), found that "imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury," it cited as authority for that finding an earlier Tenth Circuit case which determined that "[a]n irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damage."  Id. at 771 (quoting Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003)) (emphasis added).  Edmondson can be further distinguished from the plaintiff's situation in this case because it dealt with the actual imposition of fines on businesses that failed to comply with a state law on the employment of illegal immigrants, i.e., the actual payment of money by the plaintiff to the authority from which it was then unrecoverable, whereas here, the plaintiff claims that the injury is economic loss due to (1) delay in continuing or starting mining projects, and (2) in one instance, the cost of conducting additional tests to comply with the Guidance.

plaintiff has not demonstrated the certainness or the imminence of any of its members' losses.  In fact, and perhaps most importantly to this discussion of the role of recoverability in the irreparable harm calculus, the plaintiff has not even shown that the losses are wholly unrecoverable.  While the plaintiff has correctly asserted that it cannot recover economic losses in the form of money damages from the EPA and the Corps due to sovereign immunity, the plaintiff has not demonstrated how or why these losses cannot ultimately be recovered if and when the mining projects in question are permitted to proceed.  See Defs.' PI Surreply at 4 (recognizing that the Higgins Declaration, Pl.'s Opp'n re: Dismiss, Ex. 24 (Declaration of James C. Higgins ("Higgins Decl.") ¶ 9, itself asserts that the resolution of this case in favor of the plaintiff would allow reinstatement of his company's mining plans, and arguing that this would allow the company to recoup all or most of the alleged lost revenue).[12]

Nonetheless, even assuming arguendo that the purported losses are totally beyond remediation, the plaintiff has still not shown that they are imminent or certain.  The Court has no reason to doubt Mr. Higgins's assertion that the "coal mined from the Paynter Branch South Mine could have produced revenues of about $189 million at today's current sales price," Pl.'s Opp'n re: Dismiss, Ex. 24 (Higgins Decl.) ¶ 8, or his statement that "other costs . . . as a result of [the decision to forego the removal of the coal reserves at Paynter Branch South Mine] include the costs of relocating two spreads of equipment, . . . the relocation of about 20 employees to other mines[,] and the severing of about 20 employees," id., Ex. 24 (Higgins Decl.) ¶ 8.  These,

---

[12]     Mr. Higgins is the Chief Engineer for Simmons Fork Mining, Inc. and provides services to Paynter Branch Mining, which operates the Paynter Branch South Mine in West Virginia and whose Section 404 permit application is one of those subject to review under the EC Process.  Pl.'s Opp'n re: Dismiss, Ex. 24 (Higgins Decl.) ¶¶ 1, 5.  Mr. Higgins asserts that since January 2010, Paynter Branch Mining has gathered water quality data in an attempt to meet the conductivity level set forth in the Guidance, an endeavor that has cost it $114,000.  Id., Ex. 24 (Higgins Decl.) ¶ 7.  Mr. Higgins further maintains that the permitting delays have rendered infeasible proceeding with the Paynter Branch South Mine project, forcing Paynter Branch Mining to forego the retrieval of coal reserves from that mine.  Id., Ex. 24 (Higgins Decl.) ¶ 8.

however, are examples of past harm, resulting from a decision made before this case ever reached this Court.  Mr. Higgins does not provide any information on currently planned or future projects in jeopardy or at risk of incurring losses.[13]  While the plight of the workers allegedly fired by Paynter Branch Mining purportedly due to the delay in the permitted process is unfortunate, that does not change the fact that "the purpose of an injunction is the prevent <u>future</u> violations."  <u>W.T. Grant Co.</u>, 345 U.S. at 633 (emphasis added).  Thus, while past harm is relevant, the ultimate inquiry remains, "'whether there is a real and immediate threat of <u>repeated</u> injury.'"  <u>District of Columbia Common Cause</u>, 858 F.2d at 8-9 (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 496 (1974) (emphasis added).  Accordingly, whether or not they may ultimately be recovered, the plaintiff has not shown that there is a threat of future substantial losses that warrant the imposition of the "extraordinary" remedy of injunctive relief.  <u>Mazurek</u>, 520 U.S. at 972.

 To conclude its examination of the plaintiff's allegations of irreparable harm, the Court need merely state that it agrees with the federal defendants that the plaintiff's argument that the EC Process and Guidance are impermissibly interfering with the exercise of private property rights is "baseless."  Defs.' PI Opp'n at 38.  Indeed, the cases relied upon by the plaintiff do not support a finding that enforcement of the type of environmental regulations at issue here qualify as an infringement on the property interests of the plaintiff's members.  See <u>RoDa Drilling Co. v. Siegal</u>, 552 F.3d 1203, 1211 (10th Cir. 2009) (finding that the record clearly established that

---

[13] The same is true of the re-mining projects described in the declaration of William Wells, the Vice President of United Coal Company.  Pl.'s PI Mem., Ex. 9 (Declaration of William Wells, Jr.) ¶¶ 25-26.  But even assuming, for the sake of argument, that Mr. Wells had identified pending future losses, it is unclear that the losses would be of the magnitude required in this Circuit to warrant the imposition of injunctive relief, i.e., the losses would threaten the survival of the business.  See <u>Power Mobility Coal.</u>, 404 F. Supp 2d at 204 (observing that only economic loss that threatens the survival of a movan'ts business amounts to irreparable harm); Defs.' PI Opp'n at 36 & 36 n.20 (noting that although the Wells declaration does not provide a numeric figure or describe the losses purportedly suffered from the decision to forego the reclamation project, United Coal's revenues totaled more than $500 million in 2008).

