**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **NATIONAL MINING ASSOCIATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.l:10-CV-1220-RBW** |
| **v.** | ) | *consolidated with:* |
| | ) | **No. 1: ll-cv-295-RBW** |
| **LISA JACKSON, ADMINISTRATOR,** | ) | **No.l:11-cv-446-RBW** |
| **U.S. ENVIRONMENTAL PROTECTION** | ) | **No.l:11-cv-447-RBW** |
| **AGENCY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**STATE OF WEST VIRGINIA'S INDIVIDUAL MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Randy C. Huffman, in his official capacity as Cabinet Secretary of the West Virginia Department of Environmental Protection ("WVDEP"), and acting on behalf of the State of West Virginia, hereby submits this memorandum to supplement Plaintiffs' joint filings on this issue, namely, Plaintiffs' Motion for Partial Summary Judgment and the accompanying joint memorandum in support of that motion. The State submits this brief not to repeat the arguments that already have been fully briefed, but instead to highlight the adverse effect of the EC Process on the State of West Virginia, its regulatory programs, and its ability to protect the waters of this State effectively and in accordance with law.

**I.      Introduction**

When the United States Environmental Protection Agency ('EPA") and the United States Army Corps of Engineers ("the Corps") announced the new Enhanced Surface Coal Mining Pending Permit Coordination Procedures in a memorandum on June 11, 2009, (the "EC Process"), they did so without consulting the State of West Virginia in blatant disregard of the

consultation requirement imposed by the Clean Water Act. *See* 33 U.S.C. § 1251(b). As a result, EPA and the Corps have usurped the State's primary role in controlling water pollution under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* In addition, by adopting the EC Process without following notice-and-comment rulemaking under the Administrative Procedures Act, 5 U.S.C. § 553 (the "APA"), EPA and the Corps denied the State the opportunity to comment upon the new process, an opportunity to which it legally was entitled.

As a result, the State has been forced to stand idly by while West Virginia permit applicants are trapped inside the circular EC Process, which involves numerous meetings and repeated requests for further information from applicants. The EC Process can be described in a single word: **delay**. The EC Process for Section 404 permits is a much more complicated and time-consuming endeavor than that which existed under the "old" statutory and regulatory review process: there are more agencies occupying the field, with EPA rather than the Corps taking a dominant role, and decisions on permit applications are not being made anywhere close to the regulatory 60-day requirement established by the Corps or even the statutory 90-day timeline under the Clean Water Act. *See* 33 U.S.C. § 1344(q); 33 C.F.R. § 325.2; *see also* ECP000005 (404 MOU(q)). Rather, there is a lengthy pre-60-day period of undetermined length where the agencies ask the applicants for more information and participate in a negotiation process as to the permit's contents.[1] *See* Affidavit of Thomas L. Clarke, Division Director for the Division of Mining and Reclamation ¶ 12, 14, *attached hereto* as Ex. A. And that delay is not limited to Section 404 permits and the permit applicants: it directly affects the State of West

---

[1]  For the 11 Section 404 permits that are still pending in the EC Process from West Virginia as of the date of this brief, that pre-EC Process period can extend for as long as 1 year, 10 months, 21 days and counting. *See* Surface Coal Mining Activities Enhanced Coordination Procedures—Project List, *available at* http://water.epa.gov/lawsregs/guidance/wetlands/mining-projects.cfm (last visited Apr. 30, 2011).

Virginia.  The permitting backlog caused by the EC Process has all but frozen the other permitting processes for coal mining operations in West Virginia, including WVDEP's Section 402 National Pollutant Discharge Elimination System ("NPDES") regulatory program and its administration of the permitting process under the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 *et sq.* ("SMCRA").  *See id.* ¶¶ 18-20.  EPA has made it clear that WVDEP should not issue certain Section 402 NPDES permits for mining operations while the EC Process is ongoing.  *See id.* ¶ 19.  Further, the SMCRA permitting process has been prolonged due to the general cloud of uncertainty surrounding the 404 permits in the EC Process.  *See id.* ¶¶ 18, 20.

For these reasons, the State of West Virginia requests that this Court grant Plaintiffs' motion for partial summary judgment.  This Court should restore the State's proper role as the primary protector of water quality under the Clean Water Act, and order the Corps to process and review all pending mining permits pursuant to the properly codified (and mandatory) scheme in place before the EC Process suddenly altered the statutory and regulatory landscape.  That outcome would allow the State to continue to administer its regulatory programs in accordance with state and federal law, and to protect the waters within its borders while allowing for environmentally responsible mining to go forward without unnecessary delay.

