**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, et al.<br><br>Plaintiff,<br><br>COMMONWEALTH OF KENTUCKY,<br>CITY OF PIKEVILLE,<br><br>Plaintiff-Intervenors,<br>v.<br><br>LISA JACKSON, in her official capacity as Administrator, U.S. Environmental Protection Agency, *et al*<br><br>Defendants,<br><br>And<br><br>SIERRA CLUB *et al.*,<br><br>Defendant-Intervenors. | Nos. 10-cv-1220-RBW<br>11-cv-0295-RBW<br>11-cv-0446-RBW<br>11-cv-0447-RBW |

***********

**KENTUCKY COAL ASSOCIATION'S**
**INDIVIDUAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Kentucky Coal Association ("KCA") hereby submits this memorandum to supplement the joint filings made by all Plaintiffs' in support of their Motion for Partial Summary Judgment, and specifically to support KCA's claims challenging the April 1, 2010 Interim Detailed Guidance issued by the Defendant Environmental Protection Agency ("EPA") entitled "Improving EPA Review of Appalachian Surface Coal Mining Operations Under the Clean Water Act, National Environmental Policy Action and the Environmental Justice Order ("the Interim Guidance").

**INTRODUCTION**

As set forth in the Plaintiffs' Joint Memorandum, and herein, over the past two years EPA has done an "about face" in terms of its involvement in and oversight over Section 402 Clean Water Act (CWA) permits issued by Kentucky's Energy and Environment Cabinet ("the Cabinet"). Previously, EPA largely respected the proper role of the state in establishing and monitoring its own water quality standards, and since 1983 (when Kentucky assumed permitting authority for Section 402 CWA permits), EPA has never blocked Kentucky's issuance of any Section 402 permit. That all changed on April 1, 2010 with the issuance of the Interim Guidance. In contravention to long established EPA guidelines and policies, and without the required notice and comment rulemaking and input from coal industry representatives such as KCA, EPA changed the rules in the Interim Guidance. Since that time EPA has objected to numerous Section 402 individual permits for surface coal mining operations, which has in turn resulted in a virtual standstill in the development of new or expanded surface coal mines in Eastern Kentucky.

That EPA has inflexibly used the Interim Guidance as a legislative rule in contravention of the Administrative Procedures Act (APA) and CWA, and that its use in objecting to Kentucky's Section 402 permits constitutes arbitrary and capricious agency action, is best shown by EPA's dealings with the Cabinet. Identical Kentucky Section 402 permit conditions EPA sanctioned as late as mid-March 2010 were found deficient just weeks later after the issuance of the April 1, 2010 Interim Guidance. Thereafter, Kentucky invested nearly six (6) months in intense negotiations with EPA Region 4 to resolve the impasse and create a Section 402 permit template that both EPA and the state would find acceptable. The proposed permit template finally agreed to by the Cabinet and EPA Region 4 contained more stringent conditions than

those found in Section 402 permits EPA sanctioned in March 2010. It required the Cabinet to perform a Reasonable Potential Analysis (RPA) before permit issuance; whole effluent toxicity (WET) testing; and instream biological assessment to determine actual site-specific effects on water quality. It did not, however, impose a numerical effluent limit on conductivity consistent with the regional benchmark provided for in the Interim Guidance. These settlement negotiations were all for naught, however, as the proposed Section 402 permit template agreed to by Region 4 was subsequently rejected by EPA headquarters.

Clearly, Kentucky's "story" demonstrates that, contrary to EPA's protestations, its field offices have no discretion and are required to utilize the Interim Guidance (and its presumption that any discharge which exceeds 500 µS/cm in conductivity violates every Appalachian state's narrative water quality standard for conductivity) in its Section 402 permitting decisions. Yet they imposed this binding new rule without any of the required safeguards which are built into the regulatory system to ensure that all stakeholders – including the regulated community – have appropriate input and sufficient time to conform their behavior before such a final, binding rule is promulgated. EPA's use of the Interim Guidance violates the APA and CWA, and this Court should enter a summary judgment to that effect.

## BACKGROUND FACTS

### 1. Kentucky Has Established A Narrative Water Quality Standard for Specific Conductance (SC) or "Conductivity" and It, Not EPA, Must Determine Whether a Proposed Discharge Has the "Reasonable Potential" for Violating this Standard.

