## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL MINING ASSOCIATION**, *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| and | ) |
| | ) |
| **COMMONWEALTH OF KENTUCKY and** | ) |
| **CITY OF PIKEVILLE, KENTUCKY,** | ) |
| | ) |
| **Plaintiff-Intervenors,** | ) **Nos.  10-cv-1220-RBW** |
| | ) **11-cv-0295-RBW** |
| **v.** | ) **11-cv-0446-RBW** |
| | ) **11-cv-0447-RBW** |
| **LISA JACKSON, in her official capacity as** | ) |
| **Administrator, U.S. Environmental Protection** | ) |
| **Agency,** *et al.*, | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| and | ) |
| | ) |
| **SIERRA CLUB,** *et al.*, | ) |
| | ) |
| **Defendant-Intervenors.** | ) |
| | ) |

## STATE OF WEST VIRGINIA'S INDIVIDUAL MEMORANDUM IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

**Page:**

TABLE OF AUTHORITIES……………………………………………………………ii

INTRODUCTION………………………………………………………………...1

ARGUMENT………………………………………………………………………...1

    I.      EPA HAS EXERTED EVER-EXPANDING CONTROL OVER THE REGULATION OF MINING IN WEST VIRGINIA, EXCEEDING ITS STATUTORY AUTHORITY……………………………………………………1

    II.     EPA'S NEW CONDUCTIVITY STANDARD ATTEMPTS TO OVERRIDE WEST VIRGINIA'S HOLISTIC NARRATIVE WATER QUALITY STANDARDS IN VIOLATION OF THE CLEAN WATER ACT………………3

    III.    THE INTERIM GUIDANCE USURPS WEST VIRGINIA'S AUTHORITY TO ADMINISTER ITS SECTION 402/NPDES PROGRAM………………...……10

    IV.    THE INTERIM GUIDANCE USURPS THE STATE'S AUTHORITY UNDER SMCRA.........................................................................................................13

CONCLUSION……………………………………………………………...………15

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases:**

*Am. Paper Inst., Inc. v. Envtl. Prot. Agency*,
     890 F.2d 869 (7th Cir. 1989)……………………………………...…………4, 8, 9

*Chevron U.S.A., Inc. v. Hammond*,
     726 F.2d 483 (9th Cir. 1984)…………………………………………..……..4

*District of Columbia v. Schramm*,
     631 F.2d 854 (D.C. Cir. 1980)……………………………...……………..4

*Gen. Motors Corp. v. Envtl. Prot. Agency*,
     168 F.3d 1377 (D.C. Cir. 1999)……………………………………………4

*Int'l Union v. Mine Safety & Health Admin.*,
     407 F.3d 1250 (D.C. Cir. 2005)………………………….…………………15

*Keating v. F.E.R.C.*,
     927 F.2d 616 (D.C. Cir. 1991)………………………………………………4

*Mobil Oil Corp. v. Kelley*,
     426 F. Supp. 230 (S.D. Ala. 1976)…………………………..…………………9

*Nat'l Mining Ass'n v. Jackson*,
     2011 WL 124194 (D.D.C. 2011)…………………………………..………4

*Nat'l Wildlife Fed'n v. Browner*,
     No. 95-1811, 1996 WL 601451 (D.D.C. Oct. 11, 1996)……………….………………4, 9

*North Carolina v. F.E.R.C.*,
     112 F.3d 1175 (D.C. Cir. 1997)……………………………………...………4

