Case 1:10-cv-01220-RBW   Document 64-1   Filed 05/23/11   Page 1 of 204
03/24/2009: EPA Acts to Reduce Harmful Impacts from Coal Mining
Case 2:10-cv-01189   Document 1-1   Filed 10/06/10   Page 1 of 86   Page 2 of 3

# EPA Acts to Reduce Harmful Impacts from Coal Mining

Release date: 03/24/2009

Contact Information: Enesta Jones, 202-564-4355 / 7873 / jones.enesta@epa.gov

(Washington, D.C. – March 24, 2009) The United States Environmental Protection Agency has sent two letters to the U.S. Army Corps of Engineers expressing serious concerns about the need to reduce the potential harmful impacts on water quality caused by certain types of coal mining practices, such as mountaintop mining. The letters specifically addressed two new surface coal mining operations in West Virginia and Kentucky. EPA also intends to review other requests for mining permits.

"The two letters reflect EPA's considerable concern regarding the environmental impact these projects would have on fragile habitats and streams," said Administrator Lisa P. Jackson. "I have directed the agency to review other mining permit requests. EPA will use the best science and follow the letter of the law in ensuring we are protecting our environment."

EPA's letters, sent to the Corps office in Huntington, W.Va., stated that the coal mines would likely cause water quality problems in streams below the mines, would cause significant degradation to streams buried by mining activities, and that proposed steps to offset these impacts are inadequate. EPA has recommended specific actions be taken to further avoid and reduce these harmful impacts and to improve mitigation.

The letters were sent to the Corps by EPA senior officials in the agency's Atlanta and Philadelphia offices. Permit applications for such projects are required by the Clean Water Act.

EPA also requested the opportunity to meet with the Corps and the mining companies seeking the new permits to discuss alternatives that would better protect streams, wetlands and rivers.

The Corps is responsible for issuing Clean Water Act permits for proposed surface coal mining operations that impact streams, wetlands, and other waters. EPA is required by the act to review proposed permits and provides comments to the Corps where necessary to ensure that proposed permits fully protect water quality.

Because of active litigation in the 4th Circuit challenging the issuance of Corps permits for coal mining, the Corps has been issuing far fewer permits in West Virginia since the litigation began in 2007. As a result, there is a significant backlog of permits under review by the Corps. EPA expects to be actively involved in the review of these permits following issuance of the 4th Circuit decision last month.

EPA is coordinating its action with the White House Council on Environmental Quality and with other agencies including the Corps.

More information on wetlands and the letters: http://www.epa.gov/owow/wetlands/

Search This Collection | Search All Collections

# Recent additions



  

MEMORANDUM OF UNDERSTANDING AMONG THE
U.S. DEPARTMENT OF THE ARMY,
U.S. DEPARTMENT OF THE INTERIOR,
AND U.S. ENVIRONMENTAL PROTECTION AGENCY

IMPLEMENTING THE INTERAGENCY ACTION PLAN ON APPALACHIAN
SURFACE COAL MINING[1]

JUNE 11, 2009

PREAMBLE

The mountains of Appalachia possess unique biological diversity, forests, and freshwater streams that historically have sustained rich and vibrant American communities. These mountains also contain some of the nation's richest deposits of coal, which have been mined by generations of Americans to provide heat and electricity to millions in the U.S. and around the world. After generations of mining, however, the region's most readily available coal resources have diminished, and the remaining coal seams are less accessible to non-surface mining methods.

In response, a surface mining technique commonly referred to as "mountaintop mining"[2] has become increasingly prevalent in the Appalachian region. Although its scale and efficiency has enabled the mining of once-inaccessible coal seams, this mining practice often stresses the natural environment and impacts the health and welfare of surrounding human communities. Streams once used for swimming, fishing, and drinking water have been adversely impacted, and groundwater resources used for drinking water have been contaminated. Some forest lands that sustain water quality and habitat and contribute to the Appalachian way of life have been fragmented or lost. These negative impacts are likely to further increase as mines transition to less accessible coal resources within already affected watersheds and communities.

With this Memorandum of Understanding (MOU), the Department of the Interior (DOI), U.S. Environmental Protection Agency (EPA), and the U.S. Army Corps of Engineers (Corps)

---

[1] For purposes of this MOU, "Appalachian surface coal mining" refers to mining techniques requiring permits under both the Surface Mining Control and Reclamation Act (SMCRA) and Section 404 of the Clean Water Act (CWA), in the states of Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

[2] The term "mountaintop mining" may also be referred to as "mountaintop removal" or "valley fill mining."

EXHIBIT

4 B

tabbies®

are announcing this Interagency Action Plan (IAP) designed to significantly reduce the harmful environmental consequences of Appalachian surface coal mining operations, while ensuring that future mining remains consistent with federal law. This IAP includes a set of short-term actions to be implemented in 2009 to existing policy and guidance, and a longer term process for gathering public input, assessing the effectiveness of current policy, and developing regulatory actions.

The Federal government has made a commitment to move America toward a 21st-century clean energy economy based on the recognition that a sustainable economy and environment must work hand in hand. Federal Agencies will work in coordination with appropriate regional, state, and local entities to help diversify and strengthen the Appalachian regional economy and promote the health and welfare of Appalachian communities. This interagency effort will have a special focus on stimulating clean enterprise and green jobs development, encouraging better coordination among existing federal efforts, and supporting innovative new ideas and initiatives.

## Interagency Action Plan

I.    COORDINATION ON REGULATORY PROGRAMS

This MOU formalizes the agencies' IAP for coordinating the regulation of Appalachian surface coal mining. The elements of the plan are:

- A series of interim actions under existing authorities to minimize the adverse environmental consequences of Appalachian surface coal mining;
- A commitment by the agencies to investigate and, if appropriate, undertake longer term regulatory actions related to Appalachian surface coal mining;
- Coordinated environmental reviews of pending permit applications under the Clean Water Act (CWA) and Surface Mining Control and Reclamation Act (SMCRA); and
- A commitment to engage in robust public participation, through public comment mechanisms and Appalachian public outreach events, helping to inform Federal, State, and local decisions.

In addition to the steps taken above, the Federal government will help diversify and strengthen the Appalachian regional economy. This effort will include the agencies to this MOU, and other Federal agencies, as appropriate, and will work to focus clean energy investments and create green jobs in Appalachia.

Coordination of interagency policy discussions and assessment of policy effectiveness will be achieved in consultation with the Council on Environmental Quality.

II.    SHORT-TERM ACTIONS TO MINIMIZE ENVIRONMENTAL HARM

The signatory agencies will take the following short-term actions under existing laws, regulations, and other authorities to reduce the harmful environmental consequences of Appalachian surface coal mining.

Before the end of 2009, the Corps and EPA will take the following steps:
- Within 30 days of the date of this MOU, the Corps will issue a public notice pursuant to 33 C.F.R. § 330.5 proposing to modify Nationwide Permit (NWP) 21 to preclude its use to authorize the discharge of fill material into streams for surface coal mining activities in the Appalachian region, and will seek public comment on the proposed action.
- EPA and the Corps, in coordination with DOI's Fish and Wildlife Service (FWS), will jointly develop guidance to strengthen the environmental review of proposed surface coal mining projects in Appalachia under the CWA Section 404(b)(1) Guidelines.
- Recognizing that the regulation of surface coal mining extends beyond CWA Section 404, EPA will improve and strengthen oversight and review of water pollution permits for discharges from valley fills under CWA Section 402, and of state water quality certifications under CWA Section 401, by taking appropriate steps to assist the States to strengthen state regulation, enforcement, and permitting of surface mining operations under these programs.
- The Corps and EPA, in coordination with FWS and consistent with the agencies' regulations governing compensatory mitigation, will jointly issue guidance clarifying how impacts to streams should be evaluated and how to evaluate proposed mitigation projects to improve the ecological performance of such mitigation implemented to compensate for losses of waters of the United States authorized by Section 404 permits.
- EPA, in coordination with the Corps, will clarify the applicability of the CWA waste treatment exemption for treatment facilities constructed in waters of the United States in order to minimize the temporary impacts of mining operations on streams.

Before the end of 2009, DOI will take the following steps:
- If the 2008 Stream Buffer Zone Rule is vacated by the U.S. District Court for the District of Columbia in Coal River Mountain Watch et al v. Kempthorne, 1:08-cv-02212-HHK C, as requested by the Secretary of the Interior on April 27, 2009, the Office of Surface Mining Reclamation and Enforcement (OSM) will issue guidance clarifying the application of the 1983 stream buffer zone provisions to further reduce adverse stream impacts.
- OSM will reevaluate and determine how it will more effectively conduct oversight of State permitting, State enforcement, and regulatory activities under SMCRA.
- OSM will remove impediments to its ability to require correction of permit defects in SMCRA primacy states.

III.   DEVELOPMENT OF LONGER TERM REGULATORY ACTIONS TO BETTER
       MANAGE APPALACHIAN SURFACE COAL MINING

   A. OBJECTIVES

       The signatory agencies will review their existing regulatory authorities and
       procedures to determine whether regulatory modifications should be proposed to
       better protect the environment and public health from the impacts of Appalachian
       surface coal mining. At a minimum, the agencies will consider:

       • Revisions to key provisions of current SMCRA regulations, including the
         Stream Buffer Zone Rule and Approximate Original Contour (AOC)
         requirements;
       • Eliminating use of Nationwide Permit 21 in connection with surface coal
         mining in the Appalachian region when the Nationwide Permit Program is
         reauthorized in 2012; and
       • Revisions to how surface coal mining activities are evaluated, authorized, and
         regulated under the CWA.

   B. PROCESS

       The signatory agencies will create an interagency working group to coordinate the
       development of short-term actions, longer term regulatory actions, and coordination
       procedures for Appalachian surface coal mining. The group will ensure robust public
       involvement in the development of any proposed actions or regulatory reforms.

       For any proposed regulatory revision or other action under this MOU that is a major
       federal action significantly affecting the quality of the human environment (and is an
       action subject to NEPA), an Environmental Impact Statement (EIS) will be prepared
       to inform the decision-making process. At an early stage in the interagency
       coordination process, the working group will determine whether coordinating these
       NEPA processes programmatically would more effectively guide regulatory
       development and decision-making. The interagency group will coordinate with CEQ
       regarding the implementation of the National Environmental Policy Act (NEPA) in
       the development of regulatory reforms.

IV.    INTERIM INTERAGENCY COORDINATION PROCEDURES

   A. Clean Water Act

       EPA and the Corps will begin immediately to implement enhanced coordination
       procedures applicable to the Clean Water Act review of Section 404 permit
       applications for Appalachian surface coal mining activities that have been submitted
       prior to execution of this MOU. The goal of these procedures is to ensure more
       timely, consistent, transparent, and environmentally effective review of permit
       applications under existing law and regulations. The agencies are issuing these

4

enhanced joint procedures concurrently with this MOU. Also concurrently, EPA is clarifying the factual considerations it is using to evaluate pending CWA permit applications under the 404(b)(1) Guidelines.

Pending Clean Water Act Section 404 permit applications for Appalachian surface coal mining activities will continue to be evaluated by the Corps and EPA on a case-by-case basis. The agencies will focus their reviews of Appalachian surface coal mining permit applications based on likely environmental impacts with the goal of avoiding, minimizing, and mitigating such impacts to the extent practicable under the CWA Section 404(b)(1) Guidelines and consistent with NEPA. This approach will enable the continued permitting of environmentally responsible projects.

B.   Surface Mining Control and Reclamation Act

During 2009, OSM will issue guidance concerning appropriate application of the Stream Buffer Zone rule and other related rules and will ensure that states are implementing their counterpart provisions and SMCRA regulatory programs consistent with the guidance.

V.   PUBLIC INVOLVEMENT

This IAP will be accompanied by robust public comment on its short- and longer term actions. The agencies will hold public meetings in Appalachia during 2009 to gather on-the-ground input and encourage ongoing local engagement in the environmental assessment and decision-making process. Additional public participation will occur as agency actions move forward.

VI.   GENERAL

A. The policy and procedures contained within this MOU are intended solely as guidance and do not create any rights, substantive or procedural, enforceable by any party. This MOU does not constitute final agency action on any issue, and any actions contemplated by this MOU will be carried out in an appropriate administrative process by the action agency in accordance with all applicable laws and regulations.

B. This document does not, and is not intended to, impose any legally binding requirements on Federal agencies, States, or the regulated public, and does not restrict the authority of the employees of the signatory agencies to exercise their discretion in each case to make regulatory decisions based on their judgment about the specific facts and application of relevant statutes and regulations.

C. Nothing in this MOU is intended to diminish, modify, or otherwise affect statutory or regulatory authorities of any of the signatory agencies. All formal guidance interpreting this

5

MOU and background materials upon which this MOU is based will be issued jointly by the appropriate agencies.

D. Nothing in this MOU will be construed as indicating a financial commitment by DOI, the Corps, EPA, or any cooperating State agency for the expenditure of funds except as authorized in specific appropriations.

E. This MOU will take effect on the date shown above and will continue in effect until permanent procedures are established, or unless earlier modified or revoked by agreement of all signatory agencies. Modifications to this MOU may be made by mutual agreement of all the signatory agencies. Modifications to the MOU must be made in writing.

Signed,

Lisa P. Jackson
Administrator
U.S. Environmental Protection Agency

Ken Salazar
Secretary
U.S. Department of the Interior

Terrence "Rock" Salt
Acting Assistant Secretary
  of the Army (Civil Works)
U.S. Department of the Army

6




**To:**   William C. Early, Acting Regional Administrator, EPA Region III
A. Stanley Meiburg, Acting Regional Administrator, EPA Region IV
Bharat Mathur, Acting Regional Administrator, EPA Region V
COL Dionysios Anninos, District Commander, USACE Norfolk District
COL Dana R. Hurst, District Commander, USACE Huntington District
COL Michael P. Crall, District Commander, USACE Pittsburg District
COL Keith A. Landry, District Commander, USACE Louisville District
LTC Bernard R. Lindstrom, District Commander, USACE Nashville District

**From:** Lisa P. Jackson
Administrator
U.S. Environmental Protection Agency

Terrence "Rock" Salt,
Acting Assistant Secretary (Civil Works)
Department of the Army

JUN 11 2009

**Re:**   Enhanced Surface Coal Mining Pending Permit Coordination Procedures

The Environmental Protection Agency (EPA) and the Department of the Army
have developed enhanced coordination procedures to respond to the unique challenge
before us in reviewing pending surface coal mine permit applications in Appalachia. The
purpose of this enhanced coordination process is to provide for timely resolution of issues
for those permits about which the agencies have substantial environmental concerns,
ensure effective coordination among the agencies and consistent compliance with the
requirements of the Clean Water Act (CWA), its regulations and relevant policy, and to
expedite review and final decisions regarding pending permits for surface coal mining
operations in Appalachian states (OH, PA, WV, VA, TN, and KY). It is also important
that we provide additional transparency to the public during the enhanced coordination
process. The attached Enhanced Coordination Procedures should be implemented
immediately.

In accordance with the attached procedures, this process will apply to those
permits for which the Corps of Engineers (Corps) has issued a public notice or
coordinated with EPA through the Nationwide Permit coordination process by March 31,
2009. 108 CWA section 404 permit applications for surface coal mining activities in
Appalachia will be subject to review in accordance with these procedures. (List attached)
The timeframes established in the procedures will ensure timely coordination among the
agencies and applicants as we make decisions under the CWA and our regulations.

We understand and appreciate the significant work already undertaken by you and your staff to coordinate in the review of pending CWA permits in Appalachia. We look forward to supporting your efforts as the Enhanced Coordination Procedures are implemented. Your staff should contact Mr. Brian Frazer, EPA Regulatory Branch Chief, or Meg Smith, Corps Regulatory Community of Practice, Chief, with any questions about these procedures.

Attachments

EPA/Corps of Engineers

Enhanced Coordination Process

for

Pending Clean Water Act Permits Involving Appalachian Surface Coal Mining[1]

Issue:

The Corps of Engineers (Corps) has determined there are 108 CWA section 404 permit applications under review for surface coal mining activities proposing to discharge fill material into the waters of the U.S. These applications are being reviewed in 5 Corps Districts covering 6 states (OH, PA, WV, VA, TN, and KY) in Appalachia where the mining is proposed. Many of these permits have been pending for over a year as a result of ongoing litigation and other issues. The review and evaluation of these pending permits poses a unique challenge for EPA and the Corps requiring an enhanced coordination process.

To deal with this unique challenge, EPA and the Corps hereby establish a process for enhanced coordination that:

1. expedites review and final decisions regarding all pending permits,

2. provides for timely resolution of issues for those permits about which EPA has raised substantial environmental concerns,

3. ensures effective coordination among the agencies and consistent compliance with applicable provisions of the Clean Water Act, its regulations and relevant policy, and

4. provides additional transparency to the public during the enhanced coordination period.

The procedures below will apply to applications for individual and Nationwide general permits for which the Corps has issued a public notice or coordinated with EPA through the NWP coordination process by March 31, 2009. These procedures will apply to EPA Regions 3 (Philadelphia), 4 (Atlanta), and 5 (Chicago), and Corps Districts Pittsburgh, Huntington, Louisville, Nashville, and Norfolk. The agencies will continue to rely on existing coordination and review procedures for permit applications public noticed or coordinated after March 31, 2009.

General Review and Coordination Procedures:

- In early March 2009, the Corps districts noted above prepared a list of pending permit applications where the districts anticipated reaching a final permit decision within 60 days. Of this list of 48 permit applications, EPA identified 6 permit applications for which they had substantial environmental concerns. Additional review and coordination was undertaken for these 6 permits. EPA notified the Corps that it did not have concerns about the remaining 42 permit applications. Normal processing of these applications is continuing and permits for several of these 42 have been issued.

- There are 108 permits (List Attached) for which public notices or pre-construction notifications were issued prior to March 31, 2009 that are being reviewed by EPA Regions 3, 4, and 5 in coordination with EPA HQ. Corps Districts will provide EPA Regions with additional available information, including additional information requested from permit applicants, as necessary, regarding these

---

[1] "Appalachian surface coal mining" refers to mining techniques requiring permits under both the Surface Mining Control and Reclamation Act (SMCRA) and Section 404 of the Clean Water Act (CWA), in the states of Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

applications in response to EPA's written request. Within 45 days[2] of receipt of the additional data requested by EPA for these of permit applications, EPA Regions 3, 4, and 5, after review by EPA headquarters, will propose an initial list of permit applications about which the Regions have concerns and permit applications with which the Corps may proceed without further action by EPA. This initial list will identify the nature of environmental concerns EPA has identified, any steps recommended to be consistent with the Section 404(b)(1) guidelines, and actions EPA is recommending to respond to its concerns. EPA's evaluation of these permit applications will be based on the factual considerations shared previously with the Corps and EPA's views concerning compliance with existing statutory, regulatory, and policy provisions.

- The initial list developed by EPA will be transmitted to the Corps and made available to the public on the Websites of the EPA Region involved. Within 14 days after the proposed list is posted on the EPA Website, each EPA Region will identify to EPA headquarters those permit applications raising concern and applications that may proceed without further action by EPA. EPA HQ will then promptly submit to Corps HQ a consolidated EPA list of these permit applications. Permit applications raising concern will be subject to additional coordination and review following the procedures and timeframes identified below. Permit applications not subject to additional review and coordination may be acted on by the Corps without further coordination with EPA.

## Enhanced EPA/Corps Coordination Procedures for Permit Applications of Substantial Concern:

- In order to facilitate timely resolution, each Corps District and EPA Region is encouraged to begin discussions immediately (i.e., before the 60 day clock is triggered below) on those permit applications requiring additional review and coordination. This coordination may include phone conversations, field visits, exchange of new information, and other steps that help to reduce the total time necessary to reach agreement on each permit.

- When a permit application is ready for enhanced coordination consistent with the procedures below, each Corps District will provide written notice to the EPA Region. This Corps determination will be based on workload considerations, completeness of information available on each application, and other factors to ensure that the following 60 day coordination process will be as effective as possible. Corps' determinations that particular permits are ready for coordination will be promptly posted on the relevant EPA Regional website.

- Upon receipt of notification from the Corps, each District and Region will begin immediately to coordinate to discuss permit applications EPA has identified as having remaining concerns in an effort to reach timely resolution. Other relevant parties including state agencies, permit applicants, and involved consultants shall be encouraged to participate to facilitate resolution. Each Corps District and EPA Region will have 60 days to coordinate and resolve each permit application of concern. The 60 days begins on the date EPA receives the Corps' written notice described above. Meetings may include face to face discussions or teleconferences. The agencies will coordinate to ensure that a sufficient number of meetings are held to provide an effective opportunity for resolution. Meetings should include all relevant parties including mining companies and their consultants, other state or federal agencies, and agency HQs. EPA and the Corps will strive to adhere to the 60 day timeframe for interagency coordination; however, when workload dictates or issue resolution warrants, EPA or the Corps may seek a 15 day time extension.

- Should the Corps choose to issue a permit after the conclusion of the coordination period and where there are unresolved issues, the Corps will provide, within 10 days after the close of the 60 day period,

---

[2] If any timeframes in this memo fall on a weekend or Federal holiday, that timeframe is automatically extended to the next business day.

their Regional counterpart a written notice of decision to issue a permit which details how the District is responding to concerns raised by EPA. Such responses may include, for example, revisions to approved discharges, special conditions, or mitigation requirements. The Corps is encouraged to provide EPA with a draft of the permit and decision documents during this period.

- Within 10 days after receipt of the written notice of decision, the EPA Region will either (1) advise the Corps District that it does not intend to pursue further action and the Corps, therefore, is free to make a permit decision or (2) initiate action under CWA Section 404(c)

## Considerations:

- These procedures and timeframes are intended to facilitate effective and timely coordination and the agencies will work to adhere to them to the maximum practical extent, recognizing that flexibility may be needed under particular circumstances. The timeframes may be shortened or extended by mutual agreement among the agencies.

- Full and open sharing of information among the agencies is necessary for efficient review of proposed projects.

- This document does not, and is not intended to, impose any legally binding requirements on Federal agencies, States, or the regulated public, and does not restrict the authority of the employees of the signatory agencies to exercise their discretion in each case to make regulatory decisions based on their judgment about the specific facts and application of relevant statutes and regulations.

- The policy and procedures contained within this document are intended solely as guidance and do not create any rights, substantive or procedural, enforceable by any party. This document does not constitute final agency action on any issue, and any actions contemplated by this document will be carried out in an appropriate administrative process by the agencies in accordance with all applicable laws and regulations.

**Effective Date:** June 11, 2009

**Attachment:** List of 108 Permits

## LIST OF 108 PENDING 404 PERMIT APPLICATIONS

| District | Corps Number | SMCRA Number | Applicant name | Project Name |
|----------|-------------|--------------|----------------|--------------|
| Huntington | 200300065 | S-5027-99 | Hobet Mining | Hewett |
| Huntington | 200400336 | 898-0715 | Bear Fork | Bear Fork |
| Huntington | 200400624 | S-5025-97 | Independence Coal Company | Constitution Surface Mine |
| Huntington | 200400867 | S-45014-04 | Central Appal Mining | Remining No. 3 |
| Huntington | 200401152 | 10296 | Buckingham Coal | Buckingham Wash Plant |
| Huntington | 200401155 | S-2001-05 | Brooks Run Mining | Brandy St & Cove Mtn |
| Huntington | 200401451 | S-5001-02 | Independence Coal Company | Glory Surface Mine |
| Huntington | 200500167 | U-3004-06 | Catenary Coal Co. | Tenmile Fork Deep Mine |
| Huntington | 200500217 | S-4014-01 | Bluestone | Contour Auger 1 |
| Huntington | 200500421 | D-2295 | Oxford | Peabody 3 |
| Huntington | 200500753 | D-2290-1 | Oxford Mining | Long Sears Adjacent |
| Huntington | 200500934 | 898-5694 Am5 | Premier Elkhorn | U/T Old Beefhide |
| Huntington | 200501115 | O-10-83IBR9 | Green Valley Coal Company | Blue Branch Refuse |
| Huntington | 200501198 | S-5008-02 S-5021-01 | Marrowbone Development | Taywood W & Marrowbone |
| Huntington | 200501211 | S-5020-99 AM3 | Premium Energy, Inc. | Premium Mills Surface Mine |
| Huntington | 200501275 | 10397 | Oxford | Mizer |
| Huntington | 200501385 | 10400 | Oxford | Halls Knob |

## LIST OF 108 PENDING 404 PERMIT APPLICATIONS

| District | Corps Number | SMCRA Number | Applicant name | Project Name |
|---|---|---|---|---|
| Huntington | 200600100 | S-5009-00 | ICG Eastern, LLC | Jenny Creek Surface Mine |
| Huntington | 200600126 | 860-0390 Am4 | Consol of KY | Area 80 |
| Huntington | 200600127 | 860-5260 Am1 | Consol of KY | Stone Br Mine |
| Huntington | 200600821 | U-3001-98 !BR5 | Catenary Coal Co. | Laurel Fork |
| Huntington | 200602033 | S-3016-06 | Wildcat | No. 2 Surface |
| Huntington | 200602256 | 10379 | Oxford Mining | Horn |
| Huntington | 200602290 | S-7-81 | Colony Bay Coal Co. | Colony Bay Surface Mine |
| Huntington | 200700182 | S-3011-07 | Alex Energy, Inc. | Federal Surface Mine |
| Huntington | 200700282 | U-4012-06 | Pioneer Fuel | Little Eagle |
| Huntington | 200700285 | S-3009-07 | Alex Energy, Inc. | Lonestar Surface Mine |
| Huntington | 200700286 | S-3010-06 | Pioneer Fuel | MT5B |
| Huntington | 200700499 | 10372 | Oxford Mining | Page |
| Huntington | 200700708 | 10391 | Surface Mining Inc | Young Property |
| Huntington | 200701021 | 10405 | Oxford Mining | Kaiser Mathias |
| Huntington | 200800114 | U-3016-95 | Performance Coal Company | Upper Big Branch Deep Mine |
| Huntington | 200800491 | S-5002-07 | CONSOL of Energy | Buffalo Mt. Surface Mine |
| Huntington | 200800562 | S-4004-07 | Eastern Associated Coals | Huff Creek Surface Mine |

## LIST OF 108 PENDING 404 PERMIT APPLICATIONS

| District | Corps Number | SMCRA Number | Applicant name | Project Name |
|---|---|---|---|---|
| Huntington | 200800791 | S-5002-07 | Hobet Mining | Surface Mine No. 45 |
| Huntington | 200800805 | S-3001-08 | Coyote Coal Company | Joes Creek Surface Mine |
| Huntington | 200800830 | S-5006-07 | CoalMac, Inc. | Pine Creek Surface Mine |
| Huntington | 200800935 | U-5010-08 | Hampden Coal | Harrys Br |
| Huntington | 200801098 | S-5018-08 | Frasure Creek Mining | Spring Fork Surface Mine No. 2 |
| Huntington | 200802160 | 10403 | B&N Coal | Whigville III |
| Huntington | 200900427 | U-5023-92 | Argus Energy WV, LLC | Devils Trace No. 2 Punchout |
| Huntington | 200900428 | U-5031-08 | Consol of Kentucky | Spring Branch No. 3 Deep Mine |
| Louisville | 200301276 | 897-0430 A1 | Candle Ridge Mining | Candle Ridge Mining |
| Louisville | 200500851 | 867-0440 | Cheyenne Resources | Cheyenne Resources |
| Louisville | 200501893 | 895-0171 | Sturgeon Mining | Sturgeon Mining |
| Louisville | 200600756 | 897-0457 A2 | ICG Hazard | ICG Hazard |
| Louisville | 200601124 | 836-5488, 836-0317 | Matt/Co | Matt/Co |
| Louisville | 200601290 | 877-0167, 877-0168 | Licking River Resources | Licking River Resources |
| Louisville | 200601296 | 898-4150 A1 | Clintwood Elkhorn | Clintwood Elkhorn |
| Louisville | 200700069 | 898-0803 | CAM Mining | Cane Branch |
| Louisville | 200700193 | 898-0400 | Premier Elkhorn Coal | Premier Elkhorn Coal |

## LIST OF 108 PENDING 404 PERMIT APPLICATIONS

| District | Corps Number | SMCRA Number | Applicant name | Project Name |
|---|---|---|---|---|
| Louisville | 200700217 | 897-0480 | Leeco, Inc. | Stacy Branch Surface Mine |
| Louisville | 200700335 | 898-0607 | Apex Energy | Apex Energy |
| Louisville | 200700393 | 867-0456 | Consol of KY | Razorblade Surface Mine |
| Louisville | 200700400 | 895-0177 | Candle Ridge Mining | Candle Ridge Mining |
| Louisville | 200700400 | 864-0195 | Argus Energy | Argus Engergy |
| Louisville | 200700594 | 898-0800 | Premier Elkhorn Coal | Premier Elkhorn Coal |
| Louisville | 200700595 | 860-0455 | Leeco, Inc. | Elk Lick |
| Louisville | 200700669 | 836-0338 | Miller Bros. Coal | Miller Bros. Coal |
| Louisville | 200700706 | 858-0206 | Johnson Floyd Coal | Johnson Floyd Coal |
| Louisville | 200700733 | 880-5071 | Martin County Coal | Martin County Coal |
| Louisville | 200700815 | 877-0176 | Licking River Resources | Licking River Resources |
| Louisville | 200700867 | 898-0779 | CAM Mining | CAM Mining |
| Louisville | 200701026 | 836-0341 A1 | Frasure Creek Mining | Frasure Creek Mining |
| Louisville | 200701044 | 898-0712 | Apex Energy | Apex Energy |
| Louisville | 200701104 | 836-0292 A1 | The Raven Co. | The Raven Co. |
| Louisville | 200701131 | 836-0335 A2 | Miller Bros. Coal | Miller Bros. Coal |
| Louisville | 200701132 | 836-0349 | Miller Bros. Coal | Frasure Branch Mine |

## LIST OF 108 PENDING 404 PERMIT APPLICATIONS

| District | Corps Number | SMCRA Number | Applicant name | Project Name |
|---|---|---|---|---|
| Louisville | 200701190 | 897-0355 A3 | Pine Branch Coal | Pine Branch Coal |
| Louisville | 200701205 | 836-0307 | Matt/Co | Matt/Co |
| Louisville | 200701206 | 877-0782 | Frasure Creek Mining | Frasure Creek Mining |
| Louisville | 200701224 | 860-5304 | Miller Bros. Coal | Miller Bros Coal |
| Louisville | 200701230 | 860-8012 | ICG Knott Co. | ICG Knott Co. |
| Louisville | 200701301 | 836-0335 | CAM Mining | Tom's Branch Surface Mine |
| Louisville | 200701397 | 836-0350 | FCDC | FCDC |
| Louisville | 200701406 | 860-0462 | ICG Hazard | Bearville North |
| Louisville | 200701445 | 836-0339 | FCDC | FCDC |
| Louisville | 200701504 | 898-0783 A3 | CAM Mining | CAM Mining |
| Louisville | 200701515 | 897-0456 A10 | ICG Hazard | ICG Hazard |
| Louisville | 200701518 | 898-0799 | Clintwood Elkhorn | Clintwood Elkhorn |
| Louisville | 200701582 | 813-0319 | Miller Bros. Coal | Miller Bros. Coal |
| Louisville | 200701644 | 877-0166 | Consol of KY | Consol of KY |
| Louisville | 200701660 | 880-0066 | Martin County Coal | Findlay Branch Mine |
| Louisville | 200800095 | 898-0817 | Premier Elkhorn Coal | Premier Elkhorn Coal |
| Louisville | 200800114 | 897-0445 A1 | BDCC Holdings | Cherries Branch |

## LIST OF 108 PENDING 404 PERMIT APPLICATIONS

| District | Corps Number | SMCRA Number | Applicant name | Project Name |
|---|---|---|---|---|
| Louisville | 200800115 | 836-0356 | Wolverine Resources | Jake Fork and Stoney Branch Surface Mine |
| Louisville | 200800138 | 807-0352 | Chas Coal | Chas Coal |
| Louisville | 200800139 | 898-0646 A1 | Apex Energy | Apex Energy |
| Louisville | 200800226 | 880-8002 A4 | Czar Coal | Czar Coal |
| Louisville | 200800239 | 813-0328 | Frasure Creek Mining | Frasure Creek Mining |
| Louisville | 200800408 | 880-0156 | Czar Coal | Czar Coal |
| Louisville | 200800525 | 877-0191 | Middle Fork | Middle Fork |
| Louisville | 200800654 | 860-0464 | Enterprise Mining | Enterprise Mining |
| Louisville | 200800727 | 813-0310 A1 | Miller Bros. Coal | Miller Bros. Coal |
| Louisville | 200800777 | 897-0455 A3 | ICG Hazard | ICG Hazard |
| Louisville | 200800781 | 836-0348 | Wolverine Resources | Wolverine Resources |
| Louisville | 200801368 | 919-0067 | North Fork Collieries | Gilmore Surface Mine |
| Nashville | 200201435 | 3064 | Premium Coal | Refuse Area No.3 |
| Nashville | 200400062 | 3143 | Premium Coal | Area 19 |
| Nashville | 200400609 | 3112 | Appolo Fuels | Jellico Strip |
| Nashville | 200401108 | 918-0392 | Ikerd Coal | Ikerd Coal |
| Nashville | 200401391 | 861-0467 | CH Development | CH Development |

## LIST OF 108 PENDING 404 PERMIT APPLICATIONS

| District | Corps Number | SMCRA Number | Applicant name | Project Name |
|----------|--------------|--------------|----------------|--------------|
| Nashville | 200501691 | 3191 | Appolo Fuels | Buckeye Springs Mine No. 2 |
| Nashville | 200601647 | 807-0342 | Nally & Hamilton | Nally & Hamilton |
| Nashville | 200700820 | 807-0355 | Nally & Hamilton | Nally & Hamilton |
| Nashville | 200900382 | 8502 | Tennessee Land Reclamation | Cherry Branch Reclamation Project |
| Pittsburgh | 200600660 | 10395 | Ohio American Energy | Red Bird South |
| Pittsburgh | 200701180 | 10399 | Oxford Mining Company LLC | Ellis Area |



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JUN 1 1 2009

THE ADMINISTRATOR

Mr. Terrence Salt
Acting Assistant Secretary (Civil Works)
Department of the Army
108 Army Pentagon
Room 3E446
Washington, D.C. 20310-0108

Dear Acting Assistant Secretary Salt:

As you know, the U.S. Environmental Protection Agency, the U.S. Department of the Interior, and the U.S. Army Corps of Engineers, in coordination with the Council on Environmental Quality, have developed a new Memorandum of Understanding and "Interagency Action Plan" designed to significantly reduce the harmful environmental consequences of Appalachian surface coal mining operations, while ensuring that future mining is consistent with federal law. One component of the IAP is the establishment by EPA and the Corps of enhanced coordination procedures to improve the joint review of pending Clean Water Act permit applications. EPA has given thought to how we intend to conduct the review of the approximately 110 pending permit applications subject to these enhanced procedures, and I am writing to provide you with a summary of the regulations and key factual considerations that will form the basis for our identification of pending permit applications that will require further coordination between EPA and the Corps.

The Section 404(b)(1) Guidelines promulgated by EPA in conjunction with the Secretary of the Army establish the substantive environmental standards applied in the review of projects proposing to discharge dredged or fill material in waters of the United States. The Guidelines establish a "sequence" of review requiring: (1) an evaluation of all practicable alternatives that meet the project's basic purpose to ensure that only the least environmentally damaging alternative is permitted; (2) taking all appropriate and practicable steps to minimize potential adverse impacts; and (3) compensation for all remaining unavoidable impacts to aquatic resources. In addition, the Guidelines require that no discharge may be permitted that would cause or contribute to "significant degradation" of the waters of the United States. The Guidelines, therefore, will guide our review of the pending permit applications, and we have highlighted particularly relevant provisions below:

   o   Guidelines Section 230.10(a) provides that no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge that would have


PLAINTIFF'S EXHIBIT
tabbies

less adverse impact on the aquatic ecosystem. The Guidelines require consideration of project alternatives to eliminate and/or reduce the number of discharges of dredged or fill material occurring in the waters of the United States. When evaluating permit applications in light of this provision, key factual considerations include: the adequacy of the alternatives analysis submitted; the number of valley fills; the number of streams to be impacted; and the number and location of sediment ponds.

- Guidelines Section 230.10(b) provides that no discharge may be permitted that would cause or contribute to an exceedance of an applicable water quality standard, violate any applicable toxic effluent standard, or jeopardize the existence of threatened or endangered species. When evaluating permit applications in light of this provision, key factual considerations include: the pre-mining water quality and potential for water quality impacts downstream of proposed sediment ponds, including impacts from selenium, conductivity, pH, turbidity, dissolved solids, and manganese; and potential impacts to biotic integrity and to threatened and endangered aquatic species.

- Guidelines Section 230.10(c) provides that no discharge shall be permitted that will cause or contribute to significant degradation of the waters of the United States. When evaluating permit applications in light of this provision, key factual considerations include: the cumulative effects of the proposed mine in consideration of previous and reasonably foreseeable future impacts; a watershed assessment of total length of streams to be impacted and/or total area of valley fills in waters of the United States; the extent of high-value streams to be impacted, including extent of impacts to critical headwater streams and/or perennial reaches; the geographic location of the proposed mine; and an assessment of impacts based on a watershed-scale evaluation of stream quality, water temperature, stream diversity, etc.

- Guidelines Section 230.10(d) provides that no discharge shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse environmental impacts of the discharge on the aquatic ecosystem. When evaluating permit applications in light of this provision, key factual considerations include: the total length of streams to be impacted by the proposal; the total length of instream mining-related discharges; the total length of waters affected between the toe of valley fill and sediment ponds; and the adequacy of proposed mitigation to fully compensate for impacts consistent with the requirements of the recently revised mitigation regulations.

These are factors EPA intends to use to screen and evaluate the pending permit applications to determine which permit applications require further coordination between EPA and the Corps. To expedite this process and assist in making EPA's decisions efficient, consistent, and transparent, we intend to utilize a database containing information on each of the pending permit applications. We will review the database's parameters and data requirements with your staff in the near future.

I hope that our agencies will be able to reach agreement on the pending permit applications. While this letter lays out factual considerations EPA expects to review when evaluating the pending permit applications, any action EPA takes, including, if appropriate, any

exercise of EPA's authority under Section 404(c) of the CWA to restrict or prohibit the use of a site for disposal of dredged or fill material, will be based on the statute and regulations.

I look forward to this enhanced cooperation and coordination between our two agencies.

Sincerely,

Lisa P. Jackson

Q:   **How many permit applications did EPA put on its final list as requiring further coordination?**

EPA identified the need for further review of all 79 applications identified in EPA's initial Enhanced Coordination Procedure (ECP) list published September 11, 2009. EPA determined that there are remaining water quality and/or regulatory compliance issues with all of the applications. However, EPA further concluded that some applications are clearly not ready for processing, and that others are likely to be readily resolved upon further discussion with the Corps.

Q:   **What is the ECP?**

The Enhanced Coordination Procedure (ECP) is a coordination process that establishes procedures by which the Corps and EPA will evaluate pending surface coal mine projects that were initially coordinated prior to March 31, 2009. The goal of these procedures, jointly developed by EPA and the U.S. Army Corps of Engineers (Corps), is to strengthen the environmental review and ensure timely, consistent, transparent, and environmentally effective review of permit applications under existing law and regulations.

Q:   **Why has the Corps' list changed since June 11?**

An initial list of 108 pending Clean Water Act permit applications for proposed coal mines was provided by the Corps and published at the same time as the June 11, 2009 MOU. The original group of 108 projects included 13 projects whose permit applications have subsequently been withdrawn by the mining company, 8 projects for which permit issuance was imminent and occurred prior to, or concurrent with, the publication of the list, 3 projects for which an ongoing enforcement action currently precludes a permit decision, 1 permit application not complete, 1 project for which the work does not require a permit, and 5 underground mining projects determined not appropriate for the ECP. Also, 2 additional projects were added to the original list. In summary, 31 projects were removed from the original list of 108, and 2 were added, resulting in a total of 79 projects identified as remaining on the ECP list

Q:   **Will EPA stop some projects from being authorized?**

EPA's action today does not prohibit any project, nor does it reflect a judgment about the likelihood that a project will or will not be authorized. EPA's action identifies projects that require additional coordination and review in cooperation with the Corps and mining companies before a permit decision can be made. Projects that the Corps determines to be in compliance with Section 404 of the Clean Water Act may be authorized by the Corps.

Q:   **Does EPA's action today mean that mountaintop mining activities can not be authorized under Section 404 of the Clean Water Act?**

No. The recommendations made as part of the ECP do not constitute a determination by EPA under its CWA Section 404(c) authority that surface coal mining can not be permitted under CWA Section 404, nor does it represent a final recommendation from EPA to the Corps on these proposed projects. Instead, EPA's decision will help to ensure that mining

9/30/2009                                                                 1 of 8

**EXHIBIT**

tabbies

4c

projects approved under the CWA are fully consistent with the requirements of the law and will protect water quality and the environment.

**Q:** **How has EPA addressed surface coal mining since the 4th Circuit Court Appeals decision?**

Since the 4th Circuit Court decision, EPA and the Corps worked with Council on Environmental Quality to address 48 mining permits that the Corps identified for immediate issuance. After review, EPA raised environmental concerns with six out of the 48 permits. Following that effort, EPA, Corps and DOI issued a MOU which identified a pending application list of 108 projects (now 79) for screening. EPA continues to work with the Corps on permit applications that have been submitted after March 31, 2009. Where EPA believes the information contained in the public notice raises environmental concerns, we are submitting comments to the Corps explaining these concerns and our recommended actions to resolve the concerns.

**Q:** **Is the screening process too difficult for any mining application to be approved?**

The screening process itself does not establish any standard for evaluating mining projects. CWA standards used by the Corps to make permit decisions about proposed mining projects are established in the Clean Water Act's Section 404 (b)(1) Guidelines and the Corps' permit implementing regulations. EPA relies on these standards in our review of mining projects and in making decisions about which projects are consistent with the law.

**Q:** **Does the ECP constitute a policy change for EPA regarding surface coal mining?**

No. Proposals subject to the enhanced coordination procedures were evaluated for compliance with existing regulations and policies. In order to receive authorization under the Clean Water Act, proposed projects must comply with all requirements of the Section 404 regulations, regardless of activity type. Nationwide, EPA reviews proposed Clean Water Act permits through public notices and other coordination with Corps Districts and submits comments and recommendations when appropriate. The ECP protocol was designed to strengthen the environmental review of surface coal mining proposals.

**Q:** **How did EPA develop the final list? Were any actions taken during the 14-day availability period?**

Between the time when the initial ECP list was made public and the announcement of the final list, EPA has been receiving comments from the public on the initial list, coordinating with the Corps and other agencies on the plans for the ECP, and responding to inquiries from stakeholders. EPA has reviewed all comments submitted, updated project-specific information based on comments received, and finalized our review of available information on these pending projects. Following this review, EPA concluded there was no new information which warranted a change in the initial ECP list.

**Q:** **How did EPA decide that all of the permit applications should be on the list for enhanced coordination?**

9/30/2009                                                                                          2 of 8

Decisions regarding which applications will be subject to enhanced coordination were made based upon the Clean Water Act and its implementing regulations. Specifically, EPA based its determinations on the Section 404(b)(1) Guidelines. The Section 404(b)(1) Guidelines are a set of regulations developed jointly by EPA and the Corps pursuant to Section 404(b)(1) of the Clean Water Act. They can be found in Title 40, Part 230 of the Code of Federal Regulations (http://www.epa.gov/owow/wetlands/pdf/40cfrPart230.pdf). The Section 404(b)(1) Guidelines establish a number of requirements for determining whether to issue a Section 404 permit and what conditions to place in a permit. All of the permits on the list showed the potential to violate one or more of the requirements in the Guidelines.

Q:   **What comments did EPA receive on the initial list of applications published on September 11, 2009?**

Between September 11 and September 28, 2009, EPA received approximately 150 written comments on the initial ECP list. In addition, approximately 1,181 comments were received as identical form letters. Approximately 13 comments were individual submissions which provided specific information on the permits or the environmental condition in an affected area. Two (2) mining companies submitted comments regarding one or more of their projects on the initial ECP list and the Governors of Kentucky and Ohio submitted letters to EPA Administrator Lisa P. Jackson . Overall, 99% of the comments received indicated support for EPA's actions in proposing enhanced coordination for 79 pending applications. 42% of the comments submitted included information indicating that the commenter resides in one of the Appalachian States, as defined in the MOU (KY, OH, PA, TN, VA, WV)

Q:   **What environmental concerns does EPA have?**

The review of pending surface mining applications indicated potential compliance issues with the Guidelines for avoidance and minimization of impacts to aquatic resources, water quality, cumulative effects, and/or mitigation.

- The majority of the proposals recommended for further evaluation may not have adequately demonstrated avoidance and minimization of impacts in accordance with the Guidelines.
- Over 80% of the proposals recommended for further evaluation exhibited the potential for excursions from state narrative water quality standards.
- Over 50% of the proposals recommended for further evaluation raise concerns regarding the potential for significant degradation of the aquatic ecosystem, either individually or cumulatively.
- The scientific literature, EPA field experience, and available project information suggest that the mitigation proposed may not be adequate to offset proposed impacts.

EPA reviewed all proposals in light of available project data, the current science, and with regard to Clean Water Act regulations and has identified opportunities for benefits to the environment, while advancing the Administration's interest in a clean energy economy.

Q.   **Does EPA have concerns about the approach the Corps is using to comply with NEPA for these pending permits?**

The Corps is ultimately responsible for demonstrating compliance with National

Environmental Policy Act (NEPA) for the pending permits. However, as EPA works with the Corps to review the permits in more detail, EPA will evaluate and discuss the Corps' plans for NEPA compliance, as well as the Clean Water Act Section 404 permitting factors.

Q:   **What happens next?**

EPA Regions and Corps Districts should begin discussions immediately in order to resolve EPA's concerns on those applications that will be ready for processing in the near future. When an application is ready for formal coordination under the ECP, the Corps District will notify the appropriate EPA Region in writing, which begins the 60-day review period. During this time, the Region and Corps District will coordinate with applicants, relevant State agencies, and consultants, as necessary, to reach a timely resolution of the environmental concerns identified.

Q:   **How long will this enhanced coordination take?**

The environmental, technical and procedural circumstances associated with each of these 79 applications vary. As such, the time needed to commence and complete review will also vary. It is expected that for some applications, the environmental concerns will be resolved in less than 60 days. In some instances, EPA and the Corps have already begun discussions on the proposals to identify methods for resolution of environmental concerns. Based on these discussions with the Corps, EPA has also come to understand that some proposals may not be at the stage of evaluation where they are ready for coordination.

Q:   **Will EPA meet with the individual companies involved to try to resolve concerns with these permit applications?**

EPA, together with the Corps, expects to meet with some of the applicants. The enhanced application review process envisions these meetings and EPA believes they can be valuable in effectively addressing environmental concerns. In order to ensure only the least environmentally damaging practicable alternative will be authorized, EPA and the Corps may need to confirm project-specific information on mine design and minimization of impacts to aquatic resources. In some cases, EPA has already initiated communication with project applicants and consultants in order to verify data and project status. We appreciate the willingness these applicants have demonstrated to work with EPA under the ECP.

Q:   **Does the ECP usurp the Corps' authority?**

No, the Corps makes final permit decisions. The Corps has not made any decisions on the proposals subject to the enhanced coordination procedures, and the MOU is not intended to alter the Corps' decision authority for Clean Water Act Section 404 permits. Corps permitting regulations provide for coordination with other Federal agencies in order to seek a better understanding of that agency's concerns. According to Corps regulations, "If comments relate to matters within the special expertise of another federal agency, the district engineer may seek the advice of that agency" (33 CFR 325.2(a)(3)).

Q:   **How does EPA plan to deal with the magnitude of these impacts?**

EPA will coordinate with the Corps to make sure that the applications comply with the 404(b)(1) Guidelines. During the 60-day individual application review period called for in the MOU, EPA will discuss the basis for environmental concerns, recommend methods to resolve those concerns, and work with the Corps Districts and project applicants to improve environmental protection consistent with the Clean Water Act. The Clean Water Act does not prohibit all environmental impacts in order to comply with the requirements of the 404(b)(1) Guidelines, but generally requires the applicant for a proposed activity to first avoid impacts to aquatic resources, minimize any unavoidable impacts, and then evaluate the need to compensate for any remaining impacts.

Q:   **How is EPA dealing with surface coal mining applications outside the ECP list?**

Clean Water Act permit applications submitted to the Corps after the March 31, 2009, cutoff for the ECP are being processed according to the Corps' permitting process, which includes coordination with the EPA via either a Public Notice or a Pre-Construction Notification. This means that public notices are being published for proposed standard permits and EPA is continuing to review these public notices as usual, and pre-construction notifications are being provided to the EPA by the Corps for any projects being considered under a Nationwide Permit. Where EPA believes the information contained in the public notice raises environmental concerns, we are submitting comments to the Corps explaining these concerns and our recommended actions to resolve the concerns. A list of comment letters regarding proposed coal mine projects that EPA has submitted to the Corps Districts since March 31, 2009 can be found on the EPA headquarters website (http://www.epa.gov/owow/wetlands/guidance/mining-letters.html).

Q:   **What was EPA's process for identifying environmental concerns in applications?**

EPA reviewed all available data regarding the proposed mine, the existing environmental condition in the watershed where the mine is proposed, and the nature of environmental impacts predicted to result from construction and operation. This review is in keeping with the requirements of the 404(b)(1) Guidelines, which contain evaluations of a proposed activity's direct impacts, as well as the potential for significant degradation of the broader aquatic ecosystem, either individually or through cumulative effects.

Q:   **Where did you get the data to conduct this review?**

The majority of information on the proposed mines was extracted from the Corps' permit applications and from SMCRA permits. In order to ensure consistent and up-to-date information, mine applicants and/or consultants were contacted in order to verify available data. We appreciate the companies' willingness to work with EPA, their timely responses, and the updated information provided. Data on watershed condition was provided by EPA programs and State reporting data (water quality sampling data, impaired waters, etc.). The U.S. Fish and Wildlife Service and U.S. Geological Survey provided data on the presence of federally listed threatened and endangered species, critical habitat, land use and land cover.

Q:   **How was the data used to develop the list?**

Gathering basic mine and watershed data from the sources discussed above allowed EPA

staff to perform an analysis of the potential direct, secondary, and cumulative effects of the proposed mine, without subjecting all the applications to a full case-specific review, which would have increased the time needed to develop the initial list. EPA Regional experts reviewed all available data on an individual and watershed basis in order to identify potential environmental concerns with water quality, cumulative impacts, fill minimization, and significant degradation of the aquatic ecosystem.

**Q:** **I've heard that EPA used something called "MIRA" to identify the permit applications that would be subject to enhanced coordination. Is that true?**

MIRA (Multi-criteria Integrated Resource Assessment) is a data-gathering and analysis approach used by EPA decision makers to help them evaluate the permit applications. MIRA was used by EPA officials to screen the permit applications to help identify which would be subject to enhanced coordination.

**Q:** **What is MIRA?**

MIRA is a tool that EPA has developed to assist program managers' consideration of a broad array of scientific and technical information in their program and policy decisions. MIRA assists program managers by organizing and comparing pieces of relevant project data and information. It allows decision makers to compare different decision options based upon one or more common criteria and become more informed regarding the various criteria and how those criteria can be considered. With respect to Appalachian surface coal mining, MIRA was used to process an extensive set of technical data and generate summary information to facilitate program management decisions. In this case, the MIRA approach promoted consistency by allowing decision makers from three EPA regions to review, discuss and reach consistency and consensus using a common set of data for discussion and analysis.

**Q:** **Was MIRA developed specifically for coal mining?**

No. MIRA is an existing approach that EPA decision makers have utilized in a variety of contexts, including developing budgets and making certain designations under the Clean Air Act. More information about MIRA can be found on the EPA Region 3 website (http://www.epa.gov/reg3esd1/data/mira.htm).

**Q:** **How was MIRA used to decide which permit applications would be subject to enhanced coordination?**

MIRA was used by EPA officials to screen available information on the proposed projects and assist them in their decisions about which applications to further evaluate. This process allowed EPA to organize the relevant data for all mines into a central location. Using the data, EPA reviewers were able to better understand the mining impacts, including cumulative impacts. Data that is relevant to evaluation under the Section 404(b)(1) Guidelines was gathered and input into MIRA. MIRA was then used to assist program managers in considering the data in various combinations to identify potential areas of concern, and analyze the proposed mines in the context of the Section 404(b)(1) Guidelines. After reviewing the information provided through the MIRA screening and conducting

additional analysis, EPA decision makers determined which permit applications would be on the initial list.

**Q:**   **Did EPA use MIRA to create a new standard for proposed permit review?**

No.  MIRA does not create a new standard.  The data input into MIRA are the same data and criteria that would be considered pursuant to the Section 404(b)(1) Guidelines.  In the end, each permit application is subject to review under the Section 404(b)(1) Guidelines.  MIRA was not used as a substitute or surrogate for the Section 404(b)(1) Guidelines analysis.  The advantage of using MIRA in this particular circumstance is to provide a consistent and timely initial review of all permit applications subject to the enhanced coordination procedures.

**Q:**   **How was the use of MIRA appropriate given that MIRA is not designed to make discrete decisions, such as decisions about a permit application?**

The MIRA process did not make discrete decisions about particular permit applications.  Rather, it facilitated the analysis and supported the discussions regarding the aquatic ecosystem, the proposed applications' effects on that ecosystem, and potential compliance with the Section 404(b)(1) Guidelines.

**Q:**   **Do the Section 404(b)(1) Guidelines apply only to coal mining permits?**

No.  The Section 404(b)(1) Guidelines apply to all applications for permits pursuant to Section 404 of the Clean Water Act, regardless of the project purpose.  That includes applications for Section 404 permits for discharges of dredged and/or fill material associated with mining activities.

**Q:**   **What kinds of factors are in the Section 404(b)(1) Guidelines?**

Because they apply nationally, the Section 404(b)(1) Guidelines are designed to address a wide variety of permit applications and site-specific environmental conditions.  Some of the key requirements are:

- The Corps may not authorize a discharge if there is another less environmentally damaging way by which the permit applicant can accomplish the same project purpose (40 CFR § 230.10(a)).
- The Corps must ensure that the proposed project has avoided and minimized to the maximum extent practicable the discharge of fill to waters of the United States (33 CFR 332.1(c); 40 CFR 230.10(a)(1)(i); 40 CFR 230.10(d); 40 CFR 230.70-.77).
- The Corps may not issue a permit if the discharge will cause or contribute to a violation of any applicable State water quality standard (40 CFR 230.10(b)(1)).
- The Corps may not issue a permit if the discharge will cause significant degradation to waters of the United States, including significant adverse effects on the aquatic ecosystem.  This includes adverse effects on life stages of naturally occurring aquatic organisms, and aquatic ecosystem diversity, productivity and stability (40 CFR 230.10(c); 40 CFR 230.31; 40 CFR 230.61(b)(3); 40 CFR 230.22(b)).
- The Corps must consider both the impacts from the project individually and its impacts

in combination with other known existing or planned activities that will affect the same ecosystem. Although the impact of a particular discharge may be minor, the cumulative effect of numerous discharges can result in a major impact to water resources and the aquatic ecosystem (40 CFR 230.1(c); 40 CFR 230.11(g)).

**Q:    What evaluation was conducted outside of MIRA?**

Throughout the 45-day review period, EPA Regional experts have been evaluating available data on the proposed mines and condition of the watersheds in which they are proposed. This review focused on placing available data on environmental effects in the context of the 404(b)(1) Guidelines and evaluating the reasonable potential for the proposed action to violate one or more of the requirements of the Guidelines. Representatives from EPA Regions 3, 4, and 5 met on multiple occasions to discuss concerns and ensure all permit applications were evaluated in a consistent manner and using consistent criteria. EPA also consulted with representatives of the U.S. Fish and Wildlife Service, U.S. Geologic Service, and the Corps to solicit their professional knowledge and feedback.

| Permit Number Listed in ECP | Revised Permit Number | Applicant Name | Project Name | County | State |
|---|---|---|---|---|---|
| LRH-2004-00336 | | Bear Fork | Bear Fork S.M | Pike | KY |
| LRH-2005-00934 | | Premier Elkhorn | U/T Old Beefhide | Letcher | KY |
| LRH-2006-00126 | | Consol of KY | Area 80 | Knott | KY |
| LRH-2006-00127 | | Consol of KY | Stone Br Mine | Knott | KY |
| LRL-2005-00851 | | Cheyenne Resources | Cheyenne Resources | Letcher | KY |
| LRL-2006-01124 | | Matt/Co | Matt/Co | Floyd | KY |
| LRL-2006-01290 | | Licking River Resources | Licking River Resources | Magoffin | KY |
| LRL-2006-01296 | | Clintwood Elkhorn | Clintwood Elkhorn | Pike | KY |
| LRL-2007-00059 | | CAM Mining | Cane Branch | Pike | KY |
| LRL-2007-00193 | | Premier Elkhorn Coal | Premier Elkhorn Coal | Pike | KY |
| LRL-2007-00217 | | Leeco, Inc. | Stacy Branch Surface Mine | Perry | KY |
| LRL-2007-00335 | | Apex Energy | Apex Energy | Pike | KY |
| LRL-2007-00400 | | Argus Energy | Argus Energy | Lawrence | KY |
| LRL-2007-00400 | LRL-2007-00401 | Candle Ridge Mining | Candle Ridge Mining | Owsley | KY |
| LRL-2007-00594 | | Premier Elkhorn Coal | Premier Elkhorn Coal | Pike | KY |
| LRL-2007-00595 | | Leeco. Inc. | Elk Lick | Knott | KY |
| LRL-2007-00706 | | Johnson Floyd Coal | Johnson Floyd Coal | Johnson | KY |
| LRL-2007-00867 | | CAM Mining | CAM Mining | Pike | KY |
| LRL-2007-01026 | | Frasure Creek Mining | Frasure Creek Mining | Floyd | KY |
| LRL-2007-01044 | | Apex Energy | Apex Energy | Pike | KY |
| LRL-2007-01104 | | The Raven Co. | The Raven Co. | Floyd | KY |
| LRL-2007-01131 | | Miller Bros. Coal | Miller Bros. Coal | Floyd | KY |
| LRL-2007-01132 | | Miller Bros. Coal | Frasure Branch Mine | Floyd | KY |
| LRL-2007-01205 | | Matt/Co | Matt/Co | Floyd | KY |
| LRL-2007-01206 | | Frasure Creek Mining | Frasure Creek Mining | Magoffin | KY |
| LRL-2007-01224 | | Miller Bros. Coal | Miller Bros. Coal | Knott | KY |
| LRL-2007-01230 | | ICG Knott Co. | ICG Knott Co. | Knott | KY |
| LRL-2007-01301 | | CAM Mining | Tom's Branch Surface Mine | Floyd | KY |
| LRL-2007-01397 | | FCDC | FCDC | Floyd | KY |
| LRL-2007-01406 | | ICG Hazard | Bearville North | Knott | KY |
| LRL-2007-01445 | | FCDC | FCDC | Floyd | KY |
| LRL-2007-01504 | | CAM Mining | CAM Mining | Pike | KY |
| LRL-2007-01515 | | ICG Hazard | ICG Hazard | Perry | KY |

9/11/2009

**EXHIBIT**

tabbies®

4 D

| Permit Number Listed in ECP | Revised Permit Number | Applicant Name | Project Name | County | State |
|---|---|---|---|---|---|
| LRL-2007-01518 | | Clintwood Elkhorn | Clintwood Elkhorn | Pike | KY |
| LRL-2007-01582 | | Miller Bros. Coal | Miller Bros. Coal | Breathitt | KY |
| LRL-2007-01660 | | Martin County Coal | Findlay Branch Mine | Martin | KY |
| LRL-2008-00095 | | Premier Elkhorn Coal | Premier Elkhorn Coal | Pike | KY |
| LRL-2008-00114 | | BDCC Holdings | Cherries Branch | Perry | KY |
| LRL-2008-00115 | | Wolverine Resources | Jake Fork and Stoney Branch Surface Mine | Floyd | KY |
| LRL-2008-00139 | | Apex Energy | Apex Energy | Pike | KY |
| LRL-2008-00226 | | Czar Coal | Czar Coal | Martin | KY |
| LRL-2008-00239 | LRL-2009-00239 | Frasure Creek Mining | Frasure Creek Mining | Breathitt | KY |
| LRL-2008-00408 | | Czar Coal | Czar Coal | Martin | KY |
| LRL-2008-00525 | | Middle Fork Dev. | Middle Fork Dev. | Magoffin | KY |
| LRL-2008-00554 | | Enterprise Mining | Enterprise Mining | Knott | KY |
| LRL-2008-00727 | | Miller Bros. Coal | Miller Bros. Coal | Breathitt | KY |
| LRL-2008-00781 | | Wolverine Resources | Wolverine Resources | Floyd | KY |
| LRN-2005-01647 | | Nally & Hamilton | Nally & Hamilton | Bell | KY |
| LRN-2007-00820 | | Nally & Hamilton | Nally & Hamilton | BELL | KY |
| LRH-2004-01152 | | Buckingham Coal | Buckingham Wash Plant | Perry | OH |
| LRH-2005-00421 | | Oxford | Peabody 3 | Coshocton / Muskingum / Guernsey | OH |
| LRH-2005-01385 | | Oxford | Halls Knob | Guernsey | OH |
| LRH-2007-01021 | | Oxford Mining | Kaiser Mathias | Tuscarawas | OH |
| LRP-2006-00660 | | Ohio American Energy | Red Bird South | Belmont | OH |
| LRP-2007-01160 | | Oxford Mining Company LLC | Ellis Area | Jefferson | OH |
| LRN-2004-00062 | | Premium Coal | Area 19 | ANDERSON | TN |
| LRH-2003-00055 | | Hobet Mining | Hewett | Boone | WV |
| LRH-2004-00624 | | Independence Coal Company | Consultation Surface Mine | Boone | WV |
| LRH-2004-01155 | | Brooks Run Mining | Brandy St & Cove Mtn | Webster | WV |
| LRH-2004-01451 | | Independence Coal Company | Glory Surface Mine | Boone | WV |
| LRH-2005-00217 | | Bluestone | ContourAuger1 | Wyoming | WV |
| LRH-2005-01115 | | Green Valley Coal Company | Blue Branch Refuse | Nicholas | WV |
| LRH-2005-01198 | | Marrowbone Development | Taywood W & Marrowbone | Mingo | WV |
| LRH-2005-01211 | | Premium Energy, Inc. | Premium Mills Surface Mine | McDowell | WV |
| LRH-2006-00755 | LRH-2006-00100 | ICG Eastern, LLC | Jenny Creek Surface Mine | Mingo | WV |
| LRH-2006-02033 | | Wildcat | #2 Surface | Kanawha | WV |

| Permit Number Listed in ECP | Revised Permit Number | Applicant Name | Project Name | County | State |
|---|---|---|---|---|---|
| LRH-2006-02290 | | Colony Bay Coal Co. | Colony Bay Surface Mine | Boone | WV |
| LRH-2007-00182 | | Alex Energy, Inc. | Federal Surface Mine | Nicholas | WV |
| LRH-2007-00285 | | Alex Energy, Inc. | Lonestar Surface Mine | Nicholas | WV |
| LRH-2007-00286 | | Pioneer Fuel | MT5B | Raleigh | WV |
| LRH-2008-00491 | | CONSOL of Energy | Buffalo Mt. Surface Mine | Mingo | WV |
| LRH-2008-00562 | | Eastern Associated Coals | Huff Creek Surface Mine | Wyoming/ Logan | WV |
| LRH-2008-00791 | | Hobet Mining | Surface Mine No. 45 | Lincoln | WV |
| LRH-2008-00805 | | Coyote Coal Company | Joes Creek Surface Mine | Boone/ Kanawha | WV |
| LRH-2008-00830 | | CoalMac, Inc. | Pine Creek Surface Min | Logan | WV |
| LRH-2008-01098 | | Frasure Creek Mining | Spring Fork Surface Mine NO. 2 | Mingo | WV |
| LRH-2009-00428 | | Consol of Kentucky | Spring Branch No. 3 Deep Mine | Mingo | WV |
| | LRH-2006-00760 | Paynter Branch Mining | Paynter Branch South Surface Mine | Wyoming | WV |
| | LRH-2007-00134 | Atlantic Leasco | Muddlety Surface Mine No. 1 | Nicholas | WV |



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON  D.C   20460

APR 0 1 2010

## MEMORANDUM

**SUBJECT:**   Detailed Guidance: Improving EPA Review of Appalachian Surface Coal Mining
Operations under the Clean Water Act, National Environmental Policy Act, and
the Environmental Justice Executive Order

**FROM:**   Peter S. Silva
Assistant Administrator for Water

Cynthia Giles
Assistant Administrator for Enforcement and Compliance Assurance

**TO:**   Shawn Garvin
Regional Administrator, EPA Region 3

A. Stanley Meiburg
Acting Regional Administrator, EPA Region 4

Bharat Mathur
Acting Regional Administrator, EPA Region 5

## I.   Purpose

The purpose of this detailed memorandum is to provide further clarification of EPA's roles and
expectations. in coordinating with our federal and state partners, to assure more consistent,
effective, and timely compliance of Appalachian surface coal mining operations with the
provisions of the Clean Water Act (CWA), National Environmental Policy Act (NEPA), and the
Environmental Justice Executive Order (E.O. 12898).[1,2]  This memorandum reflects reviews of
past practices and emerging science to improve and strengthen permit decision-making in order

---

[1] This memorandum is effective immediately. Concurrent with its release, however, EPA is seeking public comment
on this interim final document. We fully understand the importance of this memorandum to our federal and state
partners. the coal industry, and the public, and we recognize the value in receiving their input based on experience
with its implementation. The public comment period will conclude on December 1, 2010. No later than April 1,
2011. EPA will issue final guidance after consideration of public comments and the results of the Science Advisory
Board (SAB) review, and consistent with our experience in implementation of this memorandum.  EPA may revise
the guidance sooner, as appropriate, consistent with the SAB review. EPA is publishing a notice in the *Federal
Register* that provides additional details on the public comment process.
[2] In addition to this memorandum, EPA is working with other federal agency partners to develop and implement an
interagency environmental justice strategy to more fully evaluate environmental justice considerations in review of
Appalachian surface coal mining activities.  This strategy will provide more detailed information and specific
actions to avoid and mitigate adverse impacts to low-income and minority populations.

1

EXHIBIT

4 E

tabbies

to better ensure compliance with federal environmental statutes, implementing regulations, and policies.[3] We hope this memorandum will also be helpful to our federal and state partners, the regulated public, and others in clarifying EPA's expectations regarding the need to reduce harmful impacts on public health and the environment associated with Appalachian surface coal mining and to more effectively include the voices of adversely affected communities in the Appalachian coalfields, including low-income or minority populations.[4] We expect you to begin using this interim final guidance immediately in your review of Appalachian surface coal mining activities.

## II. Introduction

A. Background

The CWA entrusts EPA with overall responsibility to administer its provisions, including protection of human health, water quality, and the environment in coalfield communities throughout Appalachia. CWA protections, including water quality requirements, extend to all waters of the United States, from headwater streams to the larger downstream systems that they feed. In particular, EPA's CWA responsibility includes preserving the long-term integrity of Appalachian watersheds, which is important in protecting their ecological condition and maintaining safe, clean, and abundant water for local communities. We make every effort to fulfill these responsibilities without compromising the economic and energy benefits that coal mining provides to both the Appalachian region and the entire nation.

In recent months, the Obama Administration has worked to ensure timely review of permit applications that have faced delays in the courts for many years. It is our hope that our efforts to make responsible and expeditious decisions on these applications will reduce the likelihood of judicial challenges to the permits and thus will be seen as a demonstration of our commitment to an Appalachian coal industry that provides economic security and protects the health of Appalachian communities, without violating environmental standards established under the law.

The environmental legacy of mining operations in the Appalachian region is far-reaching. Recent studies, as well as the experiences of Appalachian coalfield communities, point to new environmental and health challenges that were largely unknown even ten years ago. Since 1992, nearly 2,000 miles of Appalachian streams have been filled at a rate of 120 miles per year by

---

[3] The CWA and NEPA provisions and regulations described in this document contain legally binding requirements. This guidance does not substitute for those provisions or regulations, nor is it a regulation itself. It does not impose legally binding requirements on EPA, the U.S. Army Corps of Engineers (Corps), the States, or the regulated community, and may not apply to a particular situation depending on the circumstances. Any decisions regarding a particular permit will be based on the applicable statutes, regulations, case-specific facts and circumstances, and case law. Therefore, interested persons are free to raise questions about the appropriateness of the application of this guidance to a particular situation, and EPA and/or the Corps will consider whether or not the recommendations or interpretations of this guidance are appropriate in that situation based on the statutes, regulations, and case law.

[4] The discussion of the provisions of the CWA, NEPA, and E.O. 12898 in this memorandum focuses on their applicability to Appalachian surface coal mining operations in Kentucky, West Virginia, Virginia, Ohio, Tennessee, and Pennsylvania.

surface mining practices. A recent EPA study found that nine out of every 10 streams downstream from surface mining operations were impaired based on a genus-level assessment of aquatic life.[5] Another federal study found elevated levels of highly toxic and bioaccumulative selenium in streams downstream from valley fills.[6] These impairments are linked to contamination of surface water supplies and resulting health concerns, as well as widespread impacts to stream life in downstream rivers and streams. Further, the estimated scale of deforestation from existing Appalachian surface mining operations is equivalent in size to the state of Delaware. Appalachian deforestation has been linked to significant changes in aquatic communities as well as to modified storm runoff regimes, accelerated sediment and nutrient transport, reduced organic matter inputs, shifts in the stream's energy base, and altered thermal regimes.[7] Such impacts have placed further stresses on water quality and the ecological viability of watersheds.

It has been a high priority of this Administration – and EPA Administrator Lisa P. Jackson – to reduce the substantial environmental and human health consequences of surface coal mining in Appalachia, and minimize further impairment of already compromised watersheds. Administrator Jackson has also made working toward environmental justice a priority. EPA seeks to enhance water quality and environmental protection in close partnership with the states and other federal agencies, which have key implementation roles under the CWA, and under NEPA and E.O. 12898, respectively. As scientific evidence grows, EPA has a legal responsibility to address the environmental consequences of Appalachian surface coal mining.

In June 2009, the Department of the Army, EPA, and the Department of the Interior (DOI) signed a Memorandum of Understanding (MOU) to minimize the harmful consequences of Appalachian surface coal mining practices. The MOU reflects an agreement among the agencies to strengthen the environmental reviews of Appalachian surface coal mining projects under the CWA, NEPA, and the Surface Mining Control and Reclamation Act (SMCRA). EPA committed to improve its review of permits issued under Section 404 and to bolster coordination with states on both Section 402 permits for pollutant discharges from valley fills and state water quality certifications (Section 401) for mining operations. The Corps committed to reassess Nationwide Permit 21, a general permit used to authorize some surface coal mining activities, and to work with EPA to clarify Section 404 policies for environmental review and mitigation. DOI committed to evaluate how the Office of Surface Mining Reclamation and Enforcement (OSM) can more effectively oversee state permitting and enforcement activities under SMCRA.

---

[5] Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008. Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools. J. N. Am. Benthol. Soc. 27(3):717–737.

[6] Bryant, G., S. McPhilIamy, and H. Childers. 2002. A Survey of the Water Quality of Streams in the Primary Region of Mountaintop / Valley Fill Coal Mining. Mountaintop Mining Valley Fill Programmatic Environmental Impact Statement. USEPA Region 3. Wheeling, WV.
http://www.epa.gov/region03/mtntop/eis2003appendices.htm#appd

[7] Webster, J.R., S.W. Golladay, E.F. Benfield, J.L. Meyer, W.T. Swank, and J.B. Wallace. 1992. Catchment disturbance and stream response: an overview of stream research at Coweeta Hydrologic Laboratory. In P.J. Boon, P. Calow, and G.E. Petts (eds.). River Conservation. and Management. John Wiley and Sons, New York, N.Y.

B. CWA, NEPA, and E.O. 12898

The CWA, 33 U.S.C. 1251 *et seq.*, establishes a comprehensive program designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. Section 1251(a). To achieve that objective, CWA Section 301(a) prohibits the "discharge of any pollutant" – defined as the addition of any pollutant to the waters of the U.S. from any point source – except "as in compliance with" specified provisions of the CWA. 33 U.S.C. Sections 1311(a), 1362(7), 1362(12). In most cases, regulated entities achieve compliance with the relevant CWA provisions by obeying the terms of a permit issued under one of the CWA's two complementary permitting programs: (1) a permit program for discharges of dredged or fill material, which is administered primarily by the Corps pursuant to Section 404 of the CWA, 33 U.S.C. 1344; or (2) the National Pollutant Discharge Elimination System (NPDES), which is administered by the EPA and authorized states pursuant to Section 402 of the CWA, 33 U.S.C. 1342. Section 401 of the CWA also applies where federal permits are issued, enabling states to certify (or waive) that discharges from permitted operations are in compliance with state environmental regulations. Typically, surface coal mining operations in the steep slopes of Central Appalachia require Section 404 permits for the discharge of mining overburden into waters of the United States (e.g., valley fills, mine-through operations), mine faceups, stream diversions, road crossings, coal process waste impoundments, and for discharges to create sediment ponds. Discharges from the sediment ponds and any other stormwater discharges require Section 402 permits. Because the Corps issues Section 404 permits in Appalachia, states have authority to condition those permits under Section 401.

In addition, NEPA requires an assessment of the environmental impacts of federal actions, including the preparation of an Environmental Impact Statement (EIS) for federal actions that have a significant effect on the quality of the human environment. For example, the Section 404 review by the Corps of a proposed mining operation with discharges into waters of the U.S. triggers review under NEPA. An EIS presents a comprehensive and transparent evaluation of the wide range of potential environmental and human health impacts associated with a federal action, as well as project alternatives that may avoid and minimize significant adverse impacts.

E.O. 12898 and the Presidential Memorandum that accompanies it also need to be addressed appropriately in the context of any federal action – such as federal permitting under the CWA and SMCRA – including federal actions that are subject to NEPA. E.O. 12898 provides that: "To the greatest extent practicable and permitted by law…each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

Consideration of environmental justice concerns is vital to understanding the potential human health and environmental impacts of surface coal mining during the CWA and SMCRA permitting and NEPA review processes. The Presidential Memorandum articulates the role of federal environmental statutes in securing human health and environmental protection of vulnerable populations and assuring their participation in the process.

4

E.O. 12898 calls for actions that can address several key environmental justice issues associated with surface coal mining. These include: conducting research, data collection, and analysis on direct, indirect and cumulative impacts; identifying patterns of subsistence consumption of fish and wildlife; and providing effective public participation and access to information. EPA will implement the E.O. by identifying and addressing, as appropriate, any adverse effects of proposed federal activities on low-income and minority populations, including ways or measures to mitigate any adverse effects.

## C.  Recent Program Reviews and Emerging Science

Three key considerations have motivated the Agency's development of this memorandum. First has been the collection and publication of technical information documenting the scope and significance of adverse environmental and water quality effects associated with surface coal mining practices. Second, EPA has recently completed reviews of permitting actions under CWA Sections 402 and 404 for Appalachian surface coal mining. These reviews demonstrate that current permitting practices can be more effective in addressing adverse environmental and water quality effects associated with coal mining by more robustly conducting analyses required by the CWA. Third, EPA scientific offices are conducting extensive work evaluating the relationship between pollutants in streams associated with surface coal mining and impacts from these pollutants on aquatic ecosystems. As a result of this work, EPA is poised to initiate additional independent technical review and public evaluation of potential new water quality values for conductivity based on effective science and the need to improve protection of water quality, public health, and the environment.

Numerous studies, data submitted to permitting authorities for proposed mining activities, and some state impaired waters lists published pursuant to CWA Section 303(d), have shown that high levels of conductivity, dissolved solids, and sulfates are a primary cause of water quality impairments downstream from mine discharges. These studies build upon existing research from other regions that demonstrated the toxicity of specific ions, such as sulfate, as well as the complex interplay of ionic constituents associated with coal mining operations.[8] Dissolved solids contained in waters draining from valley fills are a primary cause of biological impairment resulting from changes in benthic species richness and diversity (particularly species of mayflies, a key component of headwater stream communities). An example of these studies is Pond et al. (2008), which found evidence that mining activities have subtle to severe impacts on downstream aquatic life and the biological conditions of a stream.[9] A 2003 published study by Kennedy et al. linked elevated conductivity levels in coal effluent to impaired, sensitive aquatic fauna.[10] A 2004 Kentucky Department for Environmental Protection study found that the loss of mayflies in streams below mined sites indicates that these organisms are especially sensitive to

---

[8] Soucek, D.J. and A.J. Kennedy. 2005. Effects of hardness, chloride, and acclimation on the acute toxicity of sulfate to freshwater invertebrates. Environmental Toxicology and Chemistry 24:1204-1210.

[9] Pond et al. 2008.

[10] Kennedy, A.J., DS. Cherry, and R.J. Currie. Field and laboratory assessment of a coal processing effluent in the Leading Creek Watershed, Meigs County, Ohio. Archives of Environmental Contamination and Toxicology 44:324-331.

5

coal mine drainage.[11]  A 2005 published study by Kennedy et al. linked impairment of aquatic life to elevated levels of Total Dissolved Solids (TDS).[12]  Finally, a 2010 published study by Pond links specific conductance as the most strongly correlated factor to a reduction of *Ephemeroptera* in streams impacted by mining and residential development.[13]

In addition, an analysis of peer-reviewed studies recently published in the journal *Science* shows that ecological losses downstream of coal mining valley fills are associated with increased levels of TDS and conductivity, sulfates, and selenium.[14]  EPA's Office of Research and Development (ORD) recently completed a review of the scientific literature on surface coal mining and found effects that included resource loss, water quality impairment, and adverse effects on aquatic ecosystems.  This report is being submitted to the EPA Science Advisory Board (SAB) for review and is also publicly available.

EPA recently conducted assessments of permitting practices under CWA Sections 402 and 404 for surface coal mining projects in Appalachia.  The Permit Quality Review of Section 402 permits in West Virginia, Kentucky, Tennessee and Ohio, conducted in September and October 2009, identified concerns related to effective protection of downstream water quality consistent with requirements of the CWA.  The concerns focus on the interpretation of narrative and numeric criteria in CWA Section 402 permits for surface coal mining projects.  In addition, the evaluation of pending coal mining projects under the EPA-Corps Section 404 Enhanced Coordination Procedures (ECP) found that many of these projects may not be consistent with EPA and Corps regulations, including the Section 404(b)(1) Guidelines.  As many as 80% of these permits raised concerns with respect to compliance with state narrative water quality standards, while more than half raised concern for the potential for significant degradation of aquatic ecosystems.

The emerging science related to adverse environmental and water quality effects is based on data and analyses subjected to the rigors of peer-reviewed science and quality assurance reviews.  EPA places a high priority on quality assurance and agency policy specifies necessary quality assurance activities be performed to ensure data are of sufficient quantity and adequate quality for their intended use.  EPA's reviews of ambient chemical and biological data and analyses that support some permitting decisions have revealed consistent and serious issues with underlying data quality, such as erroneous field meter readings, biological samples collected outside of state index periods or during extreme low flows, and inclusion of non-endemic taxa in taxonomic lists.  Analyses of these data also have demonstrated concerns, such as inappropriate aggregation of biological data from several stream types (headwater to larger river) or several

---

[11] Kentucky Department for Environmental Protection, Division of Water, Water Quality Branch. Effects of Surface Mining and Residential Land Use on Headwater Stream Biotic Integrity in the Eastern Kentucky Coalfield Region.
[12] Kennedy A. J., D.S. Cherry and C.E. Zipper. Evaluation of Ionic Contribution to the Toxicity of a Coal-Mine Effluent Using *Ceriodaphnia dubia*. Archives of environmental contamination and toxicology vol. 49.2:155-162.
[13] Pond, G.J. "Patterns of *Ephemeroptera* taxa loss in Appalachian headwater streams (Kentucky, USA)." Hydrobiologia 641(1):185-201.
[14] Palmer, M.A., E.S. Bernhardt, W.H. Schlesinger, K.N. Eshleman, E. Foufoula-Georgiou, M.S. Hendryx, A.D. Lemly, G.E. Likens, O.L. Loucks, M.E. Power, P.S. White, P.R. Wilcock. 2010. Mountaintop Mining Consequences. Science 327(5962):148-149.

seasons, failing to reflect natural data variability, and inappropriately including several samples from one site as independent samples in a statistical analysis (pseudoreplication).

Regions should ensure that the environmental data supporting CWA decision-making are carefully scrutinized to ensure they are of sufficient quality to support their intended use. Regions should encourage the incorporation of Quality Assurance Project Plans (QAPPs) for sampling data and Quality Assurance/Quality Control (QA/QC) data within data submitted to EPA through the permitting process. For guidance in ensuring environmental data are of sufficient quality, Regions should consult the agency's quality assurance policy at http://www.epa.gov/quality/index.html.

EPA has made substantial progress in recent months in the development of high-quality scientific information to support new numeric water quality values for conductivity, which is regularly observed at high levels in streams downstream from Appalachian surface coal mining operations. EPA expects, consistent with the requirements of the CWA, that the use of these values and the extensive scientific information that supports these numbers will be extremely helpful to states in the development of water quality-based effluent limits for Section 402 permits. Establishing enforceable numeric limits for conductivity, selenium, and other parameters in state Section 402 permits will help to improve water quality and better protect public health and aquatic life in streams downstream from Appalachian surface coal mining operations.

### III. EPA Oversight of NPDES Permitting for Surface Coal Mining Operations in Appalachia

EPA has reason to believe that discharges from surface mining activities have a significant potential to cause nonattainment of applicable water quality standards downstream from valley fills, impoundments, and sediment ponds. Discharges from Appalachian surface coal mining activities have been found to have a high potential to impact aquatic life uses.[15] Numerous studies, data submitted to permitting authorities for proposed mining activities, and some state Section 303(d) lists have shown high levels of conductivity and dissolved solids and sulfates to be a primary cause of water quality impairments downstream from such mine discharges.

The Office of Water has been working closely with Regions 3, 4, and 5 to assess the quality of state-issued CWA Section 402 (NPDES) permits for surface coal mining operations with respect to the requirements of each state's permitting program in the Appalachian states of Tennessee, Ohio, Kentucky, and West Virginia. EPA has also been assessing permits for their compliance with applicable federal requirements. The goal of this assessment is to strengthen these state-issued NPDES permits to better address the impacts discussed above.

The CWA and EPA's implementing regulations require NPDES permits to contain technology-based effluent limits and, where necessary to protect water quality, water quality-based effluent limits. All permits reviewed by EPA included appropriate technology-based

---

[15] Pond et al. 2008.

7

limits for pollutant parameters listed in the effluent limitation guidelines for coal mining (40
CFR Part 434). However, based on observations from both ongoing program oversight and a
focused Permit Quality Review of permits for surface coal mining activities, including detailed
discussions with state permit writers, EPA has identified certain concerns common to many of
the reviewed permits that warrant immediate attention to ensure that water quality is protected.
Therefore, when Regional offices exercise their authority to review draft or proposed state
NPDES permits for discharges to waters of the U.S. associated with Appalachian surface coal
mining operations, Regions should evaluate several aspects of those permits as detailed below.

The sections below detail requirements of the Act and issues identified during EPA's recent
Permit Quality Review. Should Regions identify similar concerns when reviewing draft or
proposed permits in the future, we encourage you to work with your authorized states to resolve
these concerns. As noted below, however, where discussions with the state do not produce a
proposed permit that, in the Region's judgment, satisfies the requirements of the Act, an
objection to the issuance of the proposed permit would be an appropriate response. We
encourage the Water Division Directors of the three Regions to work together to ensure a
comparable level of review and response across Appalachia.

A. Completion of Required Reasonable Potential Analyses

As noted above, the CWA requires NPDES permits to contain water quality-based effluent
limits when necessary to meet water quality standards (CWA Section 301(b)(1)(C); 40 CFR
Section 122.44(d)(1)). In order to determine whether water quality-based effluent limits are
necessary, the permitting authority is required to conduct a "reasonable potential analysis." A
reasonable potential analysis determines whether a discharge will cause, or has the reasonable
potential to cause or contribute to, an excursion above a numeric or narrative water quality
standard. EPA's regulations, EPA's 1991 Technical Support Document (TSD) for Water
Quality-based Toxics Control (EPA/505/2-90-001 PB91-127415)[16], and established state
procedures explain how to conduct this analysis.

EPA's review of NPDES permit administrative records found that parameters known to be
present in the effluent, based on data submitted with the permit applications, were often not
assessed for the reasonable potential to cause or contribute to an excursion above water quality
standards. Although each permit requires a case-specific analysis, in general, an NPDES permit
that fails to show evidence of a parameter-specific reasonable potential analysis will be
inconsistent with the requirements of the CWA. Furthermore, EPA expects that in many, if not
most, cases the available science will demonstrate that there is a reasonable potential for these
discharges to cause or contribute to an excursion above numeric or narrative water quality
standards, thus making water quality-based effluent limits necessary.

To characterize the effluent, existing dischargers applying or reapplying for NPDES
permit coverage should provide the permitting authority with screening data for a suite of
pollutants and pollutant parameters listed in the applicable NPDES permit application form.
However, for new (proposed) discharges, the application form for an individual permit requires

---

[16] This publication is available at http://www.epa.gov/npdes/pubs/owm0264.pdf.

only an estimate of the effluent characteristics. In addition to data specifically required by permit applications, 40 CFR Section 122.21 allows permitting authorities to request any additional data as necessary to support an assessment of potential water quality impacts (e.g., conductivity and total dissolved solids). Facilities applying for coverage under an NPDES general permit are required to submit information specifically identified in the Notice of Intent provisions of the general permit. EPA's review of permits and associated records found that states generally did not adequately document or explain how information submitted by applicants was used to characterize the nature of their actual or proposed discharges. In particular, where facilities had proposed to discharge, but had not yet begun construction or operation, the files contained little discussion of how the permitting authority projected or anticipated the types and concentrations of pollutants expected in the effluent.

Where effluent data are available (i.e., for existing discharges), EPA's expectation is that permitting authorities will use all valid and representative data to determine whether the discharge causes, has the reasonable potential to cause, or contributes to an excursion of numeric and/or narrative water quality criteria and standards. For new (proposed) discharges, the permitting authority should require the applicant to characterize the anticipated pollutant concentrations and loads using data from similar discharges and/or based on characteristics of local soils and geology. For example, these data may be from mining facilities located adjacent to or having similar geologic characteristics as the mine under review, or from ambient data collected as part of the Section 404 or SMCRA permit applications. Permitting authorities should independently seek to obtain such data if not submitted by the applicant or can reject the application as not sufficient. Ambient water quality data collected as part of the SMCRA and Section 404 permitting processes should be included in the NPDES permit development process and, where appropriate, should be incorporated as "background" conditions in reasonable potential analyses.

B. Incorporation of Numeric Water Quality Standards in Terms of NPDES Permits

Where a surface coal mining discharge is found to have reasonable potential to exceed a numeric water quality standard, the regulations require that NPDES permits include water quality-based effluent limits (WQBELs) based on the existing numeric water quality criteria in state water quality standards. While EPA's Permit Quality Review found that many permits did incorporate all relevant numeric water quality standards, some permits omitted them. As one example, all Appalachian states have adopted a chronic numeric criterion for selenium of 5 µg/l for the protection of aquatic life. Should a reasonable potential analysis indicate that the discharge of selenium (or another parameter) has the potential to cause or contribute to an excursion above any state standard and a state fails to include a WQBEL based on the existing state water quality standard, EPA expects that such a permit would not be consistent with the CWA.

It is the responsibility of the applicant to characterize the wastewater to be discharged from the permitted facility. In order to have a complete NPDES permit application, data must be presented by the applicant to properly characterize its discharge to enable a reasonable potential analysis to be completed by the permit writer at the time of permit issuance. Data may be

9

secured through evaluation of similarly situated facilities in adjacent watersheds or similar practices in the same ecological or geological setting.

Where there is an approved Total Maximum Daily Load (TMDL) for the receiving waterbody, the receiving waterbody is listed as impaired on the state's approved Section 303(d) list, or a downstream waterbody may be affected by the discharge, it will be important that the reasonable potential analysis include an analysis of the pollutants for which the TMDL was established or for which the waterbody is listed as impaired, or for pollutants that may affect downstream waters.

1.  Specific Guidance Regarding Compliance Schedules

Compliance with all NPDES permit terms is required at the time of permit issuance. However, federal regulations at 40 CFR Section 122.47 allow for NPDES permits to include compliance schedules for the achievement of WQBELs, when determined to be appropriate under discharger-specific circumstances. When determined to be appropriate, a compliance schedule must require compliance with the WQBEL within a time determined to be "as soon as possible" based on a discharger-specific evaluation. Compliance schedules are only available for WQBELs based on water quality standards that have been newly adopted after July 1, 1977, and where the applicable water quality standards authorize the use of such schedules. For further guidance regarding considerations for Regions when evaluating compliance schedules, please see the May 10, 2007, Memorandum from James Hanlon, Director, Office of Wastewater Management to Alexis Strauss, Director, Water Division, EPA Region IX, and the November 16, 2007, Letter from Jon M. Capacasa, Director, Water Protection Division, US EPA Region III, to Lisa A. McClung, Director, Division of Water and Water Management, West Virginia DEP, and Randy Huffman, Director, Division of Mining And Reclamation, West Virginia DEP.[17]

C.  Incorporation of Narrative Water Quality Standards in the Terms of NPDES Permits

In addition to those parameters for which there are numeric water quality standards, all Appalachian states have adopted narrative water quality standards. Of particular relevance here, nearly all Appalachian states do not currently have applicable numeric water quality criteria that account for the effects associated with high levels of conductivity, total dissolved solids, and sulfates. In lieu of such numeric criteria, all Appalachian states have applicable narrative water quality criteria. EPA regulations are clear that NPDES permits must contain provisions that implement both numeric water quality standards and narrative water quality standards and that the same reasonable potential analysis completed for numeric standards must be completed for narrative standards as well. 40 CFR Sections 122.44(d)(1) and (d)(1)(vi).

EPA's review of permits found that states did not incorporate provisions that would implement the relevant narrative water quality standards relating to discharges that increase the levels of conductivity, total dissolved solids, and sulfates. The permits do not contain limits based on whole effluent toxicity (WET) and/or a chemical-specific numeric interpretation of the

---

[17] These documents are available at http://www.epa.gov/owow/wetlands/guidance/mining.html

10

narrative criteria as required by 40 CFR Sections 122.44(d)(1)(v) and (vi). In addition, the permits' statements of basis or fact sheets do not provide information indicating that the narrative criteria were considered as part of the determination of which effluent limitations are necessary. Although EPA's review of each permit is case-specific, EPA expects that a permit that fails to include provisions implementing the narrative water quality standards and fails to explain why such omission is appropriate under the regulations will not be consistent with the requirements of the CWA.[18]

1. Documentation on How States Will Derive Effluent Limits Based on Narrative Water Quality Standards

EPA Regions should request that states provide documentation describing how the states will perform a reasonable potential analysis and, where necessary, develop effluent limits (or other permit conditions), to ensure compliance with the state's narrative water quality standards. The state should provide a detailed description of the decision-making process, including the types and sources of data used to characterize both expected effluent quality and receiving water quality with respect to narrative water quality standards. Baseline water quality analyses required for SMCRA permit applications and projected or estimated effluent concentrations characterizing expected effluent quality are expected to be used to inform each state's decisions.

In documenting how they will interpret and implement their narrative standards, the states should take into account that the NPDES regulations at 40 CFR Section 122.44(d)(1)(vi) require the consideration of relevant information pertaining to a pollutant that may cause or contribute to an excursion above an applicable state narrative water quality standard. The scientific literature is increasingly recognizing the relationship between conductivity levels in Appalachian streams and impacts to aquatic biota in streams below surface coal mining operations. Based on field measurements comparing unmined and mined watersheds in Central Appalachia, the peer-reviewed 2008 "Pond-Passmore" study concluded that aquatic life at sites with specific conductance greater than 500 μS/cm were observed to have been adversely impacted based on a genus-level multi-metric biological index.[19] In addition, EPA's draft report, *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams,*[20] also recognizes stream-life impacts associated with conductivity. This study, which is publicly available and will undergo external peer review by the SAB, applies EPA's standard method for

---

[18] In the limited cases in which a state determines that it is infeasible to calculate a numeric effluent limit to implement a narrative water quality standard, the state should include in the permit appropriate WET limits and best management practices (BMPs) to control or abate the discharge of pollutants, consistent with 40 C.F.R. Section 122.44(k)(3). In these limited circumstances, the state would need to document the basis for its determination that a numeric effluent limit for the narrative standard was infeasible to calculate, and would need to include associated provisions for monitoring the effectiveness of BMPs. Monitoring should include in-stream conditions of aquatic biota consistent with state biocriteria. Should downstream impacts exceed biocriteria, provisions for adaptive remedial action should be included.

[19] Pond et al. 2008.

[20] This methodology and benchmark were developed in a parallel but unrelated track to a literature review summary of the effects of mountaintop mining and valley fills produced by EPA that has also been issued for Science Advisory Board review and consultation.

deriving water quality criteria to field measurements and concludes that genus-level impacts to the biological community occur at conductivity levels of 300 μS/cm.[21]

During the SAB review process, EPA believes that this report should be considered by Appalachian states as relevant information per 40 CFR Section 122.44(d)(1)(vi) in implementing applicable state narrative water quality standards in NPDES permits, and by Regions in your review of these permits. Documentation of how each state will interpret and implement its narrative water quality standards (in light of the data and conclusions of this conductivity report and other relevant information) will help ensure that the public and the regulated community have a better understanding of the state's decision-making process and increased certainty that narrative water quality standards are adequately met. As a general matter, EPA expects that the conductivity impacts of projects with predicted conductivity levels below 300 μS/cm generally will not cause a water quality standard violation and that in-stream conductivity levels above 500 μS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative state water quality standards.[22] If water quality modeling suggests that in-stream levels will exceed 500 μS/cm, EPA believes that reasonable potential likely exists to cause or contribute to an excursion above applicable water quality standards; unless, based on site-specific data, the state has an alternative interpretation of their water quality standards that is supported by relevant science. Similarly, if water quality monitoring suggests that in-stream levels will exceed 300 μS/cm but will be below 500 μS/cm, EPA should work with the permitting authority to ensure that the permit includes conditions that protect against conductivity levels exceeding 500 μS/cm. In circumstances where conductivity levels in waters proposed for new mining related discharges already exceed 500 μS/cm, EPA will coordinate with the permitting authority on a site-specific basis to ensure these new discharges will not cause or contribute to a violation of water quality standards. Once EPA's draft conductivity report is finalized following SAB review, we will evaluate whether changes to the conductivity benchmarks identified here are appropriate.

At a minimum, should the record indicate that a reasonable potential exists, the permitting authority must demonstrate in the administrative record, based on site- or receiving-water-specific information, how the permit implements the narrative water quality standards in a manner that is consistent with the CWA, and Regions are encouraged to review such a record carefully. For new (proposed) discharges, the permitting authority should require the applicant to characterize the anticipated pollutant concentrations and loads using data from similar discharges and/or based on the characteristics of local soils and geology. As noted above, as a general matter, EPA expects that in-stream conductivity levels above 500 μS/cm are likely to be associated with adverse impacts to water quality. The scientific literature has identified conductivity levels above this level in impaired streams below surface coal mining operations in Appalachian ecoregions 68, 69, and 70 and, therefore, it is generally likely that such surface coal mining operations will have a reasonable potential to cause or contribute to an exceedance of

---

[21] As described in the report, this study may be applied to all waters in the Appalachian region that are dominated by salts of $SO_4^{2-}$ and $HCO_3^-$ at circum-neutral pH and low levels of chloride.

[22] In certain fact-specific circumstances, conductivity levels above 500 μS/cm may not be associated with adverse aquatic impacts. EPA will work with permitting authorities on a site-specific basis to assess reasonable potential.

water quality standards.[23]  Permits for discharges associated with activities other than surface coal mining should also be evaluated to determine whether they are likely to result in in-stream conductivity levels above 500 μS/cm.  We believe that circumstances unique to surface coal mining, however, are principally responsible for the increase in conductivity levels observed in surface waters downstream of mining practices.  Surface coal mining involves disturbing large volumes of rock and dirt, land clearing, and spoil disposal activities at a scale not typically associated with activities such as development practices or forestry.  We do not have studies of other non-mining activities demonstrating a likelihood that they will have a reasonable potential to cause or contribute to an exceedance of water quality standards.  EPA should coordinate with the permitting authority to consider relevant information when conducting a reasonable potential analysis for other activities on a case by case basis.

The state must provide adequate documentation in the permit fact sheet or statement of basis to demonstrate that it has assessed reasonable potential and, where necessary, developed effluent limits (or other permit conditions) adequate to protect all applicable water quality standards, including narrative water quality standards.  EPA will review the adequacy of the state's explanation in its fact sheet or statement of basis, considering the available scientific and other information.  Where EPA concludes that the state's explanation is not adequate, or the state fails to provide an explanation of how it has interpreted or applied its narrative water quality standards, EPA may object to the permit in accordance with the provisions of 40 CFR Section 123.44(c).

D.  Completing an Appropriate Antidegradation Analysis

As EPA increases its oversight of permits associated with surface coal mining activities, EPA will also focus on ensuring that permits are issued consistent with water quality standards-related antidegradation regulations, policies and procedures.  State antidegradation policies provide protection of waters from degradation.  EPA will, in its oversight of NPDES permits, ensure that adequate antidegradation reviews have been conducted for the receiving water consistent with applicable state water quality standards.

Antidegradation regulations require that all permits include limits sufficient to maintain and protect existing uses (Tier 1).  For outstanding national resource waters (Tier 3), antidegradation requires the maintenance and protection of ambient water quality (e.g., no lowering of water quality).  For high quality waters (Tier 2), where the quality of waters exceeds the level necessary to protect the use, EPA will particularly focus on ensuring that the state has made the finding that allowing lower water quality is "necessary to accommodate important social or economic development in the area in which the waters are located."  40 CFR Section 131.12(a)(2).  This amounts to a two-part test: demonstration of the extent to which the discharge is "necessary" in the manner and magnitude proposed, and of its importance for social or economic development.

---

[23] Ecoregions 68, 69, and 70 include portions of the six Appalachian states referenced earlier in this memorandum. A map of these ecoregions is available at http://www.epa.gov/wed/pages/ecoregions/level_iii.htm.

The finding of necessity is among the most important and useful aspects of an antidegradation program. EPA expects an alternatives analysis to evaluate whether the proposed discharge is "necessary." This analysis should include consideration of a range of less-degrading or non-degrading alternatives to the direct discharge or to the manner of discharge (e.g., non-discharging options, relocation of discharge, alternative processes, and innovative treatments). In the finding of social or economic importance of the proposed activity, EPA expects the state to analyze the social and/or economic impact associated with the lowering of water quality. The state should provide documentation to support its antidegradation analysis.

There are similar analyses of alternatives performed under CWA Sections 401, 402, and 404; NEPA; and SMCRA. To the extent that a Section 402 antidegradation analysis has been completed concurrently or in advance of analyses performed under these related authorities, Regions should encourage permitting authorities to use the Section 402 antidegradation analysis to inform similar analyses under these related authorities.

E. Conclusions Regarding Improved NPDES Permitting

Initially, we want to encourage the Regions to continue to work proactively with authorized states to improve the quality of state-issued NPDES permits for surface coal mining. In that regard, we offer eight specific suggestions:

1. Regions should request information from each state as to how that state is interpreting and incorporating applicable numeric and narrative water quality standards within its permitting decisions.

2. The permitting authority must demonstrate in the administrative record, based on site- or receiving-water-specific information, the reasonable potential determination and the basis for any limits or other permit requirements including how the permit implements the narrative water quality standards in a manner that is consistent with the CWA.

3. In recognition of the fact that during discussions with state permitting staff, some state permit writers indicated they did not have sufficient tools to interpret the narrative water quality standards for these discharges, Regions should foster additional dialogue on information and tools EPA could provide to assist the states in translating their narrative criteria into numeric effluent limits.

4. Permitting authorities should consider data from similarly situated mines in their reasonable potential analyses for new facilities. In addition, as noted in Chapter 3.2 of EPA's "Technical Support Document for Water Quality-based Toxics Control,"[24] permitting authorities may determine reasonable potential based on information other than effluent data, such as the nature of the operation and its potential impact on the receiving water. Regions should evaluate whether required and appropriate data are

---

[24] "Technical Support Document for Water Quality-based Toxics Control." EPA Office of Water, March 1991.

14

submitted with permit applications and encourage permitting authorities to consider permit applications incomplete if the data characterization is not sufficient.

5.   Regions should consider objecting to permits that do not assess reasonable potential effectively or fail to implement numeric and narrative standards.

6.   Regions should review, as appropriate, general permits, notices of intent, individual permits, and public participation efforts, and provide comments on eligibility, WQBELs, and antidegradation in particular.

7.   In situations where an NPDES permit has already been issued, but other permits or authorizations are required before a project may proceed, we encourage Regions to work with the other permitting or authorizing authorities to address any concerns left unaddressed by the NPDES permit, as appropriate.

8.   Regions should evaluate the consistency of a permit's monitoring provisions with the statutory and regulatory requirements.

When reviewing state-issued permits, we strongly encourage you to ensure that the items discussed above are addressed in a manner consistent with the CWA and EPA's implementing regulations. In instances in which the Region concludes that a proposed permit is not consistent with the CWA and EPA's implementing regulations, Regions should work closely with the state to make improvements. Historically, Regions have used several tools to try and resolve concerns regarding the sufficiency of state NPDES permits, ranging from comment letters to face-to-face meetings. We encourage Regions to continue to utilize those tools. If, however, in the Region's judgment discussions with the state do not produce a proposed permit that satisfies the requirements of the Act, an objection to the issuance of the proposed permit would be an appropriate response.[25]

1.   Specific Guidance Regarding Oversight of General Permits

Some discharges at surface coal mining sites are authorized through state-issued general NPDES permits. In light of the case-specific analysis necessary to ensure that surface coal mining activities will achieve water quality standards, general permits will often be inadequate. Regions are strongly encouraged to advise the permitting authorities whether the Region agrees that general permits are appropriate for these discharges or whether the Region believes that, in light of the environmental impacts caused by these discharges and the need for tailoring permit conditions by receiving water, permitting authorities should require individual permits in all instances.

---

[25] Following such an objection, the state or other interested parties may request a hearing and provide additional information supporting their position. After such a hearing is held (if requested), EPA can reassert its objection, modify its objection, or withdraw its objection. If EPA continues to object (or if no hearing is requested) and if EPA's objections are not satisfactorily resolved by the state permitting authority, authority to issue the permit will pass to EPA (40 CFR Section 123.44(h)).

15

When reviewing a general permit, Regions should review it closely to ensure that it includes all relevant CWA requirements. Some general permits and state NPDES Memoranda of Agreement (MOAs) provide EPA with the opportunity to review notices of intent to be covered under a general permit. When you have that opportunity, we encourage you to review the notices of intent. For example, EPA and Kentucky have entered into a MOA that sets out EPA's role in reviewing both individual NPDES permits and individual NOIs to be covered under a general permit. As provided for in the MOA, EPA notified Kentucky in a June 16, 2009, letter that EPA was exercising its option to review and comment, prior to issuance or modification, on all draft NPDES individual permits, and NOIs for all proposed coverages under an NPDES general permit for proposed projects being evaluated under the ECP process. As a result, under the MOA, EPA will review the general permit NOIs and has 10 days to notify the Kentucky Division of Water of any objection to the applicant's suitability for coverage under the General Permit.

## 2. Specific Guidance on Environmental Justice Considerations under CWA Section 402

There are important provisions under CWA Section 402 that may be relevant to environmental justice issues stemming from surface coal mining and its impact on human health and the environment. EPA will address the adequacy of the technical and scientific aspects of the permit, as well as public participation, in reviewing NPDES draft permits. In particular, EPA will consider whether the public has been given meaningful opportunity for participation in development of the permit pursuant to 40 CFR Section 124.11.

As explained above, when EPA determines that a draft or proposed permit fails to comply with the CWA, EPA has the authority to object to the issuance of that permit. When Regions review draft or proposed permits for compliance with the Act, we encourage you to also review those permits to determine the extent to which issuing the permit may result in adverse human health or environmental effects on low-income and minority populations. For example, a Region may determine that the issuance of a permit will have adverse effects on drinking water supplies or fisheries that are relied on by subsistence fishers, or wildlife used as a subsistence food source by the local population. If EPA determines that issuing the NPDES permit may result in adverse human health or environmental effects, EPA will consider such effects when determining whether to exercise its discretion to object to a draft state permit under CWA Section 402(d) and EPA's implementing regulations.

## IV. Strengthening EPA's Environmental Review Under CWA Section 404 in Coordination with the Corps of Engineers

EPA has long played a role in assessing environmental and water quality implications of proposed Section 404 permits, and is authorized to prohibit or deny projects that do not meet the criteria in the CWA and implementing regulations. While states are responsible, in coordination with EPA, for establishing state water quality standards, EPA has the critical authority under CWA Section 404(b)(1) to make independent judgments about threats to water quality. In

16

addition to the documented impacts from increased sediment loading, a growing body of data demonstrates that high conductivity and/or selenium levels in streams downstream from mining operations contribute to the impairment of biological diversity and ecological integrity of these streams and can lead to significant adverse impacts on the aquatic ecosystem and contamination of drinking water supplies. EPA and Corps regulations require consideration of these environmental and water quality concerns in the evaluations of applications for permits under CWA Section 404.

Under Section 404(a) of the CWA, the Corps is authorized to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into waters of the U.S., including wetlands. Under Section 404(b)(1), EPA is authorized to develop guidelines, in conjunction with the Corps, to ensure that the goals of the CWA are met. These regulations are located at 40 C.F.R. Section 230. These Section 404(b)(1) Guidelines (Guidelines) are applicable to all discharges of dredged or fill material to waters of the U.S, and the Corps issues Section 404 permits after evaluating proposed discharges for consistency with the Guidelines and its own implementing regulations. 40 C.F.R. Section 230.2. EPA also reviews public notices and general permit pre-construction notifications for Section 404 permits for consistency with the Guidelines. Under Section 404(q) of the CWA, the Agencies have entered into a Memorandum of Agreement (404(q) MOA) governing the sharing of information and elevating of decisions when there is a dispute between regional and district offices over implementation of the Guidelines.[26] Finally, under Section 404(c) of the CWA, the Administrator is authorized to "veto" a permit if the Administrator determines that a discharge will have an unacceptable adverse effect.[27]

When reviewing Corps public notices and general permit pre-construction notifications for CWA Section 404 authorizations for surface coal mining-related discharges to waters of the United States in Appalachian states, Regions should be guided by the following sections.

A. Principles for Regional Review of Appalachian Surface Coal Mining Section 404 Permit Applications

The fundamental premise of the Guidelines is that no discharge of dredged or fill material may be permitted if: (1) it causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable state water quality standard; (2) a practicable alternative exists that is less damaging to the aquatic environment; or (3) the nation's waters

---

[26] Clean Water Act Section 404(q): Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army (1992). Available at
http://www.usace.army.mil/CECW/Documents/cecwo/reg/mou/moa_epa404q.pdf.
[27] "The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection." CWA Section 404(c).

17

would be significantly degraded. 40 C.F.R. Section 230.10. In addition, if the proposed discharge is associated with a non-water-dependent activity, upland alternatives are presumed to exist. 40 C.F.R. Section 230.10(a)(3). Avoidance and minimization of the direct, indirect, and cumulative adverse environmental and water quality impacts to streams, wetlands, and other aquatic resources should be required. A demonstration must first be made that there is no practicable alternative to the proposed discharge to the waters of the United States that would have less adverse impact on the aquatic ecosystem. If there is no less damaging practicable alternative, then all appropriate and practicable steps to minimize potential adverse impacts of the discharge must be taken. Finally, mitigation is required to compensate for any remaining aquatic impacts.

To better ensure that surface mining proposals meet these requirements, Regions should affirm in their review that mining projects are consistent with the following principles:

1. Mining activities will not cause or contribute to violations of water quality standards, contaminate drinking water supplies, or add toxic pollutants that kill or impair stream life. 40 C.F.R. Section 230.10(b). Mining discharges must also not result in significant degradation of the aquatic environment, including contamination of water supplies. 40 C.F.R. Section 230.10(c).

2. Applicants have evaluated a full range of potential alternatives to discharging into waters of the U.S., including off-site and/or other disposal alternatives, with clear documentation regarding practicability for each alternative. 40 C.F.R. Section 230.10(a). Alternative mining methods that reduce generation of excess spoil should also be analyzed. Practicable, modern engineering and materials handling practices should be used to reduce the size and number of valley fills or the extent of streams impacted as a result of mine-through operations that bury, eliminate, and pollute local streams.

3. Mining companies have avoided and minimized their direct, indirect, and cumulative adverse environmental impacts to streams, wetlands, watersheds, and other aquatic resources. 40 C.F.R. Sections 230.10(a) and 230.10(d).

4. Remaining mining-related aquatic impacts have been effectively mitigated by establishing, restoring, enhancing, or preserving streams and wetlands; protecting water quality, including drinking water; and reclaiming watersheds when mining is completed. 40 C.F.R. Section 230.10(d).

Water quality standards are fundamental to achieving the purposes of the CWA. EPA has a role and responsibility for ensuring that water quality standards are not exceeded because of discharges regulated under Section 404 from Appalachian surface coal mining operations. In their review to determine whether a proposed discharge will cause or contribute to an exceedance of water quality standards, Regions should be guided by the principles articulated in Sections III.B. and III.C. of this memorandum addressing implementation of both numeric and narrative water quality standards. EPA retains its responsibility for ensuring that neither numeric nor narrative water quality standards are exceeded due to discharges of fill material even if a state has issued a water quality certification under Section 401 of the CWA. State certifications of

compliance with applicable water quality standards will be considered conclusive by the Corps with respect to water quality considerations unless the Regional Administrator advises the Corps of other water quality aspects to be taken into consideration. 33 C.F.R. Section 320.4(d). Thus, Regions should convey their conclusions with respect to possible exceedances of water quality standards to the Corps and, if appropriate changes to the permit are not made in response to these water quality concerns, may proceed under the 404(q) MOA and/or Section 404(c).

Similarly, with respect to the four review principles identified in this section and the guidance for applying the Guidelines in the next section, Regions should convey the results of their reviews to the Corps, the permit applicant, and the state and, if appropriate changes to the permit are not made in response to these water quality concerns, may proceed under the 404(q) MOA and/ or Section 404(c).

B. Key Information for Evaluating Permit Applications for Appalachian Surface Coal Mining

Because of the complexity, size, and scale of surface coal mining projects, in reviewing proposed Section 404 permit applications for these activities, it is essential that federal and state agencies have appropriate data to fully review the aquatic ecosystem impacts anticipated to occur. EPA Regions should evaluate project-specific data including, but not limited to, the following information. Where such data are also required by other federal and state regulatory partners, the agencies are encouraged to collaborate in sharing this information among one another to increase efficiency and better ensure regulatory decisions are being made using the same base of technical information.

- Geospatial information – Digital geospatial boundaries for the proposed project and individual valley fills. Location of nearby, reference, or unmined tributaries in the same catchment.
- Surface area disturbed – Total acreage of surface disturbance area (mineral extraction area).
- Spoil material – Volume of overburden excavated and volume of excess spoil (in cubic yards).
- Disposal location – Detailed as on site, off site, or a combination or percentage.
- Spoil for each valley fill – In cubic yards, where applicable.
- Drainage area – Above each toe of fill and each sediment pond, whichever is further downstream (in acres).
- Impacts – Aquatic resource impacts resulting from, but not limited to, valley fills, sediment ponds, slurry ponds, in-stream mining, or other mining operation features, in linear feet by type of stream (perennial, intermittent, ephemeral) or acres for other resource types, and by type of impact (permanent or temporary).
- Baseline monitoring – Pre-mine (land disturbance) sampling data and sampling location for total suspended solids, total dissolved solids, conductivity, sulfates, bicarbonate, chloride, magnesium, potassium, calcium, sodium, pH, selenium, and list of the presence and abundance of aquatic organisms identified to the loweset

19

practicable taxonomic level, usually genus-level for invertebrates and species-level for vertebrates.

- Hydrology – Cumulative Hydrologic Impact Assessments (CHIAs) and Probable Hydrologic Consequences (PHC).
- Watershed condition – Any sampling data for total suspended solids, total dissolved solids, conductivity, sulfates, bicarbonate, chloride, magnesium, potassium, calcium, and macroinvertebrate presence and abundance for adjacent mines included with the CHIA or other sources.
- Geology – Geologic strata information from core samples, including analysis of selenium, pyrite, calcium carbonate, acid-producing strata, and any strata that may cause or contribute to conductivity.
- Drinking water supplies – Location of drinking water supplies that could be affected, including private wells.
- Subsistence consumption – Patterns of local consumption of fish and wildlife that may be affected by loss of waters and impacts to surface water quality.

C. Applying the 404(b)(1) Guidelines for Surface Coal Mining Activities

The Section 404(b)(1) Guidelines prohibit issuance of a permit that will cause or contribute to excursions from applicable state water quality standards or to significant degradation of the aquatic ecosystem. 40 C.F.R. Sections 230.10(b) and (c). While issuance of the Section 402 permit is required to control discharges of pollutants into waters of the United States from surface mining operations, the discharge of fill material resulting in physical modification and elimination of portions of headwater streams may have water quality impacts that are not addressed in the NPDES permit. For example, elimination of all or even part of a headwater stream may remove from the overall watershed system an important source of freshwater dilution that contributes to water quality. Accordingly, even where a NPDES permit has been issued, the Section 404 permit must independently ensure that water quality is protected. The applicant should be required to demonstrate up front, based on proposed mining techniques, best management practices, or other actions, that the project will not cause or contribute to an excursion from applicable water quality standards or to significant degradation. The permit should include a condition, pursuant to 40 C.F.R. Sections 230.10(b) and (c), prohibiting the project from causing or contributing to an excursion from applicable water quality standards or to significant degradation.

The following discussion represents EPA's expectations for the analyses necessary to ensure compliance with water quality standards, prevention of significant degradation, and full analysis of avoidance, minimization, and (where necessary) mitigation, to achieve full compliance with the 404(b)(1) Guidelines.

1. Preventing Violations of Water Quality Standards

The Section 404(b)(1) Guidelines require that Section 404 permits must not cause or contribute, after consideration of site dilution and dispersion, to violations of applicable state

water quality standards. 40 CFR Section 230.10(b)(1). As explained more fully above in Section III, Appalachian states have narrative water quality standards that protect the native aquatic community, including protection from adverse effects associated with elevated levels of in-stream conductivity. Nearly all Appalachian states, however, have not established numeric water quality criteria for conductivity or TDS and historically have not included numeric effluent limitations to address conductivity or TDS in state-issued NPDES permits. The absence of necessary WQBELs in 402 permits has meant that EPA has needed to consider whether issuance of a 404 permit would be inconsistent with the Guidelines because authorization of a particular mining project would result in exceedances of a state's narrative standards. Section III.C. of this memorandum provides specific guidance to the Regions on how to evaluate whether provisions of NPDES permits are adequate to protect against violations of water quality standards, and that guidance also applies to how Regions should conduct that evaluation for Section 404 permits. As discussed below, even where a Section 402 permit has addressed protection of water quality standards, the Guidelines establish an independent obligation to address potential violations of water quality standards associated with discharges of dredged or fill material and to protect against significant degradation.

2. Preventing Significant Degradation

In addition to the provision in the Section 404(b)(1) Guidelines requiring that Section 404 permits must not cause or contribute, after consideration of site dilution and dispersion, to violations of applicable state water quality standards (Section 230.10(b)(1)), a separate, additional provision prohibits the permitting of a discharge that will cause or contribute to significant degradation of the waters of the U.S. (Section 230.10(c)). The Corps and EPA therefore have a responsibility to ensure sufficiently protective requirements are included when reviewing mining projects in draft Section 404 permits. To date, this has involved coordination with the Corps to develop adequate numeric action triggers in 404 permits. Our general approach has been to rely on peer-reviewed studies (including those by EPA) examining the relationship between conductivity values and water quality impairment in Appalachia. These studies point to a strong relationship between conductivity values in the range of 400-500 μS/cm in headwater streams and significant degradation of benthic communities in Appalachian streams as a result of mining activity. In response to these studies, the Corps and EPA included conditions in the recent Section 404 permit for the Hobet 45 mine that trigger remedial action requirements when conductivity levels in streams associated with this mine reach the 400-500 μS/cm level.

A recently prepared EPA ORD study, which is being noticed in the Federal Register for public comment and which will be submitted for SAB review, augments existing studies and provides an additional analysis of the relationship between impairment of stream quality in Appalachia and conductivity levels. This study identifies conductivity levels of 300 μS/cm or below in Appalachian headwater streams as a benchmark for retaining 95% of native benthic species. The study also identifies substantial impacts to native invertebrate species at conductivity levels exceeding 500 μS/cm. Because the study will be reviewed by the SAB, it does not represent a final Agency position at this time. However, EPA will need to continue reviewing 404 permits while this external peer review process is underway.

21

For purposes of Section 230.10(c) of the Guidelines, the Regions should consider the ORD report when examining whether a draft 404 permit is likely to result in significant degradation of waters of the U.S. During this interim period, the Regions should make a case-by-case determination based upon all available relevant scientific information including the ORD report. EPA anticipates that the conductivity impacts of projects with predicted conductivity levels below 300 µS/cm generally will not cause a water quality standard violation or significant degradation of the aquatic ecosystem. On the other hand, EPA expects that in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts that could rise to the level of significant degradation of the aquatic ecosystem. At a minimum, should a proposed Section 404 permit allow for increases in levels of conductivity above 500 µS/cm, the administrative record for the permit should demonstrate, based on site or receiving water specific information, how the permit is consistent with the CWA and the 404(b)(1) Guidelines, and Regions are encouraged to review such a record carefully. EPA, the Corps, and individual mining operators should be coordinating, in the context of a "sequenced" permitting approach (see IV.C.4 below), or other similarly protective measures, to ensure conductivity levels remain at levels not likely to contribute to degraded water quality, as discussed above in III.C.1. Projects projected to increase conductivity levels above 300 µS/cm should include permit conditions requiring adaptive remedial action to prevent conductivity levels from rising to levels that may contribute to water quality degradation, as discussed in III.C.1. After EPA's draft conductivity report is finalized after peer review, we will reexamine this approach.

In conjunction with the conductivity threshold, ORD's review of the scientific literature on surface coal mining (as mentioned above, scheduled to be reviewed by the SAB) and *Science* magazine found effects, including resource loss, water quality impairment, and adverse effects on aquatic ecosystems, that could support a conclusion of significant degradation of waters of the U.S. under applicable regulations.

3. Ensuring Effective Monitoring

To ensure compliance with these provisions of the Guidelines, the permit should effectively require water quality and biological monitoring in streams below surface coal mining operations to ensure permit conditions are being met and to collect data to inform continued operations as described below. Monitoring should be conducted during construction and post-construction. The permittee should be required to submit baseline monitoring data for biological condition, conductivity, total dissolved solids, sulfates, bicarbonate, chloride, magnesium, potassium, calcium, sodium, pH, and selenium to help provide information necessary to assure compliance with water quality standards and prevent significant degradation. The permittee should use the methodology employed by the state for assessing its waters pursuant to Section 303(d) or other methodology utilized by the state. In addition, with respect to biological data, the permittee should identify taxa to the genus level where the state methodology does not do so. The permittee should implement a monitoring plan for the foregoing parameters at appropriate locations upstream and downstream of the project, where applicable. As set forth in more detail below, the permit should include clear requirements for remedial actions to protect water quality

22

in the event monitoring reveals a trend toward excursion from water quality standards or a trend toward significant degradation.

4. Ensuring Independent Water Quality Protection from Section 404 Permits

Regions should ensure that, if a Section 402 permit has already been issued and does not address current science-based values for contaminants, the Section 404 permit includes needed conditions to protect water quality and to prevent significant degradation of the aquatic ecosystem. In addition to the monitoring requirements discussed in #1 above, additional conditions should explicitly address the levels of specific contaminants that must be achieved. These conditions should also address the adaptive remedial actions that will be implemented if water quality protection values are exceeded.

5. Ensuring Adequate Cumulative Impact Assessment Consistent with the 404(b)(1) Guidelines

Regions should ensure that watershed-scale (e.g., Hydrologic Unit Code 12 (HUC-12)) cumulative impact analyses are conducted as an element of the factual determinations required by the 404(b)(1) Guidelines. 40 CFR Section 230.11(g). These analyses should assess the consequences of past, present, and reasonably foreseeable future discharges of dredged or fill material (federal and non-federal) in the affected watersheds, on water quality and the aquatic environment. To the extent the cumulative impacts to water quality and the aquatic environment also affect human use characteristics, such as water supplies or fisheries, those impacts also should be addressed. Regions are encouraged to ensure that cumulative impact assessments conducted pursuant to the Guidelines are coordinated with required NEPA evaluations described in Section VI. below.

6. Assessing and Mitigating for Affected Stream Functions

Regions should ensure that applicants or the Corps conduct functional stream impact assessments and ensure they are effectively used to quantify the environmental effects of individual mining projects on streams. Regions are encouraged to work with and provide technical assistance to the Corps and states on the development and implementation of effective assessment methods. These assessments should be used to ensure that compensatory mitigation adequately replaces lost stream functions. For example, EPA should recommend alternatives to drainageways (e.g., groin ditches) as methods of stream mitigation, as they do not replace lost stream functions and are therefore not an acceptable form of compensatory mitigation. Some additional specific expectations for compensatory mitigation consistent with the agencies mitigation regulations include:

a. Timeframe – An expected timeframe for success should be identified and the mitigation should be monitored for that length of time in order to ensure success.

23

b.   Mitigation monitoring – A detailed monitoring plan outlining the observable and measureable physical, chemical and biological criteria, and expected standards to be achieved, should be incorporated into permit conditions.

c.   Adaptive remedial action – Include an adaptive remedial action plan that identifies specific triggers in the performance standards and alternate plans and strategies should the desired targets not be achieved. The plan should require additional actions and/or supplemental mitigation in the event success criteria are not achieved within an appropriate timeframe.

d.   Stream establishment – Created stream channels should be designed to develop good water quality, healthy and diverse biological communities, and similar hydrologic regimes as streams to be impacted by mining activities. The goal of these compensation projects is to replace the lost stream functions impacted through mining activities; therefore, they should be designed to achieve designated uses for aquatic life support.

e.   Ditches – No Section 404 compensation credit should be given for sediment, groin, or other water control ditches required for mining projects under SMCRA and CWA Section 402.

7.   Ensuring Environmental Justice in Section 404 Permitting

Regions should identify whether issuing a permit would result in adverse human health or environmental effects on low-income and minority populations, including impacts to water supplies and fisheries. Where such effects are likely, EPA Regions should suggest ways and measures to avoid and/or mitigate such impacts through comments to the Corps.

In addition to the principles outlined above, EPA expects that the following best management practices will help to reduce or eliminate potential increases in conductivity levels in surface waters downstream of mining-related discharges to levels consistent with meeting narrative water quality standards and preventing significant degradation, as discussed in this memo, and to minimize associated impacts to the aquatic environment.

1.   Sequencing Multiple Valley Fills for Projects Proposing More Than One Fill

Many of the proposed best management practices associated with the design of mining operations are currently unproven in their effectiveness to protect water quality and to prevent significant degradation. As a general matter, an effective approach for managing this uncertainty is to sequence multiple fills on a project. The sequenced approach, or another comparably effective measure, should be employed to account for uncertainty regarding the ability of current project best management practices to address the potential adverse impacts of multiple fills. In this context, the term "sequenced" means:

24

a.  Valley fills that are part of the same project or complex should generally be
    constructed one at a time, unless site-specific data suggest no potential downstream
    water quality concerns; and

b.  The permittee should demonstrate compliance with applicable water quality
    standards, and that significant degradation has not occurred, at each valley fill before
    the permittee may begin construction of subsequent valley fills.

EPA encourages applicants to fully sequence fills (e.g., one at a time) where monitoring
and watershed-specific factors suggest water quality impacts may occur. On a case-by-case
basis, if available data suggest that concurrently constructing more than one initial fill would not
be likely to lead to water quality concerns, such an approach may be evaluated. A trends
analysis as referenced above should be performed from the conductivity monitoring data. The
trends analysis should then be evaluated against two threshold conductivity values established
within the permit. The first value would establish a threshold at which a trend toward causing or
contributing to water quality exceedances and significant degradation is identified, and the
operator would be required to implement an adaptive remedial action plan to prevent further
degradation. The second value would establish a threshold at which an excursion from
applicable water quality standards and/or significant degradation is likely, and the permittee
would be prohibited from constructing additional valley fills until such time as the excursion
from water quality standards and/or significant degradation has been remediated and the
permittee has demonstrated that no further excursion from water quality standards and/or
significant degradation will occur. As discussed above, for many Appalachian streams, available
scientific evidence supports using thresholds of 300 and 500 uS/cm in this context, though site-
specific evidence may support alternate thresholds.

2.  Protecting Water Quality for Projects Proposing One Valley Fill

For operations proposing a single valley fill, the sequencing as described above is not an
option. As stated above, the applicant should be required to demonstrate prior to authorization
and construction, based on proposed mining techniques, best management practices, or other
actions, that the project will not cause or contribute to an excursion from applicable water quality
standards or to significant degradation. The permit should include a condition, pursuant to 40
CFR Sections 230.10(b) and (c), prohibiting the project from causing or contributing to an
excursion from applicable water quality standards or to significant degradation. In order to carry
out this requirement and to assure that the permit will not cause or contribute to an excursion
from applicable state water quality standards or to significant degradation of downstream waters,
a monitoring plan as described above should generally still be required. Such permit conditions
are also applicable and should be required for projects proposing multiple valley fills.

3.  Minimizing Spoil Generation and Water Quality Impacts Through Avoidance and
    Minimization

Because larger and more numerous valley fills in waters of the U.S. are associated with increasing both direct adverse impacts to streams and watersheds and indirect downstream water quality impacts, projects should incorporate cost effective and technologically feasible limits on the quantity of excess spoil being generated per ton of coal produced by conducting a robust alternatives analysis. By relying on more efficient mining practices, impacts to streams and watersheds can be reduced. High-ratio mining operations generally do not represent the least environmentally damaging alternative. Consistent with the June 2009 interagency surface coal mining MOU, applicable federal and state regulatory agencies should coordinate environmental reviews of pending permit applications under the CWA and SMCRA to require practicable mining techniques that maximize the amount of spoil returned to the mine bench and minimize the amount of excess spoil that must be disposed of in streams and other aquatic systems. For mine-through operations, stream impacts should be avoided to the maximum practicable extent and spoil placement should be controlled to reduce drainage through overburden into streams. Options for disposing of mine waste in uplands, including relying on remaining excess spoil capacity at adjacent mine sites, must be fully evaluated. "Piecemealing" of multiple small mines to replace fewer large mines should be carefully evaluated to ensure that substitution of smaller mines is not resulting in greater direct, secondary, and cumulative adverse environmental impacts, which is not consistent with the Guidelines.

Projects should also incorporate environmentally effective limits on the linear extent of stream impacts per ton of excess spoil produced through a robust alternatives analysis. Such limits provide for improved efficiencies in spoil handling to minimize impacts to streams and is applicable to most mining operations, including mine-through projects. Where valley fills are necessary to accommodate disposal of excess spoil, overburden should be configured to maximize disposal as far up the valley as is feasible from an engineering perspective. To reduce direct stream impacts, valley fill construction should generally be from the head of the valley downwards instead of beginning at a point downstream and moving back upstream.

4.  Certifying Mine Plan and Ensuring Full Utilization of Fill Disposal Sites

It is EPA's experience that permitted mine plans do not always reflect the "on-the-ground" construction and operation of a mine project. For many reasons, as construction and operation of the mine is underway, it is possible that the mine plan may change and that an operation may not fully utilize authorized capacity in valley fills. To prevent under-utilization of fills and to encourage additional avoidance and minimization of impacts to waters of the United States during construction, EPA should recommend that an issued permit be conditioned to require the operator to certify the mine plan and provide such certification to the Corps and EPA prior to construction of each valley fill. The operator should also be required to provide post-mining "as-built" plans.

5.  Minimizing Conductivity Impacts and In-Stream Impoundments

Projects should fully evaluate and, where feasible, incorporate the following specific aspects of effective impacts avoidance and minimization:

a.  <u>Materials handling plans</u> – Ensure that soils and rock on the mine site have been tested for concentrations of acid-, selenium- or heavy-metals-bearing or soluble strata that are likely to lead to high conductivity concerns. Overburden with high concentrations of these pollutants should be handled to minimize exposure to rainwater and groundwater and subsequent drainage into surface waters.

b.  <u>Fill construction</u> – To prevent infiltration of surface runoff into the fill mass whenever possible, overburden should be compacted, leaving the top six feet unconsolidated. The use of end dumps should be discouraged whenever possible.

c.  <u>Sedimentation ponds</u> – While achieving adequate sediment control, minimize the number of sediment ponds placed in waters of the U.S. and ensure that post-mining reclamation plans remove such ponds and restore affected streams.

6.  Reducing Drainage Area Flowing Through Fills

Projects should reduce the drainage area flowing through valley fills to the maximum practicable extent consistent with sound engineering and safety considerations. Recent studies have suggested that water (e.g., precipitation and groundwater) flowing through valley fills contributes significantly to downstream water quality concerns as infiltrating water accumulates metals, dissolved solids, and sulfates. Designing mines (including mine-through operations) and valley fills to minimize drainage through mining spoil can contribute significantly to protecting downstream water quality. Regions should ensure that projects evaluate and, where feasible, incorporate current best mining practices that reduce infiltration and protect water quality, such as constructing valley fills as "side-hill" fills to reduce infiltration by precipitation, incorporating drains in valley fills to intercept and divert groundwater, and designing mines to take more consistent advantage of natural drainage through coal and rock formations that divert flow away from surface waters.

D.  Addressing a Broad Range of Environmental Impacts

While the Guidelines evaluation process addresses impacts to the aquatic environment and the consequences of those impacts, we recognize that issuance of Section 404 permits can have other important environmental and human health impacts that are considered by the Corps as part of the "public interest review" process (33 CFR Section 320.4(a)). The public interest review process explicitly requires a "careful weighing" of up to 21 relevant public interest factors, including economics, aesthetics, energy needs, safety, and the general "needs and welfare of the people." In that light, we recommend that Regions provide comments to the Corps that address relevant public interest factors associated with the discharge of fill material

into waters of the United States, with a particular emphasis on ways or measures to mitigate potential adverse impacts to low-income and minority populations.

### E.  Conclusion

We encourage the Regions to discuss these general strategies with Corps Districts and states.  Consistent with long-standing practice, we encourage Regional staff to offer specific recommendations to permit applicants who want to work with EPA to resolve individual permit issues.  We have, in fact, engaged in productive dialogues with several permit applicants. Experience has shown that these discussions can provide an efficient and effective path to agreement on permit conditions that meet the requirements of the law while allowing mining companies to proceed on a cost-effective and environmentally responsible basis.  We encourage more interaction between industry and EPA to resolve permit issues through dialogue and technical cooperation.

### V.  CWA Section 401 Certifications by States

Section 401 conveys to states directly and eligible Tribes the authority to approve (certify), condition, or deny all federal permits or licenses authorizing a discharge to waters of the U.S., including wetlands, including CWA Section 404 permits and federally issued SMCRA permits.  States and Tribes may choose to waive their Section 401 certification authority and, if they fail to respond to a request for certification within the proscribed time (generally one year), their Section 401 authority is waived by default.

States and Tribes most commonly make their decisions to deny, certify, or condition permits or licenses primarily in consideration of whether the activity will comply with state water quality standards.  However, they also look at whether the activity will violate effluent limitations, new source performance standards, toxic pollutant controls, or other appropriate requirements of state or Tribal law or regulation.  EPA is in the process of developing an updated handbook on the basics of state Section 401 certification actions, which is intended to help clarify how states and tribes can most effectively employ this statutory water quality management tool for applicable projects, including surface coal mining projects permitted under Section 404.

Although Section 401 certification authority rests with the jurisdiction where the discharge originates, neighboring states and tribes downstream or otherwise potentially affected by the discharge have an opportunity to raise objections to, and comment on, the federal permit or license.  EPA should determine if a discharge subject to Section 401 certification may affect the water quality of other states or tribes and, if there may be such an effect, EPA Regions should notify other jurisdictions whose water quality may be affected.  The other jurisdictions should then be provided an opportunity to submit their views and objections, including opportunities for public hearings, consistent with CWA Section 401(a)(2).  Although, the nature of recommendations from neighboring jurisdictions do not have the same force as conditions from a

Section 401 certifying state, the federal agency must develop measures to address the downstream jurisdictions' concerns.

Section 401(a)(1) requires that a state "establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications." 33 U.S.C. Section 401(a)(1). To enable meaningful participation by affected communities, we recommend that Regions work with the states to ensure that these public participation procedures are in place, and encourage the states to provide appropriate opportunities for public hearings on specific certifications.

## VI. **National Environmental Policy Act Considerations**

The Regions should work with the Corps and OSM to ensure that the NEPA analyses associated with federal permit decisions provide, through an open and accountable process, a comprehensive evaluation of the potential impacts associated with proposed actions, as well as an analysis of reasonable alternatives that may avoid or minimize adverse impacts. The Corps has announced its intention to issue a notice of proposed rulemaking expanding the Corps NEPA scope of review to consider all of the effects of proposed surface coal mining "valley fills" on the aquatic environment. EPA will work with the Corps toward that objective, and furthering the purpose of NEPA to provide information to the decision maker, other federal and state agencies, and the public. In the interim, EPA will work with the Corps on a case by case basis to review permit applications and ensure that all relevant environmental information, as well as potential alternatives that may avoid or minimize the extent of the valley fills, is fully considered.

We also recommend that Regions work with the Corps and OSM to help establish opportunities for early and meaningful community input. These opportunities for increased community input may include Regions requesting that Corps Districts and OSM make draft Environmental Assessments (EAs) readily available to the public using a variety of methods, including online and print media, as early in the permitting process as possible. In addition, it is important that all agencies work with local communities, including low-income and minority populations, to identify potential adverse human health and environmental impacts and mitigation measures and improve the accessibility of meetings, crucial documents, and notices.

As discussed earlier, the NEPA process is also an effective vehicle for considering the potential cumulative effects of mining proposals. Using a watershed-scale analysis (e.g., HUC-12 analyses) would be an effective way to examine the cumulative environmental and human health impacts from past, present and reasonably foreseeable actions, including federal and non-federal actions. When working with the Corps and OSM to help define the proper scope of a NEPA cumulative impact assessment, Regions should be clear that while cumulative hydrological impact assessments (CHIAs) prepared as part of the SMCRA process can provide useful information regarding impacts to the hydrologic balance of an area, a NEPA cumulative impact assessment should consider the full suite of relevant environmental impacts.

When an agency develops and makes a commitment to require mitigation measures to avoid, minimize, rectify, reduce, or compensate for significant environmental impacts, NEPA

29

compliance can be accomplished with an EA, coupled with a Finding of No Significant Impact (FONSI) ("Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 FR 18026 (March 23, 1981)). The Regions should, in evaluating permit applications and NEPA analyses, carefully evaluate any proposed mitigation measures to ensure that they will not only be effective at eliminating or reducing impacts, but also that they are clearly stated, include binding commitments and monitoring plans, and include provisions for public access to monitoring results and related documents. Recent scientific evidence referenced earlier in this memorandum, as well as field experience with surface coal mining mitigation projects, has raised technical concerns about the capacity of some forms of mitigation to reduce on-site and downstream impacts associated with Appalachian surface coal mining to below levels of significance. For example, as noted earlier, EPA believes that no mitigation credit should be given for sediment, groin, or other water control ditches. Consequently, construction of these ditches should not be used as a basis for supporting a FONSI. Moreover, mitigation measures that rely on establishing or re-establishing streams, rather than rehabilitating or enhancing existing streams, have less certainty of successfully offsetting impacts and should generally not be used to support a FONSI.

While no specific regulatory thresholds exist for determining whether a potential impact is significant under NEPA, it is EPA's general experience with surface coal mining projects in Appalachia that there are a number of factors that should be considered. First, the scale of the proposed impacts to stream habitats is of primary importance. While smaller projects should be reviewed to determine whether potential impacts warrant preparation of an EIS, it is EPA's experience that projects that involve more than one mile of stream loss or more than one valley fill are likely to result in significant adverse impacts.

Finally, consistent with EPA's *Policy and Procedures for the Review of Federal Actions Impacting the Environment*, the Regions should consult with the Office of Federal Activities (OFA) when recommending to the Corps or OSM that an EIS be prepared. OFA can also provide assistance when Regions are unable to reach agreement with Corps Districts or OSM on whether an EIS should be prepared in a particular case. Further, although the decision to prepare an EIS rests with the Corps and OSM, under EPA's Clean Air Act Section 309 authority, EPA must "refer" to CEQ matters that the Administrator finds are "unsatisfactory from the standpoint of public health or welfare or environmental quality." OFA will work with Regions to determine an appropriate course for resolving such disputes, including the potential for a referral to CEQ, if appropriate.

## VII.   Conclusions

EPA will continue to work with our federal regulatory partners, state agencies, the mining industry and the public to fulfill our common goals of reducing adverse impacts to water quality, aquatic ecosystems, and human health. We will also communicate effectively with local communities and mining companies to provide the transparency, consistency, and efficiency expected of government agencies in dealing with issues of such importance to health, the environment, and the economy. EPA's Regional offices will continue to be the Agency's primary field representatives to co-implementing agencies, mining companies, affected

communities, and interested members of the public as we work to respond to CWA, NEPA, and environmental justice issues associated with Appalachian surface coal mining permits. We look forward to your leadership as we coordinate to develop environmentally effective, scientifically sound, and economically responsible approaches for meeting the requirements of the law.


cc:     Regional Water and Enforcement Division Directors, Regions 3, 4, and 5
        Robert Sussman, Senior Policy Counsel to the Administrator
        C. Scott Fulton, General Counsel



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON, D C   20460

**APR - 1 2010**

## MEMORANDUM

**SUBJECT:**   Guidance Summary: Improving EPA Review of Appalachian Surface Coal
Mining Operations under the Clean Water Act, National Environmental Policy
Act, and the Environmental Justice Executive Order

**FROM:**   Peter S. Silva
Assistant Administrator for Water

Cynthia Giles
Assistant Administrator for Enforcement and Compliance Assurance

**TO:**   Shawn Garvin
Regional Administrator, EPA Region 3

A. Stanley Meiburg
Acting Regional Administrator, EPA Region 4

Bharat Mathur
Acting Regional Administrator, EPA Region 5

## 1.   Purpose

This summary memorandum clarifies how EPA is carrying out our responsibilities, in
coordination with our federal and state partners, to assure that the environmental impacts of
Appalachian surface coal mining operations comply with the Clean Water Act (CWA), National
Environmental Policy Act (NEPA), and the Environmental Justice Executive Order (E.O.
12898).[1]  Our goal is to identify the steps permittees and implementing state agencies should take
to prevent harmful public health, water quality, and other environmental impacts associated with
Appalachian surface coal mining and to more effectively consider the voices of adversely
affected communities in the Appalachian coalfields.

---

[1] This memorandum is effective immediately. Concurrent with its release, however, EPA is seeking public comment
on this interim final document. We fully understand the importance of this memorandum to our federal and state
partners, the coal industry, and the public, and we recognize the value in receiving their input based on experience
with its implementation. The public comment period will conclude on December 1, 2010. No later than April 1,
2011, EPA will issue final guidance after consideration of public comments and the results of the Science Advisory
Board (SAB) review, and consistent with our experience in implementation of this memorandum.  EPA may revise
the guidance sooner, as appropriate, consistent with the SAB review.  EPA is publishing a notice in the *Federal
Register* that provides additional details on the public comment process.

1



**EXHIBIT**

4 F

## II.  Introduction

The environmental legacy of mining operations in the Appalachian region is far-reaching. Recent studies, as well as the experiences of Appalachian coalfield communities, point to new environmental and health challenges from surface coal mining that we were largely unaware of even ten years ago. Since 1992, nearly 2,000 miles of Appalachian streams have been filled at a rate of 120 miles per year by surface mining practices. A recent EPA study found that nine out of every 10 streams downstream of surface mining operations exhibit significant impacts to aquatic life.[2] Another federal study found elevated levels of highly toxic and bioaccumulative selenium in streams downstream of valley fills.[3] These impairments are linked to contamination of surface water supplies and resulting health concerns, as well as widespread impacts to stream life in downstream rivers and streams.

The CWA entrusts EPA with responsibility for protection of human health, water quality, and the environment in coalfield communities throughout Appalachia. This responsibility includes preserving the long-term health and biological integrity of Appalachian watersheds, which is important to sustain aquatic populations and maintain safe and abundant water supplies for local communities. It also includes the need to assure human health and environmental protection of vulnerable populations and to increase opportunities for their participation in the permitting process. We will make every effort to fulfill these responsibilities without compromising the economic and energy benefits that coal mining provides to both the Appalachian region and our entire nation.

## III.  EPA Review of NPDES Permitting

Although much of the focus to date has been centered on the Section 404 permits associated with surface coal mining, mining operations are also required to obtain NPDES permits for their discharges. EPA recently conducted a Permit Quality Review (PQR) in West Virginia, Kentucky, Tennessee, and Ohio. During that Review, it became clear that many of the state-issued NPDES permits failed to comply with the requirements of the CWA in several respects. In particular, the permits often lacked any water quality based effluent limits (WQBELs) to implement applicable numeric or narrative water quality standards.

The scientific literature is increasingly recognizing the relationship between conductivity levels in Appalachian streams and impacts to aquatic biota in streams below surface coal mining operations. Based on field measurements comparing unmined and mined watersheds in Appalachia, the peer-reviewed 2008 "Pond-Passmore" study concluded that aquatic life at sites with specific conductance greater than 500 μS/cm were determined to have been adversely impacted based on a genus-level multi-metric biological index. In addition, EPA's draft report, *A Field-based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams*, also recognizes stream-life impacts associated with conductivity. This study, which is publicly

---

[2] Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008. Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools. J. N. Am. Benthol. Soc. 27(3):717–737.

[3] Bryant, G., S. McPhillamy, and H. Childers. 2002. A Survey of the Water Quality of Streams in the Primary Region of Mountaintop / Valley Fill Coal Mining. Mountaintop Mining Valley Fill Programmatic Environmental Impact Statement. USEPA Region 3. Wheeling, WV.

available and set to undergo external peer review by EPA's Science Advisory Board, applies EPA's standard method for deriving water quality criteria to field measurements and concludes that genus-level impacts to the biological community can occur at conductivity levels of 300 µS/cm.

Based on this PQR, when reviewing proposed permits, EPA Regions will ensure that appropriate WQBELs are included in order to meet the relevant narrative and numeric water quality standards. Available data for determining reasonable potential to cause or contribute to a violation of water quality standards include data from mining discharges from similar mines, as well as recent science documents developed by EPA. Based on the science, as a general matter, EPA expects that in-stream conductivity levels maintained at or below 300 µS/cm will meet water quality standards and that in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative state water quality standards.[4] If water quality modeling suggests that in-stream levels will exceed 500 µS/cm, EPA believes that reasonable potential likely exists to cause or contribute to an excursion above applicable water quality standards; unless, based on site-specific data, the state has an alternative interpretation of their water quality standards that is supported by relevant science. Similarly, if water quality monitoring suggests that in-stream levels will exceed 300 µS/cm but will be below 500 µS/cm, EPA should work with the permitting authority to ensure that the permit includes conditions that protect against conductivity levels exceeding 500 µS/cm. In circumstances where conductivity levels in waters proposed for new mining related discharges already exceed 500 µS/cm, EPA will coordinate with the permitting authority on a site-specific basis to ensure these new discharges will not cause or contribute to a violation of water quality standards. Once EPA's draft conductivity report is finalized following Science Advisory Board review, we will evaluate whether changes to the conductivity benchmarks identified here are appropriate. Regions should evaluate whether NPDES permits appropriately incorporate provisions related to conductivity, as well as the other parameters contained in the effluent. Under the CWA, NPDES permits are required to ensure compliance with the permit terms upon issuance of the permit, unless an appropriate compliance schedule is included.

Regions have authority under the CWA to object to proposed NPDES permits that fail to comply with the requirements of the Act. When Regions review surface coal mining permits, in situations where proposed permits fail to incorporate any required WQBELs, an objection would be an appropriate response. Regions should work with States to assess Notices of Intent (NOIs) and work with States on denying coverage under the general permit if applicants have not fully characterized their discharges or where coverage under the general permit would be otherwise inappropriate. Regions should also work with States to ensure their antidegradation procedures are effective and are fully implemented.

## IV.   EPA's Environmental Review Under CWA Section 404 in Coordination with the Corps of Engineers

1.   **Water Quality and Environmental Integrity Must Be Protected** – Consistent with the CWA, EPA's Section 404 regulations (the Guidelines) provide that no discharge of

---

[4] In certain fact-specific circumstances, conductivity levels above 500 µS/cm may not be associated with adverse aquatic impacts. EPA will work with permitting authorities on a site-specific basis to assess reasonable potential.

dredged or fill material may be permitted if it causes or contributes to violations of any applicable state water quality standard or if the nation's waters would be significantly degraded.

EPA anticipates that projects with predicted conductivity impacts below 300 uS/cm generally will neither significantly degrade the aquatic ecosystem nor cause or contribute to a water quality violation. As a general matter, however, EPA expects that instream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts that rise to the level of significant degradation of the aquatic ecosystem and an excursion from narrative water quality criteria. At a minimum, should a proposed section 404 permit allow for increases in levels of conductivity above 500 µS/cm, the administrative record for the permit should demonstrate, based on site or receiving water specific information, how the permit is consistent with the CWA and the 404(b)(1) Guidelines, and Regions are encouraged to review such a record carefully. EPA, the Corps of Engineers (Corps), and individual mining operators should be coordinating to ensure conductivity levels remain below 500 µS/cm (e.g., by adopting a sequenced permitting approach). Projects projected to increase conductivity levels above 300 µS/cm should include permit conditions requiring adaptive remedial action to prevent conductivity levels that exceed 500 µS/cm.

2.      **Mining Projects Must Avoid and Minimize Environmental Impacts:** Mining companies must avoid and minimize their direct, indirect, and cumulative adverse environmental impacts to streams, wetlands, watersheds, and other aquatic resources. Thus, mining companies must first demonstrate that there is no practicable alternative to the proposed discharge to the waters of the United States which would have less adverse impact on the aquatic ecosystem. If there is no practicable alternative, then all appropriate and practicable steps to minimize potential adverse impacts of proposed discharges must be taken.

Mining projects that are able to eliminate or significantly reduce the number and size of valley fills associated with their projects are expected to have lesser impacts than projects with multiple valley fills. As such, we expect that, generally, it will be easier for projects with no or few valley fills to demonstrate that they comply with the requirements of the CWA and the 404(b)(1) Guidelines. Conversely, projects with multiple valley fills will generally raise serious questions about their compliance with CWA requirements and may require permit objection under 402 or elevation and possible veto under 404.

For surface coal mining operations, EPA believes that the following technically feasible and cost-effective methods should be used to minimize the size and number of valley fills and the linear feet of stream impacts associated with by mine-through operations, in order to reduce potential water quality impacts:

- Use available spoil disposal alternatives in uplands or adjacent mine sites.
- Improve efficiency of mining practices to reduce production of overburden and minimize stream impacts (avoidance and minimization).
- Construct fills as high up the valley as possible. Fills should generally be constructed from the head of the valley downstream instead of vice versa.

- Require certification of mine plan and verification of valley fill capacity for each phase of mining to ensure that the size of final valley fills are consistent with the amount of coal actually mined
- Minimize contact between rainwater/groundwater and spoil by chemically analyzing overburden and utilizing materials handling plans, drains, and "side-hill" fills.
- Minimize use of in-stream sediment ponds. Require full stream reclamation after mining.

In addition to best management practices, permits should incorporate conditions to protect water quality and prevent significant degradation (e.g., adopting a sequenced permitting approach). In this context, the term "sequenced" means: (1) only one valley fill should be authorized before subsequent fills may go forward, unless site-specific data suggest no potential downstream water quality concerns; and (2) the permittee must demonstrate compliance with applicable water quality standards and that there is no significant degradation associated with the first valley fill before the permittee may begin construction of subsequent valley fills.

3.   **Mining Impacts Must Be Effectively Mitigated**: Unavoidable mining-related environmental impacts must be effectively mitigated by establishing, restoring, enhancing, or preserving streams and wetlands; improving water quality; addressing drinking water impacts; and reclaiming watersheds when mining is completed.

To assure effective mitigation, permit applicants should conduct functional stream impact assessments and ensure these assessments are effectively used to quantify the environmental effects of individual mining projects on streams. Also, Regions should work with and provide technical assistance to the Corps and state agencies on the development and implementation of effective assessment methods. These assessments should be used to ensure that compensatory mitigation replaces lost stream functions. Mine operators must not rely on drainageways (e.g., groin ditches), which do not replace lost stream function and structure and are therefore not an acceptable form of compensatory mitigation. Stream restoration is the preferred method for replacing lost stream function and structure.

4.   **Water Quality and Biological Parameters Must Be Monitored**: Permits must require in-stream water quality and biological monitoring to ensure compliance with permit conditions and to inform adaptive remedial action. Consistent with the attached memorandum, the applicant should be required to submit robust baseline monitoring data; ensure consistency with State Section 303(d) assessment methodology; and ensure that genus-based biological assessments are conducted. Monitoring must occur both upstream and downstream of each valley fill and at one or more appropriate locations downstream of the project, both during and after construction.


V.   <u>National Environmental Policy Act (NEPA)</u>

NEPA requires preparation of an Environmental Impact Statement (EIS) for major federal actions significantly affecting the quality of the human environment. The purpose of an EIS is to comprehensively evaluate the wide range of potential environmental, human health,

5

social and economic impacts associated with the proposed project, consider alternatives that may avoid and minimize adverse impacts, and provide for public involvement in the agency's evaluation.

The Regions should work with the Corps and OSM to ensure that the NEPA analyses associated with federal permit decisions provide, through an open and accountable process, a comprehensive evaluation of the potential impacts associated with proposed actions, as well as an analysis of reasonable alternatives that may avoid or minimize adverse impacts. The Corps has announced its intention to issue a notice of proposed rulemaking expanding the Corps NEPA scope of review to consider all of the effects of proposed surface coal mining "valley fills" on the aquatic environment. EPA will work with the Corps toward that objective, and furthering the purpose of NEPA to provide information to the decision maker, other federal and state agencies, and the public. In the interim, EPA will work with the Corps on a case by case basis to review permit applications and ensure that all relevant environmental information, as well as potential alternatives that may avoid or minimize the extent of the valley fills, is fully considered.

## VI.   Environmental Justice Considerations

Surface coal mining can have adverse environmental and health impacts on neighboring communities. The federal statutes and regulations under which EPA, the Corps, OSM, and the states evaluate permit applications for surface coal mining require consideration of the full range of potential impacts on the environment, human health, and communities. Executive Order 12898 requires federal agencies to give particularly careful consideration to potential impacts on low-income or minority populations. Federal laws and regulations also require that meaningful opportunities be provided for public participation in the permit decision-making process.

EPA will work collaboratively with the Corps, OSM, and the states, through permitting and NEPA (both EISs and environmental assessments), to identify and address the potential adverse human health and environmental effects of proposed projects on low-income and minority populations. In addition, EPA will work with the other agencies to ensure that the decision making process is more transparent, with increased opportunities for meaningful community input and broad access to information.

## VII.   Conclusions

EPA's Regional offices will continue to be the Agency's primary field representatives to co-implementing agencies, mining companies, affected communities, and interested members of the public as we work to respond to CWA, NEPA, and environmental justice issues associated with Appalachian surface coal mining permits. We look forward to your leadership as we coordinate to develop environmentally effective, scientifically sound, and economically responsible approaches for meeting the requirements of the law.



RELEASE DATE: AUGUST 12, 2010
REVISED: AUGUST 18, 2010

west virginia department of environmental protection

## Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i

### INTRODUCTION

The purpose of this Permitting Guidance ("Guidance") is to assist West Virginia Department of Environmental Protection ("DEP") permit writers in developing site-specific National Pollutant Discharge Elimination System ("NPDES") permit conditions for surface coal mining operations using a holistic watershed management approach through the use of biological and chemical monitoring, whole effluent toxicity ("WET") testing, and the development of Aquatic Ecosystem Protection Plans ("AEPP") and, where necessary, Adaptive Management Plans ("AMP") to protect the State's narrative water quality standards. These standards are found in West Virginia's *Code of State Rules*, which states, in pertinent part, "No significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed."[1] These new procedures shall take effect immediately.[2]

This Guidance does not apply to outlets that are primarily precipitation induced, or for which the activities associated with those outlets have been substantially completed.[3]

### REASONABLE POTENTIAL ANALYSIS

In deciding which permit conditions to include in a permit, the first thing a permit writer must do is perform a reasonable potential analysis and document the same in the Statement of Basis for the permit. If the applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in its AEPP, that it does not have reasonable potential ("RP") to cause or contribute to an excursion above the narrative criteria, the permit writer should treat new or expanded discharges as if they have RP and include WET limits in the permit, in accordance with 40 C.F.R. § 122.44(d)(1)(v).

At permit reissuance, DEP will use all valid and representative data to determine, on a case-by-case basis, whether an existing discharge causes, has the reasonable potential to cause, or contributes to an excursion from the narrative water quality criteria. Where DEP concludes that an existing outlet has RP, the permit will include WET limits. In cases where insufficient data is available to make a determination of RP upon permit reissuance, the permit writer will place WET monitoring requirements and triggers in the permit in order to determine RP (or lack of

---

[1] 47 C.S.R. 2 § 3.2.i
[2] In light of the changing nature of the policy concerns addressed herein, this document is intended to be dynamic and will likely be modified in the future as technology and best management practices develop and improve.
[3] The term "substantially complete" shall mean that the operation is past the point when measures that could be undertaken under either an AEPP or an AMP could be effective in reducing the operation's impact on the aquatic ecosystem.

EXHIBIT

tabbies®

4 G

RP). If the monitoring shows RP, the permit writer will reopen the permit to include WET limits.

PERMIT CONDITIONS

If the applicant has RP, the permit writer should use best professional judgment to establish permit terms and conditions and determine whether the proposed control measures are sufficient to protect the narrative water quality standards. The permit writer should, depending on the type of permit being issued, establish the following conditions in the permit, each of which is discussed more completely below:

New and Expanded Discharge Permits

- WET Limits
- Chemical Monitoring
- In-Stream Biological Monitoring
- Aquatic Ecosystem Protection Plan (AEPP)
- Adaptive Management Plan (AMP), if necessary
- Reopener Clause

Permits at Reissuance

- WET Monitoring
- Chemical Monitoring
- In-Stream Biological Monitoring
- Aquatic Ecosystem Protection Plann (AEPP)
- Adaptive Management Plan (AMP), if necessary
- Reopener Clause

NEW AND EXPANDED DISCHARGE PERMITS

This Guidance does not apply to outlets that are primarily precipitation induced.

**WET Limits**

If the applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in its AEPP, that it does not have RP, the permit writer should treat new and expanded mining discharges as if they have RP and include WET limits in the permit, as prescribed by 40 C.S.R. § 122.44(d)(1)(v).

The permit writer shall establish WET limits using all applicable rules and guidance, including the EPA's 1991 *Technical Support Document for Water Quality-based Toxics Control* ("TSD").[4] To develop the WET limits, the permit writer shall consider the in-stream waste concentration of the effluent in the immediate receiving stream and calculate it so as to result in no greater than 1.0 chronic toxicity unit ($TU_c$) and 0.3 acute toxicity unit ($TU_a$) at the edge of the appropriate mixing zones, where applicable.

---

[4] EPA/505/2-90-001 PB91-127415

2

The permittee is required to perform WET testing quarterly. The TSD requires use of the most sensitive available surrogate organism (ceriodaphnia dubia) for chronic toxicity testing of effluents. DEP requires TDS, conductivity, sulfate, and bicarbonate analyses for each aliquot used in WET testing.

If WET testing shows noncompliance with the specified limitations prescribed in the permit, the permittee shall resample and test the effluent within 30 days. If the second test shows compliance, the permittee shall continue WET testing in accordance with the permit requirements. However, if the second test shows noncompliance, the permittee must, within 60 days, submit an AMP (as more fully described below) identifying actions it will take to achieve compliance with the WET discharge limitations. If WET testing shows noncompliance with the specified limitations prescribed in the permit, but the aquatic ecosystem remains healthy (as evidenced by acceptable data retrieved at the biological monitoring stations), the DEP shall reevaluate the WET limits placed in the permit to assure that such limits take into consideration the appropriate dilution factors, mixing, and the effects of the discharge on the downstream monitoring stations.

### Chemical Monitoring

In addition to what is required for monitoring associated with the protection of numeric standards, the permit will require twice-per-month effluent monitoring for TDS, specific conductance, sulfate, alkalinity, pH, calcium, magnesium, sodium, and potassium upon commencing the permitted activity. The same sampling suite is required for all established biological assessment stations ("BAS"), as described below. The results of concurrent monitoring of WET, dissolved ions, and biological conditions will provide a wealth of information to guide future decisions and possible refinements to this Guidance.

### In-Stream Biological Monitoring

The permit will require the maintenance of acceptable ecosystem health in waters of the State. Biological monitoring will be required prior to, and then regularly over the life of, the permitted activity. An applicant must submit a monitoring plan for agency approval that proposes in-stream BAS that allow a holistic assessment of the aquatic ecosystem and a determination of the impacts of the permitted activity.

The applicant should work with the permit writer and the DEP biologist to establish a monitoring strategy with the most appropriate monitoring locations for a holistic evaluation of the aquatic ecosystem. All biologic sampling shall be done in accordance with the West Virginia Division of Natural Resources' scientific collection permit and DEP's West Virginia Stream Condition Index ("WVSCI") protocol. The applicant shall submit to DEP for approval a monitoring plan that is consistent with WVDEP's Watershed Assessment Branch 2009 Standard Operating Procedures, Chapter 4,[5] which must include the following:

---

[5] http://www.dep.wv.gov/WWE/watershed/wqmonitoring/Documents/SOP%20Doc/WAB%20SOP.pdf

3

- An in-stream BAS shall be located at the first appropriate riffle/run habitat downstream of each new outlet in a perennial stream segment. Ideally, the BAS will be located such that future impacts to the stream are attributable solely to the permitted activity.
- Additional stations should be situated on a site-specific basis, but generally should be located upstream and downstream of the confluence of the immediate receiving stream and the stream into which it drains, which allows the aquatic ecosystem's health to be assessed in its entirety.
- If the first available location for a BAS is potentially influenced by other watershed activities and stressors, then a clear link between the permit controls and biological conditions at the station may not be possible. Those scenarios will require baseline documentation of the other potential stressors and tracking of watershed activities over time. The applicant will also have to submit a monitoring plan in accordance with the provisions set forth in "Chemical Monitoring" above.
- Additional monitoring stations may be designated further upstream or downstream at points that are useful in determining the entire aquatic ecosystem's health. Such stations may be beneficial in identifying actions the applicant can take to improve the overall health of the aquatic ecosystem.
- The plan should include chemical and biological monitoring at the BAS prior to the start of the permitted activity.

If the agency finds the condition of the aquatic ecosystem at the assessment stations prior to initiation of the permitted activity to be satisfactory, taking into account all potentially applicable criteria, then the acceptable future biological condition is a WVSCI score greater than or equal to the WVSCI value representing the 5th percentile of reference (currently 68.0). If the agency finds the condition of the aquatic ecosystem at the assessment stations is less than satisfactory, taking into account all potentially applicable criteria, then the applicant shall identify existing conditions within the watershed that may be contributing to the problem. If a TMDL addressing biological impairment for ionic stress is not in effect, a WVSCI score greater than or equal to the baseline value would represent an acceptable future condition.

However, permit writers should be aware that a single point in a stream may not represent the overall health of the aquatic ecosystem. WVSCI is a tool to be used as a primary indicator of stream health, but not the sole criteria; if the WVSCI score suggests a potential problem, DEP shall conduct an assessment of the health of the aquatic ecosystem as a whole. In determining whether a lower WVSCI score represents an unacceptable condition, the DEP will utilize best professional judgment in a manner comparable to the discretion it exercises in listing streams as biologically impaired pursuant to § 303(d) of the Clean Water Act, including a holistic examination of the health of the aquatic ecosystem.

## Aquatic Ecosystem Protection Plan (AEPP)

New and expanded discharge permit applications shall include an AEPP for agency review and approval, and the permit writer shall use the control measures outlined therein as part of his or her RP analysis, as outlined more fully above. The permittee shall use

the measures outlined in its AEPP as a means of maintaining the health of the aquatic ecosystem and complying with the State's narrative water quality standards.

An AEPP describes control measures the applicant will implement to achieve WET limitations and minimize adverse biological impacts to the aquatic ecosystem surrounding the permitted activity. The plan should also include controls designed to lower the magnitude of pollutant loading associated with mining activities. If the agency cannot conclude that the proposed measures are reasonably expected to result in compliance, then the permit will not be issued. The applicant should consider all appropriate options when selecting and implementing control measures. Where an initial AEPP fails to achieve WET compliance and acceptable ecosystem conditions, the applicant must amend its AEPP to include additional measures that enable it to comply with WET limits.

The applicant can implement any of a number of controls in an attempt to protect the aquatic ecosystem and to reduce or minimize the ionic strength in the stream. Some examples of control measures that may be included in the AEPP include, but are not limited to, the following:

- Test overburden to determine the material that contains sulfur or other ionic strength-bearing material, so it can be isolated through material handling;
- Minimize the amount of area disturbed at one time;
- Minimize stormwater contact with pulverized material;
- Increase stream buffer zones;
- Minimize fill areas;
- Mine down-dip instead of up-dip;
- Cap fills and spoil so as to minimize pass-through of rain water;
- Revegetate any disturbed areas to minimize runoff;
- Develop a plan to reduce or prevent ionic stress;
- If necessary, conduct TRE/TRI pursuant to EPA's TSD;
- Segregate weathered rock and return to surface;
- Expedite reclamation;
- Enhance riparian plantings;
- Limit the number of active fills;
- Restore natural streams.

Because many of the controls outlined in the AEPP are related to best management practices, they will need to be addressed in the mining permit issued pursuant to the *West Virginia Surface Coal Mining & Reclamation Act* ("Article 3 permit"). The AEPP must be included as an attachment to the NPDES permit application to allow for agency review and evaluation.

**Adaptive Management Plan (AMP)**

A "new and expanded discharge" permittee shall submit an AMP to DEP within 60 days of failing two WET tests in a 30-day period. An AMP is more than merely monitoring activities and occasionally changing them; it involves exploring alternative ways to meet environmental objectives, predicting the outcomes of alternatives based on the current

5

state of knowledge, implementing one or more of these alternatives, monitoring to learn about the impacts of management actions, and then using the results to update knowledge and adjust management actions.[6]  For purposes of this Guidance, the AMP outlines the measures the permittee will take to achieve the chronic toxicity permit limitations (1.0 $TU_c$). This plan shall include, at a minimum, a thorough review of the AEPP to determine what, if any, changes can be made to the control measures outlined therein that will bring the permittee back into compliance with its WET limits.

The permittee may also implement a Toxicity Reduction Evaluation (TRE)/Toxicity Identification Evaluation (TIE)[7] plan to obtain compliance with final effluent limits or triggers for chronic toxicity. The purpose of a TRE is to investigate the causes and to identify corrective actions for difficult effluent toxicity problems.[8] A TRE is a site-specific study conducted in a stepwise process to narrow the search for effective control measures for effluent toxicity. TREs are designed to identify the causative agents of effluent toxicity, isolate the sources of the toxicity, evaluate the effectiveness of toxicity control options, and then confirm the reduction in effluent toxicity.  The ultimate objective of a TRE is for the permittee to achieve the limits or requirements for effluent toxicity contained in the permit and thereby attain the water quality standards for the receiving waters.[9]

A TIE is a set of procedures to identify the specific chemicals responsible for effluent toxicity, and TIE methods are an integral part of the protocols for TREs. TIE procedures are performed in three phases: characterization, identification, and confirmation. In each phase, the permittee shall use aquatic organism toxicity tests to track toxicity at each step of the procedure. In most cases, these are abbreviated or shortened toxicity tests.

If the TRE/TIE identifies toxic pollutants that can be regulated through the use of numeric limits, the permit writer shall put a numeric limit for those pollutants in the permit, in accordance with 47 C.S.R. 2 § 9 and 40 C.F.R. § 122.44(d)(1)(vi)(A).  If the TRE/TIE does not identify toxic pollutants that can be regulated through the use of numeric limits, the WET limits shall remain in the permit.

<u>Reopener Clause</u>

The permit will contain an explicit reopener clause allowing DEP to modify or revoke the permit if prescribed controls do not attain and maintain applicable water quality standards.  The permittee may also request that the permit be reopened if, after a sufficient amount of data has been collected, the agency determines that RP does not exist, and the permittee can request an adjustment to its monitoring activities through a modification of the permit.

---

[6] *See*, U.S. Department of the Interior's *Technical Guide: Adaptive Management*
[7] Although TRE/TIE is briefly outlined in this document, permit writers and permittees shall refer to EPA's TSD and the guidance documents listed therein for specific direction on how to conduct these evaluations.
[8] EPA's TSD, p. 114
[9] Id.

PERMITS AT REISSUANCE

These permit conditions are only to be established for do not apply to outlets that are primarily precipitation induced or for which the activities associated with the outlets are substantially complete at the time of reissuance. If the agency determines at the time of reissuance that permitted outlets have not been constructed, the requirements outlined in "New and Expanded Discharge Permits" above will apply. Otherwise, DEP will establish the following permit conditions:

### Wet Monitoring and Limits

Where there is not sufficient WET, chemical, and/or biological assessment data to perform a reasonable potential analysis at permit reissuance, the permit writer will assign WET monitoring to determine reasonable potential to cause or contribute to an excursion above the narrative criteria, as prescribed by 40 C.F.R. § 122.44(d)(1)(ii).

The permit writer will establish WET monitoring triggers using all applicable rules and guidance, including EPA's TSD. In developing the WET trigger, the permit writer will consider the in-stream waste concentration of the effluent in the immediate receiving stream and calculate it so as to result in no greater than 1.0 chronic toxicity unit ($TU_c$) and 0.3 acute toxicity unit ($TU_a$) at the edge of the appropriate mixing zones, where applicable.

The permittee is required to perform WET monitoring quarterly. The TSD requires use of the most sensitive available surrogate organism (ceriodaphnia dubia) for chronic toxicity testing of effluents. DEP requires TDS, conductivity, sulfate, and bicarbonate analyses for each aliquot used in WET testing.

If WET monitoring shows an exceedance of the specified triggers prescribed in the permit, the permittee shall resample and test the effluent within 30 days. If the second test shows compliance, the permittee shall continue WET monitoring in accordance with the permit requirements. However, if the second test shows an exceedance, the permittee must, within 60 days, submit an AMP identifying actions it will take to achieve compliance with the WET triggers. The permittee must also submit a permit modification to place WET limits in the permit.

### Chemical Monitoring

The permit will require enhanced effluent and receiving water monitoring of dissolved ions for permits upon reissuance.

The permit will require twice-per-month effluent monitoring for TDS, specific conductance, sulfate, alkalinity, pH, calcium, magnesium, sodium, and potassium. The same sampling suite is required for all established stream monitoring stations. The results of concurrent monitoring of WET and dissolved ions testing at the discharge and in-stream monitoring locations will provide a wealth of information to guide future decisions and possible refinements to this protocol.

### In-Stream Biological Monitoring

The permit will require the maintenance of acceptable ecosystem health in waters of the State. DEP will require in-stream biological monitoring regularly over the remaining life of the permitted activity. The permittee must submit a monitoring plan for agency approval that proposes in-stream BAS that allow a holistic assessment of the aquatic ecosystem and a determination of the impacts of the permitted activity. To that end, biological monitoring as discussed above may be applied as appropriate.

### Adaptive Management Plan (AMP)

A permittee with a reissued permit shall submit an AMP to DEP within 60 days of exceeding two WET triggers in a 30-day period. The AMP shall include appropriate control measures as outlined in "Aquatic Ecosystem Protection Plan" above that are designed to obtain compliance with WET triggers, maintain the health of the aquatic ecosystem, and comply with the State's narrative water quality standards. If the WET testing results continue to exceed the established permit trigger(s), then the permittee has exhibited a reasonable potential to cause or contribute to an excursion above West Virginia's narrative water quality standards (specifically, 47 C.S.R. 2 §§ 3.2.e and 3.2.i), and the permit writer will reopen the permit to impose WET limits. Alternatively, the AMP may allow the permittee to conduct TRE/TIE (as outlined above), in an effort to identify toxic pollutants that can be regulated through the imposition of numeric limits in the permit.

### Reopener Clause

The permit will contain an explicit reopener clause allowing DEP to modify or revoke the permit if prescribed controls do not attain and maintain applicable water quality standards. The permittee may also request that the permit be reopened if, after a sufficient amount of data has been collected, the agency determines that RP does not exist, and the permittee can request an adjustment to its monitoring activities through a modification of the permit.

## REFERENCES

EPA's *Policy on the Use of Biological Assessments and Criteria in the Water Quality Program* (May 1991)

EPA's *Technical Support Document for Water Quality-based Toxics Control*, EPA/505/2-90-001 (March 1991)

EPA's *NPDES Permit Writers' Manual*, EPA-833-B-96-003

Release Date: August 12, 2010



west virginia department of environmental protection

---

# Justification and Background for Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i

PURPOSE

The West Virginia Department of Environmental Protection ("DEP") adopts this Justification and Background for its "Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards" (the "Guidance"). The Guidance is intended to facilitate compliance with applicable statutory and regulatory requirements and to provide reasonable means of effectuating the intent of the narrative criteria, as well as to enforce the mandate of the Clean Water Act ("CWA") that every permit contain effluent limitations that reflect the practicable pollution reduction a state can achieve.[1]

The Guidance was developed in accordance with the West Virginia Water Pollution Control Act ("WVWPCA"), which states that "the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the State consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development."[2]

As it must, the Guidance also recognizes the intent of the West Virginia Legislature, which has formally resolved as follows:

- That any interpretation and implementation of West Virginia's narrative water quality standards is the responsibility of the West Virginia Department of Environmental Protection;
- That the requirements of the narrative criteria are met when a stream (a) supports a balanced aquatic community that is diverse in species composition; and (b) contains appropriate trophic levels of fish (in streams with sufficient flows to support fish populations); and (c) the aquatic community is not composed only of pollution tolerant species or

---

[1] *American Paper Institute, Inc. v. United States Environmental Protection Agency*, 996 F.2d 346, 349 (D.C. Cir., 1993)
[2] W. Va. Code § 22-11-2(a).

EXHIBIT

4 H

tabbies®

the aquatic community is composed of benthic invertebrate assemblages sufficient to perform the biological functions necessary to support fish communities within the assessed reach (or, if the assessed reach has insufficient flows to support a fish community, in those downstream reaches where fish are present); and

- That interpretation of West Virginia's narrative water quality standards must faithfully balance the protection of the environment with the need to maintain and expand opportunities for employment, agriculture, and industry as set forth in the Legislature's statement of public policy as contained in the West Virginia Water Pollution Control Act.[3]

## BACKGROUND

West Virginia has had primacy of the NPDES program since 1982 and has narrative water quality standards that predate its NPDES primacy. These criteria are found in West Virginia's *Code of State Rules*, which states, in pertinent part, "No significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed."[4]

In light of its goals to advance, wherever attainable, water quality that provides for recreation and the protection and propagation of fish, shellfish, and wildlife,[5] and to assure that surface mining operations are conducted so as to protect the environment,[6] DEP reviewed its NPDES permitting and compliance assessment protocols vis-à-vis West Virginia's narrative water quality standards and solicited public comment regarding these issues. As a result, DEP adopts the Guidance, which describes the procedures DEP will implement in the development of NPDES permits for the coal mining industry. These new procedures shall take effect immediately. In light of the changing nature of the policy concerns addressed herein, this document is intended to be dynamic and will likely be modified in the future as technology and best management practices develop and improve.

While DEP appreciates EPA's recent effort to assist the states in interpreting their various narrative water quality standards, DEP finds that the Guidance is the more appropriate approach for West Virginia for several reasons. First, it involves subject matter uniquely within DEP's expertise and special knowledge. Further, while this document specifically addresses concerns related to the mining industry, it is designed to be adapted in the future to address all discharges to water bodies that will cause, or that have the reasonable potential to cause or contribute to, excursions from water quality standards. Finally, it does not use an overbroad, generic criterion (i.e. conductivity) to set unattainable limits, but instead identifies specific pollutants that can be managed through the inclusion of appropriate whole effluent toxicity ("WET") monitoring and/or limits and best management practices ("BMPs") in NPDES permits, where there is reasonable potential to cause or contribute to excursions from water quality criteria. If the

---

[3] H.C.R. 111 (2010 Regular Session).

[4] 47 C.S.R. 2 § 3.2.i

[5] *See* 33 U.S.C. § 1251(a)(2)

[6] *See* 30 U.S.C. § 1202(d)

2

applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in the plans it will submit with its application, that it does not have reasonable potential ("RP") to cause or contribute to an excursion above the narrative criteria, the permit writer should treat new or expanded discharges as if they have RP and include WET limits in the permit, in accordance with 40 C.F.R. § 122.44(d)(1)(v). Alternatively, if the operator identifies toxic pollutants that can be regulated through the use of numeric limits, DEP will put a regulatory control number for those pollutants in the operator's permit.

## PROTECTION OF THE AQUATIC ECOSYSTEM

As stated above, the narrative water quality criteria set out in 47 C.S.R. 2 § 3.2.i prohibits the introduction of wastes that cause significant adverse impact to the chemical, physical, hydrologic or biological components of aquatic ecosystems. These criteria are valid components of West Virginia water quality standards that have been properly promulgated by the West Virginia Legislature and approved by the EPA. The phrase "significant adverse impact" is not defined in the CWA or the WVWPCA, the regulations promulgated thereunder or in any literature or guidance published by the EPA. DEP has determined that "significant adverse impact" is more than a change in the numbers or makeup of the benthic macroinvertebrate community in a segment of a water body downstream from a point source discharge. It is, instead, a material decline in the overall health of an aquatic ecosystem.[7] A goal of the CWA and the WVWPCA is to protect the aquatic ecosystem as a whole; it is a holistic standard that requires a holistic approach to ecosystem assessment. In contrast to numeric water quality criteria, which can be applied by analysis of samples of water taken at any discharge or monitoring point in a stream, compliance with a standard that protects the aquatic ecosystem must be assessed in the broader area comprising the ecosystem. An ecosystem does not exist at a single point and, accordingly, its health cannot be assessed at a single point.

The Pond-Passmore Study, upon which EPA relied in the development of its guidance on this subject, concludes that West Virginia's narrative standard is violated by surface coal mining operations based on the Study's application of two biologic assessment tools, the West Virginia Stream Condition Index ("WVSCI") and the draft Genus Level Index of Most Probable Stream Status ("GLIMPSS"), to samples of benthic macroinvertibrate life taken from these streams. This conclusion is flawed for two reasons. First, West Virginia does not use the draft GLIMPSS in its assessment of the biologic health of State streams. Second, these tools are just that – tools. They are not stand-alone determinants of compliance with the narrative standard. Any application of these assessment tools in determining compliance with the narrative standard must faithfully apply the language of the standard itself, which prohibits significant adverse impacts on the chemical, physical, hydrologic or biological components of the aquatic ecosystem. Thus, DEP's Guidance follows long-standing EPA guidance, which indicates that biosurveys cannot fully characterize an entire aquatic community and its many attributes, and accordingly suggests that "State standards should contain biological criteria that consider various components (e.g.

---

[7] An aquatic ecosystem is a dynamic complex of plant, animal, and microorganism communities and their non-living environment interacting as a functional unit within water. *See*, Coweeta Long Term Ecological Research "Glossary of Terms."

algae, invertebrates, fish) and attributes (measures of structure and/or function) of the larger aquatic community."[8]

Through implementation of the Guidance, DEP continues its existing practice of using WVSCI in addition to consideration of other factors affecting the aquatic ecosystem to enforce its narrative water quality standards. By way of background, WVSCI was developed for EPA by national experts to assess biological integrity in West Virginia's waterways through "careful measurement of the natural aquatic ecosystem and its constituent biological communities,"[9] including the evaluation of benthic macroinvertebrate communities. It was specifically designed for assessment of the biological component of the 47 C.S.R. 2 § 3.2.i narrative criteria and has been used as a tool in developing the Impaired Streams List ("303(d) List") and the TMDLs resulting therefrom for almost a decade.[10] WVSCI acknowledges that "[i]t is the responsibility of West Virginia's [Department] of Environmental Protection to maintain and protect the ecosystem health of the state's waters[,]" and "[i]n keeping with the Clean Water Act and technical guidance from USEPA, DEP developed water quality standards for the protection of ecosystem health."[11]

DEP's Guidance is the appropriate methodology for implementing West Virginia's narrative water quality standards, because it is consistent with the Federal Regulations regarding establishing limitations, standards, and other permit conditions for NPDES programs, and it incorporates a holistic approach to ecosystem assessment and protection. The CWA's implementing regulations require WET testing and limits when the State finds that a discharge has RP to cause or contribute to excursions from water quality standards.

> [W]hen the permitting authority determines . . . that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative criterion within an applicable State water quality standard, the permit must contain effluent limits for whole effluent toxicity. Limits on whole effluent toxicity are not necessary where the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit . . . that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards.[12]

WET testing allows flexibility where appropriate (e.g. allowing time to collect additional data for RP determination to supplement limited data sets) and is consistent with DEP's policy that

---

[8]  EPA's *Policy on the Use of Biological Assessments and Criteria in the Water Quality Program* (May 1991) ("1991 Policy")

[9]  A Stream Condition Index for West Virginia Wadeable Streams, March 28, 2000 (Rev. July 21, 2000) ("Stream Condition Index").

[10]  However, a stand-alone WVSCI score has never been the sole determinant of compliance or non-compliance with the narrative standard.  This is because WVSCI scores are influenced by many factors (e.g. habitat, geology, and pH).

[11]  Stream Condition Index

[12]  40 C.F.R. § 122.44(d)(1)(v)

4

permittees develop robust monitoring plans with the intention of identifying any causative pollutants and adjusting their methods of operation so that those problems may be remedied before the aquatic community suffers a significant breakdown.

WVSCI considers various components (e.g. algae, invertebrates, fish) and attributes (measures of structure and/or function) of the larger aquatic community. "Because biological integrity is a strong indicator of overall ecological integrity, it can serve as both a meaningful goal and a useful measure of environmental status. . . ."[13] Based on the 5th percentile of reference values, the current WVSCI score that indicates the integrity of a benthic macroinvertebrate community in West Virginia's wadeable streams is 68.0. The threshold for inclusion on the 303(d) List has historically been 60.6. That value subtracts a precision estimate from the 5th percentile of reference values, and its historical use was intended to take into account sampling error and to aid DEP in allocating its resources so as to avoid misclassifying non-impaired waters as impaired. WVSCI and its application in the 303(d) listing process are consistent with methodologies implemented to assess protection of aquatic ecosystems by all of West Virginia's neighboring states.

CAUSATIVE POLLUTANTS / PROTECTIVE THRESHOLDS

EPA has recently set a numeric limit on conductivity at 500 μS/cm, finding that conductivity levels below 300 μS/cm generally will not cause a water quality standard violation and that in-stream conductivity levels above 500 μS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative state water quality standards.[14] However, DEP's data shows that more than a simple conductivity measurement is necessary to determine the health of a stream. As proof that a number for specific conductance is an inappropriate gauge, FIGURE 1 below illustrates that a stream can have a low level of specific conductance and a WVSCI score firmly within the range for impairment; conversely, a stream can have a high level of specific conductance and a WVSCI score that indicates the stream is above the threshold for impairment. WVSCI scores are affected by many factors: habitat, other uses of the stream and the surrounding land, other pollutants unrelated to conductivity (e.g. fecal coliform), *inter alia.* Certain stream reaches simply cannot attain a "good" WVSCI score because of those factors.

---

[13]  1991 Policy
[14]  EPA's *Detailed Guidance: Improving EPA's Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (April 1, 2010) ("April 1 Memo")



The Pond-Passmore Study found a shift in the benthic macroinvertibrate community downstream from mining activity, but did not otherwise correlate this finding with any significant or adverse impairment of the ecosystem. Where the only impacts to this component of the ecosystem are diminished numbers of certain genera of mayflies, without evidence that this has had any adverse impact of any significance on the rest of the ecosystem, the State cannot say that there has been a violation of its narrative standard. Various scientific studies and evaluations performed by DEP indicate that lowered biological condition is associated with increased ionic strength, but scientists remain less than certain about the specific causative pollutant(s) and the concentration(s) responsible for impairment. Additional uncertainty is present in correlative studies, because the effects of increased ionic strength cannot be completely distinguished from the effects of other stressors that often co-occur (e.g. organic enrichment, sedimentation). In fact, most available information attempts to relate biological condition to a surrogate parameter, such as specific conductance.

Because conductivity represents the combined concentrations of all different dissolved ions, each with potential varying toxic effects, regulation solely via an indicator such as specific conductance is not the best way to protect against excursions from narrative standards. For example, the elevated dissolved pollutants most commonly associated with mining discharges are sulfate and bicarbonate alkalinity. EPA has not published national recommended aquatic life protection criteria for those pollutants. Similarly, chloride, for which West Virginia has adopted EPA's recommended numeric aquatic life protection water quality criteria, may also be present in some cases. But because chloride seldom exists in the absence of sulfates or alkalinity, singular control of chloride cannot be expected to resolve all ionic stress.

DEP has performed a correlative evaluation of benthic condition and specific conductance. This evaluation suggests that native aquatic life is protected at various values and ranges of specific conductance. This finding supports the basic scientific principle that correlation is not cause and effect. Even though the DEP evaluation applied various filters to the

6

evaluated dataset to address complicating factors listed above, the biological condition of a stream may be different from the condition predicted by specific conductance. In situations such as these, where DEP has determined that it is infeasible to calculate a numeric effluent limit to implement a narrative water quality standard, DEP will include in the permit appropriate WET limits and BMPs to control or abate the discharge of pollutants, in accordance with 40 C.F.R. § 122.44(k)(3).

DEP routinely identifies biological stressors when developing TMDLs for biologically impaired waters. Stressor identification employs a strength-of-evidence approach that considers multiple information sources. Researchers evaluate water quality monitoring data, physical habitat data, field notes, and the composition of the biological assemblage concurrently to identify significant stressors. DEP's most recent stressor identification protocols, as used in the EPA-approved TMDL process, include the guidelines shown in FIGURE 2 below for evaluating water chemistry to determine if ionic strength is a significant stressor:

| Candidate Cause | Parameter | Elimination (Rule out stressors at these thresholds) Elimination Threshold | Strength of Evidence (Evidence for each Candidate Cause as stressor) Candidate Stressor Thresholds | |
|---|---|---|---|---|
| 4. Ionic strength | Conductivity | 326.9 umhos | Consider as independent stressor in non-acidic, non-AMD streams, when conductivity values met threshold ranges and sulfates and chloride violate conditions listed as follows. | |
| | | | >1533 | Definite Stressor |
| | | | 1075-1532.9 | Likely stressor |
| | | | 767-1074.9 | Possible stressor |
| | | | 517-766.9 | Weak stressor |
| | | | 327-516.9 | Equivocal or No Trend |
| | Sulfates | < 56.9 mg/l | >417 | Definite Stressor |
| | | | 290-416.9 | Likely stressor |
| | | | 202-289.9 | Possible stressor |
| | | | 120-201.9 | Weak stressor |
| | | | 57-119.9 | Equivocal or No Trend |
| | Chloride | < 60 mg/l | >230.0 | Definite Stressor |
| | | | 160.1-229.9 | Likely stressor |
| | | | 125.1-160 | Possible stressor |
| | | | 80.1-125.0 | Weak stressor |
| | | | 60.1-80.0 | Equivocal or No Trend |

Based on FIGURE 2, it is clear the EPA limits of 300 – 500 µS/cm established in the April 1 Memo are far more stringent than what it has long approved for West Virginia's TMDL process. As shown above, conductivity in the 300 – 500µS/cm range is "Equivocal or No Trend" as a stressor. Conductivity does not even become a "Likely Stressor" of a stream under this EPA-approved approach until it reaches three to five times these limits: 1075-1532.9 µS/cm. This is additional support for the State's conclusion that reliance on the single surrogate of specific conductance to implement and/or enforce the State's narrative water quality standards is improper. It also demonstrates that EPA's proposed limits are too narrowly focused on a single parameter and single aquatic species to determine the health of the impacted watershed.

Only the West Virginia Legislature can adopt a numeric water quality standard for conductivity (or any other pollutant); DEP has no authority to immediately or unilaterally

implement numeric standards. Through adoption of H.C.R. 111, the West Virginia Legislature has given DEP direction as to how it should implement its narrative water quality standards. Even if the Legislature does adopt a numeric standard for conductivity, DEP cannot implement it until after it is approved by the EPA. Based on the loose and questionable causal relationship between conductivity and stream impairment, it remains unclear whether EPA would approve such a numeric limit. EPA's duly promulgated regulation endorses establishment of WET limits where, as here, a state is unable to use a limit for a surrogate parameter. DEP can implement new permitting controls based on the agency's best professional judgment of actions necessary to protect the State's waters using its narrative criteria, with follow-up monitoring and contingencies for unsatisfactory outcomes. Thus, DEP is protecting against excursions from its narrative water quality standards by establishing WET limits and verifying impacts to a stream (or lack thereof) by requiring an extensive, comprehensive monitoring plan for the entire watershed.

# HOUSE CONCURRENT RESOLUTION NO. 111

(By Delegates Butcher, Cann, Givens, Manchin and Shott )



[Introduced March 10, 2010.]

Urging the United States Environmental Protection Agency to interpret the West Virginia Water Pollution Act in the manner that will faithfully balance the protection of the environment with the need to maintain and expand opportunities for employment, agriculture and industry as set forth in the Legislature's statement of public policy as contained in the West Virginia Water Pollution Control Act.

Whereas, In enacting the Federal Water Pollution Control Act Congress declared that "it is the policy of Congress to recognize, preserve and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use of land and water resources?." ; and

Whereas , As an exercise of its sovereign and primary right to plan the development and use of its lands and water resources the West Virginia Legislature previously enacted Chapter 22 Article 11 of the 1931 Code of West Virginia as amended, the West Virginia Water Pollution Control Act, and in that enactment declared it to be "the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the state consistent with (1) public health and enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development."; and

Whereas , The State of West Virginia has developed and implemented environmental protection performance and permitting standards to adequately protect the waters of the State consistent with this statement of public policy; and

Whereas , Such standards have been promulgated by the West Virginia Department of Environmental Protection and the Legislature and submitted to and approved by the United States Environmental Protection Agency pursuant to the federal Clean Water Act; and

Whereas , These environmental protections and permitting measures include narrative water quality standards codified at 47 CSR 2-3; and

Whereas, West Virginia's narrative standards must be implemented and interpreted in a manner that is protective of aquatic communities consistent with the Legislature's statement of public policy and applicable laws; and

Whereas, The State of West Virginia has not adopted subcategories of special use to protect a certain species of mayfly but protects the aquatic community consistent with the Legislature's statement of public policy; and

Whereas, West Virginia's economic stability relies on the accurate implementation of applicable laws as enacted by the Legislature; and

Whereas, The current method in which the United States Environmental Protection Agency is interpreting the West Virginia Water Pollution Control Act is hindering economic development within the state which directly affects the employment opportunities available to all West Virginians; and

Whereas, The West Virginia Legislature would not enact legislation that would have a detrimental effect on the industrial progression of the state and cause or contribute to environmental degradation; therefore, be it

*Resolved by the Legislature of West Virginia:*

That any interpretation and implementation of West Virginia's narrative water quality standards is the responsibility of the West Virginia Department of Environmental Protection; and, be it

*Further Resolved* , That the requirements of the narrative criteria are met, when a stream (a) supports a balanced aquatic community that is diverse in species composition; and (b) contains appropriate trophic levels of fish (in streams with sufficient flows to support fish populations); and (c)the aquatic community is not composed only of pollution tolerant species, or the aquatic community is composed of benthic invertebrate assemblages sufficient to perform the biological functions necessary to support fish communities within the assessed reach (or, if the assessed reach has insufficient flows to support a fish community, in those downstream reaches where fish are present); and, be it

*Further Resolved*, That interpretation of West Virginia's narrative water quality standards must faithfully balance the protection of the environment with the need to maintain and expand opportunities for employment, agriculture and industry as set forth in the Legislature's statement of public policy as contained in the West Virginia Water Pollution Control Act; and, be it

*Further Resolved*, That the West Virginia Legislature encourages the United States Environment Protection Agency to change their current interpretation of the West Virginia Water Pollution Control Act to include the intent of the 72nd and subsequent Legislatures; and be it

*Further Resolved*, That the Clerk of the House of Delegates forward a certified copy of this resolution to the West Virginia Department of Environmental Protection, the United States Environmental Protection Agency, the Huntington District of the United States Army Corps of Engineers, and other appropriate state and federal agencies.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION III
1650 Arch Street
Philadelphia, Pennsylvania 19103-2029**

JUL - 7 2008

Scott Mandirola
West Virginia Department of Environmental Protection
Division of Water and Waste Management
601 57th Street
Charleston, WV 25304

Tom Clarke
West Virginia Department of Environmental Protection
Division of Mining and Reclamation
601 57th Street
Charleston, WV 25304

Dear Messrs. Mandirola and Clarke:

I am sending this letter to request that the West Virginia Department of Environmental
Protection (WVDEP), pursuant to the *Memorandum of Agreement Regarding the Administration
and Enforcement of the National Pollutant Discharge Elimination System in West Virginia*
(1982) (1982 MOA), provide to the U.S. Environmental Protection Agency (EPA) Region III
copies of draft National Pollutant Discharge Elimination System (NPDES) permits for discharges
associated with surface coal mining operations and a monthly list of applications for NPDES
permits received by WVDEP from this specified class of dischargers as further described below.

Pursuant to Section 402(d) of the Clean Water Act and 40 C.F.R. Section 123.44, EPA
has the authority to review NPDES permits issued by WVDEP. Waiver of NPDES permit
review by EPA is expressly provided for by Section 402(e) of the Clean Water Act, 40 C.F.R.
123.24(d) and also in Section II, Part (B) of the 1982 MOA. Termination of the waiver of review
also is expressly provided for by 40 C.F.R. 123.24(e) and the 1982 MOA.

In the 1982 MOA, EPA waived review of certain classes of permits that do not exceed
500,000 gallons per day, one of which was NPDES permits for discharges from coal mining
operations. By letter dated September 29, 1998, EPA partially terminated this waiver of review,
and requested that it receive all draft NPDES permit actions for facilities which discharge
pollutants related to total maximum daily loads (TMDLs) established for the receiving stream.
By letter dated October 27, 2005, EPA notified WVDEP that it would no longer be necessary to
send on a regular basis to EPA for review draft NPDES permits for coal mining discharges to
TMDL waters.



**EXHIBIT**

4 J

Our October 27, 2005 letter also stated: "On occasion, however, we may wish to exercise our authority under the Memorandum of Agreement, Section II, Part (B) (1)(e), and under 40 C.F.R. 123.24(d)(6) to request submittal of specific draft NPDES permits for coal mining discharges for our review and comment." At this time, EPA is revoking its waiver of review for all NPDES permits for discharges associated with surface coal mining permits. In order for EPA to complete its review, please provide to EPA copies of all permit applications, draft permits, and supporting documentation for NPDES permits for discharges associated with surface coal mining permits. This request applies to both currently pending NPDES permit applications and those applications received in the future. EPA will, consistent with the MOA, provide comments and or any objections within thirty (30) days of receipt. EPA may narrow the scope of its review in the future after we have had an opportunity to familiarize ourselves with this category of NPDES permits.

The purpose of this limited withdrawal of EPA's waiver of review is to ensure that permits contain the necessary effluent and monitoring conditions to achieve water quality standards, including narrative and numeric criteria, and incorporate NPDES regulatory requirements. As discussed with your staff, EPA is also conducting a Permit Quality Review (PQR) of mining permits in all of the Region III states with significant coal mining operations. The PQR process will be similar to the review recently completed for other aspects of West Virginia's NPDES Program. The PQR will cover the central tenets of the NPDES Program as well as focus on areas of special interest.

In addition, EPA has been in discussions with WVDEP regarding the potential impacts of surface mining operations with valley fills. At this time, EPA is requesting copies of NPDES permits or draft NPDES permits associated with the specific surface coal mining operations listed below. Please indicate the status of each permit, whether draft, pending Director signature, or issued. For those operations listed below for which NPDES permits have not been issued, please provide a copy of the draft permit, application, reasonable potential analysis, and any necessary supporting documentation to EPA for review prior to permit issuance. Consistent with the MOA, EPA will respond in writing within thirty (30) days of receipt of a draft permit to provide comments and objections, if appropriate. If NPDES permits have been issued for any of the operations listed below, EPA requests that you provide a copy of the issued permit. Accordingly, please provide EPA with a copy at your earliest convenience of the NPDES permits for discharges associated with the following Surface Mining Control and Reclamation Act (SMCRA) permits:

Alex Energy Republic No. 1 Surface Mine (S-302500)
Consol of Kentucky (S-501807), (S-5002-07)
Colony Bay Coal Company (S-000781)
Highland Mining Company Reylas Surface Mine (S-501506)
Consol of Kentucky – Peg Fork Surface Mine (S-5018-06)

2

In addition to the foregoing, EPA is requesting that you provide on the fifteenth day of each month a list of all NPDES permit applications received by WVDEP for discharges from surface mining operations with valley fills and identify the corresponding SMCRA permit number, Corps of Engineers Public Notice number, the receiving waters, whether Total Maximum Daily Loads (TMDLs) have been established and where known, the number and size of valley fills and the proposed post-mining land use. Please note that EPA intends to use this list to focus its review and comments on specific draft NPDES permits for coal mining discharges.

Please provide the requested NPDES permits and lists to the attention of:

David McGuigan, Ph.D., Associate Director
Office of NPDES Permits and Enforcement
U.S. Environmental Protection Agency
Region III 3WP40
1650 Arch Street
Philadelphia, PA 19103

Please be aware that EPA may use its information gathering authorities pursuant to Section 308 of the Clean Water Act, 33 U.S.C. §1318, to require an applicant to conduct appropriate instream monitoring, effluent characterization and monitoring, and a reasonable potential analysis to ensure that the permittee does not violate water quality standards.

Thank you for your prompt attention to this matter. If you have any questions, please feel free to contact me at (215) 814-5422, or David McGuigan at (215) 814-2158.

Sincerely,

Jon M. Capacasa, Director
Water Protection Division

cc: Randy Huffman, WV DEP



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

July 23, 2009

Scott Mandirola
West Virginia Department of Environmental Protection
Division of Water and Waste Management
601 57th Street
Charleston, WV 25304

Tom Clarke
West Virginia Department of Environmental Protection
Division of Mining and Reclamation
601 57th Street
Charleston, WV 25304

Dear Messrs. Mandirola and Clarke:

I am sending this letter as a further clarification to the letter signed by Jon Capacasa on July7, 2009, letter to request that the West Virginia Department of Environmental Protection (WVDEP), pursuant to the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System in West Virginia* (1982) (MOA), provide to the U.S. Environmental Protection Agency (EPA) Region III copies of draft National Pollutant Discharge Elimination System (NPDES) permits for discharges associated with surface coal mining operations. As discussed, EPA and WV DEP have agreed that new draft permits which start public notice after August 10 will be subject to EPA review per the MOA. This will accommodate the 60-day notice of waiver revocation identified in the MOA. EPA will follow the schedule laid out in the MOA and will provide comments and a general objection if necessary within thirty (30) days of receipt of the necessary information (Fact Sheet, Draft Permit, Application, and any supporting information used in the permit determination). For those permits which have begun public notice prior to August 10, EPA may provide comments for information purposes. For the permits named specifically in the July 7th letter and listed below, EPA requests that they be submitted for review whether or not the public notice has been completed.

Alex Energy Inc., Republic No. 1 Surface Mine ( WV1019414)
Consol of Kentucky Inc., Buffalo Mountain Surface Mine ( WV1029690)
Colony Bay Coal Company (WV0057126)
Highland Mining Company, Reylas Surface Mine (WV102291)
Consol of Kentucky – Peg Fork Surface Mine (WV1023004)

**EXHIBIT**

tabbies®

4 K

EPA is also beginning to review the June 17, 2009, petition to withdraw WVDEP's authorization submitted by the Appalachian Center for the Economy & the Environment. We have requested that WV DEP provide a detailed response to the points raised in the petition and have arranged a conference call with you on August 13, 2009. We would like to receive WV DEP's response in advance of the call.

If you have any questions, please contact me at (215) 814-2158 or contact Evelyn MacKnight at (215) 814-5717 as I will be out of the office until August 10. Thank you for your prompt attention to this matter.

Sincerely,

David B. McGuigan, Associate Director
Office of NPDES Permits and Enforcement



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

October 19, 2009

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

Re:     WV NPDES No. WV1022300, New Permit (S-301307, S-303807)
        Frasure Creek Mining, LLC – Taylor Branch Surface Mine

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR Parts 123.74 and123.75, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), we received the draft permit for WVNPDES No. WV1022300 Frasure Creek Mining, LLC for review on October 15, 2009. This is a new mining operation with 16 outlets and 2 valley fills proposed. This permit has been submitted to ACOE for 404 review. Our records show that this is a minor permit that discharges to un-named tributaries of/and Taylor Branch, un-named tributaries of/and Carter Branch of Loop Creek, un-named tributaries of/and Wingrove Branch, un-named tributaries of/and Tincher Hollow, un-named tributaries of/and Dempsey Branch of Laurel Creek of New River all of the Kanawha River.

Baseline Water Quality (BWQ) data shows Selenium present in the stream above the WV Water Quality Standards (5.0 ug/l) in the Carter Branch, and Selenium limits have been added to the permit at all outfalls. Selenium was also detected in BWQ groundwater data. A materials handling plan has been added to the SMCRA permit associated with this mining operation. Water quality based effluent limits based on BWQ data and anti-degradation review have been assigned to outfalls. Fish surveys in Loop Creek and Taylor Branch were conducted by WV DNR that identified Loop Creek as a reproducing trout stream. Where appropriate, limits were set in the permit to protect water quality for trout. Although we recognize that our comments are delivered outside of the 30 day comment period, we wish you to consider the following:

- Baseline water quality data reviewed (instream BWQ, raw water data) included samples demonstrating levels of conductivity and sulfates in the receiving streams that appear consistent with levels potentially associated with biological impairment. The documentation provided to EPA does not appear to include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity and/or sulfates

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

**EXHIBIT**
**4 L**
tables

in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). If such an analysis has not been performed, we recommend that WVDEP undertake this analysis and determine whether appropriate limits should be included.

- In light of the foregoing, we recommend that the instream monitoring program required by Section D, paragraph 3 include instream monitoring upstream, at the outlet, and downstream for TDS, specific conductivity and sulfates. We would like to discuss a sampling protocol with you in the near future.
- We also recommend that the permit record include baseline West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodology(ies) employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit.

Please address the above and provide me with any changes to the draft permit and fact sheet/rationale page(s). Forward a copy of the final NPDES permit upon issuance; we would request that any associated draft NPDES permit modifications relative to the 404 review process be sent to us for comment.

Feel free to contact me at 215-814-5717 if you any questions or call Bette Conway at 215-814-5744.

Sincerely,

*Evelyn S. MacKnight* for *E.M.*

Evelyn S. MacKnight, Chief
NPDES Permits Branch
Water Protection Division

cc: Richard Roy, WV DEP

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000013



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

February 2, 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

Re:   WV NPDES No. WV1023870 MET Resources LLC – McComas Surface Mine No. 1,
      New Permit; drainage to Belcher Branch, Crane Creek, Godfrey Branch of the Bluestone
      River of New River watershed to the Kanawha River

Dear Mr. Parsons:

   Pursuant to Section 402 of the Clean Water Act, 40 CFR Parts 123.74 and 123.75, the
*Memorandum of Agreement Regarding the Administration and Enforcement of the National
Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), we received
the draft permit for WV NPDES No. WV1023870 MET Resources LLC – McComas Surface
Mine No. 1, New Permit on December 22, 2009.  This permit area is located in the New River
Watershed.

   In the interest of focusing available resources, EPA has exercised its discretion in the
review of this State-submitted draft permit and has chosen to perform a limited review.   It was
noted that the watershed has extensive mining already in place.  The Baseline Water Quality Data
data (BWQ-3616-50) showed two sampling events that exhibited elevated Specific Conductivity
(SC) values (1060 and 1120 umhos).  These events occurred in summer months (7/23/08, flow at
0.09 CFS and 8/9/2008, flow at 0.12 CFS) at a time when low flow conditions (and elevated
specific conductivity values) might be expected.  However, the remaining data exhibited slightly
elevated specific conductivity values (range of 350 to 550 umhos) with several of the reported
flow rates being similar to the months where elevated specific conductivity values were noted.
Given that some values are elevated in advance of this new facility, we suggest that the permit
include monitoring for specific conductivity and upstream/downstream biological monitoring
consistent with comments submitted on other permits recently reviewed by EPA.

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

EXHIBIT

tabbies®

4 M

Please forward a copy of the final permit amendment when issued. When submitting copies of the final permit and fact sheet to EPA Region III, please consider sending electronic versions of these documents. Feel free to contact me at 215-814-5717 if you any questions or call Bette Conway at 215-814-5744.

Sincerely,

*Evelyn S MacKnight*

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc: Richard Roy, WV DEP

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000089



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

April 15, 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

> Re:   WV NPDES No. WV1021516
> Southern Minerals - Inc Superior Augur
> Modification No. 2
> EPA Receipt Date – March 15, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR Parts 123.74 and 123.75, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. We are providing the following comments.

- Baseline water quality data reviewed included samples demonstrating levels of conductivity and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels of 1300 umhos and total sulfates of 323 mg/l. The state should identify all these parameters of concern for reasonable potential analysis to ensure compliance with both the numeric and narrative water quality criteria.

- The documentation provided to EPA did not include a reasonable potential analysis or an antidegradation analysis to determine whether total dissolved solids, specific conductivity and/or sulfates in the proposed discharges have a reasonable potential to cause or contribute to an excursion of the state narrative water quality criteria as required in 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR§ 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate water quality-based effluent limits to be included in the permit. We consider this to be an incomplete submittal; therefore we are issuing an interim objection to issuance of this permit. EPA's 30 day review under the MOA will begin once we have received this information.

**EXHIBIT**

tabbies

4 N

- In light of the foregoing, we also request that instream monitoring be required to evaluate at a minimum for total dissolved solids, specific conductivity and sulfates. We have discussed developing a monitoring protocol to be incorporated into West Virginia permits and would like to receive a proposal from WV DEP for review.

- We also recommend that the permit record include baseline West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit.

Our comments are consistent with Interim Final Guidance issued by EPA on April 1, 2010, entitled "Guidance Summary: Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order". Please review the guidance and associated documents for more details on the above issues.

This permit should not be issued until EPA has had the opportunity to review a complete submittal and these comments are addressed. Feel free to contact me at 215-814-5717 if you any questions or call Bette Conway at 215-814-5744.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000140



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

May 17, 2010

Mr. Scott Mandirola, Director
West Virginia Department of Environmental Protection
Division of Water and Waste Management
601-57th Street
Charleston, West Virginia 25304

Mr. Thomas Clarke, Director
West Virginia Department of Environmental Protection
Division of Mining and Reclamation
601-57th Street
Charleston, West Virginia 25304

> Re:   NPDES Permit Nos. WV1023578; WV1023560; WV1023551; WV1023543;
>        WV1023535; WV1023527; WV1023519; WV1023501; WV1023497;
>        WV1023489; WV1023471; and WV1023462

Dear Messrs. Mandirola and Clarke:

On March 16, 2010, the U.S. Environmental Protection Agency (EPA) sent a general objection to the West Virginia Department of Environmental Protection (WV DEP) concerning the above-referenced draft permits pursuant to the Clean Water Act (CWA), 33 U.S.C. § 1342, 40 C.F.R. § 123.44 and the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollution Discharges Elimination System in West Virginia* (1982) (MOA). The March 16, 2010 general objection letter (General Objection) served as a time extension request for the full 90-day period to review the draft permit. We have been discussing these permits with WV DEP and identified several concerns. EPA is requesting additional information and analyses and expects to continue to review the draft permits and underlying information it has received. EPA's comments are identified below. We request that these permits not be issued until these comments are resolved.

(1) <u>Reasonable Potential Analysis</u>

CWA NPDES permits must contain appropriate water quality-based effluent limits when necessary to meet water quality standards. *See* 40 C.F.R. § 122.44(d)(1). A reasonable potential analysis is required to determine whether a discharge will cause or contribute, or has the reasonable potential to cause or contribute, to an excursion above a numeric or narrative water quality standard. Where numeric water quality criteria have not been established, the permitting authority remains obligated to establish effluent limits by one of the methods

EXHIBIT
tabbies®
4-0

provided in 40 C.F.R. § 122.44(d)(1)(vi)(A)-(C). Please include a reasonable potential analysis in future proposed permits for these discharges consistent with applicable requirements

As a first step, WVDEP should determine whether proposed discharge limits are currently being achieved before determining whether any compliance schedule is considered. The background data provided with the permits suggests that effluent limits are being achieved in some cases while schedules for compliance are allowed. Additionally, none of the permits include any reasonable potential analysis of total dissolved solids (TDS), sulfates and specific conductivity (SC) to assess compliance with the state narrative water quality criteria as specified in 40 CFR 122..44(d)(1)(vi). A growing body of evidence supports that these pollutants associated with coal mine discharges are causing or contributing to violations of narrative water quality criteria. Water quality data demonstrates SC for surface water associated with many of the permits at issue-levels ranging from 611 µS/cm to 3310 µS/cm. In addition, a number of the permits discharge to the Monongahela watershed where total dissolved solids have already been identified as a parameter of concern.

Based on EPA's April 1, 2010 released *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams* (Conductivity Study),[1] EPA expects that in-stream SC greater than 500 µS/cm may indicate exceedance of water quality standards. EPA recognizes that in certain fact-specific circumstances, in-stream conductivity levels greater than 500 uS/cm may not cause adverse impacts to the biological community. If WV DEP believes the permitting authority believes this not to be the case, the permit review package should document that the rationale for that exception.

EPA has also recommends that the draft permit records include baseline West Virginia Stream Condition Index (WVSCI) scoring for the in-stream monitoring locations and that the monitoring program include in-stream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) of the CWA during the life of the permit. To the extent available, genus-level data should be considered. As we have suggested on previous permits, EPA requests that instream and outlet biological and chemical monitoring be required in the permit. EPA and WVDEP have discussed developing a monitoring protocol to be incorporated into West Virginia permits. EPA would like to receive a proposal from WVDEP for such a protocol.

---

[1] The Conductivity Study applies EPA's standard method for deriving water quality criteria to field measurements and concludes that genus-level impacts to the biological community occur in waters in the Appalachian region that are dominated by salts of $SO_4^{2-}$ and $HCO_3^-$ at circum-neutral pH and low levels of chloride beginning at conductivity levels of 300 uS/cm. While that study will be reviewed by an independent review panel convened by EPA's Science Advisory Board, it is appropriate to use the information in that study and in published, peer-reviewed scientific literature (e.g. Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream Effects Of Mountaintop Coal Mining: Comparing Biological Conditions Using Family- And Genus-Level Macroinvertebrate Bioassessment Tools*, J. N. Am. Benthol. Soc. 27(3):717–737) to inform analysis of NPDES permit applications for surface coal mining operations in Appalachia.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000173

(2) Compliance Schedules

The draft permits provide compliance schedules for a number of constituents, including total iron and total aluminum. Compliance schedules may be appropriate for discharge limits intended to achieve water quality standards (WQS) under certain circumstances. The draft permits do not provide sufficient support for the proposed compliance schedules. WVDEP should demonstrate that the proposed compliance schedules are permitted by and consistent with Federal and State regulations. *See* 40 C.F.R. § 122.47; West Virginia C.S.R. §§ 47-10-8.1 and 47-30-6.2.o. This would include a showing that:

- Immediate compliance with applicable WQBEL as of the effective date of the permit cannot occur;
- The compliance schedule will lead to compliance with effluent limits sufficient to meet WQS by the end of the compliance schedule; and
- The compliance schedules are designed to achieve compliance as soon as possible.

The information provided with these draft permits did not provide a complete record that supports that the required criteria were met. A compliance schedule in a permit must lead to compliance with the effluent limitations for water quality standards by the end of the compliance period. A finding that the discharger will achieve compliance at the end of the period must be adequately supported by the administrative record for the permit. Without such finding, a permit may not be in compliance with the applicable provisions of the Clean Water Act and applicable West Virginia laws and regulations.

WVDEP should demonstrate that compliance schedules included in any subsequent proposed permits are consistent with these requirements.

(3) Applicable effluent limits

Based on information received to date, EPA's believes that each of the draft permit discharges constitutes a discharge from an existing abandoned coal mining source. Based on data provided to date, EPA understands that the location of the draft permits are likely "post mining areas" as defined at 40 C.F.R. § 434.11(k). Therefore, EPA assumes that technology-based effluent limits for coal mining point sources are applicable and that these draft permits must contain technology-based effluent limitations consistent with 40 C.F.R. Part 434, Subpart E, applicable to "post mining areas." Compliance schedules would not appropriate to meet technology-based effluent limits for these permits since the statutory deadline to meet these limitations already passed as specified in 40 C.F.R. § 122.47(a)(1).

In addition to technology-based effluent limits, the permits must include effluent limitations necessary to meet West Virginia's water quality standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.44(d) & 122.4(d). Where a TMDL has been established, the permit must ensure that effluent limitations are consistent with the assumptions and requirements of any applicable waste load allocation. *See* 40 C.F.R. § 122.44(d)(1)(vii)(B).

3

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000174

These permits are being proposed to remedy existing water quality impairment due to abandoned mining operations. We are interested in working with WV DEP to insure that they are issued with appropriate requirements and in an expeditious manner. We request that WV DEP provide the additional information as soon as possible. As stated earlier, we request that these permits not be issued until we have had the opportunity to resolve our concerns. If you have any questions, please feel free to contact me at (215) 814-5717.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permitting Branch

cc: Jeffrey Parsons, WV DEP

4

♻ Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.
Customer Service Hotline: 1-800-438-2474

WVDEP000175



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 1 1 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

     Re:    WV NPDES No. WV1010565 - Reissuance
             Argus Energy WV LLC
             Lt Fk of Parker Branch and Kiah Creek Coalburg Surface Mines and Haulroad
             SMCRA Nos. O506289, S501504, S506389
             EPA Receipt Date – July 12, 2010

Dear Mr. Parsons:

      Pursuant to Section 402 of the Clean Water Act, 40 CFR Part 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. For the reasons described below, we consider this to be an incomplete submittal; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR Part 123.44(d)(2).

      The draft permit submittal contains water quality-based effluent limits (WQBELs) for total recoverable aluminum at outfalls 009, 010, 011, and 012. The draft permit allows a 13 month compliance schedule for this parameter without any discussion in the rationale page regarding how the schedule will ensure compliance with the WQBELs. The compliance schedule regulation specified in 40 CFR § 122.47(a) indicates that a permit may, when appropriate, specify a schedule of compliance leading to compliance with the CWA and regulations. The compliance schedule must include detailed milestones to ensure compliance with the WQBEL limits as soon as possible. Therefore, we request that the compliance schedule for this permit be revised to identify the detailed milestones that will ensure compliance with the aluminum WQBELs as soon as possible. The rationale page should include discussion on how the milestones will ensure compliance with the aluminum limits as soon as possible as required in 40 CFR § 122.47.

      On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

EXHIBIT

4 P

review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality data reviewed included samples demonstrating levels of conductivity and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels of 656.86 to 755.88 umhos. The documentation provided to EPA did not include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity, and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal and interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

2

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000246

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the basline information in the record and required instream biological monitoring identify taxa to the genus level.

As noted, please provide the requested information and changes to the permit and statement of basis, if any. Feel free to contact me at 215-814-5717 if you any questions or call Francisco Cruz at 215-814-5734.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:     Thomas L. Clarke, WV DEP
        Jon M. Capacasa, EPA

3

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000247



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 1 1 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

    Re:    WV NPDES No. WV0056693 - Reissuance
               Big Bear Mining Company
               Big Bear Preparation Plant, Eagle No. 5 Mine, Big Bear No. 5 Mine, & Refuse #1
               SMCRA Nos. O017483, U058900, D006982, O010783
               EPA Receipt Date – July 12, 2010

Dear Mr. Parsons:

    Pursuant to Section 402 of the Clean Water Act, 40 CFR Part 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. For the reasons described below, we consider this submittal incomplete; therefore we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2).

    On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

    Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm

**EXHIBIT**

tabbies®

4 Q

generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality data reviewed included samples demonstrating levels of conductivity and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels of 247 to 1224 umhos, sulfate levels of 82 to 394 mg/l, and Total Dissolved Solids (TDS) levels up to 1065 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity, and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

The rationale page of this draft permit indicates that aluminum limits were removed through an approved Aluminum Translator. As we have specified in a previous permit review, the aluminum translator must be consistent with EPA's Metals Translator Guidance, EPA 823-B-

2

WVDEP000254

96-007, which indicates that metals translator must be conducted under critical conditions to determine the fraction of total recoverable metal in the downstream water that is dissolved. This will allow the regulatory agency to convert the dissolved instream metal criteria to total recoverable effluent limits based on site specific data. Furthermore, the West Virginia Metal Translator Guidance indicates that a geometric mean translator can only be used if the majority of the data is generated at the critical condition in the receiving stream, if the dataset is log-normally distributed, and if the dissolved fraction ($f_d$) is statistically independent of total suspended solids. Please provide documentation in the rationale page on how the aluminum translator for this facility addresses the stream critical condition, the log normal distribution and that the $f_d$ is independent of TSS as specified in the above state guidance.

As noted, please provide the requested information and changes to the permit and statement of basis, if any. Feel free to contact me at 215-814-5717 if you any questions or call Francisco Cruz at 215-814-5734.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:     Thomas L. Clarke, WV DEP
        Jon M. Capacasa, EPA

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000255



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 1 1 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57ᵗʰ Street SE
Charleston, WV 25304

> Re:   WV NPDES No. WV0046612
>       LP Mineral, LLC
>       Humphreys No. 7 Mine
>       Permit Reissuance

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 C.F.R. Section 123.44, and the Memorandum of Agreement (MOA) between the U.S. Environmental Protection Agency (EPA) and the West Virginia Department of Environmental Protection (WVDEP), we received the above-referenced permit modification for review on July 12, 2010. For the reasons described below, we consider this submittal incomplete; therefore we are issuing an interim objection consistent with the MOA and 40 C.F.R Section 123.44(d)(2).

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

Based on the best information available to EPA, projects with predicted conductivity values below 300 μS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 μS/cm generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*



EXHIBIT

4 R

The NPDES application for the LP Mineral, LLC - Humpreys No. 7 Mine contains effluent data at outfall 003 for specific conductivity, total dissolved solids and total sulfates at levels potentially associated with biological impairment, greater than 500 umhos for specific conductivity, greater than 202 mg/l for total sulfates, and greater than 500 mg/l for total dissolved solids. The effluent levels of these parameters at outfall 003 are: 1654 mg/l for total dissolved solids, 2610 umhos for specific conductivity, and 1196 for total sulfates. The documentation provided to EPA did not include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity and/or sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(i), (ii) and (vi). We consider this information necessary for EPA to determine whether the permit is consistent with the CWA and NPDES regulations as described in 40 CFR§ 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 μS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. There, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000260

This draft permit should not be issued until EPA has had the opportunity to review a complete submittal and these comments are addressed.  Feel free to contact me at 215-814-5717 if you any questions or call Francisco Cruz at 215-814-5734.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:   Thomas L. Clark, WVDEP
      Jon M. Capacasa, EPA Region III

♻  *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000261



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 1 7 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

Re:    WV NPDES No. WV1019970 – New Mine
       Coal River Mining, LLC
       Surface Mine No. 7
       Surface Mine - SMCRA No. S501609 (SMA)
       EPA Receipt Date – July 7, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above concerning the issuance of a new NPDES permit. We recognize that we are offering these comments after EPA's 30-day review period allowed under the MOA. We strongly encourage you to consider these comments, since failing to address them could result in a final permit inconsistent with the NPDES permit regulations. Based on our review, we offer the following comments for your consideration and action.

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

EXHIBIT
4S

Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

The NPDES application for the Coal River Mining contains baseline water quality (BWQ) data for specific conductivity and total sulfates at levels potentially associated with biological impairment, greater than 500 umhos for specific conductivity and greater than 202 mg/l for total sulfates. The specific conductivity levels at the BWQ Station No. BWQ-WOB/0554-34 are 77 umhos to 1623 umhos with an average of 265 umhos, BWQ Station No. BWQ-1168-87 are 174 umhos to 554 umhos with an average of 385 umhos. The total sulfates levels at the BWQ Station No. BWQ-WOB/0554-34 are 12 mg/l to 424 mg/l with an average of 61 mg/l. The documentation provided to EPA did not include a reasonable potential analysis or an antidegradation analysis to determine whether specific conductivity and total sulfates have a reasonable potential to cause or contribute to an excursion of the state narrative water quality criteria as required in 40 CFR § 122.44 (d)(1)(i), (ii) and (vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR§ 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate water quality-based effluent limits to be included in the permit. The state should conduct a reasonable potential analysis for specific conductivity and total sulfates considering the values reported above to assess compliance with the state's numeric and narrative water quality criteria.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. There, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

WVDEP000279

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

The rationale page indicates that Coal River Mining, LLC will comply with the selenium limits using material handling. The rationale page should provide documentation what material handling procedures will be used in this facility to ensure comply with the selenium water quality-based effluent limits. The permittee shall require an alternative treatment system in case the material handling option does not work. We request that the permit be modified to include reporting requirements describing material handling procedures and/or treatment option that the permittee will use to comply with the selenium limits. This report must be submitted with the Discharge Monitoring Reports (DMRs).

The permit application for the Coal River Mining, LLC indicates that this facility is subject to the new source effluent guidelines specified in 40 CFR 434. The rationale page of this draft permit does not contain any discussion of which effluent guideline applies to this facility. Please revise the rationale page of this draft permit to document the effluent guidelines that applies to this facility.

This draft permit should not be issued until WV DEP addressed the above comments. Feel free to contact me at 215-814-5717 if you have any questions or call Francisco Cruz at 215-814-5734.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000280



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania. 19103-2029**

AUG 1 9 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

Re:    WV NPDES No. WV1020234
       Coyote Coal Company, LLC
       Hewitt Creek Surface Mine No. 1
       Permit Modification No. 4
       SMCRA No. S-502799
       EPA Receipt Date – July 22, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44 and the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. For the reasons described below, we consider this submittal incomplete, therefore we are issuing an interim objection consistent with the MOA and 40 C.F.R § 123.44.(d)(2).

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant



**EXHIBIT**

4 T

2.

degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm, total dissolved solids above 500 mg/l and total sulfate above 202 mg/l generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality data provided with this draft permit modification included samples demonstrating levels of conductivity, total dissolved solids and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses at BWQ-0542-59 exhibited specific conductivity levels of 212.90 µS/cm to 981.00 µS with average of 549.63 µS/cm, total dissolved solids of 120.00 mg/l to 850.00 mg/l with an average of 428.33 mg/l, and total sulfates of 84.50 mg/l to 483.00 mg/l with an average of 237.55 mg/l. The BWQ-HMND/0541-50 station exhibited specific conductivity levels of 101.50 µS/cm to 743.00 µS with average of 246.93µS/cm, total dissolved solids of 74.00 mg/l to 600 mg/l with an average of 171.83 mg/l, and total sulfates of 28.10 mg/l to 311.00 mg/l with an average of 66.28 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity and/or sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(i), (ii) and (vi). We consider this information necessary for EPA to determine whether the permit is consistent with the CWA and NPDES regulations as described in 40 CFR§ 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate, sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. There, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We notice that the aluminum translators for outfalls 026 to 033 are based on the instream analyses of total aluminum and dissolved aluminum. One of the objectives of the metals translator is to assess what portion of an effluent discharge will be dissolved in the stream.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000283

3

Since, these outfalls have not yet been built the chemical translator is not representative of this interaction. Therefore, we request that the aluminum translator be revised within six months of facility starting to discharge discharging from these outfalls to account for the interaction of the receiving stream and effluent discharge. As we have previously commented in order for an aluminum translator to be scientifically valid the majority of the data is generated at the critical condition in the receiving stream, if the dataset is log-normally distributed, and if the dissolved fraction ($f_d$) is statistically independent of total suspended solids. Please provide documentation in the rationale page on how the aluminum translator for this facility addresses the stream critical condition, the log normal distribution and that the $f_d$ is independent of TSS as specified in the above state guidance.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

As noted, please provide the requested information and changes to the permit and statement of basis, if any. Feel free to contact me at 215-814-5717 or Francisco Cruz at 215-814-5734.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:     Thomas L. Clarke, WV DEP
        Jon M. Capacasa, EPA

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000284



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 1 9 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

     Re:    WV NPDES No. WV0064840 - Reissuance
             Island Creek Coal Company
             Elk Creek No. 10 Preparation Plant and Refuse Area
             SMCRA No. H045600, P059000, U506186
             EPA Receipt Date – June 29, 2010

Dear Mr. Parsons:

     Pursuant to Section 402 of the Clean Water Act, 40 CFR Parts 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit for the above-referenced facility. We recognize that we are offering these comments after EPA's 30-day review period allowed under the MOA. Based on our review, we offer the following comments for your consideration. Please be advised that these comments are independent of any review conducted pursuant to Section 404 of the Clean Water Act.

     Baseline water quality data provided with this permit included samples demonstrating levels of conductivity and Total Dissolved Solids (TDS) in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels of 146 to 1030 umhos, and TDS levels up to 679 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity, and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We recommend that WVDEP undertake this analysis and determine appropriate limits to be included in the permit.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

**EXHIBIT**

Exhibit 4 u

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we recommend that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also recommend that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring indentify taxa on the genus level.

If you have any questions concerning this matter, please call me at 215-814-5717 or call Francisco Cruz at 215-814-5734.

Sincerely,

*Evelyn S MacKnight*

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

2

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000289



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 2 4 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

> Re:   WV NPDES No. WV0064858 - Reissuance
>       Coal-Mac, Inc. DBA Phoenix Coal-Mac Mining, Inc.
>       Holden 22 Preparation Plant and Refuse Facility
>       SMCRA No. H040900, P060600
>       EPA Receipt Date – July 26, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit for the above-referenced facility. For the reasons described below, we consider this submittal incomplete; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2).

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm

EXHIBIT
4 ✓

generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality data provided with this permit included samples demonstrating levels of conductivity, Total Dissolved Solids (TDS), and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels up to 1184.53 umhos, TDS levels up to 777 mg/l, and sulfate levels up to 359.40 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity, and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools,* J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we recommend that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring indentify taxa on the genus level.

2

♻  *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000291

If you have any questions concerning this matter, please call me at 215-814-5717 or call Francisco Cruz at 215-814-5734.

Sincerely,

*Brian P. Trulear*

~~for~~ Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:   Thomas L. Clarke, WV DEP
      Jon M. Capacasa, EPA

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000292



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 2 5 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57ᵗʰ Street SE
Charleston, WV 25304

      Re:    WV NPDES No. WV1018965 - Reissuance
               Bluestone Coal Corporation
               Sewell Seam Mine No. 2
               SMCRA No. S400900
               EPA Receipt Date – July 26, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. For the reasons described below, we consider this submittal incomplete; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2).

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm

**EXHIBIT**

4 W

generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality data reviewed included samples demonstrating levels of conductivity and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels of 801.0 to 833.0 umhos, sulfate levels up to 314.3 mg/l, and Total Dissolved Solids (TDS) levels of 507 mg/l to 557 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether total dissolved solids, specific conductivity, and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 μS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools,* J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

2

WVDEP000295

If you have any questions concerning this matter, please call me at 215-814-5717 or call Francisco Cruz at 215-814-5734.

Sincerely,

*Brian P. Trulear*

for   Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:   Thomas L. Clarke, WV DEP
Jon M. Capacasa, EPA

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000296



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

AUG 27 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

> Re:   WV NPDES No. WV1022920 - Reissuance
>        Argus Energy, WVLLC
>        Pretty Branch Surface Mine
>        SMCRA No. S500706
>        EPA Receipt Date – July 29, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. For the reasons described below, we consider this submittal incomplete; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2).

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm

EXHIBIT
4 x

generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality data reviewed included samples demonstrating levels of conductivity and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels of 603.09 to 673.19 umhos, and sulfate levels up to 238.90 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether specific conductivity and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

The Rationale Page indicates that TMDLs have not been completed for the Twelvepole Creek as of this date. The draft 2010 West Virginia 303(d) List includes receiving waters Frances Creek and Kiah Creek as impaired for CNA Biological. It is our understanding that the West Virginia policy is to include Criteria-End-of-Pipe for impaired waters until the Twelvepole TMDL is issued.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 μS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during

2

✪  *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000310

the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

If you have any questions concerning this matter, please call me at 215-814-5717 or call Francisco Cruz at 215-814-5734.

Sincerely,

for E.S.M.

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:     Thomas L. Clarke, WV DEP
        Jon M. Capacasa, EPA

3

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000311



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

SEP 2 2 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

    Re:   WV NPDES No. WV1024400 – New
            Frasure Creek Mining, LLC
            Open Fork Surface Mine No. 2
            SMCRA No. S301309
            EPA Receipt Date – August 23, 2010

Dear Mr. Parsons:

      Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. For the reasons described below, we consider this submittal incomplete; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2). Once we receive the information requested and a revised draft permit, we will reinitiate our review.

      On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

      Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant

♻   *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

EXHIBIT
tabbies®
4 Y

degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality data reviewed included samples demonstrating levels of conductivity, Total Dissolved Solids (TDS), and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting water quality analyses exhibited specific conductivity levels of up to 673 umhos, TDS levels up to 630 mg/l, and sulfate levels up to 374 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether specific conductivity, TDS, and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000336

Furthermore, we offer the following comments for your consideration and action. Please be advised that this evaluation is independent of any review conducted pursuant to Section 404 of the Clean Water Act.

Item #1 of the Rationale Page denotes that this facility is not a new or expanded discharge. Since this is a new facility with proposed outlets, please modify the Rationale Page to clarify that this is, in fact, a new discharge.

The Rationale Page indicates that none of the receiving streams are listed in either the Upper Kanawha TMDL or the drafted 2010 303(d) list for impairment. However, upon review of the 2005 Upper Kanawha Final Approved TMDL, it was noted that Loop Creek is impaired for fecal coliform. Furthermore, the aluminum translator documentation provided with the draft permit for unnamed tributaries of Loop Creek indicate that the stream is impaired for dissolved aluminum, which is counter to the narrative provided in the Rationale. Please include a discussion in the Rationale Page to clarify which receiving waters are impaired and for what parameters.

For those outlets which have not yet been constructed, the aluminum translator documentation explains that the 95th percentile has been applied due to the inability to measure the mix of discharge(s). Please include a special condition in the permit to reevaluate the aluminum translator at completion of each outlet construction.

Lastly, the draft permit contains water quality-based effluent limits for selenium. Please modify the Rationale Page to include a discussion of what treatment technology this facility will install to ensure compliance with the selenium water quality-based effluent limit, since this is a new discharge.

If you have any questions concerning this matter, please call me at 215-814-5717 or call Francisco Cruz at 215-814-5734.

Sincerely,

*Brian P. Trulean*

For   Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:   Thomas L. Clarke, WV DEP
      Jon M. Capacasa, EPA Region 3

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000337



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

OCT 1 5 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

Re:    WV NPDES No. WV1021966 Mod 2
       JMAC Leasing, Inc.
       Briar Mountain Surface Mine
       Surface Mine - SMCRA No. S302005 (SMA)
       EPA Receipt Date – September 17, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, and the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above concerning the modification of an existing NPDES permit. For the reasons described below, we consider this to be an incomplete submittal; therefore, we are issuing an interim objection consistent with the MOA and 40 C.F.R. § 123.44(d)(2). Once we receive the information and a revised draft permit, we will reinitiate our review.

EPA's review is informed, in part, by the emerging science regarding the impacts of surface coal mining on water quality. Scientific literature is increasingly recognizing the relationship between discharges from surface coal mining operations and downstream water quality impairments.[1]

---

[1] A 2003 published study, "Field and Laboratory Assessment of a Coal Processing Effluent in the Leading Creek Watershed, Meigs County, Ohio" by Kennedy, et al. linked elevated Specific Conductivity (SC) levels in the effluent to impaired, sensitive aquatic fauna. A 2004 Kentucky Department for Environmental Protection, Division of Water, Water Quality Branch study, "Effects of Surface Mining and Residential Land Use on Headwater Stream Biotic Integrity in the Eastern Kentucky Coalfield Region" found that the wholesale loss of mayflies at mined sites indicated that these organisms are especially sensitive to coal mine drainage. Dissolved solids emanating from hollow fills are a primary cause of biological impairment because of their severe impact to mayflies (a key component of headwater stream communities) and other sensitive taxa. A 2005 published study, "Evaluation of Ionic Contribution to the Toxicity of a Coal-Mine Effluent Using *Ceriodaphnia dubia*" by Kennedy, et al. linked impairment of aquatic life to elevated TDS levels. A 2008 published study, "Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools" by Pond, et al. found evidence indicating that mining activities have subtle to severe impacts on aquatic life and the biological conditions of a stream. A 2010 published study, "Mountaintop Mining Consequences" by Palmer, et al. shows that ecological losses downstream of coal mining valley fills are associated with increased levels of TDS/SC, sulfates, and selenium. A 2010 published study by Pond, "Patterns of *Ephemeroptera* taxa loss in Appalachian headwater streams (Kentucky, USA)," links SC as the most strongly correlated factor to *Ephemeroptera* abundance in streams impacted by mining and residential

✿   *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

**EXHIBIT**
4 2
tabbies®

**1. The documentation provided to EPA did not include a reasonable potential analysis or antidegradation analysis to determine whether total dissolved solids, specific conductivity, and/or total sulfates have a reasonable potential to cause or contribute to an excursion from the state narrative water quality criteria.**

The NPDES application for the JMAC Leasing, Inc. Briar Mountain Surface Mine contains baseline water quality (BWQ) data for specific conductivity and total sulfates at levels potentially associated with biological impairment, greater than 500 umhos for specific conductivity and greater than 202 mg/l for total sulfates. The BWQ data for Station No. BWQ6 exhibited concentrations of specific conductivity at 312 umhos to 1110 umhos, and total sulfates concentrations at 134 mg/l to 748 mg/l. The documentation provided to EPA did not include a reasonable potential analysis or an antidegradation analysis to determine whether discharges of total dissolved solids, specific conductivity, and/or total sulfates (pollutants generally known to be present in surface coal mining discharges within this ecoregion) have a reasonable potential to cause or contribute to an excursion of the state narrative water quality criteria as required in 40 CFR § 122.44 (d)(1)(i), (ii) and (v). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR§ 123.44(d)(2). We request that WVDEP provide this analysis. WVDEP should conduct a reasonable potential analysis for total dissolved solids, specific conductivity and total sulfates considering the values reported by the studies described in footnote 1 to assess compliance with the state's numeric and narrative water quality criteria.

The analysis should utilize valid, representative data to characterize the effluent. If site-specific data is unavailable, the effluent can be characterized using data from similar discharges from nearby or adjacent mining facilities having similar geologic characteristics as the mine under review, and/or from ambient data collected as part of the CWA § 404 or Surface Mining Control and Reclamation Act (SMCRA) permit applications, or other sources of information about the likely composition of the effluent. Characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate, sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools,* J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region.

---

development. A draft report by EPA, "The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields," found effects that include resource loss, water quality impairment, and adverse effects on aquatic resources. Finally, another draft report by EPA, "A Field-based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams" recognizes stream-life impacts associated with SC and concludes that genus-level impacts to the biological community occur at conductivity levels of 300 µS/cm. The draft EPA reports have been submitted to the EPA Science Advisory Board for review and are available to the public. In the interim, EPA believes they provide information that may inform permit review.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000345

**2.   Documentation received by EPA did not include baseline and annual WVSCI scoring for instream monitoring locations**

The documentation received by EPA did not include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations. Please provide that information and, where available, identify taxa to the genus level.

**3.   The documentation received by EPA did not include documentation apparently relied upon by WVDEP in determining whether to include water quality based effluent limitations for selenium**

It was noted that the permit does not include concentration limits for Selenium (outfalls have "report only" for selenium), with the exception of outfall 013. The rationale page indicates that a previously prepared CHIA (for amendment #1) provides detailed information, including a materials handling plan, that is supportive of a determination that this proposed amendment area "... does not necessarily have the potential to cause or contribute to Selenium exceeding the current Selenium water quality criteria (5 ug/l)." A further discussion of the CHIA indicates that "a review of the heavy metal analysis supplied with the application's original baseline does not indicate concentrations of selenium in excess of 0.005 mg/l or 5 ug/l." The rationale page also states that "A review of current DEP-Office of Hydrologic Protection – DISCHARGE MONITORING REPORT for this permit does not provide conclusive evidence for presence of Se in the discharges since outlets are either not constructed or not yet flowing." It is also mentioned that the average Se concentration in Cabin Creek is still below the 5 ug/l WQS. A review of the DISCHARGE MONITORING REPORT attached to the permit showed maximum concentrations of Se in Cabin Creek as high as 14 ug/l upstream and 17 ug/l downstream of the mining operation. Baseline Surface Water Analyses (attachment J-3, for sample site TM/BWQ6) provided in the permit showed that 1 of the 12 samples reported had a total Se concentration of 8 ug/l; the average for all 12 samples being 2 ug/l.

Please provide copies of all portions of the record, including those referenced above, relied upon by WVDEP in determining whether to include water quality based effluent limitations for selenium.

We request copies of the documentation identified above. This draft permit should not be issued until WV DEP has provided the documentation and EPA has had the full period to review the permit as set forth at in the MOA and 40 C.F.R. 123.44(d)(2). Feel free to contact me at 215-814-5717 if you have any questions, or call Bette Conway at 215-814-5744.

Sincerely,

Jon M. Capacasa, Director
Water Protection Division

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000346



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

OCT 2 8 2010

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57ᵗʰ Street SE
Charleston, WV 25304

Re:     WV NPDES No. WV1024540 – New
        White Wine Mining Venture, LLC
        Opus Highwall Mine No. 1
        SMCRA No. S300710
        EPA Receipt Date – September 28, 2010

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. This action is for a new surface mine encompassing 21.60 acres discharging to Slaughter Creek. The Permit rationale indicates that this proposed mine is considered the "1ˢᵗ-Permit-In" under the West Virginia Department of Environmental Protection's (WVDEP) antidegradation process. For the reasons described below, we consider this submittal incomplete; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2). Once we receive the information requested and a revised draft permit, we will reinitiate our review.

Based on the best information available to EPA, projects with predicted conductivity values below 300 μS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 μS/cm generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria. Baseline water quality (BWQ) data reviewed included samples demonstrating levels of conductivity, total dissolved solids (TDS) and sulfates that are consistent with levels potentially associated with biological impairment. The rationale page indicates that BWQ Station No. BWQ-1788-50 was used to assign wasteload allocations and final effluent limits for outfalls 002, 003 and 004. This BWQ station exhibited specific conductivity ranging from 76.4 μS/cm to 636 μS/cm with an average of 163.91 μS/cm; sulfates ranging from 28.76 mg/l to 204.34 mg/l with average of 56.22 mg/l. BWQ Station No. BWQ-1787-50 was used to assign wasteload allocations and final limits for outfalls 001, 005, 006 and 007. This BWQ exhibited specific conductivity ranging from

♻   *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

**EXHIBIT**

tabbies®

4 AA

188.00 μS/cm to 756 μS/cm with an average of 530.75 μS/cm; TDS ranging from 112 mg/l to 524 mg/l with an average of 353.50 mg/l; sulfates ranging from 82.02 mg/l to 350.79 mg/l with and average of 193.01 mg/l.

Given that this permit is considered the "1ˢᵗ-Permit-In" and BWQ data indicate that existing specific conductivity levels already approach and occasionally exceed 500 μS/cm, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates. In addition, we also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

WVDEP has stated that all the outfalls proposed by this facility are precipitation induced discharges associated with on-bench sediment structures and that it do not expect to have elevated mineralization/ions in the discharge. Based on this assumption, WVDEP has concluded that this facility does not have reasonable potential to exceed the West Virginia narrative water quality standards. However, WVDEP has not submitted any documentation with this draft permit to support the above assumption. EPA's regulations at 40 CFR § 122.45 establish for calculation NPDES permit conditions. 40 CFR §122.45(e) states that discharges which are non-continuous shall be described and limited considering: the frequency of discharge; total mass; maximum rate of discharge of pollutants during the discharge; and prohibition or limitation of specified pollutants by mass, concentration, or other appropriate measure. Therefore, EPA considers this an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this documentation.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 μS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region.

2

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000353

This draft permit should not be issued until WVDEP addresses the above issues. If you have any questions concerning this matter, please call me at 215-814-5717 or call Francisco Cruz at 215-814-5734.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:   Thomas L. Clarke, WV DEP
      Jon M. Capacasa, EPA Region 3

3

*♻ Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000354



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

Mr. Thomas Clarke
West Virginia Department of Environmental Protection                    DEC 2 3 2010
Division of Mining & Reclamation
601 57th Street SE
Charleston, WV 25304

      Re:    WV NPDES No. WV1021796 – Major Modification #1
            New Land Leasing Company Inc
            Patience No. 4 Surface Mine
            SMCRA No. S300105, amend (1)
            EPA Receipt Date – November 26, 2010

Dear Mr. Clarke:

      Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. This action is for a modification to the Patience No. 4 surface mine to add 77.0 acres of bonded area to the existing permit. New discharges are proposed through five new outfalls, plus the transfer of one adjacent/existing outfall and the relocation (new coordinates) for 4 existing outfalls. These outfalls discharge to Ewing Fork, Reeds Branch and Shotgun Hollow, of Paint Creek, Toney fork of Clear Fork of the Coal River, all of the Kanawha River watershed. For the reasons described below, we consider this submittal incomplete; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2). Once we receive the information requested and a revised draft permit, we will reinitiate our review. EPA's comments to this permit are provided as follows.

      The Module 11 Part III Description – Narrative indicates that the total disturbed area added under the amendment is 82.0 acres; this conflicts with the acreage given in the rationale page (77.0 acres), please revise.

      Regarding specific conductivity, WVDEP's rationale presumes that all the outfalls proposed by this facility are precipitation-induced discharges associated with on-bench sediment structures and are not expected to have elevated mineralization/ions in the discharge. Data was provided from an adjacent mining operation to support that discharges from these types of outfalls (19-23) are infrequent. However, no analytical data for was provided to support the statement of no reasonable potential for elevated mineralization/ions in the discharge from the bench ponds. In addition, the existing instream pond (001) located at the base of existing valley

**EXHIBIT**

tabbies

4 BB

fill 001 would not be considered a precipitation induced discharge; no reasonable potential analysis was provided for this discharge. The West Virginia Department of Environmental Protection (WVDEP) should perform a reasonable potential analysis for outfall 001 and the existing outlets 002-004 to assess compliance with West Virginia narrative criteria. The baseline water quality monitoring samples submitted with the draft permit modification exhibited levels of specific conductivity, total dissolved solids and total sulfates that are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance provides a framework for the Regions when they review permits for discharges associated with Appalachian surface mining projects. At the same time, EPA released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports have been submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews. Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

Baseline water quality and raw water data reviewed included samples demonstrating levels of conductivity, Total Dissolved Solids (TDS), and sulfates in the outfall discharge that are consistent with levels potentially associated with biological impairment. Supporting raw water quality analyses from adjacent mining operations exhibited specific conductivity levels of up to 4020 umhos, TDS levels up to 2571 mg/l, and sulfate levels up to 1725 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether specific conductivity, TDS, and total sulfates in the proposed discharges have a potential to cause or contribute to downstream biological impairment and whether limits for total dissolved solids, conductivity, and/or sulfates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR § 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the

2

☺ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free. Customer Service Hotline: 1-800-438-2474*

WVDEP000377

extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate , sulfate and chloride. Where instream background conditions are limestone-dominated, that also should be noted. In addition, analysis should be provided as to whether the native aquatic community is similar to that studied in the *Benchmark Conductivity Study* and in Pond, G.J., M. E. Passmore, F.A. Borsuk, L. Reynolds, and C. J. Rose. 2008, *Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools*, J. N. Am. Benthol. Soc. 27(3):717–737. Any analysis based on differences of the native aquatic community should include a review of taxa (at the genus level) at applicable reference sites within the region. Therefore, we request that instream and effluent monitoring be required to evaluate at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

Regarding Selenium, one sample (BWQ-7 PHC-10, downstream Shot Gun Hollow) exhibited a concentration of 4.35 ug/l ; The rationale page indicates that...."all 12 BWQ samples taken in the unnamed tributary (shotgun hollow) of Paint Creek were "non-detect"." The narrative also indicates elevated concentrations of Selenium in borehole samples from the proposed mining area. A re-opener clause should be placed in the permit that requires limits for Selenium to be placed in the permit for outfalls that exhibit exceedances of WQBELs for Selenium, as well as immediate implementation of other actions, such as an evaluation of treatment for Selenium discharges.

This draft permit should not be issued until WVDEP addresses the above issues. If you have any questions concerning this matter, please call me at 215-814-5717 or call Bette Conway at 215-814-5744.

Sincerely,

*Evelyn S. MacKnight*

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc: Jon Capacasa

3

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

WVDEP000378



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

Colonel Robert D. Peterson
District Engineer
Huntington District
U.S. Army Corps of Engineers          JUN 2 1 2010
502 Eighth Street
Huntington, West Virginia 25701

Dear Colonel Peterson:

The U.S. Environmental Protection Agency (EPA) has been participating in discussions with your staff and with representatives of Coal-Mac Inc. (applicant) to seek resolution of concerns expressed by EPA regarding the proposed Pine Creek Surface Mine. Pine Creek Surface Mine is one of the remaining sixteen projects located in West Virginia and identified for the enhanced coordination procedures (ECP) established in the Memorandum of Understanding (MOU) signed by our respective agencies and the Department of Interior on June 11, 2009. The 60-day ECP timeframe for resolution of issues surrounding this project began on April 6, 2010 and expired on June 4, 2010. EPA sent a letter requesting a 15 day extension for review of the project; that extension expires on June 19, 2010.

On April 1, 2010, EPA released interim final guidance to the Regional offices titled: *Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (SCM Guidance). The SCM Guidance clarifies EPA's regulations as they apply to discharges associated with surface coal mining practices and provides a framework for the Regions when they review permits for discharges associated with Appalachian surface coal mining projects. EPA Region III utilized the regulations and this Guidance during its review of the Coal Mac proposal. EPA recently also released two Office of Research and Development (ORD) reports: *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields*, and *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (Benchmark Conductivity Study)*. The ORD reports are being submitted to the EPA Science Advisory Board (SAB) for review and are also publicly available. In the interim, EPA views the reports as providing information, along with published, peer-reviewed scientific literature, that may inform permit reviews.

During the project review process as provided by the June 11, 2009 Memorandum to the Field, EPA identified four areas of general concern. These included avoidance and minimization, water quality impacts, cumulative effects, and mitigation. The project as proposed by Coal-Mac Inc. will impact 14,530 linear feet of stream channel and disturb 759 surface acres. The streams on-site are good quality and are providing clean, freshwater dilution to the Left Fork of Pine Creek. We commend Coal-Mac for its efforts to address EPA's concerns based on our

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

9

**EXHIBIT**

tables

4 cc

regulations and clarified by the SCM Guidance. EPA believes that a permit decision may move forward consistent with the application as modified by this letter.

### Avoidance and Minimization

The applicant performed a comprehensive alternatives analysis as part of the original application. Through the applicant's upfront efforts impacts to 22% of the stream resources within the project area were avoided. The applicant proposes to haul approximately 4.1 million tons of material to the adjacent mine (Pheonix No. 4 Surface Mine). The applicant proposes to raise the deck of the valley fills 100 feet beyond that which is required by the West Virginia Approximate Original Contour/Fill Optimization process. Where practicable the applicant has maximized the amount of spoil returned to the mine bench and minimized the amount of excess spoil that must be disposed of in streams. Following the initiation of the ECP process, the applicant evaluated alternatives in valley fill construction and has incorporated best management practices that are expected to reduce the likelihood of increased loading of total dissolved solids (TDS) and specific conductivity levels to minimize water quality impacts and protect against significant degradation of downstream aquatic resources. These include a materials handling plan to minimize exposure of mineral-rich overburden to surface waters and groundwater, and modification of fill construction to maximize surface water runoff and minimize infiltration of water through the fill.

In addition, the applicant has modified the mine plan in an effort to minimize the amount of land disturbed at any one point in time during the operation. The original plan proposed to have the full mine area disturbed and all three valley fills active within 12-18 months of commencing operation. The revised mine plan proposes the concurrent use of Valley Fills 1 and 3 within approximately 6 months, but represents a reduction of surface acres of disturbance at any point in time during operation by up to 25% within one year of operation. The applicant's proposal would delay the use of Valley Fill 2 until approximately 3 years from the beginning of the operation. While the applicant's efforts in this regard are appreciated, the proposal essentially calls for concurrent construction of Valley Fills 1 and 3. As set forth in more detail below, EPA recommends that the three valley fills be constructed sequentially, with earlier valley fills fully constructed and monitored prior to initial construction of subsequent fills to ensure that predicted water quality outcomes are achieved.

### Water Quality and Significant Degradation

To address the Agency's water quality concerns, the applicant has proposed to incorporate Best Management Practices recommended in the April 1 SCM Guidance. Based on peer-reviewed studies examining the relationship between conductivity and water quality impairment in Appalachia, EPA anticipates that projects with predicted conductivity levels below 300 $\mu$S/cm generally will not cause a water quality standard violation or significant degradation of the aquatic ecosystem. However, EPA expects that in-stream conductivity levels above 500 $\mu$S/cm are likely to be associated with adverse impacts that could rise to a level of significant degradation of the aquatic ecosystem. EPA has not been provided any information regarding site-specific conditions that differ from those studies. The Corps, EPA and the applicant have worked to develop protective permit conditions to ensure in-stream specific conductivity remains at levels that will not cause or contribute to degradation to water quality, including setting threshold limits within the permit of 300 $\mu$S/cm and 500 $\mu$S/cm, sequential construction of the

valley fills as described in the SCM Guidance document; a demonstration that specific conductivity at the monitoring locations remains on average below 500 µS/cm before the commencement of the next valley fill may begin.

To support this demonstration, a supplemental enhanced monitoring plan has been included with the project proposal as described in the applicant's Supplemental Monitoring and Adaptive Management Plan document. The applicant has agreed to monitor for physical, biological, and chemical parameters. The chemical parameters that will be monitored include, but are not limited to flow, pH, iron, manganese, aluminum, selenium, TDS, total suspended solids (TSS), sulfates, chlorides and specific conductivity.

The applicant proposes two conductivity thresholds for adaptive management. The first is at 300 µS/cm. If the linear trend in the twice-monthly monitoring data indicates an exceedance of 300 µS/cm below Valley Fill 1 and/or Valley Fill 3, the applicant will implement an adaptive management plan (AMP) to address the trend. The second threshold is at 500 µS/cm. The applicant proposes that, if a linear trend in twice-monthly monitoring indicates an exceedance of 500 µS/cm below Valley Fill 1, the applicant will provide additional mitigation focused on chemical improvements in the watershed. With respect to construction of Valley Fills 1 and 3, the applicant proposes to commence construction of Valley Fill 1 and to demonstrate that the average conductivity values downstream of Valley Fill 1 remain below 500 µS/cm within six months from construction of Pond 1 or after the construction of the first three lifts within Valley Fill 1, which ever period of time is longer. The applicant proposes that, if the foregoing condition is achieved, the applicant be authorized to proceed with construction of Valley Fill 3. If the foregoing condition is not achieved, the applicant proposes that it would not be authorized to proceed with construction of Valley Fill 3 until and unless successful remediation occurs. With respect to construction of Valley Fill 2, the applicant proposes to monitor both Valley Fills 1 and 3 during construction and demonstrate that average conductivity values downstream of both fills have remained below 500 µS/cm. If this condition is achieved, construction of Valley Fill 2 may proceed. Under this scenario, the applicant anticipates a period of three years between construction of Pond 1 and commencement of construction of Valley Fill 2. The applicant would not be allowed to proceed to Valley Fill 2 until and unless successful remediation occurs.

While the applicant's proposal attempts to address the Agency SCM Guidance, EPA remains concerned that the proposal essentially calls for concurrent construction of Valley Fills 1 and 3. The applicant has not demonstrated that the anticipated approximate 6 month period between construction of Pond 1 and commencement of construction at Valley Fill 3 is a sufficient monitoring period to meaningfully evaluate impacts from Valley Fill 1. For that reason, EPA recommends that each proposed valley fill be constructed to its completion and monitored over a period of time to evaluate whether significant degradation is occurring. This would allow for a comprehensive demonstration that Valley Fill 1 is consistent with the conductivity benchmark of 500 µS/cm included in the SCM Guidance and will not result in significant degradation in the receiving streams.Accordingly, EPA recommends that only Valley Fill 1 be authorized immediately using previously agreed-upon underdrain and landscape best management practices. Authorization of only Valley Fill 1 allows for time to assess the effects of removing the contribution of dilution waters with low conductivity to the Left Fork of Pine Creek where conductivity levels approach 500 µS/cm. The data from Valley Fill 1 should be utilized to determine whether to authorize remaining valley fills.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

**Mitigation**

The applicant has proposed on-site stream restoration and creation of 40,000+ linear feet of stream (greater than 2:1 ratio). The plan includes a significant monitoring plan and benchmarks for success, an adaptive management plan that provides back up plans if the projects are unsuccessful and provides for upfront financial assurances. The applicant's benchmarks of success include biological, chemical and physical measures and are intended to replace the lost functions within the immediate watershed. The primary goal of these created stream channels is to become functioning stream channels that meet Clean Water Act requirements and meet the State's designated use for aquatic life. EPA believes the proposed mitigation is consistent with CWA regulations and the considerations provided in the April 1 SCM Guidance document.

**Cumulative Impacts**

To address cumulative impacts, the applicant has offered to deed restrict three areas previously permitted to be filled on the Phoenix No. 5 Surface Mine operation. The Phoenix No. 5 operation was authorized to construct 5 valley fills. Two valley fills have been constructed. The applicant will deed restrict the three remaining unfilled sites. Those areas will therefore not be subject to filling now or in the future. This is an avoidance of impacts to 3,900 linear feet of stream channel and represents a 39.5% reduction of impacts within the Pine Creek watershed. The average conductivity values for these three streams are below 350 µS/cm and West Virginia Stream Condition Index scores greater than 85, indicating a very good biological community. In addition, the applicant has proposed to provide mitigation concurrently with the mining operation focused on improving the water quality through the reduction of TDS in the immediate watershed. There currently exists 4 deep mine discharges that are contributing to the loading of TDS on Left Fork of Pine Creek, and on Pine Creek, that the applicant is evaluating and is proposing to address.

EPA believes that a permit decision may move forward consistent with the application as modified by the Supplemental Monitoring and Adaptive Management Plan and as further modified by this letter. Incorporation of these modifications into enforceable conditions is recommended. EPA requests that we have the opportunity to review and comment on the draft permit and special conditions prior to finalization.

EPA appreciates the work your staff and Coal-Mac Inc. have undertaken to address the Agency's concerns. We look forward to continuing coordination as the permit is finalized. If you have any questions please don't hesitate to contact me or Jeff Lapp of my staff at 215-814-2717.

Sincerely,

John R. Pomponio, Director
Environmental Assessment and Innovation Division

**Chronology for:**
**Coal-Mac, Inc.**
**Pine Creek No. 1 Surface Mine**
**Public Notice No. 2008-00830**

**August 29, 2008**
Section 404 application submitted to Huntington District

**September 16, 2008**
Public Notice advertised; End of Comment Period: October 17, 2008

**October 27, 2008**
Agency notification letters sent out by Huntington District

**September 23, 2008**
Comments received from ACEE

**October 24, 2008**
Comments received from USFWS

**August 7, 2009**
Received clarification letter from USEPA

**August 17, 2009**
Provided clarification information to USEPA

**January 12, 2010**
ECP – Initial meeting in Charleston, WV with USACE, USEPA, WVDEP, OSM, and USFWS; Presented basic permit information, offered set aside on three valley fill areas.

**January 15, 2010**
Provided follow-up data from ECP meeting to USEPA

**February 2, 2010**
Provided additional information regarding the permit application to USEPA

**February 3, 2010**
Submitted draft BMPs to USEPA and DMRs from adjacent Phoenix 4 operation

**February 4, 2010**
Provided additional analysis from adjacent Phoenix 4 operation

**February 16, 2010**
Telephone conversation with USEPA regarding development of monitoring plan, reviewed sample plans from USEPA

**March 3, 2010**
Provided updated baseline information to USEPA

**March 9, 2010**
Meeting with USEPA personnel in Washington, DC regarding BMPs, monitoring

**March 18, 2010**
Revised AMP to USEPA

**March 30, 2010**
Revised AMP to USEPA; revised FCU calculations to proposed USACE SWVM spreadsheet/forms

**April 1, 2010**
EPA Draft Guidance Document issued

**April 5, 2010**
Provided discussion on revised development sequence to USEPA

**April 6, 2010**
Follow up EPC meeting in Charleston with USACE, USEPA, WVDEP, OSM, and USFWS; 60-day review period started.

**April 7, 2010**
Provided follow-up information from ECP meeting to USEPA

**April 15, 2010**
Revised AMP, WVSCI scores; and Environmental Justice information to USEPA

**April 21, 2010**
Provided additional information to ECP personnel regarding Phoenix 5 water analysis

**April 28, 2010**
Conference call with ECP personnel regarding AMP

**April 29, 2010**
Provided text portion of EID to USEPA

**May 11, 2010**
Provided EPA Guidance Document cross-reference to USEPA

**May 12, 2010**
AMP Supplement to USEPA

**May 27, 2010**
Provided revised EPA Guidance Document cross-reference to USEPA; Revised AMP to USEPA; Received 15-day extension request to 60-day review period from USEPA

**June 7, 2010**
Provided discussion on revised development sequence to USEPA

**June 10, 2010**
Revised AMP to USEPA

**June 15, 2010**
Revised SWVM calculations provided to USACE

**June 17, 2010**
Provided trends analysis on specific conductivity in Left Fork of Pine Creek to USEPA

**June 21, 2010**
Received 60-day comment letter from USEPA

**June 22, 2010**
Coal Mac acceptance letter submitted to USACE

**June 23, 2010**
Revised AMP with final commitments to USACE; submitted additional compensatory mitigation plan (biofilter)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

Colonel Robert D. Peterson                                    2010
District Engineer
Huntington District
U.S. Army Corps of Engineers
502 Eighth Street
Huntington, West Virginia 25701

Re: PN 2008-00830; Coal-Mac, Inc.; Pine Creek Surface Mine, Logan County, WV

Dear Colonel Peterson:

The U.S. Environmental Protection Agency has been participating in discussions with your staff and with company representatives of Coal-Mac, Inc. to seek resolution to concerns expressed by our agency for the proposed Pine Creek Surface Mine. The Pine Creek Surface Mine is one of the remaining sixteen projects located in West Virginia identified for the enhanced coordination process (ECP) provided in the Memorandum of Understanding (MOU) signed by our respective agencies and the Department of Interior on June 11, 2009. The 60-day ECP timeframe for resolution of issues surrounding this project began on April 6, 2010 and will expire on June 1, 2010.

In order to allow sufficient time to finalize the resolution of issues, Region III is invoking the fifteen (15) day time extension (to June 16, 2010) provided by the June 11, 2009 Memorandum from the EPA Administrator and the Acting Assistant Secretary (Civil Works) to the Field on Enhanced Coordination Procedures for Pending Permits.

Thank you for your attention to this matter. If you have any questions, please feel free to contact me at (215) 814-2702 or Jeffrey D. Lapp, Associate Director, Environmental Programs at (215) 914-2717.

Sincerely,

John R. Pomponio, Director
Environmental Assessment and Innovation Division

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*



west virginia department of environmental protection

Executive Office
601 57th Street SE
Charleston, WV 25304
Phone: (304) 926-0440
Fax:     (304) 926-0446

Randy C. Huffman, Cabinet Secretary
www.dep.wv.gov

December 1, 2010

Docket ID No. EPA–HQ–OW–2010–0315
U.S. Environmental Protection Agency
EPA Docket Center (EPA/DC) Water Docket, MC 2822T
1200 Pennsylvania Avenue, NW
Washington, DC 20460

    Re:     Docket ID No. EPA–HQ–OW–2010–0315

To Whom It May Concern:

    The West Virginia Department of Environmental Protection (WVDEP) appreciates the
opportunity to provide its comments on the Detailed Guidance: Improving EPA Review of
Appalachian Surface Coal Mining Operations Under the Clean Water Act, National
Environmental Policy Act, and the Environmental Justice Executive Order which the United
States Environmental Protection Agency (USEPA) issued on April 1, 2010 (the Detailed
Guidance).    The Detailed Guidance was sent to the three EPA Regional Administrators whose
jurisdictions include six Appalachian states (including West Virginia). Neither the State of West
Virginia nor WVDEP was consulted about the Detailed Guidance or the standards announced
therein.

    The WVDEP's comments on the Detailed Guidance fall into three general categories.
The first category includes comments on two of the motivating factors that led USEPA to
develop the Detailed Guidance, USEPA's Permit Quality Review (PQR) of state-issued NPDES
permits in the Appalachian region and the notion of emerging science.   The second category
involves the significant legal issues that arise from USEPA's promulgation and application of
this document, which the WVDEP anticipates will be resolved in one or more of the four
lawsuits that have been filed challenging the Detailed Guidance and other of USEPA's initiatives
in the regulation of coal mining.  In the third category, the WVDEP addresses what it believes is
the appropriate way of interpreting and protecting the State of West Virginia's narrative water
quality standard prohibiting significant adverse impacts on the various components of the aquatic
ecosystem.

Promoting a healthy environment.

EXHIBIT

tabbies®

4 DD

Docket ID No. EPA–HQ–OW–2010–0315
December 1, 2010
Page 2 of 8

## Motivating Factors Behind USEPA's Development of the Detailed Guidance

One of the factors USEPA has identified as a basis for the Detailed Guidance is the findings of the PQR USEPA conducted in the fall of 2009 for NPDES permits issued for surface coal mining operations in the States of Kentucky, Ohio, Tennessee, and West Virginia. This PQR found that, among other things, states were not conducting reasonable potential analyses for violation of narrative water quality standards, not effectively incorporating narrative water quality standards in NPDES permits for surface coal mining operations, and failing to adequately document the manner in which such water quality standards are incorporated into NPDES permits for surface coal mining operations. Despite USEPA's conclusion that states, including West Virginia, were not adequately addressing narrative water quality standards for the protection of aquatic life in NPDES permits, the WVDEP does not believe this is an indication that it has not been effectively implementing the NPDES program in West Virginia. USEPA has been aware of mining impacts on the most sensitive benthic macroinvertebrates for several years, at least since data suggesting this was developed as part of the Mountaintop Mining Environmental Impact Statement (EIS) in 2003. Only in early 2009, just months before it decided to undertake this PQR, did USEPA reach the conclusion that such impacts may rise to the level of excursions from the narrative standard. After USEPA's change in position on this point, there was considerable uncertainty as to the threshold level at which impacts to aquatic insects should be regarded as excursions from the standard. With this uncertainty and with EPA's very recent change in interpretation, that West Virginia did not immediately adopt a permitting protocol to address protection of the narrative standard cannot be regarded as a failure to effectively implement the NPDES program. West Virginia has since adopted such a protocol and is proceeding to implement West Virginia's narrative standard in NPDES permits for surface coal mining.

The WVDEP questions USEPA's notion of "emerging science" for at least two reasons. First, in various documents, USEPA has cited studies supporting this "emerging science" dating back to 1980. Accordingly, such science cannot seriously be said to be "emerging." Instead, what is a recent development is USEPA's release of its Detailed Guidance in which USEPA has re-drawn the line between what are considered to be acceptable impacts on the ecosystem and what are considered to be impairments in violation of narrative water quality standards. Second, while WVDEP agrees that science is always emerging, science alone does not make policy. Emerging science may properly be used to inform policy judgments. Changes in policy, as USEPA has made with the Detailed Guidance, can be implemented only after following the process for doing so – promulgation of rules, adoption of legislation or otherwise – that assures there is the transparency that accompanies public involvement in these processes. USEPA has promulgated the Detailed Guidance and made it immediately applicable without the benefit of these processes or the transparency and legitimacy they bring. Applying new standards in advance of rulemaking or legislation in making regulatory decisions is simply wrong.

## Legal Issues from USEPA's Adoption of the Narrative Guidance

WVDEP believes the proper forum for resolution of legal issues raised by the USEPA's adoption and implementation of the Detailed Guidance is in court through the lawsuit it has filed against USEPA, or in one of the three other pending lawsuits which challenge USEPA's actions.

Docket ID No. EPA–HQ–OW–2010–0315
December 1, 2010
Page 3 of 8

Nonetheless, in the interest of making a complete response to USEPA's call for comments on the Detailed Guidance, WVDEP is summarizing some of the very significant legal issues it presents below.

**Violation of or Conflict with Sections 303, 401, 402 and 404 of the Clean Water Act**

Congress intended to allocate primary responsibility for water pollution control to the states, *see* 33 U.S.C. § 1251(b), which included giving the states the ability to develop water quality standards under Clean Water Act (CWA) Section 303. Under Section 303, states may establish, review, and revise water quality standards, subject to USEPA approval. *See id.* § 1313; *see also* 40 C.F.R. § 131.4. A water quality standard establishes the water quality goals of a body of water by designating the uses for that body of water and then setting criteria intended to protect those uses. *See* 40 C.F.R. § 131.2. Those standards may be specific numeric criteria or holistic narrative standards.

Because Congress intended States to take the lead in setting water quality standards, EPA's role is a limited one. First, USEPA is empowered, after consulting with the appropriate federal and state agencies, officials, and other interested persons, to develop and publish water quality criteria reflecting the latest scientific knowledge. *See* 33 U.S.C. § 1314(a). But those criteria are not binding on the States and are not independently enforceable; a state may adopt, modify, or reject USEPA's published criteria so long as it has a sound, scientific rationale for doing so. Secondly, USEPA is empowered to review and approve or disapprove state-adopted water quality standards. *See* 33 U.S.C. § 1313; 40 C.F.R. § 131.21. If EPA determines that a state's new or revised water quality standard does not satisfy the CWA, USEPA must notify the state within a particular timeframe and specify the changes that USEPA feels are necessary. *See* 33 U.S.C. § 1313(a), (c); 40 C.F.R. §§ 131.5, 131.21. If a state fails to make the necessary changes, only then may USEPA promulgate a water quality standard, and USEPA must do so in a published regulation pursuant to a statutorily-prescribed timeframe. *See* 33 U.S.C. § 1313(b), (c).

USEPA is charged with administering the NPDES program under Section 402 of the CWA, but because Congress intended to allocate the primary responsibility for water pollution control to the States under the CWA, *see* 33 U.S.C. § 1251(b), USEPA can authorize a state to assume many of the permitting responsibilities under a system of cooperative federalism. *See id.* § 1342(b). West Virginia is among those states that have assumed NPDES permitting authority. West Virginia has had primacy to administer that program since 1982 and WVDEP is the state agency charged with that administration. EPA has limited authority to review WVDEP's actions as they relate to NPDES permitting. Specifically, USEPA has the authority to object in specific circumstances to a particular NPDES permit authorizing discharges within West Virginia. *See id.* § 1342(d)(2), (4); 40 C.F.R. § 123.44. If WVDEP does not adequately respond to EPA's objection within a specified time, EPA may assume authority to issue the particular permit. *See* 33 U.S.C. § 1342(d)(4). But if USEPA does not object to a permit based on statutory or regulatory grounds, within specified times and by following specified procedures, WVDEP may proceed with issuing the permit.

Docket ID No. EPA–HQ–OW–2010–0315
December 1, 2010
Page 4 of 8

Section 404 of the CWA regulates the discharge of dredged-or-fill material into the waters of the United States. Section 404(a) grants authority to the Secretary of the Army to issue permits for the discharge of dredged-or-fill material. *See* 33 U.S.C. § 1344(a). The Secretary of the Army has delegated that authority to the Corps. *See* 30 C.F.R. § 325.2(a). The CWA establishes a limited role for USEPA in the Corps' permitting process. First, USEPA is empowered to establish CWA Section 404(b)(1) Guidelines by which the Corps will evaluate Section 404 permit applications and which are developed in conjunction with the Corps. *See* 33 U.S.C. § 1344(b)(1). Those Guidelines are codified at 40 C.F.R. Part 230 and paramount among the water quality concerns expressed in the Guidelines is the requirement that "[n]o discharge of dredged or fill material shall be permitted if it . . . causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." 40 C.F.R. § 230.10(b)(1).

The State of West Virginia is also responsible for issuing CWA Section 401 water quality certifications that are required for the Corps' Section 404 permits. See 33 U.S.C. § 1341(a). This ensures that mining projects will not violate the State's applicable water quality standards or stream designated uses. WVDEP is the regulatory agency in West Virginia that issues Section 401 water quality certifications for Section 404 dredge-or-fill permits.

None of the six states to which the Detailed Guidance applies have a water quality standard based on measurements of conductivity in streams. Neither has USEPA formally established a recommended water quality standards based on measurements of conductivity in streams. Nonetheless, without following any of the process prescribed by the CWA and regulations for developing a federally-adopted water quality standard, the Detailed Guidance established what is effectively a new water quality standard based on in-stream conductivity and requires this standard to be used in assessing both Section 402 and Section 404 permits. This conductivity standard has the degree of specificity and mandatory reach of rules that must be promulgated in accordance with the federal Administrative Procedure Act. It provides that in-steam conductivity levels above 500 µS/cm are deemed "likely to be associated with adverse impacts to water quality that may rise to the level of exceedances of narrative state water quality standards." If water quality modeling indicates that conductivity levels will exceed 500 µS/cm, "EPA believes that reasonable potential likely exists to cause or contribute to an excursion above applicable water standards; unless, based on site-specific data, the state has an alternative interpretation of their [sic] water quality standards that is supported by relevant science." If in-stream conductivity levels are between 300 µS/cm and 500 µS/cm, USEPA has declared that the "permitting authority [should] ensure that the permit includes conditions that protect against conductivity levels exceeding 500 µS/cm." But if conductivity levels are below 300 µS/cm, USEPA announced that it expects that those projects "will not cause a water quality standard violation."

The standard usurps West Virginia's authority to establish water quality standards under CWA Section 303, WVDEP's authority to interpret and implement those standards under 402, and WVDEP's authority to issue water quality certifications under CWA Section 401. West Virginia's properly promulgated narrative water quality standards, and the factors developed by WVDEP to implement those narrative standards, look more holistically at the affected aquatic environment and provide a more accurate measure of a stream's well-being. USEPA is using the

Docket ID No. EPA–HQ–OW–2010–0315
December 1, 2010
Page 5 of 8

new conductivity standard to supplant the narrative water quality standards West Virginia has properly adopted (and USEPA has approved) under section 303 of the CWA. USEPA is intruding upon the State's authority under section 401 of the CWA through its application of the Detailed Guidance's commitment to ensure that the conductivity standard is not exceeded "even if a state has issued a water quality certification under Section 401 of the CWA." State authority under section 402 of the CWA is violated by the Detailed Guidance's expectation that states use its new conductivity standard in issuing NPDES permits under CWA Section 402. The Detailed Guidance states: "The state must provide adequate documentation in the permit fact sheet or statement of basis to demonstrate that it has assessed reasonable potential and, where necessary, developed effluent limits (or other permit conditions) adequate to protect all applicable water quality standards, including narrative water quality standards. . . . Where EPA concludes that the state's explanation is not adequate, or the state fails to provide an explanation of how it has interpreted or applied its narrative quality standards, EPA may object to the permit in accordance with the provisions of 40 C.F.R. Section 123.44(c)."[1] The Detailed Guidance also requires USEPA regions to apply the conductivity standard as well as USEPA's views on what is appropriate mitigation to permitting by the Corps under section 404 of the CWA. It provides that the regions should convey their conclusions with respect to possible exceedences of water quality standards based on application of the conductivity values set forth in the Detailed Guidance, to the Corps and, if appropriate changes to the permit are not made in response to those water quality concerns, may proceed under the 404(q) MOA and/or Section 404(c) to block the permit's issuance. Under the authority of the Detailed Guidance, USEPA is unlawfully bypassing the State's proper role in regulating water quality under Sections 303 and 402 by applying its own interpretation of State water quality standards in the context of Section 404 permitting.

## Violation of and Conflict with National Environmental Policy Act

The National Environmental Policy Act (NEPA) 42 U.S.C. § 4331 *et seq.*, requires that federal agencies take a "hard look" at the potential environmental consequences of their proposed actions before acting. NEPA applies to the issuance of CWA Section 404 permits; dredged-or-fill permitting is an agency action for which the Corps must consider any environmental effects. *See* 33 C.F.R. § 325.2(a)(4), (6); *see also* 33 C.F.R. pt. 325, App. B, § 7(b)(1), (2). The Corps is the lead agency responsible for preparing NEPA documents relating to Section 404 permit applications and, in preparing those documents, the district engineer must follow the Corps' NEPA Implementation Procedures codified at Appendix B to 33 C.F.R. pt. 325.

In the Detailed Guidance, USEPA interferes with the Corps' discretion under NEPA by establishing some "rules" the Corps must follow in its NEPA analysis under the threat of a potential USEPA elevation of a permit under section 404(q) or veto under 404(c). First, USEPA announced a blanket rule prohibiting the Corps' issuance of a Finding of No Significant Impact or "FONSI" under NEPA based on certain types of mitigation involving sediment, groin, or other

---

[1] The new requirements the Detailed Guidance attempts to impose for State-prepared fact sheets also unlawfully modify and expand the requirements set forth in the USEPA's properly promulgated rule at 40 CFR §124.7.

Docket ID No. EPA–HQ–OW–2010–0315
December 1, 2010
Page 6 of 8

water control ditches that are required for mining projects under SMCRA and CWA Section 402. It provides that "construction of these ditches should not be used as a basis for supporting a FONSI" and that "mitigation measures that rely on establishing or re-establishing streams, rather than rehabilitating or enhancing existing streams, have less certainty of successfully offsetting impacts and should generally not be used to support a FONSI." Second, the Detailed Guidance also imposes a general presumption for the Corps that "projects that involve more than one mile of stream loss or more than one valley fill are likely to result in significant adverse impacts." Third, USEPA directs that a cumulative impacts analysis the Corps conducts under NEPA should be based on a specific watershed scale (HUC-12). USEPA is not authorized to direct the Corps to utilize that scale or to promulgate any of the NEPA rules discussed above. NEPA procedures may be adopted only *after* an opportunity for public review and after review by the Council on Environmental Quality (CEQ). *See* 40 C.F.R. § 1507.3. USEPA has not submitted those procedures to the public or to CEQ. Accordingly, they violate NEPA and exceed USEPA's authority.

**Violation of and Conflict with the Surface Mine Control and Reclamation Act and its State Counterparts**

The Surface Mine Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201 *et seq.*, is a regulatory program that, among other things, regulates the disposal of excess spoil material resulting from surface coal mining operations. SMCRA utilizes what is known as a "cooperative federalism approach" in the regulation of surface coal mining. *See* 30 U.S.C. §§ 1201(f), 1253. Under SMCRA, states have exclusive jurisdiction over the regulation of surface coal mining and reclamation operations so long as the Department of Interior ("DOI") has approved the state's regulatory program. *See* 30 U.S.C. § 1253. WVDEP's SMCRA program was approved by DOI in 1981. Accordingly, WVDEP has exclusive jurisdiction over the regulation of valley fills and the disposal of excess spoil in the State of West Virginia. "As part of its federally approved SMCRA regulatory program, the WVDEP surface mine permitting process examines [e]very detail of the manner in which a coal mining operation is to be conducted . . ." *Ohio Valley Environmental Coalition v. Aracoma Coal Company*, 556 F.3d 177, at 195 (4th Cir. 2009) (internal quotation marks omitted).

The Detailed Guidance Memorandum interferes with the regulatory regime established by the state SMCRA program and West Virginia's exclusive regulatory jurisdiction to operate this program through its enumeration of several "best management practices" that EPA "expects . . . will help to reduce or eliminate potential increases in conductivity levels in surface waters downstream of mining-related discharges . . . ." EPA rejects many of the mining industry's proposed management practices that might otherwise be acceptable under the state SMCRA program as "currently unproven in their effectiveness to protect water quality and to prevent significant degradation." USEPA also prescribes what it considers to be a best practice, saying that multiple valley fills should be sequenced for projects proposing more than one valley fill and that permittees should demonstrate compliance with applicable water quality standards at each valley fill before being allowed to begin construction of the next fill. The Detailed Guidance Memorandum also sets forth a presumption that "[h]igh-ratio mining operations generally do not represent the least environmentally damaging alternative" and directs that "[p]rojects should also incorporate environmentally effective limits on the linear extent of stream impacts per ton of

Docket ID No. EPA–HQ–OW–2010–0315
December 1, 2010
Page 7 of 8

excess soil produced through a robust alternatives analysis." Mining management practices such as sequencing are part of the SMCRA permitting process and therefore fall under the authority of WVDEP and the State of West Virginia. The Detailed Guidance's attempt to regulate those practices is contrary to SMCRA and its state law counterparts.

**Violation of the Federal Administrative Procedure Act**

Section 553 of the federal Administrative Procedure Act (APA) establishes notice and comment procedures for federal rulemaking. See 5 U.S.C. § 553. This procedure ensures that the public receives notice of proposed agency rules or amendments and allows the public or other interested parties "an opportunity to participate in the rule making through submission of written data, views or arguments . . . ." *Id.* § 553(c). When agencies write new regulations or make substantive revisions to applicable regulations without following formal APA-rulemaking procedures, they violate the APA. For the reasons stated above and many more that are not fully stated here, the WVDEP believes USEPA's adoption and application of the Detailed Guidance violates the APA.

**<u>Appropriate Application of the State's Narrative Water Quality Standard</u>**

USEPA 's Detailed Guidance takes a "one size fits all" approach to six different sets of narrative water quality standards that have been adopted by six different states. In contrast, the WVDEP has developed explicit State guidance, *Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards* (Permitting Guidance) and *Justification and Background for Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i* (Justification), specifically to enable its NPDES permit writers and applicants to address the types of water quality-based concerns addressed by its narrative water quality standard for the protection of the aquatic ecosystem.

The West Virginia narrative water quality criteria are set out in 47 C.S.R. 2 § 3.2.i. It prohibits the introduction of wastes that cause significant adverse impact to the chemical, physical, hydrologic or biological components of aquatic ecosystems. Where the only impacts to this component of the ecosystem are diminished numbers of certain genera of mayflies, without evidence that this has had any adverse impact of any significance on the rest of the ecosystem, the State cannot say that there has been a violation of its narrative standard. WVDEP has determined that "significant adverse impact" is more than a change in the numbers or makeup of the benthic macroinvertebrate community in a segment of a water body downstream from a point source discharge. It is, instead, a material decline in the overall health of an aquatic ecosystem. A goal of the CWA and its counterpart in West Virginia law is to protect the aquatic ecosystem as a whole; West Virginia's narrative standard is a holistic one that requires a holistic approach to ecosystem assessment. An ecosystem does not exist at a single point and, accordingly, its health cannot be assessed at a single point. In contrast to numeric water quality criteria, which can be applied by analysis of samples of water taken at any discharge or monitoring point in a stream, compliance with a standard that protects the aquatic ecosystem must be assessed in the broader area comprising the ecosystem. The West Virginia Stream Condition Index (WVSCI) and other

biologic assessment tools are not stand-alone determinants of compliance with the narrative standard.

WVDEP has performed a correlative evaluation of benthic condition and the parameter USEPA's Detailed Guidance mandates as a water quality standard for protection of the ecosystem, specific conductance. This evaluation suggests that native aquatic life is protected at various values and ranges of specific conductance. This finding supports the basic scientific principle that correlation is not cause and effect. Even though the DEP evaluation applied various filters to the evaluated dataset to address complicating factors listed above, the biological condition of a stream may be different from the condition predicted by specific conductance. The relationship between a WVSCI score and conductivity levels is loose enough to make conductivity levels a much less than reliable predictor of WVSCI score or ecosystem health. In situations such as these, where WVDEP has determined that it is infeasible to calculate a numeric effluent limit to implement a narrative water quality standard, WVDEP will include in the permit appropriate WET limits in accordance with 40 C.F.R. §122.443(d)(1)(v), BMPs to control or abate the discharge of pollutants, in accordance with 40 C.F.R. § 122.44(k)(3) and biologic monitoring to protect the narrative standard. A copy of WVDEP's Permitting Guidance in which this approach is set forth more fully and completely is attached hereto and made a part hereof.

WVDEP further discusses the bases for its rejection of conductivity as a means of protecting its narrative standard and for the approach it has taken in its Permitting Guidance in the Justification and in its comments on USEPA's "A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams", both of which are also attached hereto and incorporated as a part of WVDEP's comments on USEPA's Detailed Guidance.

## Conclusion

As the agency in West Virginia with permitting program primacy under both the federal Surface Mining Control and Reclamation Act and the Clean Water Act, WVDEP has a keen interest in the new framework for regulation of the mining industry that is evolving in the federal government. Again, West Virginia is pleased to provide comments on the Detailed Guidance and stands ready to answer any questions you may have about our comments. If you have any questions or concerns, or if you wish to discuss this matter in any particular, please contact Thomas L. Clarke, the Director of WVDEP's Division of Mining and Reclamation at (304) 926-0440 or email thomas.l.clarke@wv.gov.

Very truly yours,

Randy C. Huffman
Cabinet Secretary



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

APR 1 1 2011

Mr. Jeffrey Parsons
West Virginia Department of Environmental Protection
Division of Mining & Reclamation
601 57ᵗʰ Street SE
Charleston, WV 25304

      Re:    WV NPDES No. WV1018906 - Reissuance
              Paynter Branch Mining Inc.
              Paynter Branch North Surface Mine
              SMCRA No. S400300
              EPA Receipt Date – March 14, 2011

Dear Mr. Parsons:

      Pursuant to Section 402 of the Clean Water Act, 40 CFR § 123.44, the *Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System (NPDES) in West Virginia (1982)* (MOA), the U.S. Environmental Protection Agency (EPA) Region III received the draft permit cited above. For the reasons described below, we consider this to be an incomplete submittal; therefore, we are issuing an interim objection consistent with the MOA and 40 CFR § 123.44(d)(2).

      Based on the best information available to EPA, projects with predicted conductivity values below 300 µS/cm generally are not likely to cause water quality violations or significant degradation of the aquatic ecosystem. Discharges with levels of conductivity above 500 µS/cm generally are likely to be associated with adverse impacts that could cause or contribute to significant degradation and/or excursions from narrative water quality criteria.

      The NPDES application effluent data for the stream outfalls 001 and 002 included samples demonstrating levels of specific conductivity, total dissolved solids (TDS), sulfates and nitrates at levels that may exceed the West Virginia Water Quality Standards. Supporting effluent characterization for these outfalls showed specific conductivity levels ranging from 1239 umhos to 1451 umhos, TDS of 1011 mg/l to 1212 mg/l, total sulfates of 536.13 mg/l to 649.54 mg/l, and nitrates of 31.56 mg/l. The documentation provided to EPA did not include a reasonable potential analysis to determine whether these parameters at outfalls 001 and 002 have a potential to cause or contribute to an excursion of West Virginia narrative or numeric water quality criteria and whether limits for total dissolved solids, conductivity, sulfates and nitrates should be developed and included in the permit pursuant to 40 CFR § 122.44 (d)(1)(vi). We consider this information necessary for EPA to determine whether the permit is consistent with



EXHIBIT

4 EE

the guidelines and requirements of the CWA and NPDES regulations as described in 40 CFR§ 123.44(d)(2). We request that WVDEP undertake this analysis and determine appropriate limits to be included in the permit. We consider this to be an incomplete submittal. Accordingly, this letter represents an interim objection to issuance of this permit and our review under the MOA will recommence once we have received this information.

EPA recognizes that in certain fact-specific circumstances, instream conductivity levels greater than 500 µS/cm may not cause adverse impacts to the biological community. To the extent that is believed to be the case here, characterization of the effluent should include an analysis of the ionic matrix and whether the effluent will be dominated by calcium, magnesium, bicarbonate, sulfate and chloride. Therefore, we request that instream and effluent monitoring be required to evaluate, at a minimum, total dissolved solids (TDS), specific conductivity (SC), calcium, magnesium, bicarbonate, chlorides and sulfates.

We also request that the permit record include baseline and annual West Virginia Stream Condition Index (WVSCI) scoring for the instream monitoring locations and that the monitoring program required by Section D, paragraph 3 include instream biological monitoring using WVSCI, EPA's Rapid Bioassessment protocols, and any other methodologies employed or accepted by WVDEP to assess attainment of biological use for purposes of Section 303(d) during the life of the permit. We recommend that the baseline information in the record and required instream biological monitoring identify taxa to the genus level.

As noted, please provide the requested information and changes to the permit and statement of basis, if any. Feel free to contact me at 215-814-5717 if you any questions or call Francisco Cruz at 215-814-5734.

Sincerely,

Evelyn S. MacKnight, Chief
NPDES Permits Branch (3WP41)
Water Protection Division

cc:   Thomas L. Clarke, WV DEP
      Jon M. Capacasa, EPA

Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.
Customer Service Hotline: 1-800-438-2474

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL MINING ASSOCIATION**, *et al.*,    ) | |
|       ) | |
|     **Plaintiffs,**    ) | |
|       ) | |
| **and**    ) | |
|       ) | |
| **COMMONWEALTH OF KENTUCKY and**    ) | |
| **CITY OF PIKEVILLE, KENTUCKY,**    ) | |
|       ) | |
| **Plaintiff-Intervenors,**    ) | **Nos. 10-cv-1220-RBW** |
|       ) | **11-cv-0295-RBW** |
|     **v.**    ) | **11-cv-0446-RBW** |
|       ) | **11-cv-0447-RBW** |
| **LISA JACKSON**, in her official capacity as    ) | |
| **Administrator, U.S. Environmental Protection**    ) | |
| **Agency**, *et al.*,    ) | |
|       ) | |
|     **Defendants,**    ) | |
|       ) | |
| **and**    ) | |
|       ) | |
| **SIERRA CLUB**, *et al.*,    ) | |
|       ) | |
| **Defendant-Intervenors.**    ) | |

## AFFIDAVIT OF THOMAS L. CLARKE

I, Thomas L. Clarke, declare and state as follows:

1. I am the Division Director for the Division of Mining and Reclamation ("DMR") at the West Virginia Department of Environmental Protection ("WVDEP"). I have served in that position for 3 years. Prior to my current position, I served at WVDEP as counsel for the mining regulatory programs for 12 years. My career includes 23 years of experience in environmental regulation of the mining industry.



EXHIBIT

4 FF

2. WVDEP is an agency of the State of West Virginia headquartered in Charleston, West Virginia. The mission of WVDEP is to: "Use all available resources to protect and restore West Virginia's environment in concert with the needs of present and future generations." WVDEP is committed to protecting and improving the environmental quality of life for all of West Virginia's citizens.

3. DMR's mission within WVDEP is to regulate the mining industry in accordance with federal and state law. DMR's responsibilities include, but are not limited to, issuing and renewing permits for mineral extraction sites and related support facilities, inspecting facilities for compliance, monitoring water quality, and issuing and assessing violations.

4. Prior to the imposition of the new Enhanced Surface Coal Mining Pending Permit Coordination Procedures (the "EC Process"), coal mining in West Virginia most often required the following permits under the Clean Water Act: Section 401 certifications, Section 402 National Pollutant Discharge Elimination System ("NPDES") permits, and Section 404 permits. All coal mining operations also require Surface Mining Control and Reclamation Act ("SMCRA") permits.

5. WVDEP is the primary administrator for the NPDES regulatory program and the SMCRA program in West Virginia. WVDEP has had primacy to administer the NPDES program since EPA approved its program in 1982. WVDEP was given primacy over the SMCRA program in 1981.

6. DMR administers all coal and mining-related NPDES permits (the Division of Water and Waste Management administers all other types of NPDES permits) and the SMCRA program. DMR therefore issues all relevant permits for mining operations in West

2

Virginia, with the exception of Section 404 permits.  Section 404 permits are issued by the United States Army Corps of Engineers ("the Corps").

7.  WVDEP is responsible for developing and issuing water quality certifications under Clean Water Act Section 401.  Such certifications are required for Clean Water Act Section 404 permits that govern the discharge of dredged or fill material.  DMR is responsible for mining-related Section 401 certifications.

8.  The United States Department of the Army, the United States Department of the Interior, and EPA signed a "Memorandum of Understanding Implementing the Interagency Action Plan on Appalachian Surface Coal Mining" on June 11, 2009 (the "MOU"), announcing their goal of coordinating the regulation of surface coal mining in six Appalachian states, including pending Section 402 NPDES permits, 404 permits, and SMCRA permits.

9.  West Virginia is one of the six Appalachian states targeted by the MOU.  West Virginia was not given advance notice of, or the opportunity to comment, on the MOU.

10. On June 11, 2009, EPA and the Corps instituted a new extra-regulatory review of certain Clean Water Act Section 404 permits, namely, the EC Process, which subjected targeted permits to enhanced scrutiny and delay outside of the properly codified review process.

11. West Virginia is one of the six Appalachian states targeted by the EC Process.  West Virginia was not given advance notice of, or the opportunity to comment on, the EC Process.

12. The EC Process has caused a delay in the review and issuance of Section 404 permits from West Virginia.  Moreover, the delay inherent in the EC Process has resulted in a domino effect for all mining permits related to a proposed project, thereby causing a corresponding slow-down of DMR's processing of NPDES and SMCRA permits because

the Section 401 water quality certification, the NPDES permit, the Section 404 permit, and the SMCRA permit for an operation must contain similar standards and requirements.

13. In July 2009, EPA revoked its waiver of review of West Virginia mining NPDES permits that had been established by the 1982 Memorandum of Agreement between EPA and the State ("MOA"). Since 1982, WVDEP has administered that program without incurring any major criticism from EPA. In the MOA, EPA waived its right to review NPDES permits issued by WVDEP. However, EPA retained its right to terminate the waiver in whole or in part by notifying WVDEP at least 60 days before such termination became effective. EPA informed WVDEP in July 2009 that it had revoked that waiver, but did not give WVDEP the requisite 60 days' notice under the MOA. After I brought that failure to EPA's attention, EPA agreed that WVDEP was entitled to 60 days' notice and the agencies agreed that the waiver would become effective for permits submitted for comments after August 10, 2009. Since that time, WVDEP has been required to submit all draft NPDES mining permits of major modifications to EPA before they may be issued. That is true for all types of mining in the State not limited to surface mining.

14. EPA issued the "Detailed Guidance: Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Order" ("Interim Guidance") on April 1, 2010. The Interim Guidance was issued to EPA Regions 3, 4, and 5. West Virginia is served by EPA Region 3, based out of Philadelphia.

15. The Interim Guidance was issued without any advance notice to the State or an opportunity to comment.

4

16. EPA immediately began to apply the Interim Guidance and the standards announced therein, particularly the new conductivity standard based on the most sensitive benthic macroinvertebrates: mayflies. EPA has used the Interim Guidance, the studies cited by the Guidance, and its conductivity standard to "comment" on and object to West Virginia NPDES mining permits. EPA has issued objections for all types of NPDES mining permits not limited to surface mining.

17. DMR's NPDES permit backlog has increased since the Interim Guidance was issued. EPA also has "invited" WVDEP to refrain from issuing certain NPDES permits while the corresponding 404 permit is undergoing EC Process review.

18. West Virginia was given an opportunity to submit comments to EPA on the Interim Guidance only after its issuance, which the State did on December 1, 2010.

19. The West Virginia Legislature has promulgated numeric and narrative water quality standards under Section 303 of the Clean Water Act.

20. The Legislature adopted numeric standards for many parameters, including dissolved aluminum, arsenic, chloride, manganese, and zinc. The Legislature has not adopted a numeric conductivity water quality standard. WVDEP lacks the authority unilaterally to do so.

21. The State's narrative water quality criteria prohibits the introduction of wastes that cause significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems.

22. The State's numeric and narrative standards have been approved by EPA. The State's narrative water quality standards predate its NPDES primacy and have never before been challenged by EPA. In 2009, EPA approved the State's latest changes to its numeric

5

water quality standards. The Legislature charged WVDEP with interpreting and implementing those standards.

23. In Fall 2009, EPA conducted a Permit Quality Review for NPDES permits issued by Kentucky, Ohio, Tennessee, and West Virginia. EPA concluded that the states were not adequately addressing water quality standards in surface mining permits. On August 12, 2010, after soliciting public comment and conducting internal studies, WVDEP promulgated a Permitting Guidance document to provide guidance to NPDES permit writers on the State's narrative water quality standards. WVDEP also issued a Justification and Background document explaining its protocol and decision-making process.

24. The West Virginia Legislature and WVDEP have rejected the Interim Guidance and its new conductivity standard, concluding that the State's narrative standards are a more appropriate measure of the overall health of the holistic aquatic ecosystem. Based on WVDEP's studies, the agency has determined that conductivity is an overbroad, generic criterion that does not accurately reflect stream impairment. The Pond-Passmore study, upon which EPA's conductivity standard is based, found a shift in the benthic macroinvertibrate community downstream from mining activity, but did not otherwise correlate that finding with any significant or adverse impairment of the ecosystem. Where the only impacts to this component of the ecosystem are diminished numbers of certain genera of mayflies, without evidence of adverse impact to the rest of the ecosystem, the State cannot say that the narrative standards have been violated.

25. WVDEP's studies indicate that lowered biological condition is associated with increased ionic strength, but scientists remain less certain about the specific causative pollutant or

pollutants and the concentration(s) responsible for impairment. WVDEP has determined that because conductivity represents the combined concentrations of all different dissolved ions, each with potential varying toxic effects, regulations solely through an indicator like conductivity is not the best way for the State to protect against excursions from its narrative standards.

26. In its Permitting Guidance, WVDEP adopted the following protocol: the identification of specific pollutants can be managed through the inclusion of appropriate whole effluent toxicity ("WET") monitoring and/or limits and best management practices in NPDES permits where there is reasonable potential to cause or contribute to excursions from water quality criteria. If the permit applicant cannot demonstrate through chemical and biological monitoring and control measures that it does not have reasonable potential to cause or contribute to an excursion above the narrative criteria, WVDEP has instructed the permit writer to include WET limits in the permit. Alternatively, if the operator identifies toxic pollutants that can be regulated through the use of numeric limits, WVDEP will include a regulatory control number for those pollutants in the permit.

27. WVDEP's Permitting Guidance endorses the establishment of WET limits where (as with conductivity) the State cannot use a limit for a surrogate parameter. WVDEP also requires an extensive, comprehensive monitoring plan for the entire watershed.

28. EPA has not provided any comment on the State's Permitting Guidance.

29. EPA continues to use the Interim Guidance to object to NPDES mining permits, asking the State to conduct a reasonable potential analysis for conductivity. Even when EPA has not specifically cited to the Interim Guidance, it has used the standards announced therein as justification for its interim objections.

7

30. Those "interim" objections in effect constitute final objections because EPA has required standards and testing that is inconsistent with the State's water quality standards and its Permitting Guidance.

31. EPA has not confined its implementation of the Interim Guidance to new surface mining projects but has used it to object to all types of mining permits in West Virginia—permit reissuances and modifications, bond reclamation sites, preparation plants and refuse areas, and deep mines.  This has impeded all types of mining in the State.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Thomas L. Clarke

Dated:  May 23, 2011

Memorandum of Agreement

Between The

Division of Water Resources

Of The

Department of Natural Resources

Of The

State of West Virginia

And The

Regional Administrator, Region III
U. S. Environmental Protection Agency

Regarding The Administration and Enforcement
Of The National Pollutant Discharge Elimination System (NPDES)

EXHIBIT

4GG

35



**STATE OF WEST VIRGINIA**
DEPARTMENT OF NATURAL RESOURCES
CHARLESTON 25305

JOHN D. ROCKEFELLER IV
Governor

July 2, 1981

DAVID C. CALLAGHAN
Director

WILLIS H. HERTIG, JR.
Deputy Director

Mr. Jack J. Schramm
Regional Administrator
U. S. Environmental Protection Agency
Region III
Sixth and Walnut Streets
Philadelphia, Pennsylvania 19106

Dear Mr. Schramm:

Please find enclosed the division's final submittal under the NPDES program development outlined in the State/EPA Agreement.

Enclosed is a Memorandum of Agreement which describes how the State intends to carry out its responsibilities under 40 CFR Part 123 and the Attorney General's statement regarding the State's legal authority for the State's proposed Pretreatment Program and identifying the State laws which provide authority to carry out the NPDES Program at the State level, along with copies of State statutes and regulations for implementing the Program.

Your expeditious comments on the previously submitted Pretreatment Program and any documented comments on the April 1 submission regarding compliance tracking and enforcement are necessary to keep on schedule with the targeted October 1, 1981 date for State delegation of the NPDES Program.  Also, your prompt action on the review of the enclosures, and in particular the MOA, in accordance with 40 CFR 123.3 and 123.77 is necessary to enable preparations for the timely assumption by the State of the NPDES Program.

The Governor's letter requesting approval of the State Program is in process and will be forwarded separately.

Very truly yours,

WATER RESOURCES DIVISION

David W. Robinson
Chief

DWR:jrt
cc: James Burke, W. Va. Program Officer, EPA
    Jeff Hass, Chief, W. Va. Section, PEB, EPA

Enclosures

## Table of Contents

I.   Introduction                                                                              1

II.  Permit Review and Issuance                                                                4

     A.  General                                                                               4

     B.  Waiver of EPA Review of State-Issued NPDES Permits                                    4

     C.  Transmission of Information to Division of Water Resources Upon
         Program Transfer                                                                      6

     D.  Transmission of Information to EPA                                                     9

     E.  Processing of NPDES Applications                                                     12

     F.  Formulation of Draft Permits                                                         18

     G.  Public Notice                                                                        20

     H.  Permit Issuance                                                                      21

     I.  EPA Review of Permit Modifications                                                   22

     J.  Variance Requests                                                                    22

III. Pretreatment                                                                            24

     A.  General                                                                              24

     B.  State Program                                                                        25

     C.  NPS Categorical Standards                                                            26

     D.  Categorical NPS Credit Removal                                                       26

     E.  POTW Pretreatment Program Approvals                                                  26

     F.  Variances from Categorical Pretreatment Standards for Fundamentally
         Different Factors                                                                    27

IV.  Compliance Monitoring and Inspection                                                    28

     A.  Compliance Sampling Inspection                                                       28

     B.  Compliance Evaluation Inspection                                                     28

     C.  Performance Audit Inspection                                                         28

     D.  Routine Periodic Facility Inspections                                                28

     E.  Bioassays                                                                            28

Table of Contents
(continued)

V.   Enforcement                                                  29

     A.   General                                              29

     B.   State Enforcement Action                             29

     C.   EPA Notification to the Division of Water Resources  29

     D.   EPA Enforcement Action                               30

     E.   Endangerment to Health                               30

     F.   Laboratory Assistance                                30

VI.   Confidentiality of Information                          31

VII.  Term of Agreement                                        32

I. Introduction

In recognition of the Clean Water Act (CWA) with amendments through 1978, the Consolidated Permit Regulations of 1980 (40 CFR Parts 122-125), the promulgated pretreatment regulations (40 CFR Part 403) and that the State of West Virginia is requesting approval of a State program for National Pollutant Discharge Elimination System (NPDES) delegation, it is necessary to execute a Memorandum of Agreement (MOA) between the Chief and the EPA Regional Administrator.

This MOA is the mechanism for specifying the details of the EPA over-view role of the State NPDES program, which is provided for in the above referenced regulations.

The State shall administer the NPDES Program consistent with this MOA, the CWA, applicable federal regulations, promulgated effluent guidelines and State law and regulations issued pursuant thereto.

Each of the parties has responsibilities to assure that the requirements of the National Pollutant Discharge Elimination System are met. The parties agree to maintain a high level of cooperation and coordination between State and EPA staffs in a partnership to assure successful and effective administration of the NPDES Program. In this partnership, the EPA shall provide to the Division of Water Resources, technical and legal assistance as herein provided and in accordance with the State/EPA agreement.

It is the goal of both the Division of Water Resources and EPA to minimize the flow of documents. To this end, both parties further agree to cooperate in the development of an automatic data processing (ADP) system and other systems which will allow for efficient and effective implementation by the State of the NPDES Program.

The EPA shall provide, on a continuing basis and in a timely fashion to the Division of Water Resources, information relative to proposed, revised, new, promulgated, remanded or withdrawn or suspended regulations and to further advise the State of results of cases pertaining to the NPDES program in general, which could impact the implementation of the program at the State level.

The Division of Water Resources is responsible for the issuance, modification, reissuance, compliance monitoring and enforcement of all NPDES permits issued by the State and those issued by the EPA and subsequently accepted and transferred to the Division of Water Resources. The annual State Section 106 Program Plan shall be the document which establishes strategies and priorities of the specific implementation of compliance monitoring, enforcement and pretreatment.

All Evidentiary Hearings properly filed for by permittees in accordance with 40 CFR Part 124.74 shall be retained by EPA. EPA shall be responsible for resolving issues by these Hearings and the Division of Water Resources shall retain its rights under Section 401 of the CWA to certify or not, to any change in issued NPDES permits which result from resolution of Adjudicatory Hearings subject to this section.

If requested by either party, meetings will be scheduled between the Division of Water Resources and EPA to review specific operating procedures, resolve problems or discuss mutual concerns involving the administration of the NPDES Permit Program.

The EPA shall assess the Division of Water Resources' administration of the NPDES Program, from time to time, for consistency with the CWA, this MOA and all applicable Federal regulations. This assessment shall be accomplished through the review of permits, reports and enforcement actions

3

submitted by the Division of Water Resources to EPA, in accordance with
this MOA. The Regional Administrator may consider as a part of this
assessment, comments concerning the Division of Water Resources' admini-
stration of the NPDES Permit Program documented and received by permittees,
the public, and appropriately involved Federal and local agencies. Copies
of any such comments received by the Regional Administrator shall be for-
warded to the Chief. When these assessments are made, the EPA shall submit
a written report to the Chief advising the particulars of the assessment
and whether or not the State is satisfactorily administering the NPDES
Program.

This MOA shall be reviewed jointly at least annually by the Division
of Water Resources and the Regional Administrator during the preparation
and evaluation of the annual program plan.

Either party may initiate action to modify this MOA.

Following two (2) years of administration by the Division of Water
Resources with satisfactory assessment of such State administration, the
EPA agrees to renegotiate this MOA to reflect and provide for a significant
lesser overview role of the State and to significantly reduce, where possible,
the categories of dischargers subject to EPA review.

As a part of future annual State Section 106 Program Plans, EPA and
the Division of Water Resources shall agree upon a list of industrial and
municipal facilities to be designated major dischargers during the succeeding
fiscal year for the purposes of establishing priorities for permit issuance,
compliance inspection frequency and transmission of information to EPA.
Until such future designation is made, the current list of major dischargers
identifying 121 facilities will be used.

II.  Permit Review and Issuance

    A.  General

        It is recognized by the Division of Water Resources and the EPA
that the CWA and regulations adopted pursuant thereto provide that
upon approval of a state program for NPDES, NPDES permits subject to
such program will be issued by the Division of Water Resources and not
EPA.  Further, EPA maintains an overview role and may object to con-
ditions of NPDES permits.  Therefore, it is in the interest of the
EPA and the Division of Water Resources to reach an agreement which
specifies the details of the EPA overview of NPDES permits to be
issued by the State.

    B.  Waiver of EPA Review of State-Issued NPDES Permits

      1.  Except as hereinafter expressly provided, EPA waives the right to
review, object to, or comment upon State-issued permits under
402(d),(3), (e) or (f) of the CWA for all categories of discharges
except:

        a.  Discharges which may affect the waters of another State.

        b.  Discharges proposed to be regulated by general permits.

        c.  Discharges from POTWs with a daily average discharge exceed-
ing 1 million gallons per day.

        d.  Discharges of uncontaminated cooling water with a daily average
discharge exceeding 500 million gallons per day.

        e.  Discharges from any major discharger or from any discharger
within any of the industrial categories listed in Appendix A
to 40 CFR Part 122, dated May 19, 1980.

        f.  Discharges from other sources with a daily average discharge
exceeding 0.5 million gallons per day.

5

2.  The Regional Administrator retains the right to terminate the
    foregoing waiver as to future permit actions, in whole or in
    part, by sending the Chief written notice of termination at
    least sixty (60) days before such termination shall be effective,
    except where EPA cannot practically give this much advance
    notice.

6

C. Transmission of Information to Division of Water Resources Upon Program Transfer

1. The Regional Administrator shall transfer all NPDES files to the Chief at the time of program approval except those for which EPA maintains jurisdiction, as delineated below or those documents involved in litigation that have not yet been filed in court.

2. All files transferred to the Chief shall be on microfiche, except for pending permit applications and support files for permit issuance, which consist of all relevant information collected before approval of the State Program and not already in the possession of the Chief, and including the record of any proceedings, enforcement action, compliance reports, etc.  Pending permit application files shall be transferred to the Chief, subject to the following:

a. Commencing immediately, the Regional Administrator shall begin preparation for transferral to the Division of Water Resources, a list of all pending NPDES permit applications received by EPA. The list will include the name of each discharger, SIC Code, and specifically designate whether the application is:

   (1) administratively complete;

   (2) administratively incomplete or otherwise deficient; or

   (3) of undetermined status.

b. Upon receipt of the above list, the Division of Water Resources shall identify the priority order to be used by EPA to transfer application files to the Division of Water Resources.

c. To the extent practicable, the Regional Administrator shall, within one hundred eighty (180) days of EPA's approval of West Virginia's NPDES Program, complete the transferral of all NPDES permit application files (including those for Federal installations),

7.

and any other relevant data collected by the Regional Administrator prior to approval of West Virginia's Program.

d.  Subsequent to EPA's approval of West Virginia's Program, the Regional Administrator shall forward all appropriate information received thereafter relating to the NPDES permit applications to the Division of Water Resources, no later than fifteen (15) days after the receipt of such information, for those installations.

e.  All NPDES permit applications in Category (1) above shall be transferred without further actions by the Regional Administrator.

f.  All NPDES permit applications in Category (2) above shall be transferred with a document prepared by the EPA which specifies the information needed to make the application administratively complete or identify other deficiencies.

g.  All NPDES permit applications in Category (3) above shall have completeness determinations made by the Regional Administrator prior to transfer of the file to the Division of Water Resources and a document prepared by the EPA and submitted to the Division of Water Resources which specifies if the application is complete or not and if not complete, such document shall specify the information needed to make the application administratively complete or identify other deficiencies.

3.  Where the Chief has not adopted and accepted NPDES permits issued by EPA under Section 3.03 of Chapter 2 of the W. Va. Administrative Regulations, EPA shall maintain jurisdiction over those permits.

4.  The retention of EPA jurisdiction over any permits shall include the processing of any permit appeals, modification requests or variance requests; the performance of inspections, and the receipt and review of self-monitoring reports. If any permit appeal, modification request

8

or variance request is not finally resolved when the Federally issued permit expires, EPA will retain jurisdiction until the matter is resolved, unless the Division of Water Resources and the Regional Administrator make some other arrangement.

5. The Division of Water Resources shall become the sole permit issuing authority and the Administrator shall suspend the issuance of permits upon approval of the State Program.

6. If an NPDES applicant or permittee contacts the Regional Administrator concerning either an application or a permit, except for those covered in 3. and 4., above, the Regional Administrator shall inform the applicant of the Division of Water Resources' role and refer all inquiries concerning the specific NPDES application or permit to the Division of Water Resources.

7. The Division of Water Resources shall not issue a permit on the basis of any application received from EPA resulting from this transfer, which the Regional Administrator identifies as incomplete or otherwise deficient until the Chief receives information from the applicant sufficient to complete the application or correct the deficiency.

8. The Regional Administrator will forward to the Chief copies of all inspections performed by EPA and provide in writing to the Chief documentation advising of any enforcement action the EPA pursues against a violator.

9. Following EPA audit or any other review of the State NPDES Program, the Regional Administrator will forward a draft report of any such audit or review to the Chief for his review and comment in advance of release of any final report.

D. Transmission of Information to EPA

1.  The Division of Water Resources shall transmit to the Regional Administrator:

    a.  Copies of permit program forms as developed or significantly modified.

    b.  Copies of all complete NPDES permit applications received by by the Chief except those for which permit review has been waived.

    c.  Whenever requested by EPA, copies of permit applications for which permit review has been waived.

    d.  Notice of every action taken by the Division of Water Resources related to the consideration of any permit application or general permit, including a copy of each draft permit and any conditions, requirements or documents which are related to the draft permit, except for those for which permit review by EPA has been waived.

    e.  Whenever requested by EPA, copies of notices for which permit review has been waived.

    f.  A copy of every State-issued NPDES permit, along with any and all terms, conditions, requirements, or documents which are related to or affect the authorization of the permit.

2.  The Division of Water Resources shall transmit a copy of each draft general permit, except those for separate storm sewers, to the EPA Director, Office of Water Enforcement and Permits at the same time such draft is transmitted to the Regional Administrator.

3.  The Chief shall transmit to the EPA:

    a.  Upon request of the Regional Administrator, notices from publicly-owned treatment works for actions in accordance with 40 CFR Part 122.61(b) and 40 CFR Part 403.

   b. A copy of any significant comments presented in writing pursuant to the public notice of a draft permit and a summary of any significant comments presented at any hearing on any draft permit, except those for which permit review has been waived by EPA and for which EPA has not otherwise requested receipt, if:

     (1) The Regional Administrator requests the information; or

     (2) The proposed permit contains requirements significantly different from those contained in the tentative determination and draft permit; or

     (3) Significant comments objecting to the tentative determination and draft permit have been presented at the public hearing or in writing pursuant to the public notice.

   c. The Division of Water Resources shall keep such records as the Regional Administrator may reasonably require to ascertain whether the State program complies with the requirements of the CWA or 40 CFR Part 123.

4. The Division of Water Resources will forward to EPA copies of compliance inspection reports on major dischargers and copies of correspondence to major dischargers regarding non-compliance.

5. Upon program approval, the Chief shall prepare quarterly and annual noncompliance reports on NPDES permittees and submit to the Regional Administrator.

   a. The Chief shall submit quarterly narrative reports for major facilities, as elsewhere defined and agreed upon through this document. The report shall:

     (1) Be subcategorized as non-POTWs, POTWs and Federal permittees.

     (2) Be alphabetized by permittee name. When two or more permittees have the same name, the permittee with the lowest permit number shall be listed first.

11

(3) For each entry, include in the following order the following information:

(a) Name, location and permit number of the noncomplying permittee.

(b) Brief description of noncompliance for that permittee.

(c) Date(s) and brief description(s) of action(s) taken by Chief to insure compliance.

(d) Status of resolution of the noncompliance.

(e) Any details which tend to explain or mitigate the instance(s of noncompliance, provided that such reports be kept confidential by EPA if the State is contemplating or is taking enforcement action against a particular facility for which these details are submitted.

b. These quarterly noncompliance reports (QNCRs) shall be submitted in accordance with the schedule required by EPA regulations effective at the time. Currently, this is prescribed by 40 CFR Part 122.18(e).

c. Statistical reports shall be submitted on an annual basis by the Chief on minor NPDES permittees indicating the total number reviewed, the number of noncomplying minor permittees, the number of enforcement actions and number of permit modifications extending compliance deadlines. The statistical information shall be organized to follow the types of noncompliance listed in 40 CFR Part 122.18(a)(2).

d. A separate list of minor discharges which are one or more years behind in construction phases of the compliance schedule shall be submitted and alphabetized by permittee name and permit number.

e. These annual reports shall be prepared for a calendar year basis and completed within 60 days after the end of the calendar year.

E. Processing of NPDES Applications

1. In accordance with Section D., copies of complete NPDES permit applications shall be forwarded to the Regional Administrator immediately following the Division of Water Resources' determination that the application is complete. The draft permit for facilities for which the Regional Administrator has not waived review shall be submitted to the Regional Administrator concurrently with the complete application.

2. The Regional Administrator has up to thirty (30) days after receipt of the copy of the draft permit to make general comments upon, objections to or recommendations with respect to the draft permit. If the Regional Administrator requires additional time to supply specific grounds for objection, the Regional Administrator shall notify the Chief in writing during the thirty (30) day period of need for a time extension, and specify the length of the requested extension, but in no case shall it exceed ninety (90) days from the time he receives the draft permit. Such written notification shall provide information on the general objection of EPA to the draft permit.

3. In the event the Regional Administrator fails to provide the general objection or notify the Division of Water Resources of the request for an extension within such thirty (30) day period, the application shall be deemed complete with respect to EPA.

4. In the case of draft general permits, EPA shall have 90 days from the date of receipt of the draft general permit to comment upon, object to or make recommendations with respect to the draft general permit.

5. The written notification by the Regional Administrator , or the Director, Office of Water Enforcement and Permits, as appropriate, shall include:

   a. A statement of reasons for the objection (including the section of the CWA or regulation thereunder that supports the objection), and

   b. The actions that must be taken by the Chief to eliminate the objection (including the effluent limitations and conditions which the permit would include if it were issued by the Regional Administrator).

6. The Regional Administrator or Director, Office of Water Enforcement and Permits objection to the issuance of a draft permit must be based upon one or more of the following grounds:

   a. The permit fails to apply, or to insure compliance with any applicable requirement of 40 CFR Part 123;

   b. In the case of a draft permit for which notification to the Administrator is required under section 402(b)(5) of the CWA, the written recommendations of an affected State have not been accepted by the permitting State and the Regional Administrator finds the reasons for rejecting the recommendations are inadequate;

   c. The procedures followed in connection with formulation of the draft permit failed in a material respect to comply with procedures required by the CWA or by regulations thereunder or by the MOA;

   d. Any finding made by the Chief in connection with the draft permit misinterprets the CWA or any guidelines or regulations under the CWA, or misapplies them to the facts;

e.  Any provision of the draft permit relating to the maintenance of records, reporting, monitoring, sampling or provision of any other information by the permittee are inadequate, in the judgement of the Regional Administrator to assure compliance with permit conditions, including effluent standards and limitations required by the CWA, by the guidelines and regulations issued under the CWA, or by the draft permit;

f.  In the case any draft permit with respect to which applicable effluent standards or limitations under sections 301, 302, 306, 307, 318, 403 and 405 of CWA have not yet been promulgated by the Agency, the draft permit, in the judgement of the Regional Administrator, fails to carry out the provisions of the CWA or any regulations issued under the CWA; the provisions of this subparagraph apply to determinations made pursuant to 40 CFR Part 125.3(c)(2) in the absence of applicable guidelines and best management practices under section 304(e) of CWA, which must be incorporated into permits as requirements under sections 301, 306, 307, 318, 403, or 405, as the case may be;  The objection by the Regional Administrator shall take into consideration the draft permit terms and conditions provided in accordance with Section II. F.8. this MOA.

g.  Issuance of any draft permit would in any other respect be outside the requirements of the CWA, or regulations issued under the CWA.

7.  Upon receipt of EPA's general objection, the Division of Water Resources shall promptly notify the applicant and advise that the time provided by the regulations for the Chief to act on the application may be extended, due to EPA's general objection to the permit.

15

8. Upon receipt of EPA's specific objection, the Division of Water Resources shall promptly notify the applicant that the EPA has objected to the issuance of the permit and the time provided by the regulations for the Chief to act on the application will be extended. This notification will include all comments, recommendations and objections made by EPA on the draft permit and will request the applicant to provide the information necessary to comply with the recommendations or to remove the cause for EPA objection. If the cause for EPA objection was based on procedural aspects or judgment by the Division of Water Resources varying from that of the Regional Administrator, rather than due to any cause by the applicant, the Chief shall advise the Regional Administrator of the reasoning, as the situation demands.

9. Prior to notifying the Chief on an objection based upon any of the grounds set forth above, the Regional Administrator:

   a. Shall consider all data transmitted to the EPA by the Division of Water Resources.

   b. May, if the information provided is inadequate to determine whether the draft permit meets the guidelines and requirements of the CWA, request the Chief to transmit to the Regional Administrator the complete record of the permit proceedings before the Division of Water Resources, or any portions of the record that the Regional Administrator determines are necessary for review. If this request is made within thirty (30) days of receipt of the Division of Water Resources submittal, it shall constitute an interim objection to the issuance of the permit and the full period of time specified (90 days) shall

be allowed, provided the Regional Administrator's request for information on the specific inadequacies of the draft permit is submitted with the request for the complete record.

10. Within ninety (90) days of receipt by the Chief of an objection by the Regional Administrator, the State or interstate agency may request that a public hearing be held by the Regional Administrator on the objection. The public hearing, in accordance with the procedures of 40 CFR Part 124.12(c) and (d) shall be held, and public notice provided in accordance with 40 CFR Part 124.10, whenever requested by the State or interstate agency.

11. A public hearing held in accordance with the above provisions shall be conducted by the Regional Administrator within sixty (60) days of the request by the State or interstate agency.

12. Following the public hearing, the Regional Administrator shall reaffirm the original objection, modify the terms of the objection, or withdraw the objection, and shall notify the State of this decision.

13. If no public hearing is held and the State does not resubmit a permit revised to eliminate the objection of the Regional Administrator within ninety (90) days of receipt of the objection, the Regional Administrator may issue the permit in accordance with 40 CFR Parts 121, 122 and 124 and any other guidelines and requirements of the CWA. The EPA shall maintain jurisdiction over any permit it issues, accordingly.

14. If a public hearing is held and the Regional Administrator does not withdraw the objection, and the State does not resubmit a permit revised to eliminate the objection or modified objection within thirty (30) days of the date of the receipt of the Regional Administrator's notification aforementioned, the Regional Administrator

17

may issue the permit in accordance with 40 CFR Parts 121, 122 and 124 and any other guidelines and requirements of the CWA. The EPA shall maintain jurisdiction over any permit it issues, accordingly.

{NOTE: In the case of draft general permits for discharges other than separate storm sewers, the Director, Office of Water Enforcement and Permits should be substituted for Regional Administrator whenever it appears above.}

18

F. Formulation of Draft Permits

1. Concurrent with the staff of the Division of Water Resources deter-
mining an NPDES permit application is complete, a draft permit shall
be prepared and subjected to public notice with copies of the complete
permit application and draft permit for all categories of discharges,
except those for which EPA has waived review, forwarded to EPA.

2. On NPDES permits for POTWs, where construction is required to obtain
compliance with Section 301(b)(1) of the CWA, a compliance schedule
for the construction of facilities shall be included, in accordance
with the provisions of Chapter 20-5A-7(b).

3. In acquiring permit information for privately-owned treatment works,
pursuant to Chapter 2, Section 4.04(b)(3) of the W. Va. Administrative
Regulations, the Chief will require all users to be identified, except
for residential users discharging only domestic waste.

4. All permits will contain conditions required by 40 CFR Part 122.60(a)(2),
(c)(2) and (d).

5. All NPDES permits issued to major dischargers shall require copies
of DMRs and non-compliance reports be submitted to EPA.

6. The types of samples required by 40 CFR Part 122.53(d)(7) will be
required by NPDES permit applicants.

7. The Division of Water Resources and EPA acknowledge that during the
period of application review and formulation of the draft permit,
effective cooperation is essential.  Therefore, EPA agrees to provide,
when requested and to the extent possible, appropriate staff to advise
and assist the staff of the Division of Water Resources.

8. On NPDES permits up for reissuance for categories of dischargers where BAT guidelines are not finalized, EPA agrees to make the necessary EPA staff available, on specifically requested applications, with the expertise to assist in development of permit terms and conditions which should be in the permit, and further, agrees to provide personnel to defend the terms and conditions of the permit in such cases where the permittee appeals the permit to the State Water Resources Board.

9. EPA agrees to assist the Division of Water Resources in the determination of fundamentally different factors, in accordance with Sections 301(b), 304, and 307(b) of the CWA and any regulations promulgated pursuant thereto, where the applicant claims such, when submitting the permit application to the Division of Water Resources.

20

G.  Public Notice

1.  The Division of Water Resources shall issue a permit only after
    public notice and opportunity for a public hearing.

2.  The Division of Water Resources, upon its determination that an
    application is complete, shall concurrently prepare a draft permit
    and provide public notice and opportunity for a public hearing.
    Concurrent with the public notice, copies of the public notice,
    any required fact sheet and the draft permit, shall be forwarded
    to the applicant and EPA, except for those categories of dis-
    chargers where EPA has waived review.

3.  The Division of Water Resources shall consider all comments
    received pursuant to the public notice in preparing the final
    permit.

H.  Permit Issuance

1.  After the public notice period and, if required, a public hearing,
the final permit shall be issued, unless the Division of Water Resources
proposes to issue a final permit which differs significantly from
the draft permit reviewed by the Regional Administrator , the
Regional Administrator  has objected to the draft permit, or there
is significant public comment on the draft permit.

2.  If any of the situations arise as delineated above, a proposed
permit shall be forwarded to EPA for review and the procedures of
Section II.E. shall be followed.

3.  Within thirty (30) days after the EPA receives the proposed permit
from the Division of Water Resources, the Regional Administrator
shall provide in writing to the Chief, any comments or objections
to the issuance of the proposed permit.

4.  If no comments or objections are provided by the Regional Administrator
during the thirty (30) day period, the Chief shall issue the permit.

5.  If comments or objections, based  on the proposed permit, are received
from the Regional Administrator  within the thirty (30) day period,
the Chief shall promptly notify the applicant and follow the
procedures outlined in Section II.E., just as for a draft permit on
which EPA has documented objections.

6.  The Division of Water Resources shall not issue an NPDES permit
when the Regional Administrator  has objected in writing.

7.  All NPDES permits issued shall include an expiration date not to
exceed five (5) years from the date of issuance.

I.  EPA Review of Permit Modifications

  1.  When the Division of Water Resources proposes to modify a permit,
      not subject to the waiver provisions of Section II.B., the draft
      permit shall be submitted to EPA, put to public notice and issued
      in accordance with the outlined procedures of Section II.E.,F.,G.,
      and H.

J.  Variance Requests

  1.  When the Chief receives a completed request for a variance in
      accordance with Section 4.04(d), (e), and (f) of the State
      regulations, he shall process the variance request in accordance
      with Sections 10.02 of the regulations.

  2.  If the Chief grants a variance request in accordance with Section
      10.02(a), the variance shall be included in a draft permit and
      the procedures of Part II. E., F., G., H., and I. of this Memorandum
      followed.

  3.  If the Chief sends to EPA with a written concurrent or sends to
      EPA without recommendation a completed variance request in
      accordance with Section 10.02(b) of the regulations, EPA shall
      have 90 days from receipt to approve or deny the request and to
      notify the Division, unless the Regional Administrator finds it
      necessary to obtain the review and assistance of EPA headquarters,
      in which case EPA shall have 150 days to make a decision.

  4.  If EPA denies a variance request under Section 10.02(b) of the
      regulations, the Chief shall so notify the requestor.  If EPA
      approves such a variance request, the State may prepare a draft
      permit.  The procedures of Sections II. E., F., G., H., and I.
      of this Memorandum shall be followed.

23

5. Any notice of EPA's denial of a variance request, and any public
   notice of a draft permit resulting from a variance request approved
   by EPA, shall identify the procedures for appealing the variance
   decision contained at 40 CFR Part 124.64.

24

III. Pretreatment

    A. General

        The EPA and the Division of Water Resources recognizes that it is
necessary to control pollutants from indirect dischargers which pass
through or interfere with the treatment processes in POTWs or which may
contaminate sewage sludge.  In recognition of this, the EPA promulgated
General Pretreatment Regulations for Existing and New Sources of Pollution,
40 CFR Part 403.  In this Part, a state must develop a requisite pretreat-
ment program before making application for NPDES authority.  The State
initially prepared such a program and submitted to the Regional Admini-
strator in August, 1979.  Subsequently, revisions requested by EPA were
made and the document was resubmitted for approval on December 29, 1980.
Following receipt of EPA consultant comments, a second revised version
of the document was submitted on October 21, 1981.

        This section of the MOA is to delineate the Division of Water
Resources' and EPA's responsibilities in carrying out the establishment
and enforcement of National Pretreatment Standards (NPS) for new and
existing sources pursuant to Section 307(b) and (c) of the CWA and
40 CFR Part 403.

        Nothing in this section is intended to affect any pretreatment
requirement, including any standards or prohibitions established by
State law, as long as the State requirements are not less stringent
than (1) any set forth in the NPS, or (2) other requirements or pro-
hibitions established under the CWA or applicable regulations.

B. State Program

    1. The Division of Water Resources has primary responsibility for:

        a. Enforcement against discharges prohibited by 40 CFR Part 403.5;

        b. Application and enforcement of any NPS established by the Administrator in accordance with Section 307(b) and (c) of the CWA;

        c. Review, approval, and oversight of Publicly-Owned Treatment Works (POTW) Pretreatment Programs to insure that NPS are enforced in accordance with the procedures outlined in 40 CFR Part 403.11;

        d. A POTW Pretreatment Program incorporated in permits issued to POTWs as required in 40 CFR Part 403.8 and as provided in Section 402(b)(8) of the CWA;

        e. Review and approval of modifications of categorical NPS to reflect removal of pollutants by a POTW and enforcement of related conditions in the POTW permit.

    2. The Division of Water Resources shall carry out inspection, surveillance, and monitoring procedures which will determine (independent of information supplied by the POTW) compliance or noncompliance by the POTW with pretreatment conditions incorporated into its permit.

The Division of Water Resources will also carry out inspection, surveillance, and monitoring procedures which will determine (independent of information supplied by the industrial discharger) if the industrial discharger is in compliance with the NPS. The number of inspections to determine compliance shall be agreed upon as part of the annual Section 106 program plan process and shall be consistent with State resources.

C. NPS Categorical Standards

The Division of Water Resources shall review requests from industrial dischargers or POTWs for industrial subcategory determinations received after the effective date of a NPS. The Division of Water Resources shall make a written determination as to whether the industrial discharger does or does not fall within that particular subcategory, in accordance with 40 CFR Part 403.6.

The EPA Enforcement Division Director waives the right to review the Chief's determinations.

D. Categorical NPS Credit Removal

The Division of Water Resources shall review POTW applications for removal credit and either approve or disapprove, in accordance with 40 CFR Part 403.7. The Regional Administrator waives the right to review and object to POTW submissions requesting removal credit.

E. POTW Pretreatment Program Approvals

Following determination by the Division of Water Resources that the submission of a request for a local POTW Pretreatment Program meets all appropriate requirements of 40 CFR Parts 403.9 and 403.11, the Chief shall provide a thirty (30) day public notice of the submission and opportunity for a public hearing. If written comments received are insufficient to warrant a public hearing, the Division of Water Resources shall approve the submission.

27

F.  Variances from Categorical Pretreatment Standards for Fundamentally
    Different Factors

The Division of Water Resources shall conduct an initial review of
all categorical pretreatment standards fundamentally different factors
variance requests from indirect dischargers and either deny the request
and notify the indirect discharger or send the request to the EPA
Enforcement Division Director with a recommendation for approval, in
accordance with 40 CFR 403.13.  EPA shall notify the State whether it
denies or approves the variance request and the Division of Water Resources
shall advise the indirect discharger making the request.  If the EPA
does not notify the Division of Water Resources of a determination
within forty-five (45) days after its receipt, the Division of Water
Resources shall consider the variance request denied and so notify the
requester.

28

IV.  Compliance Monitoring and Inspection

The State will expand its compliance monitoring capability to cover the entire State.  The State will conduct a number of inspections to administer the program.

Inspections shall be of the following types:

A.  Compliance Sampling Inspection (CSI) - The Compliance Monitoring Section conducts these.  Reports are to be sent to EPA for review.

B.  Compliance Evaluation Inspection  (CEI) - The field inspection force is to be used for this function.  This is a new responsibility for them and training will be required.

C.  Performance Audit Inspection (PAI) - The Division currently has a QA Officer whose projected responsibility will include PAIs.

D.  Routine Periodic Facility Inspections - conducted by Field Operations Inspections.

E.  Bioassays - conducted by the Biology Section for NPDES Compliance work and general effluent categorization.

Joint inspections (EPA and DWR) and/or independent EPA inspections shall be coordinated with DWR's Monitoring Section.  Requests by EPA for specific site monitoring will be processed as they are now, however, the Division will have the program and our needs will take precedence.  Copies of inspections conducted by EPA independent of DWR shall be forwarded to DWR for inclusion in State files in a timely manner.

The Division shall inspect every major at least once a year utilizing either a CSI, CEI or PAI.  The number and type of other inspections will be determined by the Division, depending upon the need to assess permit compliance.

V. Enforcement

    A. General

        It is recognized by the Division of Water Resources and the EPA that an effective and aggressive enforcement program is necessary to obtain compliance with the requirements of the NPDES program. It is therefore necessary that these agencies coordinate any enforcement activities. A wide range of criminal, administrative and judicial actions may be brought by Federal and State laws to insure compliance. However, with the exceptions covered in II.C.3. and 4., the State will have the primary responsibility for taking appropriate enforcement actions against persons in violation of NPDES requirements, detected by either the State or EPA.

    B. State Enforcement Action

        The Division of Water Resources shall insure that all appropriate enforcement proceedings are initiated within thirty (30) days after notification by the Regional Administrator of an alleged violation. The Regional Administrator shall be advised, from time to time, on the progress of any such ensuing enforcement proceedings. The Regional Administrator may participate in any enforcement proceedings and/or shall provide staff assistance upon request by the Chief.

        Any civil penalty sought or agreed upon by the Chief shall be appropriate to the violation.

    C. EPA Notification to the Division of Water Resources

        This MOA shall not be construed to limit the authority of the EPA to take action pursuant to Section 309 of the CWA, but, to provide the required enforcement activities, and for the coordination of enforcement activities, the EPA shall notify the Division of Water Resources of an alleged violation concurrently with the alleged violator.

D.  EPA Enforcement Action

In the event the EPA pursues enforcement action against an NPDES violator, the EPA shall notify the Division of Water Resources. This notification shall be made regardless of the existence or extent of previous communication between EPA and the Division of Water Resources on the matter.

E.  Endangerment to Health

The Division of Water Resources will insure that any pollution source or combination of sources which is presenting an imminent and substantial endangerment to the health or welfare of persons, is immediately subjected to appropriate enforcement proceedings, including, but not limited to, a request for injunctive relief.

F.  Laboratory Assistance

The EPA will provide, through the Wheeling Field Office, laboratory assistance for DWR field inspectors in the Northern Panhandle area. This will include sample analysis and support that may later be needed.

31

VI.  Confidentiality of Information

A.  Any information obtained or used in the administration of the NPDES
program shall be available to EPA upon request without restriction.

B.  If the information has been submitted to the State under a claim of
confidentiality, the State will submit that claim to EPA when pro-
viding information under this section.  The claim of confidentiality
shall be treated in accordance with the requirements of 40 CFR Part 2.

C.  The Chief shall deny any claim of confidentiality related to effluent
data, application forms, or permits under the NPDES program.

D.  EPA shall furnish to the State the information in its files not sub-
mitted under a claim of confidentiality which the State needs to
implement its program.  EPA shall furnish to the State information
submitted to EPA under a claim of confidentiality, which the State
needs to implement its program, subject to the conditions in 40 CFR
Part 2.

32

VII.   Term of Agreement

This Memorandum of Agreement will take effect upon program approval by the Administrator of the EPA, pursuant to Section 402(b) of the CWA and will remain in effect until revised or terminated in writing, by the parties involved.

The State Water Resources Board is proposing amendments to the West Virginia NPDES regulations.  The proposed amendments shall be filed in the Secretary of State's Office and publicly noticed on February / , 1982 (see Appendix A for proposed amendments).  DWR and EPA agree that the State's NPDES program cannot be approved until after these regulations have been adopted, and are fully effective.

Dated _____ by _____
                                     David W. Robinson, Chief
                                     Division of Water Resources

Dated _____ by _____
                                     Peter Bibko, Regional Administrator
                                     Environmental Protection Agency

Dated _____ approved by _____
                                     Anne M. Gorsuch, Administrator
                                     Environmental Protection Agency