## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL MINING ASSOCIATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 10-1220 (RBW) |
| LISA JACKSON, Administrator, U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) ) | Civil Action No. 11-0295 (RBW) Civil Action No. 11-0446 (RBW) Civil Action No. 11-0447 (RBW) |
| Defendants, | ) ) | |
| and, | ) ) | |
| SIERRA CLUB, et al., | ) ) | |
| Defendant-Intervenors. | ) ) | |

## MEMORANDUM OPINION

These consolidated cases are before the Court on the parties' cross-motions for partial summary judgment.[1]  The Court heard oral argument on these motions at a hearing on September

---

[1]     On July 20, 2010, plaintiff National Mining Association ("NMA") filed a complaint seeking declaratory and injunctive relief against multiple federal defendants.  Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 1.  The complaint, brought pursuant to Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (2006), and the Clean Water Act, 33 U.S.C. § 1251 (2006), challenges a series of memoranda and letters written by the Environmental Protection Agency ("EPA"): the June 11, 2009 Enhanced Coordination Process memoranda, including the Multi-Criteria Resource ("MCIR") Assessment, and the April 1, 2010 Interim Detailed Guidance Memorandum.  See Compl. at 39.  In January 2011, the Court denied the NMA's motion for a preliminary injunction and denied the federal defendants' motion to dismiss the NMA's complaint.  See Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 56 (D.D.C. 2011).  After that ruling, four cases pending in United States District Courts in West Virginia and Kentucky were transferred to this Court and consolidated with case number 10-cv-1220, the case in which the NMA had moved for a preliminary injunction in this Court.  The plaintiffs proposed, and the Court accepted, a bifurcated briefing schedule with respect to the challenged EPA actions (i.e., the Enhanced Coordination Process and the Interim Detailed Guidance).  The cross-motions currently before the Court and this Memorandum Opinion address only the Multi-Criteria Integrated Resource Assessment ("MCIR Assessment") and the Enhanced Coordination Process ("EC Process").

16, 2011.  For the reasons explained below, the Court will grant the plaintiffs' motion for partial summary judgment and deny the federal defendants' motion for partial summary judgment.[2]

## I.      BACKGROUND[3]

Clean Water Act Section 404 permits are issued by the United States Army Corps of Engineers ("Corps") "for the discharge of dredged and fill material into navigable waters at specific disposal sistes," 33 U.S.C. § 1344(a) (2006), and govern material that fills or displaces receiving waters, Pls.' Mem. at 3.  The Corps has sole authority to issue Section 404 permits, 33 U.S.C. § 1344(a); Defs.'Mem. at 8, but in doing so must apply guidelines that it develops in conjunction with the EPA.  See Pls.' Mem. at 3; Defs.' Mem. at 3.  As required by the Clean Water Act, 33 U.S.C. 1344(b), the EPA and the Corps promulgated 404(b)(1) guidelines, which are codified at 40 C.F.R. Part 230 (2010), to guide the Corps' review of the environmental effects of proposed disposal sites, Defs.' Mem. at 3; Pls.' Mem. at 7.  The 404(b)(1) guidelines provide that "[n]o modifications to the basic application, meaning, or intent of these guidelines will be made without rulemaking by the Administrator [of the EPA] under the Administrative Procedure Act."  40 C.F.R. § 230.2(c).

In addition to giving the EPA the responsibility to develop the guidelines with the Corps, the Clean Water Act accords the EPA the authority to prevent the Corps from authorizing certain

---

[2]      In deciding the cross-motions, the Court also considered the following filings made by the parties: the Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment ("Pls.' Mem."); the State of West Virginia's Individual Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment; the United States' Memorandum of Law in Support of its Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Defs.' Mem."); Sierra Club et al. Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendants' Cross-Motion ("Def.-Ints.' Mem."); the Plaintiffs' Reply Memorandum in Support of Their Motion for Partial Summary Judgment ("Pls.' Reply"); the State of West Virginia's Reply Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment; the United States' Reply Memorandum in Support of its Motion for Partial Summary Judgment ("Defs.' Reply"); and the parties' Notice of Filing of Joint Administrative Record Appendix ("Notice Joint App'x").

