**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, et al.  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| COMMONWEALTH OF KENTUCKY,  ) | |
| CITY OF PIKEVILLE,  ) | |
| ) | |
| Plaintiff-Intervenors,  ) | |
| v.  ) | |
| ) | |
| LISA JACKSON, in her official capacity as  ) | Nos.  10-cv-1220-RBW |
| Administrator, U.S. Environmental Protection  ) | 11-cv-0295-RBW |
| Agency, *et al*  ) | 11-cv-0446-RBW |
| ) | 11-cv-0447-RBW |
| Defendants,  ) | |
| And  ) | |
| ) | |
| SIERRA CLUB *et al.*,  ) | |
| ) | |
| Defendant-Intervenors.  ) | |

\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' JOINT MOTION**
**TO COMPLETE AND SUPPLEMENT THE RECORD**

The Plaintiffs and Plaintiff Intervenors hereby submit this memorandum in support of

their joint motion (i) to complete the administrative record by ordering the inclusion of certain

documents before the U.S. Environmental Protection Agency ("EPA") at the time it issued the

Final Guidance; and/or (ii) to supplement the record or otherwise agree to consider other

indisputably authentic, relevant documents that will assist the court in resolving the impending

summary judgment motions. These documents are relevant to the question at hand: whether, in

promulgating and enforcing its Final Guidance, EPA has exceeded its statutory authority and/or

acted in an arbitrary and capricious manner.[1]

---

[1] On December 21, 2011, and in advance of the filing of this Motion, counsel for the movants requested that EPA and the Defendant Intervenors agree to complete and/or supplement the Administrative Record with the

A list of the documents at issue, and a copy of the documents themselves, are attached as Exhibit A.  Each one of Kentucky's documents is attached to the Plaintiff KCA's Amended Complaint and, while not included in EPA's Administrative Record, they are all in the court record in this action.  The sole document West Virginia seeks to add to the Record was not attached to its Complaint because West Virginia only received that letter *after* EPA filed the Administrative Record in this case.

## FACTUAL BACKGROUND

1.  **Following the Issuance of EPA's April 1, 2010 Interim Guidance, EPA Has Objected to the Issuance of Any NPDES Section 402 Permit for Any Surface Mines in Eastern Kentucky, and Has Relied Upon Its New Standards In Objecting to West Virginia Mining Permits.**

On April 1, 2010, EPA released its Interim Guidance to provide "detailed guidance" to EPA Regions 3, 4 and 5 on their review of Appalachian coal mining activities, including their review of National Pollutant Discharge Elimination System ("NPDES") Section 402 CWA individual permits issued by states. The document stated on its face that it was "effective immediately" and that EPA expected Regions 3, 4 and 5 to "begin using this interim final guidance immediately in your review of Appalachian surface coal mining activities."  (*See* KCA Amended Complaint ("AC") at ¶ 25) [DE 102]; *see also* FG003984-85.  In it, EPA found state permits to be deficient in two principal ways: (a) the state permitting authority had not conducted a sufficient "reasonable potential" analysis under 40 C.F.R. §122.44(d)(1) at the time of permit issuance; and (b) even in the absence of an RPA, "available science" (and in particular, the Pond-Passmore study) supplied a sufficient causal link for state permitting authorities to determine that

---

documents listed in Exhibit A and attached hereto, or in the alternative to permit the court to consider the documents as extra-record evidence or to take judicial notice of those documents authored by EPA.  EPA is considering the request, but was unable to provide a substantive response by the deadline for filing of the summary judgment motion by Plaintiffs and Plaintiff Intervenors, which cites to and relies upon these documents. Plaintiff and Plaintiff Intervenors proceeded to file the instant Motion to ensure that they sought appropriate and timely relief from the Court.

coal mining discharges which increase conductivity, dissolved solids or sulfates would likely violate narrative water quality standards" and thus EPA concludes in the Interim Guidance that such permits should have contained effluent limits for these pollutants.  (AC at ¶ 27);  *see also* FG003984, 88-98.

The Interim Guidance also criticized state permitting authorities for not incorporating provisions that would implement state narrative water quality standards, particularly relating to discharges that increase conductivity.  Specifically, EPA contends in the Interim Guidance that "scientific literature" should be considered as relevant information in implementing narrative water quality standards, and that two such scientific reports – specifically the 2008 study entitled *Downstream Effects of Mountaintop Coal Mining: Comparing Biological Conditions Using Family and Genus Level Macroinvertebrate Bioassessment Tools* (the Pond-Passmore Study) and a draft report of EPA's called *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams* – have linked conductivity levels in streams below surface coal mining operations and adverse impacts to aquatic life in those streams.  *See* FG003984, 88-89, 94.  According to EPA, these studies demonstrate that "conductivity impacts of projects with predicted conductivity levels below 300 µS/cm generally will not cause a water quality standard violation and that in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative water quality standards."  *Id.* at FG003995.  The Interim Guidance further directs Regions 3, 4 and 5 to work with state permitting authorities to "ensure that the permit includes conditions that protect against conductivity levels exceeding 500 µS/cm."  *Id.*  It even directs regional offices to "object to issuance of [a] proposed permit" if it fails to comply with the CWA "as noted" in the Interim Guidance.  (AC at ¶ 29); *see also* FG003984, 91, 98.

