# PERMITTING PROCEDURES
# FOR DETERMINING
# "REASONABLE POTENTIAL"

## Natural Resources and
## Environmental Protection Cabinet



## Kentucky Division of Water
## Frankfort, Kentucky

## May 1, 2000

List of Contributors

R. Bruce Scott, P.E., Manager – KPDES Branch
Sandra Gruzesky, P.E., Supervisor – Municipal Section

These procedures have been approved for release:

for _Robert W. Ware_
Jack A. Wilson, Director
Division of Water

_6-14-00_
Date

*The Natural Resources and Environmental Protection Cabinet does not discriminate on the basis of race, color, national origin, sex, age, religion, or disability and provides, on request, reasonable accommodations including auxiliary aids and services necessary to afford an individual with a disability an equal opportunity to participate in all services, programs, and activities.*

# REASONABLE POTENTIAL PROCEDURES

## SECTION I.      Regulatory Requirements

Limitations shall control all pollutants or pollutant parameters (conventional, non-conventional, or toxic) which the Cabinet determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any water quality standard, including narrative criteria for water quality.

When determining whether a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative or numeric criteria within a water quality standard, the Cabinet shall use procedures which account for existing controls on point and non-point sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing when evaluating whole effluent toxicity, and where appropriate, the dilution of the effluent in the receiving water.

Specifically, the review procedures to be used shall be in accordance with the "Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (June, 2000) as attached. Of particular note, the procedures outlined in Chapter 3: Toxic Pollutants, and Appendix G: Toxic Criteria Methodology, shall be the basis for technical evaluation of reasonable potential as discussed in the paragraph above. In addition, the procedures outlined in "Permitting Procedures for Discharges into Impaired Waters" (draft) shall be followed where a discharge is into an impaired waterbody.

## SECTION II.      Setting Effluent Limits

### (a) Chemical Specific

When the Cabinet determines, using the review procedures, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a numeric criteria within a water quality standard for an individual pollutant, the permit shall contain effluent limits for that pollutant.

### (b) In the Absence of a Water Quality Standard

If 401 KAR 5:031 does not specify a water quality criterion for a specific chemical pollutant that is present in an effluent at a concentration that causes, has a reasonable potential to cause, or contributes to an excursion above a narrative criterion within an applicable water quality standard, the Cabinet shall establish limits using one (1) or more of the following options:

1.  Establish effluent limits using a calculated numeric water quality criterion for the pollutant which the Cabinet demonstrates will attain and maintain applicable water quality criteria and will fully protect the designated use. Such a criterion may be derived using administrative regulations interpreting the narrative water quality criterion, supplemented with other relevant information which may include: EPA's Water Quality Standards Handbook, risk assessment data, exposure data, information from the Food and Drug Administration, and current EPA criteria documents; or

2. Establish effluent limits on a case-by-case basis, using water quality criteria listed in 401 KAR 5:031, supplemented when necessary by other relevant information; or

3. Establish effluent limitations on an indicator parameter for the pollutant of concern if:

   a. The permit identifies which pollutants are intended to be controlled by the use of the effluent;

   b. The fact sheet sets forth the basis for the limit, including a finding that compliance with the effluent limit on the indicator parameter will result in controls on the pollutant of concern, which are sufficient to attain and maintain applicable water quality standards;

   c. The permit requires all effluent and ambient monitoring necessary to show that during the term of the permit, the limit on the indicator parameter continues to attain and maintain applicable water quality standards; and

   d. The permit contains a reopener clause allowing the Cabinet to modify or revoke and reissue the permit, if the limits on the indicator parameter no longer attain and maintain applicable water quality standards.

When developing water quality based effluent limits, the Cabinet shall ensure that:

1. The level of water quality to be achieved by limits on point sources is derived from and complies with all applicable water quality standards; and

2. Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the Cabinet.

Limitations shall control all toxic pollutants which:

1. The Cabinet determines, based on information reported in a permit application under 401 KAR 5:060, Section 2(7), or in a notification under 401 KAR 5:065, Section 1(15)(a), or other information, are or may be discharged at a level greater than the level which can be achieved by the technology-based treatment requirements (Best Professional Judgement – BPJ) appropriate to the permittee under 401 KAR 5:080, Section 1(2)(c); or

2. The discharger does or may use or manufacture as an intermediate or final product or by-product.

The requirement for control of toxic pollutants as set forth above shall be satisfied by:

1. Limitations on those pollutants; or

2. Limitations on other pollutants which, in the judgment of the Cabinet, will provide treatment of the pollutants of concern to the levels required by 401 KAR 5:080, Section 1(2)(c).

2

### (c) Whole Effluent Toxicity

When the Cabinet determines, using the review procedures, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a numeric criterion for whole effluent toxicity, the permit shall contain limits for whole effluent toxicity.

Limits for whole effluent toxicity are not necessary where the Cabinet demonstrates in the fact sheet or statement of basis of the KPDES permit, using the aforementioned review procedures, that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative water quality standards.

## SECTION III.    Chemical Specific Procedures

1. Review the permit application for pollutants that will, or have reasonable potential to cause, or contribute to an excursion above any water quality criteria. Review of all municipal applications shall verify industrial user contribution and, for those municipalities with an approved pretreatment program, this review shall include toxic scans of influent, effluent, and sludge, audits, and inspection reports.

2. Limit any pollutant(s) given in an effluent guideline (in addition, water quality based limits may be applied as well; e.g. mass limitations calculated from the effluent guidelines and concentration limitations derived from water quality criteria).

3. Wasteload allocation shall be utilized as a method for determination of limits for pollutants that will, or have reasonable potential to cause, or contribute to an excursion above water quality criteria. The "Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (June, 2000) as attached shall be the basis for the determination with consideration of stream dilution, available discharge data, in-stream concentrations, and criteria for aquatic life (acute and chronic) and human health.

4. Limit any pollutant(s) based on Best Professional Judgement (BPJ). The basis for establishing these limitations will be included in the fact sheet or statement of basis of the permit.

5. Where reasonable potential does not exist, or sufficient data does not exist to make a determination, it may be desirable to require "monitor only" as an interim measure to provide for collection and evaluation of necessary data prior to the determination of an appropriate limitation. Sufficient data is five (5) or more data points.

6.  Where a comparison of the data against the wasteload allocation reveals that a pollutant is present in the range of 70% - 90% of the wasteload allocation for that pollutant, then a monthly monitor and report requirement will be imposed for a one (1) year period.  If this data reveals that the pollutant is present in an amount exceeding 90% of the wasteload allocation for that pollutant, then the effluent limit for that pollutant will become effective at that time.  If this data reveals that the pollutant is present in the range of 70% - 90% of the wasteload allocations, then the monitor and report requirement will continue for the remainder of the permit duration and the limitation will be held in abeyance.  If this data reveals that the pollutant is present in an amount less than 70% of the wasteload allocation, then the monitor and report requirement will cease.

7.  A comparison of the data against the wasteload allocation will be performed in order to identify any pollutant(s), which will, or have a reasonable potential to cause, or contribute to, an excursion above any water quality criteria.  The average of the available data will apply when comparing against chronic and human health criteria, while the maximum individual data point will apply when comparing against acute criteria.  A limitation will be placed on any pollutant, which the data reveals is exceeding 90% of the wasteload allocation.

## SECTION IV.   <u>Whole Effluent Toxicity Procedures</u>

1.  All complex effluents present a reasonable potential to cause, or contribute to in-stream toxicity.  Complex effluents typically have a number of differing or variable wastestreams.  These various wastestreams may act synergistically to cause toxicity.  All designated major facilities, all municipalities with an approved pretreatment program, as well as other facilities (i.e., major industrials, etc.) with reasonable potential to discharge toxic pollutants, are required to conduct Whole Effluent Toxicity (WET) testing.  The primary means of determining applicability of either the chronic or acute method is through the wasteload allocation method as outlined in the Kentucky DOW-KPDES Branch: Water Quality Computer Programs document (June, 2000) as attached.

2.  Where some data may exist for an effluent previously having no WET testing requirements, that indicates some toxic effect(s), the data will be evaluated to determine whether to impose a WET limitation or only monitoring and reporting requirements.  If the data indicating toxic effects pertains directly to the effluent, and sufficient data is available, then a WET limitation will be imposed.  If the data pertains to in-stream effects for which there may be multiple causes, or sufficient data is not available to make a determination, then a quarterly monitor and report requirement will be imposed for one year.

3. For those cases where only monitoring and reporting is required, if after one year the data reveals that the effluent is not toxic (no effect using 100% effluent), then the requirement will cease. If the data reveals that the effluent is toxic, however it is toxic in an amount less than 70% to 90% of the applicable WET limitation, then the monitor and report requirement will continue for the remainder of the permit duration and the limitation held in abeyance. If the data reveals that the effluent is toxic in an amount greater than 90% of the applicable WET limitation, then the limitation will become effective at that time. The average of the data will be used when comparing against chronic toxicity units and the maximum will be used when comparing against acute toxicity units.

4. For cases in which acute toxicity is deemed appropriate, a limitation for acute toxicity is determined and test procedures included as a permit condition.

   a. If noncompliance with the toxicity limit occurs, the permittee has the option of performing accelerated testing (four (4) tests within sixty (60) days) or performing a Toxicity Reduction Evaluation (TRE). Also, if the accelerated testing reveals significant noncompliance ($\geq 1.2$ times the limit on any 2 of 6 tests), a TRE will be required.

   b. If a TRE is required, a plan and implementation schedule must be submitted within thirty (30) days of notification. The TRE protocol shall follow that outlined in the most recent edition of the EPA TRE guidance manual.

5. For cases in which chronic toxicity is deemed appropriate, a chronic toxicity limit will be determined and the chronic test procedures included as a permit condition.

   a. If noncompliance with the toxicity limit occurs, the permittee must conduct a second test within 15 days of the first failure. If this second test demonstrates noncompliance with the toxicity limitation, the permittee has the option of performing accelerated testing (four (4) tests within ninety (90) days) or performing a TRE. Also, if the accelerated testing reveals significant noncompliance ($\geq 1.2$ times the limit on any 2 of 6 tests), a TRE will be required.

   b. If a TRE is required, a plan and implementation schedule must be submitted within thirty (30) days of notification. The TRE protocol shall follow that outlined in the most recent edition of the EPA TRE guidance manual.

# SECTION V.    Specific Technical Issues

There are a number of specific technical questions that are not addressed in the "Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (June, 2000) as attached. In order to address these issues, this section is intended to be presented in a question and answer format.

**Q1.**  How will be agency handle single or multiple data points (chemical specific or WET) on applications, DMRs, or other sources of information as it relates to reasonable potential?

**A1.**  In determining reasonable potential, the agency will assume any single data point to be representative of the discharge.  While most effluents exhibit a lognormal distribution relative to concentrations of constituents being released, the agency has chosen not to assume any coefficient of variation for a data set (regardless of size).  As such, a single data point shall be evaluated against what limits might be required ["Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (June, 2000)] as a direct comparison.

For multiple data points, the data shall be reviewed under one of two approaches.  First, the data may be averaged and then compared to what the limit would need to be for that constituent in order to determine whether reasonable potential exists.  In some instances, it may be necessary to discard a data outlier where it is readily apparent that the data point is not reflective of the discharge.  Secondly, the reviewer may choose a single data point in determining reasonable potential.  The later case is generally only done where a highly variable effluent exists and a high data point is deemed to be more reflective of the effluent.

See Section III of this document for further clarification on when an effluent limit or monitoring would be required.

In all cases, the fact sheet or statement of basis of the KPDES permit shall describe the basis for the permitting action taken.

**Q2.** How will background conditions (background concentrations, hardness, etc.) be factored into the reasonable potential evaluation?

**A2.**  In the absence of any data in close proximity to the discharge, the reviewer will generally assume background levels of zero for use in the respective computations.  ["Kentucky DOW-KPDES Branch:  Water Quality Computer Programs" document (June, 2000)]  Prior to making this assumption, a review of the all available data will be performed.  This review will include, but not be limited to data available in STORET, data collected as a result of watershed studies, and other site-specific studies when available.  As data becomes more readily available or is already available for the stream being discharged into (i.e., Watershed monitoring data, etc.), the reviewer shall use representative data in the respective computations.  The resultant permit limits from this evaluation shall be compared to the data as discussed in A1 above for purposes of determining reasonable potential.

In all cases, the fact sheet or statement of basis of the KPDES permit shall describe the basis for the permitting action taken.

6

**Q3.**  How will non-detectable or below detection limits data points be used in determining reasonable potential?

**A3.** Any data point that is reported as non-detectable or below detection limits shall be assigned a value of zero in evaluating reasonable potential.

**Q4.** How will reasonable potential be determined where no data is available?

**A4.** For new or expanded discharges, there will be instances where data is not available to reflect the characteristics of the discharge. In those instances, the reviewer must use their Best Professional Judgement (BPJ) to determine which, if any, constituents might exhibit a reasonable potential to exceed water quality standards. In addition, the procedures discussed in "Chemical Specific Procedures" and "Whole Effluent Toxicity Procedures" shall be followed in making this BPJ determination. Whether a limit or monitoring is required will be based upon the characteristics of the receiving stream (i.e., impaired waterbody, etc.) in addition to the potential for that parameter to be discharged.

# REASONABLE POTENTIAL PROCEDURES

## SECTION I.    Regulatory Requirements

Limitations shall control all pollutants or pollutant parameters (conventional, non-conventional, or toxic) which the Cabinet determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any water quality standard, including narrative criteria for water quality.

When determining whether a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative or numeric criteria within a water quality standard, the Cabinet shall use procedures which account for existing controls on point and non-point sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing when evaluating whole effluent toxicity, and where appropriate, the dilution of the effluent in the receiving water.

Specifically, the review procedures to be used shall be in accordance with the "Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (October 1997) as attached. Of particular note, the procedures outlined in Chapter 3: Toxic Pollutants, and Appendix G: Toxic Criteria Methodology, shall be the basis for technical evaluation of reasonable potential as discussed in the paragraph above. In addition, the procedures outlined in "Permitting Procedures for Discharges into Impaired Waters" (draft) shall be followed where a discharge is into an impaired waterbody.

## SECTION II.    Setting Effluent Limits

### (a) Chemical Specific

When the Cabinet determines, using the review procedures, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a numeric criteria within a water quality standard for an individual pollutant, the permit shall contain effluent limits for that pollutant.

### (b) In the Absence of a Water Quality Standard

If 401 KAR 5:031 does not specify a water quality criterion for a specific chemical pollutant that is present in an effluent at a concentration that causes, has a reasonable potential to cause, or contributes to an excursion above a narrative criterion within an applicable water quality standard, the Cabinet shall establish limits using one (1) or more of the following options:

1.  Establish effluent limits using a calculated numeric water quality criterion for the pollutant which the Cabinet demonstrates will attain and maintain applicable water quality criteria and will fully protect the designated use. Such a criterion may be derived using administrative regulations interpreting the narrative water quality criterion, supplemented with other relevant information which may include: EPA's Water Quality Standards Handbook, risk assessment data, exposure data, information from the Food and Drug Administration, and current EPA criteria documents; or

1

2. Establish effluent limits on a case-by-case basis, using water quality criteria listed in 401 KAR 5:031, supplemented when necessary by other relevant information; or

3. Establish effluent limitations on an indicator parameter for the pollutant of concern if:

   a. The permit identifies which pollutants are intended to be controlled by the use of the effluent;

   b. The fact sheet sets forth the basis for the limit, including a finding that compliance with the effluent limit on the indicator parameter will result in controls on the pollutant of concern, which are sufficient to attain and maintain applicable water quality standards;

   c. The permit requires all effluent and ambient monitoring necessary to show that during the term of the permit, the limit on the indicator parameter continues to attain and maintain applicable water quality standards; and

   d. The permit contains a reopener clause allowing the Cabinet to modify or revoke and reissue the permit, if the limits on the indicator parameter no longer attain and maintain applicable water quality standards.

When developing water quality based effluent limits, the Cabinet shall ensure that:

1. The level of water quality to be achieved by limits on point sources is derived from and complies with all applicable water quality standards; and

2. Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the Cabinet.

Limitations shall control all toxic pollutants which:

1. The Cabinet determines, based on information reported in a permit application under 401 KAR 5:060, Section 2(7), or in a notification under 401 KAR 5:065, Section 1(15)(a), or other information, are or may be discharged at a level greater than the level which can be achieved by the technology-based treatment requirements (Best Professional Judgement – BPJ) appropriate to the permittee under 401 KAR 5:080, Section 1(2)(c); or

2. The discharger does or may use or manufacture as an intermediate or final product or by-product.

The requirement for control of toxic pollutants as set forth above shall be satisfied by:

1. Limitations on those pollutants; or

2. Limitations on other pollutants which, in the judgment of the Cabinet, will provide treatment of the pollutants of concern to the levels required by 401 KAR 5:080, Section 1(2)(c).

**(c) Whole Effluent Toxicity**

When the Cabinet determines, using the review procedures, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a numeric criterion for whole effluent toxicity, the permit shall contain limits for whole effluent toxicity.

Limits for whole effluent toxicity are not necessary where the Cabinet demonstrates in the fact sheet or statement of basis of the KPDES permit, using the aforementioned review procedures, that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative water quality standards.

## SECTION III.    Chemical Specific Procedures

1.  Review the permit application for pollutants that will, or have reasonable potential to cause, or contribute to an excursion above any water quality criteria. Review of all municipal applications shall verify industrial user contribution and, for those municipalities with an approved pretreatment program, this review shall include toxic scans of influent, effluent, and sludge, audits, and inspection reports.

2.  Limit any pollutant(s) given in an effluent guideline (in addition, water quality based limits may be applied as well; e.g. mass limitations calculated from the effluent guidelines and concentration limitations derived from water quality criteria).

3.  Wasteload allocation shall be utilized as a method for determination of limits for pollutants that will, or have reasonable potential to cause, or contribute to an excursion above water quality criteria. The "Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (October 1997) as attached shall be the basis for the determination with consideration of stream dilution, available discharge data, in-stream concentrations, and criteria for aquatic life (acute and chronic) and human health.

4.  Limit any pollutant(s) based on Best Professional Judgement (BPJ). The basis for establishing these limitations will be included in the fact sheet or statement of basis of the permit.

5.  Where reasonable potential does not exist, or sufficient data does not exist to make a determination, it may be desirable to require "monitor only" as an interim measure to provide for collection and evaluation of necessary data prior to the determination of an appropriate limitation. Sufficient data is five (5) or more data points.

3

6. Where a comparison of the data against the wasteload allocation reveals that a pollutant is present in the range of 70% - 90% of the wasteload allocation for that pollutant, then a monthly monitor and report requirement will be imposed for a one (1) year period. If this data reveals that the pollutant is present in an amount exceeding 90% of the wasteload allocation for that pollutant, then the effluent limit for that pollutant will become effective at that time. If this data reveals that the pollutant is present in the range of 70% - 90% of the wasteload allocations, then the monitor and report requirement will continue for the remainder of the permit duration and the limitation will be held in abeyance. If this data reveals that the pollutant is present in an amount less than 70% of the wasteload allocation, then the monitor and report requirement will cease.

7. A comparison of the data against the wasteload allocation will be performed in order to identify any pollutant(s), which will, or have a reasonable potential to cause, or contribute to, an excursion above any water quality criteria. The average of the available data will apply when comparing against chronic and human health criteria, while the maximum individual data point will apply when comparing against acute criteria. A limitation will be placed on any pollutant, which the data reveals is exceeding 90% of the wasteload allocation.

## SECTION IV. Whole Effluent Toxicity Procedures

1. All complex effluents present a reasonable potential to cause, or contribute to in-stream toxicity. Complex effluents typically have a number of differing or variable wastestreams. These various wastestreams may act synergistically to cause toxicity. All designated major facilities, all municipalities with an approved pretreatment program, as well as other facilities (i.e., major industrials, etc.) with reasonable potential to discharge toxic pollutants, are required to conduct Whole Effluent Toxicity (WET) testing. The primary means of determining applicability of either the chronic or acute method is through the wasteload allocation method as outlined in the Kentucky DOW-KPDES Branch: Water Quality Computer Programs document (October, 1997) as attached.

2. Where some data may exist for an effluent previously having no WET testing requirements, that indicates some toxic effect(s), the data will be evaluated to determine whether to impose a WET limitation or only monitoring and reporting requirements. If the data indicating toxic effects pertains directly to the effluent, and sufficient data is available, then a WET limitation will be imposed. If the data pertains to in-stream effects for which there may be multiple causes, or sufficient data is not available to make a determination, then a quarterly monitor and report requirement will be imposed for one year.

3.     For those cases where only monitoring and reporting is required, if after one year the data reveals that the effluent is not toxic (no effect using 100% effluent), then the requirement will cease. If the data reveals that the effluent is toxic, however it is toxic in an amount less than 70% to 90% of the applicable WET limitation, then the monitor and report requirement will continue for the remainder of the permit duration and the limitation held in abeyance. If the data reveals that the effluent is toxic in an amount greater then 90% of the applicable WET limitation, then the limitation will become effective at that time. The average of the data will be used when comparing against chronic toxicity units and the maximum will be used when comparing against acute toxicity units.

4.     For cases in which acute toxicity is deemed appropriate, a limitation for acute toxicity is determined and test procedures included as a permit condition.

    a.     If noncompliance with the toxicity limit occurs, the permittee has the option of performing accelerated testing (four (4) tests within sixty (60) days) or performing a Toxicity Reduction Evaluation (TRE). Also, if the accelerated testing reveals significant noncompliance ($\geq 1.2$ times the limit on any 2 of 6 tests), a TRE will be required.

    b.     If a TRE is required, a plan and implementation schedule must be submitted within thirty (30) days of notification. The TRE protocol shall follow that outlined in the most recent edition of the EPA TRE guidance manual.

5.     For cases in which chronic toxicity is deemed appropriate, a chronic toxicity limit will be determined and the chronic test procedures included as a permit condition.

    a.     If noncompliance with the toxicity limit occurs, the permittee must conduct a second test within 15 days of the first failure. If this second test demonstrates noncompliance with the toxicity limitation, the permittee has the option of performing accelerated testing (four (4) tests within ninety (90) days) or performing a TRE. Also, if the accelerated testing reveals significant noncompliance ($\geq 1.2$ times the limit on any 2 of 6 tests), a TRE will be required.

    b.     If a TRE is required, a plan and implementation schedule must be submitted within thirty (30) days of notification. The TRE protocol shall follow that outlined in the most recent edition of the EPA TRE guidance manual.

