**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, et al., | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| LISA JACKSON, Administrator, | ) |
| U.S. ENVIRONMENTAL PROTECTION | ) |
| AGENCY, et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and, | ) |
| | ) |
| SIERRA CLUB, et al., | ) |
| | ) |
| Defendant-Intervenors. | ) |

Civil Action No. 10-1220 (RBW)
Civil Action No. 11-0295 (RBW)
Civil Action No. 11-0446 (RBW)
Civil Action No. 11-0447 (RBW)

_____

## MEMORANDUM OPINION

This case is before the Court on the parties' cross-motions for partial summary judgment

regarding the Final Guidance memorandum issued by the Environmental Protection Agency

("EPA") on July 21, 2011.[1]   See Plaintiffs' Motion for Partial Summary Judgment ("Pls.'

---

[1]   On July 20, 2010, plaintiff National Mining Association ("the Association") filed a complaint seeking declaratory and injunctive relief against multiple federal defendants. On September 17, 2010, the Association filed a motion for a preliminary injunction, but consented to the defendants' request for an extended briefing schedule. On January 14, 2011, the Court denied the Association's motion for a preliminary injunction and denied the federal defendants' motion to dismiss the Association's complaint. See Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 56 (D.D.C. 2011) ("Nat'l Mining Ass'n I"). After that ruling, four cases pending in United States District Courts in West Virginia and Kentucky were transferred to this Court and consolidated with case number 10-cv-1220, the case in which the Association had moved for a preliminary injunction in this Court. The plaintiffs proposed, and the Court accepted, a bifurcated summary judgment briefing schedule with respect to the challenged EPA actions (i.e., the Enhanced Coordination Process and the Interim Detailed Guidance).

On October 6, 2011, the Court granted the plaintiffs' first motion for partial summary judgment after it concluded that the EPA exceeded its statutory authority under the Clean Water Act ("CWA"), 33 U.S.C. 1251 (2006), in adopting its Multi-Criteria Integrated Resource Assessment ("MCIR Assessment") and Enhanced Coordination Process ("EC Process"). See Nat'l Mining Ass'n v. Jackson , 816 F. Supp. 2d 37, 49 (D.D.C. 2011)

(Continued . . . )

Mot."); United States' Motion for Partial Summary Judgment ("Defs.' Mot."). The Court heard

oral argument on the motions on July 13, 2012. For the reasons that follow, the plaintiffs'

motion will be granted and the defendants' motion will be denied.[2]

## I.  STATUTORY AND REGULATORY BACKGROUND

A.  The Surface Mining Control and Reclamation Act

"The Surface Mining Control and Reclamation Act embodies Congress' recognition that

'the expansion of coal mining to meet the Nation's energy needs makes even more urgent the

establishment of appropriate standards to minimize damage to the environment . . . ." In re

Permanent Surface Mining Regulation Litigation, 653 F.2d 514, 516 & 516, n.1 (D.C. Cir. 1981)

("In re PSMRL") (citing 30 U.S.C. § 1201). Accordingly, the SMCRA requires those engaging

in surface coal mining operations to comply with permitting requirements and environmental

protection standards. 30 U.S.C. §§ 1202, 1256-1266 (2006). The SMCRA is administered and

enforced by the Department of the Interior's Office of Surface Mining Reclamation and

---

( . . . continued)

("Nat'l Mining Ass'n II"). On July 21, 2011, the EPA issued its Final Guidance Memorandum, mooting the plaintiffs' challenges to the Interim Guidance. The plaintiffs and plaintiff-intervenors then amended their complaints, alleging that the Final Guidance violates the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1202 (2006), CWA, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (2006). The parties then rebriefed the challenges to the Final Guidance, and the pending cross-motions pertain only to the Final Guidance.

[2]     In addition to the documents already referenced, the Court considered the following filings in resolving the parties' cross-motions: (1) the Plaintiffs' Joint Memorandum in Support of their Motion for Partial Summary Judgment [ECF 122-1] ("Pls.' Mem."); (2) the United States' Memorandum in Support of its Cross-Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Joint Motion for Partial Summary Judgment ("Defs.' Mem."); (3) the Defendant-Intervenors Sierra Club et al. Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendants' Cross-Motion for Partial Summary Judgment ("Def.-Ints.' Mem."); (4) the Plaintiffs' Opposition to Defendants' and Defendant-Intervenors' Cross-Motions for Partial Summary Judgment and Reply Memorandum in Support of their Joint Motion for Partial Summary Judgment ("Pls.' Reply"); (5) the United States' Reply Memorandum in Support of its Cross-Motion for Partial Summary Judgment ("Defs.' Reply"); (6) the Defendant-Intervenors Sierra Club et al. Memorandum in Reply and in Support of Defendants' Cross-Motion for Partial Summary Judgment ("Def.-Ints.' Reply"); (7) the Plaintiffs' Responses to the Court's Request for Filings Addressing Jurisdictional Questions ("Pls.' Resp."); (8) the United States' Pre-Hearing Responses to Questions Posed by the Court ("Defs.' Resp."); (9) the Administrative Record ("A.R."); and (10) the extra-record evidence the Court ruled it would consider in its April 20, 2012, July 2, 2012, and July 13, 2012 Orders.

Enforcement ("Office of Surface Mining"), 30 U.S.C. § 1211(c)(1), but a state may assume primary jurisdiction over the regulation of surface mining within its borders by having its proposed program approved by the Secretary of the Interior,[3] 30 U.S.C. § 1253.  Pursuant to the SMCRA, before approving a state program the Secretary must solicit and then publicly disclose the views of certain federal agencies regarding the state regulatory program and must obtain the written concurrence of the EPA with respect to the aspects of the state program that relate to water quality standards promulgated under the Clean Water Act, 33 U.S.C. § 1313 (2006).  30 U.S.C. § 1253(b).  Once a state program is approved, the state has the primary responsibility for all aspects of the regulatory program.  See In re PSMRL, 653 F.2d at 516 ("The Secretary may only approve the state program if he finds it capable of carrying out the exacting provisions of the [SMCRA] and consistent with his own regulations."); id. at 518 ("Under a state program, the state makes decisions applying the national requirements of the [SMCRA] to the particular local conditions of the state.  The Secretary is initially to decide whether the proposed state program is capable of carrying out the provisions of the [SMRCA], but is not directly involved in local decisionmaking after the program has been approved.").

The statute provides only a limited role for the EPA.  First, the SMCRA requires the Secretary of the Interior to obtain the EPA's written concurrence on any SMCRA-implementing regulations that relate to air or water quality standards.  Second, as noted, the Office of Surface Mining may not approve a proposed state program until it has solicited and publicly disclosed the EPA's views and obtained the EPA's written concurrence as to any aspects of the state program that relate to water quality standards promulgated under the CWA.  In short, although

---

[3]      Of the six Appalachian states with active coal mining and subject to the Final Guidance, only Tennessee does not have an approved state SMCRA permitting program.  Defs.' Mem. at 12; Pls.' Mem. at 3, n.2.

the SMCRA explicitly conveys Congress's admonition that the EPA cooperate with the Office of

Surface Mining to the greatest extent practicable, 30 U.S.C. § 1292, it is clear that oversight

authority of the state permitting authorities belongs to the Secretary of the Interior.  See In re

PSMRL, 653 F.2d at 519 ("The Secretary's ultimate power over lax state enforcement is set out

in section 521(b) of the [SMCRA].  When the Secretary determines that violations result from a

state's lack of intent or capability to enforce the state program, he is to enforce permit conditions

directly, and to take over the entire permit-issuing process himself."); see also id. ("Once the

State has assumed all these functions, the Secretary's role is primarily one of oversight."); id. at

520 ("Direct intervention by the Secretary in the operation of state regulatory programs is clearly

intended as an extraordinary remedy.")  And of significant importance, the SMCRA does not

supersede the Clean Water Act.  See 30 U.S.C. § 1292.