RoDa was being denied its right to interest in its real property because it had been "denied unfettered ownership" due to the defendant's refusal to transfer record title, and concluding that "while being denied record title, RoDa simply cannot participate in the everyday operations of its own interests, and the damages arising from that are incalculable"); Pelfresne v. Village of Williams Bay, 865 F.2d 877, 883 (7th Cir. 1989) (in a suit seeking to bar demolition of buildings on the plaintiff's land, the court noted that "[a]s a general rule, interference with the enjoyment or possession of land is considered irreparable [because] land is viewed as a unique commodity for which monetary compensation is an inadequate substitute," but found that a similar rule should not necessarily apply to buildings located on a piece of real estate as buildings, unlike land, can be repaired or replaced). Clearly, these two cases do not present issues even remotely comparable to those presented in this case.

While the plaintiff's assertion that a preliminary injunction "in this case will do nothing more than restore the regulatory environment that existed prior to the unlawful application of the EC Process and the Guidance to coal mining operations," Pl.'s PI Mem. at 41, may be true, the fact remains that the plaintiff has made an inadequate showing of irreparable harm. The issuance of a preliminary injunction to "restore" the previously existing regulatory environment would not be in line with the purposes of injunctive relief, as the ultimate inquiry would still remain "whether there is a real and immediate threat of repeated injury." D.C. Common Cause, 858 F.2d at 8-9.

3. Possibility of Substantial Harm to Other Interested Parties

Having concluded that a showing of irreparable harm is lacking, it is not necessary to engage in a lengthy discussion of the remaining two factors, see Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (holding that the failure to demonstrate harm provides "grounds for

refusing to issue a preliminary injunction, even if the other three factors entering the [preliminary injunction] calculus merit such relief"), and the Court will therefore address them only briefly. See id. at 304-05 (observing that "[i]t is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with [Federal Rule of Civil Procedure] 52(a)," which provides that when denying a preliminary injunction a district court "shall . . . set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed. R. Civ. P. 52(a)).

The plaintiff maintains that a preliminary injunction in this case will not harm the federal defendants or the defendant intervenors as it "will do nothing more than restore the regulatory environment that existed prior to the" MCIR Assessment, the EC Process, and the Guidance Memorandum. Pl.'s PI Mem. at 41. Both the federal defendants and the defendant intervenors, on the other hand, assert that "significant environmental interests are at stake here." Defs.' PI Opp'n at 41. While it may be true that the challenged EPA actions were "designed to significantly reduce the harmful environmental consequences of Appalachian surface coal mining operations, while ensuring that future mining remains consistent with federal laws," id., these environmental interests—the actual environmental impact of surface mining—are not currently before the Court. It may well be the case that the MCIR Assessment, the EC Process, and the Guidance Memorandum are necessary to protect the environment, especially considering the assertion made by counsel for the defendant intervenors that the substantive requirements of the Clean Water Act were essentially ignored by the prior Administration, but the Court need not make that assessment now. Whether the current or the prior Administration's actions are in compliance with the APA and the Clean Water Act is an inquiry that can be left for another day. And the most the Court can say about whether other interested parties would be harmed by the

issuance of an injunction is that none of the parties before the Court, based on the record currently before it, have made a sufficiently compelling case to tip the scales in their favor.

    4.  <u>The Interests of the Public</u>

The plaintiff maintains that a preliminary injunction is in the public interest as it would protect "the integrity of the administrative regulatory process" and because the public has a strong interest in developing domestic sources of energy and job growth. Pl.'s PI Mem. at 42-43. On the other hand, the federal defendants assert that the public interest is served by allowing the Corps and the EPA to complete their review and consideration of permit applications in a thoughtful and considered manner. Defs.' PI Opp'n at 42. The Court, however, finds neither of these arguments determinative of whether preliminary injunctive relief should be granted in this case.

**V.  <u>Conclusion</u>**

For the above reasons, the federal defendants' motion to dismiss and the plaintiff's motion for a preliminary injunction are both **DENIED**.[14]

                                   _____/s/_____
                                    Reggie B. Walton
                                    United States District Judge

---

[14]    The Court has issued a contemporaneous Order consistent with this Memorandum Opinion.