## II.    Discussion

As discussed more extensively in Plaintiffs' joint brief, when EPA and the Corps announced that they had conceived a new review process for Section 404 permits, they violated both the Clean Water Act and the APA.  The EC Process has had unique ramifications for the State of West Virginia, which was one of the six Appalachian states targeted for the new

process.[2]  The original list of 108 Section 404 permits pending as of June 11, 2009, was whittled down to 79 permits selected for the EC Process, 23 of which (or 34%) were located in West Virginia.  As of the date of this brief, 3 of those permits had been issued by the Corps, 9 were withdrawn from consideration by the applicants, and 11 were still awaiting the start of the EC Process 60-day review—over 1 year and 10 months from the time the EC Process was announced.[3]  *See* Surface Coal Mining Activities Enhanced Coordination Procedures—Project List, *available at* http://water.epa.gov/lawsregs/guidance/wetlands/mining-projects.cfm (last visited Apr. 30, 2011).

### A.   EPA And The Corps Violated The Clean Water Act When They Instituted The EC Process With Total Disregard For West Virginia's Role As The Primary Protector Of Water Quality.

When EPA and the Corps commenced the new review process on June 11, 2009, they violated the Clean Water Act by disregarding the State of West Virginia's role as the primary protector of its waters and by failing to consult with the State in creating that process.  With the Clean Water Act, Congress established a regulatory regime under which the federal and state governments both work to control water pollution and to regulate the discharge of any pollutant into the nation's navigable waters.  *See* 33 U.S.C. § 1251(a)(1).  Such regulation naturally must be a system of cooperative federalism because "[t]he boundary between federal and local water resources is uniquely permeable."  *Envtl. Def. Ctr., Inc. v. Envtl. Prot. Agency*, 319 F.3d 398, 414 (9th Cir. 2003), *vacated on other grounds by* 344 F.3d 832.  Significantly, when Congress

---

[2]     Those six Appalachian states are Ohio, Pennsylvania, West Virginia, Virginia, Tennessee, and Kentucky.  *See* ECP000020.

[3]     Moreover, the original list has expanded to include permits that ripened after June 11, 2009.  Although the agencies' continuing enhanced review of new permit applications has not formally been identified as conducted under the EC Process, those agencies are applying identical, EC Process-like standards and timelines to new permit applications.  *See* Affidavit of Thomas L. Clarke, Division Director for the Division of Mining and Reclamation ¶ 17, *attached hereto* as Ex. A.

assigned different roles and responsibilities to the states and to EPA in the Clean Water Act, it did not give the federal government primary regulatory authority.  Rather, "Congress carefully constructed a legislative scheme that imposed major responsibility for control of water pollution on the states. . . . [] Congress envisioned the EPA's role as largely a supervisory one." *District of Columbia v. Schramm*, 631 F.2d 854, 860 (D.C. Cir. 1980).  In doing so, Congress respected the States' historic role as the primary protector of water quality and sought to preserve that role.  *See Nat'l Wildlife Fed'n v. Browner*, No. 95-1811, 1996 WL 601451, at *2 (D.D.C. Oct. 11, 1996).  As a result, "[t]he states remain, under the Clean Water Act, the prime bulwark in the effort to abate water pollution[.]"  *Keating v. F.E.R.C.*, 927 F.2d 616, 622 (D.C. Cir. 1991) (internal quotation marks omitted); *see also Am. Paper Inst., Inc. v. Envtl. Prot. Agency*, 890 F.2d 869, 873 (7th Cir. 1989) (stating that "numerous courts have recognized the primacy of state and local enforcement of water pollution controls as a theme that resonates throughout the history of the Act" (alteration omitted) (internal quotation marks omitted)).

In the first section of the Act, after declaring that the Clean Water Act was intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), Congress announced its "overarching policy" of "recogniz[ing], preserv[ing], and protect[ing] the primary responsibilities of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter."  *Id.* § 1251(b); *North Carolina v. F.E.R.C.*, 112 F.3d 1175, 1194 (D.C. Cir. 1997) (Wald, J., dissenting); *see also Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 489 (9th Cir. 1984) ("Under [the Clean Water Act], the states maintain primary responsibility for abating pollution in their jurisdictions[.]").  The overarching policy of placing primary responsibility on

the States to protect water quality permeates the Act, as demonstrated by Section 303. As this Court recently recognized, "Section 303 . . . allocates primary authority for the development of water quality standards to the States."[4] *Nat'l Mining Ass'n v. Jackson*, __ F. Supp.2d __, 2011 WL 124194, at *1 (D.D.C. 2011) (citing 33 U.S.C. § 1313); *accord Gen. Motors Corp. v. Envtl. Prot. Agency*, 168 F.3d 1377, 1383 (D.C. Cir. 1999); *see also* 33 U.S.C. § 1311(b)(1)(C). The Act also gives the States primary authority to administer the Section 402 NPDES permitting system once EPA approves a state program.[5] *See Gen. Motors Corp.*, 168 F.3d at 1382; *Am. Paper Inst.*, 890 F.2d at 873-74 & n.6.