Congress intended "to recognize, preserve and protect the primary responsibilities and rights of States to prevent, reduce and eliminate pollution." 33 U.S.C. §1251(b). In that vein, the CWA authorizes states to establish their own water quality standards. 33 U.S.C. § 1313(c); 40 C.F.R. §131.4. State water quality standards can be either narrative or numerical. Kentucky

has adopted a narrative water quality standard for conductivity. *See* 401 KAR 10:031, Section 4(1)(f) which states that "Total dissolved solids or specific conductance shall not be changed to the extent that indigenous aquatic community is adversely affected." This standard has been formally approved by EPA. (*See* Affidavit of R. Bruce Scott at ¶ 3, attached hereto as Exhibit A) (hereinafter "Scott Affidavit")[1].

The Cabinet, as the Section 402 permitting authority, determines in the first instance whether a proposed discharge will, after complying with technology-based effluent limitations, have a reasonable potential to cause an in-stream excursion above a numeric or narrative criterion within an applicable water quality standard. 40 C.F.R. §122.44(d). This analysis is called a "Reasonable Potential Analysis" or RPA. If the discharge has such a reasonable potential, the Cabinet must develop permit limitations to ensure the water quality standard is complied with.

### 2. EPA Previously Approved Kentucky's Procedures for Conducting "Reasonable Potential Analysis," including Permit Reopeners if Site-Specific Data Obtained During an RPA Suggested there was a Possible Exceedance.

To ensure that the narrative criteria of a state water quality standard are attained, states like Kentucky are required to develop implementation procedures for RPAs. 40 C.F.R. 131.11(a)(2). EPA approved Kentucky's standards for RPAs in July 2000. (*See* Scott Affidavit at ¶ 5). These standards are clear: when insufficient data exists to make a determination as to the

---

[1] KCA has contemporaneously moved to supplement the administrative record with numerous documents – some which pre-date and others which post-date the Interim Guidance – and all of which will assist it in demonstrating that EPA is using the Interim Guidance in a binding fashion in violation of the APA. As set forth in more detail in the Plaintiffs' Joint Motion to Supplement the Record, this Court may consider extra-record evidence for various reasons, including, when the agency action is not adequately explained in the record and/or the bare record presented would frustrate judicial review. Affidavits, too, have been considered by district courts to help explain the agency action. *See e.g., Menkes v. Dept' of Homeland Security*, 662 F.Supp. 62 (D.C. Cir. 2009). KCA has identified the Scott Affidavit (Exhibit A hereto) and Exhibits 1 and 3-18 to the Scott Affidavit as documents subject to the Joint Motion to Supplement the Record. EPA has agreed that all other exhibits hereto are either part of the Administrative Record (Exhibit 2 to the Scott Affidavit and Exhibit B) and/or may be considered by the Court (Exhibit C hereto).

"reasonable potential" of the discharge to violate water quality standards, Kentucky has the option to require "monitor only" or a quarterly monitor and report requirement as an interim measure to provide for collection and evaluation of data prior to determination of an appropriate effluent limit. (*Id.* and Exh. 1 to Scott Affidavit, at pp. 3-4). Kentucky can and has always been authorized to require monitoring either prior to permit issuance, or after permit issuance. *Id.* As noted in EPA's own *Technical Support Document for Water Quality-Based Toxics Control,* "the regulatory authority [i.e., the state] may find it protective of water quality to include a permit reopener for the imposition of an effluent limit should the effluent testing establish that the discharge causes, has the reasonable potential to cause, or contributes to excursion above a water quality criteria." (*Id.* and Exh. 2 to Scott Affidavit at p. 51).

Prior to April 1, 2010, EPA concluded that conducting RPAs after permit issuance to gather sufficient site-specific data from new and expanded facilities and providing for permit reopeners to potentially establish effluent limits or other permit limitations in the future was consistent with the CWA, and never objected to the Cabinet's issuance of Section 402 permits containing such provisions. (*See* Scott Affidavit, ¶ 6).