**Statutes:**

30 U.S.C. § 1201...………………..………………….……………………………13

30 U.S.C. § 1201(f)…………………………………….……………………………13, 14

30 U.S.C. § 1253…………………………………….………………………………13

30 U.S.C. § 1256(a)…………………………………………...……………………14

33 U.S.C. § 1251(b)………………………………………………………………………………4

33 U.S.C. § 1311(b)(1)(C)………………………………………………………………………4

33 U.S.C. § 1313……………………………………………………………………………4, 5

33 U.S.C. § 1313(a)-(c)…………………………………………………………………………..9

33 U.S.C. §1313(c)(3)-(4)………………………………………………………………………9

33 U.S.C. § 1341(a)…………………………………………………………….………………4, 9

33 U.S.C. § 1342……………………………………………………………………….…………..10

33 U.S.C. § 1342(b), (c)(1)………………………………………………………..…………10

33 U.S.C. § 1342(d)(2), (4)………………………………………………………………………10

W. Va. Code § 22-1-1(a)(2)……………………………………………..…………………4, 5

W. Va. Code § 22-11-4(a)(16)…………………………………………………………7 n. 5

W. Va. Code § 22-11-7b(a)…………………………………………………..…………7 n. 5

**Federal Register:**

75 Fed. Reg. 18500…………………………………………………...……………………15

**Administrative Regulations:**

40 C.F.R. §123.24(d), (e)……………………………………………………………..…10

40 C.F.R. §123.44……………………………………………………………………………10

40 C.F.R. § 131.4(a) …………………………………………………………………4, 9

33 C.F.R. § 320.4(d) ……………………………………………………..…………4, 9

40 C.F.R. § 123.44(b)(1)-(2)………………………………………………………...…11

40 C.F.R. § 123.44(d)(2)……………………………………………………..…………11

W. Va. Code R. § 47-2…………………………………………………………………5

W.Va. Code R. § 47-2-3.2.i………………………………………………………………5

Plaintiff Randy C. Huffman, in his official capacity as Cabinet Secretary of the West Virginia Department of Environmental Protection ("WVDEP"), and acting on behalf of the State of West Virginia, submits this memorandum in support of and as a supplement to Plaintiffs' Motion for Partial Summary Judgment, in which the State of West Virginia has fully joined.  The State writes separately to illustrate how the April 1, 2010 Interim Detailed Guidance issued by the U.S. Environmental Protection Agency ("EPA")—the "Detailed Guidance:  Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Order" ("Interim Guidance")—has trampled upon the State's ability to effectively regulate coal mining in the State and its historic role in protecting the quality of its waters.  In doing so, EPA has violated the Clean Water Act, the Surface Mining Control and Reclamation Act ("SMCRA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedures Act ("APA").

I.      **EPA Has Exerted Ever-Expanding Control Over The Regulation Of Mining In West Virginia, Exceeding Its Statutory Authority.**

Beginning in 2009, the federal government steadily usurped the State of West Virginia's authority to regulate mining and to protect the integrity of its waters.  The sweeping changes began when EPA and the U.S. Army Corps of Engineers ("the Corps") entered into a Memorandum of Understanding with the U.S. Department of the Interior on June 11, 2009 ("MOU").  The MOU heralded a sea change in those agencies' attitude toward coal mining in six Appalachian states, including West Virginia.  The MOU announced the agencies' plan to substantially alter the regulation of coal mining under Sections 401, 402, and 404 of the Clean Water Act, and SMCRA.[1]  *See* DG000209-DG000214.

---

[1]      The MOU stated:  "Recognizing that the regulation of surface coal mining extends beyond CWA Section 404, EPA will improve and strengthen oversight and review of water pollution permits for discharges from valley fills under CWA Section 402, and of state water quality certifications under CWA Section 401."  DG000211.  It

True to their word, those agencies have seized control over the regulation of mining in West Virginia.  On June 11, 2009, EPA and the Corps instituted a new extra-regulatory review of certain Clean Water Act Section 404 permits (the "Enhanced Surface Coal Mining Pending Permit Coordination Procedures" or "EC Process"), which subjected targeted permits to enhanced scrutiny and delay outside of the properly codified review process.  See ECP000017-000019; ECP000020-000031.  The cloud of uncertainty overshadowing Section 404 permits undergoing EC Process review has spread to the State's regulation of programs for which it has primary authority, namely, Section 402 National Pollutant Discharge System (or "NPDES") permits and SMCRA permits.  That has delayed and impeded the State's review of all types of coal mining permits.

As the Joint Memorandum so aptly states, the MOU and the EC Process "were just a harbinger of the sweeping regulatory changes in store for those six states and their permit applicants."  In July 2009, EPA revoked its waiver of review of West Virginia mining NPDES permits that had been established by the 1982 Memorandum of Agreement between EPA and the State.  See Ex. 4(J); Ex. 4(K).  That revocation required the State to submit every draft mining Section 402 permit to EPA before it could be finalized.  It has resulted in EPA's increased objections to NPDES permits for all types of mining operations in West Virginia (not limited to surface mining).  See Ex. 4(FF) at ¶¶ 16-17, 29-31.  With that revocation, EPA obtained the opportunity to impose the new standards announced in the Interim Guidance on the State.

---

announced that the Corps and EPA "would issue guidance clarifying how impacts to streams should be evaluated and how to evaluate proposed mitigation projects" for Section 404 permits and "immediately [would] implement enhanced coordination procedures applicable to the Clean Water Act review of Section 404 permit applications." DG000212.  And the MOU declared that the Department of the Interior would take steps to "clarify[] the application of the 1983 stream buffer zone provisions" and to "more effectively conduct oversight of State permitting, State enforcement, and regulatory activities under SMCRA."  Id.