[3]      The statutory and regulatory background and underlying facts of this case were explained in detail in the Court's earlier Memorandum Opinion in this case, and will thus be only briefly recounted here as necessary to decide the issues presented by the parties' cross-motions.  See Nat'l Mining Ass'n, 768 F. Supp. 2d at 38-41.

disposal sites.  33 U.S.C. § 1344(c).  To exercise its authority to prevent the Corps from

authorizing a particular dumpsite, known as the 404(c) veto authority, the EPA must determine,

after notice and an opportunity for public hearing, that certain unacceptable environmental

effects would occur if the disposal site were approved.  Id.  Section 404(c) requires the EPA to

"set forth in writing and make public [its] findings and [its] reasons for making any

determination under this subsection."  Id.

Section 404(q) of the Clean Water Act directs the Corps to coordinate with the

appropriate federal agencies to assure that, "to the maximum extent practicable," a decision on a

pending application for a Section 404 permit will be made within 90 days of the publication of

the notice for that application.  33 U.S.C. § 1344(q).  In August 1992, the Corps signed a

Memorandum of Agreement with the EPA as required by section 404(q) of the Clean Water Act,

see Administrative Record ("AR") at ECP000001-10 (Memorandum of Agreement between the

Environmental Protection Agency and the Department of the Army ("404(q) Memorandum")),

which makes clear that "the Corps is responsible for reviewing and evaluating information

concerning all permit applications," id. at ECP000001.  The 404(q) Memorandum acknowledges

"that the EPA has an important role" in the Corps' Section 404 permitting process and envisions

that the EPA will provide comments to the Corps, but also clarifies that the EPA's comments will

be provided to the Corps within the time frames established in the agreement itself and the

applicable regulations.  Id. at ECP000002.   The 404(q) Memorandum also notes, however, that

the Corps may request additional comments from the EPA or discuss issues with the EPA after

the close of the comment period.  Id. at ECP000005.  Additionally, the 404(q) Memorandum

clarifies that it in no way alters the Corps' "authority to decide whether a particular individual

permit should be granted, including determining whether the project is in compliance with the

Section 404(b)(1) Guidelines, or the [EPA's] authority under Section 404(c) of the Clean Water Act." Id. at ECP000002.  Further, the 404(q) Memorandum provides for the "elevation," i.e., additional review, of individual permit decisions.  Id. at ECP000006-10.  The "final decision on the need to elevate a specific individual permit case" rests "solely" with the Assistant Secretary of the Army for Civil Works.  Id. at ECP000007.  Finally, the 404(q) Memorandum states that it shall "be effective immediately upon the date of the last signature and will continue in effect until modified or revoked by agreement of both parties, or revoked by either party alone upon six months written notice."  Id. at ECP000003.

On June 11, 2009, the EPA, the Corps, and the Department of the Interior signed a Memorandum of Understanding on Implementing the Interagency Plan on Appalachian Surface Coal Mining.  Id. at ECP000011-16 (June 11, 2009 Memorandum of Understanding ("June 11, 2009 MOU")).  The June 11, 2009 MOU represented the announcement of "a set of short-term actions to be implemented in 2009 to existing policy and guidance, and a longer term process for gathering public input, assessing the effectiveness of current policy, and developing regulatory actions."  Id. at ECP000012.  One element of the plan was "coordinated environmental reviews of pending permit applications under the Clean Water Act."  Id.; see also id. at ECP000014 (explaining that the "EPA and the Corps will begin immediately to implement enhanced coordination procedures applicable to the Clean Water Act review of Section 404 permit applications for Appalachian surface coal mining activities that have been submitted prior to the execution of" the MOU).

Concurrently with the June 11, 2009 MOU, the federal defendants "issued two separate memoranda outlining the formal details of the EC Process, a two-step process that begins with [the] EPA's MCIR Assessment and proceeds to a separate coordination process between the

Corps and [the] EPA."  Pls.' Mem. at 10.  The MCIR Assessment[4] involves the EPA applying the

404(b)(1) guidelines and directing the Corps on which permit applications must go through the

EC Process for further review and coordination.  See id. at 11; Defs.' Mem. at 12.  "[T]he Corps

was not involved in developing the MCIR Assessment, despite its statutory role as the permitting

authority."  Pls.' Mem. at 11; see also AR at ECP000017-19 (June 11, 2009 Letter from

Administrator Jackson to Acting Assistant Secretary Salt) (setting forth the "factors [that the]

EPA intends to use to screen and evaluate the pending permit applications to determine which

permit applications require further coordination between [the] EPA and the Corps").  If the EPA

determines during the MCIR Assessment that further review is necessary, then the pending

permit application is subjected to the EC Process.  Defs.' Mem. at 14-15.  According to the

plaintiffs, this EC Process is a "burdensome review that is wholly separate from the process

outlined in Section 404, the Corps' implementing regulations, and the 404(q) [Memorandum]."