3

The Interim Guidance's directives were a dramatic departure from prior EPA practices and procedures concerning its oversight of NPDES 402 permits. For example, EPA had long sanctioned a state's inclusion of post-permit RPAs coupled with permit reopeners for new surface mines, thereby allowing state permitting authorities the ability to determine the "reasonable potential" for a discharge to exceed state water quality standards using site-specific data.   EPA's own *Technical Support* document supplied to the field and state permitting authorities sanctioned them, and EPA specifically approved Kentucky's RPA standards which included them. (*See* AC at ¶¶ 18-19).   More importantly, just weeks before issuance of the Final Guidance EPA had commented upon (but did not object) to at least twenty-seven NPDES 402 permits issued by Kentucky which included post-permit RPAs and permit reopeners and did not include numerical effluent limits for conductivity.   By so doing, EPA acknowledged that these permits were consistent with the CWA.   (*Id.* at ¶¶ 20-22).   However, the Interim Guidance concludes that "in general, an NPDES permit that fails to show evidence of a parameter-specific reasonable potential analysis will be inconsistent with the requirements of the CWA."   (*Id.* at ¶ 28); *see also* FG003984, 91.

The Interim Guidance's announcement of EPA's new conductivity "benchmark" was also striking because it ignored the states' own water quality standards and their determinations of what constitutes an excursion of those standards.   Four of the six Appalachian states subject to the Interim Guidance have narrative standards that do not mention conductivity (Pennsylvania, Tennessee, Virginia, and West Virginia).   Additionally, the State of West Virginia has explicitly rejected the use of conductivity as an appropriate means to implement its narrative water quality standard.  *See* FG003984, 65-66, 68-69, 78-85.

EPA Region 4 notified Kentucky about the Interim Guidance on April 2, 2010. Despite having failed to object to the 27 NPDES 402 permits the Cabinet had issued just weeks before, in its April 2nd correspondence Region 4 now characterized the same permits – which included increased effluent monitoring, WET testing, and post-permit RPAs coupled with permit reopeners– as deficient. Of particular concern, according to EPA, was "the missing reasonable potential analyses associated with narrative water quality standards and appropriate numeric effluent limits associated with these standards, including but not limited to conductivity and total dissolved solids." EPA specifically noted in this April 2, 2010 letter that the Interim Guidance would "provide the framework that will assist states in drafting Appalachian coal mining NPDES permits" and that reviews of "future draft NPDES permits for coal mining will continue to emphasize the need for DOW to interpret narrative water quality standards (including but not limited to conductivity and total dissolved solids) to conduct reasonable potential analyses associated with narrative water quality standards, and to include appropriate numeric effluent limits associated with those standards." (*See* AC at ¶¶ 31-33).

Since the issuance of the Interim Guidance, there has been a virtual moratorium on NPDES 402 permits for Eastern Kentucky and West Virginia surface mines. While not a single NPDES individual permit issued by Kentucky had been objected to prior to April 1, 2010, twenty-one such permits were objected to by EPA in September and October 2010. (*Id.* at ¶¶ 35-36). EPA has thereafter even refused to conduct any hearing on the operator's contest to any of those objections. (*Id.* at ¶ 51). Kentucky's efforts to resolve the matter with EPA were futile, as EPA Headquarters blocked EPA Region 4 from agreeing to any NPDES 402 individual permits for Eastern Kentucky surface mines that did not include pre-permit RPAs and numerical effluent limits for conductivity. (*Id.* at ¶¶ 42-50).

Like Kentucky, West Virginia experienced a drastic increase in the number of comments and objections from EPA based on the standards announced in the Interim Guidance, most notably based on EPA's conductivity "benchmark." *See, e.g.,* FG002750-52; FG0002742-44; FG002731-33; FG002718-20; FG002713-14; FG002698-700; FG002683-84; FG002677-79; FG002671-73; FG002663-66; FG002659-61; FG002643-45; FG002637-39; FG002632-33; FG002613-15; FG002594-95; FG002592-93.

EPA has acted as if the Interim Guidance and its standards were final and binding as of April 1, 2010. And because states may not issue a particular NPDES permit if EPA has objected to it, EPA's new standards effectively halted the issuance of mining permits in Kentucky and West Virginia.