# SECTION V.    Specific Technical Issues

There are a number of specific technical questions that are not addressed in the "Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (October, 1997) as attached. In order to address these issues, this section is intended to be presented in a question and answer format.

**Q1.**  How will be agency handle single or multiple data points (chemical specific or WET) on applications, DMRs, or other sources of information as it relates to reasonable potential?

**A1.** In determining reasonable potential, the agency will assume any single data point to be representative of the discharge. While most effluents exhibit a lognormal distribution relative to concentrations of constituents being released, the agency has chosen not to assume any coefficient of variation for a data set (regardless of size). As such, a single data point shall be evaluated against what limits might be required ["Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (October 1997)] as a direct comparison.

For multiple data points, the data shall be reviewed under one of two approaches. First, the data may be averaged and then compared to what the limit would need to be for that constituent in order to determine whether reasonable potential exists. In some instances, it may be necessary to discard a data outlier where it is readily apparent that the data point is not reflective of the discharge. Secondly, the reviewer may choose a single data point in determining reasonable potential. The later case is generally only done where a highly variable effluent exists and a high data point is deemed to be more reflective of the effluent.

See Section III of this document for further clarification on when an effluent limit or monitoring would be required.

In all cases, the fact sheet or statement of basis of the KPDES permit shall describe the basis for the permitting action taken.

**Q2.** How will background conditions (background concentrations, hardness, etc.) be factored into the reasonable potential evaluation?

**A2.** In the absence of any data in close proximity to the discharge, the reviewer will generally assume background levels of zero for use in the respective computations. ["Kentucky DOW-KPDES Branch: Water Quality Computer Programs" document (October 1997)] Prior to making this assumption, a review of the all available data will be performed. This review will include, but not be limited to data available in STORET, data collected as a result of watershed studies, and other site-specific studies when available. As data becomes more readily available or is already available for the stream being discharged into (i.e., Watershed monitoring data, etc.), the reviewer shall use representative data in the respective computations. The resultant permit limits from this evaluation shall be compared to the data as discussed in A1 above for purposes of determining reasonable potential.

In all cases, the fact sheet or statement of basis of the KPDES permit shall describe the basis for the permitting action taken.

6

**Q3.** How will non-detectable or below detection limits data points be used in determining reasonable potential?

**A3.** Any data point that is reported as non-detectable or below detection limits shall be assigned a value of zero in evaluating reasonable potential.

**Q4.** How will reasonable potential be determined where no data is available?

**A4.** For new or expanded discharges, there will be instances where data is not available to reflect the characteristics of the discharge. In those instances, the reviewer must use their Best Professional Judgement (BPJ) to determine which, if any, constituents might exhibit a reasonable potential to exceed water quality standards. In addition, the procedures discussed in "Chemical Specific Procedures" and "Whole Effluent Toxicity Procedures" shall be followed in making this BPJ determination. Whether a limit or monitoring is required will be based upon the characteristics of the receiving stream (i.e., impaired waterbody, etc.) in addition to the potential for that parameter to be discharged.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

[JUL 0 7 2000

R. Bruce Scott, P.E.
Environmental Engineer Branch Manager
KPDES Branch
Division of Water
KY Dept. for Environmental Protection
Frankfort Office Plaza
14 Reilly Road
Frankfort, KY 40601-1189

Dear Mr. Scott:

EPA has completed its review of the Division of Water's draft Reasonable Potential Procedures, dated June 14, 2000 (as amended in your July 5, 2000 electronic submittal) for the use in KPDES permits and hereby approves them. I appreciate the cooperation provided by you and your staff in getting these finalized and in resolving this longstanding issue.

Sincerely,

Douglas F. Mundrick, P.E., Chief
Permits, Grants and Technical Assistance Branch
Water Management Division



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

DEC 2 1 2009

Ms. Sandy Gruzesky
Director, Division of Water
Kentucky Department for Environmental Protection
200 Fair Oaks Lane, Fourth Floor
Frankfort, Kentucky 40601

Subject:   Review of Draft Permit
    NPDES Permit No. KY0108022
    Premier Elkhorn Coal Company – Penny Road Deep Mine

Dear Ms. Gruzesky:

  On September 21, 2009, the above-referenced National Pollutant Discharge Elimination System (NPDES) draft permit and fact sheet were received by the United States Environmental Protection Agency (EPA) from the Kentucky Division of Water (KDOW). On October 20, 2009, EPA sent a letter to KDOW requesting a 90-day extension for review in accordance with Section IV.B.3 of the Kentucky Environmental and Public Protection Cabinet/EPA Memorandum of Agreement (MOA) and 40 Code of Federal Regulations (C.F.R.) § 123.44(a). We have now completed our review of the draft permit and are providing the following comments and recommendations with respect to the draft permit in accordance with Section IV.B.3 of the MOA and 40 C.F.R. §123.44(a).

  The proposed coal mine project is a new source underground coal mine. The draft permit allows the discharge of coal mine effluent via three outfalls to Shelby Creek. Shelby Creek has a low flow rate for 7 consecutive days occurring on an average once every 10 years (7Q10) of 0.5 cubic feet per second. The designated uses for Shelby Creek are warm water aquatic habitat, fish consumption, and primary and secondary contact recreation. Shelby Creek has a warm water aquatic habitat designated use impairment. The pollutants causing impairment associated with coal mining are sedimentation/siltation and total dissolved solids (TDS).

  As explained in detail below, our comments and recommendations generally relate to insufficient reasonable potential analysis and a lack of water quality-based effluent limits necessary to ensure that the discharges authorized by the permit will not cause or contribute to violations of state water quality standards (WQS), as required by Section 301(b)(1)(C) of the Clean Water Act (CWA) and 40 C.F.R. §122.4((a), (d) and (i), and 40 C.F.R. §122.44(d)(1). We request that you address these comments prior to issuing a final permit to ensure that the final permit is consistent with the requirements of the CWA and its implementing regulations.

**1. The State did not provide a Reasonable Potential Analysis relating to narrative WQS.**

  The draft permit and fact sheet do not contain a reasonable potential analysis or demonstration that the discharges that would be authorized under the draft permit will not cause or contribute to violations of these narrative standards. Kentucky's WQS include the following narrative standards:

"Total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected." 401 Kentucky Administrative Regulations (KAR) 10:031, Section 4(1)(f); and

"Surface waters shall not be aesthetically or otherwise degraded by substances that … injure, are chronically or acutely toxic to or produce adverse physiological or behavioral responses in humans, animals, fish and other aquatic life." 401 KAR 10:031, Section 2.

A reasonable potential analysis and demonstration is necessary in light of information indicating that coal mine discharges are causing impairments of water quality standards throughout Appalachia coal mining regions.

A growing body of evidence demonstrates that certain pollutants associated with coal mine discharges are causing or contributing to violations of narrative water quality standards. Recent studies have shown that there is a direct correlation between stream impairment and discharge of total dissolved solids (TDS)/specific conductivity (SC) due to coal mining and coal processing.[1]  Much of this body of developing information regarding the extent to which coal mines are causing, or could cause, impairments to waters receiving discharges from coal mines in Appalachian coal mining regions has recently become available.

In addition to these studies, the Kentucky Division of Water's 2008 list of impaired waters provided to EPA under Section 303(d) of the CWA identified 1,199 stream miles in the Upper Kentucky River watershed, 487 stream miles in the Upper Cumberland River watershed, and 780 stream miles in the Big Sandy/Little Sandy/Tygarts Creek watershed as impaired with coal mining identified as a suspected source. The "2008 Integrated Report to Congress on Water Quality in Kentucky" (305(b) Report), Table 3.3.1-4, ranks TDS as the seventh leading cause of pollution to Kentucky rivers and streams and ranks SC as the seventeenth. The draft permit would authorize discharges to impaired waters on Kentucky Section 303(d) list. The facility will discharge to Shelby Creek, which is listed as impaired for sedimentation/siltation, TDS, nutrient/eutrophication biological indicators, and organic enrichment biological indicators. Sediments and TDS are known to be associated with coal mining.

**2. The State should provide additional information to support a reasonable potential analysis for narrative WQS.**

To support the reasonable potential analysis, information regarding effluent characteristics and ambient stream quality should be provided.  The draft permit, fact sheet and the permit application do not contain such information.  Pollutant analytical values were not submitted on Section V of Form C of the application submitted for this draft permit.  The application and fact sheet note that the existing discharge points do not yet exist.  However, this does not justify a failure to conduct an appropriate reasonable potential analysis.  The applicant

---

[1] A 2003 published study, "Field and Laboratory Assessment of a Coal Processing Effluent in the Leading Creek Watershed, Meigs County, Ohio" by Kennedy, et al. linked elevated specific conductance levels in the effluent to impaired, sensitive aquatic fauna. A 2004 Kentucky Department for Environmental Protection, Division of Water, Water Quality Branch study, "Effects of Surface Mining and Residential Land Use on Headwater Stream Biotic Integrity in the Eastern Kentucky Coalfield Region" (http://www.water.ky.gov/NR/rdonlyres/ED76CE4E-F46A-4509-8937-1A5DA40F3838/0/coal_mining1.pdf ) found that the wholesale loss of mayflies at mined sites indicated that these organisms are especially sensitive to coal mine drainage. Dissolved solids emanating from hollow fills are a primary cause of biological impairment because of their severe impact to mayflies (a key component of headwater stream communities) and other sensitive taxa.  A 2005 published study, "Evaluation of Ionic Contribution to the Toxicity of a Coal-Mine Effluent Using *Ceriodaphnia dubia*" by Kennedy, et al. linked impairment of aquatic life to elevated TDS levels. Finally, a 2008 published study, "Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools" by Pond, et al. found evidence indicating that mining activities have subtle to severe impacts on aquatic life and the biological conditions of a stream.

2

should have completed a baseline water quality analysis for their Surface Mining Control and Reclamation Act (SMCRA) permit application and this information should be incorporated into the reasonable potential analysis and fact sheet. The applicant has other coal mines within the region and is one of four subsidiaries of TACO Coal which operates in the region. Therefore, representative effluent data from these sources can be used to report effluent characteristics. A reasonable potential analysis should be performed using such data and other information regarding the likely effluent characteristics, together with ambient stream data that will allow KDOW to determine whether the receiving water body has sufficient assimilative capacity to ensure that the discharges that would be authorized by the draft permit remain in compliance with applicable numeric and narrative WQS. The applicant should also be required to submit Form C within 2 years from the commencement of discharge.

As part of the analysis, you also should consider baseline pre-mining and post-mining water quality and biological data and post-mining data from streams downstream from other surface coal mining operations within the watershed.

**3. The permit should contain water quality-based effluent limits to achieve narrative water quality standards.**

Based on the information described above, it appears that the draft permit would authorize discharges that will have the reasonable potential to cause or contribute to the violation of narrative WQS. Accordingly, unless KDOW is able to provide an analysis which demonstrates that the discharges will not have the reasonable potential to cause or contribute to a WQS violation, the draft permit should be revised to include effluent limits that achieve the applicable narrative standards.

The permit should include a general condition requiring the operator of the coal mine to install, implement and properly operate and maintain controls as necessary to meet WQS. In addition, to address the pollutants which present a reasonable potential for causing or contributing to violations of WQS, the permit should be revised to include the specific water quality-based effluent limits as follows.

EPA recommends that KDOW take action to translate its narrative WQS into protective numeric effluent limits for TDS and SC. EPA acknowledges that the translation of the relevant narrative standards into numeric effluent limits can be complex and vary based on site-specific conditions that depend on the biologic community present in a system and the specific geology in an area. If the state determines that a numeric effluent limit is infeasible, 40 C.F.R. §122.44(k)(3) allows the use of best management practices (BMPs) to control or abate the discharge of pollutants. In such cases the state should document the basis for such a determination in the fact sheet and require the BMPs described in 4, below, with the BMP effectiveness monitoring provisions described in 5, below.

EPA anticipates that, as effluent and in-stream data are developed and analyzed, additional evidence will support development of numeric effluent limits for these pollutants. In addition, EPA expects to issue an aquatic life advisory for conductivity during the term of the permit. For this reason EPA also recommends that the permit include a specific reopener that would authorize the reopening of the permit to insert appropriate numeric limits as new information is made available.

40 C.F.R. §122.44(d)(1)(v) specifies that, when a discharge has reasonable potential to cause a violation of a narrative criterion within an applicable state WQS, "the permit must contai

effluent limits for whole effluent toxicity (WET)," unless the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit "that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards." Absent such a demonstration, the permit should be revised to include a WET limit. The permit should include conditions to ensure that chronic WET tests use *Ceriodaphnia dubia* and *Pimephales promelas* and acute WET tests use either *Daphnia magna* or *D. pulex* and *P. promelas.*

As noted above, the draft permit would authorize the discharge of coal mine effluent from a new facility into receiving waters that are already impaired for sedimentation/siltation, TDS, nutrient/eutrophication biological indicators, and organic enrichment biological indicators. Sediments and TDS are known to be present in coal mine effluent; however, the draft permit does not contain any effluent limit for TDS and an appropriate limit for sedimentation (TSS) to ensure that it does not authorize additional loadings that will contribute to the existing impairment. Therefore, the permit does not comply with Section 301(b)(1)(C) of the CWA or 40 C.F.R. §§122.4(i) and 122.44(d)(1)(i).

In order to ensure that the draft permit does not authorize discharges that will contribute to the existing impairment, the permit should be revised to include an effluent limitation that prohibits the discharge of sedimentation/siltation and TDS at levels above background loadings prior to operation of the facility. Alternatively, the permit should require the offsetting of any increased loadings of sedimentation/siltation and TDS with equal or greater reductions from other sources of sedimentation/siltation and TDS to the impaired segment.

Should the draft permit authorize an offset as its mechanism for ensuring that the facility does not contribute to the existing impairment, the permit provisions requiring the offset should meet the following criteria:

(1)  The permit should contain effluent limits for sedimentation/siltation and TDS at a level that ensures that any increased loading from the facility is at least fully offset by expected reductions.
(2)  The permit should make clear that the permittee is not entitled to rely on offsets until the actions proposed to achieve the reductions have been fully implemented; the actions must be completed within the relevant compliance period.
(3)  The permit should include monitoring requirements to measure loadings of sedimentation/siltation and TDS from the source at which offsets will be obtained, both before and after the offset creating actions are taken, and the permittee must be responsible under the permit for the success or failure of the offsets to achieve the necessary reductions during the relevant compliance period. It should be clear that a failure to achieve and document the required reductions during the compliance period will be a violation of the permit, and that the permittee will be required to take further action so that all required reductions are ultimately achieved.

**4. EPA recommends the permit include additional BMPs to control or abate the discharge of pollutants to address specific conductivity.**

40 C.F.R. §122.44(k)(4) authorizes the use of BMPs to control or abate the discharge of pollutants when the practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA. EPA has determined that the permit should be revised to include additional BMPs to ensure that the discharges do not cause or contribute to violations of narrative water quality standards, as required by the CWA.

4

To implement this recommendation, KDOW should include a condition requiring the permittee to submit, within 120 days of the effective date of the permit, a Water Quality Standards Protection Plan (WQSPP), specific to the proposed mining activity that would be authorized by the permit. The permit should require that the WQSPP include BMPs that will ensure that discharges from the permitted outfalls do not cause or contribute to violations of narrative water quality standards. The specific content of the WQSPP should be tailored to conditions at the proposed mine.

**5. EPA recommends the permit include additional effluent and in-stream monitoring.**

The permit should also be revised to require effluent and in-stream biological and chemical monitoring before (i.e., baseline), during and after active mining activities in order to evaluate the effectiveness of BMPs and any downstream water quality effects as the mining proceeds. Recommended monitoring requirements to allow assessment of the success (or failure) of BMPs in protecting water quality are enclosed as Enclosure A to this letter. The permit should further require, whenever monitoring indicates that in-stream SC levels are approaching 400 micro Siemens per centimeter (uS/cm) under critical low-flow conditions, that the permittee implement additional BMPs to further reduce pollutant discharges. When the 400 uS/cm SC trigger is met or exceeded, the permit should also require an increase of the monitoring frequency of in-stream and effluent chemicals identified in Enclosure A to four times per month at least five days apart. If in-stream SC levels rise to more than 500 uS/cm as a monthly average for two successive quarters, the permittee should be required to reduce the footprint of disturbed acreages of land and apply additional BMPs to the area contributing to the associated outfall where in-stream monitoring shows SC above 500 uS/cm, or alternatively, treat the effluent or cease further mining activities in areas contributing to the discharge from the outfall until the in-stream SC is below 500 uS/cm as a monthly average for two consecutive months.

In accordance with the MOA and 40 C.F.R. §123.44, EPA submits these comments and recommendations on the draft permit. EPA requests that KDOW revise the draft permit and fact sheet to address these comments and recommendations before issuing a final permit. We commit to working with you on an expedited basis to resolve the issues in a manner that ensures that a permit will be issued that is consistent with the requirements of the CWA. We look forward to working with you to achieve that objective. If you have any questions, please call me at (404) 562-9470 or have your staff contact Mark Nuhfer of the Municipal and Industrial NPDES Permit Section, at (404) 562-9390.

Sincerely,

James D. Giattina
Director
Water Protection Division

Enclosure A - Monitoring Plan

cc:   Ms. Stacey Billiter
      Premier Elkhorn Coal Company

5

## Enclosure A - MONITORING PLAN

The purpose of this Monitoring Plan is to set forth requirements for chemical and whole effluent toxicity (WET) effluent monitoring, and in-stream biological and chemical monitoring before (i.e., baseline), during and after active mining in order to evaluate BMP effectiveness and downstream water quality effects as mining proceeds.

### Effluent Monitoring

The permittee should perform effluent monitoring on at least one outfall (i.e, a "representative outfall") for each receiving water body, to be specified in the permit by the Permit Issuing Authority.

a. Parameters and Test Methods

The permittee should perform effluent monitoring, using at least one grab sample, for the parameters listed in Table 1, below. Environmental Protection Agency (EPA) Test Methods in 40 Code of Federal Regulations (C.F.R.) Part 136 should be used.

Table 1. List of Parameters To Be Sampled*

| Parameter | EPA Test Method |
|---|---|
| Stream Flow, cubic feet per second | |
| Specific conductance (SC), uS/cm | |
| Total Dissolved Solids (TDS), mg/l | 160.1 |
| Turbidity, Nephelometric Turbidity Units (NTU) | |
| Sulfates, mg/l | 300.0 |
| Chlorides, mg/l | 300.0 |
| Bicarbonate Alkalinity, mg/l | |
| Total Dissolved Antimony, ug/l | 200.8 |
| Total Dissolved Arsenic, ug/l | 200.8 |
| Total Dissolved Beryllium, ug/l | 200.8 |
| Total Dissolved Cadmium, ug/l | 200.8 |
| Total Dissolved Chromium, ug/l | 200.8 |
| Total Dissolved Copper, ug/l | 200.8 |
| Total Dissolved Iron, ug/l | 200.8 |
| Total Dissolved Lead, ug/l | 200.8 |
| Total Dissolved Manganese, ug/l | 200.8 |
| Total Dissolved Mercury, ug/l | 1631E or 245.7 |
| Total Dissolved Nickel, ug/l | 200.8 |
| Total Dissolved Selenium, ug/l | 200.8 |
| Total Dissolved Silver, ug/l | 200.8 |
| Total Dissolved Thallium, ug/L | 200.8 |
| Total Dissolved Zinc, ug/l | 200.8 |
| Hardness, mg/l (as $CaCO_3$) | SM 2340B |
| pH, Standard Units | |

| | |
|---|---|
| Total Calcium, ug/l | 200.7 |
| Total Magnesium, ug/l | 200.7 |
| Total Sodium, ug/l | |
| Total Potassium, ug/l | |

*Specific conductance is a measurement of the sum of various ionic components in water that have the ability to conduct electricity. Due to differences in site-specific geology, the specific individual constituents comprising a SC (or TDS) concentration can vary. Relatively high levels of SC/TDS may impair the ability for some organisms to osmoregulate. Based on best professional judgment, the analyses for these parameters will be useful in determining the specific ionic species that may be the major constituent(s) in the conductivity level at the site.

b. Sampling Location
The sampling should be conducted at each representative outfall, to be specified in the permit by the Permit Issuing Authority. Selected outfalls for each receiving water body should be representative of the effluent being discharged from the mine site and expected by the Permit Issuing Authority to have the greatest impact on downstream water quality (e.g., the mine site area which is currently undergoing the most mining disturbance, or the outfall with the largest discharge) based on data/information submitted in the permit application.

c. Sampling Frequency
The sampling frequency should be twice per month, at least five days apart, and the inches of precipitation measured at the sampling location should be recorded and reported as part of the sampling report. In the event that in-stream monitoring results (as described below) show in-stream conductivity levels above 400 uS/cm, the permittee is required to increase the monitoring frequency to four times per month, at least five days apart. Note that these sampling and reporting requirements are in addition to any water quality-based or technology-based effluent limits and/or permit conditions in the NPDES permit.

d. Reporting
All results should be reported to the Permit Issuing Authority as part of the discharge monitoring report (DMR).

**WET Monitoring**

Coal mine effluents are complex due to the combination of specific conductivity/TDS levels and metals. Depending on the duration of the discharge, EPA believes coal mine permits should require the permittee to perform either acute or chronic WET tests on the representative outfalls (as specified above under "Effluent Monitoring") for surface mine discharges and for all underground mine discharges (as applicable). The results of WET monitoring will be used to determine the effectiveness of the BMPs and compliance with whole effluent toxicity limits included in the permit.

The State should verify the duration of the discharge based on DMRs. (Although some coal mining outfalls discharge only during wet-weather events, EPA has reviewed DMRs with sampling results which indicate some sedimentation ponds discharge on a regular basis.)

In cases where DMRs (or other effluent monitoring data) indicate a sedimentation pond with any volume of discharge lasting more than four consecutive days, chronic WET tests should be performed using *Ceriodaphnia dubia* and *Pimephales promelas* and using a dilution series that includes 100% effluent and the in-stream waste concentration. The end points should be reported as the inhibition concentration that affects 25% of the test organisms compared to the control ($IC_{25}$). Sampling should be performed quarterly. Any WET failures during the permit term should result in a requirement to do a toxicity reduction evaluation. All results should be reported to the Permit Issuing Authority as part of the DMR.