    B.  The Clean Water Act

The CWA establishes a permitting scheme for pollutants discharged into bodies of water,

and coal mining operations typically must obtain both CWA permits and SMCRA permits.

    1.  Section 404 Permits

Clean Water Act Section 404 permits are issued by the United States Army Corps of

Engineers ("Corps") "for the discharge of dredged and fill material into navigable waters at

specific disposal sites," 33 U.S.C. § 1344(a), and govern material that fills or displaces receiving

waters.  The Corps has sole authority to issue Section 404 permits, id., but in doing so must

apply guidelines that it develops in conjunction with the EPA, id. § 1344(b).  As required by the

Clean Water Act, id., the EPA and the Corps promulgated 404(b)(1) guidelines to guide the Corps' review of the environmental effects of proposed disposal sites.[4]

    2. <u>Section 402 Permits</u>

Known as National Pollutant Discharge Elimination System ("NPDES") permits, Section 402 permits are typically issued by states for the discharge of all other pollutants not covered by Section 404 permits (i.e., non-dredged or fill material). <u>See</u> 33 U.S.C. § 1342(a). NPDES permits govern pollutants that are assimilated by receiving waters by establishing limits placed on the make-up of wastewater discharge. <u>See</u> 33 U.S.C. § 1342.

Section 402 permits are issued by the EPA, unless a state has an approved program.[5] <u>See</u> <u>id.</u> § 1342(b). Once the EPA approves a state permitting program, the state has exclusive authority to issue NPDES permits, although the EPA does have limited authority to review the state action. <u>Id.</u> § 1342(d). For example, the state must submit draft permits to the EPA, and the EPA may object to a proposed permit that is not consistent with the CWA or federal regulations. <u>Id.</u> If the state does not respond to an EPA objection to a permit within specified timeframes, the EPA assumes the authority to issue the permit. <u>See</u> <u>id.</u> § 1342(d)(4). If the EPA does not object to the issuance of a permit within the specified timeframe, the state may proceed to issue the permit. <u>Id.</u> § 1342(d)(2).

---

[4]    The 404(b)(1) guidelines, which are codified at 40 C.F.R. Part 230, played a considerable role in the parties' arguments regarding the validity of the EC Process and the MCIR Assessment. The Court's October 6, 2011 ruling on the plaintiffs' challenges to the EPA's EC Process concluded that the "EPA ha[d] expanded its role in the issuance of Section 404 permits and ha[d] thus exceeded the statutory authority afforded it by the Clean Water Act." <u>Nat'l Mining Ass'n II</u>, 816 F. Supp. 2d at 45.

[5]    All of the Appalachian states subject to the Final Guidance—Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia—have approved programs and thus administer the Section 402 permitting programs within their states.

a. <u>The Relationship Between Section 301 Effluent Limits and Section 402 Permits</u>

In accordance with Section 301 of the CWA, 33 U.S.C. § 1313,  NPDES permits "typically contain numerical limits called 'effluent limitations'[6] that restrict the amounts of specified pollutants that may be discharged." Defs.' Mem. at 9.  "Water quality based effluent limitations are required for all pollutants that the permitting authority determines 'are or may be discharged at a level [that] will cause, have the reasonable potential to cause, or contribute to an excursion above any [applicable] water quality standard, including state narrative criteria for water quality.'"  <u>Id.</u> (quoting 40 C.F.R. § 122.44(d)(1)(i)).  Accordingly, the procedure for determining the need for effluent limits is called a reasonable potential analysis.  If the discharge does have the reasonable potential to cause an excursion[7] above a numeric or narrative water quality standard set in accordance with Section 303 of the CWA, the state must develop permit limitations to ensure compliance with that water quality standard.  <u>See Am. Paper Inst. v. EPA</u>, 996 F.2d 346, 349 (D.C. Cir. 1993) (explaining that Section 301 of the CWA, 33 U.S.C. § 1311, requires that "every permit contain (1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls, and (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet water quality standards") (citing 33 U.S.C. § 1311(b)(1)(A) & (C)).  To achieve this compliance, the states may establish either numeric or narrative permit limits.  <u>See id.</u> (noting that criteria come in "two varieties: specific numeric limitations on the concentration of a specific pollutant in the water . . . or more general narrative statements applicable to a wide set of pollutants").

---

[6]     An effluent is an outflowing of water, gas, or some other material.  Thus, an effluent limitation, is a limitation imposed on outflows, and a water-quality based effluent limitation is a limitation based on the maintenance of water quality standards.

[7]     To say that a discharge may cause or has caused an excursion is simply to say that the standard has been exceeded or violated.

3. <u>Section 303 Water Quality Standards</u>

Section 303 "requires states to adopt water quality standards applicable to their intrastate and interstate waters."  Defs.' Mem. at 8 (citing 33 U.S.C. § 1313(a)-(c); <u>see also</u> <u>Am. Paper.</u> <u>Inst.</u>, 996 F.2d at 349 ("Under the CWA, the water quality standards referred to in section 301 [and which the Section 301 effluent limitations are intended to protect] are primarily the states' handiwork."); <u>id.</u> at 350 ("Of course, the [section 303] water quality standards by themselves have no effect on pollution; the rubber hits the road when the state-created standards are used as the basis for specific [section 301] effluent limitations in NPDES permits [i.e., Section 402 permits].").  A water quality standard designates uses for a particular body of water and establishes criteria for protecting those uses.  As already noted, Section 303 water quality standards can be expressed as a specific numeric limitation on pollutants or as a general narrative statement.

While states are responsible for developing the water quality standards, the EPA is required to review the standards for approval.  <u>See</u> 33 U.S.C. § 1313(c).  The EPA may assume the role of actually promulgating water quality standards only if (1) it determines that a state's proposed new or revised standard does not measure up to the Clean Water Act's requirements and the state refuses to accept EPA-proposed revisions, or (2) a state does not act, and the EPA determines that a new or revised standard is necessary.  <u>See</u> <u>Am. Paper Inst.</u>, 996 F.2d at 349 (citing 33 U.S.C. § 1313(c)(3)-(4)).

## II.  FACTUAL BACKGROUND AND THE PARTIES' ARGUMENTS

In April 2010, the EPA released its "interim" guidance memorandum.  In seeking a preliminary injunction from this Court in September 2010, the plaintiffs asserted that the EPA had made sweeping pronouncements regarding the need for water quality-based limits in CWA

Section 402 and 404 permits.  The plaintiffs maintained that the interim guidance had (1) effectively established a region-wide water quality standard based on conductivity[8] levels it associated with adverse impacts to water quality, (2) was being used by the EPA to cause indefinite delays in the permitting process, and (3) caused various permitting authorities to include the conductivity level into pending permits.  See Pls.' Mem. at 14-16.  The defendants responded by arguing that the interim guidance was not final agency action and was therefore not ripe for review.  In an opinion denying both the plaintiffs' motion for a preliminary injunction and the defendants' motion to dismiss, the Court observed that "based on the record [then] before the Court . . . , it appear[ed] that the EPA [wa]s treating the [interim] [g]uidance as binding."  Nat'l Mining Ass'n I, 768 F. Supp. 2d at 45.