Even under the provisions of the Act where States do not take the lead, they continue to play a significant role under the Act's "delicate balance of federalism." *Nat'l Wildlife Fed'n*, 1996 WL 601451, at *2. For example, States may derail a Section 404 permit by declining to issue a water quality certification under Section 401. *See Keating*, 927 F.2d at 350 ("Although federal licenses are required for most activities that will affect water quality, an applicant for such a license must first obtain state approval of the proposed project." (discussing 33 U.S.C. § 1341(a)(1)); *see also North Carolina*, 112 F.3d at 1195 ("The § 401 certification is an essential component of the Act's state-oriented regulatory scheme."); *Keating*, 927 F.2d at 622 ("One of the primary mechanisms through which states may assert the broad authority reserved to them is the certification requirement set out in section 401 of the Act. Section (a)(1) of that provision says that no federal license or permit may be granted in the absence of the requisite state

---

[4]     West Virginia has exercised that authority by developing narrative water quality standards that it has determined will best protect the overall well-being of the State's waters. *See* W. Va. Code § 22-11-2(a); W. Va. Code R. § 47-2-3.2.i.

[5]     West Virginia has had primacy to administer the NPDES program since 1982. *See* Ex. A, ¶ 5.

certification indicating that no state water quality standards will be violated by the proposed project." (citation omitted)).

Despite the Act's repeated emphasis on the States' primary role in protecting water quality, the State of West Virginia was not consulted, or even forewarned, about the genesis of the EC Process.  *See* Ex. A, ¶ 10.  The State's role in the process has become functionally equivalent to that of a bystander.[6]  *See id.* ¶¶ 10, 13-14.

### B. EPA And The Corps Have Obstructed The State's Ability To Operate Regulatory Programs Under the Clean Water Act and SMCRA, Over Which The State, Not EPA, Has Primary Authority.

In imposing the EC Process upon West Virginia permit applicants, EPA and the Corps have not only inhibited and delayed the Section 404 permitting process, but they also have impeded the State's ability effectively to administer its NPDES and SMCRA programs, despite the fact that the EC Process purportedly applies only to Section 404 permits.[7]  Coal mining operations are conducted under an interrelated web of statutes and regulations, none of which can be viewed in a vacuum—the vast majority of such operations require several permits and

---

[6]     WVDEP has hosted many of the EC Process meetings at its headquarters as a courtesy, but has not participated in any meaningful way.  Neither WVDEP nor the State is privy to the majority of the communications between permit applicants and EPA or the Corps, and WVDEP is unable to offer applicants any direction or guidance on how to navigate the EC Process.  *See* Ex. A, ¶¶ 13-14, 21.  What WVDEP *has* been privy to is increasing frustration and expressions of feelings of futility from those applicants.  *See id.* ¶ 15.

[7]     Although the EC Process memorandum refers only to Section 404 permits, *see* ECP000020, when the United States Department of the Army, the United States Department of the Interior, and EPA signed the Memorandum of Understanding Implementing the Interagency Action Plan on Appalachian Surface Coal Mining on June 11, 2009 (the "MOU"), they federalized the regulation of surface coal mining in six Appalachian states.  As a result, WVDEP is expected to attend the EC Process meetings as the permitting authority for NPDES and SMCRA permits, but has no meaningful input into the standards imposed by EPA on Section 404 permits or negotiated between EPA and the applicant without WVDEP's knowledge.  WVDEP then is expected to conform its NPDES and SMCRA permits to the standards imposed by EPA. *See* Ex. A, ¶¶ 9, 12-14.

agency actions, including State 401 water quality certification, a Section 402 NPDES permit, a Section 404 permit, and (for surface operations) a SMCRA permit.[8]

WVDEP has had primacy over the Section 402 NPDES program since 1982, at which time EPA's own NPDES permitting program was suspended. *See* 33 U.S.C. § 1342(b), (c)(1); Ex. A, ¶ 5. EPA retains only limited authority to object under specific circumstances to a particular NPDES permit. *See* 33 U.S.C. § 1342(d)(2), (4); 40 C.F.R. § 123.44. WVDEP long has administered that program without incurring any major criticism from EPA. *See* Ex. A, ¶ 19. But since the new administration took office, EPA has revoked its waiver of its review of WVDEP's NPDES permits,[9] which has caused WVDEP to send every draft NPDES permit to EPA for review, resulting in increased "comments," "interim objections," and objections from EPA. *See id.* ¶ 19. Significantly, while reviewing all of WVDEP's draft mining NPES permits, EPA also has instructed WVDEP to refrain from issuing certain Section 402 NPDES permits

---

[8]    NMA and the State have described those statutory schemes in detail in their respective Complaints, and in their joint memorandum. For the sake of brevity, the State will not repeat that analysis here.