**3. As Late as March 2010 EPA Approved Numerous Kentucky Section 402 Permits Which Did Not Contain Pre-Permit RPAs or Numerical Effluent Limits on Conductivity.**

On June 11, 2009, the federal government announced a Memorandum of Understanding (MOU) between EPA and other federal agencies to take coordinated action to minimize the environmental consequences of mountaintop coal removal. Six Appalachian states, including Kentucky, were targeted for increased scrutiny as it regards both Section 402 and 404 permits. Starting around July 30, 2009, individual Section 402 permits began to receive greater scrutiny and comment from EPA than ever before. From July 30, 2009 through February 2010, thirty-six

(36) proposed Section 402 individual permits which the Cabinet had forwarded for public notice and comment were sent to EPA Region 4 (EPA's regional office which covers Kentucky) for review. By March 19, 2010, EPA Region 4 *commented* on twenty-seven (27) of those permits. The comment letters were extensive. In them, EPA Region 4 indicated that the Cabinet's Section 402 permits should include requirements for pre-permit RPAs; WET testing; Best Management Practices (BMPs); and bioassessments. While EPA did not mandate a numerical limit on conductivity, the letters indicated that instream conductivity levels between 400 and 500 µS/cm should trigger additional BMPs and biological monitoring. (*See* Scott Affidavit at pp. 5-6 and Exh. 6-8 to Scott Affidavit). Importantly, however, EPA did not object to these 27 permits, which would have had the effect of preventing their issuance. By sending only comment letters, EPA Region 4 effectively approved the permits for issuance as being consistent with the CWA. (*See* February 14, 2008 Memorandum of Agreement (MOA), attached hereto as Exhibit B)[2]. On March 19, 2010, the Cabinet issued the 27 permits, all of which contained significant new requirements, including WET testing; instream biological monitoring; an adaptive management BMP plan; and a reopener clause to allow the agency to perform an RPA analysis based on site-specific data collected after permit issuance and revise the permit to impose other permit requirements, if necessary. (*See* Scott Affidavit, p. 6). None of the 27 permits EPA Region 4 "approved" required pre-permit RPAs or numeric effluent limits on conductivity.

**4. The Interim Guidance is Issued on April 1, 2010 and EPA Notifies Kentucky that the New Permit Conditions Discussed Therein Will be Required.**

[2] Pursuant to the MOA between the Cabinet and EPA (which acknowledges the Cabinet's "primary responsibility to establish the State NPDES program priorities"), EPA's limited role is to either comment or object to a draft Section 402 permit. If EPA only comments on a permit, the Cabinet may proceed to issue it. If EPA objects, the Cabinet may not issue the permit and, under some conditions, EPA may thereafter assume authority over the permit.

On April 1, 2010, EPA released its Interim Guidance to provide "detailed guidance" to EPA Regions 3, 4 and 5 on its review of Appalachian coal mining activities, including their review of Section 402 CWA permits issued by states. Concurrent with its release, EPA published the Interim Guidance in the Federal Register for public comment. 75 Fed. Reg. 18500. EPA characterized the document as an "interim final document" and announced that it would issue final guidance after receipt of public comments and the results of an external peer review by the Science Advisory Board. It further asserted that it is "not a regulation" and "does not impose legally binding requirements on EPA."

Such disclaimers are inconsistent, however, with both its text and EPA's later conduct applying the Interim Guidance in a binding fashion. The document states on its face that it was "effective immediately" and that EPA expected Regions 3, 4 and 5 to "begin using this interim final guidance immediately in your review of Appalachian surface coal mining activities." (*See* Interim Guidance at pp. 1-2, attached hereto as Exhibit C.) EPA found state permits to be deficient in two principal ways: (a) the state permitting authority had not conducted a sufficient RPA at the time of permit issuance; and (b) even in the absence of an RPA, "available science" (and in particular, the Pond-Passmore study) supplied a sufficient causal link for state permitting authorities to determine that coal mining discharges which increase conductivity, dissolved solids or sulfates would likely violate narrative water quality standards" and thus EPA concludes in the Interim Guidance that such permits should have contained effluent limits for these pollutants. (*Id.* at 8). Post-permit RPAs coupled with permit reopeners had long been sanctioned by EPA for new or expanded discharges (as evidenced by its own *Technical Support* document and EPA's failure to object to Kentucky 402 permits containing such conditions just weeks before) yet the Interim Guidance concludes that states should conduct RPAs before permit

issuance, using data from similar discharges at adjacent mine sites. (*Id.* at 9). The Interim Guidance concludes that "in general, an NPDES permit that fails to show evidence of a parameter-specific reasonable potential analysis will be inconsistent with the requirements of the CWA." (*Id.* at 8).