2

EPA issued the Interim Guidance to EPA Regions 3, 4, and 5 on April 1, 2010, without advance notice to the State or an opportunity for comment.  *See* Ex. 4(E); Ex. 4(FF) at ¶ 18.  As discussed more extensively in Plaintiffs' joint memorandum, the Interim Guidance announced a new water quality standard based on the impact of conductivity on the most sensitive benthic microinvertebrates:  mayflies.  The Guidance purports to override the State's authority to establish its own water quality standards, issue Section 401 water quality certifications, administer its NPDES program, and to regulate surface mining under SMCRA.  Although the Interim Guidance contains "disclaimer" language claiming that it is a non-binding guidance document, that rings hollow when viewed in light of EPA's subsequent actions.  Since April 15, 2010, EPA has used the Interim Guidance and the standards announced therein to object to NPDES mining permits as if the Interim Guidance were a binding rule.

The State brought suit against EPA and the Corps to restore the proper statutory and regulatory scheme governing coal mining, which Congress intended to be a system of cooperative federalism that recognized the historic power of the States to regulate mining and protect water quality within their borders.  Under that system, West Virginia promulgated its own numeric and narrative water quality standards, adopted by the West Virginia Legislature and approved by EPA.  WVDEP developed a Permitting Guidance that interprets those standards and provides guidance for its NPDES permit writers.  EPA's attempt to unilaterally rewrite federal statutes and to avoid proper rulemaking procedures eviscerates the State's actions and violates the Clean Water Act, SMCRA, and the Administrative Procedures Act.

## II.    EPA's New Conductivity Standard Attempts To Override West Virginia's Holistic Narrative Water Quality Standards In Violation of the Clean Water Act.

The Interim Guidance unlawfully usurps the State of West Virginia's authority to establish water quality standards under Section 303 of the Clean Water Act, and its power to

certify under Section 401 that a particular Corps' Section 404 permit will not cause an excursion from its water quality standards. *See* 33 U.S.C. §§ 1313, 1341(a); 33 C.F.R. § 320.4(d); 40 C.F.R. § 131.4(a). Congress allocated primary responsibility for water pollution control to the states, *see* 33 U.S.C. § 1251(b), and EPA eviscerated that system when it announced a new region-wide water quality standard based on conductivity.

In the Clean Water Act, "Congress carefully constructed a legislative scheme that imposed major responsibility for control of water pollution on the states. . . . [] Congress envisioned the EPA's role as largely a supervisory one." *District of Columbia v. Schramm*, 631 F.2d 854, 860 (D.C. Cir. 1980). Congress respected the states' historic role as the primary protector of water quality and sought to preserve that role. *See Nat'l Wildlife Fed'n v. Browner*, No. 95-1811, 1996 WL 601451, at *2 (D.D.C. Oct. 11, 1996). "The states remain, under the Clean Water Act, the prime bulwark in the effort to abate water pollution[.]" *Keating v. F.E.R.C.*, 927 F.2d 616, 622 (D.C. Cir. 1991) (internal quotation marks omitted); *accord Am. Paper Inst., Inc. v. Envtl. Prot. Agency*, 890 F.2d 869, 873 (7th Cir. 1989); *see also* 33 U.S.C. § 1251(b).

In keeping with Congressional intent to retain the states' primary responsibility to protect water quality, *see, e.g., North Carolina v. F.E.R.C.*, 112 F.3d 1175, 1194 (D.C. Cir. 1997) (Wald, J., dissenting); *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 489 (9th Cir. 1984), "Section 303 . . . allocates primary authority for the development of water quality standards to the States," *Nat'l Mining Ass'n v. Jackson*, __ F. Supp.2d __, 2011 WL 124194, at *1 (D.D.C. 2011) (citing 33 U.S.C. § 1313); *accord Gen. Motors Corp. v. Envtl. Prot. Agency*, 168 F.3d 1377, 1383 (D.C. Cir. 1999); *see also* 33 U.S.C. § 1311(b)(1)(C); W. Va. Code § 22-1-1(a)(2). West Virginia thus developed numeric and narrative water quality standards to protect its waters.

The West Virginia Water Pollution Control Act

> declare[s] [it] to be the public policy of the state of West Virginia to maintain reasonable standards of purity and quality of the water of the state consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development.

W. Va. Code § 22-11-2(a).   "It is also the public policy of the state of West Virginia that the water resources of this state with respect to the quantity thereof be available for use by all the citizens of the state."  *Id.* § 22-11-2(b).