Pls.' Mem. at 11-12.  The plaintiffs maintain that the EC Process adds a good deal of time to the

permitting process because it "involves discussions among [the] EPA, the Corps, the permit

applicant, and other potentially relevant agencies during a 60-day coordination period."  Id.

## II.    STANDARD OF REVIEW

The summary judgment standard set forth in Federal Rule of Civil Procedure 56(a) does

not apply in a case involving review of a final agency action under the APA because of the

limited role of a court in reviewing the administrative record.  See Stuttering Found. of Am. v.

---

[4]       The federal defendants allege that the MCIR Assessment is more accurately described as a screening
process.  Defs.' Mem. at 14 n.13.  They claim that the MCIR Assessment "itself makes no determinations and
performs no screening function.  It merely allowed EPA officials to organize and compare existing data in the course
of their review of the permit applications."  Id.  In their briefs, the federal defendants thus refer to the MCIR
Assessment as simply "the screening procedure."  See, e.g., id. at 1.  For the sake of clarity, specificity, and
consistency with the Court's prior Memorandum Opinion and Orders in this case, this Memorandum Opinion uses
the term MCIR Assessment to describe the process used by the EPA to determine which of the pending permits
would be subject to the additional scrutiny of the EC Process.

Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).  "Under the APA, . . . 'the function of the

district court is to determine whether . . . as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did.'"  Id. (quoting Occidental Eng'g Co. v.

INS, 753 F.2d 766, 769-70 (9th Cir. 1985)); see also Fund for Animals v. Babbitt, 903 F. Supp.

96, 105 (D.D.C. 1995) (explaining that where a case involves a challenge to a final

administrative action, a court's review is limited to the administrative record) (citing Camp v.

Pitts, 411 U.S. 138, 142 (1973))).  "Summary judgment thus serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review."  Stuttering Found., 498 F. Supp. 2d

at 207 (citing Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

## III.    LEGAL ANALYSIS

The parties, and the Court, agree that the cross-motions currently before the Court pose

two questions of law.  First, do the MCIR Assessment and the EC Process violate the Clean

Water Act because they amount to actions in excess of the agency's statutory authority?  Second,

does the agency's utilization of the MCIR Assessment and the EC Process in the absence of

notice and comment violate the APA?  The Court will address each question in turn.

### A.    Whether the EPA's role in the MCIR Assessment and the EC Process exceeds its statutory authority under the Clean Water Act

The APA requires that reviewing courts "shall . . . hold unlawful and set aside agency

action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right."  5 U.S.C. § 706(2)(C).  In determining whether the MCIR Assessment and the

EC Process exceed the statutory authority afforded the EPA by the Clean Water Act, the Court

must engage in the two-step inquiry set forth in Chevron v. Natural Resources Defense Council,

467 U.S. 837 (1984).  The Chevron test directs courts to first determine whether Congress,

through the enabling statute, has clearly addressed the precise question at issue.  Id. at 842; see also Colo. Wild Horse & Burro Coal. v. Salazar, 639 F. Supp. 2d 87, 90-91 (D.D.C. 2009).  If the answer to this first question is in the affirmative, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43.  If, on the other hand, the answer to this first question is in the negative, the second inquiry becomes "whether the agency's [action] is based on a permissible construction of the statute."  Id. at 843.