2.    **EPA Has Continued to Block Kentucky and West Virginia from Issuing NPDES Section 402 Permits for Surface Mines Since the Issuance of EPA's Final Guidance.**

On or about July 21, 2011, and after public notice and comment, EPA issued its Final Guidance. Like its predecessor (the Interim Guidance), it is replete with disclaimers about its binding effect, including that the Final Guidance "does not impose legally binding requirements and will not be implemented as binding in practice." FG005440. Despite the benefit of public notice and comment, the Final Guidance differs little from the Interim Guidance. While it boasts of prompt action on permits; its tone is conciliatory; and its wording suggests a more flexible and collaborative approach, a close and thorough review of the language of the Final Guidance, and EPA's subsequent use of it in objecting to additional NPDES Section 402 individual permits for surface mines in Eastern Kentucky, and to a surface mining permit in West Virginia, belie EPA's characterization of the Final Guidance as advisory and non-binding. In truth, EPA's Final Guidance is simply a continuation of EPA policy changes first announced in the Interim

Guidance and effective since April 1, 2010, which have led to EPA's moratorium on Section 402 NPDES individual permits for new and expanded surface coal mines in Eastern Kentucky and for surface mining operations in West Virginia that do not contain the permit limitations and numerical effluent limits EPA demands. (*See* AC at ¶ 54; W. Va. Am. Compl. ¶¶ 135-39).

In essence, in the Final Guidance, EPA instructs its field offices that the CWA requires that an RPA be conducted before a permit is issued, and that for new surface coal mines, the state permitting authority should utilize either data from "adjacent watersheds" to conduct this pre-permit RPA (as opposed to site-specific data from the discharge itself) or, it can utilize "best available science" (i.e., the Pond-Passmore study and its progeny and the conductivity presumption) to establish "reasonable potential to violate state water quality standards". FG005440, 52, 55-57.  The Final Guidance neither contains any caveat or exceptions to this directive, nor does it grant EPA field offices any discretion to approve permits for new surface mines on a case-by-case basis which provide for an RPA after issuance of a Section 402 NPDES individual permit.   It is thus a mandatory, binding rule.  (AC at ¶55.)

The Final Guidance also continues to mandate numerical conductivity limits for surface coal mines in Eastern Kentucky and West Virginia.  It directs state permitting authorities that they must establish a WQBEL once they determine that there is a "reasonable potential" that the discharge will violate state water quality standards – which EPA believes can be assumed from "best available science."  (*Id.* at ¶ 56); *see also* FG005440, 56-58.  While acknowledging that WQBEL may be expressed in a narrative form "when it is infeasible to derive a numeric limit," EPA goes on to state that "in many cases calculation of numeric effluent limits for conductivity is feasible, in light of the extensive scientific evidence".  FG005440, 56.  It also "recommends" that a numerical effluent limit for conductivity be set at 300 µS/cm and/or not outside the range

of 300-500 µS/cm.  *Id.* at FG005457.  EPA continually refers to this as its conductivity "benchmark".  (AC at ¶ 56.); *see also, e.g.*, FG005440, 44, 49, 61.

EPA is now utilizing the Final Guidance to object to Section 402 NPDES individual permits in Kentucky and West Virginia. As recently as July 1, 2011, Kentucky posted fifty-four additional Section 402 NPDES individual permits for notice and comment.  (*See* AC at ¶ 59.) EPA commented on thirty-five of those permits, thus permitting them to be issued.  However, all thirty-five were for either underground coal mining or for coal mining activities outside ecoregions 68, 69 and 70, or for coal preparation plants, and thus not subject to the Final Guidance.  (*Id.* at ¶ 60).

EPA objected to the remaining nineteen Section 402 NPDES individual permits – all of which were for new or expanded surface coal mines in Eastern Kentucky.  (*Id.* at ¶ 60).  While the Final Guidance was not specifically mentioned, EPA objected to these permits for the same reasons the twenty-one Section 402 NPDES individual permits were objected to in 2010: because they failed to comply with the directives found in the Interim and now Final Guidance, namely (1) in each, Kentucky proposed to "conduct the RPA during the permit term, and not prior to the authorization of the discharge" and EPA concluded this approach "is inconsistent with the CWA and its implementing regulations[2]" (*Id.*); and (2) because they lacked numerical effluent limits for conductivity.  Specifically, in its September 28, 2011 objection letter, EPA told Kentucky officials that "additional effluent limits are necessary to ensure that discharges do not contribute to violations of WQS"; that this is demonstrated by "best available science"; and that EPA would include in any permit it issued "effluent limits… to ensure that all discharges

---

[2]  It should be noted that the pre-permit RPA requirement that EPA contends is mandated by the CWA was not an aspect of the thirty-five Section 402 NPDES individual permits that EPA permitted KDOW to issue in late September 2011 (those involving underground mining, for example), thus calling into question how a pre-permit RPA could in fact be a mandatory requirement of the CWA.  (*See* AC  n. 2).

from these projects do not exceed a conductivity level of 300 µS/cm" unless site specific data suggests that another WQBEL is justified. (*Id.*)

### 3. The Administrative Record Fails to Include Documents which Pre-Date and Were Therefore Before the Agency at the Time it Issued the Final Guidance.