In cases where the effluent discharge may be short in duration, it may be necessary to collect a high volume effluent sample and properly preserve it for use in the static-renewal test. Please refer to Section 8.5.4 on page 32 of EPA's document entitled, "Short-term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Freshwater Organisms" (October 2002). Alternative acute WET test organisms are either *Daphnia magna* or *D. pulex* and *Pimaphales promelas*. Any WET failure during the permit term should result in reopening the permit to include a requirement to do a toxicity reduction evaluation. All results should be reported to the Permit Issuing Authority as part of the DMR.

**In-stream Chemical Monitoring**

The permittee should perform in-stream monitoring for the parameters listed above in Table 1, in accordance with 40 C.F.R. §122.44(d)(1)(vi)(C)(3). EPA Test Methods in 40 C.F.R. Part 136 should be used.

a. <u>Sample Type</u>
Grab samples should be taken whenever possible.

b. <u>Sample Frequency</u>
The sampling frequency should be twice per month, at least five days apart, until reclamation is completed and the final bond is released. In the event that monitoring results show in-steam conductivity levels above 400 uS/cm as a monthly average, the permittee should increase the monitoring frequency to four times per month, at least five days apart. The amount of precipitation for the previous 24 hour period should be noted.

c. <u>Sampling Sites and Representative Outfalls</u>
Samples should be taken from the following locations:

3

      i. One sampling point located upstream of the sediment pond for each representative outfall, as specified above under "Effluent Monitoring."

      ii. One in-stream monitoring site located immediately below the toe of the sediment pond for each representative outfall, as specified above under "Effluent Monitoring."

      iii. One sampling point located *the further* of 200 meters (656 feet) downstream of for each representative outfall, as specified above under "Effluent Monitoring," or the furthest downstream location that is upstream of any intervening tributaries. The sampling point should be downstream of riprap and other disturbance and located within a relatively natural and intact riparian zone.

      iv. One sampling point located downstream of the first intervening tributary.

d. Conditions for Taking Samples
Samples should be collected during low- or base-flow conditions (e.g., not during, or within 24 hours after, a precipitation event).

e. New/Proposed Mines
For new/proposed mines, in-stream samples should be taken at a point upstream of the proposed outfall and at a point near a representative proposed outfall which is up-gradient of any other confluence/stream segment and below the proposed representative outfall.

f. Test Methods
All analyses should be done using EPA methods in 40 C.F.R. Part136; specific low-level methods for metals are indicated in Table 1.

g. Reporting
The permittee should submit the laboratory report showing the analytical results and the latitude and longitude of the sampling locations, to the NPDES Permit Issuing Authority as part of the DMR.

**In-stream Biological monitoring**

      The permittee should implement an annual benthic macroinvertebrate study plan during critical low-flow conditions using approved state protocols for benthic macroinvertebrate sampling. In the event that monitoring results show in-stream conductivity levels above 400 uS/cm, the permittee should implement more frequent benthic macroinvertebrate sampling in accordance with State-approved bioassessment protocols.

4

a. Concurrent in-stream monitoring
In-stream samples for SC, TDS, pH, temperature and dissolved oxygen should be taken at the same locations along with benthic samples.

b. Methods
The permittee should implement an annual benthic macroinvertebrate study plan using approved state-protocols for benthic macroinvertebrate sampling.

c. Sampling Locations
Use the same locations as shown above for in-stream chemical monitoring.

d. Sampling Time
Sampling should be avoided during periods of excessive precipitation and scouring floods. In cases where a large flow rate of the receiving water does not lend itself to a benthic assessment (i.e, only has non-wadeable sites), the permittee should perform a bioassessment using fish. Both fish and benthic macroinvertebrate studies should be performed for receiving waterbodies that are conducive to fish assessments. Results from sampling either of the two assemblages may be used to determine if the water body is impaired.

e. Reporting
The permittee should submit the results of the study to the Permit Issuing Authority no later than 30 days following the permitee's receipt of the final report.

## Scott, R. Bruce (EEC)

| | |
|---|---|
| **From:** | Gruzesky, Sandy (EEC) |
| **Sent:** | Monday, December 21, 2009 1:39 PM |
| **To:** | Scott, R. Bruce (EEC); Becker, Jory (EEC); Sowder, Larry (EEC) |
| **Cc:** | Goodmann, Peter (EEC) |
| **Subject:** | EPA Region 4 Comment Letters to Draft 402 Coal Permits in KY |
| **Attachments:** | KY0107654_EPA_lte_FCDC_122109.pdf; KY0107735_EPA_ltr_Elk Horn_122109.pdf; KY0108022_EPA_ltr_PremierElkHorn_122109.pdf; KY0108073_EPA_ltr_HarlanReclamation_122109.pdf; KY0108081_EPA_ltr_Xinergy_122109.pdf; KY0108103_EPA_ltr_BearBr_122109.pdf; KY0108111_EPA_ltr_FrasureCr_122109.pdf |

-----Original Message-----
From: Thomas.Chris@epamail.epa.gov [mailto:Thomas.Chris@epamail.epa.gov]
Sent: Monday, December 21, 2009 1:38 PM
To: Gruzesky, Sandy (EEC)
Cc: Goodmann, Peter (EEC); Giattina.Jim@epamail.epa.gov; Nuhfer.Mark@epamail.epa.gov; Meiburg.Stan@epamail.epa.gov
Subject: EPA Region 4 Comment Letters to Draft 402 Coal Permits in KY

Sandy

Attached below are response letters to 7 draft coal permits submitted to EPA for review per the MOA.  If you have any questions, please do not hesitate to contact Jim or myself.   Thanks!!

(See attached file: KY0107654_EPA_lte_FCDC_122109.pdf)
(See attached file: KY0107735_EPA_ltr_Elk Horn_122109.pdf)
(See attached file: KY0108022_EPA_ltr_PremierElkHorn_122109.pdf)
(See attached file: KY0108073_EPA_ltr_HarlanReclamation_122109.pdf)
(See attached file: KY0108081_EPA_ltr_Xinergy_122109.pdf)
(See attached file: KY0108103_EPA_ltr_BearBr_122109.pdf)
(See attached file: KY0108111_EPA_ltr_FrasureCr_122109.pdf)

Chris Thomas, Chief
Pollution Control and Implementation Branch
Water Protection Division
United States Environmental Protection Agency, Region 4

thomas.chris@epa.gov
Tel:  404.562.9459

CONFIDENTIALITY NOTICE

This message is intended exclusively for the individual(s) or entity(s) to which it is addressed.  This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure.  If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it.  If you have received this message in error, please notify the sender immediately by email and delete all copies of the message.

**Scott, R. Bruce (EEC)**

| | |
|---|---|
| From: | Syed.Sharmin@epamail.epa.gov |
| Sent: | Friday, November 05, 2010 4:36 PM |
| To: | Scott, R. Bruce (EEC) |
| Cc: | Boornazian.Linda@epamail.epa.gov; Laverty.Tom@epamail.epa.gov; Segall.Martha@epamail.epa.gov; Hoyt.Sarita@epamail.epa.gov; Jones-Coleman.Diane@epamail.epa.gov; Giattina.Jim@epamail.epa.gov; Meiburg.Stan@epamail.epa.gov; Thomas.Chris@epamail.epa.gov; Nuhfer.Mark@epamail.epa.gov; Schwartz.Paul@epamail.epa.gov |
| Subject: | KY Information Request |
| Attachments: | EPA objections 2000-2010.xlsx |

Bruce,

As promised, attached is a list of permits for which EPA has submitted specific objections from 2000-present. The spreadsheet you provided was used, with a couple of modifications for added clarification.

Thanks again for working with us on this request. Should you need anything further, please feel free to contact me or Region 4's Water Protection Division.

Sharmin Syed

Program Management, Analysis, and Data Team
State and Regional Branch
Water Permits Division, Mail Code 4203M

Office of Wastewater Management
US Environmental Protection Agency

Ph: (202) 564-3052
Fax: (202) 564-9544

EPA Specific Permit Objection 2000 to present

| Region | Name of Facility in receipt of specific EPA objection | NPDES permit number | Date of Specific Permit Objection | Date of Permit Issuance following specific permit objection | Permit was issued by State or EPA? | If EPA issued, when did permit & enforcement oversight revert back to state? | Comments |
|---|---|---|---|---|---|---|---|
| R1 | Hartford Quechee WWTF, VT | VT0100978 | 1/15/2010 | Not yet Issued | N/A | NA | |
| R1 | Beacon Falls, CT | CT0101061 | 6/18/2010 | Not yet Issued | N/A | NA | |
| R3 | Rehoboth Beach WWTP | DE0020028 | 10/10/2003 | 9/21/2005 | State | N/A | |
| R3 | Brockway Area SA | PA0028428 | 9/21/2009 | Not yet Issued | State | N/A | Draft permit |
| R3 | Berwick Area JSA | PA0023248 | 11/14/2000 | 8/29/2001 | State | N/A | |
| R3 | Mahanoy City MA | PA0070041 | 12/21/2000 | 8/21/2001 | State | N/A | |
| R3 | Chalfont-New Britain Twp | PA0025917 | 4/17/2001 | 1/10/2002 | State | N/A | |
| R3 | AK Steel Corp | PA0006343 | 11/21/2000 | 5/1/2002 | State | N/A | |
| R3 | City of Pittsburgh | PA0217611 | 12/11/2000 | 4/22/2004 | State | N/A | |
| R3 | Shenango Inc - Neville | PA0002437 | 2/14/2002 | 9/18/2002 | State | N/A | |
| R3 | Southwest Delaware County Mun | PA0027383 | 3/20/2002 | 3/11/2003 | State | N/A | |
| R3 | Wheatland Tube Co. - Sharon | PA0006378 | 11/23/2001 | 7/29/2003 | State | N/A | |
| R3 | North East Boro | PA0023043 | 4/6/2001 | 7/10/2003 | State | N/A | |
| R3 | New Freedom Boro Auth | PA0043257 | 12/12/2003 | 3/30/2004 | State | N/A | |
| R3 | Upper Moreland-Hatboro JSA | PA0025976 | 6/11/2001 | 9/26/2006 | State | N/A | |
| R3 | Orion Power Midwest - Chesw | PA0001627 | 2/14/2002 | 8/6/2007 | State | N/A | |
| R3 | Lemoyne Boro STP | PA0026441 | 4/25/2009 | 8/21/2009 | State | N/A | |
| R3 | A&G Coal Co.-Ison Rock Ridge | VA1003841 | 12/10/2009 | Not yet Issued | State | N/A | Draft permit |
| R3 | Tenaska Virginia Generating Station | VA0090905 | 2/25/2002 | 5/20/2002 | State | N/A | |
| R3 | Greif Brothers | VA0006408 | 9/25/2001 | 6/28/2002 | State | N/A | |
| R3 | Argus Energy - Copley Trace No. 2 | WV1020013 | 5/27/2010 | Not yet Issued | N/A | N/A | Pending |
| R3 | Alex Energy - Kayford No. 5 | WV1022113 | 12/21/2009 | see Comments | N/A | N/A | Withdrawn |
| R3 | Catenary Coal - Samples Mine | WV1014684 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Coal-Mac DBA Phoenix Coal | WV0068764 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Mingo Logan Coal - Wolfpen/2-C | WV0005690 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Southern WV Resources - Tug | WV0044172 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Consolidation Coal Co. | WV0050598 | 2/9/2010 | Not yet Issued | N/A | N/A | Pending |
| R3 | Mingo Logan Coal - Ancillary | WV0066737 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Jacks Branch Coal Co. | WV0093929 | 10/8/2010 | Not yet Issued | N/A | N/A | Pending |
| R3 | Mingo Logan Coal - Ardrossan | WV0096369 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Catenary Coal - Left Fork | WV0096962 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Apogee Coal - Ruffner Mine | WV0099520 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Mingo Logan Coal - Left Fork 2 | WV1004956 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Maple Coal - Sycamore, N & S | WV1009311 | 8/10/2010 | Not yet Issued | N/A | N/A | Pending |
| R3 | ICG Eastern - Evergreen Mining | WV0094889 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Mingo Logan Coal - Monclo | WV0065889 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | Mingo Logan Coal - Hobet Gut | WV1011120 | 5/27/2010 | see Comments | N/A | N/A | Application for Modification Denied |
| R3 | * Hobet Mining - Spruce No. 1 | WV1017021 | 7/29/2002 | 8/7/2007 | State | N/A | * Objection withdrawn, 12/3/2002, renewed in 2007 |
| R3 | Weirton Steel Corp | WV0003336 | 12/2/2002 | 3/4/2003 | State | N/A | |

| Region | Name of Facility in receipt of specific EPA objection | NPDES permit number | Date of Specific Permit Objection | Date of Permit Issuance following specific permit objection | Permit was Issued by State or EPA? | If EPA issued, when did permit & enforcement oversight revert back to state? | Comments |
|---|---|---|---|---|---|---|---|
| | | | | EPA Specific Permit Objection - CY2000 to present | | | |
| R4 | Timber Energy (Telogia Power) | FL0039951 | 4/15/2003 | 1/28/2010 | State | N/A | |
| R4 | Rayonier Inc | FL0000701 | 9/30/2003 | 12/1/2004 | State | N/A | |
| R4 | Premier Chemical | FL0002607 | 7/28/2003 | 6/10/2008 | State | N/A | |
| R4 | Laurel Mountain Resources | KY0108715 | 9/16/2010 | Not yet issued | N/A | N/A | |
| R4 | Labco LLC | KY0105953 | 9/28/2010 | Not yet issued | N/A | N/A | |
| R4 | Matt/Co Inc | KY0107212 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | Clintwood Elkhorn Coal Co. | KY0107310 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | Enterprise Mining Co LLC | KY0107808 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | PIA Co Inc | KY0107603 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | Nally & Hamilton Enterprises | KY0042765 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | Sandlick Coal Company | KY0108561 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | Sidney Coal Company | KY0107085 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | Matt/Co Inc | KY0107778 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | Matt/Co Inc | KY0107760 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R4 | CNA Holdings | NC0004952 | 11/24/2008 | 4/24/2009 | State | N/A | |
| R4 | Blue Ridge Paper | NC0000272 | 2/22/2010 | 5/26/2010 | State | N/A | |
| R4 | AL Phase II MS4 General Permit | ALR040000 | 8/9/2010 | Not yet issued | N/A | N/A | |
| R4 | LCWSC/Clinton- Joanna WWTP | SC0037974 | 8/18/2004 | 12/1/2005 | EPA | 6/1/2010 | |
| R4 | City of Lancaster/Catawba River WWTP | SC0046892 | 8/18/2004 | 9/30/2005 | EPA | Pending | Administratively continued, State in process of renewing. |
| R4 | Town of Moncks Corner WWTP | SC0021598 | 8/18/2004 | 3/31/2006 | EPA | N/A | |
| R4 | Town of Batesburg-Leesville WWTP | SC0024465 | 8/18/2004 | 12/1/2005 | EPA | 4/1/2010 | |
| R4 | Michelin North America/Sandy Springs | SC0026701 | 8/18/2004 | 12/1/2005 | EPA | 11/1/2008 | |
| R4 | ECW&SA/Johnston #1 Plant | SC0025691 | 8/18/2004 | 5/1/2006 | EPA | 3/1/2010 | |
| R4 | City of Columbia Metro WWTP | SC0020940 | 8/25/2004 | 9/1/2009 | EPA | 11/1/2010 | |
| R4 | Greenwood Metro District/Wilson Creek WWTP | SC0021709 | 8/25/2004 | 2/1/2006 | EPA | 6/1/2009 | |
| R4 | Laurens CPW/City of Laurens | SC0020702 | 7/20/2004 | 2/1/2006 | EPA | 1/1/2010 | |
| R4 | Timmonsville WWTP | SC0025356 | 8/26/2004 | 8/31/2006 | EPA | N/A | |
| R4 | Lexington/Coventry Woods WWTP | SC0026735 | 9/1/2004 | 5/1/2006 | EPA | 2/1/2010 | |
| R4 | Alpine Utilities WWTP | SC0029483 | 9/3/2004 | 12/1/2005 | EPA | 7/1/2010 | |
| R4 | WCRSA/Grove Creek WWTP | SC0024317 | 9/13/2004 | 5/31/2006 | EPA | N/A | |
| R4 | Town of Ninety Six WWTP | SC0036048 | 9/22/2004 | 6/22/2006 | EPA | N/A | |
| R4 | Ware Shoals/Dairy Street WWTP | SC0020214 | 9/22/2004 | 2/2/2006 | EPA | N/A | |
| R4 | Town of Wagener WWTP | SC0026204 | 9/29/2004 | 2/1/2006 | EPA | 12/1/2C10 | |
| R4 | Honeywell Nylon, LLC/Columbia Site | SC0003557 | 8/18/2004 | 9/25/2008 | EPA | N/A | |
| R4 | Milliken Abbeville Plant | SC0000353 | 8/18/2004 | 3/1/2006 | EPA | 6/1/2010 | |
| R4 | SCE&G/Cope Station | SC0045772 | 9/22/2004 | 8/1/2006 | EPA | 11/1/2009 | |
| R4 | Easley/Middle Branch WWTP | SC0039853 | 9/29/2004 | 7/28/2006 | EPA | N/A | |
| R4 | HSL, Inc. | SC0001155 | 7/23/2004 | see Comments | EPA | N/A | Facility Closed. |
| R4 | Velcorex, Inc. | SC0043419 | 8/18/2004 | 11/1/2006 | State | 11/1/2006 | |

EPA Specific Permit Objection - CY2000 to present

| R e g i o n | Name of Facility in receipt of specific EPA objection | NPDES permit number | Date of Specific Permit Objection | Date of Permit Issuance following specific permit objection | Permit was issued by State or EPA? | If EPA issued, when did permit & enforcement oversight revert back to state? | Comments |
|---|---|---|---|---|---|---|---|
| R5 | Isabella County Landfill | MI0054003 | 6/4/2004 | 5/17/2005 | EPA (Tribal) | N/A | |
| R5 | TPI Petroleum, Inc. | MI0056537 | 11/5/2001 | 9/3/2002 | EPA | N/A | Discharge terminated, permit inactive since 11/9/06 |
| R5 | Dayton Power and Light | OH0004316 | 9/29/2010 | Not yet issued | N/A | N/A | |
| R5 | Wausau-Mosinee Paper Corporation | WI0003671 | 7/8/2005 | 9/7/2005 | State | N/A | |
| R5 | US Steel Gary Works | IN0000281 | 10/16/2007 | 1/22/2010 | State | N/A | |
| R5 | General Permit Indv. Sewage Treatment Systems | ILG4 | 11/21/2007 | Not yet issued | N/A | N/A | EPA is preparing to federalize this permit |
| R6 | Barling | AR0048801 | 6/10/2003 | 10/31/2003 | State | N/A | |
| R6 | Benton Packing Company | AR0049506 | 06/20/03 | 9/30/2003 | State | N/A | |
| R6 | Bentonville | AR0022403 | 06/20/03 | 11/30/2003 | State | N/A | |
| R6 | Clarksville | AR0022187 | 06/20/03 | 11/30/2003 | State | N/A | |
| R6 | Eastman Chemical Company | AR0035386 | 06/20/03 | 10/31/2003 | State | N/A | |
| R6 | El Dorado Chemical | AR0000752 | 2/3/2006 | 2/28/2007 | State | N/A | |
| R6 | El Dorado Joint Pipeline | AR0050296 | 02/03/06 | 2/28/2007 | State | N/A | |
| R6 | International Paper - Pine Bluff | AR0001970 | 11/15/04 | 05/31/05 | State | N/A | |
| R6 | Jonesboro - West Plant | AR0037907 | 09/10/04 | 01/31/05 | State | N/A | |
| R6 | Maumelle SID #500 | AR0033626 | 06/10/03 | 09/30/03 | State | N/A | |
| R6 | Osage Basin | AR0050024 | 4/9/2004 | 12/31/2004 | State | N/A | |
| R6 | NACA | AR0050024 | 1/16/2009 | 10/7/2009 | State | N/A | |
| R6 | Russellville | AR0021768 | 07/28/04 | 02/28/05 | State | N/A | |
| R6 | Sand and Gravel and Rock Quarry Facilities | ARG5000000 | 03/12/04 | 05/31/05 | State | N/A | |
| R6 | Small MS4 | ARR040000 | 09/25/03 | 12/31/03 | State | N/A | |
| R6 | Springdale | AR0022063 | 10/30/03 | 02/29/04 | State | N/A | |
| R6 | Shell Oil Company* | TX0004863 | 4/30/2004 | 7/29/2004 | State | N/A | |
| R6 | City of Seguin | TX0022365 | 3/13/2002 | 3/3/2005 | State | N/A | |
| R6 | K-3 Resources (dba Biosolids) | TXL005009 | 7/26/2002 | 9/10/2002 | State | N/A | |
| R6 | Petroleum Bulk Storage* | TXG340000 | 8/23/2004 | 4/23/2007 | State | N/A | |
| R6 | City of Beeville* | TX0113859 | 4/16/2002 | 3/1/2005 | State | N/A | |
| R6 | Temple Inland* | TX0102156 | 9/9/2003 | 8/4/2005 | State | N/A | |
| R6 | Harris County MUD* | TX0100161 | 4/16/2002 | 10/29/2004 | State | N/A | |
| R6 | City of Henderson | TX0091910 | 10/1/2002 | 9/27/2004 | State | N/A | |
| R6 | North Mission Glen MUD* | TX0087271 | 10/15/2002 | 9/30/2005 | State | N/A | |
| R6 | Cibolo Creek Municipal Authority | TX0077232 | 11/22/2002 | 4/25/2005 | State | N/A | |
| R6 | City of Copperas Cove* | TX0069850 | 3/14/2002 | 7/23/2002 | State | N/A | |
| R6 | City of Seagoville* | TX0054526 | 3/27/2002 | 5/29/2002 | State | N/A | |
| R6 | City of Houston | TX0034886 | 3/6/2002 | 12/29/2005 | State | N/A | |
| R6 | City of Houston* | TX0026875 | 8/1/2002 | 6/24/2003 | State | N/A | |
| R6 | City of Fort Worth* | TX0047295 | 12/21/2001 | 11/28/2006 | State | N/A | |
| R6 | City of Corpus Christi* | TX0047082 | 1/7/2002 | 11/12/2002 | State | N/A | |
| R6 | City of Austin* | TX0046981 | 1/9/2002 | 5/31/2005 | State | N/A | |