On July 21, 2011, the EPA issued the Final Guidance, which, according to the EPA, reflects public input on the interim guidance and accounts for and responds to key concerns raised by the Appalachian states and the mining industry during the earlier stages of this litigation.  Defs.' Mem. at 1-2.  The plaintiffs, however, allege that the EPA's Final Guidance exceeds the EPA's authority under the SMCRA and the CWA, is arbitrary and capricious, and is an abuse of discretion.  See Pls.' Mem. at 1-2.  The defendants' principal response is a bevy of arguments targeting the Court's ability to review the Final Guidance.  They assert that the Final Guidance is not final agency action, Defs.' Mem. at 13; that the Final Guidance is not ripe for review, id. at 24; and that the plaintiffs do not have standing to maintain their challenges to the Final Guidance, id. at 26.  Alternatively, the defendants maintain that if the Final Guidance does

---

[8]     As the defendants helpfully explain, "[a]n increase in conductivity means that the water is getting saltier. Salinity is often expressed as specific conductance, or conductivity, which is a measure of the ability of water to conduct an electrical current.  It is highly dependent on the amount of dissolved solids . . . in the water." Defs.' Mem. at 2, n. 2.  The defendants further state: "As conductivity levels rise, fish, amphibians, mussels, and other aquatic organisms can be adversely affected." Id. at 2, n.3.

constitute final agency action, 33 U.S.C. §1369(b)(1) vests exclusive jurisdiction of its review in the District of Columbia Circuit.  Id. at 23.  The defendants further assert that the Final Guidance is consistent with existing statutory and regulatory authority.  Id. at 30, 33.  Lastly, the defendants maintain that the Final Guidance satisfactorily explains its recommendations and thus does not violate the APA.  This Memorandum Opinion addresses these arguments in turn.

### III.   STANDARD OF REVIEW

The summary judgment standard set forth in Federal Rule of Civil Procedure 56(a) does not apply in a case involving review of a final agency action under the APA due to the limited role of a court in reviewing the administrative record.  See Catholic Health Initiatives-Iowa, Corp. v. Sebelius, 841 F. Supp. 2d 270, 276 (D.D.C. 2012).  "Under the APA, . . . 'the function of the district court is to determine whether . . . as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  Id. (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)); see also Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) (explaining that where a case involves a challenge to a final administrative action, a court's review is limited to the administrative record) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973))).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  Catholic Health, 841 F. Supp. 23d at 276 (citing Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

### IV.   LEGAL ANALYIS

A.  Can the Court Review the Final Guidance?

"Firing nearly all the arrows in its jurisdictional quiver," Natural Res. Def. Council v. EPA, 643 F.3d 311, 313 (D.C. Cir. 2011), the EPA argues that the Final Guidance is not final

agency action, or, alternatively, if it is, that exclusive jurisdiction for its review rests with the

Circuit, that the Final Guidance is not ripe for review, and that the plaintiffs lack standing to

challenge the Final Guidance.  As explained below, "[a]ll [four] arrows miss their target."  Id.

    1. Final Agency Action

The APA limits judicial review to "final agency action for which there is no other

adequate remedy in court."  5 U.S.C. § 704.  In other words, finality is a "threshold question"

that determines whether judicial review is available.  Fund for Animals, Inc. v. U.S. Bureau of

Land Mgmt., 460 F.3d 13, 18 (D.C. Cir. 2006).  The Supreme Court has explained that, "[a]s a

general matter, two conditions must be satisfied for agency action to be final: First, the action

must mark the consummation of the agency's decision making process," and second, "the action

must be one by which rights or obligations have been determined, or from which legal

consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quotation marks

omitted).

"Finality resulting from the practical effect of an ostensibly non-binding agency

proclamation is a concept [that the District of Columbia Circuit has] recognized in the past."

Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005) (citing Gen. Elec. Co.

v. EPA, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[I]f the language of the document is such that

private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be

binding as a practical matter[.]"); McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1321

(D.C. Cir. 1988) (agency action, though facially nonbinding, "created a norm with present day

binding effect")).  For example,

> [i]f an agency acts as if a document issued at headquarters is controlling in the
> field, if it treats the document in the same manner as it treats a legislative rule, if it
> bases enforcement actions on the policies or interpretations formulated in the
> document, if it leads private parties or State permitting authorities to believe that

it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes binding.

Appalachian Power Co. v. EPA, 208 F.3d 1015, 1021 (D.C. Cir. 2000) (emphasis added). However, "if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review." Norton, 415 F.3d at 15.

Here, the Court finds that the EPA's Final Guidance marks the "consummation of the agency's decision making process." Bennett, 520 U.S. at 177-78.   Indeed, the defendants concede that the first prong of the Bennett test is met as the arguments in their opposition pertain only to whether the Final Guidance is a binding legislative rule or whether it is merely a policy statement. See Defs.' Mem. at 15-23.  This concession was expressed again at the July 13, 2012 hearing when defense counsel explicitly stated that the EPA does not dispute that the Final Guidance is the consummation of the decision making process.

Despite the defendants' concession, because final agency action is a "threshold question," Fund for Animals, Inc., 460 F.3d at 18, the Court is compelled to briefly set forth its reasoning why the first prong of the Bennett test is satisfied.  The Final Guidance was issued after the EPA received over 60,000 comments on the interim guidance.  See Norton, 415 F.3d at 14 (concluding that the agency protocols at issue "clearly marked the consummation of the decision making process," and observing that the protocols were "published after [the agency] solicited input from specialists and reviewed" past data); Appalachian Power, 208 F.3d at 1022 (observing that the EPA guidance in dispute followed the circulation of two earlier drafts).  The Final Guidance itself notes that it "replaces [the] EPA's interim final guidance issued on April 1, 2010, and the Regions should begin consulting it immediately."  Final Guidance at 1 (A.R. FG005440). Furthermore, and most important as to the first element of Bennett, the Final Guidance reflects

the EPA's settled position on both its understanding of its authority under the respective statutes and regulations, see id. at 2 (A.R. FG005441), and its understanding of the science upon which the Final Guidance is based, see id. at 5 (A.R. FG005444).  It is thus clear that the Final Guidance represents the consummation of the EPA's decision making process.

Next, the Court must assess whether the second element of Bennett is satisfied—whether the Final Guidance is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  520 U.S. at 178.  Unsurprisingly, the plaintiffs argue yes and the defendants argue no.  The EPA contends that the Final Guidance "is a policy statement, not a legislative rule."[9]  Defs.' Mem. at 15.  Of the various claims the defendants advance in support of this assertion, of greatest import here is their contention that "the Guidance does not establish new obligations, change the governing legal norm, or purport to provide [the] EPA with any authority that [the] EPA does not already possess to review draft permits or permit applications.  Rather, the Guidance relies upon existing standards in the CWA and [the] EPA's regulations."  Id. at 17.  At the July 13, 2012 hearing, the defendants similarly maintained that the "critical point" is that the Final Guidance does not provide new authority to the EPA.  The plaintiffs obviously disagree, asserting that "[p]rior to the issuance of the Final Guidance, neither the SMCRA nor the CWA nor EPA regulations nor case law authorized EPA regional directors to regulate mine design and planning upland from waters of the United States."  Pls.' Reply at 3.

As an initial matter, the Court is unconvinced by the defendants' arguments in regard to the nonbinding language in the Final Guidance.  See Defs.' Mem. at 16, 18-19.  It is true that the Final Guidance contains language avowing that the recommendations within the document are

---

[9]      "A policy statement is one that, first, does not have 'a present-day binding effect,' that is, it does not 'impose any rights and obligations,' and second, 'genuinely leaves the agency and its decision makers free to exercise discretion.'"  McLouth Steel, 838 F.2d at 1320.

not binding pronouncements.  See, e.g., Final Guidance at 1 (A.R. FG005440) ("This

memorandum does not impose legally binding requirements and will not be implemented as

binding in practice.  It does not impose any obligations on private parties."); id. at 9 (A.R.