[9]    WVDEP's NPDES permitting program is governed by the Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge System in West Virginia (1982) (the "MOA") between West Virginia and EPA. *See* 40 C.F.R. § 123.24 stating that "[a]ny State that seeks to administer a program under this part shall submit a Memorandum of Agreement" that is "executed by the State Director and the Regional Administrator," and listing requirements for the content of that Agreement). EPA executed that waiver in the MOA, waiving its authority under the Clean Water Act to review NPDES permits issued by WVDEP, but retaining its right to terminate the waiver in whole or in part by notifying WVDEP at least 60 days before such termination became effective. *See* 33 U.S.C. § 1342 (giving EPA authority to waive review); 40 C.F.R § 123.44 (same). In July 2009, EPA revoked that waiver for all West Virginia NPDES permits for discharges associated with surface coal mining permits and announced it would begin reviewing those permits. EPA has since requested that WVDEP provide it with copies of *all* current and pending NPDES permits associated with mining operations (not limited to surface mining). *See* Ex. A, ¶ 19.

while the EC Process is ongoing.[10]  *See id.*  In doing so, EPA acted well outside of any statutory authority.  This has left WVDEP in limbo, wary of inviting an objection or veto from EPA if WVDEP exercises its legitimate authority under the Clean Water Act.

That uncertainty also has affected WVDEP's SMCRA program.  Like the Clean Water Act, SMCRA utilizes a "cooperative federalism approach" in regulating surface coal mining.  *See* 30 U.S.C. §§ 1201(f), 1253.  When SMCRA was enacted in 1977, five years after the Clean Water Act, Congress reinforced the Clean Water Act's "overarching policy" of granting primacy to the States, and it did so explicitly for surface mining.  *See, e.g., id.* § 1201(f) ("[B]ecause of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this

---

[10]     For example, in a letter to the Environmental Resources Program Administrator for the Division of Water and Waste Management at WVDEP, the Associate Director of the Office of NPDES Permits & Enforcement, Water Protection Division at EPA Region III notified WVDEP that NPDES Permit No. 1022229 for Atlantic Leaseco LLC's Muddlety Surface Mine No. 1 had been selected for EC Process review.  EPA informed WVDEP that it expected to engage in a period of informal negotiations prior to the start of the formal 60-day review process, and that such negotiations had not yet been initiated.  EPA stated that it

> believe[d] that the most efficient way to resolve our concerns regarding this permit would be to engage with you, the Company, the Corps and the Section 404 program and to coordinate the Section 402 and 404 permits concurrently.  To that end, we invite WVDEP to refrain from issuing this permit at this time and to participate with EPA and the Corps as part of the enhanced coordination process for this project under the Appalachian Surface Mining MOU.  In light of the status of the Section 404 permit, the project will not be unduly delayed by WVDEP's coordination of the Section 402 permit as part of the enhanced coordination process.  We believe that WVDEP's participation in the enhanced coordination process will facilitate consistency between the Section 402 and Section 404 permits and promote resolution of environmental concerns.

Letter from David B. McGuigan, Associate Director, Office of NPDES Permits & Enforcement, Water Protection Division, EPA Region III, to Scott Mandirola, Director, Division of Water and Waste Management, West Virginia Department of Environmental Protection (Nov. 19, 2009), *attached hereto* as Ex. B.

chapter should rest with the States."). WVDEP has had primacy over the SMCRA program since 1981. *See* Ex. A, ¶ 5. In the past, SMCRA permits served as the repository for all pertinent permit information, but that is no longer the case due to EPA's increasingly rigorous permit requirements for Section 404 and 402 permits. WVDEP's review and issuance of SMCRA permits has been caught up in the EC Process quagmire due to the general cloud of uncertainty surrounding the permits undergoing that review. *See id.* ¶¶ 18, 20.

All of the permitting that affects coal mining in West Virginia has been delayed and impeded by the EC Process. As a result of clearly unauthorized actions by EPA and the Corps, the State has been unable to perform its statutorily authorized duties and to administer its regulatory programs in accordance with state and federal law. This Court should restore Congress' explicit (and repeatedly expressed) intent of allowing the States to take the lead in protecting their own waters and regulating mining on their lands.