The Interim Guidance also criticizes state permitting authorities for not incorporating provisions that would implement state narrative water quality standards, particularly relating to discharges that increase conductivity. Specifically, EPA contends in the Interim Guidance that "scientific literature" should be considered as relevant information in implementing narrative water quality standards, and that two such scientific reports – specifically the 2008 study entitled *Downstream Effects of Mountaintop Coal Mining: Comparing Biological Conditions Using Family and Genus Level Macroinvertebrate Bioassessment Tools* (the Pond-Passmore Study) and a draft report of EPA's called *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams* – have linked conductivity levels in streams below surface coal mining operations and adverse impacts to aquatic life in those streams. (*Id.* at 5-6, 11). According to EPA, these studies demonstrate that "conductivity impacts of projects with predicted conductivity levels below 300 μS/cm generally will not cause a water quality standard violation and that in-stream conductivity levels above 500 μS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative water quality standards." (*Id.* at 12). The Interim Guidance further directs Regions 3, 4 and 5 to work with state permitting authorities to "ensure that the permit includes conditions that protect against conductivity levels exceeding 500 μS/cm." (*Id.*). It even directs regional offices to "object to issuance of [a] proposed permit" if it fails to comply with the CWA "as noted" in the Interim Guidance (*Id.* at 8).

In essence, the Interim Guidance establishes a presumption that any discharge which exceeds 500 µS/cm in conductivity violates the state narrative water quality standard for conductivity in all six Appalachian states, including Kentucky's narrative water quality standards, and that effluent limits should thus be established for this pollutant. EPA further concludes in the Interim Guidance that most such effluent limits should be numerical, and that it is in only the most "limited cases" where it will be infeasible to establish a numerical effluent limit to implement a narrative water quality standard. EPA concludes that "[e]stablishing enforceable numeric limits for conductivity…in state Section 402 permits will help to improve water quality and better protect public health and aquatic life in streams downstream from Appalachian surface coal mining operations." (*Id.* at 7).

EPA Region 4 notified the Cabinet about the Interim Guidance on April 2, 2010. Despite having failed to object to the 27 Section 402 permits the Cabinet had issued just weeks before, in its April 2nd correspondence Region 4 now characterized the same permits – which included increased effluent monitoring, WET testing, and post-permit RPAs coupled with permit reopeners– as deficient. Of particular concern, according to EPA, was "the missing reasonable potential analyses associated with narrative water quality standards and appropriate numeric effluent limits associated with these standards, including but not limited to conductivity and total dissolved solids." EPA specifically noted in this April 2, 2010 letter that the Interim Guidance would "provide the framework that will assist states in drafting Appalachian coal mining NPDES permits" and that reviews of "future draft NPDES permits for coal mining will continue to emphasize the need for DOW to interpret narrative water quality standards (including but not limited to conductivity and total dissolved solids) to conduct reasonable potential analyses associated with narrative water quality standards, and to include appropriate numeric effluent

limits associated with those standards." (*See* Scott Affidavit at pp. 6-7 and Exh. 10 to Scott Affidavit).

To clarify the objectives and implementation details of the Interim Guidance, Cabinet Secretary Len Peters wrote to EPA Administrator Lisa Jackson on April 27, 2010, attaching an extensive list of questions, including ones surrounding EPA's stance on appropriate permit limitations for conductivity. (*See* Scott Affidavit at p. 7-8 and Exhibits 11-12 to Scott Affidavit) In response, Region 4 responded that all discharges from surface coal mining valley fills have high levels of conductivity that have been shown in studies to cause downstream impacts. They then conclude that "[t]hese discharges therefore have the reasonable potential to cause or contribute to an excursion of applicable water quality standards." According to the EPA, this reasonable potential can be found, not from site-specific data (what state and federal authorities have always relied upon) but instead from EPA studies and data from nearby mining sites which justify imposition of numerical effluent limits at the outset. Thus, permit reopeners, or requirements for WET testing, long sanctioned by EPA, are no longer acceptable given the data that exists and instead "EPA expects that…numeric limits be incorporated in the permit." (*See* Exhibit 12 to Scott Affidavit).

**5. EPA Objects to Kentucky Section 402 Permits Containing the Identical Permit Limitations EPA Approved in March 2010.**

On or about April 16, 2010, the Cabinet posted twenty-three (23) additional Section 402 individual permits for public notice and comment. Ultimately, EPA sent specific objection letters with regard to twenty-one (21) of the 23 permits, or *all* of the draft Section 402 permits involving surface coal mining operations in Eastern Kentucky[3]. These permits contained the identical

[3] The remaining two were for coal preparation plants not subject to the Interim Guidance.

conditions Region 4 had sanctioned as late as March 2010. (*See* Scott Affidavit at pp. 7-8 and Exh. 13-15 to Scott Affidavit). EPA now found these same conditions deficient since they contained post-permit RPAs and permit reopeners and did not contain a numerical limit on conductivity. (*Id.*).