The West Virginia Legislature adopted both numeric and narrative water quality standards through the legislative review and adoption process.  *See generally* W. Va. Code R. § 47-2; *see also* W. Va. Code R. § 47-2-3.2.i.; App. E, Table 1 to Chapter 47, § 2; *see also* West Virginia Department of Environmental Protection, "Water Quality Standards," *available at* http://www.dep.wv.gov/WWE/Programs/wqs/Pages/default.aspx (last visited May 22, 2011) (explaining WVDEP's water quality standards).  It established numeric standards for parameters including dissolved aluminum, arsenic, chloride, manganese, and zinc based on the designated use of the water body and a three-tiered antidegradation approach.  The State also adopted narrative standards, which in relevant part prohibit "[a]ny other condition, including radiological exposure, which adversely alters the integrity of the waters of the State including wetlands; no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed."[2]  W. Va. Code R. § 47-2-3.2.i.  EPA approved the numeric and narrative standards pursuant to 33 U.S.C. § 1313.  The State's narrative standards predate

---

[2]     WVDEP has defined "significant adverse impact" as "more than a change in the numbers or makeup of the benthic macroinvertebrate community in a segment of a water body downstream from a point source discharge.  It is, instead, a material decline in the overall health of an aquatic ecosystem."  *See* Ex. 4(H) at 3; *see also* Ex. 4(DD) at 7-8.

West Virginia's attainment of primacy over the NPDES program in 1982 and have never before been challenged by EPA. Ex. 4(FF) at ¶ 22. In 2009, EPA approved the State's latest changes to its numeric standards. *Id.*

The State has not adopted a numeric standard for conductivity. *Id.* ¶ 20. Indeed, none of the six Appalachian states targeted by the Interim Guidance have done so. But now, EPA has imposed a new numeric standard based on conductivity on those states (300 to 500 µS/cm). After the Interim Guidance was issued, the West Virginia Legislature rejected the use of EPA's new conductivity standard in the 2010 House Concurrent Resolution No. 111. It declared that the, "[t]he State of West Virginia has not adopted subcategories of special use to protect a certain species of mayfly but protects the aquatic community consistent with the Legislature's statement of public policy." *See* Ex. 4(I).[3] The Legislature further resolved

> [t]hat the requirements of the narrative criteria are met, when a stream (a) supports a balanced aquatic community that is diverse in species composition; and (b) contains appropriate trophic levels of fish (in streams with sufficient flows to support fish populations); and (c) the aquatic community is not composed only of pollution tolerant species, or the aquatic community is composed of benthic invertebrate assemblages sufficient to perform the biological functions necessary to support fish communities within the assessed reach (or, if the assessed reach has insufficient flows to support a fish community, in those downstream reaches where fish are present).

*Id.* As WVDEP rightly recognized, only the West Virginia Legislature can adopt a numeric water quality standard for conductivity, or any other pollutant. WVDEP may not unilaterally do so. *See* Ex. 4(H) at 7-8. Moreover, "[e]ven if the Legislature does adopt a numeric standard for conductivity, DEP cannot implement it until after it is approved by the EPA." *Id.* at 8.

In Fall 2009, as a precursor to the Interim Guidance, EPA conducted a Permit Quality Review ("PQR") for NPDES permits issued by Kentucky, Ohio, Tennessee, and West Virginia.

---

[3]       That resolution was adopted unanimously in the 2010 regular session and forms part of the basis for West Virginia's Permitting Guidance. *See* Ex. 4(G).

EPA concluded that the states were not adequately addressing water quality standards in surface mining permits.[4]  *See* Ex. 4(FF) at ¶ 23.  In response, WVDEP adopted a permitting protocol on August 12, 2010, to address protection of West Virginia's narrative standard and has proceeded to implement that standard in NPDES mining permits.[5]  *See id.*; *see also* Ex. 4(G); Ex. 4(H).  WVDEP solicited public comment and conducted studies to inform that protocol.  *See* Ex. 4(FF) ¶ 23.  WVDEP determined that conductivity was "an overbroad, generic criterion" and that the more appropriate way to ensure that discharges did not violate the State's narrative water quality standards was to "identif[y] specific pollutants that can be managed through the inclusion of appropriate whole effluent toxicity ("WET") monitoring and/or limits and best management practices ("BMPs") in NPDES permits, where there is reasonable potential to cause or contribute to excursions from water quality criteria."[6]  Ex. 4(H) at 2; *see also* Ex. 4(FF) ¶¶ 24-27.  WVDEP explained:

> In contrast to numeric water quality criteria, which can be applied by analysis of samples of water taken at any discharge or monitoring point in a stream, compliance with a standard that protects the aquatic ecosystem must be assessed in the broader area comprising the ecosystem.  An ecosystem does not exist at a single point, and, accordingly, its health cannot be assessed at a single point.

---

[4]      The Draft Version of the PQR report, issued on March 31, 2010—one day before the Interim Guidance—is available in the Administrative Record at DG001645-DG001722.  The word "DRAFT" is stamped in large font across each page, and is yet another example of a draft report that EPA used in unilaterally issuing the Interim Guidance.  The final Findings and Recommendations were not issued until July 13, 2010.

[5]      The Legislature has empowered WVDEP to interpret the Act and "to promulgate rules and implement water quality standards."  W. Va. Code § 22-11-7b(a); *see also id.* § 22-11-4(a)(16).