Whether there is statutory ambiguity is for the Court to decide, and the Court "owe[s] the agency no deference on the existence of ambiguity."  Am. Bar Ass'n v. FTC, 430 F.3d 457, 468 (D.C. Cir. 2005).  If the Court determines that the statute is either silent or ambiguous, the Court must then proceed to the second component of Chevron and determine whether the agency's position is based on a permissible construction of the statute.  Colo. Wild Horse & Burro Coal., 639 F. Supp. 2d at 91.  Courts are hesitant to "presume a delegation of power based solely on the fact that there is not an express withholding of such power."  Am. Petroleum Inst. v. EPA, 52 F.3d 1113, 1120 (D.C. Cir. 1995) (citing Ethyl Corp. v. EPA, 51 F.3d 1053, 1060-61 (D.C. Cir. 1995)).  Similarly, "the duty to act under certain carefully defined circumstances simply does not subsume the discretion to act under other, wholly different, circumstances, unless the statute bears such a reading."  Ry. Labor. Execs. Ass'n v. Nat'l Mediation Bd., 29 F.3d 655, 671 (D.C. Cir. 1994) (emphasis omitted); see also id. at 670 ("categorically reject[ing]" the Board's suggestion that "it possesses plenary authority to act within a given area simply because Congress has endowed it with some authority to act in that area").

The plaintiffs argue that the Clean Water Act clearly limits the EPA's role in the Section 404 permitting process.  Pls.' Mem. at 15.  They maintain that Congress intended the EPA to

have a limited role in the issuance of Section 404 permits, and thus assigned it only two tasks: "(1) developing the Section 404(b)(1) Guidelines with the Corps for the Corps to apply when designating disposal sites; and (2) exercising its authority under Section 404(c) to prohibit the Corps' decision to issue a permit for a particular disposal site, but only if [it] follows the specified statutory and regulatory procedures governing the exercise of [Section 404(c) veto] authority." Id. (internal quotation marks omitted).  They further assert that the Clean Water Act envisions coordination between the EPA and the Corps in only three instances: (1) the joint development of the 404(b)(1) guidelines, (2) the requirement that the EPA consult the Corps in making a determination whether to prohibit, under its 404(c) veto power, the designation of a disposal site, and (3) the consummation of an agreement to assure that permit decisions will be made not later than 90 days after the notice of that application is issued—an agreement the agencies executed in August 1992.  Id. at 18; see also Pls.' Reply at 4-5 ("[The f]ederal defendants appear to suggest that any time the Congress creates a regulatory program involving more than one agency, those agencies can establish whatever coordination procedures those agencies may deem are necessary, even if that means disregarding existing regulations.").  Alternatively, the plaintiffs contend that if the Court finds that ambiguity exists as to the nature of the coordination between the EPA and the Corps as prescribed by the Clean Water Act, the Court should look to the Corps' implementing regulations and the 404(q) Memorandum to resolve that ambiguity, Pls.' Mem. at 19, which provide no basis "to superimpose the EC Process," id. at 20.

On the other hand, the federal defendants maintain that both the EC Process and the MCIR Assessment "fall within the agencies' authority under the [Clean Water Act] and within their broad discretion to establish the procedures necessary to carry out their statutory functions."

Defs.' Mem. at 17.  Specifically, the federal defendants assert that the challenged actions are a "necessary corollary," id. at 19, to the EPA's Section 404(c) veto authority.  See also Def.-Ints.' Mem. at 1 (arguing that "the Court need look no further than the ultimate veto power" of the EPA in deciding this case).  The federal defendants also seize on the "coordination" required by Section 404(q), Defs.' Mem. at 20; see also id. ("[The p]laintiffs do not . . . identify any language in the [Clean Water Act] suggesting that Congress, by specifying the three instances of coordination, meant to establish a ceiling on interagency coordination."), and assert that the specific instances of required coordination identified by the plaintiffs are the "statutory minimum prescribed by Congress," id. at 21.  The federal defendants also argue that even if the challenged actions represent a "modification or relaxation of the existing permitting regulations, any such modification was within the agencies' discretion," as it is always within an agency's discretion to modify the procedural rules it has adopted.  Id. at 29.  The Court does not find any of the federal defendants' arguments convincing.