EPA filed the Administrative Record for the Final Guidance on November 14, 2011[3]. [DE 108]. Several material documents which are clearly relevant to EPA's continued analysis of proper CWA permitting standards for surface coal mines in Eastern Kentucky and which pre-date the issuance of the Final Guidance are missing from the Administrative Record. They include:

- *A document entitled "Permitting Procedures for Determining 'Reasonable Potential'. authored by the Kentucky Natural Resources and Environmental Protection Cabinet, Division of Water, dated May 1, 2000 and Letter from Douglas F. Mundrick, EPA, to R. Bruce Scott, Kentucky Division of Water (KDOW), dated July 7, 2000.*

The CWA requires states to develop implementation standards for performing the "reasonable potential" analysis and making its "reasonable potential" determination. 40 C.F.R. § 131.11(a)(2). This document contains Kentucky's RPA standards, and EPA's approval of same.

- *Letter from James D. Giattina, EPA, to Sandy Gruzesky, KDOW, dated December 21, 2009, commenting on proposed NPDES Draft Permit for Premier Elkhorn Coal Company, and E-mail from Chris Thomas at EPA to Sandy Gruzesky, dated December 21, 2009 forwarding seven (7) identical comment letters to NPDES draft permits.*

Even though EPA had been in possession of the scientific studies they now consider the "best available" science since at least 2008, EPA did not object to numerous NPDES 402 permits issued by Kentucky in late 2009 and early 2010, thereby acknowledging that these permits (containing post-permit RPAs and permit reopeners as well as other restrictions such as WET testing and BMPs) were consistent with the CWA. This document contains one of EPA's

---

[3] EPA filed its Administrative Record for the Interim Guidance on April 21, 2011. On or about May 23, 2011, Plaintiffs filed a Joint Motion to Supplement the Record so as to supplement this Administrative Record with numerous documents. [DE 63]. Following the issuance of the Final Guidance, that Motion became moot and was thus denied by the Court. [DE 109].

comment letters and a forwarding e-mail from EPA evidencing that identical letters were sent to Kentucky for other draft permits that same date.

- *E-mail from Sharmin Syed, EPA, to R. Bruce Scott, KDOW, dated November 5, 2010 and attached spreadsheet, responding to KDOW's request for a list of permits for which EPA has submitted specific objections from 2000 to the present.*

EPA has only a limited role in supervising NPDES 402 permits issued by states.  To assess the way EPA has performed its role over time, and the significant effect the Interim Guidance had played in EPA's new expanded view of its oversight over state NPDES permits, Kentucky officials sent a Freedom of Information Act request to EPA seeking information about the number of specific objections it has lodged to NPDES permits since 2000.  This document is EPA's response to the FOIA request which shows that, as of November 5, 2010, thirty-six of the thirty-eight objections which have been lodged to NPDES 402 permits for coal operations during this period have occurred after April 1, 2010 and the issuance of EPA's Interim Guidance.

- *E-mail from R. Bruce Scott, KDOW to EPA's Stan Meiburg, Jim Giattina, Chris Thomas et al., dated January 10, 2011, and attached spreadsheet, outlining major issues associated with the CWA 402 permitting of coal mining operations in Kentucky.*

- *E-mail from R. Bruce Scott, KDOW, to EPA's Stan Meiburg, Jim Giattina, Chris Thomas et al., dated January 12, 2011, and attached spreadsheet, containing options for an agreed upon template for CWA 402 permits issued by Kentucky.*

- *E-mail from Chris Thomas, EPA, to Sandy Gruzesky, KDOW, dated March 10, 2011, containing EPA's additional thoughts and observations about Kentucky's coal NPDES individual permit template.*

The aforementioned three e-mail communications contain and reflect settlement discussions which took place between Kentucky and EPA officials in early 2011 over an acceptable NPDES 402 permit for coal operations in Kentucky.  A settlement reached between Kentucky and EPA Region 4 which would have permitted long stalled NPDES 402 permits to be issued was later nixed by EPA Headquarters.