| Region | Name of Facility in receipt of specific EPA objection | NPDES permit number | Date of Specific Permit Objection | Date of Permit issuance following specific permit objection | Permit was issued by State or EPA? | If EPA issued, when did permit & enforcement oversight revert back to state? | Comments |
|---|---|---|---|---|---|---|---|
| | | | EPA Specific Permit Objection - CY2000 to present | | | | |
| R6 | ARKLA. | LA0122432 | 6/22/2007 | Not yet Issued | EPA | N/A | EPA is preparing to federalize this permit |
| R6 | City of Garland | TXS001001 | 3/10/2005 | 12/22/2005 | State | N/A | |
| R6 | City of San Antonio TXDOT, SAWS | TXS001901 | 10/17/2003 | 9/28/2007 | State | N/A | |
| R6 | City of Bridge City | TX0025500 | 2/7/2002 | Not yet Issued | N/A | N/A | Expired as of 3/1/2001 |
| R6 | City of Midlothian* | TX0025011 | 4/2/2002 | 11/12/2002 | State | N/A | |
| R6 | City of Port Lavaca* | TX0047562 | 10/21/02 | 12/2/2002 | State | N/A | |
| R6 | Steely Lumber* | TX0123421 | 9/2/2003 | 6/26/2007 | State | N/A | |
| R6 | City of Longview* | TX0022217 | 10/21/2001 | 5/7/2002 | State | N/A | |
| R6 | San Jacinto River Authority | TX0054186 | 1/6/2004 | 4/12/2006 | EPA | N/A | In Appeal. |
| R7 | Waterloo, IA | IA0042650 | 11/1/2009 | 3/1/2010 | State | N/A | |
| R7 | Johnson County, KS (JoCo) - Nelson | KS0055492 | 5/19/2006 | Not yet issued | N/A | N/A | Administratively Continued |
| R7 | JoCo - Douglas Smith | KS0119601 | 11/2/2009 | Not yet issued | N/A | N/A | Administratively Continued |
| R7 | JoCo - Tomahawk | KS0055484 | 11/2/2009 | Not yet issued | N/A | N/A | Administratively Continued |
| R7 | St Charles, MO | MO0058351 | 5/1/2008 | 2/13/2009 | State | N/A | |
| R8 | Pumpkin Creek Watershed General Permit for CBM | WYG280000 | 11/13/2009 | Not yet Issued | N/A | NA | Pending |
| R8 | Willow Creek Watershed General Permit for CBM | WYG290000 | 11/13/2009 | Not yet Issued | N/A | NA | Pending |
| R10 | SHORELINE SANITARY DISTRICT TREATMENT FACIITY | OR0022550 | 3/9/2009 | 11/19/2009 | State | N/A | |
| R10 | CITY OF CHILOQUIN WWTP | OR0020320 | 5/1/2009 | Not yet Issued | N/A | N/A | |
| R10 | CITY OF COBURG WASTEWATER RECLAMATION FACILITY | OR0044628 | 3/20/2009 | 7/20/2009 | State | N/A | |
| R10 | CITY OF PORTLAND BUREAU OF ENVIRONMENTAL SERVICE FA | OR0026905 | 4/20/2006 | Not yet issued | N/A | N/A | |
| R10 | CITY OF AUMSVILLE SEWAGE TREATMENT PLANT | OR0022721 | 6/1/2009 | 2/8/2010 | State | N/A | |
| R10 | CITY OF TILLAMOOK WWTP | OR0020664 | 3/2/2009 | 11/23/2009 | State | N/A | |
| R10 | SUNDOWN SANITARY DISTRICT TREATMENT FACILITY | OR0027219 | 3/2/2009 | 11/16/2009 | State | N/A | |
| R10 | USDA\US FOREST SERVICE COLUMBIA RIVER GORGE NATIONA | OR0040410 | 3/2/2009 | 11/19/2009 | State | N/A | |
| R10 | WESTPORT SEWER SERVICE DISTRICT TREATMENT PLANT | OR0031496 | 3/2/2009 | Not yet Issued | N/A | N/A | |
| R10 | CITY OF WARRENTON TREATMENT FACILITY | OR0020877 | 3/2/2009 | Not yet issued | N/A | N/A | |
| R10 | CITY OF SPOKANE RIVERSIDE PARK WATER RECLAMATION FAC | WA0024473 | 12/3/2007 | Not yet Issued | N/A | N/A | |
| R10 | LIBERTY LAKE SEWER AND WATER DISTRICT | WA0045144 | 12/3/2007 | Not yet Issued | N/A | N/A | |
| R10 | INLAND EMPIRE PAPER COMPANY | WA0000892 | 12/3/207 | Not yet Issued | N/A | N/A | |
| R10 | KAISER ALUMINUM FABRICATED PRODUCTS LLC | WA0000892 | 12/3/2007 | Not yet Issued | N/A | N/A | |
| R10 | CITY OF PORTLAND COLUMBIA BOULEVARD WWTP | OR0026905 | 4/6/2006 | Not yet Issued | N/A | N/A | |

# Scott, R. Bruce (EEC)

| | |
|---|---|
| **From:** | Scott, R. Bruce (EEC) |
| **Sent:** | Monday, January 10, 2011 6:05 PM |
| **To:** | 'Meiburg.Stan@epamail.epa.gov'; 'Giattina.jim@epamail.epa.gov'; 'Thomas.Chris@epamail.epa.gov'; 'KeyesFleming.Gwendolyn@epamail.epa.gov' |
| **Cc:** | Peters, Len (EEC Cabinet Secretary); Haines, Mike (EEC); Higgins, Wendy (EEC) |
| **Subject:** | EPA-KY draft discussions issues list for CWA 402 coal mine permitting |

**ATTORNEY-CLIENT CONFIDENTIAL DRAFT**

Gwen / Stan / Jim / Chris,

Please find attached a spreadsheet that we prepared that outlines the major issues associated with the CWA 402 permitting of coal mining operations in Kentucky. This document has not been shared with other staff within the agency.

This is not an all-inclusive list of every issue or every option, but does represent the major categories of options available. For example, the use of the KY General Permit is not listed since that is already an approved option that KY has authority to use where appropriate. I don't discuss mixing zones, variances, and other tools that may be available in a given case specific situation.

As presented, the major issues are identified under the "Major Issue Item" column.

Reading across the column headers, the "KY Proposed Draft Permit Requirement" lists the permit requirement as KY proposed to EPA prior to EPA specific objection, objection, or comment.

The "Potential Options" column lists the various options that exist for that specific "Major Issue Item". For example, for the major issue item "Narrative Water Quality Standard for Conductivity/TDS", there are three identified existing "KY Proposed Draft Permit Requirement" items, and four "Potential Options" associated with that Issue Item.

The "KY Position" and "EPA Position" is then listed in the subsequent columns as KY understands it. I recognize that EPA may have a different perspective on the EPA Position as presented.

Finally, the document is presented in such a manner that the "major issue items" represent a suite of options available that may constitute compliance with KY and EPA regulatory requirements. For example, it may be that an option under Major Issue Item 2 is not necessary in addition to option(s) under Major Issue Items 3, 4, or 5, and vice versa, or some other combination. I would anticipate that some combination of options will be sufficient, but we do not anticipate or expect that every major issue would necessarily have to be included in a given CWA 402 permit for a given coal mining operation, no differently than any other CWA 402 permit that is issued.

As you are aware, KY provided a variety of draft permit approaches to EPA in response to the first 11 specific objection letters. It is likely that the next 10 KY revised drafts will have a similar approach. All, some, or none of those may be viewed by EPA to be acceptable. Obviously KY believes that a case can be made for each to be approved or KY would not have proposed the drafts.

The desired outcome of this effort would be that: 1) there is one consistent way – a template – by which to craft all future CWA 402 permits for coal mining operations in KY, and/or 2) there may be multiple combinations of options that satisfy regulatory requirements. There are advantages to each approach. It may be preferred to have a template that is common to many, but that is not necessarily mandatory.

If you have any questions, please let me know.

Thanks,
Bruce

**Exhibit D**

## Kentucky - EPA Region IV Confidential Draft Issue Discussion regarding CWA 402 permitting of KY coal mining operations (January 10, 2011)

| No. | Major Issue Item | KY Proposed Draft Permit Requirement | Potential Options | KY Position | EPA Position | KY-EPA Agreed Upon Position |
|---|---|---|---|---|---|---|
| 1 | Reasonable Potential Analysis (RPA) | a) KY did not presume RP of the discharge and proposed to have issued IP's collect information to perform RPA in accordance with 40 CFR 122.44, EPA TSD, and KY's RPA procedures. | i) No change | KY's initial proposed permits are consistent with procedures used previously by KY and other delegated states and approved by EPA. EPA has previously approved coal mining permits using this approach prior to April 1, 2010. | EPA did not object to KY proposed draft permits prior to April 1 2010 using this approach. Post April 1, 2010, EPA began to object to certain surface mining permits using this proposed approach. | |
| | | | ii) KY modify it's procedures in response to EPA comments to consider RP and require samples as a part of the permit application prior to permit drafting and impose permit requirements as appropriate | KY is willing to modify it's approach to resolve EPA's concerns and perform an RPA prior to permit drafting. Collection of samples (up to 5) representative of the proposed discharge remain a logistical challenge and concern however. | | |
| 2 | Narrative Water Quality Standard for Conductivity/TDS | a) Permit requirement: 401 KAR 10:031, Section 4(1)(f): Total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected. | i) No change | Ky proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | b) Monitor for conductivity of effluent and instream at selected locations | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this permit requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | c) No numeric effluent limit for conductivity or TDS | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | | ii) Make a numeric interpretation of the KY narrative water quality standard for conductivity and impose a numeric effluent limit for conductivity | Neither KY or USEPA has a water quality standard for conductivity. Absent KY adopting a water quality standard, KY is not in a position to impose a numeric limitation for the narrative water quality standard for conductivity. | | |

DRAFT ATTORNEY CLIENT CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| 3 | Instream Biological Monitoring | a) KY proposed in draft IP's for coal mining operations to perform instream biological analysis at various locations for purposes of determining compliance with the KY narrative water quality standard for conductivity/TDS as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | Ky proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA has not objected to this permit condition. EPA's position if the permit requirement were removed is undetermined. |
| 4 | Whole Effluent Toxicity (WET) testing | a) KY proposed in draft IP's for coal mining operations to perform acute WET testing of the effluent. If the testing indicated RPA, then acute WET limits would be imposed as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | Ky proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA has not objected to this permit condition. EPA's position if the permit requirement was removed is undetermined. |
| | | | ii) Presume RP prior to permit issuance and impose an acute WET limit | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may or may not be used in combination with other options. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | iii) Presume RP prior to permit issuance and impose an acute WET limit and chronic WET limit to be required as appropriate depending upon duration of discharge | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may or may not be used in combination with other options. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| 5 | Best Management Practices Plans (BMP) | a) KY proposed in draft IP's for coal mining operations to develop a BMP plan as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | ii) Modify the BMP plan to include a biological "trigger" to require evaluation of other operational methods. | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may be used in combination with other options. The "trigger" would be the existing KY narrative water quality standard and would be initiated based on the results of the instream biological monitoring results. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | iii) Modify the BMP plan to include a numeric "trigger" to require evaluation of other operational methods. | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may be used in combination with other options. However, KY does not believe that in the absence of a water quality standard for conductivity that it is in position to impose a numeric trigger in a BMP plan. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| 6 | Compliance Schedule(s) | a) KY has not proposed in a draft permit | i) No change | KY is willing to discuss options with the use of a compliance schedule | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | ii) Use a compliance schedule in conjunction with one or more of the permit requirements | KY is willing to discuss options with the use of a compliance schedule | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is |

DRAFT

ATTORNEY CLIENT CONFIDENTIAL

# Scott, R. Bruce (EEC)

| | |
|---|---|
| **From:** | Scott, R. Bruce (EEC) |
| **Sent:** | Wednesday, January 12, 2011 9:57 AM |
| **To:** | 'c123thomas@comcast.net'; ckgiattina@gmail.com; 'meiburg@bellsouth.net'; 'gkeyesflem@gmail.com'; 'Meiburg.Stan@epamail.epa.gov'; 'Giattina.jim@epamail.epa.gov'; 'Thomas.Chris@epamail.epa.gov'; 'KeyesFleming.Gwendolyn@epamail.epa.gov' |
| **Cc:** | Peters, Len (EEC Cabinet Secretary); Haines, Mike (EEC) |
| **Subject:** | EPA-KY draft discussions issues list for CWA 402 coal mine permitting |

**CONFIDENTIAL – ATTORNEY-CLIENT DRAFT**

Gwen / Stan / Jim / Chris,

I assume the EPA offices are still closed and your server access is still down, so I am sending this to your home email addresses in addition to your work email.

As a followup to our discussion yesterday, I have provided the attached spreadsheet which has two tabs containing the two primary options that we discussed yesterday. I have modified the spreadsheet cells and the two tabs contained therein with a yellow highlight to identify the key options that represent the major permit requirements under each of those respective major options that we discussed. The third tab, "Partial List" represents the document from which the discussion was conducted.

1. **Option 1** tab would represent KY's primary template for the permitting of coal mining operations under the CWA 402 program. This would involve an approach using:
   a. An RPA up front in the drafting of the permit, and
   b. Imposition of a combination of WET, instream biological analysis, narrative standard, and adaptive BMP with biological trigger for purposes of implementing the narrative water quality standard for conductivity
2. **Option 2** tab would represent an option that a coal mining operation might accept of their own choosing in lieu of Option 1. This would involve:
   a. RPA up front in the drafting of the permit, and
   b. Imposition of a numeric interpretation of the narrative water quality standard directly as a permit limit for conductivity (or other appropriate chemical specific parameter if available and sufficient, such as sulfate) along with the possibility of a compliance schedule for purposes of implementing the narrative water quality standard for conductivity. There would also be a standard BMP plan requirement. This could be done at the applicant's request in lieu of WET, instream biological analysis, the narrative standard, and a BMP plan with a biological trigger built in.

I recognize that there are details to flesh out within the major issues themselves, but we firmly believe that both of these options fully meet the KY and EPA regulatory requirements under the CWA 402 program, and we are hopeful that EPA Region 4 would agree with this approach.

Please keep in mind that we have not formally discussed this with other agency staff and stakeholders, so that will need to occur concurrent with your decision-making process in hopes of bringing this to a quick and effective resolution. We are encouraged that an agreement may be successfully achieved in the very near future.

If you have any questions, please let me know.

Thanks,
Bruce

EPA KY Draft Issue
  Discusssion...

1

# Kentucky - EPA Region IV Confidential Draft Issue Discussion regarding CWA 402 permitting of KY coal mining operations (January 10, 2011)

| No. | Major Issue Item | KY Proposed Draft Permit Requirement | Potential Options | KY Position | EPA Position | KY-EPA Agreed Upon Position |
|---|---|---|---|---|---|---|
| 1 | Reasonable Potential Analysis (RPA) | a) KY did not presume RP of the discharge and proposed to have issued IP's collect information to perform RPA in accordance with 40 CFR 122.44, EPA TSD, and KY's RPA procedures. | i) No change | KY's initial proposed permits are consistent with procedures used previously by KY and other delegated states and approved by EPA. EPA has previously approved coal mining permits using this approach prior to April 1, 2010. | EPA did not object to KY proposed draft permits prior to April 1, 2010 using this approach. Post April 1, 2010, EPA began to object to certain surface mining permits using this proposed approach. | |
| | | | ii) KY modify it's procedures in response to EPA comments to consider RP and require samples as a part of the permit application prior to permit drafting and impose permit requirements as appropriate | KY is willing to modify it's approach to resolve EPA's concerns and perform an RPA prior to permit drafting. Collection of samples (up to 5) representative of the proposed discharge remain a logistical challenge and concern however. | | |
| 2 | Narrative Water Quality Standard for Conductivity/TDS | a) Permit requirement: 401 KAR 10:031, Section 4(1)(f): Total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected. | i) No change | KY proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon. | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | b) Monitor for conductivity of effluent and instream at selected locations | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this permit requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | c) No numeric effluent limit for conductivity or TDS | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | | ii) Make a numeric interpretation of the KY narrative water quality standard for conductivity and impose a numeric effluent limit for conductivity | Neither KY or USEPA has a water quality standard for conductivity. Absent KY adopting a water quality standard, KY is not in a position to impose a numeric limitation for the narrative water quality standard for conductivity. | | |

DRAFT

ATTORNEY CLIENT CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 3 | Instream Biological Monitoring | a) KY proposed in draft IP's for coal mining operations to perform instream biological analysis at various locations for purposes of determining compliance with the KY narrative water quality standard for conductivity/TDS as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | Ky proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA has not objected to this permit condition. EPA's position if the permit requirement were removed is undetermined. |
| 4 | Whole Effluent Toxicity (WET) testing | a) KY proposed in draft IP's for coal mining operations to perform acute WET testing of the effluent. If the testing indicated RPA, then acute WET limits would be imposed as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | Ky proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA has not objected to this permit condition. EPA's position if the permit requirement was removed is undetermined. |
| | | | ii) Presume RP prior to permit issuance and impose an acute WET limit | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may or may not be used in combination with other options. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | iii) Presume RP prior to permit issuance and impose an acute WET and chronic WET limit to be required as appropriate depending upon duration of discharge | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may or may not be used in combination with other options. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| 5 | Best Management Practices Plans (BMP) | a) KY proposed in draft IP's for coal mining operations to develop a BMP plan as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | ii) Modify the BMP plan to include a biological "trigger" to require evaluation of other operational methods. | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may be used in combination with other options. The "trigger" would be the existing KY narrative water quality standard and would be initiated based on the results of the instream biological monitoring results. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | iii) Modify the BMP plan to include a numeric "trigger" to require evaluation of other operational methods. | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may be used in combination with other options. However, KY does not believe that in the absence of a water quality standard for conductivity that it is in position to impose a numeric trigger in a BMP plan. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| 6 | Compliance Schedule(s) | a) KY has not proposed in a draft permit | i) No change | KY is willing to discuss options with the use of a compliance schedule | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | ii) Use a compliance schedule in conjunction with one or more of the permit requirements discussed previously | KY is willing to discuss options with the use of a compliance schedule | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |

DRAFT ATTORNEY CLIENT CONFIDENTIAL

## Kentucky - EPA Region IV Confidential Draft Issue Discussion regarding CWA 402 permitting of KY coal mining operations (January 10, 2011)

| No. | Major Issue Item | KY Proposed Draft Permit Requirement | Potential Options | KY Position | EPA Position | KY-EPA Agreed Upon Position |
|---|---|---|---|---|---|---|
| 1 | Reasonable Potential Analysis (RPA) | a) KY did not presume RP of the discharge and proposed to have issued IP's collect information to perform RPA in accordance with 40 CFR 122.44, EPA TSD, and KY's RPA procedures. | i) No change | KY's initial proposed permits are consistent with procedures used previously by KY and other delegated states and approved by EPA. EPA has previously approved coal mining permits using this approach prior to April 1, 2010. | EPA did not object to KY proposed draft permits prior to April 1, 2010 using this approach. Post April 1, 2010, EPA began to object to certain surface mining permits using this proposed approach. | |
| | | | ii) KY modify it's procedures in response to EPA comments to consider RP and require samples as a part of the permit application prior to permit drafting and impose permit requirements as appropriate | KY is willing to modify it's approach to resolve EPA's concerns and perform an RPA prior to permit drafting. Collection of samples (up to 5) representative of the proposed discharge remain a logistical challenge and concern however. | | |
| 2 | Narrative Water Quality Standard for Conductivity/TDS | a) Permit requirement: 401 KAR 10:031, Section 4(1)(f): Total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected. | i) No change | Ky proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | b) Monitor for conductivity of effluent and instream at selected locations | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this permit requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | c) No numeric effluent limit for conductivity or TDS | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA previously agreed to this requirement during meetings in Knoxville in March 2010 and subsequently did not object to permits with this requirement. It is unclear as to whether EPA has actually made a specific objection to any KY draft permits with respect to the narrative water quality standard for conductivity or TDS since April 1, 2010 upon reading EPA's specific objection letters and EPA's legal responses in the various legal actions regarding coal mining since April 1, 2010. | |
| | | | ii) Make a numeric interpretation of the KY narrative water quality standard for conductivity and impose a numeric effluent limit for conductivity | Neither KY or USEPA has a water quality standard for conductivity. Absent KY adopting a water quality standard, KY is not in a position to impose a numeric limitation for the narrative water quality standard for conductivity. | | |

DRAFT ATTORNEY CLIENT CONFIDENTIAL

| # | | | | |
|---|---|---|---|---|
| 3 | Instream Biological Monitoring | a) KY proposed in draft IP's for coal mining operations to perform instream biological analysis at various locations for purposes of determining compliance with the KY narrative water quality standard for conductivity/TDS as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | KY proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA has not objected to this permit condition. EPA's position if the permit requirement were removed is undetermined. |
| 4 | Whole Effluent Toxicity (WET) testing | a) KY proposed in draft IP's for coal mining operations to perform acute WET testing of the effluent. If the testing indicated RPA, then acute WET limits would be imposed as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | Ky proposes to maintain this permit requirement unless some alternative approach for determining compliance with the narrative water quality standard is agreed upon | EPA has not objected to this permit condition. EPA's position if the permit requirement was removed is undetermined. |
| | | | ii) Presume RP prior to permit issuance and impose an acute WET limit | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may or may not be used in combination with other options. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | iii) Presume RP prior to permit issuance and impose an acute WET and chronic WET limit to be required as appropriate depending upon duration of discharge | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may or may not be used in combination with other options. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| 5 | Best Management Practices Plans (BMP) | a) KY proposed in draft IP's for coal mining operations to develop a BMP plan as per 40 CFR 122.44, the EPA TSD, and KY's RPA procedures. | i) No change | KY proposes to maintain this permit requirement as stated in the KPDES permit | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | ii) Modify the BMP plan to include a biological "trigger" to require evaluation of other operational methods. | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may be used in combination with other options. The "trigger" would be the existing KY narrative water quality standard and would be initiated based on the results of the instream biological monitoring results. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | iii) Modify the BMP plan to include a numeric "trigger" to require evaluation of other operational methods. | KY is willing to discuss this approach as an option for determining compliance with the narrative water quality standard and other chemical specific pollutants. The requirement may be used in combination with other options. However, KY does not believe that in the absence of a water quality standard for conductivity that it is in position to impose a numeric trigger in a BMP plan. | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| 6 | Compliance Schedule(s) | a) KY has not proposed in a draft permit | i) No change | KY is willing to discuss options with the use of a compliance schedule | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |
| | | | ii) Use a compliance schedule in conjunction with one or more of the permit requirements discussed previously | KY is willing to discuss options with the use of a compliance schedule | EPA has not objected to this permit condition. EPA's position if the permit requirement was used in conjunction with other permit requirements is undetermined. |

DRAFT ATTORNEY CLIENT CONFIDENTIAL

-----Original Message-----
From: Thomas.Chris@epamail.epa.gov [mailto:Thomas.Chris@epamail.epa.gov]
Sent: Thursday, March 10, 2011 2:02 PM
To: Gruzesky, Sandy (EEC)
Cc: Nuhfer.Mark@epamail.epa.gov; Tyler.Kip@epamail.epa.gov
Subject: EPA Recommendations to Template

Sandy

Below are additional thoughts and observations we've had since our call
where we discussed your coal NPDES individual permit template.  We're
looking forward to receiving permits written to the template.  If you
have any questions, please do not hesitate to call.  Thanks!!!