FG005448 ("The use of language such as 'recommend,' 'may,' 'should,' and 'can' is intended to

describe agency policies and recommendations, while the use of mandatory terminology such as

'must' and 'required' refers to existing requirements under the CWA, its implementing

regulations, and relevant case law.").  This Circuit has, however, described similar disclaimers as

"boiler-plate."  Appalachian Power, 208 F.3d at 1023; see also id. (explaining that because the

policies in the disclaimer impose requirements, "'rights' may not be created but 'obligations'

certainly are—obligations on the part of the State regulators and those they regulate").  With the

adage that actions speak louder than words thus ringing true, the Court will examine "the

practical effect of [the] ostensibly non-binding [Final Guidance]."  Norton, 415 F.3d at 15.

Review of the Final Guidance itself and of the post-implementation evidence before the

Court makes clear that the Final Guidance, whether intentionally or not, has caused EPA field

offices and the state permitting authorities to believe that permits should and will be denied if its

"suggestions" and "recommendations" are not satisfied.  For example, after the bulk of the first

four paragraphs of the Final Guidance explain that it is nonbinding, the conclusion of the fourth

paragraph makes clear that "[w]e [EPA Headquarters in Washington, D.C.] expect EPA Regions

3, 4, and 5 to give appropriate consideration to this guidance when reviewing proposed permits

or permit applications associated with Appalachian surface coal mining activities."  Final

Guidance at 2 (A.R. FG005441) (emphasis added).  Indeed, the document itself proclaims that it

is "intended to guide EPA staff in reviewing and commenting on permitting activities related to

Appalachian surface coal mining."  Id. (A.R. FG005441).  Additionally, after discussing two

EPA reports and their review by the EPA's Science Advisory Board, the Final Guidance explains the review "reinforce[ed] the significant aquatic effects of Appalachian surface coal mining and the appropriateness of [the] EPA's conductivity benchmark for protecting aquatic life." Id. at 5 (A.R. FG005444). This leaves no doubt that the EPA's regional field offices and the state permitting authorities are on notice that the "EPA will consider the recommendations in this guidance, along with other relevant factors, when reviewing CWA permits." Id. at 10 (A.R. FG005449).

As plaintiffs' counsel asked at the July 13, 2012 hearing, when EPA Headquarters explains to its subordinate regional offices that they "should" do something, can any region actually feel free not to comply? Perhaps predictably, then, communication between the regional offices and the state permitting authorities shows that the considerations set forth in the Final Guidance have played a prominent role in the regional offices' review of draft permits. Compare Pls.' Reply, Exhibit ("Ex.") B (Declaration of Thomas Cook ("Cook Decl.") (describing a letter received from the EPA that suggests using conductivity as a trigger indicator) with Final Guidance at 27 (A.R. FG005466) (explaining that the EPA is "particularly concerned" with high conductivity levels); compare Pls.' Reply, Ex. C (Declaration of R. Bruce Scott) (explaining that "EPA Region 4 very clearly based their [September 28, 2011] objection to all 19 permits on the fact that each provided for a post-permit [reasonable potential analysis]") with Final Guidance at 13 (A.R. FG005452) ("In order to submit a complete NPDES permit application for an individual permit, the applicant must present data to properly characterize its discharge to enable a reasonable potential analysis to be completed by the permit writer at the time of permit issuance.") (emphasis added), and 14 (A.R. FG005453) ("permitting authorities should not defer reasonable potential analyses until after permit issuance"). The post-implementation

communication also reveals at least one instance in which a state permitting agency has acceded to the regional office's request, resulting in the abandonment of the EPA objection for that particular permit.  See United States' Response to the Court's July 2, 2012 Order ("Defs.' Extra-record Resp."), Declaration of Mark Nuhfer ("Nuhfer Decl.") ¶ 18 ("Kentucky submitted a revised permit fully meeting [the] EPA's objection and that permit has been issued.").  Specifically, with regard to a draft Section 402 permit for Matt/Co, Inc., the EPA's September 29, 2010 objection

> was based on the [Kentucky Department of Water's (KDOW)] failure to conduct an adequate reasonable potential analysis, in accordance with 40 C.F.R. § 122.44(d), to determine whether the proposed discharge will cause, have reasonable potential to cause, or contribute to, a violation of state water quality standards (WQS), and KDOW's failure to include in the permit, effluent limits necessary to ensure that the proposed discharge will not cause or contribute to a violation of WQS.

Defs.' Extra-record Resp., Nuhfer Decl., Ex. 2 (April 2, 2012 Letter from James Giattina, EPA Region 4, to Sandy Gruzesky, Director, Division of Water, Kentucky Department for Environmental Protection ("April 12, 2012 Giattina Letter")) at 1 (internal quotations marks omitted).  The September 29, 2010 objection made clear that to address the objection, "KDOW [had to] submit a revised permit with effluent limitations that are as stringent as necessary to meet applicable narrative and numeric WQS."  Id. (internal quotation marks omitted).  And it was only after the KDOW revised the draft permit and resubmitted it for the EPA's consideration, that the EPA withdrew its objection after determining that "the revised permit reflect[ed] a more robust reasonable potential analysis and . . . contain[ed] the necessary conditions and effluent limits."  Id.  The record before the Court thus confirms the plaintiffs' allegations that the Final Guidance is being implemented as binding and having a practical effect on the permitting process for new Appalachian surface coal mining projects.

To complete its final agency action analysis, the Court must address the defendants'

argument that "[w]here [the] EPA merely comments on a draft permit, but does not object, the

State can issue the permit without further action from [the] EPA; thus, [the] EPA's comments

cannot possibly be seen as mandating compliance with a binding standard."  Defs.' Reply at 20.

Under the rationale of Appalachian Power, 208 F.3d at 1021, the distinction between an EPA

comment letter and a formal EPA objection letter seems unimportant in light of the EPA's

warnings to state regulators that "it expects [the state permitting authority] to take its comments

seriously and to address them."  Defs.' Extra-record Resp., Declaration of Linda Boornazian

("Boornazian Decl.") ¶ 8; see also Defs.' Extra-record Resp., Declaration of Evelyn S.

MacKnight ("MacKnight Decl.") ¶ 10 ("When [the] EPA issues a comment letter, [the] EPA has

exercised its discretion not to utilize its authority udner CWA Section 402(d) to object to a

permit.  Nevertheless, [it is] correct that [the] EPA's comment letters often state an expectation

that [the state permitting authority] should address [the] EPA's comments.  That is because [the]

EPA has taken the time and expended the resources to review the permit, has identified . . .

concerns . . . , and accordingly anticipates that its comments and concerns will be reviewed and

addressed.").   Indeed, the EPA's own affidavits convey what the Court construes as a comply-

or-else attitude in regard to the review process.  See, e.g., Defs.' Extra-record Resp., Boornazian

Decl. ¶ 8 (explaining that she had "pointed out that if [the] EPA's comment letters were

consistently disregarded, that fact would be considered in determining whether to exercise [the]

EPA's discretion to utilize the more formal objection process with respect to future permits that

raise similar issues"); Defs.' Extra-record Resp., MacKnight Decl ¶ 11 ("stating the rather

obvious point that, if [the] EPA were to repeatedly find its comment letters disregarded, that fact

would be considered in determining whether to exercise [its] discretion to issue an objection with

respect to future permits").  And in light of such statements made by EPA employees with leadership roles in the regional offices, it is hard to see how state permitting authorities could be expected to view an EPA comment letter any differently from a formal EPA objection letter. Either form of critique would undoubtedly "lead[] private parties or State permitting authorities to believe that [the agency] will declare permits invalid unless they comply."  <u>Appalachian Power</u>, 208 F.3d at 1021.