      **C.**    **EPA And The Corps Violated The Clean Water Act And The APA When They Failed To Either Consult With West Virginia Before Creating The EC Process, Or To Give The State The Opportunity To Comment.**

EPA and the Corps simultaneously violated the Clean Water Act and the APA when they created the EC Process without consulting West Virginia as required by the Clean Water Act or giving the State the opportunity to participate in a notice-and-comment process under the APA. First, when Congress enacted the Clean Water Act, it announced that the Administrator should consult with the States in the exercise of his authority under the Clean Water Act. 33 U.S.C. § 1251(b). Before the new administration took office, EPA had a long history of consulting with the State and WVDEP, but no such consultation took place in generating the EC Process. *See* Ex. A, ¶ 10. EPA and the Corps imposed a new rigorous and more time-consuming Section 404 permit review process upon six Appalachian states, including West Virginia, without first

consulting the States.  And the agencies did so in clear violation of the consultation requirement imposed by 33 U.S.C. § 1251(b).

Moreover, because the EC Process was generated by EPA and the Corps without notice to the public or any opportunity for comment (a point vividly illustrated by the paucity of the EC Process Administrative Record submitted by Defendants),[11] the State was denied the opportunity to comment upon that process in violation of the APA.  As discussed more fully in Plaintiffs' joint memorandum, as soon as the EC Process came into being, it was implemented as a binding substantive rule.  West Virginia therefore should have been given the opportunity to ask the kinds of questions that it is legally entitled to pose:  questions about why permits from only these six Appalachian states are subject to the new review process, or regarding the agencies' motivation for implementing a new process, or why EPA revoked its waiver of authority under the West Virginia MOA for all mining NPDES permits issued by WVDEP.  The questions raised by the EC Process could go on *ad infinitum*, but the bottom line is this:  the State of West Virginia was denied the opportunity to comment on or have a dialogue about a decision that has drastically changed the legal landscape and adversely affected the State's own regulatory

---

[11]     As Plaintiffs' joint memorandum noted, based on the Administrative Record submitted by Defendants for the EC Process, two federal agencies apparently decided to embark on a drastically different permitting review program in violation of federal statutes and regulations based on only five documents, totaling a mere fifty-two pages.

The sparse nature of the record raises another issue.  In their Complaint, the State of West Virginia and Secretary Huffman challenged not only the genesis of the EC Process, but also its implementation.  However, with respect for the consolidated parties' agreement to bifurcate briefing and desire to proceed on an expedited schedule, the State will not at the present time seek to supplement the record or ask for discovery on its "as applied" challenge.  If the Court strikes down the EC Process on its face, which Plaintiffs urge it to do, that challenge need go no further.  If, however, this issue remains viable after the Court's ruling on the instant motion, the State hereby reserves its right to pursue an as applied challenge to the EC Process and seek necessary supplementation of the record or discovery.

programs.  Accordingly, the EC Process should be vacated as contrary to the Clean Water Act

and as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## III.     Conclusion

Because EPA and the Corps violated the Clean Water Act and the APA when they

created the extra-regulatory EC Process for Section 404 permits, the State of West Virginia asks

this Court to grant Plaintiffs' motion for partial summary judgment and to issue an order

declaring the EC Process unlawful, vacating it, and directing the Federal Defendants to reinstate

the Corps' longstanding Section 404 regulatory process.

**Respectfully submitted,**

**Plaintiffs RANDY C. HUFFMAN, in his**
**official capacity as CABINET SECRETARY OF THE**
**WEST VIRGINIA DEPARTMENT OF**
**ENVIRONMENTAL PROTECTION, and acting on**
**behalf of the STATE OF WEST VIRGINIA,**
**by Counsel**

**/s/Michael L. Murphy**
**Michael L. Murphy, No. 480163**
**Benjamin L. Bailey,** *Pro Hac Vice*
**Sherrie A. Armstrong, Pro Hac Vice**
**Gregory Y. Porter, No. 458603**
**BAILEY & GLASSER, LLP**
**209 Capitol Street**
**Charleston, WV 25301**
**(304) 345-6555**

**Dated:  May 2, 2011**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **NATIONAL MINING ASSOCIATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | *No.l:10-CV-1220-RBW* |
| **v.** | ) | *consolidated with:* |
| | ) | *No. 1: ll-cv-295-RBW* |
| **LISA JACKSON, ADMINISTRATOR,** | ) | *No.l:11-cv-446-RBW* |
| **U.S. ENVIRONMENTAL PROTECTION** | ) | *No.l:11-cv-447-RBW* |
| **AGENCY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of May, 2011, I filed the foregoing **" STATE OF WEST VIRGINIA'S INDIVIDUAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT"** using the Court's *CM/ECF* system which will cause a copy to be served upon below named counsel:

Cynthia J. Morris, Esquire
***USDOJ***
Environmental & Natural Resources Division
601 D Street, NW
Washington, DC 20004-2904

Kenneth C. Amaditz, Esquire
***USDOJ***
Environmental & Natural Resources Division
P.O. Box 23986
Washington, DC 20026-3986

Joseph Lovett, Esquire
Derek O. Teaney, Esquire
***Appalachian Center for the Economy & Environment***
P.O. Box 507
Lewisburg, WV 24901

Mindy G. Barfield, Esquire
Sadhna G. True, Esquire
***Dinsmore & Shohl, LLP***
250 W. Main Street, Suite 1400
Lexington, KY 40507

Emma Cheuse, Esquire
Stephen F. Roady, Esquire
Jennifer C. Chavez, Esquire
***Earthjustice***
1625 Massachusetts Avenue, NW
Suite 702
Washington, DC 20036-2234

Kristen Nathanson, Esquire
John C. Martin, Esquire
David Y. Chung, Esquire
***Crowell & Moring, LLP***
1001 Pennsylvania Avenue, NW
Suite 1100
Washington, DC 20004

Russell Davis, Esquire
***Baird & Baird, P.S. C.***
P. O. Box 351
Pikeville, KY 41502

Josh W. Nacey, Esquire
C. Michael Haines, Esquire
Mary Alma Stephens, Esquire
***KY Energy & Environment Cabinet***
Office of General Counsel
200 Fair Oaks Lane, I st Floor
Frankfort, KY 40601

F. William Hardt, Esquire
Barry D. Hunter, Esquire
Paul Sullivan, Esquire
***Frost Brown & Todd, LLC***
250 W. Main Street
2700 Lexington Financial Center
Lexington, KY 40507

***/s/Michael L. Murphy***
Michael L. Murphy (State Bar #480163)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.*,<br><br>        **Plaintiffs,**<br><br>**and**<br><br>**COMMONWEALTH OF KENTUCKY and CITY OF PIKEVILLE, KENTUCKY,**<br><br>        **Plaintiff-Intervenors,**<br><br>        **v.**<br><br>**LISA JACKSON, in her official capacity as Administrator, U.S. Environmental Protection Agency, *et al.*,**<br><br>        **Defendants,**<br><br>**and**<br><br>**SIERRA CLUB, *et al.*,**<br><br>        **Defendant-Intervenors.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**Nos. 10-cv-1220-RBW**<br>     **11-cv-0295-RBW**<br>     **11-cv-0446-RBW**<br>     **11-cv-0447-RBW** |

## AFFIDAVIT OF THOMAS L. CLARKE

I, Thomas L. Clarke, declare and state as follows:

1.  I am the Division Director for the Division of Mining and Reclamation ("DMR") at the West Virginia Department of Environmental Protection ("WVDEP"). I have served in that position for 3 years. Prior to my current position, I served at DEP as counsel for the mining regulatory programs for 12 years. My career includes 23 years of experience in environmental regulation of the mining industry.



PLAINTIFF'S EXHIBIT

A

tabbies

2. WVDEP is an agency of the State of West Virginia headquartered in Charleston, West Virginia. The mission of WVDEP is to: "Use all available resources to protect and restore West Virginia's environment in concert with the needs of present and future generations." WVDEP is committed to protecting and improving the environmental quality of life for all of West Virginia's citizens.

3. DMR's mission within WVDEP is to regulate the mining industry in accordance with federal and state law. DMR's responsibilities include, but are not limited to, issuing and renewing permits for mineral extraction sites and related support facilities, inspecting facilities for compliance, monitoring water quality, and issuing and assessing violations.

4. Prior to the imposition of the new Enhanced Surface Coal Mining Pending Permit Coordination Procedures (the "EC Process"), coal mining most often required the following permits under the Clean Water Act: Section 401 certifications, Section 402 National Pollutant Discharge Elimination System ("NPDES") permits, and Section 404 permits. Surface operations also require Surface Mining Control and Reclamation Act ("SMCRA") permits.

5. WVDEP is the primary administrator for the NPDES regulatory program and the SMCRA program in West Virginia. WVDEP has had primacy to administer the NPDES program since EPA approved its program in 1982. WVDEP was given primacy over the SMCRA program in 1981.

6. DMR administers all coal and mining-related NPDES permits (the Division of Water and Waste Management administers all other types of NPDES permits) and the SMCRA program. DMR therefore issues all relevant permits for mining operations in West

Virginia with the exception of Section 404 permits. Section 404 permits are issued by the United States Army Corps of Engineers ("the Corps").