EPA's own statistics tell a similar story about the wholesale change which has taken place in EPA's oversight of Section 402 permits since 2009, and particularly since April 1, 2010. Nationwide EPA objected to one hundred forty-eight (148) Section 402 permits in the last ten (10) years, with sixty (60) of those objections (or 40%) of them) having occurred since 2009. Of those sixty (60), thirty (38) have involved coal mining operations, and of those 38, all but two (2) of EPA's objections have occurred since April 1, 2010. (*Id.* at 9 and Exh. 16 to Scott Affidavit).

**6. EPA Headquarters Rejects a Kentucky Section 402 Permit Template Agreed Upon by EPA Region 4.**

To attempt to resolve the impasse, Kentucky officials reached out to officials at EPA headquarters to determine if agreements could be consummated with EPA Region 4 regarding EPA's objections to the 21 pending Section 402 Eastern Kentucky permits. Between December 2010 and April, 2011, Kentucky and EPA Region 4 officials discussed and negotiated at length an acceptable Section 402 template for Eastern Kentucky surface coal mining operations. Ultimately, the Cabinet sent for final review and acceptance to Region 4 a proposed agreed upon Section 402 template containing even more stringent conditions than the ones EPA approved as of March 2010, including pre-permit RPAs and a combination of WET, instream biological analysis, narrative standard and adaptive BMPs with a biological trigger for purposes of implementing Kentucky's narrative water quality standard for conductivity. (*See* Scott Affidavit at pp.9-11 and Exh. 17-20 to Scott Affidavit). However, no numerical effluent limit for conductivity was required in the proposed permit template. Region 4 notified the Cabinet in a

telephone call on April 1, 2011 that EPA had accepted Kentucky's revised approach to resolve the pending permit objections. However, on May 4, 2011, Region 4 officials traveled to Kentucky to deliver the news that EPA headquarters had rejected the agreed upon Section 402 template. (*Id*.)

## ARGUMENT

### 1. This Court should enter a Summary Judgment that the Interim Guidance is a Legislative Rule Which was Promulgated in Violation of Section 553 of the Administrative Procedure Act

There is no factual dispute that EPA issued the Interim Guidance on April 1, 2010 without subjecting it to public notice and comment. Instead, the dispute is legal in nature and centers around whether EPA was subject to APA Section 553's public notice and comment procedure requirements. EPA argues that it is exempt from these requirements as the Interim Guidance was an interim, non-binding policy statement and nothing more. They cite to their own pronouncements within and accompanying the Interim Guidance that it did not constitute a final rule. However, this Court may and should disregard those statements given that the text of the Interim Guidance, and EPA's later conduct applying it to Kentucky Section 402 permits, confirms its binding character. According to one court, "[i]f an agency acts as if a document issued at headquarters is controlling in the field…if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2008).

While the text of the Interim Guidance, as discussed in pages 7-9 *infra* herein, evidences its binding nature, it is its use by EPA since April 1, 2010 that indisputably demonstrates that the

Interim Guidance is in fact a legislative rule subject to APA's notice and comment requirements. In March 2010, EPA Region 4 did not object to 27 draft Kentucky Section 402 permits, therefore permitting the Cabinet to issue them. Those permits called for WET testing; instream biological monitoring; and adaptive management BMPs, all of which were suggested by EPA in their extensive comment letters in response to the permits. Consistent with Kentucky procedures approved by EPA, these permits for new and expanded facilities did not require RPAs to be performed prior to permit issuance. Instead, they called for site-specific data to be gathered after permit issuance, with a permit reopener to allow the Cabinet to later impose new requirements (including numerical effluent limits, if necessary) if it appeared *the actual site-specific* discharge "has the potential to cause, or contributes to excursion above" Kentucky's narrative water quality standards for conductivity. Yet just weeks later, those same Region 4 officials characterized these permit conditions as deficient because they did not comply with the Interim Guidance's directive that state Section 402 permits must incorporate pre-permit RPAs (using data not from the site of the actual discharge but instead from adjacent mine sites) and impose numerical conductivity limits (again, not based on site-specific data establishing that the discharge was causing a violation of Kentucky state water standards, but on regional data from a few EPA studies). EPA has objected to every proposed individual Section 402 permit for surface coal mines in Eastern Kentucky since April 1, 2010 even though they contained the identical conditions and limitations EPA found to be consistent with the CWA as late as March 2010. Certainly, the Interim Guidance – issued at EPA headquarters – is being treated as binding in the field and enforcement actions are being based upon it.