[6]      Moreover,

> If the applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in the plans it will submit with its application, that it does not have reasonable potential ("RP") to cause or contribute to an excursion above the narrative criteria, the permit writer should treat new or expanded discharges as if they have RP and include WET limits in the permit, in accordance with 40 C.F.R. § 122.44(d)(1)(v).  Alternatively, if the operator identifies toxic pollutants that can be regulated through the use of numeric limits, DEP will put a regulatory control number for those pollutants in the operator's permit.

Ex. 4(H) at 2-3.

Ex. 4(H) at 3. "DEP's data shows that more than a simple conductivity measure is necessary to determine the health of a stream." *Id.* at 5. Stream impairment is "affected by many factors: habitat, other uses of the stream and the surrounding land, other pollutants unrelated to conductivity (e.g. fecal coliform), *inter alia.*" *Id.* "Without a demonstration that diminished numbers of certain genera of mayflies have had a significant adverse impact on the rest of the ecosystem, the State cannot determine based on conductivity alone that the narrative standards have been violated." *See id.* at 6. WVDEP determined that a more appropriate way to protect stream quality is to determine the specific causative pollutant or pollutants and the concentration or concentrations responsible for impairment when elevated conductivity numbers are present since conductivity is an indicator that represents a concentration of different dissolved ions rather than a specific pollutant. *See id.* WVDEP performed a correlative evaluation of benthic condition and specific conductance and concluded that "aquatic life is protected at various values and ranges of specific conductance." *Id.* In promulgating the Permitting Guidance, WVDEP "is protecting against excursions from its narrative water quality standards by establishing WET limits and verifying impacts to a stream (or lack thereof) by requiring an extensive, comprehensive monitoring plan for the entire watershed." *Id.* at 8.

But this Court need not wade into the validity of EPA's new conductivity standard versus West Virginia's holistic narrative standards. To find that the Interim Guidance violates the Clean Water Act, it is enough that West Virginia has not adopted the conductivity standard announced in the Interim Guidance. With the new standard, EPA has attempted to bypass the State's water quality standards without satisfying either of the Clean Water Act's preconditions for EPA to "step in and promulgate water quality standards itself."[7] *See Am. Paper Inst.*, 996

---

[7]     EPA may do so "only in [two] limited circumstances:"    (i) if EPA has determined that a state's proposed new or revised water quality standard "does not measure up to CWA requirements and the state refuses to accept

F.2d at 349; *see also* 33 U.S.C. § 1313(c)(3)-(4).   It is the State's prerogative to adopt water quality standards under Section 303.  *See* 33 U.S.C. § 1313(a)-(c); *see also* 40 C.F.R. § 131.4(a). EPA cannot impose a new numeric water quality standard by fiat.[8]

Similarly, EPA cannot override the State's water quality certification under Section 401 of the Clean Water Act, which certifies to the Corps that a particular 404 permit will not violate the State's water quality standards.  *See* 33 U.S.C. § 1341(a); 33 C.F.R. § 320.4(d); *Mobil Oil Corp. v. Kelley*, 426 F. Supp. 230, 234-35 (S.D. Ala. 1976) ("It therefore follows that certification under Section 401 is set up as an exclusive prerogative of the States"); *see also Am. Paper Inst.*, 996 F.2d at 352 ("where [a] state reasonably certifies a particular limitation as consistent with its water quality standards, EPA may not mandate *more* stringent limitations"). The Interim Guidance impermissibly instructs the Corps to follow the new conductivity standard and other mitigation measures announced therein, whether or not the State has issued a water quality certification under Section 401.  *See* Ex. 4(E).   EPA has used the Interim Guidance and its new conductivity standard in reviewing Section 404 permits in the EC Process*.   See* Ex. 4(CC).   EPA's actions intrude upon the State's authority to establish water quality standards and to protect those standards through the Section 401 certification process.

In issuing the Interim Guidance, EPA shifted the statutory balance of power away from the states, which were given a critical role in protecting their own waters from pollution under the Clean Water Act's "delicate balance of federalism."  *Nat'l Wildlife Fed'n v. Browner*, No.

---

EPA-proposed revisions to the standard;" or (ii) if a state does not act to propose such a standard and EPA determines that a new or revised standard is necessary to meet the requirements of the CWA.  *Am. Paper Inst.*, 996 F.2d at 349 (D.C. Cir. 1993) (citing 33 U.S.C. § 1313(c)(3)-(4)).

[8]   As explained in greater detail *infra*, EPA has attempted to force the State to adopt its new conductivity standard by objecting to Section 402/NPDES permits using the Detailed Guidance.

95-1811, 1996 WL 601451, at *2 (D.D.C. Oct. 11, 1996).  For that reason, the Interim Guidance should be vacated.