Although the Administrator of the EPA is tasked with administering the Clean Water Act, the Administrator's authority is subject to limitations.  See 33 U.S.C. § 1251(d) ("Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Agency (hereinafter in this chapter called 'Administrator') shall administer this chapter.") (emphasis added).  First, and most important, Section 404 of the Clean Water Act, codified at 33 U.S.C. § 1344, provides an express limitation on the Administrator's authority with respect to the issuance of Section 404 permits.  The statutory language explicitly establishes the Secretary of the Army, acting through the Corps, as the permitting authority, which strikes the Court as an express limitation of the sort referenced in 33 U.S.C. § 1251(d).  See 33 U.S.C. § 1344(a) ("The secretary may issue permits . . . "); 33 U.S.C. § 1344(d) ("The term 'Secretary' as used in this section

means the Secretary of the Army, acting through the Chief of Engineers.").   And the parties do not dispute that the Corps is the sole entity authorized to issue Section 404 permits.  Defs.' Mem. at 8; Pls.' Mem. at 3.   Second, after the first subsection of Section 404 establishes the Corps as the sole permitting authority, other subsections delineate discrete roles for the Administrator in the Section 404 permitting framework.   Thus, while it is true that the EPA does have some role to play in the Section 404 permitting process, the carving out of limited circumstances for EPA involvement in the issuance of Section 404 permits appears to be a statutory ceiling on that involvement.   The permitting scheme in Section 404 gives the EPA the authority to: (1) work with the Corps to develop guidelines, 33 U.S.C. § 1344(b)(1), (2) "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site" after notice and opportunity for public hearings and consultation with the Corps, 33 U.S.C. § 1344(c), (3) work with states desiring to administer their own permitting programs for dredge and fill material, 33 U.S.C. § 1344(g)-(j), (4) promulgate categories of discharge that shall not require permits under a state permitting program, 33 U.S.C. § 1344(*l*), and (5) enter into agreements with the Corps to minimize "duplication, needless paperwork, and delays in the issuance of permits," 33 U.S.C § 1344(q).   The statute is therefore not ambiguous, as it establishes the Corps as the principal player in the permitting process, and then specifies certain roles for the EPA to play in that process.   Thus, if a responsibility involving the permitting process has not been delegated to the EPA by Congress, that function is vested in the Corps as the permitting authority.

Because the District of Columbia Circuit rejected arguments similar to those made by the federal defendants in this case, the above reasoning is supported by the Circuit's holding in Railway Labor Executive's Association.  29 F.3d at 671.  In that case, the Circuit examined the Railway Labor Act and the "authority" it conferred on "the National Mediation Board . . . to

investigate representation disputes among a carrier's employees." Id. at 658 (internal quotation marks omitted).  The Circuit determined that the Railway Labor Act specified that an investigation by the Board can be "initiated only 'upon request of either party to the dispute,'" and that "it is clear that a carrier is not a 'party.'"  Id. (quoting 45 U.S.C. § 152 Ninth (1988)).  Nonetheless, the Board had announced that "carriers, as well as the Board itself, could initiate representation proceedings in the wake of railroad mergers" because such events were likely to cause representation disputes.  Id.  The Board acknowledged that the language of the statute did not support the asserted authority, but argued the court should "presume a delegation of power from Congress absent an express withholding of such power."  Id. at 659 (emphasis omitted).  The Circuit was not impressed and found "that the Board's attempt to expand its jurisdiction ha[d] no basis whatsoever in the language of the statute or its legislative history, and . . . because the Board's novel claim of authority [was] belied by longstanding agency practice," held "that the Merger Procedures constitute[d] a gross violation" of the Railway Labor Act.  Id. (internal quotation marks omitted).

The same is true here.  Congress' decision to adopt Section 404 of the Clean Water Act and specifically identify the Corps as the permitting authority, and then to denote specific instances in which the EPA and the Corps were to coordinate their efforts, and to assign the EPA discrete functions, precludes the Court from accepting the federal defendants' argument that Congress simply intended to prescribe a statutory minimum in regard to the EPA.  Rather, as the statute plainly reads, Congress established a permitting scheme in which the Corps is to be the principal player, and the EPA is to play a lesser, clearly defined supporting role.  With the adoption of the MCIR Assessment and the EC Process, the EPA has expanded its role in the

issuance of Section 404 permits and has thus exceeded the statutory authority afforded to it by the Clean Water Act.