4.      **The Administrative Record Also Fails to Include Documents Which Post-Date the Issuance of the Final Guidance And Evidence How the Final Guidance Has Been Applied.**

The Final Guidance purports to promise a more flexible and collaborative approach, and suggests that permits will each be viewed by EPA on a case-by-case basis.  However, EPA's subsequent use (or non-use) of the Final Guidance in commenting or objecting to NPDES 402 permits belie this characterization and demonstrate that (i) it is a binding rule and NPDES 402 permits for Eastern Kentucky surface mines and West Virginia mining operations must contain its mandated restrictions or they will be subject to a specific objection from EPA; and (ii) it is being applied in an arbitrary and capricious manner, as EPA is objecting to every NPDES 402 permits for Eastern Kentucky surface mines which do not contain the permit restrictions mandated by the Final Guidance, but not objecting to NPDES 402 permits for underground mines or other coal facilities which fail to include numeric conductivity limits or the Final Guidance's bar on post-permit RPAs.

There currently are no documents in the Administrative Record that are relevant to and support Plaintiffs' challenges to the implementation of the Final Guidance.  The instant Motion seeks to supplement the record with three letters authored by EPA, and/or for the court to take judicial notice of these letters, and/or to consider them as well as the following Affidavit as extra-record evidence, as they are all relevant and help explain and support Plaintiffs' challenges:

- *Letter from James D. Giattina, EPA, to Sandy Gruzesky, KDOW, dated September 28, 2011, commenting on 35 draft NPDES 402 permits;*

- *Letter from James D. Giattina, EPA, to Sandy Gruzesky, KDOW, dated September 28, 2011, and specifically objecting to 19 draft NPDES 402 permit.*

- *Affidavit of R. Bruce Scott, dated May 23, 2011;*

- *Letter from Evelyn S. MacKnight, NPDES Branch, EPA Region III, to Jeffrey Parsons, Division of Mining & Reclamation, WVDEP, dated November 20, 2011,*

*following a general objection to a surface mine permit with comments based on the Final Guidance.*

## ARGUMENT

**I.     EPA's Compiled Administrative Record Omits Documents that were Before EPA At the Time it Issued the Final Guidance and is Therefore Incomplete.**

**A.     The Movant Need Only Demonstrate that the Agency Directly or Indirectly Considered the Documents to Support a Motion for Record Completion.**

There can be no dispute that this Court's review of Plaintiffs' challenge to the Final Guidance "is to be based on the full administrative record that was before [EPA] at the time [it] made [its] decision," and that a "full administrative record" must include materials that "were directly or indirectly" considered by EPA in its decision-making process. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006).   In deciding whether the documents identified by Plaintiffs are necessary to complete the record the court must determine whether the document was, in fact *considered* (as opposed to relied upon) by the agency.   In determining what materials were before the decision-maker, "the agency cannot arbitrarily close its eyes and refuse to consider certain materials placed before it."   *See Ad Hoc Metals Coal v. Whitman*, 227 F.Supp. 134, 139 (D.D.C. 2002) (EPA cannot exclude documents from the record that it considered, even indirectly, on the grounds it did not rely upon it to make a final decision); *United States v. Keystone Sanitation Co.*, No. 93-1482, 1996 WL 33410108, at *6 n.6 (M.D. Pa. Aug. 27, 1996) ("A document need not literally pass before the eyes of the final agency decision-maker to be considered part of the administrative record"). A document authored by the agency or in its files can be deemed to be a document which was "before the agency."   *See Cnty. Of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 76 (D.D.C. 2008) (stating that "it is axiomatic that documents created by an agency itself or otherwise located in it is files were before it").   A

showing of bad faith on the part of EPA is *not* required for a court to agree to complete a record with documents which were before the agency at the time of the decision and should have been part of the record in the first place.  *Id.* at 140 n.5.

   **B.**     **The Documents Which Predate the Final Guidance Are Properly Part of the Administrative Record.**

   This Court should enter an order directing EPA to include the first eight (8) documents listed in Exhibit A as part of the Administrative Record for the Final Guidance as they all were before EPA at the time it issued the Final Guidance[4].  All of these documents pre-date the Final Guidance.  They were all either authored by EPA or within its files at the time the Final Guidance was issued.  They are all relevant to the subject matter of the Final Guidance – proper permitting practices and procedures established or approved by EPA for RPAs and determining when or if numerical effluent limits for certain pollutants, including conductivity, are warranted.  All such relevant documents before EPA at the time of the Final Guidance should have made their way into the Administrative Record.

   These documents also offer material support to the arguments made by the Plaintiffs that, through the Final Guidance and its directives, EPA has usurped proper state authority in violation of the CWA and acted in an arbitrary and capricious way.  The November 5, 2010 response to Kentucky's FOIA request demonstrates that, consistent with Plaintiff's allegations, EPA had rarely if ever objected to NPDES 402 permits for coal operations prior to April 1, 2010, and that nearly all objections raised since the year 2000 came after April 1, 2010 and the issuance of its Interim Guidance.  The Kentucky RPA standards dated May 1, 2000; the EPA letter dated July 7, 2000 approving those standards; and the December 21, 2009 EPA comment