1. Clarify Effluent Limits for Instream Ponds


  A. We recommend that KDOW clarify if their intent is to require all
  in-stream ponds or simply representative in-stream ponds meet the
  effluent limits; we recommend that the effluent limits be applicable
  to all in-stream ponds.


2. Clarify Total Recoverable Metals Limits and Monitoring Frequency


  A. The average monthly limit is unclear for total recoverable metals
  that have been determined to have RP. The average monthly limit is
  "report" only.  If the monthly average limit applies, the applicant
  must find the limit within a complex fact sheet.  We recommend that
  the average monthly numeric limit(s) should be contained in table
  1.2.1.  Additionally, we recommend that the frequency of monitoring
  should be increased to 2/month in order to be consistent with all
  other compliance monitoring required by the permit.


3. Clarify TSS RPA and WQBELs Fact Sheet Language


  A. KDOW only removed some of the fact sheet language regarding the
  reasonable potential analysis for the TSS WQBELs.  The rationale for
  a 40 mg/l TSS WQBEL is still conclusive for streams with a zero 7Q10
  (see page 72).  Additionally, page 73 states that "TSS shall not be
  changed to the extent the indigenous aquatic community is adversely
  affected, which can be interpreted as 40 mg/l as shown above."  We
  recommend that KDOW completely remove the references to the TSS WQBEL
  and more clearly explain how the sediment ponds (constructed to

1

comply with the ELGs) do not result in a RP determination for narrative standards (as stated on page 72 of the fact sheet). Also, we recommend that the explanation discuss how the biological assessment requirements and BMP implementation contained in the permit will protect the narrative standard for TSS.

4. Clarify BMP Implementation Requirements
A. According to the permit, a maximum of 9 months is allowed to implement new BMPs even if SMCRA permit modification is not required. The permittee is given 1 month to evaluate the BMPs, 2 months to submit the evaluation to KDOW, and 6 months to implement the BMPs. We recommend a maximum of 30 days to submit the evaluation to KDOW and 90 days to implement new BMPs that do not require SMCRA approval as a reasonable time period.

B. If a SMCRA permit modification is necessary for implementation of new BMPs, a time line to submit the request to KDNR is not established. We recommend that the permit require the permittee submit a request a SMCRA permit revision from KDNR within some specified time frame. Also, we recommend that the permittee be given a maximum of 30 days to submit the necessary information to KDNR and that the permit require the permittee to implement the new BMPs within a specified time frame (e.g., 90 days) of receipt of necessary authorization from KDNR.

C. The fact sheet and permit are contradictory about BMP implementation. The permit (page 25) says that BMPs shall be evaluated and implemented for both the 30% and 10% action levels. The fact sheet (page 31) states that BMPs only need to be evaluated at the 30% and 10% action levels. EPA agrees with the language contained within the permit - that BMPs shall be evaluated and implemented at the 30% and 10% action levels and we recommend that the fact sheet should be adjusted to reconcile the fact sheet with the permit language.

5. Clarify the Justification for BMPs and Biological Assessments

A. The requirements to conduct biological assessments, review and revise BMPs, and the prohibition against categorical decline are enforceable effluent limits that are included to address the existing reasonable potential (RP) that the discharges will cause a violation of narrative standards. We recommend that the permit and fact sheet should clearly state that these requirements are included to address the RP that the discharges authorized will cause or contribute to violations of narrative standards. The absence of such a statement, or any clear explanation why these provisions are being required, may undermine the defensibility of the permit and make the permit vulnerable to challenge. Currently, according to pg. 31 of the fact sheet, a finding of RP based on the results of the biological assessment is something that may occur during the permit term; this may confuse the reader into thinking that KDOW has not yet conducted the reasonable potential analysis.

B. KDOW originally connected the critical thresholds of 30% and 10% to a possible finding of RP and a confirmation of RP, respectively. KDOW removed this RP justification from the permit but did not remove it from the fact sheet (page 31). As discussed above, we recommend that the fact sheet explain that the thresholds and obligations to

2

review and revise BMPs are effluent limits that are intended to
address RP that the discharges cause or contribute to violations of
narrative standards.

C. A consequence of removing the RP language connected to the
critical thresholds is that the difference between the 10% and 30%
action levels disappears. The same action (BMP evaluation and
implementation) is now required at both the 30% and 10% thresholds.
The only difference is that the permit may be modified for a
biological score within 30%; and the permit is required to be
modified for biological score within 10%.  We recommend that KDOW
confirm that this is their intent.

6.  Clarify Chronic WET Requirements

A. The previous permits sent to satisfy our objections automatically
required chronic WET limits (without reopening the permit) if the
average effluent flow duration exceeded 4 days for 2 consecutive
quarters. The current template requires chronic WET monitoring and
allows for the permit to be reopened after 1 year if the chronic WET
monitoring results demonstrate RP.  As currently written, the permit
may be vulnerable to challenge because the RP determination for
chronic WET is being conducted after permit issuance, and the chronic
limits automatically apply for other pollutants determined to have RP
but the chronic WET limits do not.  We recommend that the permit
require chronic WET limits if the effluent flow duration is
continuous.

B. Page 4 of the permit requires grab samples for both acute and
chronic WET.  However page 8 of the permit requires composite
samples.  We recommend that the requirements on page 4 and page 8 be
clarified for consistency.

7.  Clarify Flow Rate Duration Requirements

A. We recommend that KDOW clarify whether the permit only allows
daily visual inspections for the effluent flow rate duration
measurement.  If a permittee decides that it is more cost effective
to employ continuous flow measurement devices, will these results be
allowed by KDOW?  (For example, Czar Coal (KY0040495) already has
continuous flow rate monitoring).

Chris Thomas, Chief
Pollution Control and Implementation Branch
Water Protection Division
United States Environmental Protection Agency, Region 4

thomas.chris@epa.gov
Tel:  404.562.9459

CONFIDENTIALITY NOTICE

This message is intended exclusively for the individual(s) or entity(s)
to which it is addressed.  This communication may contain information

3

that is proprietary, privileged, or confidential or otherwise legally
exempt from disclosure.  If you are not the named addressee, you are not
authorized to read, print, retain, copy, or disseminate this message or
any part of it.  If you have received this message in error, please
notify the sender immediately by email and delete all copies of the
message.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

SEP 2 8 2011

Ms. Sandy Gruzesky
Director, Division of Water
Kentucky Department for Environmental Protection
200 Fair Oaks Lane, Fourth Floor
Frankfort, Kentucky 40601

Subject:  EPA Comments and Recommendations Regarding the 35 Draft NPDES Permits
Listed in Enclosure 1

Dear Ms. Gruzesky:

On July 1, 2011, the Kentucky Division of Water (KDOW) transmitted to the U.S. Environmental
Protection Agency 34 of the 35 draft National Pollutant Discharge Elimination System (NPDES)
permits and fact sheets listed in Enclosure 1, for our review. Additionally, KDOW submitted for our
review another draft NPDES permit and fact sheet, also listed in Enclosure 1, on September 1, 2011.
The EPA has been reviewing these draft permits in accordance with the NPDES Memorandum of
Agreement (MOA) with Kentucky and the EPA's regulations at 40 Code of Federal Regulations (CFR)
§ 123.44(a). We have now completed our review of the draft permits and we are providing comments
and recommendations in accordance with MOA Section IV.B.3 and 40 CFR § 123.44(a).

We have significant concerns that these permits will allow discharges that may cause water quality
impacts due to the absence of effluent limits based upon an appropriate reasonable potential analysis
necessary to demonstrate that the permitted discharges will not cause or contribute to a violation of the
Commonwealth's narrative or numeric water quality standards. We are eager to work with you to
address our concerns, particularly as we coordinate on future applications for coal mining-related
discharges in Kentucky.

I want to emphasize that our review of the draft permits has been guided by our mutual goal of
protecting public health and water quality consistent with the requirements of the Clean Water Act
(CWA) and reducing unnecessary duplication and delay in the permitting process. We recognize the
important role that the CWA provides to states in administering NPDES programs. In 2008 the
Commonwealth of Kentucky and the EPA Region 4 signed an updated NPDES MOA in which we
agreed to maintain a high level of cooperation and coordination to ensure successful and effective
administration of the NPDES program. Together we share an important responsibility to implement the
CWA and we appreciate your efforts to work with us to address issues identified during our permit
review.

Our review of the 35 draft permits has identified general concerns regarding the quality and detail of
information contained in the permit applications, fact sheets and draft permits submitted to the EPA and
provided to the public in accordance with 40 CFR Part 124. As a general matter, the efficiency and
effectiveness of our oversight and review is dependent upon the quality, consistency and detail of

information provided to us. We are concerned that basic information regarding the nature, characteristics and potential effects of proposed discharges is missing from the permit applications making it difficult to assess compliance with CWA requirements. We understand that permit data is often difficult to collect and we are prepared to work immediately with you and the applicants to identify the discrepancies as well as the information that is most relevant and necessary for efficient and effective review of the proposed discharges and resolution of the draft permits.

In response to these concerns regarding the quality of information included with the permits submitted in July and September, I request that KDOW review and confirm that the information presented in the applications, draft permits, and fact sheets is complete and accurate prior to issuance of the permits. Where there is a discrepancy among the information supporting the NPDES permit application and information supporting a Surface Mining Control and Reclamation Act permit, or a CWA Section 404 permit, it is appropriate for KDOW to explain the reason for the discrepancy or require the applicant to update its application to reflect accurate project information. We are prepared to work with KDOW to identify existing discrepancies and other factual concerns in a timely manner so that the factual concerns can be resolved as quickly as possible.

A detailed statement of our comments and recommendations for the 35 permits is set forth in Enclosure 2. As a general matter, we are concerned that a reasonable potential analysis required in accordance with 40 CFR § 122.44(d), is either inadequate or missing for each of the draft permits with respect to applicable narrative or numeric water quality standards. A reasonable potential analysis is necessary to determine whether the proposed discharges will cause, or have the reasonable potential to cause or contribute to, a violation of the Commonwealth's water quality standards. The draft permits also do not include effluent limits necessary to ensure that the proposed discharges will not cause or contribute to a violation of the Commonwealth's water quality standards, as required by Section 301(b)(1)(C) of the CWA and the EPA's regulations at 40 CFR §§ 122.4(a) and (d), and 122.44(d)(1). We are prepared to work with you immediately to begin addressing these deficiencies in order to ensure that final permit decisions can be made as quickly as possible.

Thank you again for your willingness to work with us to protect public health and water quality consistent with the requirements of the CWA. I look forward to following up with you to resolve these issues and to make timely decisions on these mining operations. If you have any questions, please call me at (404) 562-9345 or Mark Nuhfer of the Municipal and Industrial NPDES Section at (404) 562-9390.

Sincerely,

James D. Giattina
Director
Water Protection Division

Enclosures

cc: Permit Applicants

Enclosure 1

| # | AI # | NPDES # | SMCRA # | Company |
|---|------|---------|---------|---------|
| 1 | 33224 | KY0105660 | 917-5017 | Allied Resources Inc. |
| 2 | 111111 | KY0109746 | 898-8165 | Apex Energy |
| 3 | 39502 | KY0107697 | 892-0105 | Armstrong Coal Company |
| 4 | 2312 | KY0090123 | 858-9000 | Beech Fork Processing, Inc. |
| 5 | 35893 | KY0043851 | 807-8050 | Bell Co. Coal Corp |
| 6 | 111308 | KY0109410 | 913-0013 | Camp Eleven Mining LLC |
| 7 | 81522 | KY0106666 | 898-4320 | Clintwood Elkhorn Mining Co. |
| 8 | 14499 | KY0102008 | 898-8097 | Clintwood Elkhorn Mining Co. |
| 9 | 4182 | KY0094994 | 917-5014 | Cochise Coal Company |
| 10 | 98885 | KY0107158 | 889-8005 | Covol Fuels No 2, LLC |
| 11 | 1176 | KY0098400 | 836-5341 | Czar Coal Corp |
| 12 | 1873 | KY0067121 | 854-8011 | Don Bowles Coal No 1 LLC |
| 13 | 4203 | KY0071471 | 918-8013 | Emlyn Coal Processing |
| 14 | 2669 | KY0046035 | Multiple | Enterprise Mining Company |
| 15 | 1151 | KY0078271 | 836-8071 | Frasure Creek Mining, LLC |
| 16 | 1128 | KY0053546 | 836-8066 A2 | Frasure Creek Mining, LLC |
| 17 | 50315 | KY0105597 | 833-9005 | Fuel Recovery Partners |
| 18 | 1723 | KY0043133 | 848-8059 | Harlan Cumberland Coal Company |
| 19 | 83376 | KY0108588 | 860-5350 | KY Fuel Corp |
| 20 | 2514 | KY0094510 | 860-8020 | KY Fuel Corp |
| 21 | 108487 | KY0109185 | 860-8019 | KYZ Red Oak Resources |
| 22 | 101782 | KY0108391 | 898-9144 | Landfall Mining, Inc. |
| 23 | 126 | KY0021547 | Multiple | Left Fork Mining Company |
| 24 | 3644 | KY0000396 | Multiple | Long Fork Coal |
| 25 | 13148 | KY0051551 | 898-8163 | McCoy Elkhorn Coal Corp. |
| 26 | 3657 | KY0031402 | Multiple | McCoy Elkhorn Coal Corp. |
| 27 | 101892 | KY0107611 | 836-9023 | NFC Mining, Inc. |
| 28 | 1828 | KY0090913 | 851-8004 | Patriot Coal Company |
| 29 | 106710 | KY0108634 | 898-9147 | PB Dirtmovers, Inc. |
| 30 | 1259 | KY0059366 | 836-8057 | Prater Creek Coal Corp |
| 31 | 12525 | KY0087327 | 848-5491 | Resource Land Company |
| 32 | 1706 | KY0097608 | 848-8069 | Sequoia Energy, LLC |
| 33 | 104486 | KY0104486 | 889-0145 | Shaunaco LLC |
| 34 | 3720 | KY0025950 | Multiple | Sidney Coal Company, Inc. |
| 35 | 83386 | KY0107034 | 830-0093 A1 | Western KY Minerals, Inc |

**Comments and Recommendations for the 35 NPDES permits:**

1. **The draft permits and fact sheets do not include an adequate reasonable potential analysis (RPA) for some pollutants and do not include appropriate effluent limits.**

According to 40 CFR § 122.44(d), National Pollutant Discharge Elimination System (NPDES) permits must contain limitations for all pollutants that have the reasonable potential to cause or contribute to violations of numeric or narrative water quality standards (WQS). An adequate RPA is necessary to determine if the receiving water body has sufficient assimilative capacity to ensure that the proposed discharges do not cause or contribute to violations of applicable numeric and narrative WQS. As explained below, the draft permits and facts sheets do not include an adequate RPA for coal mining-related pollutants with narrative and numeric WQS. The draft permits and fact sheets do not consider available information indicating that the proposed discharges do have the reasonable potential to cause or contribute to violations of applicable WQS, and the draft permits do not include appropriate effluent limits. As a result, discharges that would be authorized by the permits listed in Enclosure 1 may cause or contribute to violations of WQS.

   A. **The draft permits and facts sheets do not include an adequate RPA for pollutants with narrative WQS that are generally known to be present at significant levels in coal mine discharges.**

   NPDES regulations at 40 CFR § 122.44(d)(1)(vi) require NPDES permits to contain provisions implementing narrative WQS, and the RPA that must be completed for numeric WQS must also be completed for narrative standards.[1] The draft permits and fact sheets do not include an RPA for pollutants with narrative WQS such as sulfate, conductivity or total dissolved solids (TDS) to ensure that the proposed discharges would not cause or contribute to a WQS excursion. The fact sheets state that "in order to determine if reasonable potential exists [for conductivity and TDS], the baseline biological conditions of the intended receiving streams are compared to the biological conditions of the receiving streams during active mining…If the annual score(s) are lower than the baseline score but within the baseline category, then reasonable potential may exist. If the annual score(s) indicate the receiving water has declined in category then reasonable potential has been demonstrated." KDOW proposes to conduct the required RPA during the permit term after it receives the results of the required biological monitoring. This approach potentially allows water quality degradation during the period between the scheduled annual biological assessments.

   While additional data on water quality is always welcome, this approach does not consider available, valid and representative data showing that the proposed discharges have the reasonable potential to cause or contribute to violations of WQS. In addition, for some of the draft permits and fact sheets, Kentucky Division of Water (KDOW) did not evaluate whether

---

[1] Kentucky's WQS include narrative standards for the protection of aquatic life, conductivity, and total dissolved solids. "Total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected." 401 Kentucky Administrative Regulations (KAR) 10:031, Section 4(1)(f); and "Surface waters shall not be aesthetically or otherwise degraded by substances that … injure, are chronically or acutely toxic to or produce adverse physiological or behavioral responses in humans, animals, fish and other aquatic life" 401 KAR 10:031, Section 2. In addition, Kentucky has narrative standards for TSS and settleable solids. See 401 KAR 10:031(4)(1)(g) and (h); (g) "Total suspended solids. Total suspended solids shall not be changed to the extent that the indigenous aquatic community is adversely affected;" (h) "Settleable solids. The addition of settleable solids that may alter the stream bottom so as to adversely affect productive aquatic communities is prohibited."

1

the discharges that would be authorized under those permits have the reasonable potential to contribute to the existing impairments. Of the 53 permits currently under review, 24 discharge to receiving water bodies identified as impaired for coal mining related pollutants according to the 2008 or draft 2010 Clean Water Act (CWA) § 303(d) list. The impairments are for a number of pollutants with narrative WQS: conductivity, sedimentation/siltation (seattleable solids and total suspended solids), sulfate, and TDS.

Given the existence of information indicating that reasonable potential exists,[2] the proposal to conduct the RPA during the permit term, and not prior to authorization of discharge, is inconsistent with the CWA and its implementing regulations. These regulations require that the permits contain water quality-based effluent limits (WQBELs) for all discharges that have reasonable potential to cause or contribute to a violation of WQS at the time of permit issuance (40 CFR § 122.44(d)(1)(iii, iv, vi)).

**B. The draft permits and fact sheets do not include an adequate RPA for pollutants with numeric WQS.**

The draft permits and fact sheets do not include an adequate RPA for pollutants with numeric WQS (such as metals) as required by 40 CFR § 122.44(d)(1)(i, ii, iii). The fact sheets state that "the permittee was unable to submit complete and acceptable data prior to public notice" for the effluent and in-stream levels and "representative outfalls were proposed to be monitored to provide data to perform the RPA." In some cases, the projects have existing discharges that could provide such data. Alternatively the applications could have been determined to be incomplete and the applicant could have been required to submit the data to appropriately characterize the effluent. In other cases, where projects do not have existing discharges from which to obtain data, similar projects and information from relevant studies could have been used as representative data. Furthermore, in some permits, representative outfalls and in-stream monitoring points were not identified, which results in effluent limitations and monitoring requirements that only apply to undefined representative outfalls.[3] The draft permits and facts sheets are based on incomplete applications and do not include effluent data and information from the projects and/or from other similar projects. Conducting the RPA during the permit term, and not prior to authorization of discharge, does not comply with the CWA and its implementing regulations.

The draft permits and facts sheets also do not adequately characterize the frequency and duration of discharges in order to conduct an adequate RPA. Not all of the draft permits and fact sheets include available site-specific data to characterize the effluent flow frequency and

---

[2] A 2004 Kentucky Department for Environmental Protection, Division of Water, Water Quality Branch study, "Effects of Surface Mining and Residential Land Use on Headwater Stream Biotic Integrity in the Eastern Kentucky Coalfield Region" found that the wholesale loss of mayflies at mined sites indicated that these organisms are especially sensitive to coal mine drainage and dissolved solids emanating from hollow fills are a primary cause of biological impairment because of their severe impact to mayflies and other sensitive taxa. A 2008 published study, "Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools" by Pond, et al. found evidence indicating that mining activities have subtle to severe impacts on aquatic life and the biological conditions of a stream at conductivity levels of 500 μS/cm. A final EPA report (2011), "The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields," found effects that include resource loss, water quality impairment, and adverse effects on aquatic resources. Another final report by EPA (2011), "A Field-based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams" concludes that 5% of native macroinvertabrate genera are extirpated where conductivity levels reached 300 μS/cm.
[3] The fact sheets for these draft permits state that "the permittee did not submit a QAPP or representative outfall selection prior to this application. Therefore the permittee will be required to submit to DOW a QAPP within thirty (30) days of issuance of this permit. This QAPP must be found to be acceptable by DOW within ninety (90) days of permit issuance. DOW will reopen the permit as a minor modification to add representative outfalls and instream monitoring points at that time.