The Final Guidance constitutes final agency action because it is both the consummation of the EPA's decision making process, and, even if facially nonbinding, it has been applied by the regional field offices in their review of draft permits in a manner that has had the practical effect of changing the obligations of the state permitting authorities.  Therefore, the Final Guidance is a de facto legislative rule.[10]  Accordingly, the following language from <u>Appalachian Power</u> aptly describes the Final Guidance in this case and provides an appropriate conclusion to the Court's final agency action analysis:

> [W]hatever [the] EPA may think of its Guidance generally, the elements of the
> Guidance petitioners challenge consist of the agency's settled position, a position
> it plans to follow in reviewing State-issued permits, a position it will insist State

---

[10]      In deciding the question of whether the Final Guidance amounts to final agency action, the Court also necessarily decides the question of whether the EPA's actions constitute a de facto legislative rule. This is so given the similarity between the second aspect of the <u>Bennett</u> finality assessment—whether the action gives rise to legal obligations or is one from which legal consequences flow—and the standard for determining whether a challenged action amounts to a rule or a mere statement of policy—"whether the action has binding effects on private parties or on the agency," <u>Molycorp, Inc. v. EPA</u>, 197 F.3d 543, 545 (D.C. Cir. 1999), or, in other words, "whether the agency action binds private parties or the agency itself with the force of law," <u>General Electric v. EPA</u>, 290 F.3d 377, 382 (D.C. Cir. 2002).  Indeed, the District of Columbia Circuit has recognized the manner in which these standards become intertwined:

> In order to sustain their position, appellants must show that the [challenged guidelines] either (1) reflect
> "final agency action," . . . or, (2) constitute a de facto rule or binding norm that could not properly be
> promulgated absent the notice-and-comment rulemaking required by [the APA].  These two inquiries are
> alternative ways of viewing the question before the court.  Although, if appellants could demonstrate the
> latter proposition, they would implicitly prove the former, because the agency's adoption of a binding norm
> obviously would reflect final agency action.

<u>Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.</u>, 452 F.3d 798, 806 (D.C. Cir. 2006).

and local authorities comply with in setting the terms and conditions of permits issued to petitioners, a position EPA officials in the field are bound to apply.

208 F.3d at 1022.

2. Circuit Jurisdiction

Section 509 of the CWA places exclusive jurisdiction in the federal Courts of Appeals to review certain EPA actions taken under color of the CWA. See Am. Frozen Food Inst. v. Train, 539 F.2d 107, 124 (D.C. Cir. 1976) ("The Act gives the Courts of Appeals of the United States wide and exclusive jurisdiction to review the actions of the Administrator."). Section 509, codified at 33 U.S.C. § 1369, provides that:

> Review of the Administrator's action . . . (E) in approving or promulgating any effluent limitation or other limitation under section 1311 [i.e., Section 301 of the CWA], 1312, 1316, or 1345 of this title, [or] (F) in issuing or denying any permit under section 1342 [i.e., Section 402 of the CWA] of this title . . . may be had by any interested person in the Circuit Court of Appeals of the United States.

33 U.S.C. §1369(b)(1).

The defendants assert that, because the Court has agreed with the plaintiffs that the Final Guidance is a binding rule, the "[p]laintiffs' challenge to the portions of the [Final] Guidance that address Section 402 permits must be dismissed for lack of jurisdiction," as the Final Guidance "plainly relate[s] to the issuance or denial of Section 402 permits" and the plaintiffs' challenge therefore "falls within the exclusive jurisdiction of the Courts of Appeals." Defs.' Mem. at 23. The plaintiffs disagree, maintaining that "Section 509(b)(1) delineates six very specific categories of agency action for which a challenge must be brought as an original proceeding in a court of appeals," and that their "challenge to the Final Guidance is not among them and need not be reviewed by a court of appeals." Pls.' Reply at 11. The Court agrees with the plaintiffs.

The Final Guidance is not subject to the Circuit's original jurisdiction on the basis of 33 U.S.C. § 1369(b)(1)(E) because it is not an approved or promulgated Section 301 effluent limitation.  First, even under the most expansive reading, the Final Guidance cannot be interpreted as establishing Section 301 effluent limitations.  In other words, the Final Guidance does not set specific limits and mandate their inclusion in all Section 402 permits.  Rather, the Final Guidance is concerned with (1) the interplay between Section 303 water quality standards and conductivity, and (2) the need for pre-permit reasonable potential analyses to ensure that Section 402 permits contain the most stringent effluent limitations necessary.  Thus, while the Final Guidance does touch on the need for Section 301 effluent limitations in its discussion of pre-permit analyses and the requirements of 40 C.F.R. §122.44(d), it does not attempt to prescribe certain effluent limitations.  Second, even if the Final Guidance could be read as establishing Section 301 effluent limitations, the Final Guidance was not "promulgat[ed]" and therefore lies outside Section 509's reach.  While the defendants urge the Court to employ a "practical rather than cramped construction" of Section 509, Defs.' Resp. at 1 (quoting Natural Res. Def. Council Inc. v. EPA, 673 F.2d 400, 405 (D.C. Cir. 1982)), it is clear that in this Circuit "[i]f the agency does not define the term by regulation and if the statute supports (or at least does not foreclose) the interpretation, 'promulgation' is accorded its 'ordinary meaning'—i.e., publication in the Federal Register."  Horsehead Res. Dev. Co. v. EPA, 130 F.3d 1090, 1093 (D.C. Cir. 1997).  The CWA does not define promulgate and Section 509 does not foreclose according promulgation its ordinary meaning.  And it is worth noting that "[i]n [the] EPA's own words, it 'did not publish the [Final] Guidance in the Federal Register, nor is it codified in the C.F.R.'"  Pls.' Resp. at 2 (quoting Defs.' Mem. at 17).  Although the Final Guidance was certainly issued, it was not promulgated as that term is understood in this Circuit.  Section

1369(b)(1)(E) therefore does not vest exclusive jurisdiction in the Circuit because the Final

Guidance did not approve or promulgate Section 301 effluent limitations.

Next, because the EPA has neither issued nor denied any Section 402 permits, §

1369(b)(1)(F) does not vest exclusive jurisdiction in the Circuit.  While the EPA's formal

objection to draft 402 permits may once have been construed as the "functional denial" of a

permit, see Crown Simpson Pulp Co. v. Costle, 445 U.S. 193 (1980), it is clear that after the

1977 Amendments to the CWA, an EPA objection "is no longer 'functionally similar' to denying

a permit." Am. Paper Inst. v. EPA, 890 F.2d 869, 874 (7th Cir. 1989); see also id. at 874, n.7

(explaining that the challenge in Crown Simpson preceded the 1977 Amendments).  Here, then,

while the plaintiffs are correct that Final Guidance does "relate to" the issuance of 402 permits,

Defs.' Mem. at 23, it does not amount to an EPA issuance or denial of a 402 permit.

Accordingly, § 1369(b)(1)(F) does not vest exclusive jurisdiction in the Circuit.

As neither of the two §1369(b)(1) subsections cited by the defendants as mandating

exclusive Circuit jurisdiction apply to the Final Guidance, this Court possesses original

jurisdiction to review the Final Guidance.