7.  WVDEP is the state agency with whom the United States Environmental Protection Agency ("EPA") and the Corps consult about mining issues, and is responsible for developing and issuing water quality certifications under Clean Water Act Section 401. Such certifications are required for Clean Water Act Section 404 permits that govern the discharge of dredged or fill material.

8.  The West Virginia Legislature has developed narrative water quality standards under Section 303 of the Clean Water Act, which EPA has approved.   WVDEP has promulgated administrative rules and a guidance document interpreting and implementing those standards. DMR regulates mining pursuant to those standards.

9.  When the United States Department of the Army, the United States Department of the Interior, and EPA signed the Memorandum of Understanding Implementing the Interagency Action Plan on Appalachian Surface Coal Mining on June 11, 2009 (the "MOU"), they announced their goal of coordinating the regulation of surface coal mining in six Appalachian states, including the review of pending Section 402 NPDES permits, 404 permits, and SMCRA permits.

10. Although West Virginia is one of the six Appalachian states targeted in the MOU and the EC Process, neither EPA nor the Corps consulted with WVDEP before announcing the MOU or imposing the EC Process on the State.  Neither WVDEP nor the State of West Virginia were given the opportunity to submit comments on the MOU or the EC Process.

11. I am familiar with the EC Process through my attendance at EC Process meetings as the permitting authority for 402 and SMCRA permits, and through discussions with

3

applicants about that process. I also attended informational meetings held by EPA to educate applicants about the new process.

12. Since the EC Process was announced on June 11, 2009, EPA has become the major player in reviewing all types of mining permits. As part of the EC Process, representatives from the Corps, EPA, WVDEP, and the applicant companies hold numerous meetings. EPA is informing applicants that the proposed projects must conform to more stringent standards than those previously required by the Corps or WVDEP, such as those announced in EPA's Interim Detailed Guidance Memorandum issued on April 1, 2010. At those meetings, EPA is not clear about the kind of permit standards it would like to see from applicants and provides no meaningful guidance. For example, EPA indicates that it is "awaiting additional information from applicant" for the 11 pending Section 404 permits still under EC Process review. But the message sent by EPA at EC Process meetings is that EPA would like to see some kind of stricter standards or better management practices, and EPA does not inform applicants precisely what "additional information" it is seeking. The message from EPA is essentially this: EPA is telling applicants to jump, and it will tell them once they have jumped high enough, but it will not tell them the height of the bar. EPA's approach has generated a substantial amount of uncertainty in the permitting process that extends not only to Section 404 permits, but to NPDES and SMCRA permits as well.

13. EPA has made it clear to WVDEP that it is expected to attend the EC Process meetings. WVDEP has hosted many of the pre-submittal and EC Process meetings as a courtesy to the federal agencies and permit applicants. Those meetings have been held on a monthly basis (with isolated exceptions) since January 2010. No decisions are made at the EC

4

Process meetings. EPA sends low-level staff members, who merely transmit information back to higher officials and to headquarters. This is in contrast to the level of participation from WVDEP and the Corps, both of which send high-level staff with decision-making authority. Moreover, on at least once occasion EPA staff participated only by telephone, which inhibited their ability to effectively review maps for proposed projects.

14. WVDEP is not privy to many of the communications between applicants and EPA during the EC Process. Often, permit standards are negotiated between those two entities without WVDEP's participation. WVDEP is then expected to conform its NPDES and SMCRA permits to whatever was negotiated, without input from WVDEP.

15. WVDEP has received many expressions of dissatisfaction and feelings of futility from applicants involved in the EC Process.

16. Of the original 79 Section 404 permits targeted by EPA for EC Process review, 23 were for West Virginia mining operations. Of those permits, 3 have been issued by the Corps, 9 were withdrawn by the applicants, and 11 are still awaiting the start of the formal 60-day review period.

17. The EC Process has been expanded beyond the original list of 79 permits. The same type of heightened review continues to be applied to Section 404 permits that ripened after June 11, 2009, the date the EC Process was announced.

18. The delay inherent in the EC Process has resulted in a domino effect for all mining permits related to a proposed project, thereby causing a corresponding slow-down of DMR's processing of NPDES and SMCRA permits because the Section 401 water

quality certification, the NPDES permit, the Section 404 permit, and the SMCRA permit must contain similar standards and requirements.