Equally compelling is EPA's recent rejection of the agreement reached between Kentucky and EPA Region 4. If, as EPA suggests, its Interim Guidance is simply "guidance"

and its field offices have discretion, then it would have respected the agreement reached between Kentucky and Region 4 in creating a proposed Section 402 permit template. The agreed upon template included more stringent conditions than contained in permits EPA approved in March 2010. It even included pre-permit RPAs, as called for in the Interim Guidance. It did not include a numerical effluent limit on conductivity, but did empower the Cabinet to later impose such a requirement if site-specific data generated during the RPA justified it. But this did not comport with the Interim Guidance, and ultimately EPA headquarters rejected the agreement reached by Region 4. Clearly, EPA Region 4 has no discretion to deviate from the Interim Guidance's directive that Section 402 permits include numerical effluent limits on conductivity. This is the kind of "binding" legislative rule described in *Appalachian Power*.

The APA's requirement that final agency action be subject to notice and comment rulemaking procedures serves several important purposes, including "improving the quality of agency rulemaking by testing proposed rules through exposure to public comments…[and it also provides] an opportunity to be heard, which is basic to fundamental fairness." *United Church Board of World Ministries v. S.E.C.*, 617 F.Supp. 837 839 (D.D.C. 1985) (citing *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). EPA has frustrated these important purposes. KCA and its members (which include the regulated coal industry in Kentucky) had no opportunity to be "heard" or demonstrate why the proposed discharges which are the subject of the Section 402 permits at issue would not violate Kentucky's narrative water quality standards. Instead, EPA imposed a legislative rule from headquarters and it became binding in the field immediately, leaving the Kentucky surface coal mining industry no time to have input into the rule or to conform its behavior to the new standards. This is fundamentally unfair. There are no material issues of fact, or legitimate issues of law in dispute, and this Court

should grant KCA's Motion (and those of the other Plaintiffs) that EPA's use of the Interim Guidance in Section 402 permitting decisions violates APA Section 553.

**2. The Court Should Enter a Summary Judgment that the Interim Guidance Constitutes Arbitrary and Capricious Agency Action in Violation of Section 706 of the Administrative Procedures Act.**

In defining the task of the court in evaluating whether an agency action is "arbitrary and capricious," the Court of Appeals for the District of Columbia has stated that "our primary task is to ensure that the agency has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Kristen Brooks Hope Center v. Federal Communications Commission*, 626 F.3d 586, 688 ( D.C. Cir. 2010).

Even though the Interim Guidance identifies two studies when discussing the 500 µS/cm conductivity standard, neither provides a sufficient basis for the Court to conclude that EPA's derivation of the 500 µS/cm conductivity standard "was the product of reasoned decision making." *Pennaco Energy v. EPA*, 692 F.Supp.2d 1297, 1311 (D. Wyo. 2009). The 2008 Pond-Passmore study expressly recognizes its own limitations and calls for additional research prior to the development of water quality standards. Even less reliable are the draft reports relied upon by EPA, none of which had been subject to peer review at the time EPA issued the Interim Guidance. EPA's objection to every individual Section 402 permit submitted by the Cabinet since April 1, 2010 in reliance on what were, by its own admission, preliminary findings, was and is arbitrary and capricious.

For all the reasons stated herein, KCA respectfully requests that the Court grant Plaintiffs' Motions for Summary Judgment with regard to the Interim Guidance.

Respectfully Submitted,

/s/ Mindy G. Barfield______________________
Mindy G. Barfield (admitted pro hac vice)
DINSMORE & SHOHL LLP
Lexington Financial Center
250 W. Main Street, Suite 1400
Lexington, KY 40507

/s/ Sadhna G. True______________________
Sadhna G. True
D.C. Bar No. 434669
DINSMORE & SHOHL LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507
(859) 425-1000

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing was filed with the Clerk of Court on the 23rd day of May, 2011 using the CM/ECF system which will send electronic notification to all counsel of record.

/s/ Mindy G. Barfield____________________
Counsel for Plaintiff,
Kentucky Coal Association

414411v2