### III.    The Interim Guidance Usurps West Virginia's Authority To Administer Its Section 402/NPDES Program.

The Interim Guidance also usurps the State's authority to administer its Section 402/NPDES permitting program.  West Virginia has had primacy to administer that program since 1982, at which time EPA's own NPDES permitting program was suspended.  *See* 33 U.S.C. § 1342(b), (c)(1); Ex. 4(FF) ¶ 5.  EPA retains only limited authority to object under specific circumstances to a particular West Virginia NPDES permit.  *See* 33 U.S.C. § 1342(d)(2), (4); 40 C.F.R. § 123.44.  WVDEP long administered that program without incurring major criticism from EPA, but in recent years EPA encroached upon the State's authority to do so by revoking its waiver of review of NPDES mining permits and objecting to permits based on the Interim Guidance.  *See* Ex. 4(FF) ¶¶ 13, 16-17, 29-31.

When WVDEP obtained primacy over the Section 402/NPDES program in 1982, it entered into a Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge System in West Virginia (the "MOA").  *See* Ex. 4(GG); *see also* 40 C.F.R. § 123.24 (stating that "[a]ny State that seeks to administer a program under this part shall submit a Memorandum of Agreement" that is "executed by the State Director and the Regional Administrator," and listing requirements for the content of that Agreement).  Although EPA has the statutory authority to review NPDES permits issued by WVDEP, see 33 U.S.C. § 1342; 40 C.F.R § 123.44, EPA waived that right when it entered into the MOA as to the review of NPDES permits issued by WVDEP for discharges from coal mining operations.  *See* Ex. 4(GG) at 4.  EPA reserved the right to terminate that waiver by notifying WVDEP at least sixty days prior to such termination becoming effective.  *See id.* at 4-5; see also 40 C.F.R. § 123.24(d), (e).

In July 2009, EPA revoked its waiver of its review of all permits issued by WVDEP associated with surface coal mining operations.[9]   *See* Ex. 4(J); Ex. 4(k).  EPA stated,"[t]he purpose of this . . . withdrawal of EPA's waiver of review is to ensure that permits contain the necessary effluent and monitoring conditions to achieve water quality standards, including narrative and numeric criteria, and incorporate NPDES regulatory requirements."  Ex. 4(J).

With that revocation, EPA paved the way to its application of the Interim Guidance to Section 402 permits.  Since that time, EPA has required WVDEP to send every major draft mining NPDES permit to EPA for review (not limited to surface mining), objections have increased, and EPA has objected to many of those permits based on the Interim Guidance.  *See* Ex. 4(FF) ¶¶ 13, 16-17, 29-31.

Although EPA has insisted that the Interim Guidance and the standards announced therein are not binding, EPA's actions reveal otherwise.  *See id.* ¶¶ 16-17, 29-31; *see also* Exs. 4(J)-4(CC), 4(EE).  EPA began using conductivity as a new measure of water quality in reviewing and objecting to West Virginia NPDES mining permits as early as October 19, 2009. *See* Ex. 4(L).  On that date, EPA submitted untimely comments[10] on a permit for a new surface mine.  Although EPA's untimely response allowed WVDEP to issue the permit under the MOA, EPA recommended that WVDEP not issue the permit without performing a reasonable potential

---

[9]      In a letter dated July 7, 2009, Ex. 4(J), EPA attempted to immediately revoke that waiver of review without providing WVDEP with the 60-day notice required under the MOA.  After WVDEP asked EPA for that notice period, EPA responded with a second letter on July 23, 2009, Ex. 4(K), "clarify[ing]" that WVDEP was entitled to 60-days' notice.  EPA and WVDEP agreed that permits that begin public notice after August 10, 2009 were subject to the waiver and would be sent to EPA for its review.  *See* Ex. 4(FF) ¶ 13.

[10]      40 C.F.R. § 123.44 and the MOA determine whether the response from EPA to a NPDES permit qualifies as a comment, an interim objection, or an objection.  After the Regional Administrator receives a draft NPDES permit, he has thirty days to make general comments on, objections to, or recommendations with respect to the draft permit.  *See* Ex. 4(GG) at 12.  If the Regional Administrator needs more time, he is required to issue a general objection to the permit, which gives EPA sixty additional days to issue a specific objection.  *Id.*; *see also* 40 C.F.R. § 123.44(b)(1)-(2).  If the Regional Administrator does not respond within thirty days of receipt of a draft permit, the permit is deemed to be complete.  *See* Ex. 4(GG) at 12.  But if EPA requests more information on a permit within thirty days of receipt, "it shall constitute an interim objection."  *Id.* at 15-16; *see also* 40 C.F.R. § 123.44(d)(2).