B.  Whether the EPA's issuance of the MCIR Assessment and the EC Process without Notice and Comments violates the APA

The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "Although federal agencies ordinarily must provide the public with notice of a proposed rule and the opportunity to submit comments on it, the APA makes an exception for . . . 'rules of agency organization, procedure, or practice.'"  James V. Hurson Assocs., Inc. v. Glickman, 229 F.3d 277, 280 (D.C. Cir. 2000) (quoting 5 U.S.C. § 553(b)(3)(A)).  Legislative rules are agency pronouncements that "have the force and effect of law," Appalachian Power Co. v. EPA, 208 F.3d 1015, 1020 (D.C. Cir. 2000), whereas procedural rules are binding rules "that do not themselves alter the rights or interests of parties," Hurson Assocs., 229 F.3d at 280 (citing JEM Broad. Co. v. FCC, 22 F.3d 320, 326 (D.C. Cir. 1994)).  New rules that work substantive changes or major legal additions to existing rules or regulations are subject to the APA's notice and comment procedures as legislative rules.  See U.S. Telecom. Ass'n v. FCC, 400 F.3d 29, 34-35 (D.C. Cir. 2005).  Similarly, "if an agency adopts 'a new position inconsistent with' an existing regulation, or effects 'a substantive change in the regulation,' notice and comment are required."  Id. at 35 (emphasis omitted) (quoting Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 (1995)).

The plaintiffs maintain that the MCIR Assessment "effectively amended the established permitting regime under Clean Water Act Section 404 and hence, was subject to the APA's notice and comment procedures."  Pls.' Mem. at 22.  They argue that there can be no dispute that the MCIR Assessment had a present, binding effect on the agencies and the permit applicants.

Id. at 24.  Similarly, the plaintiffs argue that the EC Process imposes unequivocal requirements and reflects an obvious change in the permitting process.  Id. at 25.  They therefore assert that there is no question that both the MCIR Assessment and the EC Process are legislative rules and, as such, should not have been established absent the notice and comment process required by the APA.  Id.

On the other hand, the federal defendants maintain that the MCIR Assessment and the EC Process are, at most, procedural rules that, although binding on the parties, do not alter any rights or obligations.  See Defs.' Mem. at 39, 45.  They argue that while the EC Process calls for "additional scrutiny" for a specific group of permit applications, the associated procedures are flexible and the agencies retain discretion.  Id. at 39.  They further contend that no part of the EC Process "alter[s] the rights or interests of permit applicants because permit applicants remain subject to the substantive permitting standards established by the [Clean Water Act] and relevant regulations."  Id. at 43; see also id. at 46.

The federal defendants' arguments that the MCIR Assessment and the EC Process are procedural rules are unconvincing, as the cases relied upon by the federal defendants are inapposite.  The federal defendants primarily rely on Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, 435 U.S. 519 (1978), as proof that the MCIR Assessment and the EC Process "fall well within the broad discretion accorded to agencies in adopting the procedures and methods of inquiry necessary to carry out their statutory obligations."  Defs.' Mem. at 1.  Vermont Yankee dealt with a rulemaking instituted by the Atomic Energy Commission regarding "the question of consideration of environmental effects associated with [nuclear power reactors]."  435 U.S. at 528.  The District of Columbia Circuit had examined the rulemaking proceedings and, "despite the fact that it appeared that the agency

employed all the procedures required by [the APA,] and more, [nonetheless] determined the proceedings to be inadequate and overturned the rule." Id. at 535.  The Supreme Court reversed, holding that "[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." Id. at 543 (internal quotation marks and citation omitted).  The Court continued: "In short, all of this leaves little doubt that Congress intended that the discretion of the agencies and not that of the courts be exercised in determining when extra procedural devices should be employed." Id. at 546 (emphasis added).  The Court concluded that "[the] sort of unwarranted judicial examination [engaged in by the District of Columbia Circuit regarding] perceived procedural shortcomings of a rulemaking proceeding can do nothing but seriously interfere with that process prescribed by Congress." Id. at 548.

Vermont Yankee thus answers the question of whether courts may compel agencies to follow procedures above or in addition to those required by the APA.  It does not, however, shed light on the question of what constitutes a procedural rule, as there was no question that the agency had acted in accordance with the notice and comment requirements of the APA and had conducted a formal rulemaking.  See id. (explaining that there was no doubt that the agency "employed at least the statutory minima" of the APA).  Accordingly, the federal defendants' reliance on Vermont Yankee to demonstrate that the MCIR Assessment and the EC Process are procedural rules is misplaced.  See Pls.' Reply at 4 n.5 (discussing the federal defendants' misguided reliance on Vermont Yankee, and citing Doe v. Rumsfeld, 341 F. Supp. 2d 1, 13 (D.D.C. 2004), as on point).  Here, the judicial examination is not the "sort of unwarranted . . . examination of a rulemaking proceeding" that was prohibited by the Supreme Court in Vermont

Yankee; rather, it is a wholly necessary judicial examination into whether the federal defendants should have satisfied the "statutory minima" of the APA and subjected the MCIR Assessment and the EC Process to notice and comment.