---

[4] Alternatively, and if the Court declines to order the inclusion of these eight (8) documents in the Administrative Record, then it should at least consider these documents as extra-record evidence and/or take judicial notice of them consistent with the standards identified on pages 17-20 herein.

letter all demonstrate that prior to April 1, 2010, EPA concluded that post-permit RPAs with permit reopeners were appropriate in NPDES permits and were consistent with the CWA. Yet only a month or so later, any individual permit for Eastern Kentucky surface mines containing such restrictions has been objected to by EPA. The January 10, 12 and March 10, 2011 e-mails between Kentucky and EPA officials confirm that settlement discussions were progressing between the two towards an acceptable template NPDES individual permit for Kentucky surface mines. This settlement was nixed by EPA headquarters precisely because the agreed upon template did not mandate pre-permit RPAs or contain numerical effluent limits for conductivity. This demonstrates that, in contrast to the protestations in the Final Guidance, EPA is inflexible as it relates to the inclusion of post-permit RPAs and conductivity limits in NPDES permits for Eastern Kentucky surface mines.

There is no reason for the exclusion of these documents from the Administrative Record, as many of the same types of documents – internal procedure manuals or documents; comment or objection letters to state NPDES draft permits; or informal communications with state permitting authorities about state permits - are included within the Administrative Record. Certainly, they should not be excluded simply because they may be adverse to EPA, or are being relied upon by the Plaintiffs to substantiate their claims that EPA has usurped proper state authority or acted arbitrarily and capriciously. The Administrative Record should contain all documents before the agency, not just the ones EPA self-selects and which support its own views.

**II.    This Court Should Supplement the Administrative Record to Include Documents That Help Explain the Plaintiff's Challenge to the Implementation of the Final Guidance, or Alternatively, Consider these Documents as Relevant and Necessary Extra-Record Evidence.**

"Ordinarily, review is to be based on the full administrative record that was before the [agency head] at the time he made his decision." *Pac. Shores Subdivision,* 448 F. Supp. 2d at 5. However, "[l]ike most well-tested rules, the rule limiting judicial review to the record is subject to certain narrow exceptions." *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 11 (D.D.C. 2001); *accord Am. Wildlands*, 530 F. 3d at 1002; *Delano v. Roche*, 391 F. Supp. 2d 79, 88 (D.D.C. 2005).  A court may exercise its discretion to supplement the record "in at *least* three instances:" (1) when the agency excluded documents that may have been adverse to its decision; (2) supplementation of the record is necessary to enable the court to determine whether the agency considered all relevant information; and (3) the agency failed to explain its action "so as to frustrate judicial review." *Am. Wildlands*, 530 F.3d at 1002 (citation omitted) (emphasis added) (internal quotation marks omitted); *accord Amfac Resorts*, 143 F. Supp. 2d at 11.  The unique posture of this case makes supplementation of the record a necessity, as it does not present a typical administrative law challenge.  Plaintiffs have not confined their challenge to the text of the Final Guidance itself.  Plaintiffs have challenged *both* the new standards announced in the Final Guidance, which violate several federal laws, *as well as* EPA's arbitration and capricious application of the Final Guidance.

Since April 1, 2010, EPA has used first the Interim Guidance and now the Final Guidance to object to all NPDES 402 individual permits for Eastern Kentucky and to NPDES permits for West Virginia surface mines.  EPA's implementation of its guidance documents has turned the statutory and regulatory regime governing coal mining on its head.  Those actions are

not adequately explained by the record, as there is nothing in the record that post-dates the Final

Guidance or that relates to its application.

In West Virginia, Region 3 (a different EPA region from that that regulates activities in

Kentucky) did not immediately apply the Final Guidance after its issuance.  EPA instead limited

its comments, questions, and objections to West Virginia's Permitting Guidance.  But very

shortly after EPA filed the Administrative Record in this litigation, that changed.  On November

20, 2011, EPA issued a comment letter on a WVDEP NPDES permit that relied heavily upon the

standards announced in the Final Guidance.  That letter followed EPA's general objection to the

NPDES permit for the Spring Fork Surface Mine No. 2, and instructed WVDEP that it should be

following EPA's conductivity "benchmark."  EPA used the letter to call into question WVDEP's

use of WET limits, directing WVDEP that it should include numeric limits for conductivity

and/or conductivity triggers.  That letter is highly relevant to West Virginia's argument that EPA

is disregarding its Permitting Guidance, objecting to and commenting upon NPDES permits

using the conductivity "benchmark" as if it were a properly promulgated water quality standard.

Accordingly, to ensure this Court's effective review of the Final Guidance, as applied,

Plaintiffs seek to include two letters dated September 28, 2011 from EPA to Kentucky permitting

authorities, which are attached at Exhibit A. Plaintiffs also seek to include the November 20,

2011 letter from EPA to West Virginia permitting authorities, also attached at Exhibit A.