The draft permits and facts sheets also do not adequately characterize the frequency and duration of discharges in order to conduct an adequate RPA. Not all of the draft permits and fact sheets include available site-specific data to characterize the effluent flow frequency and duration such as existing discharge monitoring reports, surface water monitoring reports, the CWA § 404 application, information about the watershed size draining to specific outfalls that is contained in the Surface Mining Control Reclamation Act (SMCRA) application, and available information about the in-stream flow regime.[4] For example, where available information indicates that a project's in-stream sediment pond is within an intermittent or perennial stream segment, or the scientific literature shows that the drainage area of the pond is well within the regionally documented intermittent or perennial flow regime, the in-stream pond is likely to flow intermittently at a minimum. Based on the foregoing, a more detailed analysis is necessary to support determinations that the discharges authorized under the permits will not cause or contribute to exceedances of acute or chronic WQS.

In some cases the projects have existing discharges, and applicants should have submitted the required data to appropriately characterize the frequency of discharge. Instead, the fact sheets state that "discharges from the outfalls covered by this permit only occur during precipitation events." This statement is not supported by data regarding frequency or duration of discharge, and does not ensure protection of chronic WQS that would apply to any continuous discharge or any intermittent discharge that occurs frequently enough to have reasonable potential to exceed a chronic WQS. Due to the applicants' failure to submit "complete and acceptable" effluent data and the assumptions that the discharges are precipitation-driven, the permits listed in Appendix A contain maximum daily effluent limits for all metals based on an application of acute WQS only. The effluent limits within the permit do not negate the fact that an appropriate RPA must be conducted for both acute and chronic WQS, and the permit must include effluent limits necessary to meet acute and chronic WQS based on the results of the RPA before permit issuance.

2. **Additional effluent limits are necessary to ensure that discharges do not cause or contribute to violations of WQS.**

NPDES permits must contain effluent limitations for all pollutants that have the reasonable potential for the discharge to cause or contribute to violations of numeric or narrative WQS according to 40 CFR § 122.44(d). To address these comments, KDOW should develop revised permits and fact sheets that characterize the effluent and the background conditions in the receiving water bodies for these permits using existing data (including where necessary representative data from other similar projects, or require additional data from the applicants for existing projects); include an adequate

[4] Available scientific literature indicates that even small watersheds in central Appalachia can produce intermittent or perennial flow. A 2003 published study by Paybins, "Flow origin, drainage area, and hydrologic characteristics for headwater streams in the mountaintop coal-mining region of southern West Virginia," found that the median watershed size for intermittent streams was 14.5 acres and the median for perennially flowing streams was 40.1 acres. A 2005 published study by Svec, et al., "Defining perennial, intermittent, and ephemeral channels in Eastern Kentucky: application to forestry best management practices," monitored stream flow in 23 headwater catchments throughout the eastern Kentucky coal field region from 2000 to 2001. The flow duration in all catchments exceeded 50% of the period of record, indicative of at least intermittent stream flow in all catchments, including six watersheds draining less than 10 acres. Perennial stream flow was documented in watersheds as small as 32.2 acres. Another published study in 2008, "Physical indicators of hydrologic permanence in forested headwater streams" by Fritz and others categorized channel flow conditions in forested headwater streams located mostly, but not exclusively, in the central Appalachian states. The authors found that intermittent stream flow in central Appalachia was generated by a mean drainage area of approximately 126 acres and an average drainage area of approximately 210 acres generated perennial stream flow. Another study commissioned by the National Mining Association in 2011, "Variability of benthic invertebrate communities of headwater streams in southern West Virginia: final report to National Mining Association" by GEI, found highly diverse aquatic communities in West Virginia headwaters that drained between 12 and 25 acres with wetted stream widths of only one foot wide.

3

RPA; and include WQBELs that are as stringent as necessary to meet all narrative and numeric WQS based on the results of the RPA.

We would include in the permits effluent limits necessary to meet WQS based on the results of the RPAs. In performing the RPAs, the Environmental Protection Agency would consider relevant and available information, including the studies cited above in footnotes 2 and 4, and available data (including data from discharge monitoring reports, surface water monitoring reports, the CWA § 404 permit applications, the SMCRA permit applications, and representative data from other sites). As noted in footnote 2, relevant studies indicate that adverse impacts occur to the aquatic community at conductivity levels of 300 µS/cm and substantial aquatic life effects have already occurred when conductivity reaches 500 µS/cm. If the EPA was issuing these permits, we would include effluent limits in the permits to ensure that all discharges from these projects do not exceed a conductivity level of 300 µS/cm, unless site-specific information suggests that an alternate WQBEL is appropriate.[5]

In addition to chemical-specific limits to meet a narrative WQS, 40 CFR § 122.44(d)(1)(v) specifies that, when a discharge has reasonable potential to cause or contribute to a violation of a narrative criterion within an applicable State WQS, "the permit must contain effluent limits for whole effluent toxicity (WET)," unless the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit "that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards." Absent such a demonstration, the permits should be revised to include the appropriate WET limits. For outfalls that discharge greater than 96 hours in duration,[6] the permits should be revised to include chronic WET limits, and limits for other coal-mining pollutants that may be discharged at levels exceeding chronic WQS.

### 3. Recommendations regarding the reliability of permitting information.

Our review of the 35 permits has raised questions about the accuracy of information in the applications, draft permits and fact sheets. The uncertainty regarding the accuracy of permitting information makes it difficult, if not impossible, to confirm that the permits contain effluent limits as stringent as necessary to meet state water quality standards. For example, if permit information does not reliably characterize the location, type or number of outfalls, the frequency or duration of discharge and the existing water quality in receiving water bodies, it is not possible to perform an adequate RPA. Our review of the 35 draft permits revealed a sufficiently pervasive pattern of inconsistencies, discrepancies and questions regarding permit information to lead us to recommend that KDOW conduct a review of all of the permitting information for accuracy and completeness before issuance of the final permits. We recommend that KDOW conduct a review of information in the applications, draft permits and fact sheets to ensure that its permitting decisions are based on accurate permitting information. This may involve informing permit applicants of our concerns regarding the accuracy of permit information and requiring applicants to review the information in applications and certify its accuracy or, if necessary, submit revised applications with updated

---

[5] Application of narrative WQS in the context of a specific permit is a case-by-case determination taking into account the specific circumstances of each permit. Conductivity levels outside the range of 300 – 500 µS/cm may be consistent with meeting applicable narrative WQS in some water bodies, depending on their characteristics. Different conductivity levels might be appropriate for waters that are different from those on which the EPA reports were based, such as those with dissimilar ionic mixtures or aquatic life communities. Whenever limits for conductivity are set at numeric values above 300 – 500 µS/cm, site-specific data and high-quality scientific information should be used in order to ensure that they fully protect applicable aquatic life uses.
[6] This duration is consistent with the way that the EPA expresses numeric criteria.

information, certified in accordance with 40 CFR § 122.22. We recommend that KDOW also ensure that the application information is reconciled with information in the draft permits and fact sheets, and that adequate RPAs are conducted based on this information.

**4. Recommendation for supplemental permit conditions.**

In addition to the foregoing comments and recommendations for the permits, we also recommend that if KDOW continues to use the proposed supplemental permit conditions (best management practices (BMPs) and biological-based limits), the conditions be revised in order to ensure that the permits are protective of Kentucky WQS and consistent with the CWA. These revised limits would provide greater assurance that water quality will be protected and that degradation resulting from coal mine discharges will be promptly identified and addressed.

We recommend that BMP-based effluent limits as authorized by 40 CFR § 122.44(k)(3) should include clear, specific and enforceable measures to ensure that the BMPs are performing as expected. We recommend that action levels be set at levels sufficient to identify problems and require that adaptive action be taken promptly if it appears that WQS may be exceeded. An appropriate action level to protect narrative WQS would be an effluent conductivity level of 300 µS/cm, unless site-specific information suggests that an alternate action level is appropriate. When such action levels are exceeded, we recommend that the permit require implementation of an enforceable adaptive management plan to better control discharges before they degrade water quality.

We also recommend revisions to the biological-based limits that are applied in-stream to ensure they are as stringent as necessary to achieve Kentucky's WQS in accordance with 40 CFR § 122.4(d) and CWA § 301(b)(1)(C). The permit requirements for the biological-based limits should be designed to ensure that the effects from existing sources can be quantified and distinguished from the effects from other permitted discharges and baseline stream conditions. The permit conditions should include measurable and enforceable thresholds representing a violation of the permit that places the responsibility on the permittee to take action and avoid long-term noncompliance with the permit and WQS. The biological-based limits should be consistent with applicable WQS. As currently structured in the draft permits, the biological limits only require maintenance (no worsening) of an existing degraded condition. A biological-based limit that maintains and contributes to an existing impairment is not protective of applicable WQS. For example, if a headwater stream in the Eastern Kentucky coal region has been identified as impaired on Kentucky's CWA § 303(d) list or by the project's baseline biological assessment, a macroinvertebrate biological index score of 72 (consistent with meeting applicable WQS) is the minimal acceptable future condition to ensure that the discharge will not cause or contribute to an exceedance of Kentucky's narrative standards.

In accordance with the MOA and 40 CFR § 123.44, the EPA submits these comments and recommendations for the draft permits. The EPA requests that KDOW revise the draft permits and fact sheets to address these recommendations before issuing final permits.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

SEP 2 8 2011

Ms. Sandy Gruzesky
Director, Division of Water
Kentucky Department for Environmental Protection
200 Fair Oaks Lane, Fourth Floor
Frankfort, Kentucky 40601

Subject:  Notice of Specific Objections – 19 Draft NPDES Permits Listed in Enclosure 1

Dear Ms. Gruzesky:

On July 1, 2011, the Kentucky Division of Water (KDOW) transmitted to the U.S. Environmental
Protection Agency 55 draft National Pollutant Discharge Elimination System (NPDES) permits and fact
sheets for our review. The EPA has been reviewing these draft permits under the 90 day schedule
identified in our Memorandum of Agreement (MOA) with Kentucky and the EPA's regulations at 40
Code of Federal Regulations (CFR) § 123.44(a). We issued a comment letter for one of the draft
permits, Phoenix Resources (KY0109312), that identified our recommended changes to ensure
consistency with Clean Water Act (CWA) requirements. For another of the draft permits, Beech Fork
Processing, Inc. (KY0108339), we advised you in a letter dated August 16, 2011 that we had previously
objected to a draft NPDES permit for that facility and, therefore, we would work with you to resolve our
objection in accordance with 40 CFR § 123.44 and the MOA. We have now completed our review of the
remaining 53 draft permits.

This letter also provides notice of our specific objection to 19 permits listed in Enclosure 1 in
accordance with MOA Section IV.B and 40 CFR § 123.44(a). We have significant concerns that these
permits will allow discharges that may cause significant water quality impacts due to the absence of
effluent limits based upon an appropriate reasonable potential analysis necessary to demonstrate that the
permitted discharges will not cause or contribute to a violation of the Commonwealth's narrative or
numeric water quality standards. We will be providing additional comments on the remaining 34 permits
in a separate letter. We are eager to work with you to address our concerns, particularly as we coordinate
on future applications for coal mining-related discharges in Kentucky.

I want to emphasize that our review of the draft permits has been guided by our mutual goal of
protecting public health and water quality consistent with the requirements of the CWA and reducing
unnecessary duplication and delay in the permitting process and we recognize the important role that the
CWA provides to states in administering NPDES programs. In 2008 the Commonwealth of Kentucky
and the EPA Region 4 signed an updated NPDES MOA in which we agreed to maintain a high level of
cooperation and coordination to ensure successful and effective administration of the NPDES program.
Together we share an important responsibility to implement the CWA and we appreciate your efforts to
work with us to address issues identified during our permit review.

Our review of the 19 draft permits has identified general concerns regarding the quality and detail of information contained in the permit applications, fact sheets and draft permits submitted to the EPA and provided to the public in accordance with 40 CFR Part 124. As a general matter, the efficiency and effectiveness of our oversight and review is dependent upon the quality, consistency and detail of information provided to us. We are concerned that basic information regarding the nature, characteristics and potential effects of proposed discharges is missing from the permit applications making it difficult to assess compliance with CWA requirements. We understand that permit data are often difficult to collect and we are prepared to work immediately with you and the applicants to identify the discrepancies as well as the information that is most relevant and necessary for efficient and effective review of the proposed discharges and resolution of the draft permits.

In response to these concerns regarding the quality of information included with the permits submitted in July, I request that KDOW, in developing its response to these objections, confirm that the information presented in the applications, draft permits and fact sheets is complete and accurate. Where there is a discrepancy among the information supporting the NPDES permit application and information supporting a Surface Mining Control and Reclamation Act permit, or a CWA Section 404 permit, it is appropriate for KDOW to explain the reason for the discrepancy or require the applicant to update its application to reflect accurate project information. We are prepared to work with KDOW to identify existing discrepancies and other factual concerns in a timely manner so that these issues can be resolved as quickly as possible.

Enclosure 2 details the issues that underlie our objections to the 19 permits. As a general matter, we are concerned that a reasonable potential analysis required in accordance with 40 CFR § 122.44(d), is either inadequate or missing for each of the draft permits with respect to applicable narrative or numeric water quality standards. A reasonable potential analysis is necessary to determine whether the proposed discharges will cause, or have the reasonable potential to cause or contribute to, a violation of the Commonwealth's water quality standards. The draft permits also do not include effluent limits necessary to ensure that the proposed discharges will not cause or contribute to a violation of the Commonwealth's water quality standards, as required by Section 301(b)(1)(C) of the CWA and the EPA's regulations at 40 CFR §§ 122.4(a) and (d), and 122.44(d)(1). We are prepared to work with you immediately to begin addressing these deficiencies in order to ensure that final permit decisions can be made as quickly as possible.

Thank you again for your willingness to work with us to protect public health and water quality consistent with the requirements of the CWA. I look forward to following up with you to resolve these issues and to make timely decisions on these mining operations. If you have any questions, please call me at (404) 562-9345 or Mark Nuhfer of the Municipal and Industrial NPDES Section at (404) 562-9390.

Sincerely,

James D. Giattina
Director
Water Protection Division

Enclosures

cc:   Permit Applicants

Enclosure 1

| # | AI # | NPDES # | SMCRA # | Company |
|---|------|---------|---------|---------|
| 1 | 81614 | KY0106682 | 897-5061 | BDCC Holding Company |
| 2 | 3428 | KY0091847 | 897-8039 | Blue Diamond Coal Company |
| 3 | 3506 | KY0092509 | Multiple | Clintwood Elkhorn Mining Co. |
| 4 | 107023 | KY0109123 | 880-0157 A3 | Czar Coal Corp |
| 5 | 111103 | KY0109321 | 880-0194 | Czar Coal Corp |
| 6 | 78571 | KY0106445 | 836-8068 | FCDC Coal, Inc. |
| 7 | 3430 | KY0046981 | 897-8048 | Frasure Creek Mining, LLC |
| 8 | 96732 | KY0109100 | 836-5595 | Laurel Mountain Resources |
| 9 | 2654 | KY0091910 | 897-0287 | Leeco, Inc. |
| 10 | 74997 | KY0054810 | Multiple | Martin Co. Coal Corp |
| 11 | 14192 | KY0105767 | Multiple | Matt/Co, Inc. |
| 12 | 107199 | KY0108821 | 888-0091 | Mine Rite Coal Company, Inc. |
| 13 | 8752 | KY0105651 | 860-0404 | Nally & Hamilton Enterprises, Inc. |
| 14 | 106751 | KY0108421 | 826-0621 | Robinson Coal Company, Inc. |
| 15 | 15415 | KY0108723 | 848-9026 | Sandlick Coal Company, LLC |
| 16 | 15379 | KY0109738 | 898-0573 | Sidney Coal Company, Inc. |
| 17 | 108157 | KY0108782 | Multiple | Sidney Coal Company, Inc. |
| 18 | 85262 | KY0107140 | 898-0798 A1 | Sidney Coal Company, Inc. |
| 19 | 108158 | KY0108774 | 898-0848 | Sidney Coal Company, Inc. |

Enclosure 2

**Basis for Environmental Protection Agency Specific Objections:**

**1.   The draft permits and fact sheets do not include an adequate reasonable potential analysis (RPA) for some pollutants and do not include appropriate effluent limits.**

According to 40 CFR § 122.44(d), National Pollutant Discharge Elimination System (NPDES) permits must contain limitations for all pollutants that have the reasonable potential to cause or contribute to violations of numeric or narrative water quality standards (WQS). An adequate RPA is necessary to determine if the receiving water body has sufficient assimilative capacity to ensure that the proposed discharges do not cause or contribute to violations of applicable numeric and narrative WQS. As explained below, the draft permits and facts sheets do not include an adequate RPA for coal mining-related pollutants with narrative and numeric WQS. The draft permits and fact sheets do not consider available information indicating that the proposed discharges do have the reasonable potential to cause or contribute to violations of applicable WQS, and the draft permits do not include appropriate effluent limits. As a result, discharges that would be authorized by the permits listed in Enclosure 1 may cause or contribute to violations of WQS.

**A.   The draft permits and facts sheets do not include an adequate RPA for pollutants with narrative WQS that are generally known to be present at significant levels in coal mine discharges.**

NPDES regulations at 40 CFR § 122.44(d)(1)(vi) require NPDES permits to contain provisions implementing narrative WQS, and the RPA that must be completed for numeric WQS must also be completed for narrative standards.[1] The draft permits and fact sheets do not include an RPA for pollutants with narrative WQS such as sulfate, conductivity or total dissolved solids (TDS) to ensure that the proposed discharges would not cause or contribute to a WQS excursion. The fact sheets state that "in order to determine if reasonable potential exists [for conductivity and TDS], the baseline biological conditions of the intended receiving streams are compared to the biological conditions of the receiving streams during active mining...If the annual score(s) are lower than the baseline score but within the baseline category, then reasonable potential may exist. If the annual score(s) indicate the receiving water has declined in category then reasonable potential has been demonstrated." KDOW proposes to conduct the required RPA during the permit term after it receives the results of the required biological monitoring. This approach potentially allows water quality degradation during the period between the scheduled annual biological assessments.

While additional data on water quality is always welcome, this approach does not consider available, valid and representative data showing that the proposed discharges have the reasonable potential to cause or contribute to violations of WQS. In addition, for some of the draft permits and fact sheets, Kentucky Division of Water (KDOW) did not evaluate whether

---

[1] Kentucky's WQS include narrative standards for the protection of aquatic life, conductivity, and total dissolved solids. "Total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected." 401 Kentucky Administrative Regulations (KAR) 10:031, Section 4(1)(f); and "Surface waters shall not be aesthetically or otherwise degraded by substances that ... injure, are chronically or acutely toxic to or produce adverse physiological or behavioral responses in humans, animals, fish and other aquatic life" 401 KAR 10:031, Section 2. In addition, Kentucky has narrative standards for TSS and settleable solids. See 401 KAR 10:031(4)(1)(g) and (h); (g) "Total suspended solids. Total suspended solids shall not be changed to the extent that the indigenous aquatic community is adversely affected;" (h) "Settleable solids. The addition of settleable solids that may alter the stream bottom so as to adversely affect productive aquatic communities is prohibited."

the discharges that would be authorized under those permits have the reasonable potential to contribute to the existing impairments. Of the 53 permits currently under review, 24 discharge to receiving water bodies identified as impaired for coal mining related pollutants according to the 2008 or draft 2010 Clean Water Act (CWA) § 303(d) list. The impairments are for a number of pollutants with narrative WQS: conductivity, sedimentation/siltation (seattleable solids and total suspended solids), sulfate, and TDS.

Given the existence of information indicating that reasonable potential exists,[2] the proposal to conduct the RPA during the permit term, and not prior to authorization of discharge, is inconsistent with the CWA and its implementing regulations. These regulations require that the permits contain water quality-based effluent limits (WQBELs) for all discharges that have reasonable potential to cause or contribute to a violation of WQS at the time of permit issuance (40 CFR § 122.44(d)(1)(iii, iv, vi)).

## B. The draft permits and fact sheets do not include an adequate RPA for pollutants with numeric WQS.

The draft permits and fact sheets do not include an adequate RPA for pollutants with numeric WQS (such as metals) as required by 40 CFR § 122.44(d)(1)(i, ii, iii). The fact sheets state that "the permittee was unable to submit complete and acceptable data prior to public notice" for the effluent and in-stream levels and "representative outfalls were proposed to be monitored to provide data to perform the RPA." In some cases, the projects have existing discharges that could provide such data. Alternatively the applications could have been determined to be incomplete and the applicant could have been required to submit the data to appropriately characterize the effluent. In other cases, where projects do not have existing discharges from which to obtain data, similar projects and information from relevant studies could have been used as representative data. Furthermore, in some permits, representative outfalls and in-stream monitoring points were not identified, which results in effluent limitations and monitoring requirements that only apply to undefined representative outfalls.[3] The draft permits and facts sheets are based on incomplete applications and do not include effluent data and information from the projects and/or from other similar projects. Conducting the RPA during the permit term, and not prior to authorization of discharge, does not comply with the CWA and its implementing regulations.

The draft permits and facts sheets also do not adequately characterize the frequency and duration of discharges in order to conduct an adequate RPA. Not all of the draft permits and fact sheets include available site-specific data to characterize the effluent flow frequency and

---

[2] A 2004 Kentucky Department for Environmental Protection, Division of Water, Water Quality Branch study, "Effects of Surface Mining and Residential Land Use on Headwater Stream Biotic Integrity in the Eastern Kentucky Coalfield Region" found that the wholesale loss of mayflies at mined sites indicated that these organisms are especially sensitive to coal mine drainage and dissolved solids emanating from hollow fills are a primary cause of biological impairment because of their severe impact to mayflies and other sensitive taxa. A 2008 published study, "Downstream effects of mountaintop coal mining: comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools" by Pond, et al. found evidence indicating that mining activities have subtle to severe impacts on aquatic life and the biological conditions of a stream at conductivity levels of 500 µS/cm. A final EPA report (2011), "The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields," found effects that include resource loss, water quality impairment, and adverse effects on aquatic resources. Another final report by EPA (2011), "A Field-based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams" concludes that 5% of native macroinvertebrate genera are extirpated where conductivity levels reached 300 µS/cm.
[3] The fact sheets for these draft permits state that "the permittee did not submit a QAPP or representative outfall selection prior to this application. Therefore the permittee will be required to submit to DOW a QAPP within thirty (30) days of issuance of this permit. This QAPP must be found to be acceptable by DOW within ninety (90) days of permit issuance. DOW will reopen the permit as a minor modification to add representative outfalls and instream monitoring points at that time.