3. Ripeness

"[R]epresent[ing] a prudential attempt to balance the interests of the court and the agency

in delaying review against the petitioner's interest in prompt consideration of allegedly unlawful

agency action," Fla. Power & Light Co. v. EPA, 145 F.3d 1414, 1420-21 (D.C. Cir. 1998), the

ripeness doctrine requires courts to consider the framework set forth by the Supreme Court in

Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967).  First, a court must "evaluate the

'fitness of the issues for judicial decision.'" Fla. Power & Light, 145 F.3d at 1421 (quoting

Abbott Labs., 387 U.S. at 149).  If a challenged decision is not "fit" for review, "the petitioner

must show 'hardship' in order to overcome a claim of lack of ripeness." Fla. Power & Light,

145 F.3d at 1421.   In assessing the fitness prong, courts evaluate "whether the agency action is

final; whether the issue presented for decision is one of law which requires no additional factual

development; and whether further administrative action is needed to clarify the agency's

position." Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931, 940 (D.C. Cir. 1986).

In light of the earlier conclusion that the Final Guidance constitutes final agency action,

the Court need not tarry long on the defendants' ripeness argument.  Indeed, the primary

consideration for a court assessing the fitness of the issue for judicial decision is whether the

agency action is final.  See id.  Having examined that question at length above, the Court will

here only add that the other two components of the fitness evaluation are likewise met by the

Final Guidance.  First, as the EPA asserts that the Final Guidance is not an expansion of its

authority under the SMCRA, the CWA, or their implementing regulations, it is clear that review

of the Final Guidance "is one of law which requires no additional factual development," id.;

rather, the Court's review is limited to an analysis of the pertinent statutes and regulations—the

law—to assess the accuracy of the EPA's claim.  Second, as explained above, the EPA has

conceded that the Final Guidance represents the consummation of their decision making process.

Therefore, no "further administrative action is needed to clarify the agency's position." Id.

Accordingly, the Final Guidance is ripe for review.

4. Standing

The irreducible constitutional minimum of standing contains three elements: (1) injury in

fact, (2) causation, and (3) the possibility of redress by a favorable decision.  Lujan v. Defenders

of Wildlife, 504 U.S. 555, 560-61 (1992).  These requirements apply whether an organization

asserts standing on its own behalf, or on behalf of its members.  <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 378 (1982).

The defendants assert that the plaintiffs have failed to demonstrate injury in fact and causation because "[t]he [Final] Guidance does not impose any obligations on the regulated industry and does not bind [the] EPA, the States, or the Corps in taking action on permit applications."  Defs.' Mem. at 26.  The defendants' standing argument thus strikes a similar chord to their arguments on final agency action.  And those arguments have already been rejected by the Court.  The Final Guidance is binding in regard to the obligations it imposes on the state permitting authorities, and thus the members of the regulated industry seeking the permits, and these obligations amount to injuries caused by the Final Guidance.  And a decision vacating the Final Guidance would redress the plaintiffs' injuries.  Accordingly, the plaintiffs have standing to challenge the Final Guidance.

In sum, the Court is confident that it has authority to review the claims asserted in this case and is unmoved by any of the defendants' jurisdictional arguments.  The Final Guidance is final agency action, subjecting it to this Court's review under the APA; the Final Guidance does not trigger any of the subsections of § 1369(b)(1), which would divest this Court of jurisdiction and confer exclusive jurisdiction on the Circuit; the Final Guidance is ripe for review; and the plaintiffs have demonstrated that they have standing to challenge the Final Guidance.  Consequently, the Court now moves to the heart of the plaintiffs' contentions: What did Congress intend the SMCRA and the CWA to regulate, and what role does the EPA play in that regulation?

B. The EPA's Statutory and Regulatory Authority

Under the APA, courts must hold unlawful and set aside agency actions found to be in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(C). To determine whether an agency exceeded its statutory authority under the APA, the Court must engage in the two-step inquiry required by Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984). Under Chevron, if a statute reflects that Congress has directly addressed the question at issue, then the court and the agency must give effect to the clearly expressed intent of Congress. See id. at 842-43. If, however, the court determines that an agency's enabling statute is silent or unclear with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. See id. at 843.

Whether statutory ambiguity exists is for the Court to decide, and the Court "owe[s] the agency no deference on the existence of ambiguity." Am. Bar Ass'n v. FTC, 430 F.3d 457, 468 (D.C. Cir. 2005). If the Court determines that the statute is either silent or ambiguous, the Court must then proceed to the second component of Chevron and determine whether the agency's position is based on a permissible construction of the statute. Colo. Wild Horse & Burro Coal., 639 F. Supp. 2d at 91. Courts are hesitant to "presume a delegation of power based solely on the fact that there is not an express withholding of such power." Am. Petroleum Inst. v. EPA, 52 F.3d 1113, 1120 (D.C. Cir. 1995) (citing Ethyl Corp. v. EPA, 51 F.3d 1053, 1060-61 (D.C. Cir. 1995)). Similarly, "the duty to act under certain carefully defined circumstances simply does not subsume the discretion to act under other, wholly different, circumstances, unless the statute bears such a reading." Ry. Labor. Execs. Ass'n v. Nat'l Mediation Bd., 29 F.3d 655, 671 (D.C. Cir. 1994) (emphasis omitted); see also id. at 670 ("categorically reject[ing]" the Board's

suggestion that "it possesses <u>plenary</u> authority to act within a given area simply because Congress has endowed it with <u>some</u> authority to act in that area").

 1. <u>The EPA's Authority Under the SMCRA</u>

 As noted above, "Congress chose a special kind of regulatory structure for the [SMCRA], in which the federal government shares administrative responsibility with the states." <u>In re</u> <u>PSMRL</u>, 653 F.2d at 518.  It is, however, the Secretary of the Interior, acting through the Office of Surface Mining, who executes the duties that the SMCRA imposes on the federal side of the state-federal relationship.  The SMCRA grants to the EPA only the ability to comment on and provide its written concurrence prior to the Secretary's approval of a state SMCRA permitting program.  In other words, once the EPA has given its assent to approve a state SMCRA permitting program, the SMCRA affords it no further authority in the oversight or administration of the SMCRA regime.  The plaintiffs are therefore correct that "[n]othing in the SMCRA expressly—or even implicitly—contemplates that [the] EPA will 'work with' SMCRA permitting authorities to incorporate [Best Management Practices] or otherwise influence permit terms."  Pls.' Mem. at 30.  As the SMCRA unambiguously limits the EPA's authority, there is no need to advance to the second step of the <u>Chevron</u> analysis.

 Attempting to cast the issue differently, the defendants argue that the Final Guidance does not violate the SMCRA because "there is substantial overlap between issues that are appropriately considered by the SMCRA permitting authority during its permit process, and issues that are properly considered by the Corps during its CWA Section 404 permit process or by State permitting authorities during the 402 permitting process."  Defs.' Mem. at 30-31; <u>see</u> Pls.' Mem. at 27 ("[The] EPA seeks to either duplicate or undo the work of SMCRA permitting authorities under the guise of ensuring compliance with the 404(b)(1) Guidelines.").  Regardless

of any purported overlap between the SMCRA and the CWA, the defendants' argument fails. Under the CWA, the EPA possesses neither the authority to apply the 404(b)(1) Guidelines to Section 404 permits, nor, once it has approved state permitting programs, the authority to work with the regulated industry on their Section 402 permits.  For example, the defendants assert that the "[Final] Guidance identifies best management practices that can facilitate compliance with the CWA and the 404(b)(1) Guidelines," but, as explained above, the EPA itself has a very limited role in the issuance of CWA permits and has only the authority to develop the 404(b)(1) guidelines with the Corps (while it is the Corps, as the permitting authority, that actually determines compliance with the guidelines).  It is thus beyond the EPA's purview to declare that "[p]rojects should fully evaluate and, where appropriate and practicable, incorporate the following general aspects of effective impact minimization" or to attempt to specify to the Office of Surface Mining or the State SMCRA agency what constitutes an "appropriate" best management practice.  Final Guidance at 36 (A.R. FG005475).