19. EPA also has become increasingly involved in DMR's NPDES program. Since 1982, WVDEP has administered that program without incurring any major criticism from EPA. WVDEP's NPDES permitting program is governed by the Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge System in West Virginia (the "MOA"), entered into by WVDEP and EPA in 1982. In the MOA, EPA waived its right to review NPDES permits issued by WVDEP. However, EPA retained its right to terminate the waiver in whole or in part by notifying WVDEP at least 60 days before such termination became effective. EPA informed WVDEP in July 2009 that it had revoked that waiver, but did not give WVDEP the requisite 60 days notice. After I brought that failure to EPA's attention, EPA notified WVDEP that it was giving such notice and that it planned to revoke its waiver of review of all mining-related NPDES permits effective within 60 days. Since that time, WVDEP has been required to submit all draft NPDES permits for mining operations to EPA before they may be issued. That is true for all types of mining in the State not limited to surface mining. DMR's NPDES permit review has been delayed as a result of EPA's revocation of the waiver because EPA increasingly has objected to, "commented" upon, or issued "interim objections" for draft NPDES permits. EPA also has "invited" WVDEP to refrain from issuing certain NPDES permits while the corresponding 404 permit is undergoing EC Process review. There has been an increase in the backlog of pending NPDES permits since the EC Process was announced.

20. That backlog has been accompanied by a similar upward trend in the backlog of SMCRA permits due to the uncertainty surrounding pending NPDES and Section 404 permits.

21. WVDEP has been unable to offer any guidance or direction to permit applicants on how to navigate the EC Process.  WVDEP effectively has been "left in the dark" by EPA and the Corps.


I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Thomas L. Clarke


Dated:  May 2, 2011



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

November 19, 2009

Mr. Scott Mandirola,
West Virginia Department of Environmental Protection
Division of Water and Waste Management
601-57th Street
Charleston, West Virginia 25304

Re: NPDES Permit No. 1022229
    Atlantic Leaseco LLC
    Muddlety Surface Mine No. 1
    Gauley River Sub-basin, Nicholas County, West Virginia

Dear Mr. Mandirola:

Pursuant to Section 402 of the Clean Water Act, 40 C.F.R. Sections 123.74 and .75, and the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System in West Virginia* (1982) (NPDES MOA), we received the above-referenced draft permit for review on October 5, 2009. We requested and received from the West Virginia Department of Environmental Protection (WVDEP) an extension to November 19, 2009 to provide any comment or objection.

We note that the Clean Water Act Section 404 permit for the Atlantic Leasco LLC Muddlety Surface Mine No. 1 (SMCRA No. S-3004-07) is one of seventy-nine projects that were identified for enhanced coordination by the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Corps) pursuant to the *Memorandum of Understanding Implementing the Interagency Action Plan on Surface Coal Mining in Appalachia* signed on June 11, 2009 by EPA, the Corps, and the U.S. Department of the Interior (Appalachian Surface Mining MOU). Pursuant to the Enhanced Coordination Procedures provided as part of the Appalachian Surface Mining MOU, when the Section 404 permit file is ready for enhanced coordination, the Corps will provide written notice to EPA, thus commencing a formal 60-day coordination period. As a general matter, EPA, the Corps and the Companies have engaged in informal negotiations prior to the commencement of the formal 60-day coordination period on other projects and would expect to do the same with respect to this project as well. EPA has not yet initiated informal discussions regarding this project and has not received notice from the Corps that the Section 404 permit file is ready for enhanced coordination.

*Customer Service Hotline: 1-800-438-2474*



WVDEP000044

Our review of this draft NPDES permit raises a number of concerns similar to concerns recently expressed in connection with other permits. These generally include, but are not limited, to the need to document how and whether potential to cause excursions from narrative water quality criteria was considered and how and whether data supplied as part of the SMCRA application was used in developing the NPDES permit. In lieu of a formal response under the NPDES MOA, we believe that the most efficient way to resolve our concerns regarding this permit would be to engage with you, the Company, the Corps and the Section 404 program and to coordinate the Section 402 and Section 404 permits concurrently. To that end, we invite WVDEP to refrain from issuing this permit at this time and to participate with EPA and the Corps as part of the enhanced coordination process for this project under the Appalachian Surface Mining MOU. In light of the status of the Section 404 permit, the project will not be unduly delayed by WVDEP's coordination of the Section 402 permit as part of the enhanced coordination process. We believe that WVDEP's participation in the enhanced coordination process will facilitate consistency between the Section 402 and Section 404 permits and promote resolution of environmental concerns.

We would be pleased to work with you as part of the enhanced coordination process. If you have any questions, please contact Evelyn Macknight at (215) 814-5717 or Bette Conway at (215) 814-5744. If you have specific questions regarding the enhanced coordination process, please contact Jeff Lapp, Associate Director, Office of Environmental Programs at (215) 814-2717.

Sincerely,

David B. McGuigan, Ph.D.
Associate Director
Office of NPDES Permits & Enforcement
Water Protection Division

Cc:   Jeff Parsons, WVDEP
      Richard Roy, WVDEP

*Customer Service Hotline: 1-800-438-2474*