analysis for total dissolved solids, specific conductivity, and/or sulfates, and conduct in-stream monitoring of the same. *Id.* EPA justified that recommendation by saying that baseline water quality data included samples demonstrating levels of conductivity and sulfates "that appear consistent with levels potentially associated with biological impairment," but it did not identify those levels. *Id.*

EPA began to object to permits using the Interim Guidance almost immediately upon its issuance. On April 15, 2010, EPA issued an interim objection to a permit modification because WVDEP had not performed a reasonable potential analysis or antidegradation analysis for total dissolved solids, specific conductivity, and/or sulfates, or in-stream monitoring for those parameters. *See* Ex. 4(N). EPA stated, "[o]ur comments are consistent with Interim Final Guidance issued by EPA on April 1, 2010." *Id.*

On May 17, 2010, EPA used much stronger language in a letter issued after its general objection to twelve bond forfeiture NPDES permits for abandoned mine sites for which WVDEP is responsible. *See* Ex. 4(O). EPA required a reasonable potential analysis for those parameters. *See id.* EPA declared that "[a] growing body of evidence supports that [total dissolved solids, sulfates, and specific conductivity] associated with coal mine discharges are causing or contributing to violations of narrative water criteria." *Id.* In making that assertion, EPA cited to one of the draft studies upon which the Interim Guidance was based, stating that "[b]ased on EPA's April 1, 2010 released *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams* (Conductivity Study), EPA expects that in-stream SC greater than 500 µS/cm may indicate exceedance of water quality standards." *Id.* EPA "request[ed] that these permits not be issued until we have the opportunity to resolve our concerns." *Id.*

EPA repeatedly has issued "interim" objections to NPDES mining permits relying on the Interim Guidance, its new conductivity standard, the two draft studies that EPA relied upon in crafting the Guidance, and the Pond-Passmore conductivity study. *See, e.g.,* Ex. 4(P); Ex. 4(Q); 4(R); 4(T); 4(U); (4V); 4(W); 4(X); 4(Y); 4(Z); 4(AA); 4(BB). Even when EPA has not specifically cited to the Interim Guidance, it has used the standards announced therein as justification for its interim objections. *See, e.g.,* Ex. 4(Z); Ex. 4(AA); Ex. 4(EE). EPA has not confined its implementation of the Interim Guidance to surface mining projects, but has applied it to all types of mining permits—permit reissuances and modifications, Ex. 4(N); Ex. 4(P); Ex. 4(T); Ex. 4(X), bond reclamation sites, Ex. 4(O), preparation plants and refuse areas, Ex. 4(Q); Ex. 4(U); Ex. 4(V), and deep mines, Ex. 4(FF) ¶ 31.

WVDEP may not issue a particular NPDES mining permit if EPA has objected to it. EPA's increased objections to Section 402/NPDES permits and its binding use of the Interim Guidance based on a water quality standard that has not been properly promulgated has prevented WVDEP from administering its NPDES program, applying its own water quality standards, or following its Permitting Guidance. This violates the Clean Water Act.

## IV.    The Interim Guidance Usurps The State's Authority Under SMCRA.

With the Interim Guidance, EPA also has encroached upon the State's authority to regulate surface mining in West Virginia under SMCRA. SMCRA, 30 U.S.C. § 1201 *et seq.*, is a regulatory program that, among other things, regulates the disposal of excess spoil material resulting from surface coal mining operations. Like the Clean Water Act, SMCRA utilizes a "cooperative federalism approach" in regulating surface coal mining. *See* 30 U.S.C. §§ 1201(f), 1253. When SMCRA was enacted in 1977, five years after the Clean Water Act, Congress reinforced the Clean Water Act's "overarching policy" of granting primacy to the States, and it

did so explicitly for surface mining.  *See, e.g., id.* § 1201(f) ("[B]ecause of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States.").

WVDEP has had primacy over the State's SMCRA program since 1981.  *See* Ex. 4(FF) ¶ 5.  Accordingly, WVDEP has exclusive jurisdiction over the regulation of valley fills and the disposal of excess spoil in the State of West Virginia.  Anyone wishing to engage in surface coal mining in the state must obtain a permit from WVDEP.  *See* 30 U.S.C. § 1256(a).

In the Interim Guidance, EPA declares that it has identified what it believes to be the best management practices for the surface mining industry and rejects existing practices adopted by that industry as "unproven in their effectiveness."   Ex. 4(E) at 24.  For example, EPA purports to require permittees to sequence multiple valley fills for surface mining projects proposing more than one valley fill and to require permittees to demonstrate compliance with applicable water quality standards at each valley fill before being allowed to begin construction of the next fill. See *id.* at 24-25.  EPA's proposed best management practices, and its rejection of existing practices, have not been evaluated by the Office of Surface Mining or the State of West Virginia. EPA's attempt to regulate surface mining practices far exceeds its authority.