The federal defendants next point to James V. Hurson Associates, Inc. v. Glickman, 229 F.3d 277 (D.C. Cir. 2000), as supporting their argument that the MCIR Assessment and the EC Process are procedural, not legislative, rules. Hurson Associates dealt with a U.S. Department of Agriculture ("USDA") rule that controlled the manner in which the agency received requests for food labeling. 229 F.3d at 279. Prior to the rule's adoption, commercial food producers could seek approval of proposed labels in three ways: (1) by mailing in an application, (2) by personally visiting the relevant division within the USDA, or (3) by hiring an expediter firm whose employees would meet with USDA representatives during office hours. Id. This latter method was known as "face-to-face." Id. The USDA rule at issue in Hurson Associates abolished the face-to-face application method. Id. The Circuit determined that the USDA's "abolition of face-to-face did not alter the substantive criteria by which it would approve or deny proposed labels; it simply changed the procedures it would follow in applying those substantive standards." Id. at 281. The Circuit further concluded "that an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties." Id. The Circuit, however, found it important that "the USDA's rule [did] not change the agency personnel who [would] be responsible for reviewing proposed labels." Id. at 282; see also id. (explaining that the crucial element "is not whether one has 'face time' with agency staff members, but which staffers have decisionmaking authority").

Here, where it is undisputed that the EPA—and the EPA alone—applied the 404(b)(1) guidelines during the MCIR Assessment to determine which permit applications would be

subject to the EC Process, Defs.' Mem. at 12-13, <u>Hurson Associates</u> would seem to indicate that the change in reviewing authority favors a finding that the MCIR Assessment is not a procedural rule.  In other words, the fact that the creation of the MCIR Assessment removed the task of applying the 404(b)(1) guidelines to pending permits from the Corps and bestowed it upon the EPA signifies a substantive, rather than a procedural, change to the permitting framework.

Finally, <u>American Mining Congress v. Mine Safety & Health Admin.</u>, 995 F.2d 1106 (D.C. Cir. 1993), another case relied upon by the federal defendants both in their briefs and at the September 16, 2011 motions hearing, is not only distinguishable, but in fact supports a finding that the MCIR Assessment and the EC Process are legislative rules.  In <u>American Mining</u>, the District of Columbia Circuit answered the question whether "Program Policy Letters of the Mine Safety and Health Administration, stating the agency's position that certain x-ray readings qualify as 'diagnoses' of lung disease within the meaning of agency reporting regulations, are interpretive rules under the [APA]."  <u>Id.</u> at 1107.  The policy letters had been issued to clarify a regulation that required mine operators to report diagnoses of certain occupational illnesses, <u>id.</u>, and explained that x-rays rating a certain score "on the International Labor Office classification system would be considered a diagnosis that the x-rayed miner had silicosis or one of the other pneumonoconioses for the purposes of the reporting requirements," <u>id.</u> at 1108.  The agency did not follow the notice and comment requirements of the APA when it issued the policy letters, and maintained that they were not obliged to do so because the policy letters were interpretive rules subject to the exemption of 5 U.S.C. § 553(b)(3)(A).  <u>Id.</u>  After reviewing the differences between substantive rules, interpretive rules, and general statements of policy, <u>id.</u> at 1109, the Circuit noted that it had "distinguished between cases where a rule is 'based on specific statutory provisions' (interpretive), and where one is instead 'based on an agency's power to exercise its

judgment as to how best to implement a general statutory mandate' (legislative)."  Id. at 1110

(quoting United Technologies Corp. v. EPA, 821 F.2d 714, 719-20 (D.C. Cir. 1987)).  The