Without inclusion of these letters in the Administrative Record, the Plaintiffs' "challenge to the

agency's action cannot be evaluated." *Menominee Indian Tribe of Wis. v. U.S. Dep't of Interior*,

No. 09-496, 2010 US. Dist. Lexis 118496, at *7-9 (E.D. Wis. Nov. 4, 2010) (internal quotation

marks omitted) (quoting *USA Grp. Loan Servs., Inc. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996)).

In *Menominee Indian Tribe*, the court granted the Tribe's motion to supplement the record

because it determined that judicial review of the Tribe's challenge would not be effective without those documents.  The court explained that

> [the document the Tribe seeks to add to the record] are apparently intended to provide support for the Tribe's argument that the Department [of Interior] improperly applied a proposed rule in the form of a Guidance Memorandum in reaching its decision.  Supplementing the record with these documents simply permits the Tribe to put forward its argument.  Whether the argument has merit is not the issue to be decided at this point in the proceeding.  There is no dispute that the documents are authentic and reflect ongoing policy considerations within the Department.  Supplementing the record with these documents does not undermine the purpose of the general rule limiting judicial review to the agency record and does not unduly intrude into its decision making process.  It will enable the court to properly assess the Tribe's principal claim that the Department's decision was arbitrary, capricious, and in bad faith.

*Id*. at *21.

Just as in *Menominee Indian Tribe*, it is necessary to supplement this record to allow Plaintiffs to assert their as-applied challenges.   The letters from EPA are authentic, and Kentucky's letters are already part of the court record.  EPA cannot argue that it did not know about these documents – indeed, it authored all three of them.  *See Cnty. Of San Miguel*, 587 F. Supp. 2d at 76 (stating that "it is axiomatic that documents created by an agency itself or otherwise located in it is files were before it").

If the Court declines to exercise its discretion to supplement the record with these documents, the Court alternatively should consider the EPA letters post-dating the Final Guidance as relevant extra-record evidence because it provides the Court with a more accurate explanation of EPA's actions, a way to understand the issues in this case more clearly, and a vehicle to decide Plaintiffs' challenges to EPA's implementation of the Final Guidance.  The Court should also consider the Affidavit of R. Bruce Scott ("The Scott Affidavit"), also attached at Exhibit A, as extra-record evidence.   The Court should review these documents because

"simply reviewing the administrative record is not enough to resolve the case." *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006).

"Extra record evidence consists of evidence *outside of* or *in addition to* the administrative record that was not necessarily considered by the agency." *Stainback v. Winter*, 520 F. Supp. 2d 181, 186 n.4 (D.D.C. 2007) (internal quotation marks omitted); *accord Amfac Resorts*, 448 F.Supp. 2d at 5.  The U.S. Court of Appeals for the District of Columbia Circuit has recognized the following instances in which such review is warranted:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (80 in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).  "Underlying all of these exceptions is the assessment that resort to extra-record information is necessary to enable judicial review to become effective." *Calloway v. Harvey*, 590 F. Supp. 2d 29, 38 (D.D.C. 2008) (alteration omitted) (internal quotation marks omitted).

All of the documents fit into one of the recognized rationales for resort to extra-record evidence.  The factual background involving the Final Guidance is complex and the Scott Affidavit – which explains in detail the manner in which EPA has performed its oversight role over Kentucky NPDES permits both before and after April 1, 2010 as well as before and after the Final Guidance – will enable the Court to understand Kentucky's unique challenges to both the text and implementation of the Final Guidance.  The three letters from EPA to Kentucky and West Virginia permitting authorities are evidence arising after the agency action being challenged, are relevant to Plaintiffs' challenges to EPA's issuance of the Final Guidance, its

impact on the current statutory and regulatory regime, and Plaintiffs' claims that EPA has applied the Guidance as a binding rule and in an arbitrary and capricious manner.[5]  They also are similar to letters pre-dating the Final Guidance that are already part of the Administrative Record.  Moreover, because there is no evidence in the record relevant to Plaintiffs' challenges to EPA's application of the Final Guidance, extra-record evidence such as the Scott Affidavit or the comment and objection letters from EPA to the Kentucky and West Virginia permitting authorities are necessary to ensure this Court's effective review of Plaintiffs' as-applied challenges.  Therefore, if the Court declines to include the attached documents in the record, it nevertheless should consider them in evaluating Plaintiffs' claims.

### III. This Court May Also Take Judicial Notice of the Documents, Which were Either Authored or Received by EPA and Whose Authenticity and Accuracy Cannot be Questioned.

Finally, and in the alternative, this Court may take judicial notice of the two September 28, 2011 letters to Kentucky and the November 20, 2011 letter to West Virginia, whose authenticity and contents are not in dispute.  Those documents are appropriate for judicial notice because they were all authored by EPA and are public or governmental records.  Accordingly, the Court may take judicial notice of that evidence regardless of its evaluation of the sufficiency *vel non* of the administrative record.