2

duration such as existing discharge monitoring reports, surface water monitoring reports, the CWA § 404 application, information about the watershed size draining to specific outfalls that is contained in the Surface Mining Control Reclamation Act (SMCRA) application, and available information about the in-stream flow regime.[4] For example, where available information indicates that a project's in-stream sediment pond is within an intermittent or perennial stream segment, or the scientific literature shows that the drainage area of the pond is well within the regionally documented intermittent or perennial flow regime, the in-stream pond is likely to flow intermittently at a minimum. Based on the foregoing, a more detailed analysis is necessary to support determinations that the discharges authorized under the permits will not cause or contribute to exceedances of acute or chronic WQS.

In some cases the projects have existing discharges, and applicants should have submitted the required data to appropriately characterize the frequency of discharge. Instead, the fact sheets state that "discharges from the outfalls covered by this permit only occur during precipitation events." This statement is not supported by data regarding frequency or duration of discharge, and does not ensure protection of chronic WQS that would apply to any continuous discharge or any intermittent discharge that occurs frequently enough to have reasonable potential to exceed a chronic WQS.[5] Due to the applicants' failure to submit "complete and acceptable" effluent data and the assumptions that the discharges are precipitation-driven, the permits listed in Appendix A contain maximum daily effluent limits for all metals based on an application of acute WQS only. The effluent limits within the permit do not negate the fact that an appropriate RPA must be conducted for both acute and chronic WQS, and the permit must include effluent limits necessary to meet acute and chronic WQS based on the results of the RPA before permit issuance.

**2. Additional effluent limits are necessary to ensure that discharges do not cause or contribute to violations of WQS.**

NPDES permits must contain effluent limitations for all pollutants that have the reasonable potential for the discharge to cause or contribute to violations of numeric or narrative WQS according to 40

---

[4] Available scientific literature indicates that even small watersheds in central Appalachia can produce intermittent or perennial flow. A 2003 published study by Paybins, "Flow origin, drainage area, and hydrologic characteristics for headwater streams in the mountaintop coal-mining region of southern West Virginia," found that the median watershed size for intermittent streams was 14.5 acres and the median for perennially flowing streams was 40.1 acres. A 2005 published study by Svec, et al., "Defining perennial, intermittent, and ephemeral channels in Eastern Kentucky: application to forestry best management practices," monitored stream flow in 23 headwater catchments throughout the eastern Kentucky coal field region from 2000 to 2001. The flow duration in all catchments exceeded 50% of the period of record, indicative of at least intermittent stream flow in all catchments, including six watersheds draining less than 10 acres. Perennial stream flow was documented in watersheds as small as 32.2 acres. Another published study in 2008, "Physical indicators of hydrologic permanence in forested headwater streams" by Fritz and others categorized channel flow conditions in forested headwater streams located mostly, but not exclusively, in the central Appalachian states. The authors found that intermittent stream flow in central Appalachia was generated by a mean drainage area of approximately 126 acres and an average drainage area of approximately 210 acres generated perennial stream flow. Another study commissioned by the National Mining Association in 2011, "Variability of benthic invertebrate communities of headwater streams in southern West Virginia: final report to National Mining Association" by GEI, found highly diverse aquatic communities in West Virginia headwaters that drained between 12 and 25 acres with wetted stream widths of only one foot wide.

[5] For the following examples, either the information in the CWA § 404 application, the discharge monitoring reports (DMRs), or the watershed size provides evidence to support a finding that these in-stream ponds have a continuous effluent flow frequency such that chronic WQS must apply. For Phoenix Resources (KY0109312 ), information gathered to support the CWA § 404 application places the in-stream pond in a intermittent stream section. The DMRs are limited but do indicate that the in-stream pond had measurable flow every two weeks from January to March of 2011. The SMCRA application shows that the total drainage area of the in-stream pond is 88 acres. As another example, the DMRs for outfall 001 from January 2007 to June 2011 at Czar Coal (KY0109123) indicate that discharge has occurred every two weeks since January 2007 (except for 3 month period in 2008). Based on the DMRs, the average flow rate from outfall 001 in 2011 is approximately 120,000 gallons per day. The watershed size for pond 001 is 597 acres according to the SMCRA application. Finally, the DMRs for outfall 008 associated with Clintwood Elkhorn (KY0092509) show that it has discharged every two weeks from January 2007 until June 2011. The watershed size for pond 008 is 567 acres according to the SMCRA application. For permits KY0109123 and KY0092509, the discharges that occurred every two weeks for over 4 years is highly unlikely to be the result of discharge occurring "during precipitation events."

3

CFR § 122.44(d). To address these objections, KDOW must provide revised permits and fact sheets that characterize the effluent and the background conditions in the receiving water bodies for these permits using existing data (including where necessary representative data from other similar projects, or require additional data from the applicants for existing projects); include an adequate RPA; and include WQBELs that are as stringent as necessary to meet all narrative and numeric WQSs based on the results of the RPA.

We would include in the permits effluent limits necessary to meet WQS based on the results of the RPAs. In performing the RPAs, the Environmental Protection Agency would consider relevant and available information, including the studies cited above in footnote 2 and 4, and available data (including data from discharge monitoring reports, surface water monitoring reports, the CWA § 404 permit applications, the SMCRA permit applications, and representative data from other sites). As noted in footnote 2, relevant studies indicate that adverse impacts occur to the aquatic community at conductivity levels of 300 μS/cm and substantial aquatic life effects have already occurred when conductivity reaches 500 μS/cm. If the EPA were issuing these permits, we would include effluent limits in the permits to ensure that all discharges from these projects do not exceed a conductivity level of 300 μS/cm, unless site-specific information suggests that an alternate WQBEL is appropriate.[6]

In addition to chemical-specific limits to meet a narrative WQS, 40 CFR § 122.44(d)(1)(v) specifies that, when a discharge has reasonable potential to cause or contribute to a violation of a narrative criterion within an applicable State WQS, "the permit must contain effluent limits for whole effluent toxicity (WET)," unless the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit "that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards." Absent such a demonstration, the permits must be revised to include the appropriate WET limits. For outfalls that discharge greater than 96 hours in duration[7], the permits must be revised to include chronic WET limits, and limits for other coal-mining pollutants that may be discharged at levels exceeding chronic WQS.

**Additional Comments and Recommendations**

1. **Recommendations regarding the reliability of permitting information.**

Our review of the 53 permits has raised questions about the accuracy of information in the applications, draft permits and fact sheets. The uncertainty regarding the accuracy of permitting information makes it difficult, if not impossible, to confirm that the permits contain effluent limits as stringent as necessary to meet state water quality standards. For example, if permit information does not reliably characterize the location, type or number of outfalls, the frequency or duration of discharge and the existing water quality in receiving water bodies, it is not possible to perform an adequate reasonable potential analysis. Our review of the 53 draft permits revealed a sufficiently pervasive pattern of inconsistencies, discrepancies and questions regarding permit information to

---

[6] Application of narrative WQS in the context of a specific permit is a case-by-case determination taking into account the specific circumstances of each permit. Conductivity levels outside the range of 300 – 500 μS/cm may be consistent with meeting applicable narrative WQS in some water bodies, depending on their characteristics. Different conductivity levels might be appropriate for waters that are different from those on which the EPA reports were based, such as those with dissimilar ionic mixtures or aquatic life communities. Whenever limits for conductivity are set at numeric values above 300 – 500 μS/cm, site-specific data and high-quality scientific information should be used in order to ensure that they fully protect applicable aquatic life uses.
[7] This duration is consistent with the way that the EPA expresses numeric criteria.

4

lead us to recommend that KDOW review all of the permitting information for accuracy and completeness as it develops its response to the specific objections. We recommend that KDOW conduct a review of information in the applications, draft permits and fact sheets to ensure that its permitting decisions, and review by the public and the EPA, are based on accurate permitting information. This may involve informing permit applicants of our concerns regarding the accuracy of permit information and requiring applicants to review the information in applications and certify its accuracy or, if necessary, submit revised applications with updated information, certified in accordance with 40 CFR § 122.22. We recommend that KDOW also ensure that the application information is reconciled with information in the draft permits and fact sheets, and that adequate RPAs are conducted based on this information.

2.  **Recommendation for supplemental permit conditions.**

In addition to the foregoing basis for our specific objections to the permits, we recommend that if KDOW continues to use the proposed supplemental permit conditions (best management practices (BMPs) and biological-based limits), the conditions be revised in order to ensure that the permits are protective of Kentucky WQS and consistent with the CWA. While the absence of such conditions would not be a basis for the EPA's specific objection, revised limits would provide greater assurance that water quality will be protected and that degradation resulting from coal mine discharges will be promptly identified and addressed.

We recommend that BMP-based effluent limits as authorized by 122.44(k)(3) should include clear, specific and enforceable measures to ensure that the BMPs are performing as expected. We recommend that action levels be set at levels sufficient to identify problems and require that adaptive action be taken promptly if it appears that WQS may be exceeded. An appropriate action level to protect narrative WQS would be an effluent conductivity level of 300 µS/cm, unless site-specific information suggests that an alternate action level is appropriate. When such action levels are exceeded, we recommend that the permit require implementation of an enforceable adaptive management plan to better control discharges before they degrade water quality.

We also recommend revisions to the biological-based limits that are applied in-stream to ensure they are as stringent as necessary to achieve Kentucky's WQS in accordance with 40 CFR § 122.4(d) and CWA § 301(b)(1)(C).  The permit requirements for the biological-based limits should be designed to ensure that the effects from existing sources can be quantified and distinguished from the effects from other permitted discharges and baseline stream conditions. The permit conditions should include measurable and enforceable thresholds representing a violation of the permit that places the responsibility on the permittee to take action and avoid long-term noncompliance with the permit and WQS. The biological-based limits should be consistent with applicable WQS. As currently structured in the draft permits, the biological limits only require maintenance (no worsening) of an existing degraded condition. A biological-based limit that maintains and contributes to an existing impairment is not protective of applicable WQS. For example, if a headwater stream in the Eastern Kentucky coal region has been identified as impaired on Kentucky's CWA § 303(d) list or by the project's baseline biological assessment, a macroinvertebrate biological index score of 72 (consistent with meeting applicable WQS) is the minimal acceptable future condition to ensure that the discharge will not cause or contribute to an exceedance of Kentucky's narrative standards.

To address our specific objections, KDOW should submit revised permits and fact sheets for these projects which address and meet the terms of these objections in accordance with the Memorandum of Agreement (MOA) Section III.B.6 and 40 CFR § 123.44(j). Please note that covering these facilities

under the Kentucky general permit will not satisfactorily address our specific objections. Within 90 days of the receipt of this letter, KDOW, or any interested person, may request that a public hearing be held on any of the specific objections in accordance with MOA Section IV.B.7 and 40 CFR § 123.44. For each of the permits subject to objection, if a public hearing is not requested and KDOW does not submit a proposed permit that has been revised to meet our specific objections within 90 days of receipt of this letter, exclusive authority to issue the permits passes to the EPA for one permit term in accordance with 40 CFR §123.44(h). Any request for a hearing on an objection and the procedures for resolving any objection shall be governed by 40 CFR § 123.44, as provided in MOA Section IV.B.7.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, et al.  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| COMMONWEALTH OF KENTUCKY,  ) | |
| CITY OF PIKEVILLE,  ) | |
| ) | |
| Plaintiff-Intervenors,  ) | |
| v.  ) | |
| ) | |
| LISA JACKSON, in her official capacity as  )  Nos. | 10-cv-1220-RBW |
| Administrator, U.S. Environmental Protection  ) | 11-cv-0295-RBW |
| Agency, *et al*  ) | 11-cv-0446-RBW |
| ) | 11-cv-0447-RBW |
| Defendants,  ) | |
| ) | |
| And  ) | |
| ) | |
| SIERRA CLUB *et al.*,  ) | |
| ) | |
| Defendant-Intervenors.  ) | |

**\*\*\*\*\*\*\*\*\*\*\***

<u>**AFFIDAVIT OF R. BRUCE SCOTT**</u>

1.  I, R. Bruce Scott, received a chemical engineering degree from the University of Kentucky in 1982 and have been a registered professional engineer in Kentucky since 1991. I have been employed by the Commonwealth of Kentucky Energy and Environmental Cabinet ("the Cabinet") for 28 years, or from August 6, 1983 to December 31, 2008; and currently from April 1, 2009 to the present. From 1983 to 2004, I worked in the Cabinet's Division of Water Kentucky Pollution Discharge Elimination System Permitting Branch, serving as Branch Manager from 1994 to 2004. In those roles, I have worked on thousands of Clean Water Act (CWA) Section 402 National Pollutant Discharge Elimination System (NPDES) permits, including hundreds for coal mining operations. On January 16, 2008 I was appointed

Commissioner of the Cabinet's Department for Environmental Protection and served in that role until my retirement on December 31, 2008. On April 1, 2009 I was again appointed Commissioner for the Department of Environmental Protection and currently serve in that position. I have personal knowledge of the matters discussed herein.

2.     There are two categories of permits authorized by the CWA that are generally required to conduct coal mining activities in Kentucky: (i) Section 404 permits, issued by the U.S. Army Corp of Engineers, for the discharge of dredged and fill material; and (ii) Section 402 NPDES permits, which are issued by the states, and which govern point source discharges of pollutants into waters of the United States. Kentucky has been authorized to administer its own Section 402 NPDES program since 1983. Some surface coal mining operations do not involve valley fills and thus do not require Section 404 permits. However, every surface coal mine must obtain a Section 402 NPDES permit.

3.     Kentucky is authorized by the CWA to establish its own water quality standards, which it has done and those standards are expressed as either specific numerical limits or in a general narrative statement. For example, Kentucky has adopted a narrative water quality standard for conductivity. *See* 401 KAR 10:031, Section 4(1)(f) which states that "Total dissolved solids or specific conductance shall not be changed to the extent that indigenous aquatic community is adversely affected." All of Kentucky's water quality standards relevant to the issues in this case have been formally approved by EPA.

4.     The Cabinet, as the Section 402 permitting authority, determines in the first instance whether a proposed discharge will, after complying with the technology-based effluent limitations, have a reasonable potential to cause an in-stream excursion above a numeric or narrative criterion within an applicable water quality standard. 40 C.F.R. 122.44(d). This

2

analysis is called a "Reasonable Potential Analysis" or RPA.   If the discharge has such a

reasonable potential, the Cabinet must develop permit limitations to ensure the water quality

standard is complied with.

5.      To ensure that the narrative criteria of a state water quality standard are attained,

states like Kentucky are required to develop implementation procedures for RPAs.  40 C.F.R.

131.11(a)(2).   On or about May 1, 2000, and during the time I served as Manager of the

Kentucky NPDES program, I developed procedures for conducting RPAs in Kentucky, and this

document was entitled "Permitting Procedures for Determining 'Reasonable Potential,' which

procedures were approved by EPA for use in Kentucky NPDES permits.  (*See* Exhibit 2 to

Kentucky Intervening Complaint) (attached hereto as Exhibit 1).  Those procedures made clear

that when insufficient data exists to make a determination as to the "reasonable potential" of the

discharge to violate water quality standards, Kentucky has the option to require "monitor only"

or a quarterly monitor and report requirement as an interim measure to provide for collection and

evaluation of data prior to determination of an appropriate effluent limit.  (*See* Id. at pp. 3-4).

Kentucky can and has always been authorized to require monitoring either prior to permit

issuance, or after permit issuance as "the regulatory authority may find it protective of water

quality to include a permit reopener for the imposition of an effluent limit should the effluent

testing establish that the discharge causes, has the reasonable potential to cause, or contributes to

excursion above a water quality criteria."  (*See Technical Support Document for Water Quality-

based Toxics Control*, authored by EPA, March 1991, at p. 51, attached hereto as Exhibit 2).

6.      Prior to April 1, 2010, EPA concluded that conducting RPAs after permit issuance

to gather sufficient site specific data from new and expanded facilities and providing for permit

reopeners to potentially establish effluent limits or other permit limitations in the future was

consistent with the CWA, and never objected to the Cabinet's issuance of Section 402 permits containing such provisions.

7.    A brief chronology of events listed below best describes the ever-evolving position EPA has taken about Section 402 permits for coal mining activities and EPA's role in that process over the last two years.

- **April 1, 2009:** On my first day in office after being re-appointed Commissioner of the Kentucky Department for Environmental Protection, I was contacted by EPA Region 4 to discuss their comments regarding the draft Kentucky coal General Permit that Kentucky was in the process of reissuing.

- **April 3, 2009:**   Consistent with the Memorandum of Agreement between the Cabinet and EPA (MOA), on April 3, 2009, EPA wrote KDOW with comments about the draft General Permit, including its concern that "[r]ecent studies have shown that there is a direct correlation between stream impairment and discharge of TDS/SC due to coal mining and coal processing," citing the Pond-Passmore Study and a handful of other similar studies, and requesting that the General Permit be revised to include additional data submission and monitoring requirements for specific conductance (SC) and total dissolved solids (TDS) that would enable the Cabinet to determine whether surface coal mine operators subject to coverage under the General Permit may cause or contribute to violations of Kentucky's water quality standards.   EPA asked the Cabinet to withdraw the draft General Permit and to develop a new one, with input from EPA, "that would be consistent with the requirements of the Clean Water Act." (*See* April 3 letter attached hereto as Exhibit 3).   Thereafter, the Cabinet revised the General Permit so as to address the concerns raised in EPA's April 3, 2009 letter, adding several new requirements, including effluent and in-stream chemical monitoring and in-stream biological monitoring.

- **May 11-15, 2009:** The Kentucky Division of Water (KDOW) sent an email to EPA Region 4 with an attached revised draft coal mining General Permit addressing the concerns expressed by EPA. The draft General Permit was public noticed on May 15, 2009.

- **June 11, 2009:** The Federal government announced a Memorandum of Understanding (MOU) between Department of the Army (USACE), Department of the Interior (OSM), and US EPA to take coordinated action to strengthen the oversight and regulation, and minimize adverse environmental consequences of mountaintop coal removal. The Administration in Washington targeted six (6) Appalachian states Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia. This June 11, 2009 federal initiative has since evolved from mountaintop coal removal operations to include valley fills, and subsequently surface coal mining in general within the Appalachian coal mining states.

4

- **June 12, 2009:** The Kentucky Division of Water received an email and correspondence from EPA Region 4, outlining the Coal Mining MOU and Interagency Action Plan (IAP) to review of coal mining operations on the Enhanced Coordination Process (ECP) list, in addition to the procedures for the ECP. (*See* e-mail, attached as Exhibit 4). The information also contained a spreadsheet containing a list of 63 operations in Kentucky awaiting Section 404 permits to be reviewed under the ECP even though the June 11, 2009 announcement had identified only 49 operations in Kentucky on the list awaiting Section 404 permits. In truth, the list of operations to receive increased EPA review continued to grow over the course of time to essentially include all surface mining operations in Eastern Kentucky, for both Section 402 and 404 permits.

- **June 16, 2009:** On or about June 16, 2009, and within thirty (30) days of its receipt of the revised General Permit, EPA sent a letter which stated "[i]n accordance with the EPA/Commonwealth of Kentucky NPDES MOA, we have completed our review of the above draft permit and have no objections to the proposed permit conditions. The draft permit satisfies EPA's concerns that were discussed in our April 3, 2009 letter to KDOW." KDOW issued the final General Permit following its receipt of this June 16, 2009 letter from EPA voicing no objections to its issuance (*See* June 16, 2009 Letter, attached as Exhibit 5). The Section 402 KY Coal General Permit went into effect on August 1, 2009 for a period of 5 years. The letter went on to request information for 63 pending Section 404 permits in addition to expressing EPA's intent to exercise its authority under the KY/EPA NPDES MOA to review and comment on the issuance of individual Section 402 permits or general permit coverages for this list of 63 coal mining operations.

- **July 30, 2009:** Kentucky began to receive extensive comments from EPA regarding proposed individual Section 402 coal mining permits. Among the comments were included the statement that "the permit should be revised to include a requirement to perform bioassessments to evaluate if the discharge will allow compliance with narrative aquatic life criteria." No conductivity limit was considered or discussed. The comments also indicated that instream data should be collected in advance of the permit application, that Best Management Practices (BMPs) should be required, and that whole effluent toxicity testing (WET) should be required. (*See* EPA Comment Letters, attached as Exhibit 6).

- **September 11, 2009:** Kentucky Governor Steve Beshear sent a letter to EPA Administrator Lisa Jackson strongly urging EPA to take expeditious action on the list of 49 Kentucky Section 404 pending permits.

- **September 18, 2009:** KDOW issued public notice of the first group of proposed Section 402 individual coal mining permits consistent with the more stringent requirements of the KY Coal General Permit that EPA had approved, and with additional requirements in response to subsequent EPA comments.

5

- **December 7-11, 2009:** Kentucky Division of Water received emails from EPA Region 4 outlining the basic approach that EPA was drafting for model permit language. The approach being considered was a BMP adaptive management approach where effluent and instream monitoring would indicate potential stream impacts that would trigger the implementation of BMPs. A conductivity limit was not proposed or discussed. (*See* e-mails, attached as Exhibit 7).

- **December 21, 2009:** EPA submitted comment letters with significant comments (these comment letters were in response to the September 18, 2009 proposed permits discussed previously). By the end of February 2010, 36 proposed Section 402 individual permits had been public noticed and sent to EPA Region 4 for review. Twenty-seven (27) comment letters had been received by the end of February 2010. The comment letters, which were very extensive, did not require a conductivity limit, but did indicate that instream conductivity levels between 400 and 500 uS/cm trigger additional BMPs and biological monitoring. (*See* Comment Letter, attached as Exhibit 8).

- **March 4-18, 2010:** A meeting was held in Knoxville, Tennessee between Kentucky Department for Environmental Protection staff and EPA Region 4 staff on March 4, 2010 to discuss resolution of EPA's comments on Kentucky's proposed draft permits. Kentucky presented options and revisions to EPA that largely addressed EPA's comments. A summary of the discussion was prepared by EPA. (*See* emails, attached as Exhibit 9). Subsequent discussions with EPA led to a satisfaction of EPA's concerns.