Moreover, the defendants themselves seemingly recognize the limitations on their permitting authority as they correctly identify the entities that do possess such authority: the Corps and state permitting authorities.  See Defs.' Mem. at 30.  Thus, even assuming the existence of overlap between the SMCRA and the CWA, it is not the EPA that is responsible for working with the SMCRA permitting authorities on matters where overlap exists.  Stated differently, in circumstances where the EPA lacks the authority to issue the permits, whether there is overlap between requirements for SMCRA permits and CWA permits is of no moment. Accordingly, the EPA cannot justify its incursion into the SMCRA permitting scheme by relying on its authority under the CWA—it has no such permitting authority.  The EPA has therefore

impermissibly interjected itself into the SMCRA permitting process with the issuance of the Final Guidance.

### 2. The EPA's Authority Under the CWA

The plaintiffs assert that, with the issuance of the Final Guidance, the EPA has overstepped the limitations on its CWA authority in two principal ways: (1) by setting "what is tantamount to a region-wide water quality criterion for conductivity," thus infringing on the State's role under Section 303, Pls.' Mem. at 32, and (2) by insisting that draft permits contain a pre-issuance reasonable potential analysis, thus "usurping the State's primary authority to determine when and if a discharge has the 'reasonable potential' to exceed" water quality standards, Defs.' Mem. at 37. The Court will examine each of these contentions in turn.

### a. The EPA's Section 303 Authority

As explained above, Section 303 of the CWA allocates primary authority for the development of water quality standards to the states. All parties agree that the EPA does have the authority to promulgate section 303 water quality standards in certain instances, but likewise agree that they those procedures have not been undertaken here. See Defs.' Mem. at 33, n.23 (citing Pls.' Mem. at 9-10, 31); see also 33 U.S.C. § 1313(c)(3)-(4). Logically, then, having recognized that the EPA has only limited authority under Section 303 to establish water quality standards, and having conceded that it has not exercised that authority here, the question is not what authority the EPA possess. The question necessarily becomes whether the EPA, through the Final Guidance, has established a water quality standard. And this is where the parties disagree. See Pls.' Mem. at 32 (arguing that the Final Guidance amounts to a region-wide water quality criterion for conductivity); Defs.' Mem. at 33 (asserting that the Final Guidance does not set a region-wide water quality criterion for conductivity).

Throughout their briefs, the defendants assert the nonbinding language of the Final Guidance, but nowhere more than in regard to the conductivity "benchmarks" or "triggers." <u>See</u> Defs.' Mem. at 33 ("The conductivity benchmarks set forth in the [Final] Guidance are just that—benchmarks."); <u>id.</u> ("Neither the language of the [Final] Guidance itself, nor the experience in the field, supports [the p]laintiffs' contention that the conductivity benchmarks are binding water quality standards or that they have been applied as such."); <u>id.</u> at 34 ("There is simply nothing in the [Final] Guidance to support [the p]laintiffs' assertion that the conductivity benchmarks are binding water quality standards."); <u>id.</u> at 36 (noting that the Final Guidance merely "recommends" that states give serious consideration to the science contained in the EPA's two studies, which indicated that substantial impacts on aquatic life occur as conductivity increases beyond the lower range of the EPA's benchmark).  The defendants thus offer nothing more than a repetition of the arguments made in regard to the finality of the Final Guidance, arguments earlier ejected by the Court.

With the Court and the parties all in agreement as to the EPA's statutory authority under Section 303, the assessment of the plaintiffs' claim that the EPA has impermissibly infringed on the states' Section 303 authority is less a matter of statutory interpretation and more a matter of assessing the Final Guidance itself.  Accordingly, in light of its earlier determination that the Final Guidance's conductivity benchmarks were being treated as binding by the EPA's regional offices, <u>see</u> supra at 14, 17, the Court must again conclude that the Final Guidance impermissibly sets a conductivity criterion for water quality.  The EPA has, therefore, overstepped the authority afforded it by Section 303 of the CWA.

b. <u>The EPA's Section 402 Authority</u>

As described earlier in this Memorandum Opinion, the Appalachian States subject to the Final Guidance all have EPA-approved permitting programs and thus administer the Section 402 permitting scheme for permits sought within their state borders.  As such, the states are the primary permitting authority for Section 402 permits, but must submit draft permits to the EPA for review.  Should the EPA determine that the draft permit does not meet the requirements of the CWA, the EPA possesses the statutory authority to object to that draft permit.  If the state does not respond to the EPA's objection, the EPA may assume the responsibility to issue the permit.  It is this authority—the authority to review draft permits for compliance with the CWA—that the defendants cite as the authority underpinning the Final Guidance.

The plaintiffs assert that the EPA has usurped the State's primary authority to determine when and if a discharge has the reasonable potential to exceed state water quality standards.  Pls.' Mem. at 37.  Specifically, the plaintiffs maintain that

> it is the state permitting authority, not [the] EPA, that "determines," in the first instance, whether the discharge has the "reasonable potential" to exceed state water quality standards and whether [the] next steps (e.g., adopting numeric [Section 301] effluent limits for conductivity in order to meet state narrative water quality standards for such pollutants) must be taken.

<u>Id.</u>; <u>see also</u> <u>id.</u> at 38 ("40 C.F.R. § 122.44(d)(1) is clear and unambiguous that states, not [the] EPA, make the 'reasonable potential' determination.")  The plaintiffs continue: "There is no permissible construction of the CWA or its regulatory scheme that would permit [the] EPA to displace state permitting authorities from their role of determining whether a discharge violates their own state narrative water quality standards and/or when specific numeric effluent limits must be established."  <u>Id.</u> at 38; <u>see also</u> Pls.' Reply at 22 ("Under the plain language of the CWA, the states, not [the] EPA, determine how to best interpret their narrative standards and

when there is a reasonable potential to cause or contribute to an excursion from those standards. [The] EPA cannot substitute its judgment for the states' in a guidance document."). Lastly, the plaintiffs maintain that since the issuance of the Final Guidance, "[s]tate permitting authorities no longer have the discretion to conduct post-permit [reasonable potential analyses] and determine through collection of site-specific data whether the discharge actually will cause or has the potential to cause a violation of state standards." Pls.' Mem. at 38.

The defendants respond that the "EPA promulgated regulations more than 20 years ago that require state permitting authorities to incorporate water quality-based effluent limitations in permits for all pollutants that have the reasonable potential to cause or contribute to an excursion above any applicable water quality standard, including narrative water quality standards." Defs.' Mem. at 36. The defendants further maintain that "[w]hile the reasonable potential determination rests with the State in the first instance, existing regulations require that States consider relevant information when performing a reasonable potential analysis for narrative standards."[11] Id. at 38; see also Def.-Ints.' Mem. at 6 ("The [Final] Guidance appropriately recommends a pre-permit [reasonable potential analysis] because this analysis is already mandated by Section 402 regulations."). Finally, and most telling, the defendants argue that the "[Final] Guidance merely sets forth [the] EPA's presumption that the science supporting the conductivity benchmarks will be relevant to the reasonable potential analysis, and [the] EPA's

---

[11] The defendants also advance their recurring argument that the Final Guidance's is not binding and merely recommends a pre-issuance reasonable potential analysis. See, e.g., Defs.' Mem. at 38 (contending that the "[Final] Guidance does no more than suggest approaches to ensure that the permit complies with existing regulations"); id. at 39 (claiming that the Final Guidance does not dictate when the reasonable potential analysis must be performed or how necessary water quality-based effluent limitations must be incorporated in an NPDES permit). To the extent that these arguments are separable from the assertion that the EPA possesses the underlying statutory or regulatory authority asserted, the Court rejects the arguments that the Final Guidance is not binding for the same reasons set forth at various points earlier in this Memorandum Opinion.

suggestion that relevant data can be secured through evaluation of similarly situated facilities in adjacent watersheds."  Defs.' Mem. at 38.