## V.    EPA Denied The State The Opportunity to Comment on the Interim Guidance Before Its Implementation.

Finally, in implementing the Interim Guidance as a binding rule without prior notice or an opportunity for public comment, EPA violated the APA.  The purpose of public comment under the APA is to ensure that agency regulations are tested, that parties receive fair treatment

from agencies, and that an administrative record is developed to ensure effective judicial review. *See Int'l Union v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

EPA purported to issue the Interim Guidance as a draft, non-binding document, and sought public comment beginning on April 12, 2010, *see* 75 Fed. Reg. 18500. But EPA immediately applied the Interim Guidance as a binding rule, thereby exposing the subsequent comment-gathering process as a *pro forma* exercise which is nothing but a charade. Any comments received by EPA on the Interim Guidance, including those submitted by WVDEP on December 1, 2010, *see* Ex. 4(DD), have no real meaning and did not influence EPA's immediate application of the Interim Guidance. Although EPA has assured the State and this Court that it is in the process of promulgating a final guidance document, it continues to apply the Interim Guidance as a binding rule. EPA has violated the APA by paying lip service to its requirements, while in reality avoiding its statutory obligations.

## VI.  Conclusion

Because EPA has violated the Clean Water Act, SMCRA, and the APA in issuing and applying the Interim Guidance, the Court should grant Plaintiffs' motion for partial summary judgment, restoring the State of West Virginia to its rightful place under the system of cooperative federalism governing mining regulations and the prevention of water pollution.

Respectfully submitted,


Plaintiffs RANDY C. HUFFMAN, in his
official capacity as CABINET SECRETARY OF THE
WEST VIRGINIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION, and acting on
behalf  of the STATE OF WEST VIRGINIA,

by Counsel

/s/Michael L. Murphy
Michael L. Murphy, No. 480163
Benjamin L. Bailey, *Pro Hac Vice*
Sherrie A. Armstrong, *Pro Hac Vice*
Gregory Y. Porter, No. 458603
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555


Dated:  May 23, 2011

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL MINING ASSOCIATION,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **COMMONWEALTH OF KENTUCKY and** | ) |
| **CITY OF PIKEVILLE, KENTUCKY,** | ) |
| | ) |
| **Plaintiff-Intervenors,** | ) **Nos.  10-cv-1220-RBW** |
| | ) **11-cv-0295-RBW** |
| **v.** | ) **11-cv-0446-RBW** |
| | ) **11-cv-0447-RBW** |
| **LISA JACKSON,** in her official capacity as | ) |
| **Administrator, U.S. Environmental Protection** | ) |
| **Agency,** *et al.*, | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **SIERRA CLUB,** *et al.*, | ) |
| | ) |
| **Defendant-Intervenors.** | ) |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of May, 2011, I filed the foregoing "STATE OF WEST VIRGINIA'S INDIVIDUAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT" using the Court's CM/ECF system which will cause a copy to be served upon below named counsel:

17

Cynthia J. Morris, Esquire
***USDOJ***
Environmental & Natural Resources Division
601 D Street, NW
Washington, DC 20004-2904

Kenneth C. Amaditz, Esquire
***USDOJ***
Environmental & Natural Resources Division
P.O. Box 23986
Washington, DC 20026-3986

Joseph Lovett, Esquire
Derek O. Teaney, Esquire
***Appalachian Center for the Economy & Environment***
P.O. Box 507
Lewisburg, WV 24901

Mindy G. Barfield, Esquire
Sadhna G. True, Esquire
***Dinsmore & Shohl, LLP***
250 W. Main Street, Suite 1400
Lexington, KY 40507

Emma Cheuse, Esquire
Stephen F. Roady, Esquire
Jennifer C. Chavez, Esquire
***Earthjustice***
1625 Massachusetts Avenue, NW
Suite 702
Washington, DC 20036-2234

Kristen Nathanson, Esquire
John C. Martin, Esquire
David Y. Chung, Esquire
***Crowell & Moring, LLP***
1001 Pennsylvania Avenue, NW
Suite 1100
Washington, DC 20004

Russell Davis, Esquire
***Baird & Baird, P.S.C.***
P. O. Box 351
Pikeville, KY 41502

Josh W. Nacey, Esquire
C. Michael Haines, Esquire
Mary Alma Stephens, Esquire
***KY Energy & Environment Cabinet***
Office of General Counsel
200 Fair Oaks Lane, I st Floor
Frankfort, KY 40601

F. William Hardt, Esquire
Barry D. Hunter, Esquire
Paul Sullivan, Esquire
***Frost Brown & Todd, LLC***
250 W. Main Street
2700 Lexington Financial Center
Lexington, KY 40507

/s/Michael L. Murphy
Michael L. Murphy (#480163)