Circuit continued: "[T]he legislative or interpretive status of the agency rules turns not in some

general sense on the narrowness or [the] breadth of the statutory (or regulatory) term in question,

but on the prior existence or non-existence of legal duties and rights."  Id.  Before concluding

that the policy letters at issue were interpretive because the regulations themselves required the

reporting so there was no "legislative gap that required the [policy letters] as a predicate to

enforcement action," id. at 1112, the Circuit opined:

> Accordingly, insofar as our cases can be reconciled at all, we think it almost
> exclusively on the basis of whether the purported interpretive rule has "legal
> effect", which in turn is best ascertained by asking (1) whether in the absence of
> the rule there would not be an adequate legislative basis for enforcement action or
> other agency action to confer benefits or ensure the performance of duties, (2)
> whether the agency has published the rule in the Code of Federal Regulations, (3)
> whether the agency has explicitly invoked its general legislative authority, or (4)
> whether the rule effectively amends a prior legislative rule. If the answer to any of
> these questions is affirmative, we have a legislative, not an interpretive rule.

Id.

American Mining actually supports the Court's conclusion that the MCIR Assessment

and the EC Process are legislative rules, and therefore should have been subjected to notice and

comment, for two reasons.[5]  First, as this Memorandum Opinion has earlier made clear, the

Clean Water Act contains no provisions that contemplate the EPA applying the 404(b)(1)

guidelines to pending permit applications.  See supra p. 11.  Indeed, the Clean Water Act

specifically names the Corps the permitting authority and carves out a limited (albeit important)

---

[5]     It is perhaps worth noting that at no point during the life of this case have the federal defendants asserted
that the MCIR Assessment or the EC Process are interpretive rules; rather, they repeatedly assert that the MCIR
Assessment and the EC Process are procedural rules.  Of course, interpretive rules and procedural rules are both
exempted from the APA's notice and comment requirements by the same exemption—5 U.S.C. § 553(b)(3)(A).

role for the EPA in the permitting process.  Thus, the EPA must argue, and has argued throughout this litigation, that the MCIR Assessment and the EC Process are "based on [its] power to exercise its judgment as to how best to implement a general statutory mandate," id. at 1110; see also Defs.' Mem at 17 (asserting that both the EC Process and the [MCIR Assessment] "fall within the agencies' authority under the [Clean Water Act] and within their broad discretion to establish the procedures necessary to carry out their statutory functions").  American Mining teaches that such agency reasoning often tends to result in a finding that the agency action in question was, in fact, a legislative rule.  Similarly, as the foregoing pages of this Memorandum Opinion have demonstrated, the MCIR Assessment and the EC Process are not consistent with the legal duties and authority accorded the EPA by Section 404 of the Clean Water Act, see supra pp. 9-11, and American Mining demonstrates that the "prior existence or non-existence of legal duties and rights" is an important consideration in assessing what agency action must be subjected to notice and comment.  995 F.3d at 1110.  Finally, the Court finds that it can answer two of the questions set forth in American Mining in the affirmative.  First, in the absence of the June 11, 2009 MOU and the letters written the same day, "there would not be an adequate legislative basis for" the EPA to conduct the MCIR Assessment or subject the pending permit applications to the additional scrutiny of the EC Process.  Id. at 1112.  Second, as explained above, it is apparent that the MCIR Assessment and the EC Process "effectively amend" the Section 404 permitting process by conferring additional reviewing authority on the EPA— authority that the statute reserves for the Corps.  Id.  American Mining therefore compels a finding that the MCIR Assessment and the EC Process are legislative rules.

## IV.     CONCLUSION

Upon examining the administrative record in this case in conjunction with this Circuit's precedent, the Court finds no reason to depart from its earlier conclusion "that it is clear . . . that the EPA has implemented a change in the permitting process."  Nat'l Mining Ass'n, 768 F. Supp. 2d at 44; see also id. ("The EC Process Memoranda impose unequivocal requirements on the exercise of regulatory authority regarding the pending permit applications.").  Accordingly, because the EPA has exceeded the statutory authority conferred upon it by the Clean Water Act, and because the MCIR Assessment and the EC Process are legislative rules not exempt from the APA's notice and comment rulemaking requirements, the plaintiffs' motion for partial summary judgment is granted, and the federal defendants' motion for partial summary judgment is denied.[6]

**SO ORDERED** this 6th day of October, 2011.

REGGIE B. WALTON
United States District Judge

---

[6]     The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.