Federal Rule of Evidence 201 provides that a court may take judicial notice of "adjudicative facts" that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate

---

[5] Relevance is defined broadly.  As this Court held in *Delano*, "[o]ne recognized exception" to the general rule that judicial review of agency action should focus on the administrative action is "when the supplemental information is relevant to the final decision."  *Delano*, 391 F. Supp. 2d at 24.  All of the attached documents satisfy the broad definition of relevance taken from Federal Rule of Evidence 401.  *See id*. ("Federal Rule of Evidence 401 adopts a broad view of relevance, defining such evidence as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidences." (quoting Fed. R. Evid. 401)).

and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  Plaintiffs' documents proposed for judicial notice are relevant and reliable on their face, unlike the documents at issue in *County of San Miguel*.  In that case, the validity of the conclusions in a report and the "investigative process which led to the report's conclusions" upon which plaintiffs' sought to rely were at issue and the report therefore was not appropriate for judicial notice.  *Cnty. of San Miguel*, 587 F. Supp. 2d at 78.  This case is more like *Menominee Indian Tribe*, in which the court took notice of a 2009 land to trust denial letter from the agency to an Indian tribe because "[j]udicial notice is proper for agency decisions." 2010 U.S. Dist. Lexis 118496, at *16 (citing *Fornalik v. Perryman*, 223 F. 3d 523 (7th Cir. 2000)).

There is no dispute about the following key facts, each of which are easily capable of accurate and ready determination by resort to the two September 28, 2011 EPA letters whose authenticity and accuracy cannot be reasonably questioned: (i) Of fifty-four NPDES 402 draft individual permits Kentucky posted for review, EPA commented upon thirty-five of them on September 28, 2011 and thus permitted Kentucky to issue them; (ii) none of the aforementioned thirty-five permits were for surface mines in Eastern Kentucky and none of them included pre-permit RPAs or numerical limits for conductivity; (iii) on September 28, 2011 EPA objected to the remaining nineteen NPDES 402 draft individual permits, which were for new or expanded surface mines in Eastern Kentucky because they did not include pre-permit RPAs or numerical effluent limits on conductivity.  The November 20, 2011 letter from EPA to West Virginia speaks for itself, and clearly relies upon the standards announced in the Final Guidance, including EPA's conductivity "benchmark."  Moreover, the three letters are appropriate for judicial notice because they are reliable public records.  *See Seifert v. Winter*, 555 F. Supp. 2d 3,

11 n.5 (D.D.C. 2008) (holding that public or government documents are generally subject to judicial notice); *see also Banner Health v. Sebelius*, 715 F. Supp. 1452, 157 n.14 (D.D.C. 2010) (concluding that a court may take judicial notice of the legislative acts of federal and state legislative bodies).   Accordingly, the Court properly may take judicial notice of those documents without reaching the issue of record's adequacy.

Respectfully Submitted,

/s/ Mindy G. Barfield
Mindy G. Barfield (admitted pro hac vice)
DINSMORE & SHOHL LLP
Lexington Financial Center
250 W. Main Street, Suite 1400
Lexington, KY 40507

/s/ Sadhna G. True
Sadhna G. True
D.C. Bar No. 434669
DINSMORE & SHOHL LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507
(859) 425-1000
*Attorneys for Plaintiffs Kentucky Coal Association*

Michael L. Murphy, No. 480163
Benjamin L. Bailey, *Pro Hac Vice and Special
    Assistant Attorney General*
Sherrie A. Armstrong, *Pro Hac Vice*
Gregory Y. Porter, No. 458603
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
*Counsel for Plaintiff Randy C. Huffman, in his
official capacity as Cabinet Secretary of the West
Virginia Department of Environmental
Protection and acting on behalf of the State of
West Virginia*

John Martin, No. 358679
Kirsten L. Nathanson, No. 463992
David Y. Chung, No. 500420
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500

Katie Sweeney, Of Counsel
Karen C. Bennett, No. 477151
NATIONAL MINING ASSOCIATION
101 Constitution Avenue, N.W.
Washington, DC 20001
(202) 463-2600
*Attorneys for Plaintiff National Mining Association*

C. Michael Haines
Mary Stephens
Josh Nacey
Office of General Counsel
200 Fair Oaks Lane, First Floor
Frankfort, KY 40601
(502) 564-3410
*Attorneys for Plaintiff-Intervenor*
*Commonwealth of Kentucky*
*Energy and Environment Cabinet*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was filed with the Clerk of Court on the 22nd day of December, 2011 using the CM/ECF system which will send electronic notification to all counsel of record.

/s/ Mindy G. Barfield
Counsel for Plaintiff,
Kentucky Coal Association

431426v2