- **March 19, 2010:** Kentucky issued a press release announcing resolution with EPA on 27 proposed Section 402 coal mining permits that EPA had provided significant comments on and Kentucky's intention to move forward with issuance of these permits in accordance with EPA's acceptance. These revised permits included significant new requirements, in order to satisfy applicable statutory and regulatory requirements, including but not limited to (a) monitoring for chemical specific parameters of concern, (b) whole effluent toxicity (WET) testing, (c) instream biological monitoring, (d) an adaptive management BMP plan, (e) imposition of narrative water quality standard, (f) a reopener clause to allow the agency to perform an RPA analysis based on data collected and revise the permit accordingly, in addition to other permit requirements. EPA did not object to the issuance of these revised Section 402 permits, none of which required pre-permit Reasonable Potential Analysis (RPAs) or numeric effluent limits on conductivity.

- **April 1, 2010:** EPA headquarters conducted a conference call with certain Appalachian state environmental leaders including me, to discuss "an important announcement regarding mountaintop removal mining." During the call they discussed the Interim Guidance, which was issued on that date.

- **April 2, 2010:** On April 2, 2010, James D. Giattina, Director of EPA Region 4's Water Protection Division, sent an e-mail to KDOW, attaching a copy of a letter, also dated April 2nd. (*See* April 2, 2010 Giattina E-mail and Letter, attached hereto

collectively as Exhibit 10). In the e-mail, Director Giattina referenced the Section 402 KPDES Individual Permits recently issued by KDOW without objection by EPA, and noted that EPA "will not be requesting further review of these permits" but would be "working with you to fully address our concerns under our regs for future permits."

In the accompanying letter, EPA stated that the new permit requirements imposed by KDOW in the recently issued permits had not addressed all of EPA's concerns. Despite having failed to object to these permits just weeks before, EPA now characterized their contents - increased effluent monitoring, WET testing, post-permit RPAs coupled with permit reopeners - as deficient. Of particular concern, according to EPA, was "the missing reasonable potential analyses associated with narrative water quality standards and appropriate numeric effluent limits associated with these standards, including but not limited to conductivity and total dissolved solids." Again, RPAs and specific numerical limits on conductivity had never before been raised, despite the extensive ongoing discussions between Kentucky and EPA Region 4.

- **April 6-8, 2010:** EPA Region 4 sent an objection letter to Kentucky regarding a general permit coverage under the EPA approved KY Coal General Permit. An additional objection letter for a general permit coverage was received on April 8, 2010. In both cases, EPA was objecting to coverage under the KY Coal General Permit that EPA had approved less than a year before.

- **April 16, 2010:** On or about April 16, 2010 KDOW posted 23 additional Section 402 KPDES individual permits for public notice and comment.

- **April 27, 2010.** To clarify the objectives and implementation details of the Interim Guidance, Cabinet Secretary Len Peters wrote to EPA Administrator Lisa Jackson, attaching an extensive list of questions, including EPA's stance on appropriate permit limitations for conductivity. (*See* April 27, 2010 Letter, attached as Exhibit 11).

- **May 14, 2010:** Kentucky had a phone call with EPA Region 4 staff which indicated that EPA would be sending interim objection letters on proposed Section 402 surface mining permits in Eastern Kentucky. EPA also reiterated its concern with the use of general permit coverages for ECP coal mining operations. Later that day, EPA sent Kentucky twelve (12) interim objection letters. In essence, the proposed individual Section 402 permits for coal mining operations that contained the same permit requirements that EPA had accepted prior to April 1, 2010, were now being objected to.

- **May 25, 2010.** On this date, EPA Region 4 Administrator Stanley Meiberg wrote in response to Secretary's Peters April 27th inquiries. (See May 25, 2010 Letter, attached as Exhibit 12). Therein EPA states that the Interim Guidance was not a final rule subject to judicial review. However, in the same breadth, EPA left no doubt that the Interim Guidance's conclusions and benchmarks are intended to be

followed by states and bind EPA staff in their oversight of state Section 402 permits.

- For example, with regard to conductivity EPA states that all discharges from surfacing coal mining valley fills have high levels of conductivity that have been shown in studies to cause downstream impacts. They then conclude that "[t]hese discharges therefore have the reasonable potential to cause or contribute to an excursion of applicable water quality standards." According to the EPA, this reasonable potential can be found, not from site specific data (what state and federal authorities have always relied upon) but instead from EPA studies and data from nearby mining sites and justify imposition of numerical effluent limits at the outset. Permit reopeners, long sanctioned by EPA, is no longer acceptable given the data that exists.

- According to this letter, "EPA believes there is sufficient information available to develop numeric interpretation of the narrative criterion. In such cases, EPA would expect that such numeric limits be incorporated into the permit as necessary...For the vast majority of surface coal mine discharges, EPA believes it is feasible to calculate a numeric limit for conductivity that implements the narrative water quality standard. A permit condition to do WET testing, as opposed to a permit limit for WET, would not be appropriate where there is a finding of reasonable potential to cause or contribute to an exceedance of an applicable water quality standard."

- Notably, both WET testing and permit reopeners were contained in Kentucky Section 402 permits approved by EPA as late as mid March, 2010.

- **June 29, 2010:** KDOW responded to EPA's interim objections stating that they were improper and would be treated as comments to the permits.

- **September 16, 2010:** EPA issued its first formal specific objection with regard to Laurel Mountain Resources proposed Section 402 coal permit drafted by the KDOW. While EPA did not directly cite the Interim Guidance, it utilized the Interim Guidance rational, arguments and conclusions as the basis for the EPA specific objection. (*See* September 16, 2010 Objection Letter, attached as Exhibit 13).

- **September 28-29, 2010:** Kentucky received 9 more specific objection letters from EPA Region 4 on proposed Section 402 individual coal mining permits. EPA's specific objections occurred after EPA's 90-day extended review and interim objections, thus lengthening EPA's review process substantially beyond the normal 30-day review period. (*See* Additional Objection Letter, attached as Exhibit 14). The permit to which EPA objected contained the same terms and conditions as permits approved by EPA in March 2010 prior to issuance of the Interim Guidance.

8

- **October 22-28, 2010:** Kentucky receives 10 more specific objection letters from EPA Region 4 in response to proposed individual Section 402 permits for coal mining operations. Each of these permits contained the same terms and conditions approved by EPA in March 2010 prior to issuance of the Interim Guidance.

- **November 5, 2010:** Kentucky receives information from EPA in response to its Freedom of Information Act (FOIA) request. The information was in the form of a spreadsheet listing all Section 402 permits that EPA has objected to nationwide over the period January 1, 2000, to October 15, 2010. As indicated by the spreadsheet listing (attached as Exhibit 15 hereto), EPA has objected to 148 proposed draft Section 402 permits nationwide over the course of that nearly ten-year period. Of the 148, 50 (or 33.8%) of those Section 402 permit objections have occurred since early 2009. Had this spreadsheet been further completed to the present, Kentucky alone would have added an additional 10 EPA permit objections to the list, or 60 of the 158. Thus, nearly 40 percent of all of the Section 402 permit objections during the past 10 years have occurred since early 2009, not including objections in other states that may have occurred since October 15, 2010. At least 38 of the 60 objections that have occurred since January 20, 2009, have been for coal mining operations, and of those 38, all but 2 have occurred since April 1, 2010.

- **December, 2010:** Kentucky officials reach out to EPA officials in Washington, D.C. to determine if agreements can be reached with EPA Region 4 regarding the 21 pending Section 402 permit objections. Kentucky received assurance that EPA headquarters would support an agreement between Kentucky and EPA Region 4 officials if an agreement can be reached.

- **December 16, 2010:** I sent a message to EPA Region 4 regarding our understanding of this agreement and to set up a meeting time for Kentucky to travel to Atlanta to discuss potential options for resolution.

- **January 10-12, 2011:** I provided EPA Region 4 with a series of options to be considered for purposes of resolving the Kentucky Section 402 permits for which EPA had objected. (*See* January 10, 2011 e-mail, attached as Exhibit 16). A revised spreadsheet list of options was prepared and sent to EPA on January 12, 2011. It is attached as Exhibit 17 and states:

  > "**1. Option 1** tab would represent KY's primary template for the permitting of coal mining operations under the CWA 402 program. This would involve an approach using:
  >
  > a. An RPA up front in the drafting of the permit, and
  >
  > b. Imposition of a combination of WET, instream biological analysis, narrative standard, and adaptive BMP with biological trigger for purposes of implementing the narrative water quality standard for conductivity.

9

**2. Option 2** tab would represent an option that a coal mining operating might accept of their own choosing in lieu of Option 1. This would involve:

a. RPA up front in the drafting of the permit, and

b. Imposition of a numeric interpretation of the narrative water quality standard directly as a permit limit for conductivity (or other appropriate chemical specific parameter if available and sufficient, such as sulfate) along with the possibility of a compliance schedule for purposes of implementing the narrative water quality standard for conductivity. There would also be a standard BMP plan requirement. This could be done at the applicant's request in lieu of WET, instream biological analysis, the narrative standard, and a BMP plan with a biological trigger built in."

- **January 28, 2011:** Kentucky officials traveled to Atlanta to meet with EPA Region 4 officials in order to resolve the pending permit objections.

- **February 1, 2011:** EPA Region 4 officials traveled to Kentucky to have an all day meeting with KDOW program staff in order to resolve the pending permit objections.

- **February 22, 2011:** Kentucky sent yet another revised permit template to EPA Region 4 for review and consideration in hopes of obtaining resolution to the permit objections.

- **February 25, 2011:** A conference call with EPA Region 4 officials was held to discuss some additional requested revisions needed in order for the objections to be resolved, including several minor fact sheet and permit clarifications, and a request from EPA for Kentucky to express the instream biological requirement as a "clear, specific, measurable, and enforceable permit requirement" of the Kentucky narrative water quality quality standard for conductivity/TDS. Kentucky's eventual final proposed draft permit that was provided to EPA Region 4 agreed to express the instream biological requirement as a "clear, specific, measurable, and enforceable permit requirement" as a means to implement Kentucky's narrative water quality standard for conductivity/TDS, along with triggers (and other permit requirement triggers) to require operational changes at the mining operation in the event that instream biological assessment determined that the operation was having a negative impact on the receiving stream. Kentucky's approach to implement the Kentucky narrative water quality standard for conductivity/TDS using an instream biological assessment determines actual site specific effects to protect water quality rather than EPA's final interim guidance conductivity benchmark that is intended for broad regional consideration and guidance.

- **March 4, 2011:** Kentucky received a phone call from EPA Region 4 indicating that they were in agreement with Kentucky's revised approach to resolve the pending objections.

- **March 10, 2011:** Kentucky received an email from EPA Region 4 identifying some last minute revisions to the permit and fact sheet to (a) clarify effluent limits for instream ponds, (b) clarify the expression of total recoverable metals limits and monitoring frequency, (c) clarify TSS RPA and associated language in the permit fact sheet, (d), clarify BMP implementation requirements, (e) clarify the justification for BMPs and biological assessments, (f) clarify chronic WET requirements, and (g) clarify flow rate duration requirements. EPA wanted to provide final clarity to the resolution and asked for Kentucky to send the final revised CWA 402 permit template.  Kentucky addressed each of EPA's concerns in its final proposed permit draft provided to EPA Region 4. The e-mail is attached as Exhibit 18.

- **March 25, 2011 to April 4, 2011:** Kentucky sends to EPA Region 4 for final review and acceptance its revised permit template, in response to all of EPA's follow-up comments.  Kentucky received a phone call from EPA Region 4 staff late Friday, April 1, 2011, that EPA had accepted Kentucky's revised approach to resolve the pending permit objections.

- **April 11, 2011:** Kentucky received a phone call from EPA Region 4 indicating that some reservations were now being expressed at EPA headquarters on the revised permit template.

- **May 4, 2011:** EPA Region 4 officials traveled to Kentucky to meet with Cabinet officials to inform Kentucky that, despite the agreement of EPA Region 4, the revised permit template approach had been rejected by EPA headquarters and there was no agreement. This was contrary to what EPA Region 4 had represented on two prior occasions.

8.      As set forth herein, during the last two years Kentucky has made efforts to fully resolve EPA's stated concerns and issue Section 402 permits only to encounter new concerns throughout this time.  The constant approval-disapproval cycle by EPA culminated in the most recent efforts of the Cabinet to resolve EPA's concerns over the blocked 21 Section 402 permits. After months of negotiation, and representations by EPA Region 4 that a settlement had been reached, EPA notified the Cabinet that EPA headquarters would not approve the settlement.

11

9.     Since EPA's issuance of its Interim Guidance on April 1, 2010, no individual Kentucky Section 402 permit proposed after April 1, 2010, has been issued for a discharge from an eastern Kentucky surface mining operation due to EPA's objections discussed herein.

FURTHER THE AFFIANT SAYETH NAUGHT.

_____
R. Bruce Scott

COMMONWEALTH OF KENTUCKY        )
                                )
COUNTY OF ___Franklin_____   )

Sworn to and subscribed before me, this _23_ day of May, 2011.

_____
Notary Public

414826v3

12



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION III
1650 Arch Street
Philadelphia, Pennsylvania 19103-2029**

November 20, 2011

Mr. Jeffrey Parsons
Division of Mining and Reclamation
West Virginia Department of Environmental Protection
601 57th Street
Charleston, West Virginia 25304

Re:    NPDES Permit No.WV1029924 – New
       Frasure Creek Mining, LLC
       Spring Fork Surface Mine No. 2
       SMCRA No. S501808
       EPA Receipt Date – August 22, 2011

Dear Mr. Parsons:

Pursuant to Section 402 of the Clean Water Act, 40 C.F.R. § 123.44 and the
*Memorandum of Agreement Regarding the Administration and Enforcement of the National
Pollutant Discharge Elimination System (NPDES) in West Virginia 1982* (MOA), the U.S.
Environmental Protection Agency (EPA) Region III received the draft NPDES permit cited
above. EPA provided a notification of a general objection, pursuant to 40 C.F.R. § 123.44(b)(1),
on September 21, 2011 which served as time extension for the full 90-day review period.

EPA is providing final comments on this application. The EPA's comments are based
upon the proposed permit and documentation received from August 22, 2011 to the present,
including but not limited to certain baseline water quality information, a copy of the Aquatic
Ecosystem Protection Plan (AEPP), and a revised rationale page submitted on November 18,
2011.

We recognize and appreciate the applicant's efforts to reduce impacts from this project
and to take steps to protect water quality. We also appreciate WVDEP's efforts to craft a permit
that includes a number of important and protective features, including inclusion of chronic
Whole Effluent Toxicity limitations, extensive ambient water quality monitoring, and a condition
based upon instream biology.

The permit proposes to discharge from 14 on-bench, precipitation induced outfalls to an
unnamed tributary of Gilbert Creek and the Right Fork of Gilbert Creek of the Guyandotte River
and from one in-stream outlet (Outlet 001) that will convey effluent discharging from Pond No.
1, associated with Valley Fill No. 1, to an unnamed tributary of Sims Fork of Fourpole Creek of
Tug Fork River. The draft permit presumes that discharges from Outlet 001 have reasonable
potential to cause or contribute to violations of the narrative water quality criteria, and thus it

3

- Designing on-bench drainage structure to flow away from valley fill watershed

The BMPs referenced above are intended to reduce groundwater infiltration and surface water penetration which should in turn reduce the contact time of water with overburden material, thus reducing the potential for elevated levels of TDS, particularly considered in conjunction with the fact that the valley fill is located up-gradient of the groundwater intercept and on the up-dip side of the operation. We recommend as an additional BMP that the valley fill be constructed with the least reactive (or most weathered) material.

The BMPs should be specifically referenced in the permit. While the permit document states: "The herein activity is to be … constructed or installed, and operated, used and maintained strictly in accordance with the terms and conditions of this permit, the plans and specifications submitted with Permit Application No. WV1029924, completed the 28 day of June 2011," it is not apparent from the face of the permit document that the foregoing BMPs intended to protect water quality are incorporated into and are an enforceable condition of the permit. These measures should be more explicitly made special conditions of the NPDES permit. The AEPP indicates that these measures may be part of the SMCRA permit. To the extent that is the case, this could be accomplished by cross-referencing and incorporating by reference the applicable provisions of the SMCRA permit.

We appreciate that the permit includes requirements for monitoring TDS, specific conductance, calcium, magnesium, sodium, potassium, and total sulfates at the outfalls and monitoring for TDS, specific conductance, and total sulfates at the biological monitoring locations. The permit should also include monitoring for bicarbonate at these locations and sulfates + bicarbonate should be reported as a separate line in all reports.

While the monitoring requirements, particularly if they are modified to include bicarbonate, will allow WVDEP and the applicant to determine whether the BMPs are performing as expected, the permit contains no provision to address an unanticipated failure of the BMPs to perform as expected. Evidence that the suite of BMPs proposed will be sufficient to protect water quality is limited. The permit should include a requirement for the permittee to report quarterly on implementation on the AEPP and the performance of the BMPs relative to preventing increases in conductivity over baseline conditions, and to implement adjustments as needed. The permit should include a numeric trigger for TDS, specific conductivity, or total sulfates + bicarbonate at Outfall 001. If that trigger is reached, the permit should require additional remedial measures to be taken to limit TDS. The permit also should include a provision so that failure of the BMPs and additional remedial measures to control TDS would constitute a permit violation.

WVDEP's approach efforts to include a permit provision based directly on instream biology. The provision defines acceptable condition as the 5th percentile of

3

- Designing on-bench drainage structure to flow away from valley fill watershed

The BMPs referenced above are intended to reduce groundwater infiltration and surface water penetration which should in turn reduce the contact time of water with overburden material, thus reducing the potential for elevated levels of TDS, particularly considered in conjunction with the fact that the valley fill is located up-gradient of the groundwater intercept and on the up-dip side of the operation. We recommend as an additional BMP that the valley fill be constructed with the least reactive (or most weathered) material.

The BMPs should be specifically referenced in the permit. While the permit document states: "The herein activity is to be ... constructed or installed, and operated, used and maintained strictly in accordance with the terms and conditions of this permit, the plans and specifications submitted with Permit Application No. WV1029924, completed the 28 day of June 2011," it is not apparent from the face of the permit document that the foregoing BMPs intended to protect water quality are incorporated into and are an enforceable condition of the permit. These measures should be more explicitly made special conditions of the NPDES permit. The AEPP indicates that these measures may be part of the SMCRA permit. To the extent that is the case, this could be accomplished by cross-referencing and incorporating by reference the applicable provisions of the SMCRA permit.

We appreciate that the permit includes requirements for monitoring TDS, specific conductance, calcium, magnesium, sodium, potassium, and total sulfates at the outfalls and monitoring for TDS, specific conductance, and total sulfates at the biological monitoring locations. The permit should also include monitoring for bicarbonate at these locations and sulfates + bicarbonate should be reported as a separate line in all reports.

While the monitoring requirements, particularly if they are modified to include bicarbonate, will allow WVDEP and the applicant to determine whether the BMPs are performing as expected, the permit contains no provision to address an unanticipated failure of the BMPs to perform as expected. Evidence that the suite of BMPs proposed will be sufficient to protect water quality is limited. The permit should include a requirement for the permittee to report quarterly on implementation on the AEPP and the performance of the BMPs relative to preventing increases in conductivity over baseline conditions, and to implement adjustments as needed. The permit should include a numeric trigger for TDS, specific conductivity, or total sulfates + bicarbonate at Outfall 001. If that trigger is reached, the permit should require additional remedial measures to be taken to limit TDS. The permit also should include a provision so that failure of the BMPs and additional remedial measures to control TDS would constitute a permit violation.

WVDEP's approach efforts to include a permit provision based directly on instream biology. The provision defines acceptable condition as the 5th percentile of

4

reference (currently WVSCI = 68). The permit, however, does not define failure to achieve acceptable biological condition as a permit violation and instead, states that a WVSCI score less than acceptable requires the permittee to identify potential sources in the watershed.

We are concerned by the selection of BAS-1 as the biological monitoring location. BAS-1 is located on Fourpole Creek, the receiving stream of Sims Fork, just upstream of the confluence of Fourpole Creek and Brushy Fork. This location is approximately 1.6 miles downstream from the confluence of Sims Fork and Fourpole Creek. We note that BAS-1 is located some distance downstream from Outfall 001 in a watershed that is experiencing other influences, including gas wells. Accordingly, it does not appear that BAS-1 is a good location for identifying whether there are impacts in the future caused by the facility.

We also note that the Rationale page and the permit give the sampling anniversary as October 7, 2010. The AEPP (page 8) also states that information was collected October 7, 2010. However, elsewhere, the AEPP gives the sampling date as September 29, 2010 (e.g., pages 24 & 25). In addition, the WVSCI score at BAS-1 is below the "acceptable" level defined in the permit and would cause the stream to be included as impaired on West Virginia's list of impaired waters pursuant to Clean Water Act Section 303(d). Accordingly, it is not clear what value would be added from the permit provision directing the applicant to identify sources. The applicant states that the ambient water chemistry at the Site is generally good and habitat modification appears to be the limiting factor. We note, however, that the level of specific conductivity at BAS-1 is 722 uS/cm (AEPP, page 16, 23). (Elsewhere, specific conductance at BAS-1 is given as 694 uS/cm (see table on page 25)). This exceeds the level of conductivity shown by various studies as likely to cause extirpation of naturally occurring genera, and is also at level identified by WVDEP as a weak stressor.

Accordingly, it seems that water quality also may be a limiting factor at BAS-1. While we recognize that BAS-1 was selected because upstream areas were not flowing at the time of sampling (October 7, 2010), the biological assessment sampling location should be located closer to Outfall 001 to allow for better assessment of impacts. This could be accomplished by selecting a sample location in an area known to have flow during the springtime months within the WVSCI indexing period when seasonal streams are more likely to be flowing and modifying the rapid bioassessment protocol analysis to account for seasonal flow. Sampling should be increased to twice per year, with one sampling event during the spring months of the WVSCI indexing period. In addition, the permit should provide that any reduction in the WVSCI score at the new biological sampling location below the 5th percentile of reference (currently WVSCI = 68) is a violation of the permit.

This permit will provide additional information through enhanced monitoring and implementation of BMPs. EPA reserves the right to modify its position on this permit and others submitted in the future. We request that WVDEP address our comments and provide a

5

response before issuing the permit. If you have any questions, please contact me at (215) 814-5717.

Sincerely,

Evelyn S. MacKnight

Evelyn S. MacKnight, Chief
NPDES Branch

cc: Frasure Creek Mining, LLC
Thomas Clarke, WVDEP