It is thus clear that the parties' disagreement boils down to whether the CWA and its implementing regulations—specifically, 40 C.F.R. § 122.44—require that the reasonable potential analysis be conducted prior to the state's issuance of a Section 402 permit.  In making this assessment, the Court must "'give substantial deference to an agency's interpretation of its own regulations.'"  St. Mark's Housing Co., Inc. v. HUD, 610 F.3d 75, 82 (D.C. Cir. 2010) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).  To be sure, "'the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"  St. Mark's Housing Co., 610 F.3d at 82 (quoting Thomas Jefferson Univ., 512 U.S. at 512).

In pertinent part,[12] 40 C.F.R. § 122.44(d)(1) reads as follows:

In addition to the conditions established under § 122.43(a), each NPDES permit shall include conditions meeting the following requirements when applicable.
. . .
(d) Water quality standards and State requirements: any requirements in addition to or more stringent than promulgated effluent limitations guidelines or standards under sections 301, 304, 306, 307, 318, and 405 of CWA necessary to:

(1) Achieve water quality standards established under section 303 of the CWA, including State narrative criteria for water quality.

(i) Limitations must control all pollutants or pollutant parameters (either conventional, nonconventional, or toxic pollutants) which the Director[13]

---

[12]    As plaintiffs' counsel explained at the July 13, 2012 hearing, § 122.44(d)(1)(vi) is not applicable as Kentucky has established water quality criterion for specific chemical pollutants.  And, for reasons unclear to the Court, the pre-issuance reasonable potential analysis has apparently only manifested as a problem in Kentucky.  See Pls.' Mem. at 39, n.30 ("Although West Virginia has not shared Kentucky's experience regarding pre-permit [reasonable potential analyses] and permit reopener clauses, it joins and fully supports Kentucky's challenge thereto. Kentucky's experience mirrors that of West Virginia insofar as [the] EPA seeks to undo its prior permitting practices and override the states' CWA Authority.").

[13]    40 C.F.R § 122.2 makes clear that "Director means the Regional Administrator or the State Director, as the context requires, or an authorized representative. When there is no 'approved State program,' and there is an EPA
(Continued . . . )

<u>determines are or may be</u> discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality.

(ii) <u>When determining whether a discharge causes, has the reasonable potential to cause, or contributes to</u> an in-stream excursion above a narrative or numeric criteria within a State water quality standard, <u>the permitting authority</u> shall use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water.

(iii) <u>When the permitting authority determines</u>, using the procedures in paragraph (d)(1)(ii) of this section, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a State numeric criteria within a State water quality standard for an individual pollutant, the permit must contain effluent limits for that pollutant.

(iv) <u>When the permitting authority determines</u>, using the procedures in paragraph (d)(1)(ii) of this section, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the numeric criterion for whole effluent toxicity, the permit must contain effluent limits for whole effluent toxicity.

(v) Except as provided in this subparagraph, <u>when the permitting authority determines</u>, using the procedures in paragraph (d)(1)(ii) of this section, toxicity testing data, or other information, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative criterion within an applicable State water quality standard, the permit must contain effluent limits for whole effluent toxicity. Limits on whole effluent toxicity are not necessary where the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit, using the procedures in paragraph (d)(1)(ii) of this section, that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards.

40 C.F.R. § 122.44(d)(1)(i)-(v) (footnote and emphases added).

There is no quarrel here that the "permitting authority" referenced in the regulation is the

state, as all Appalachian states have EPA approval to administer Section 402 permitting regimes

---

( . . . continued)
administrative program, 'Director' means the Regional Administrator.  When there is an approved State program, 'Director' normally means the State Director."

for coal mining projects on lands within their state boundaries.  And it is clear that the permitting

authority is afforded the authority to determine whether a discharge "causes, has the reasonable

potential to cause, or contributes to" and excursion of water quality standards.  Id. §

122.44(d)(1)(ii).  As written, the regulation does not mandate when the state permitting authority

must conduct its analysis of the discharge's impact on the water quality standard.  For example,

40 C.F.R. § 122.44(d)(1)(i) provides that "limitations must control all pollutants . . . which the

Director determines are or may be discharged," suggesting that the pollutants could already have

been discharged at the time the Director makes the determination or may be discharged in the

future.  Additionally, the regulation sets forth procedures for the state-permitting authorities to

use "when determining whether a discharge causes, has the reasonable potential to cause, or

contributes to an in-stream excursion above a narrative or numeric criteria within a State water

quality standard."  40 C.F.R. § 122.44(d)(1)(ii) (emphasis added).  The fact that two of these

determinations are written in the present—rather than future—tense belies the defendants'

assertion that the CWA, and particularly § 122.44, require a pre-issuance reasonable potential

analysis.  To be clear, the Court agrees that § 122.44(d)(1) sets forth requirements with which the

states must comply, but it does not impose or mandate the timing of that compliance (i.e.,

whether compliance must be achieved prior to the issuance of the permit).

Accordingly, the EPA's "presumption" that, based on the scientific studies regarding

conductivity, it is likely that all discharges will lead to an excursion or that the conductivity

studies will be instructive on the matter, Defs.' Mem. at 38, removes the reasonable potential

analysis from the realm of state regulators.  In other words, by presuming anything with regard to

the reasonable potential analysis, the EPA has effectively removed that determination from the

state authority.  And there can be no question that a plain reading of the regulation leaves that

determination, and the decision as to when it must be made, solely to state permitting authorities. The EPA's interpretation of the regulation, an interpretation on which it has premised the Final Guidance, is therefore "inconsistent with the regulation" itself.  St. Mark's Housing Co., 610 F.3d at 82.  Should the EPA wish to alter the manner by which an reasonable potential analysis is conducted, it is of course free to amend the regulation in a manner consistent with the APA and its own statutory authority.  Until it does so, however, it cannot make the reasonable potential determination for the states.  The Final Guidance's "recommendation"—which the Court has found is more than a mere suggestion—that permitting authorities should not defer reasonable potential analyses until after permit issuance, therefore finds no support in the CWA or 40 C.F.R. § 122.44(d)(1).

## V.  CONCLUSION

The Court is not unappreciative of the viable interests asserted by all parties to this litigation.  How to best strike a balance between, on the one hand, the need to preserve the verdant landscapes and natural resources of Appalachia and, on the other hand, the economic role that coal mining plays in the region is not, however, a question for the Court to decide.  In this litigation, the sole inquiry for the Court is the legality of the Final Guidance, and, for the reasons set forth above, that inquiry yields the conclusion that the EPA has overstepped its statutory authority under the CWA and the SMCRA, and infringed on the authority afforded state regulators by those statutes.  Accordingly, because the EPA has exceeded its statutory authority, the plaintiffs' motion for partial summary judgment is granted and the defendants' motion for partial summary judgment is denied.[14]

---

[14]    The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

REGGIE B. WALTON
United States District Judge